1
2
3
4
5
6

**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

7
8
9
10
11
12

**COHEN MILSTEIN SELLERS**
    **& TOLL PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Tel:   (312) 629-3737

13
14

*Lead Counsel for Plaintiffs
and the Class*

[Additional counsel on signature page]

15
16
17

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br>Hon. James E. Simmons, Jr. |

# TABLE OF CONTENTS

Page

PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934 .................................................................................................2

I.    INTRODUCTION ......................................................................2

II.   JURISDICTION AND VENUE ................................................7

III.  THE EXCHANGE ACT PARTIES ..........................................7

    A.    The Plaintiffs ..................................................................7

    B.    The Exchange Act Defendants ........................................9

IV.   FACTUAL BACKGROUND..................................................10

    A.    Silvergate Targets the Cryptocurrency Industry To Drive Deposits. .........................................................10

    B.    Silvergate Assures Investors That It Vets, Conducts Due Diligence on and Monitors All of Its Customers. ...............................................13

    C.    Investors Trusted the Exchange Act Defendants' Representations, and Silvergate's Stock Price Soared.......................19

    D.    In Truth, Silvergate Did Not Vet, Perform Due Diligence on, or Monitor Its Customers..........................21

    E.    Silvergate Failed To Vet, Conduct Due Diligence on, or Monitor FTX and Its Related Entities.................33

    F.    Silvergate Failed To Vet, Conduct Due Diligence on, and Monitor Its Other Major Exchange Customers.................42

    G.    Customers and Investors Learn That Silvergate Did Not Vet, Perform Due Diligence On, or Monitor Its SEN Network Participants. ................................52

V.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................62

    A.    False Statements in 2019.................................................64

1.  July 2019 Interview of Defendant Lane .....................................64

2.  Initial Registration Statement .....................................65

B.  False Statements in 2020 .....................................67

1.  August 2020 Investor Presentation .....................................67

2.  August 2020 Canaccord Investor Conference .....................................70

C.  False Statements in 2021 .....................................72

1.  February 2021 Interview of Defendant Lane .....................................72

2.  September 2021 Barclays Investor Conference .....................................73

3.  September 2021 Interview of Defendant Lane .....................................75

4.  November 2021 Interview of Defendant Lane .....................................76

D.  False Statements in 2022 .....................................77

1.  June 2022 Interview of Defendant Lane .....................................77

2.  June 2022 Crypto + Banks: The Frontier of Money Movement Interview .....................................79

3.  June 2022 *CNBC* Interview of Defendant Lane .....................................81

4.  November 2022 Public Letter from Defendant Lane .....................................83

5.  December 2022 Public Letter from Defendant Lane .....................................85

E.  False Statements in 2023 .....................................89

1.  January 2023 "Business Update" Call .....................................89

VI.  ADDITIONAL ALLEGATIONS OF SCIENTER .....................................91

VII.  ADDITIONAL LOSS CAUSATION ALLEGATIONS .....................................103

VIII.  PRESUMPTION OF RELIANCE .....................................116

IX.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .....................................117

X.  CAUSES OF ACTION UNDER THE EXCHANGE ACT .....................................118

COUNT I – VIOLATION OF § 10(B) OF THE EXCHANGE ACT (AGAINST SILVERGATE AND DEFENDANT LANE)..........................118

COUNT II – VIOLATION OF § 20(A) OF THE EXCHANGE ACT (AGAINST DEFENDANT LANE) ................................................121

PART TWO - CLAIMS UNDER THE SECURITIES ACT OF 1933 .................122

XI.    JURISDICTION AND VENUE...................................................122

XII.   THE SECURITIES ACT DEFENDANTS ..................................123

XIII.  THE OFFERING DOCUMENTS CONTAINED FALSE OR MISLEADING STATEMENTS AND OMISSIONS ..................................124

XIV.   THE MISSTATEMENTS AND OMISSIONS WERE MATERIAL.........154

XV.    CAUSES OF ACTION UNDER THE SECURITIES ACT ......................157

COUNT III - VIOLATIONS OF § 11 OF THE SECURITIES ACT IN CONNECTION WITH THE 2021 OFFERINGS (AGAINST SILVERGATE, EXECUTIVE AND DIRECTOR DEFENDANTS, AND UNDERWRITER DEFENDANTS)...................................157

COUNT IV - VIOLATIONS OF § 12(A)(2) OF THE SECURITIES ACT IN CONNECTION WITH THE 2021 OFFERINGS (AGAINST SILVERGATE, EXECUTIVE AND DIRECTOR DEFENDANTS, AND UNDERWRITER DEFENDANTS)...................................161

COUNT V - VIOLATION OF § 15 OF THE SECURITIES ACT IN CONNECTION WITH THE 2021 OFFERINGS (AGAINST THE EXECUTIVE AND DIRECTOR DEFENDANTS) ..................................164

XVI.   CLASS ACTION ALLEGATIONS .............................................165

XVII.  PRAYER FOR RELIEF ........................................................167

XVIII. JURY TRIAL DEMAND ......................................................167

Lead Plaintiffs Indiana Public Retirement System; Boston Retirement System; Public School Teachers' Pension & Retirement Fund of Chicago; International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario; and UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust; and additional Plaintiff Bucks County Employees Retirement Fund (collectively "Plaintiffs") by and through their counsel, bring two sets of claims in this action.

First, as set forth in **Part I** of the Complaint, Plaintiffs assert claims under the Securities Exchange Act of 1934 (the "Exchange Act") individually and on behalf of all persons and entities who purchased or otherwise acquired the publicly traded stock of Silvergate Capital Corporation ("Silvergate," the "Bank," or the "Company") between November 7, 2019 through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby. As to these Exchange Act claims, Plaintiffs allege that throughout the Class Period, Defendant Silvergate and its Chief Executive Officer, Alan Lane ("Lane"), made a series of statements that they knew or, at minimum, were severely recklessly in not knowing were materially false or misleading.

Second, as set forth separately in **Part II** of the Complaint, Plaintiffs assert claims under the Securities Act of 1933 (the "Securities Act") individually and on behalf of all persons and entities who purchased Silvergate securities in or traceable to Silvergate's series of securities offerings completed during 2021 (the "2021 Offerings"). As to these Securities Act claims, Plaintiffs allege that the Securities Act Defendants are strictly liable for the materially false and misleading statements in the 2021 Offering Documents. These Securities Act claims are based solely on strict liability and negligence and, as to these Securities Act claims, Plaintiffs disclaim any allegations of fraud.

The allegations in this Complaint are based upon Plaintiffs' personal knowledge as to themselves and their own acts and upon information and belief as

to all other matters. Plaintiffs' information and belief are also based on the independent investigation of its counsel. This investigation included, among other things, a review and analysis of: (i) Silvergate's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts; (iii) transcripts of Silvergate investor conference calls; (iv) Silvergate investor presentations; (v) press releases and media reports; (vi) securities pricing data; (vii) interviews of former Silvergate employees, some of whom were afraid to provide Lead Counsel with information for fear of retaliation by Silvergate; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

## PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934

## I.    INTRODUCTION

1.    In just a few years, Silvergate went from a local community lending bank to the go-to bank of the world's $600 billion cryptocurrency industry. Silvergate's deposits ballooned 10-fold; its stock price skyrocketed almost 20-fold; and its top executives profited handsomely. But Silvergate achieved these results through deception, giving the Silvergate "seal of approval" to and bringing aboard as "Silvergate-approved" customers some of the biggest sham entities in American history. All the while, Silvergate and its CEO, Alan Lane, time-and-again assured the public that the Bank conducted extensive vetting, due diligence, and monitoring of customers—which supposedly was Silvergate's "secret sauce" that provided it a "distinct competitive advantage." Customers and investors alike trusted these representations, pouring in their deposits and sending the stock price soaring.

2.    When the public eventually learned the truth—*i.e.*, that Silvergate did not vet, perform due diligence on, or monitor its customers—Silvergate's customers

fled and its stock price tumbled almost 100%. The Bank was forced into liquidation; its employees were nearly all fired; the DOJ is conducting an investigation; Silvergate failed to file its annual report with the SEC; and a bipartisan group of U.S. senators lambasted Lane and Silvergate for their "severe due diligence failures" and "egregious failure" to "monitor for and report suspicious financial activity carried out by its clients."

3.    The Class Period begins on November 7, 2019. On that date, Silvergate and Lane completed their IPO and listed Silvergate's shares on the New York Stock Exchange. To boost the Company's stock price, Lane and Silvergate stressed to investors from the outset that the Bank had a "robust risk management and regulatory compliance framework" and a "deep-rooted commitment and proprietary approach to regulatory compliance." They emphasized that Silvergate "comprehensively investigates prospective customers" and that its "due diligence and onboarding processes include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate." They added that, once onboarded, Silvergate-approved customers were subject to non-stop monitoring, which included "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

4.    Lane and Silvergate repeated and amplified these representations over the next months and years during the Class Period. They repeatedly highlighted the Bank's extensive "vetting" and "initial due diligence" of customers, which included a thorough review of customers' "culture of compliance," "anti-money laundering programs," and "site visits" by the Bank's personnel. Lane and Silvergate also impressed upon investors that their "ongoing monitoring" consisted of "daily transaction monitoring." Lane trumpeted that, through this vetting and monitoring, they achieved "a deep knowledge of [their] clients"—with Lane telling investors that, at Silvergate, "we only bank institutions that are serious about regulation," and

that, if they could not "get comfortable with a company's regulatory stature," then they do "not bank them."

5.      These representations were critical to attract cryptocurrency customers to the Bank—and to drive deposits.  Participants in the cryptocurrency industry believed, based on Lane and his colleagues' repeated assurances, that Silvergate's customers had, indeed, been vetted and were being closely monitored.  This was an important benefit to prospective Silvergate customers—and a key reason why cryptocurrency exchanges wanted to bank at Silvergate.  Per Lane's representations, the Bank's cryptocurrency exchange customers could point to Silvergate's "seal of approval" to gain customer confidence and generate more business.  Lane specifically highlighted this "seal of approval" when speaking to customers, stressing that Silvergate eliminated "counterparty risk" for the entities that dealt with Silvergate's "vetted" customers.

6.      Lane's assurances were also important to investors deciding whether to buy the Company's stock.  Investors and securities analysts at major Wall Street firms—including Wells Fargo, J.P. Morgan, and Bank of America—highlighted Lane's representations about the Bank's "vetting" and "monitoring" of its customers.  They identified the Bank's "vetting" and "monitoring" as a "distinct competitive advantage" when recommending that investors "BUY" Silvergate stock.  On the back of Lane's representations, Silvergate's stock price soared during the Class Period, increasing by 1400%—over $200 per share.

7.      Unknown to investors at the time, Silvergate did not vet, perform due diligence of, or monitor its clients.  Rather, to drive deposits, Silvergate indiscriminately banked cryptocurrency entities—many of which were outright shams that fleeced innocent customers of billions of dollars.  Multiple former Silvergate employees have explained that the Bank did <u>not</u> prioritize compliance, did <u>not</u> vet its customers, did <u>not</u> perform site visits, did <u>not</u> know its customers' businesses, did <u>not</u> review its customers' compliance programs, did <u>not</u> review its

customers' culture of compliance, did <u>not</u> have compliance policies to address the cryptocurrency industry, did <u>not</u> provide compliance training to employees specific to the cryptocurrency industry, did <u>not</u> perform daily or periodic reviews, did <u>not</u> perform customer risk scoring, and did <u>not</u> monitor its clients' transaction activity. Instead, wire limits of hundreds-of-millions of dollars were blindly authorized, anti-money laundering software was never implemented, suspicious and anomalous activity was ignored, subpoenas from the U.S. government concerning customers' wire activity piled up, any monitoring was simply a "check the box" activity, and, when employees pushed back, they were told "nobody cared" and reprimanded by the Bank's management. And when the Federal Reserve eventually found out, it sent Lane and the Bank confidential reports reprimanding them and identifying these deficiencies as "Matters Requiring Immediate Attention"—of which Lane and Silvergate told investors nothing.

8. The Bank's major "approved" customers included FTX, a cryptocurrency exchange that single-handedly constituted over 17% of the Bank's overall deposits and that was singled out on Silvergate's website, featuring a "testimonial" from FTX's then-CEO, Sam Bankman-Fried. Silvergate and Lane specifically and repeatedly assured investors that the Bank "conducted significant due diligence on FTX and its related entities including Alameda Research" when, in truth, they did not. Had Silvergate actually conducted due diligence on FTX or its related entities (Alameda and North Dimension), it would have readily discovered that these entities were shams. For example, consumers seeking to purchase FTX cryptocurrency were told to send their money to North Dimension. But North Dimension was nothing more than a fake website posing as an online electronics retailer, which listed the same address as FTX, had no staff or operations, and was replete with misspellings and absurd product offerings and prices. FTX's then-CEO, Sam Bankman-Fried, used North Dimension and Alameda (which was an equally

blatant fraud) to siphon billions of dollars that Bankman-Fried and his cronies used as their own.

9.      Silvergate's other approved customers included Binance.US, Huobi Global, Nexo Capital, and Bittrex, among others.  Each of these entities was an egregious fraud—as investigative journalists and regulators would readily show later.  For example, had Silvergate actually vetted, conducted due diligence on, and monitored its customers, it would have learned that Binance.US was controlled by Binance, "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders."  As a group of U.S. senators later explained in their bipartisan report, Binance.US was a "blatant attempt to dodge the world's financial regulators, serve 'users without licenses,' and violate anti-money laundering laws."

10.     Investors eventually learned the truth about Silvergate's failure to vet, conduct due diligence on, or monitor its "Silvergate-approved" customers. Beginning in November 2022, reports emerged that FTX—Silvergate's most important customer—was a clear fraud that stole billions of dollars from consumers. Over the following weeks and months, investigative journalists uncovered facts demonstrating Silvergate's failure to vet, perform due diligence on, and monitor FTX, as well as Binance.US and many of the Bank's other customers.  Soon thereafter, a bipartisan group of U.S. senators wrote to Lane chastising Silvergate and Lane for what "appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."

11.     As customers learned the truth about Silvergate's "vetting"—and that the Bank's "seal of approval" was worthless—they pulled their deposits and left the Bank.  Silvergate's deposits shrank by 60% within weeks.  News then broke that the DOJ had opened an investigation into Silvergate's misconduct.  Following this revelation, Silvergate's remaining customers also withdrew their deposits and announced they would bank elsewhere.  Shortly thereafter, Silvergate discontinued

its SEN Network, ceased operations, and fired its remaining employees. The Company weeks later announced its intention to wind down and liquidate Silvergate Bank altogether.

12.    Investors have suffered immensely as a result of Defendants' misrepresentations. Silvergate's stock, which exceeded $225 per share during the Class Period, now trades at barely above $1.

## II.        JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The acts and conduct complained of herein occurred in substantial part in this District.

16.    In connection with the acts and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities market.

## III.       THE EXCHANGE ACT PARTIES

### A.        The Plaintiffs

17.    Lead Plaintiff Indiana Public Retirement System ("Indiana") is a pension fund operated for the benefit of over 517,000 active and retired members, representing more than 1,300 employers, including public universities, schools, municipalities and state agencies. As of June 30, 2022, Indiana managed more than $42.4 billion in assets. Indiana purchased shares of Silvergate common stock during

the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Exhibit A, attached hereto.

18. Lead Plaintiff Boston Retirement System ("Boston") is a governmental defined benefit plan that provides retirement benefits for employees, and their beneficiaries, of the City of Boston, Boston Planning & Development Agency, Boston Housing Authority, Boston Public Health Commission, and Boston Water & Sewer Commission. As of September 30, 2022, Boston managed approximately $5.7 billion in net assets on behalf of more than 34,000 members and their beneficiaries. Boston purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* ECF No. 16-3.

19. Lead Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") is a public pension fund that provides for the financial security of a group of dedicated individuals who serve, or have served, the Chicago Public Schools/Charter Schools through a career in public service. As of June 30, 2022, Chicago Teachers managed over $12.1 billion in assets for the benefit of its approximately 92,390 active and retired members. Chicago Teachers purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* ECF No. 16-3.

20. Lead Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793") is a Canadian Registered Pension Plan that provides retirement benefits to crane and heavy equipment operators, other skilled workers, and their families. Local 793 manages over $2.5 billion ($3.5 billion CAN) in assets for the benefit of more than 18,000 active and retired members. Local 793 purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* ECF No. 16-3.

21.   Lead Plaintiff UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust ("Wespath"), supervises and administers retirement plans, investment funds, and health and welfare benefit plans for active and retired clergy and lay employees of the United Methodist Church. Wespath manages over $29.8 billion in assets for the benefit of more than 100,000 participants. Wespath purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Exhibit A, attached hereto.

22.   Additional Plaintiff Bucks County Employees Retirement Fund ("Bucks County") provides pension benefits to more than 1,700 retired employees of Bucks County, Pennsylvania. As of January 2023, Bucks County managed more than $913 million in assets. Bucks County purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Exhibit A, attached hereto.

**B.   The Exchange Act Defendants**

23.   Defendant Silvergate Capital Corporation was incorporated in Maryland and, along with its wholly owned subsidiary Silvergate Bank, operated and maintained its corporate headquarters at 4250 Executive Square, Suite 300, La Jolla, California. Silvergate's common stock is publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SI."

24.   Defendant Alan J. Lane ("Lane") served as Silvergate's CEO and a member of its Board of Directors at all relevant times. Lane changed Silvergate Bank from a local community lending bank into the go-to bank for cryptocurrency exchanges and participants in the crypto industry. Lane was Silvergate's chief spokesperson with investors and securities analysts, regularly touting and detailing Silvergate's "robust compliance framework" and professing to know what he was

talking about.  As the Bank's deposits ballooned and Silvergate's stock price skyrocketed, Defendant Lane unloaded $21.2 million of his personal Silvergate stock during the Class Period at tremendous profits.

25.    Defendants Silvergate and Lane are collectively referred to as the "Exchange Act Defendants."

## IV.    FACTUAL BACKGROUND

### A.    Silvergate Targets the Cryptocurrency Industry To Drive Deposits.

26.    For most of its 35-year history, Silvergate was a local community lending bank focused on financing small real-estate deals.  Silvergate had only a handful of branches, 40 employees, and a few hundred million dollars in deposits. Over time, it became increasingly challenging for Silvergate to attract deposits— which were its primary source of income.  Scarred by the financial crisis and its aftermath, consumers were wary of local banks, and turned instead to larger, more established banking institutions to deposit their funds.  This created an existential threat for Silvergate.  Lane put it bluntly: the Bank "needed deposits."[1]

27.    To jumpstart its deposits, Lane and Silvergate directed their attention to the red-hot cryptocurrency industry.  In 2017, the crypto industry saw record-breaking growth rates.  Consumers and investors were eager to convert their fiat currency (*i.e.*, national currencies, such as U.S. Dollars or Euros) into cryptocurrency (*i.e.*, digital currencies, such as Bitcoin, Ethereum, COIN, and FTT). Market demand pushed the market cap for the cryptocurrency industry over $600 billion, and the price of cryptocurrencies skyrocketed as a result.[2]

28.    By 2018, there were dozens of different cryptocurrencies sold and exchanged on "cryptocurrency exchanges."  These cryptocurrency exchanges

---

[1] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).
[2] *InvestNet*, "Cryptocurrency Growth Trends & Industry Performance" (May 26, 2018).

created and sold their own, branded cryptocurrency. For example, the cryptocurrency exchange Coinbase created and sold the cryptocurrency "COIN," and the cryptocurrency exchange FTX created and sold the cryptocurrency "FTT." Investors purchased billions of dollars of these and other cryptocurrencies from these exchanges, with the exchanges acting like brokers—*i.e.*, storing the cryptocurrency and allowing investors to buy and sell from the exchange and with others.

29.    Over time, the owners of these cryptocurrency exchanges increasingly needed a bank willing to house the U.S. dollars and other fiat currency that consumers paid them in exchange for their cryptocurrency, as well as to conduct wire transfers among the consumers buying and selling cryptocurrency on their exchanges. But the cryptocurrency exchanges faced a problem: traditional, larger banks were reticent to accept them as clients. Traditional, larger banks were concerned that cryptocurrency exchanges might be scams—*i.e.*, their owners might be using the cryptocurrency exchanges to steal customer funds, commit fraud, or facilitate money laundering. As the *Financial Times* explained in their article "Silvergate: from tiny local lender to bank behind the crypto boom," cryptocurrency "had been linked to money laundering and illegal drugs," and "major financial institutions refused to bank crypto exchanges and started blocking transfers by customers to buy cryptocurrencies."[3] Defendant Lane was aware of all of this, publicly admitting that the creators of these cryptocurrency exchanges "were being shunned by the broader banking ecosystem."[4]

30.    Silvergate and Defendant Lane were, nevertheless, willing—and, in fact, eager—to open their doors to cryptocurrency exchanges and their creators. Silvergate's former President recounted, "We needed deposits and Alan [Lane] started seeing that companies like Coinbase were getting kicked out of

---

[3] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).
[4] *Fintech Nexus USA 2022*, "Why Every Bank Needs a Crypto Strategy, with Alan Lane, CEO, Silvergate Bank (Full Session)" (June 8, 2022).

banks."[5]  To entice these "kicked out" cryptocurrency exchanges and their customers to bank at Silvergate, Lane and Silvergate created and actively promoted the Silvergate Exchange Network (the "SEN Network").  The SEN Network provided a 24-hour, 7-days-a-week platform for Silvergate-approved cryptocurrency exchanges and Silvergate's other approved customers to instantaneously transact among themselves.

31.    Defendants Lane and Silvergate told prospective customers that, by banking with Silvergate and joining the SEN Network, they would receive a meaningful benefit—namely, Silvergate's "good housekeeping seal of approval."[6] This "seal of approval" was important to cryptocurrency exchanges and the Bank's other cryptocurrency customers.  As advertised, it meant that Silvergate, after carefully "vetting" the prospective customer and "monitoring" its activity, determined that the cryptocurrency exchange was a legitimate entity with sound controls and in compliance with state and federal laws and regulations.  This "seal of approval," Lane publicly represented, "eliminated counterparty risk" for those entities and individuals who transacted with the Silvergate-approved cryptocurrency exchanges and customers, as these counterparties could rest assured that Silvergate conducted thorough due diligence and monitored the activity of the Silvergate-approved entities.[7]

32.    Defendant Lane's efforts to promote Silvergate and the SEN Network worked.  Within just a few years, the SEN Network became, by Lane's own account, Silvergate's "flagship product" and "what [Silvergate was] known for in this

---

[5] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).
[6] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).
[7] *See, e.g.*, *Real Vision Finance*, "Silvergate: The Banking Solution of the Future" (Feb. 1, 2021).

ecosystem."[8]  It was "the driver of [Silvergate's] strategy," with the Bank "all in" on cryptocurrency, according to Lane and his colleagues.[9]    Silvergate's customers increasingly included cryptocurrency exchanges—with 35 cryptocurrency exchange customers by September 2018; and 94 by December 2021.

33.    As consumers poured their money into Silvergate's "vetted" and "monitored" cryptocurrency exchange customers, the Bank's deposits ballooned. Silvergate went from a small, local bank—with just $1.4 billion in deposits by the end of 2018—to the heavyweight in the cryptocurrency sector—with over $14 billion in deposits by 2021.  "All of that growth," Lane acknowledged, "ha[d] really been on the back of SEN."[10]

## B. Silvergate Assures Investors That It Vets, Conducts Due Diligence on and Monitors All of Its Customers.

34.    Investors deciding whether to buy Silvergate's stock were laser-focused—and for good reason—on the "vetting," "due diligence," and "monitoring" that Silvergate purportedly performed on its cryptocurrency customers, including the Silvergate-approved cryptocurrency exchanges.    If participants in the cryptocurrency industry lost faith in the quality of Silvergate's "vetting," "due diligence," or "monitoring," they would invariably lose faith in the SEN Network and Silvergate's cryptocurrency exchange customers themselves.  If that were to occur, there was a real risk that the Bank's customers would pull their deposits from the Bank or even leave the Bank and cease using the SEN Network altogether.  Such

---

[8] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[9] *See, e.g.*, "Silvergate Capital Corp. at Oppenheimer Blockchain Digital Assets Summit - The Evolution of Digital Assets" (Nov. 18, 2021); *Roundtable: Banking in the Digital Age with Alan Lane*, Market Rebellion (Nov. 8, 2021).

[10] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

a result would be catastrophic to Silvergate because, as Lane acknowledged, by 2021, "98% or 99%" of the Bank's deposits "related to crypto."[11]

35.    Silvergate also could face devastating fines and crippling regulatory action for violating "know-your-customer" ("KYC") and "anti-money laundering" ("AML") banking rules if it did not carefully vet and monitor its customers. Lane understood all of this too. As he publicly acknowledged at the time, the KYC and AML requirements "mak[e] sure that you know who your customers are and mak[e] sure that you're not in any way providing funding, financing etc. for illicit activity…. The penalties are fines and they can be really severe. You can essentially put the entire bank at jeopardy."[12]

36.    With investors focused on the subject, Lane and Silvergate repeatedly singled out the Bank's "deep-rooted commitment and proprietary approach to regulatory compliance" as a chief reason to purchase Silvergate's stock.[13] In presentations to investors, Lane identified the Bank's "robust compliance framework" as an "Investment Highlight," with the Bank's careful "vetting" and "monitoring" of the Silvergate-approved customers providing "a distinct competitive advantage for us, and provid[ing] a meaningful barrier to entry against our potential competitors."[14] Silvergate's "compliance process," Lane and Silvergate added, gave the Bank a "first-mover advantage within the digital currency industry" and was the "cornerstone of our leadership position today."[15] They further told investors that "our compliance and due diligence is our secret sauce that has gotten us to where we are today."[16]

---

[11] *Roundtable: Banking in the Digital Age with Alan Lane*, Market Rebellion (Nov. 8, 2021).

[12] *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[13] *See, e.g.*, Silvergate, Annual Report (Mar. 10, 2020).

[14] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).

[15] *See, e.g.*, Silvergate, Annual Report (Mar. 8, 2021).

[16] Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).

37.    To inspire further investor confidence, Lane and Silvergate detailed to investors the precise ways that the Bank purportedly "vetted" and conducted "due diligence" on prospective customers before approving them.  They also detailed the "ongoing monitoring" supposedly done on the Bank's customers, as well as, "in the case of digital currency exchanges, their customers."[17]    Defendants Lane and Silvergate made these representations repeatedly—in SEC filings, media interviews, and during conference calls with investors and analysts, as further detailed below.

38.    ***Vetting and Diligence***: Over and over, Lane and Silvergate told investors that the Bank adhered to a strict "vetting" and "diligence" process before deciding whether to permit customers to bank at Silvergate and participate on the SEN Network.  During a July 30, 2019 interview, for example, Defendant Lane stated that, "if you get an account at Silvergate, then we've gone through the process of vetting you."[18]  Defendant Lane reiterated during investor calls and interviews throughout 2021 that the "members of SEN . . . have been vetted by Silvergate" and that "folks that are transferring to each other [on the SEN Network] have all been vetted by Silvergate."[19]  Silvergate and Lane emphasized this message through the remainder of the Class Period, telling investors that "we were vetting all of our customers" and that all of the participants "on SEN have gone through a similar due diligence process."[20]

39.    Silvergate and Lane stressed the supposed robustness of these "vetting" and "due diligence" processes.  Time and again, they told investors that the Bank "comprehensively investigate[d] prospective customers," conducted "thorough

---

[17] *See, e.g.*, Silvergate, Annual Report (Mar. 8, 2021).
[18] *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).
[19] *Real Vision Finance*, "Silvergate: The Banking Solution of the Future" (Feb. 1, 2021); *The Blockchain Interview series hosted by Dan Weiskopf featuring Alan Lane of Silvergate*, ETF Think Tank (Sept. 24, 2021).
[20] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).

reviews . . . as part of our due diligence process . . . to detect any such illicit activities conducted by our potential or existing customers (or, in the case of digital currency exchanges, their customers)" and, as a result, developed "a deep knowledge of our clients."[21]

40.    Silvergate and Lane also made detailed representations to investors about what the Bank's "vetting" and "due diligence" supposedly included.  "First and foremost," according to Silvergate and Lane, they would develop an "understand[ing] [of the] customer's business" and an "understanding [of] what [the] customers are doing."[22]  This would "include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate."[23]  "For each and every account," Silvergate would also "determine the beneficial owner, the source of funds, and the purpose and expected use of funds."[24]

41.    ***Compliance Reviews***: Silvergate and Lane further represented to investors that the Bank conducted "compliance reviews" for prospective customers and, as a result of those reviews, had an "understanding of their compliance programs."[25]  According to Lane, these compliance reviews "verify" that the Bank's customers' "compliance programs are sound."[26]  Silvergate also represented to investors that it looked "to understand that the pillars of [the customer's] AML

---

[21] *See, e.g.*, Silvergate, Prospectus Supplement (Nov. 8, 2019); Silvergate, Annual Report (Mar. 10, 2020); Silvergate, Registration Statement (Nov. 16, 2018); "Silvergate Capital Corp. at Canaccord Genuity Growth Conference" (Aug. 12, 2020).

[22] *See, e.g.*, Silvergate, Regulation FD Disclosure Financial (Form 8-K) (Oct. 29, 2020); "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).

[23] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).

[24] Silvergate, Form 8-K (Dec. 5, 2022).

[25] *See, e.g.*, Silvergate, Investor Presentation (Jan. 28, 2021); "Q3 FY 2020 Silvergate Capital Corp. Earnings Conference Call" (Oct. 26, 2020).

[26] *Silvergate CEO Alan Lane on the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).

---

compliance are well designed and functioning."[27]  This supposedly would include "evaluating [the prospective customer's] ability to actively monitor the flow of funds of their own customers."[28]  It would also include, according to Lane, a "review of [the] organization's culture of compliance" and, importantly, a "Site Visit."[29]  Additionally, the Bank's reviews of its cryptocurrency exchange customers supposedly included an examination of their "policies and procedures regarding the BSA [Bank Secrecy Act], consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as [their] transaction monitoring systems and audit results."[30]

42.    ***Monitoring of Activity***: Lane and Silvergate further assured investors that Silvergate kept a close watch on their Silvergate-approved customers' activity through the Bank's "ongoing monitoring" and "transaction monitoring."[31]  Lane told investors that, "[a]fter accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."[32]  He emphasized that Silvergate "monitors transaction activity for every account and identifies activity outside of the expected usage."[33]

43.    Lane and Silvergate made further representations to investors about the specifics of the Bank's "ongoing monitoring" program.  In quarterly PowerPoint presentations to investors (*see, e.g.*, Figure 1, *infra*), Lane represented that the Bank's "ongoing monitoring" included daily "anti-money-laundering alerts," "enhanced due diligence," "customer counterparty reviews," "periodic reviews" of

---

[27] *See, e.g.*, Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).
[28] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[29] *See, e.g.*, Silvergate, Investor Presentation (Jan. 28, 2021).
[30] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[31] *See, e.g.*, Silvergate, Investor Presentation (Jan. 28, 2021).
[32] *See, e.g.*, Silvergate, Form 8-K (Dec. 5, 2022).
[33] *See, e.g.*, *id.*

the customers, "quarterly account activity reviews" and "annual reviews" of the customers. Silvergate's "ongoing monitoring" also supposedly included the Bank's use of "a system of 'red flags' specific to various customer types and activities."[34]



**Figure 1.** Quarterly Silvergate PowerPoint presentation to investors.

44. ***Strict Customer Standards***: Defendants Lane and Silvergate bolstered these representations with additional assurances that, if Silvergate discovered adverse facts about prospective customers during the due diligence and vetting processes, they refused to bank them. Lane and Silvergate told investors that the Bank was "highly selective in our customer onboarding process to ensure the integrity of the platform."[35] Lane added that "we require [customers] to comply [with federal and state regulations]" and "we only bank institutions who are also serious about regulation."[36] He explained that, "if we can't get comfortable with a company's regulatory stature, then we don't bank them. And that's really well-

---

[34] *See, e.g.*, Silvergate, Prospectus (Nov. 6, 2019).
[35] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[36] *See, e.g.*, *CNBC Television*, "We actually welcome increased crypto scrutiny: Silvergate Bank CEO" (June 28, 2022).

known."[37]  Silvergate further told investors that "we serve only customers that represent the best business opportunity for Silvergate to operate safely, soundly, and compliantly."[38]  Lane reiterated that "they have to satisfy not only their own legal and regulatory requirements, but then we have to verify that their compliance programs are sound."[39]

45.    Likewise, Defendants Lane and Silvergate assured investors that the Bank would take swift and severe action if Silvergate's "ongoing monitoring" indicated any improper activity.  In a November 21, 2022 letter to investors, for example, Lane represented that, "if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions."[40]

## C.    Investors Trusted the Exchange Act Defendants' Representations, and Silvergate's Stock Price Soared.

46.    The market trusted Lane's and Silvergate's repeated representations and highlighted Silvergate's "robust compliance framework" as a reason to buy the Bank's stock.  For example, when Compass Point initiated coverage on Silvergate's stock and told investors to "BUY" in a November 18, 2019 analyst report, its analysts echoed Defendants' representations about Silvergate's "compliance capabilities," repeating Lane's statements to investors that Silvergate conducted "ongoing monitoring of customer activities and evaluat[ed] a market participant's ability to actively monitor the flow of funds of their own customers."  The Compass Point analysts similarly adopted and repeated Lane's representations about Silvergate's "due diligence" and "onboarding process" for its customers.

---

[37] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

[38] "Silvergate Capital Corp. at Canaccord Genuity Growth Conference" (Aug. 12, 2020).

[39] *Silvergate CEO Alan Lane on the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).

[40] "A letter to our customers" (Nov. 21, 2022).

47.    Investors continued to rely on Lane and Silvergate's representations during the Class Period.  In their October 26, 2020 analyst report, Canaccord Genuity's analysts also told investors to "BUY" Silvergate's stock and increased their per-share price target from $19 to $26, lauding Silvergate as "firing on all cylinders" as a result of its "vetting and onboarding processes."  In their June 14, 2021 report, Goldman Sachs's analysts upped their price target for Silvergate's stock even further to $120 per share and highlighted the supposed robustness of Silvergate's "KYC/AML controls."[41]  J.P. Morgan's analysts repeated Lane's pitch to investors: "With Silvergate completing due diligence related to KYC and AML (when it onboards new clients to the SEN platform), the company effectively reduces counterparty risks for its clients."[42]  Wells Fargo's analysts likewise recommended that investors "BUY" Silvergate's stock in their June 13, 2022 analyst report, also repeating Lane's representations that Silvergate "provides the vetting platform that essentially eliminates counterparty risk, as both sides of any transaction that takes place on the SEN need to be [Silvergate] clients."[43]

48.    On the back of Defendant Lane's and Silvergate's repeated representations, Silvergate's stock price soared.  The Bank's stock jumped nearly 1300% in just over a year from the start of the Class Period.  It then continued its sharp rise, climbing as high as $227 per share during the Class Period—a nearly 1900% increase in just two years.

49.    But as analysts and investors would ultimately learn, Lane's and Silvergate's assurances that the Bank performed "vetting," "due diligence," and "ongoing monitoring" of its Silvergate-approved customers were false, misleading,

---

[41] Goldman Sachs, "Differentiated high growth bank with leverage to crypto but valuation keeps us on sidelines: Initiate at Neutral with a $120 price target" (June 14, 2021).
[42] J.P. Morgan, "JPM's 2021 Crypto Economy Forum: Silvergate an Indispensable Banking Partner in Crypto Ecosystem" (Dec. 1, 2021).
[43] Wells Fargo Securities, LLC, "SI: Carving Out Niche Role as Banker to Crypto Ecosystem; Initiate at Overweight" (June 13, 2022).

and omitted material facts.  Silvergate did not conduct vetting, due diligence, or monitoring, and its approved customers included "fraudsters" and "sketchy companies and individuals who used Silvergate to move a trillion dollars into—and out of—crypto markets all over the world."[44]  As these facts became known, the DOJ commenced an investigation (which remains ongoing), the Company was ultimately forced to cease the Bank's operations and liquidate, Silvergate's stock price crashed, and Silvergate's investors lost billions.

### D.  In Truth, Silvergate Did Not Vet, Perform Due Diligence on, or Monitor Its Customers.

50.     Contrary to Silvergate's and Lane's repeated representations during the Class Period, the Bank did not perform "vetting," "due diligence," or "monitoring" on Silvergate's approved customers.  Instead, the Bank indiscriminately approved cryptocurrency exchanges to bank at Silvergate and to transact on the SEN Network, enabling these entities to use Silvergate's "seal of approval" to bilk customers and investors out of billions of dollars.  These facts have been confirmed by, among other things, Silvergate's former employees.

51.     Former Employee ("FE") 1 was a Senior Vice President, Finance Manager at the Bank.  She worked and interacted directly with Defendant Lane.[45] FE 1 explained that Silvergate did not vet existing customers before adding them to the SEN Network.  FE 1 did not see any efforts by Silvergate to get to know their customers or to make sure they were complying with the law.  FE 1 explained that Silvergate's focus was all about sales and getting clients, not compliance.  FE 1 said

---

[44] *New York Magazine*, "The Crypto Industry's Favorite Bank Is in Deep Trouble" (Jan. 24, 2023).

[45] FE 1 joined Silvergate in March 2019 and stopped working at the Bank the week before Christmas in December 2019.  She originally reported to Regan Lauer, who hired her, then briefly to Kellie VavRosky, then to Alan Lane, and then to Antonio Martino.  She worked directly with Alan Lane from September to November 2019. Her responsibilities included overseeing Treasury and financial planning and analysis ("FP&A").  She worked closely with the Controller, and she worked on Silvergate's initial public offering.

if these were subjects of discussion, someone at her level—a senior vice president of the organization—would have known about it.

52.    When asked whether she had seen "extensive regulatory compliance diligence" performed by Silvergate during her time at the Bank, FE 1 replied, "I did not."  When asked whether she had seen Silvergate perform any type of "enhanced procedures to screen and monitor [crypto customers]" during her time at Silvergate, she replied, "I did not."   When asked whether Silvergate "comprehensively investigated prospective customers" or conducted "customer risk scoring with risk factors specific to the digital-currency industry," FE 1 stated that she was not aware of any of that occurring at Silvergate.

53.    FE 1 also never heard of Silvergate conducting any of the specific onboarding measures that Lane and Silvergate had claimed repeatedly to customers and investors that they performed, including: "a review of the organization's culture of compliance, a review of its BSA/AML program, confirming its money transmitter registration and licensing, reviewing its independent audits and exams, performing site visits, and reviewing the prospective customer's information security."  FE 1 likewise never saw "detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate."  Furthermore, she did not hear of the Bank performing "reputation reviews of prospective customers" or "compliance reviews for prospective customers."  FE 1 again said that, if these were subjects of discussion, someone at her level—a senior vice president—would have known about it.

54.    FE 1 was aware that Silvergate conducted no customer vetting of participants on the SEN Network based on meetings she attended with other senior executives and her 30 years of banking experience.  FE 1 has worked at multiple banks over her 30 years of banking experience, including Wells Fargo for 19 years in various roles, where she was very aware of the existence of their compliance

practices, including AML and KYC programs.  Other banks have established practices and policies in place, FE 1 explained.

55.    FE 1 also did not see Silvergate monitoring its clients on the SEN Network.  FE 1 reported that Silvergate did not perform daily BSA/AML alerts monitoring of its customers, daily news monitoring on its customers, customer counterparty reviews, negative news reviews on its customers, or quarterly account activity reviews of its customers.  When asked whether FE 1 had seen Silvergate conduct "thorough reviews . . . as part of our due diligence process . . . designed to detect any such illicit activities conducted by our potential or existing customers [and] in the case of digital currency exchanges, their customers" during her time at Silvergate, FE 1 replied, "I did not."  Likewise, when asked whether she had seen Silvergate engage in "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers" or "system monitoring rules tailored to digital currency activities," FE 1 replied, "I did not."  Finally, when asked whether she had seen "a system of 'red flags' specific to various customer types and activities," FE 1 replied, "I did not."

56.    Silvergate did not prioritize compliance, notwithstanding its representations to investors about its robust practices in this area or the critical nature of compliance in banking, particularly when dealing with cryptocurrency transactions and KYC/AML requirements.  FE 1 said that ever since Silvergate turned towards crypto, there was no focus on anything like KYC.  FE 1 worked closely with Megan Collins, Silvergate's Controller from late 2016 to January 2020, and attended senior meetings led by Kathleen Fraher, Silvergate's then-Vice President, "Compliance and BSA Officer."  FE 1 estimated that these meetings happened monthly, and Lane attended about 75% of them.  During these meetings, they discussed everything of importance to the Bank—which did *not* include compliance.  FE 1 did not recall any discussion of prioritizing compliance.  She said, "It was not a focus in the least. It was all, 'Rah rah, we got these new crypto

customers.'" FE 1 explained that in connection with her work (in particular given the fact that she attended senior level meetings), if or to the extent the Company truly prioritized KYC principles, she would have known about it.

57.     FE 1 also knew Silvergate had no ongoing monitoring because employees never received the training to do it.  FE 1 does not recall Silvergate having the employees take tests on KYC or anything else compliance-related.  Nor does FE 1 recall any training regarding KYC or specific crypto-related compliance issues.

58.     FE 1's account is further corroborated by the accounts provided by FE 2, who worked as a "BSA analyst" at Silvergate from October 2017 to June 2019; FE 3, who served as a digital banking manager at Silvergate in 2022; FE 4, who was a VP of Deposit Operations from 2011 to July 2021; and FE 5, who was a "FRCM Initial Due Diligence Manager" from May 2022 to May 2023.

59.     FE 2 explained that about half of Silvergate's customers were not even known by the Bank.[46]  He would ask people at Silvergate what a business did, who the owners were, and what the management structure was, and Silvergate did not have that information.  Based on his experience and understanding, Silvergate banked everyone who wanted to be a customer and seemed to bank everyone regardless of what their compliance programs were like.  FE 2 confirmed that any diligence was a "check the box" activity.  FE 2 reported that he and his fellow analysts felt like they were checking boxes for the sake of it without the Bank actually being mindful of the risk they were absorbing.

60.     FE 2 stated that, in his experience, Silvergate did not have a deep-rooted commitment to compliance and said that he does not believe a lot of action was taken regarding suspicious activity.  FE 2 explained that everyone in his department, including FE 2, mentioned concerns with respect to compliance to Jennifer Steinbock, the Silvergate "BSA/Compliance Manager."  FE 2 recalled that he and

---

[46] FE 2 worked at Silvergate from October 2017 to June 2019 as a "BSA Analyst," reporting to Jennifer Steinbock.

his colleagues knew that there was frustration on the part of Steinbock regarding customers they believed should be exited but would not be by order of Silvergate's Chief Operating Officer.

61.    FE 2 remembers asking his Silvergate colleagues so many times, how many of these suspicious reports are we going to absorb, and he was told they would just keep re-reviewing them forever.  FE 2 agreed that any determinations that the identified suspicious activity was "normal" were not justified and just an effort by Silvergate to keep the business.  FE 2 explained that no Silvergate customer accounts were ever closed.

62.    FE 2 explained that he left Silvergate because he did not feel they had a culture of compliance.

63.    As for FE 3, when asked if Silvergate had a deep-rooted commitment to regulatory compliance, FE 3 also said, "Not at all."[47]

64.    FE 3 explained that, when customers wanted to join the SEN Network, "the gates were open."  If customers wanted to join the SEN Network, FE 3's group was given a list of accounts and names to authorize.  There was no compliance or research done on a customer at the time it wanted to join the SEN Network; nobody in management reviewed or approved those requests.

65.    FE 3 explained that Silvergate did not perform due diligence on the identity of the customers that were allowed to join SEN.  In fact, instead of asking the customers to fill out their own beneficial ownership paperwork, Silvergate employees (and not the customers) filled out the paperwork.  FE 3 explained that

---

[47] FE 3 was a digital banking manager at Silvergate from the beginning of March 2022 until the end of November 2022 and reported to Dina Matias, Silvergate's Senior Vice President, Operations Administrator.  FE 3 was responsible for the SEN Network, including onboarding customers to the SEN Network, handling account maintenance, account changes, monthly account fee analysis, limit changes, and adding and moving accounts.

FE 6, Silvergate's Private Client Manager II, told FE 3 that relationship managers were told to fill out the beneficial ownership forms for the customers.

66.    FE 6 confirmed that he and other Silvergate employees filled out beneficial ownership forms (*i.e.*, not the customers), and they were told to do so by Silvergate management.[48]  FE 6 explained that at Silvergate, whether the form was new or needed to be recertified, it fell to the private client managers to fill out the form, instead of the customer itself.  This was the policy across the board at Silvergate, and it existed throughout FE 6's entire time at Silvergate.  He explained that bank employees should not have been filling out the beneficial ownership forms.

67.    Multiple former Silvergate employees said that Silvergate did not perform "site visits" of the Bank's customers and SEN Network participants.  FE 2 said that Silvergate did not conduct site visits and added that site visits are important because you need to understand that a customer is an actual business and that you are not just banking a shell company.  Likewise, FE 6 confirmed that he did not know of any actual site visits taking place by Silvergate.  FE 3 explained that, when she joined Silvergate, she asked about "site visits" because she was concerned about working for a crypto bank; she spoke to Silvergate's Relationship Managers with whom she worked, and they told FE 3 that Silvergate "never, ever did a site visit." FE 5 confirmed that Silvergate did not conduct site visits, and there was nothing written in procedure for site visits anywhere, before August 15, 2022.

68.    FE 3 explained that Silvergate also did not ask for supporting documentation for customers' wire limits.  FE 3 explained that new clients could dictate to Silvergate whatever wire limits they wanted, and Silvergate gave it to them and never checked if the customer could cover it.  FE 3 described how she reached out to Silvergate's front office, and was told—including by Christie Hicks,

---

[48] FE 6 was a private client manager at Silvergate from November 2020 until January 2023.  In that role, he was the liaison for larger clients and managed day-to-day account maintenance activities such as transfers, inquiries, and adding and removing signers.

Silvergate's Client Support Manager—that Silvergate just asks customers what they want for a wire limit and gives it to them. In fact, FE 3 recounted how she had a phone conversation with Dina Matias concerning a $250 million wire limit for a customer that only had $70,000 in their account. FE 3 explained that she questioned why Silvergate would give a $250 million wire limit to someone with $70,000 in their account, but was screamed at by Ms. Matias when she asked.

69. FE 3 was told by several of her colleagues—including Christie Hicks, Silvergate's Client Support Manager—that Silvergate did not get the proper documentation to validate wire limits. "We just give them whatever they want," they told FE 3.

70. FE 3's account further corroborates that Silvergate did not conduct the represented "enhanced ongoing monitoring" or "enhanced due diligence" of its cryptocurrency exchange customers. When asked whether Silvergate conducted enhanced ongoing monitoring, FE 3 replied, "Absolutely not." Likewise, when asked whether Silvergate conducted enhanced due diligence, FE 3 replied, "Absolutely not." And as far as FE 3 was aware, "customer risk scoring, with risk factors specific to the digital-currency industry" did not exist at Silvergate; and she explained that in her position at the Bank, she would expect to be aware of such a process, if it existed.

71. FE 3 was also in meetings with Lane and his direct reports. The meetings happened about once a month and covered issues concerning revenue, how well the Bank was doing, and new hires. Notwithstanding Lane's public statements to investors that "compliance is at the forefront of everything we do,"[49] there was never anything stated about compliance during these regular internal meetings with Lane's direct reports.

---

[49] *Bitcoin for Corporations Strategic Vendor: Silvergate*, MicroStrategy (Feb. 8, 2022).

72.    FE 3 further confirmed that Silvergate did not perform the specific types of "ongoing monitoring" that Silvergate and Lane represented to investors during the Class Period.  When asked whether Silvergate conducted customer counterparty reviews, FE 3 replied, "Absolutely not."  When asked whether Silvergate conducted annual company reviews, FE 3 replied, "Absolutely not."  When asked if Silvergate did not perform daily BSA or AML monitoring, FE 3 replied, "That is consistent with my understanding."  When asked if Silvergate did not perform daily news monitoring, FE 3 also replied, "That is consistent with my understanding."  When asked if Silvergate conducted negative news reviews, FE 3 replied, "Not at all."  When asked whether Silvergate conducted quarterly account activity reviews, FE 3 replied, "Absolutely not."  In addition to her own experience, FE 3 knew because she spoke with managers who would be responsible for that if it occurred, including Ellen Hansen, Mitchel Sanderson, and Kacy Pendergrass.

73.    FE 3 explained that she did not see anything at Silvergate like compliance policies or controls designed to address the digital currency industry.  She added that she never saw Silvergate implement policies and procedures to comply with AML and KYC requirements.  In fact, during 2022, FE 3 tried to find policies concerning KYC on Silvergate's intranet, and she could find no procedures regarding beneficial ownership or KYC.  FE 3 confirmed that all policies concerning bank processes were on Silvergate's intranet, but she could never find policies concerning compliance processes.

74.    When asked about Silvergate's public statements that it had a "system of red flags specific to various customer types and activities," FE 3 explained that Silvergate had purchased an AML software to do this, but it was never implemented. FE 3 explained that the AML software was supposed to flag customer activity with sanctioned countries, excessive cash transactions, and other kinds of alerts; and the Company would be able to set the parameters on what the software should flag. None of that was being done at Silvergate, explained FE 3.  FE 3 added that, during

meetings, she heard it noted that the implementation of the AML software would be a project at some point, but it was never put on the active project list.

75.    FE 3 asked her colleagues in 2022 whether Silvergate was doing anomaly detection—*i.e.*, looking for suspicious activity.  She was told that they were not.  FE 3 then tried to create a report, based on a manual review, that would detect anomalous activity.  FE 3 recounted, however, there was no one to tell even if her team found suspicious activity, because, "Nobody cared."  FE 3 confirmed that—outside of her failed manual attempt—Silvergate did not perform any anomaly detection.

76.    FE 3 had direct knowledge about Silvergate's failure to monitor FTX and its related entities.  FE 3 handled wire limit changes for FTX, Alameda, and North Dimension.  FE 3 saw no ongoing monitoring of FTX, Alameda, or North Dimension.  In her role, she would at least be aware of such monitoring if it existed, explained FE 3.  FE 3 added that this monitoring should have included currency transaction reports, wire volumes, wire destinations, ACH exceeding limits, invalid or unauthorized return rates, and activity between accounts.

77.    Additionally, FE 4 described how, when Silvergate received reports from customers and other banks of unauthorized transactions, Silvergate would not investigate.[50]  FE 4 explained that even when the originating bank would tell Silvergate that the client had said a transaction was unauthorized, Silvergate did not investigate.  FE 4 said receiving these unauthorized transaction requests was a red flag, but there was never any investigation by Silvergate to determine what happened with unauthorized transactions.

78.    When the Federal Reserve eventually learned of Silvergate's failure to vet, perform due diligence on, or monitor its customers, the Federal Reserve took

---

[50] FE 4 worked at Silvergate from February 2011 to July 2021 as "VP of Deposit Operations."  She reported to Dina Matias, Silvergate's "Senior Vice President, Operations Administrator," who reported to Elaine Hetrick, Silvergate's Chief Administrative Officer.

significant action.  FE 5 explained that the Federal Reserve gave private feedback to Silvergate that its compliance was insufficient.[51]  FE 5 further explained that, in the first quarter of 2022, the Federal Reserve sent Silvergate a report identifying Matters Requiring Immediate Attention (or "MRIAs").

79.    According to the Federal Reserve, "Matters Requiring Immediate Attention" are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization; and (4) in the case of consumer compliance examinations, matters that have the potential to cause significant consumer harm."[52]  When issued, Matters Requiring Immediate Attention are directed to a bank's most senior executives and board of directors, and must specifically state that "'The board of directors (or executive-level committee of the board), or banking organization **is required to immediately . . . .**'" take the actions specified by the Federal Reserve.[53]

80.    FE 5 explained that the Matters Requiring Immediate Attention provided to Silvergate related to onboarding, among other things.  The nature of the concerns was around Silvergate's lack of basic program requirements for vetting and onboarding.  FE 5 added that the Federal Reserve also provided Silvergate with

---

[51] FE 5 worked at Silvergate from May 2022 until May 2023 as a "FRCM Initial Due Diligence Manager."  During his over decade-long banking career, he has held roles as an enhanced due diligence manager, ongoing due diligence manager, and AML risk compliance officer at four other major banks.  FE 5 received reports from Silvergate's consultants, including K2, who had summarized the MRIAs in their reports.  While employed at Silvergate, FE 5 had access to Silvergate's records from before his employment.

[52] Supervisory Considerations for the Communication of Supervisory Findings, https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

[53] *Id.*

MRIAs related to ongoing due diligence.  The MRIAs said that things were either lacking or not proceduralized.  FE 5 further noted that, regarding Silvergate's ongoing monitoring, the Federal Reserve said it was not sufficient.  FE 5 added that he knows that the regulators also found deficiencies with Silvergate's screening process and SAR filings.

81.    FE 5 further stated that the regulators came back at the end of June 2022 to check progress.  FE 5 explained that the MRIAs were still going to stick—*i.e.*, they were going to remain in place—and FE 5 believes Silvergate was going to have even more MRIAs issued to it; however, Silvergate voluntarily started closing down before that ever occurred.

82.    FE 5 explained that, after the Federal Reserve issued its MRIAs, Silvergate retained third-party contractors, including the consulting firm, K2.  FE 5 explained that the contractors agreed that Silvergate lacked the appropriate controls around due diligence and KYC, and his team used their analyses to write up procedures.  FE 5 explained that he and his team worked on the procedures and had to give them to regulators by June 20, 2022.  FE 5 explained that Silvergate rolled out the new diligence processes on August 15, 2022.

83.    FE 5 agreed that, prior to August 15, 2022, Silvergate did not know its customers.  FE 5 also agreed that, prior to August 15, 2022, Silvergate did not review potential customers at the onboarding stage to determine whether they had an appropriate culture of compliance.  He knows this because, in his role at the Company, he read narratives and cases and was finding "all the garbage that was slopped through."  When he looked at Silvergate's paperwork from before August 2022, FE 5 could not tell who the customer was, what they did, what the sources of wealth were, or where the jurisdictions were, and the flow of funds did not make sense.  FE 5 added that, before May 2022, the Bank never said "no" to a client, which he knows from his looking at the Company's records.  FE 5 further explained that there was no record of any prospective client ever not being approved by Silvergate.

84.    FE 5 also agreed that, prior to August 15, 2022, when employees raised concerns about or identified suspicious or anomalous activity, Silvergate did not do anything about it.  FE 5 further agreed that, before August 15, 2022, Silvergate lacked a focus on compliance.

85.    FE 5 explained that, specifically with regard to Binance, there were a lot of red flags.  Among them, Binance had a big issue with the "wire rule."  The "wire rule" provides that you are supposed to include certain information in a wire when you complete it, including the originator and where the funds are going.  FE 5 explained that there were a lot of wires with Binance and Silvergate's other crypto-exchange customers where the information was just blank.  According to FE 5, Silvergate was supposed to reject those or strongly discipline customers, including suspending their accounts, and insist customers include the information.  But, FE 5 explained, nobody at Silvergate took a hard enough line with customers to say Silvergate was going to suspend accounts unless customers included all the information on the wires.  FE 5 noted that this continued to be a problem even after August 15, 2022.

86.    FE 5 agreed that, prior to August 15, 2022, Silvergate did not do site visits.  FE 5 noted that there was also nothing written in Silvergate's procedure for site visits anywhere.  FE 5 said site visits are important to make sure a company is real and not a shell company or a front.  FE 5 elaborated with an example: if a company says it is a gas station, you need to make sure it is actually a gas station, that there are things on the shelves and people work there.  You need to make sure it is not just a dusty shop where nothing has been moved that is a front for drug money.  FE 5 agreed that it was shocking that Silvergate did not conduct site visits, adding that if you would not travel to where the prospective customer is located, then you should not do business with a customer located there.

87.    FE 5 explained that, following its receipt of the MRIAs and with the Federal Reserve breathing down its neck, Silvergate put in place new procedures on

August 15, 2022.  Following the implementation of Silvergate's new procedures on August 15, 2022, FE 5's team wanted to go through any customers that had not gone through Silvergate's new onboarding process when those customers were previously onboarded and have an automatic look back to apply the new procedures for those customers as if those customers were being onboarded anew.  FE 5 explained that Silvergate did not do that, even though FE 5's boss agreed with the recommendation that Silvergate should.  FE 5 explained it would be industry standard for Silvergate to look back and apply the new procedures as if they were new customers; yet, Silvergate did not do this.  Nor, of course, did it disclose the Federal Reserve's findings or <u>any</u> of these critical facts to investors.

### E. Silvergate Failed To Vet, Conduct Due Diligence on, or Monitor FTX and Its Related Entities.

88.     Additional facts corroborate the accounts provided by Silvergate's former employees.  These facts show—among other things—that Silvergate failed to vet, conduct due diligence on, and monitor its most critical customer—the crypto-exchange FTX, which was an outright sham that Silvergate and its "seal of approval" enabled to defraud customers of billions of dollars.

89.     FTX and its related entities alone comprised approximately $2.1 billion in deposits—*i.e.*, over 17% of Silvergate's overall, Bank-wide deposits.[54] Recognizing FTX's significance to the Bank and its bottom line, Defendants Lane and Silvergate prominently highlighted Silvergate's relationship with FTX.  On its website, Silvergate displayed FTX's logo and included the below "testimonial" from

---

[54] On November 16, 2022, Silvergate issued a press release disclosing that as of November 15, 2022, its "[a]verage quarter-to-date digital asset customer deposits" were "approximately $9.8 billion, excluding all deposits from FTX and its related entities."  This was a $2.1 billion reduction from the $11.9 billion that the Company had reported five days earlier for "deposits from all digital assets customers," which included FTX deposits.  *Compare* Press Release, "Silvergate Provides Statements on FTX Exposure (Nov. 11, 2022) *with*, Press Release, "Silvergate Provides Mid-Quarter Update and Announces Participation in Oppenheimer's 5th Blockchain & Digital Assets Summit" (Nov. 16, 2022).

FTX's Founder and CEO, Sam Bankman-Fried about how "hard" it was "to overstate" Silvergate's importance to FTX:




**Figure 2**. Screenshot of Silvergate's website.[55]

90.    As the industry publication *CoinGeek* rightly observed, FTX's and Silvergate's "cozy relationship . . . boosted Silvergate's status and share price."[56]

91.    Silvergate repeatedly assured investors that it had performed its "secret sauce" vetting and due diligence on FTX and its related entities, as well as its other cryptocurrency exchange customers, prior to allowing them to bank at Silvergate and participate on the SEN Network.  For example, Defendant Lane publicly singled out FTX, by name, in a June 2022 public interview as one of Silvergate's four "major" cryptocurrency exchange customers—all of whom, Lane represented, were "serious about regulation."[57]  During that same interview, Lane further assured investors "that's an important distinction because [the Silvergate-approved exchanges] have to satisfy not only their own legal and regulatory requirements but then we have to verify that their compliance programs are sound."[58]

---

[55]https://web.archive.org/web/20220511235432/https://www.silvergate.com/solutions/digital-currency/sen; https://web.archive.org/web/20221022144431/https://www.silvergate.com/.
[56] *CoinGeek*, "Feds probe Silvergate bank's ties to FTX, SBF vs. CZ cage-match documentary" (Feb. 6, 2023).
[57] *Silvergate CEO Alan Lane on the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).
[58] *Id.*

92.    In reality, Silvergate did <u>not</u> conduct diligence on FTX or its related entities and did <u>not</u> "verify that their compliance programs are sound."  Instead, Silvergate allowed and enabled Sam Bankman-Fried to use FTX and his other entities to dupe innocent customers out of billions of dollars.

93.    Sam Bankman-Fried's and FTX's fraud of their customers was simple. When customers sought to purchase cryptocurrency from FTX's account, they were directed to wire their U.S. dollars or other fiat currency into the Silvergate-approved accounts of two entities that were <u>not</u> FTX—specifically, they were directed to wire their funds to "North Dimension" and "Alameda."  None the wiser, innocent FTX customers wired more than $8 billion to the Silvergate-approved accounts of North Dimension and Alameda.[59]  FTX's CEO, Sam Bankman-Fried, then absconded with those dollars from Silvergate, without crediting the customers' cryptocurrency accounts at FTX.  Once FTX collapsed, FTX customers were left empty-handed and unable to find or free their money.

94.    All three entities—North Dimension, Alameda, and FTX—were shams, which would have been obvious to Silvergate had it actually conducted "vetting," "due diligence," or "ongoing monitoring" of its approved customers.

95.    ***North Dimension*** was a fake online electronics retailer.  On its website, North Dimension claimed to sell mobile phones, laptops, watches and other personal electronics.   But there was no actual way to purchase anything from North Dimension.   Clicking the links on its website to buy products "sold" at North Dimension generated a typo-filled, incoherent pop-up response to "Get A Quote," which stated: "Fee [*sic*] free to send a message. We collaborate with ambitious brands and people; we'd love to build something great together."[60]

---

[59] *Vox*, "Sam Bankman-Fried tries to explain himself" (Nov. 16, 2022); *Financial Times*, "FTX balance sheet, revealed" (Nov. 12, 2022).
[60] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).

**Figure 3**.  Screenshot of North Dimension's website.[61]

96.    If that were not enough of a "red flag" for Silvergate, North Dimension's address, which was listed in plain sight on its website, was the <u>same</u> address as FTX's address: 2000 Center St., Suite 400, Berkeley, California.  *See* Figure 4, *infra*.  Worse yet, as *NBC* would later note following its investigation, North Dimension's website was "rife with misspellings and bizarre product prices; for example, item listings sometimes showed 'sale' prices that were hundreds of dollars above a regular price."[62]  The "About Us" section of North Dimension's website displayed text that "may have been written by a not-too-smart artificial intelligence," with North Dimension describing itself as a "World top E-commerce site for consumer electronics in order to provide the lowest costs for authentic items from the world's most reputable brands."[63]

---

[61] Web archive of North Dimension's website (as of Nov. 11, 2022).
[62] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).
[63] *Cointelegraph*, "Here's what SBF's fake electronics outlet 'North Dimension' looks like" (Dec. 30, 2022).



**Figure 4**. Screenshots of North Dimension's website.[64]

97.    In addition to not actually selling electronics products and being rife with misspellings, North Dimension's website included "sale" prices on item listings that were hundreds of dollars <u>above</u> the "regular" prices.  For example, an 11-inch iPad—listed as a "Cell Phone"—inexplicably displayed a "sale" price of $899 and an "original" price of $410.



**Figure 5**.  Screenshot of North Dimension's website.[65]

98.    Far from an "online electronics retailer," North Dimension was an utter sham created and controlled by FTX's CEO, Sam Bankman-Fried, to fraudulently divert billions of dollars of customer funds intended for FTX.  North Dimension had no employees, other than Bankman-Fried, and no physical location.  It had no actual

---

[64] Web archive of North Dimension's website (Nov. 11, 2022).
[65] *Id.*

business operations and was nothing more than a Silvergate-approved sham allowed to fleece innocent customers out of billions of their hard-earned dollars.

99.    ***Alameda Research*** was North Dimension's parent company, and also a Silvergate-approved customer.  Silvergate approved Alameda to open a Silvergate account in 2018, when FE 2 and FE 4 were at the Bank.  FTX and Alameda are separate legal entities and, accordingly, supposed to—and legally required by law to—operate independently.  Nevertheless, FTX and Alameda were operated as if they were one and the same.  Bankman-Fried controlled both entities and, as with North Dimension, FTX and Alameda shared the same address—2000 Center Street, Suite 400, Berkeley, California.  Also, as with North Dimension, FTX's unsuspecting customers were directed to wire (and did wire) billions of dollars of funds to Alameda's Silvergate-approved accounts when, in reality, they wanted to send their money to FTX.

100.    Sam Bankman-Fried has now been criminally indicted, three of his associates have pled guilty, and FTX has gone bankrupt.  The fact that FTX was a complete ruse would have been obvious to Silvergate, had it actually conducted the represented diligence.  Bankman-Fried ran the multibillion-dollar cryptocurrency exchange as a "personal fiefdom."[66]  FTX had no CFO, a wildly inexperienced C-suite of Bankman-Fried's cronies, and a "Chief Regulatory Officer" who had been caught on tape aiding and abetting fraud in his previous position as General Counsel of Ultimate Bet, an online gambling site.[67]

101.    As FTX's new CEO, John Ray, has admitted in his remarks to Congress: at FTX, there was an "absolute concentration of control in the hands of a

---

[66] *Law360*, "FTX Pledges Better Books, Celsius Faulted for Asset Mingling" (Nov. 23, 2022).

[67] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022); *Business Insider*, "Chamath Palihapitiya said Sam Bankman-Fried once pitched him, but after the investor suggested changes like forming a board, FTX told him to get lost" (Nov. 15, 2022).

very small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money or assets."[68]  FTX's new CEO has further admitted that FTX "did not keep appropriate books and records, or security controls, with respect to its digital assets."[69]  FTX's new CEO also added, "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[70] These are strong admissions coming from Mr. Ray, who has "over 40 years of legal and restructuring experience" and has overseen the clean-up of "several of the largest corporate failures in history," including Enron.[71]

102.   FTX's new CEO, Mr. Ray, also admitted in his testimony to Congress that, at FTX, "there was an absence of any management," adding, "You need records, you need controls, and you need to segregate people's money. It's simple." When asked if FTX had significant risk management systems, Ray responded that "there were virtually no internal controls and no separateness whatsoever" between FTX and Alameda, the parent company of North Dimension.  Ray further testified that Bankman-Fried owned 90% of Alameda, and there was "no distinction whatsoever" in governance between FTX and Alameda.[72]

103.   As Mr. Ray summarized, FTX's fraud "[was]n't sophisticated whatsoever.  This is just plain old embezzlement. . . . This is just taking money from customers and using it for your own purpose."[73]  Rather than being safely kept at

---

[68] Written Testimony of Mr. John J. Ray III, CEO, FTX Debtors, House Financial Services Committee (Dec. 13, 2022).

[69] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.

[70] *Id.*

[71] *Id.*

[72] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[73] *Id.*

Silvergate, FTX customer funds were diverted to two other Silvergate-approved entities (North Dimension and Alameda), and then "used to purchase homes and other personal items for [Silvergate] employees and advisors" in the Bahamas. When FTX employees wanted to make such purchases, they needed only to "submit[] payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis."[74]  As observed by Federico Lascano of Fiducient Advisors, the lack of "cash controls" at FTX "enabled customer funds to be freely transferred to Alameda," and "would have been an enormous red flag during the operational due diligence process."[75]

104.   Had Silvergate monitored FTX, Alameda, or North Dimension, it would have seen the $8 billion from FTX customers (intended to be deposited into FTX accounts to be traded on the FTX Exchange) transferred, instead, into North Dimension's account.   As the industry press later recounted, "Silvergate's lackadaisical approach to oversight of who/what was transacting on the 24/7 SEN platform was on full display in its approval of North Dimension—a fake electronics retailer set up by FTX to facilitate payments to/from its U.S. customers—based solely on assurances of propriety from [Sam Bankman-Fried]."[76]

---

[74] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.

[75] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022).   Mr. Lascano researches and performs operational due diligence on alternative investment managers.   Prior to joining Fudicient Advisors in 2022, Mr. Lascano worked in regulatory finance at NatWest Markets, the investment banking arm of NatWest Group based in the United Kingdom.

[76] *CoinGeek*, "'Crypto' firms unbank themselves from struggling Silvergate" (Mar. 3, 2023).

105.   FTX's new CEO further explained that, at FTX, "literally there's no record-keeping whatsoever."[77]   Mr. Ray added, in amazement: "They use[d] Quickbooks. A multibillion-dollar company using Quickbooks."  He elaborated that FTX "used QuickBooks as their accounting system and relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities."[78]   Ray further noted that, at FTX, "[a]pproximately 80,000 transactions were simply left as unprocessed accounting entries in catch-all QuickBooks accounts titled 'Ask My Accountant.'"[79]   Mr. Ray concluded that FTX is "one of the worst [entities] from a documentation standpoint" and "it's really unprecedented in terms of the lack of documentation."[80]

106.   Bankman-Fried has himself now publicly admitted that he made zero effort to manage risk at FTX: "I wasn't even trying, like, I wasn't spending any time or effort trying to manage risk on FTX."[81]   He added, "If I had been spending an hour a day thinking about risk management on FTX, I don't think [the collapse of FTX] would have happened."[82]   Bankman-Fried has also admitted that there was a "massive failure of oversight of risk management" at FTX.[83]   And FTX's new CEO,

---

[77] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[78] Ray explained "QuickBooks was not designed to address the needs of a large and complex business like that of the FTX Group, which handled billions of dollars of securities, fiat currency, and cryptocurrency transactions across multiple continents and platforms," First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov 11, 2022), ECF No. 1241-1 at 13.

[79] *Id.*

[80] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[81] *Wall Street Journal*, "Sam Bankman-Fried 'Wasn't Even Trying' to Manage Risk at FTX, He Says" (Dec. 1, 2022).

[82] *Id.*

[83] *Id.*

Mr. Ray, has confirmed these admissions, testifying that FTX's systems for accounting, audit, cash management, cybersecurity, risk management, and data protection "did not exist to an appropriate degree" or "did not exist" at all.[84]

107.    These stark admissions from FTX's most senior insiders about FTX's complete absence of any internal compliance programs are directly contrary to Silvergate's and Defendant Lane's public assurances that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring" and that Silvergate "verif[ied]" that FTX's "compliance programs are sound."

108.    Silvergate's "vetting," "due diligence," and "ongoing monitoring" was supposed to protect against this very type of misconduct. Unfortunately for investors, Defendants Lane and Silvergate utterly failed to perform any of them. If they had, Silvergate would have—as it repeatedly reassured investors in such circumstances—"refused to bank" FTX and its related entities. As a bipartisan group of senators of the U.S. Senate Banking Committee later explained in a December 5, 2022 letter to Defendant Lane: "Your bank's involvement in the transfer of FTX customer funds to Alameda Research reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."[85]

### F.    Silvergate Failed To Vet, Conduct Due Diligence on, and Monitor Its Other Major Exchange Customers.

109.    Additional facts corroborate that, contrary to their statements to investors, Defendants Silvergate and Lane failed to conduct "regulatory compliance diligence" on prospective customers and failed to "vet[] all of [the Bank's] customers from KYC, anti-money laundering, Bank Secrecy Act." As *New York*

---

[84] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.

[85] Letter from Warren, Kennedy, and Marshall to Lane (Dec. 5, 2022).

*Magazine* would later note, "Silvergate has been the go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy." Marc Cohodes, a famed corporate watchdog and market participant rightfully added, Silvergate was not a banking platform; it was "a publicly traded crime scene."

110. **Binance** is a cryptocurrency exchange, with approximately one-third of its users based in the United States. Notwithstanding its substantial U.S. customer base, Binance did not register with the U.S. Department of the Treasury ("Treasury Department"), as is required by the Bank Secrecy Act for "financial companies with 'substantial' business in the United States."[86] Instead, Binance and its owner, Changpeng Zhaou, created Binance.US—a U.S.-based exchange—and registered it with the Treasury Department as "fully independent" from Binance.

111. Silvergate approved Binance.US to bank at Silvergate and join its SEN Network in November 2020.[87] Silvergate did not perform due diligence on Binance.US. Those who have conducted due diligence on Binance.US have readily uncovered facts demonstrating that it is <u>not</u> "fully independent" from Binance; in fact, they are one and the same. As U.S. senators clearly explained in a bipartisan letter, "While Mr. Zhao has claimed that Binance.US, is a 'fully independent entity,' in reality, he controls the company as a '*de facto* subsidiary' of Binance," with "Binance's Cayman Islands holding company ke[eping] custody of Binance.US customers' digital wallets."[88] The *Wall Street Journal* likewise found that "Binance and Binance.US have been much more intertwined than the companies have disclosed, mixing staff and finances and sharing an affiliated entity that bought and

---

[86] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[87] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

[88] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

sold cryptocurrencies."[89]  *Reuters* also concluded that "Binance created Binance.US as a *de facto* subsidiary in 2019 in order to draw the scrutiny of U.S. regulators away from the global exchange."

112.  If it had actually conducted due diligence, Silvergate would also have learned that Binance and its executives controlled Binance.US's finances at Silvergate.  When it conducted its review, *Reuters* readily found that Binance's executives, including its finance executive Susan Li, had key access to Binance.US's Silvergate account.  The bipartisan group of U.S. senators similarly concluded that, "in truth, 'the global Binance exchange, which is not licensed to operate in the United States, controlled the finances of Binance.US, despite maintaining that the American entity is entirely independent and operates as its 'US Partner.'"[90]

113.  Silvergate additionally failed to monitor Binance.US's activity, allowing transfers of hundreds of millions of dollars to Zhao's other entities without the permission—or even the knowledge—of Binance.US's employees.  As *Reuters* revealed, beginning in late 2020, $400 million of funds at Silvergate were transferred from Binance.US to a separate account controlled by Zhao "without [Binance.US's] knowledge."[91]  Funds were moved from Binance.US's account at Silvergate to "Merit Peak," another shell entity owned by Zhao and approved by Silvergate as a customer.  Merit Peak then transferred funds to "Key Vision Development Limited," yet another sham entity that "held an account at Silvergate at the time" and that also "identified CEO Zhao as a director."[92]

114.  Had Silvergate actually performed the represented due diligence on these entities (as it told investors it had) or monitored their activity on its platform

---

[89] *Wall Street Journal*, "Texts From Crypto Giant Binance Reveal Plan to Elude U.S. Authorities" (Mar. 5, 2023).

[90] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[91] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

[92] *Id.*

(as it told investors it did), it would have realized that they were nothing more than sham entities created to evade U.S. laws and funnel funds from Binance.US to Binance and Zhao. Indeed, "Mr. Zhao 'decline[d] to disclose the location or entity behind his own exchange [at Binance]' in what many regard as a blatant attempt to dodge the world's financial regulators, serve 'users without licenses,' and violate anti-money laundering laws."[93]

115. Additionally, a simple "site visit" to the address provided for Key Vision Development Limited (Office 22 Alpha Centre, Providence, Mahe, Seychelles), or even a search using "Google Earth" for the address, would have made plain that it was the address for a massive warehouse—not the business office of an entity transacting in hundreds of millions of dollars in cryptocurrency:[94]



**Figure 6.** Images of Key Vision Limited Development's purported address.[95]

---

[93] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).
[94] Post by Stefan Luebeck, a cryptocurrency market expert, dated Feb. 16, 2023; Google Earth Image Search.
[95] Post by Stefan Luebeck, a cryptocurrency market analyst at BTC-ECHO, dated Feb. 16, 2023; Google Earth Image Search.

116.    If Silvergate had actually performed the due diligence it represented to investors, it would also have discovered that these Binance entities lacked any compliance program.  Binance is, as the U.S. senators explained in their March 2023 bipartisan letter, "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders."  This conclusion is well-founded: "crypto researcher Chainalysis, hired by U.S. government agencies to track illegal flows, concluded in a 2020 report that Binance received criminal funds totaling $770 million in 2019 alone, more than any other crypto exchange."[96]  And Binance's own Chief Compliance Officer admitted that its KYC checks were "weak," with Binance's CEO (Mr. Zhao) wanting "no kyc."[97]

117.    Actual vetting and monitoring by Silvergate would have further shown that "Binance.US was also in on the scheme: 'Almost half the U.S. compliance team quit by mid-2022 after a new U.S. boss was appointed by Zhao, . . . because the new chief pushed them to register users so swiftly that they couldn't conduct proper money laundering checks.'"[98]    Binance.US executives directed compliance personnel to "apply more lenient checks" to "VIP customers" who had been referred to the platform to increase its liquidity.[99]  The bipartisan group of U.S. senators rightfully concluded that Binance maintained a "laughably weak anti-money laundering compliance program," with *Reuters* similarly finding that, "the main Binance exchange let users open accounts and trade crypto anonymously by merely providing an email address."[100]

---

[96] *Reuters*, "How crypto giant Binance became a hub for hackers, fraudsters and drug traffickers" (June 6, 2022).

[97] *Reuters*, "SPECIAL REPORT-Crypto giant Binance kept weak money-laundering checks even as it promised tougher compliance, documents show" (Jan. 21, 2022).

[98] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[99] *Id.*

[100] *Id.*

118. In sum, if Silvergate had conducted the "extensive regulatory compliance diligence" and "vetting" that it told investors it had (but which it had not), Silvergate would have found—as investigators and U.S. senators uniformly have—that "Binance and its related entities have purposefully evaded regulators, moved assets to criminals and sanctions evaders, and hidden basic financial information from its customers and the public."[101]

119. ***Huobi Global*** was a Seychelles-based cryptocurrency exchange, founded in China. Silvergate approved Huobi to bank at Silvergate and participate on its SEN Network, assuring investors it had conducted "enhanced due diligence" on it. In reality, Silvergate had not. Had Silvergate conducted the represented diligence, it would have discovered a slew of troubling facts, including that Huobi lacked compliance controls. For example, in December 2020, investigators at the forensics company CipherBlade conducted a review of Huobi's controls. Their review "demonstrated how simple it was to create false accounts" at Huobi and transact on the exchange, which created conditions ripe for money laundering and other illegal transfers.[102] Customers transacting on the Huobi exchange could wire funds using phony information, including obviously false names and photographs of themselves, such as "Taylor Swift" and "Borat." Other investigators similarly concluded that Huobi "fail[ed] to perform stringent backgrounds checks" and "know-your-customer (KYC) processes" on customers, making it a "'gateway for money laundering and other gray activities.'"[103] Public company investigator Aurelius Capital Value summed it up correctly when it questioned Silvergate

---

[101] *Id.*

[102] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

[103] *Verdict*, "Dirty bitcoin: Exchanges' KYC laxity eases money laundering – report" (Oct. 27, 2021).

1  associating with Huobi: it is impossible "to find a way to harmonize the formal due

2  diligence procedure that Silvergate uses with Huobi's onboarding process."[104]

3       120.   If Silvergate had actually conducted due diligence, it also would have

4  found that "Huobi Global had not taken any action against the links that were made

5  between Huobi and the darknet marketplace Hydra."[105]   In October 2021,

6  investigators of the National Bureau of Economic Research in Cambridge,

7  Massachusetts issued a report "show[ing] that the highest volume entities interacting

8  directly with Hydra Market users are non-KYC exchanges, including . . . Huobi."[106]

9  The U.S. Justice Department has described Hydra as "the world's largest and

10  longest-running darknet market," with Hydra having received in total around $5.2

11  billion in cryptocurrency.[107]

12       121.   ***Nexo Capital Inc.*** was a cryptocurrency lending firm that Silvergate

13  also approved to bank and operate on its SEN Network.  Silvergate did not perform

14  the represented due diligence on Nexo.  If Silvergate had performed due diligence

15  on Nexo, it would have learned that Nexo failed to register with the SEC, as required

16  by law.  Following its review of Nexo, the SEC "charged Nexo with failing to

17  register its retail crypto lending product before offering it to the public, bypassing

18  essential disclosure requirements designed to protect investors."[108]  Prosecutors that

19  have conducted due diligence on Nexo have also learned, as reported by *Reuters*,

20  that "Nexo has been operating through many companies, many of which were just

21

22

23

24  [104] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

25  [105] *Id*.

26  [106] National Bureau of Economic Research, *Blockchain Analysis of the Bitcoin Market* (October 2021).

27  [107] Press Release, DOJ, "Justice Department Investigation Leads to Shutdown of Largest Online Darknet Marketplace" (Apr. 5, 2022).

28  [108] Press Release, SEC, "Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product" (Jan. 19, 2023).

'post boxes.'"[109]  Indeed, the SEC has forced Nexo to cease and desist and required it to pay $45 million in fines to the SEC and state regulators.[110]

122. **Miles Guo** (a/k/a Ho Wan Kwok) owned two entities approved by Silvergate: Hamilton Opportunity Fund SPC (Silvergate Account Numbers: 5090037713, 5090037705, 5090037754, 5090042770, 5090042762, 5090042853, 5090037739, 5090042853) and Hamilton Investment Management Ltd (Silvergate Account Number: 5090030288).  Silvergate did not perform the represented due diligence on Guo or his entities.  Had Silvergate performed the represented due diligence on Guo or his entities, it would have found what the SEC and others readily discovered: "Guo was a serial fraudster" who "took advantage of the hype and allure surrounding crypto and other investments to victimize thousands and fund his and his family's lavish lifestyle."[111]  Guo—who is currently under arrest in the United States—operated through "fraudulent and fictitious businesses" that "connected dozens of interrelated entities," allowing Guo "to solicit, launder, and misappropriate victim funds."[112]  On September 18, 2022, the DOJ seized over $389 million from Guo's accounts at Silvergate, including Hamilton Opportunity Fund SPC and Hamilton Investment Management Ltd.[113]

123. **Virgil Sigma Fund LP and VQR Multistrategy Fund LP** were two cryptocurrency hedge funds run by convicted felon Stefan Qin.  Both entities were also approved by Silvergate to participate on the SEN Network and authorized to set

---

[109] *Reuters*, "Bulgaria launches probe of crypto lender Nexo, raids sites" (Jan. 12, 2023).

[110] Press Release, SEC, "Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product" (Jan. 19, 2023).

[111] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023).

[112] Sealed Indictment, *United States v. Ho Wan Kwok*, No. 23-cr-118 (S.D.N.Y. Mar. 6, 2023).

[113] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023); Press Release, USAO SDNY, "Ho Wan Kwok, A/K/A "Miles Guo," Arrested For Orchestrating Over $1 Billion Dollar Fraud Conspiracy" (Mar. 15, 2023).

up twelve accounts at Silvergate.[114]  Silvergate did not perform the represented due diligence on these Silvergate-approved entities.  If Silvergate had conducted the due diligence and the monitoring it represented, it would have discovered that these entities operated a Ponzi scheme.  When the New York Field Office of Homeland Security Investigations Unit reviewed these entities, they readily found that "Virgil Sigma and VQR, two multimillion-dollar cryptocurrency investment funds, were . . . slush funds for Qin to live his extravagant lifestyle.  Qin orchestrated this reprehensible criminal scheme for many years, making misrepresentations and false promises that coaxed investors into pouring millions of dollars into fraudulent cryptocurrency firms, all the while stealing the hard-earned money of his investors."[115]

124.  ***Bittrex, Inc.*** was a cryptocurrency exchange that Silvergate approved for its SEN Network and specifically highlighted, by name, on the Bank's website as one of its major customers.  Silvergate did not conduct the due diligence on Bittrex that it represented to investors.  Had Silvergate actually conducted due diligence on Bittrex, it would have discovered, as the Treasury Department has found, that Bittrex "violated multiple sanctions programs and failed to adequately guard against money laundering."[116]  Among other things, Bittrex "failed to have a proper anti-money laundering program" and "unnecessarily exposed the U.S. financial system to threat actors."[117]  Bittrex has now been required to pay $53 million for violating multiple

---

[114] *Business Insider*, "Silvergate had close ties to Sam Bankman-Fried's FTX and Alameda.  The crypto bank was also reportedly a favorite of other troubled clients including an Australian Ponzi criminal" (Jan. 24, 2023).

[115] Press Release, USAO SDNY, "Founder Of $90 Million Cryptocurrency Hedge Fund Charged With Securities Fraud And Pleads Guilty In Federal Court" (Feb. 4, 2021).

[116] *Decrypt*, "Treasury Fines Crypto Exchange Bittrex $53 Million for Sanctions Violations" (Oct. 11, 2022).

[117] *Id.*

U.S. sanctions programs, which was "the biggest fine on a crypto business by the Treasury Department."[118]

125. **Paxos and OSL Digital** were cryptocurrency exchanges approved by Silvergate. The Bank did not conduct the represented due diligence on either of these cryptocurrency exchanges or monitor their activity. As a result, these exchanges were able to launder $425 million between September 2021 and June 2022 from four, Silvergate-approved accounts: Paxos Global PTE LTD.; Paxos Trust Company LLC; OSL Digital LTD; and OSL SG PTE LTD.[119] If Silvergate had conducted the represented "ongoing monitoring" of the activity on its SEN Network, it would have detected the money laundering and not approved the cryptocurrency exchanges that facilitated such illegal activity.

126. Florida's Money Laundering Task Force ("MLTF") conducted a review of "the records produced by Silvergate Bank" for these cryptocurrency exchanges.[120] MLTF readily found that these exchanges facilitated "the laundering of illicit funds." The Deputy Sherriff of Broward County, assigned to the MLTF, submitted an affidavit on August 23, 2022, following his review of the "the records produced by Silvergate Bank" and concluded that:

> "During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms [at Silvergate] into accounts held at different US banks."

> "The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized . . . by the [Broward County Sheriff's Office Strategic Investigations Division, Money

---

[118] *Id.*

[119] *CryptoSlate*, "Silvergate records reveal $425M in transfers to South American money launderers" (Nov. 16, 2022).

[120] "Affidavit in Support of Probable Cause for Forfeiture," *In re: Seizure of Two Million Forty-Eight Thousand Two Hundred Twenty-Nine Dollars and 48/100 ($2,048,229.48) in United States Currency*, No. CACE-22-012446 (Cir. Ct., 17th Jud. Cir., Broward Cnty., Fla.).

Laundering Task Force] for being used to facilitate the laundering of illicit funds."

"In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same [Silvergate] records."

"In general, these companies all appeared to be shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details . . . ."[121]

127.   Had Silvergate actually monitored the activity of its customers and on its SEN Network (as it represented it had), it also would have identified that these entities' transactions "were not consistent with the transaction patterns of thousands of other persons and businesses" and recognized that hundreds of millions of dollars were being wired from the Silvergate-approved exchanges to "shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details."[122]

### G.   Customers and Investors Learn That Silvergate Did Not Vet, Perform Due Diligence On, or Monitor Its SEN Network Participants.

128.   The world gradually learned the true facts about Silvergate's failure to vet, perform due diligence on, and monitor its customers—including FTX.   On November 2, 2022, the publication *CoinDesk* released an investigative report that described the "unusually close" ties between two of Silvergate's customers, FTX and Alameda, as reflected in a leaked internal Alameda financial document. *CoinDesk* noted that "even though [FTX and Alameda] are two separate businesses," Alameda's balance sheet included billions of dollars of FTT—*i.e.*, the

---

[121] *Id.*
[122] *Id.*

cryptocurrency token issued and owned by FTX.[123]   This revelation sparked the ultimate collapse of FTX and Alameda as complete frauds.

129.   Just five days later, on November 7, 2022, Silvergate announced the sudden replacement of Tyler Pearson, the Bank's Chief Risk Officer.  In addition to being Silvergate's "Chief Risk Officer," Pearson was also Defendant Lane's son-in-law.   Commentators erupted following the news of Pearson's replacement, connecting it to Silvergate's failure to conduct diligence on FTX and related entities. Marc Cohodes, a popular market commentator and corporate watchdog, explained in a November 8, 2022 post commenting on this news, "When FTX is your largest customer this is a Major problem."[124]  Marcus Aurelius Research echoed this, asking rhetorically, "How long until the new [Silvergate] 'Risk Officer' takes [Sam Bankman-Fried's testimonial] down" from the Bank's website.[125]

130.   Over the subsequent days and weeks, further reports emerged connecting FTX's misconduct to Silvergate, and exposing Silvergate's lack of customer diligence and monitoring.  For example, on November 15, 2022, it was revealed that Silvergate was implicated in a $425 million money laundering operation by a South American cryptocurrency crime ring linked to smugglers and drug traffickers.  Marcus Aurelius Research explained that "[r]ecently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers."[126]

131.   Two days later, EventLongShort, another popular analyst and corporate watchdog, issued a series of postings detailing "why Silvergate $SI may be in a

_____

[123] *CoinDesk*, "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" (Nov. 2, 2022).
[124] Post by Marc Cohodes (Nov. 8, 2022).
[125] Post by Marcus Aurelius Research (Nov. 8, 2022).
[126] Post by Marcus Aurelius Research (Nov. 15, 2022).

whole heap of KYC/AML trouble with the FTX collapse."[127]  *See* Figure 7, *infra*. EventLongShort explained that, when FTX's customers wanted to transfer funds, they were directed "to send the funds to their bank [at] Silvergate" and that, even though "one should expect the beneficiary account" to be FTX, instead "the beneficiary account on the Silvergate/FTX wire instructions appear[ed] to be Alameda accounts." EventLongShort added that "the accounts FTX customers were told to wire funds to appear to be the Silvergate bank accounts of Alameda Research Ltd and North Dimensions Inc, a subsidiary of Alameda."  A host of market participants flooded Twitter and other social media platforms with examples reflecting these exact wire instructions.  EventLongShort went on to explain why these "huge red flags" pointed to failures at Silvergate:



**EventLongShort** @EventLongShort · Nov 17, 2022 ···
And because these were $SI bank accounts, they had to see all the transfers out from Alameda to FTX and SBF.  Huge red flags should have gone off.  Regulators will undoubetdly start with $SI in following the cash.



**EventLongShort** @EventLongShort · Nov 17, 2022 ···
This is a big problem for $SI who under KYC rules were required to know that Alameda and North Dimension were NOT FTX.com / FTX Trading Ltd. They were seperate companies. Yet, they were facilitating customers depositing into FTX.com thru Alameda.



**EventLongShort** @EventLongShort · Nov 17, 2022 ···
Silvergate should have NEVER been taking FTX customer deposits into Alameda, a legally seperate company.  Why would Silvergate ever enable this?



**EventLongShort** @EventLongShort · Nov 17, 2022 ···
The easy answer is the deposit growth was so massive and attractive they just ignored KYC and AML requirements.  Also, possible they were concerned about do biz w/ FTX directly, as it was banned in the US.  So Alameda was way around that

---

[127] Post by EventLongShort (Nov. 17, 2022).

EventLongShort @EventLongShort · Nov 17, 2022
This is a big deal. Its like trying to send money to Amazon.com but Silvergate allowed you to send it to Blue Origin instead because Jeff Bezos owns both. Now you try and get your money back from Amazon, and they don't have it because...they never got it

**Figure 7.** Postings by corporate watchdog, EventLongShort.

132. Additional reports from other investigative journalists followed. *Bloomberg News*'s Crypto Market Structure Reporter (Yuqi Yang) and *Bloomberg*'s Finance Reporter (Max Reyes) published an article days later detailing how Silvergate utterly failed to vet, perform due diligence on, or monitor FTX, implicating Silvergate as a key facilitator of the fraud at FTX. On November 28, 2022, *Bloomberg* published a report based on the accounts of people familiar with FTX, which described how Silvergate solved FTX's inability to get access to traditional banking sources by allowing Alameda to become a Silvergate customer and then allowing FTX customers to wire funds to Alameda.[128] The article explained how FTX customers "wired $8 billion to Alameda" using Silvergate-approved accounts and quoted Alma Angotti (a former enforcer with the SEC and Treasury Department), who explained that "[i]t's very bad practice and risk management in any book to mingle your customer funds with counterparty funds and other funds."

133. Silvergate's failure to vet, conduct due diligence on, and monitor its Silvergate-approved customers also drew the ire of the U.S. government. On the morning of December 6, 2022, U.S. senators issued a bipartisan letter to Lane and Silvergate that questioned the Bank's relationship to Sam Bankman-Fried's entities, and specifically FTX and Alameda. The bipartisan letter expressed concerns "about the bank's role in facilitating the improper transfer of FTX customer funds to Alameda."[129] The senators scolded Silvergate for having "failed to apply" its

---

[128] *Bloomberg*, "FTX Received Some Customer Deposits Via Bank Accounts Held by Alameda" (Nov. 28, 2022).
[129] Letter from Warren, Kennedy, and Marshall to Lane (Dec. 5, 2022).

purported diligence processes to Alameda and FTX and having done "nothing to halt these activities." The senators concluded: "Your bank's involvement in the transfer of FTX customer funds to Alameda reveals what appears to be <u>an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its client</u>." The U.S. senators further stated that "Silvergate's failure to take adequate notice of [the FTX] scheme suggests that it may have <u>failed to implement or maintain an effective anti-money laundering program</u>."

134. The same morning, Senior Financial Reporter for *NBC News Investigations*, Gretchen Morgenson, reported that Silvergate was FTX's primary banking partner. Morgenson's sources included a recorded conversation between an investment manager and a former top FTX employee with direct knowledge of the transactions. On the recording, which was shared with *NBC News* and brought to the attention of the U.S. Senate Banking Committee, the FTX insider "described transfers of funds between FTX's Silvergate account, which included FTX customers' money, and accounts belonging to other entities believed to be controlled by Bankman-Fried, including Alameda Research, the supposedly separate crypto trading operation."[130]

135. Even as the truth about FTX and Silvergate's lack of customer diligence started to come out, Silvergate and Lane tried to quiet investor and customer concerns. On December 5, 2022, Defendant Lane issued a public letter "to set the record straight about Silvergate's role in the digital asset ecosystem" and to blame recent reports on "speculation" and "misinformation."[131] In his public letter, Defendant Lane again represented (falsely) that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with

---

[130] *NBC News*, "Sen. Warren demands answers from Silvergate Bank about its business dealings with FTX" (Dec. 6, 2022).
[131] Silvergate, Form 8-K (Dec. 5, 2022).

our risk management policies and procedures and the requirements."  Defendant Lane also insisted (falsely) that the Bank "monitors transaction activity for every account and identifies activity outside of the expected usage."

136.    Defendant Lane also denied the U.S. senators' findings, stating (falsely) that "Silvergate has instituted, and consistently updates and improves, a robust compliance and risk management program that spans the life cycle of each client."[132] Lane likewise doubled down, stating (falsely) in that same letter to the U.S. senators that, "[i]n accordance with our risk management policies and procedures, Silvergate conducted significant due diligence on FTX and its related entities, including Alameda Research, both during the onboarding process and through ongoing monitoring."

137.    Investors and financial analysts credited Lane's and Silvergate's denials—at least initially.  For example, securities analysts at the investment firm J.P. Morgan accepted Lane's denials, repeating in their analyst reports Lane's statements that "all participants in the SEN are vetted by Silvergate" and "need[] to pass compliance checks."[133]

138.    Notwithstanding Lane's denials, the truth continued to emerge.  On December 13, 2022, FTX's new CEO, John Ray, testified before the U.S. House Financial Services Committee.  During his testimony, he explained that the Silvergate-approved FTX lacked "virtually any of the systems or controls that are necessary for a company entrusted with other people's money or assets," each of which Silvergate's purported KYC diligence would have caught had any such diligence occurred.  Mr. Ray further explained that FTX had "near-zero in terms of the corporate infrastructure and record-keeping that one would expect to find in a

---

[132] Letter from Lane to Warren, Kennedy, and Marshall (Dec. 19, 2022).
[133] J.P. Morgan, "Addressing Key Concerns and Separating Fact from Fiction; Downside Scenario and Buyback Analysis" (Nov. 21, 2022).

multi-billion dollar international business."[134]   Silvergate failed to identify this "near-zero" infrastructure because it never bothered to vet, diligence or monitor FTX, Alameda, or North Dimension.

139.   As a result of the world gradually learning the true facts about Silvergate, participants on the SEN Network pulled their deposits and left the Bank. By January 6, 2023, customers had withdrawn 60% of the Bank's total deposits (over $8.1 billion), with Silvergate laying off 40% of its workforce.[135]

140.   Over the following days and months, investors continued to learn the true facts about Silvergate's lack of diligence and the sham entities that it approved on the SEN Network.  On January 24, 2023, *New York Magazine*'s Intelligencer published an article, titled "The Crypto Industry's Favorite Bank Is In Deep Trouble," which explained that Silvergate's SEN Network "includes alleged fraudsters like Bankman-Fried along with a slew of other sketchy companies and individuals who used Silvergate to move a trillion dollars into—and out of—crypto markets all over the world."[136]  *New York Magazine* described documents it obtained that showed that Silvergate was the "go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy," including FTX, Alameda, Binance, Huobi, Nexo, and Bittrex.

141.   Next, on February 2, 2023, news broke that the DOJ's Fraud Section was examining Silvergate's hosting of accounts connected to FTX and its CEO Sam Bankman-Fried.  *Bloomberg* told its readers that the DOJ investigation "adds to mounting scrutiny" of Silvergate, and *Reuters* noted that "[s]crutiny of Silvergate

---

[134] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).
[135] Silvergate, Costs Associated with Exit or Disposal Activities (Form 8-K) (Jan. 5, 2023).
[136] *New York Magazine*, "The Crypto Industry's Favorite Bank Is in Deep Trouble" (Jan. 24, 2023).

has been mounting in the wake of FTX's collapse."[137]  *Business Insider* added that the DOJ "wants to know just how deep [Silvergate's] ties with FTX ran," and further observed that "Silvergate has worked with more than a dozen crypto firms that have gone bankrupt, faced scrutiny or been under investigation, including FTX and Alameda."[138]

142.   Then, on February 16, 2023, *Reuters* published an investigative report based on bank records obtained from Binance.US, the cryptocurrency exchange approved by Silvergate to bank and participate on the SEN Network.  The records showed that Binance.US transferred $400 million, beginning in 2020 and throughout the first three months of 2021, from its Silvergate accounts to a trading firm called Merit Peak, which was controlled by Binance's global exchange founder, CEO Zhao.[139]   These $400 million transfers were not approved or authorized by Binance.US, and a portion of the funds were transferred to Key Vision Development Limited, another Silvergate-approved account in which CEO Zhao was a director. These transfers further demonstrated how Silvergate's failure to monitor allowed Binance's CEO—much like FTX's CEO—to use Silvergate-approved entities to fleece customers and siphon funds from the cryptocurrency exchanges to the executive's personal account.

143.   On March 1, 2023, Silvergate announced that it needed to make the "risk-based decision" to discontinue the SEN Network altogether.  That same day, Silvergate filed a Form 12b-25 with the SEC, in which the Company stated that it was "unable to file with the [SEC] its Annual Report on Form 10-K for the fiscal

---

[137] *Bloomberg*, "Silvergate Faces US Fraud Probe Over FTX and Alameda Dealings" (Feb. 2, 2023); *Reuters*, "U.S. prosecutors probe Silvergate's dealings with FTX. Alameda -source" (Feb. 2, 2023).
[138] *Business Insider*, "Silvergate had close ties to Sam Bankman-Fried's FTX and Alameda.  The crypto bank was also reportedly a favorite of other troubled clients including an Australian Ponzi criminal" (Jan. 24, 2023).
[139] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

year ended December 31, 2022, within the prescribed time period."[140]  Silvergate added that it could not meet the SEC's deadline because the Bank was "currently analyzing certain regulatory and other inquiries and investigations that are pending with respect to the Company" and that it was forced to conduct an "evaluation of the effectiveness of the Company's internal control over financial reporting."[141]

144.    This news further stunned investors.  As analysts at *Wall Street on Parade* observed, the Bank's latest revelation "stands in rather stark contrast to Silvergate's website lauding how the company is . . . 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'"[142]

145.    The situation became even more dire for Silvergate's investors.  The Bank's few remaining crypto-exchange customers (and their customers) were no longer able to trust Silvergate's vetting, diligence, or monitoring.  Silvergate's "seal of approval" was no longer of any value.  Accordingly, Silvergate's remaining customers—including Coinbase, Galaxy Digital, Paxos, Circle Internet Financial, Gemini—announced one-by-one that they had stopped accepting or initiating payments through Silvergate.  As *CoinGeek* described it, "countless crypto firms are doing their damnedest to avoid being sucked into Silvergate's death spiral."[143]

146.    A week later, on March 8, 2023, Silvergate announced "its intent to wind down operations and voluntarily liquidate the Bank."[144]  Shortly thereafter, U.S. Senator Elizabeth Warren issued a statement rightfully criticizing Silvergate for its "severe due diligence failures" and its "risky, if not illegal activity."  *CoinGeek*

---

[140] Silvergate, Notice of Late Filing of Form 10-K (Mar. 1, 2023).
[141] *Id.*
[142] *Wall Street on Parade*, "Weird Things Are Happening at Silvergate Bank and First Republic Bank" (Mar. 29, 2023).
[143] *CoinGeek*, "'Crypto' firms unbank themselves from struggling Silvergate" (Mar. 3, 2023).
[144] Press Release, Silvergate, "Silvergate Capital Corporation Announces Intent to Wind Down Operations and Voluntarily Liquidate Silvergate Bank" (Mar. 8, 2023).

added that "[s]peculation is mounting over how long it will be before Silvergate CEO Alan Lane is perp-walked out of his offices by federal law enforcement."[145]

147.  Just weeks later, on March 20, 2023, Silvergate announced that—in light of its inability to timely file its Annual Report owing to its business and regulatory challenges in the face of customers pulling their deposits from the Bank and investigations by its regulators, Congress, and the DOJ—the NYSE had sent a non-compliance notice to the Company days earlier.  In the notice, the NYSE informed Silvergate that, "as the Company had not timely filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the '10-K'), the NYSE will closely monitor the status of the Company's late filing and related public disclosures for up to a six-month period from its due date."[146]  The Company further disclosed that the NYSE warned that future delayed filings could lead to "suspension and delisting procedures."

148.  Investors suffered immensely as a result of Lane's and Silvergate's misrepresentations and misconduct.  All told, Silvergate's empty declarations about its "customer diligence," "vetting," and "ongoing monitoring" caused investors to suffer billions of dollars of losses.  Market commentators correctly recounted: "The collapse of Silvergate Capital has been spectacular" and "even daredevils should avoid Silvergate Capital stock."[147]  Indeed, the Bank's stock price—which soared above $225 per share—plummeted to $1.47 a share by the end of the Class Period, wiping out over $2 billion in shareholder value.

149.  Silvergate's investors continue to suffer to this day.  On May 11, 2023, the date of this filing, Lane and Silvergate halted trading in the Bank's stock and announced that—notwithstanding Silvergate's prior assurances—"it continues to be

---

[145] *CoinGeek*, "'Crypto' firms unbank themselves from struggling Silvergate" (Mar. 3, 2023).
[146] Silvergate, Form 8-K (Mar. 20, 2023).
[147] *InvestorPlace*, "Even Daredevils Should Avoid Silvergate Capital (SI) Stock" (Apr. 11, 2023).

unable to file with the SEC the 2022 Form 10-K and is unable to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2023." Worse yet, the Bank declared that it would <u>never</u> file with the SEC a 2022 Form 10-K (i.e., an annual report for 2022) or a 2023 Form 10-Q (i.e., a quarterly report). As for its stated justification for this remarkable declaration, Lane and Silvergate cited "<u>continuous developments relating to the regulatory matters and other inquiries and investigations</u> that are pending with respect to the Company and the Bank." While Lane and Silvergate did not say as much, the true reason they do not want to issue any more reports with the SEC is plain: they do not want to be forced to restate their prior SEC filings, admit facts that demonstrate that their prior statements to investors were false, and make any statement that subjects themselves to additional civil and criminal liability in connection with the ongoing regulatory investigations.

## V.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

150.    The Exchange Act Defendants made numerous materially false and misleading statements during the Class Period in violation of Sections 10(b) and 20(a) Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

(a)    Defendants Lane and Silvergate told investors that they performed extensive "vetting" of the Silvergate-approved customers, including "initial due diligence" to satisfy the Company's AML/KYC requirements such as "site visits" and reviewing the customers' "BSA/AML program." In reality, the Company conducted <u>no</u> actual vetting or diligence, had <u>no</u> policies or procedures for onboarding participants to the SEN Network, conducted <u>no</u> site visits, and did <u>not</u> ensure that its customers had a proper BSA/AML program.

(b)    Defendants Lane and Silvergate told investors that they performed extensive "ongoing monitoring" of the Silvergate-approved customers, including monitoring "transaction activity," performing "enhanced due diligence," and daily, quarterly, and annual "reviews." In truth, the Company performed <u>no</u> ongoing transaction monitoring,

no enhanced due diligence procedures, and had no system to perform daily, periodic, or annual reviews.

(c)  Defendants Lane and Silvergate told investors that "we don't bank" institutions that are not "serious about regulation" with "sound" compliance programs.  In reality, the Bank permitted entities to bank at Silvergate and participate on the SEN Network regardless of whether they had compliance programs—including FTX, Alameda, North Dimension, Binance, Huobi, Nexo, Bittrex, Paxos, and the many other Silvergate-approved cryptocurrency exchanges and customers that have been punished and charged by the DOJ and SEC.

(d)  Defendants Lane and Silvergate told investors that they performed "extensive due diligence" both during the "onboarding process" and "ongoing monitoring" of FTX and its related entities.  In reality, they did not.  Had Silvergate performed this diligence and monitoring, they would not have allowed these entities to bank at Silvergate or participate on the SEN Network.

151.  The Exchange Act Defendants also omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Once Defendants decided to tout the Company's purported vetting procedures, due diligence, ongoing monitoring, and strict customer standards, they were required to do so in a manner that did not mislead investors.  Among other things, Defendants misled investors by omitting that Silvergate: (i) performed no vetting or due diligence before allowing customers to open accounts at Silvergate; (ii) performed no ongoing monitoring of customers using the SEN Network; (iii) did not hold its SEN Network participants to strict customer standards; and, as a result (iv) permitted numerous sham businesses to bank at Silvergate and engage in fraudulent activity on the SEN Network.  *See* Section IV.D-F, *supra*.

**A.**    **False Statements in 2019**

**1.**    **July 2019 Interview of Defendant Lane**

152.    On July 30, 2019, Defendant Lane appeared on the industry podcast, *What Bitcoin Did Podcast*.   During the interview, Lane emphasized Silvergate's purported due diligence on the cryptocurrency companies that banked at Silvergate and participated on its SEN Network.  Specifically, he stated:

> [I]f you get an account at Silvergate, then we've gone through the process of vetting you. We joke that we're kind of like the good housekeeping seal of approval. If you've gone through the rigor of satisfying our KYC, our diligence process, we're intentional about it and you can have confidence that you have an account at Silvergate.

153.    The statements identified in paragraph 152 were false, misleading, and omitted material facts.   Contrary to his statements, (i) Silvergate did <u>not</u> "go[]" through the process of vetting" the customers who obtained "an account at Silvergate"; (ii) there was no "rigor of satisfying [its] KYC, [or its] diligence process"; and, as a result, (iii) Silvergate was <u>not</u> "like the good housekeeping seal of approval."  *See* Section IV.D-F, *supra*.

154.    The statements identified in paragraph 152 also omitted material facts when made, including that Silvergate failed to perform vetting of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not have compliance policies to address the digital currency industry; (d) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (e) Silvergate did not review customers' culture of compliance; (f) Silvergate did not review customers' BSA/AML Programs to ensure they were sound; (g) Silvergate did not verify customer ownership; and (h) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud through their Silvergate accounts and the SEN

Network, despite the fact that these entities had no internal controls and no compliance programs.  *See* Section IV.D-F, *supra*.

### 2.    Initial Registration Statement

155.    On November 6, 2019, Silvergate issued its Prospectus ahead of its November 7, 2019 initial public offering.  In the Prospectus, Defendants Lane and Silvergate represented that the Bank "comprehensively investigates prospective customers."  Defendants Lane and Silvergate further represented that the Company's "due diligence and onboarding processes include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate."  Additionally, Defendants Lane and Silvergate represented that "all our digital currency customers must submit to initial and continued due diligence by us."  Defendants Lane and Silvergate also specifically represented that Silvergate's extensive due diligence on prospective cryptocurrency exchange clients included "reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding the BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

156.    Defendants Lane and Silvergate's statements identified in paragraph 155 were false, misleading, and omitted material facts.  Contrary to these statements, (i) Defendants did not "comprehensively investigate[] prospective customers"; (ii) they did not perform "due diligence and onboarding processes [that] include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate"; (iii) "all [of Silvergate's] digital currency customers" were not required to "submit to initial and continued due diligence by us"; and (iv) they did not perform "reputational reviews," "reviews of customer policies and procedures regarding the BSA" or "reviews of transaction monitoring systems and audit results."  *See* Section IV.D-F, *supra*.

157.   The statements identified in paragraph 155 also omitted material facts when made, including that Silvergate failed to perform vetting of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; and (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements. *See* Section IV.D-F, *supra*.

158.   Additionally, Defendants Lane and Silvergate further represented to investors in the Prospectus that Silvergate's compliance efforts "include ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

159.   Defendant Lane and Silvergate's statement identified in paragraph 158 was false, misleading, and omitted material facts.  Contrary to the statement, Silvergate did <u>not</u> conduct "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers." *See* Section IV.D-F, *supra*.

160.   The statement identified in paragraph 158 also omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring;

(c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; and (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags. *See* Section IV.D-F, *supra*.

## B.    False Statements in 2020

### 1.    August 2020 Investor Presentation

161.    On August 10, 2020, Defendants Lane and Silvergate published a presentation for investors, which was also filed with the SEC on a Form 8-K signed by Defendant Lane. The investor presentation contained the below slide, which was contained in nearly every Silvergate quarterly investor presentation thereafter. The slide touted Silvergate's "compliance process" as "the cornerstone of our leadership today" and made a series of specific representations about the Bank's purported vetting, diligence and monitoring. Specifically, Defendants Lane and Silvergate represented that the Company had a "Robust Compliance and Risk Management Framework" with specific procedures, including "initial due diligence" with "reputation reviews"; "compliance reviews" of customers' "culture of compliance," "BSA/AML Program," "Independent Audits & Exams," and a "site visit"; "ongoing monitoring" that included "Daily Transaction Monitoring" and "Daily" "BSA/AML

Alerts Monitoring"; "enhanced due diligence" with "Customer Counterparty Reviews" and "Negative News Reviews"; and "Periodic Reviews" with "Quarterly Account Activity Reviews" and "Annual Company Reviews."



162.    Lane and Silvergate included this same slide in Silvergate's investor presentations during nearly every subsequent financial quarter, including on November 20, 2020, January 28, 2021, May 5, 2021, August 3, 2021, November 8, 2021, February 14, 2022, May 10, 2022, and August 8, 2022. Each of these slides was included in the investor presentations submitted on those dates to the SEC on Form 8-K, which were signed by Defendant Lane.

163.    The representations contained in Lane's quarterly investor PowerPoint slides, identified in paragraph 161, were false, misleading, and omitted material facts. Contrary to Lane and Silvergate's representations, (i) Silvergate did not conduct the "initial due diligence" that it purported to conduct, including a "Compliance Review," "Review of Organization's Culture of Compliance," "BSA/AML Program," "Review Independent Audits & Exams," and "Site Visit"; (ii) Silvergate did not conduct "Ongoing Monitoring" of its customers, including the

"Daily" monitoring it described, "Enhanced Due Diligence," and "Periodic Review"; and (iii) Silvergate did <u>not</u> conduct "Daily Transaction Monitoring." *See* Section IV.D-F, *supra*.

164.   The representations contained in Lane's quarterly investor PowerPoint slides, identified in paragraph 161, also omitted material facts when made, including that Silvergate failed to perform vetting of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; and (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements. *See* Section IV.D-F, *supra*.

165.   The representations contained in Lane's quarterly investor PowerPoint slides, identified in paragraph 161, omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate

did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; and (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags.  *See* Section IV.D-F, *supra*.

## 2.    August 2020 Canaccord Investor Conference

166.   On August 12, 2020, Silvergate and Defendant Lane participated in the Canaccord Genuity Growth Conference for investor and securities analysts.  During Silvergate's prepared remarks, Silvergate's President stated the following on behalf of Silvergate:

> Our program includes, know your customer, enhanced due diligence and transaction monitoring processes, designed to illustrate a deep knowledge of our clients whether it be an exchange, an investor or software developer. Both our initial due diligence process and our ongoing monitoring processes are designed to ensure we serve only customers . . . to operate safely, soundly, and compliantly.[148]

---

[148] Ben Reynolds was Silvergate's President during the Class Period.  From January 2019 to October 2022, he was Silvergate's Chief Strategy Officer. He oversaw a team that was responsible for "investor relations," among other things, and Reynolds also regularly communicated with Silvergate's regulators, including the Federal Reserve that sent an MRIA to the Bank concerning its deficient procedures. Before this role, he was the SVP of Business Development, credited with having invented and developed the SEN Network and the first dedicated employee serving digital asset clients. From November 2022 until March 2023, Reynolds was Silvergate's President.  In his roles as Chief Strategy Officer and President, Reynolds spoke on behalf of Silvergate to investors and analysts numerous times, holding himself out as someone with intimate knowledge about the Company's business practices. Reynolds was laid off at the end of the Class Period.

167.   The statements identified in paragraph 166 were false, misleading, and omitted material facts.  Contrary to Silvergate's statements: (i) its program did <u>not</u> "include[], know your customer, enhanced due diligence and transaction monitoring processes, designed to illustrate a deep knowledge of our clients"; and (ii) Silvergate's "initial due diligence process and [its] ongoing monitoring processes" were <u>not</u> "designed to ensure [it] serve[d] only customers that represent the best business opportunity for Silvergate and to operate safely, soundly, and compliantly."  *See* Section IV.D-F, *supra*.

168.   The statements identified in paragraph 166 also omitted material facts when made, including that Silvergate failed to know its prospective customers or perform diligence, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; and (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements.  *See* Section IV.D-F, *supra*.

169.   The statements identified in paragraph 166 omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative

news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; and (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags. *See* Section IV.D-F, *supra*.

### C.    False Statements in 2021

#### 1.    February 2021 Interview of Defendant Lane

170.    On February 1, 2021, Defendant Lane appeared in a video presentation for investors published by *Real Vision Finance*, titled "Silvergate: The Banking Solution of the Future." During the interview, in discussing the purported benefits of the SEN Network, Lane stated:

> [I]f you are a member of the SEN, you have an account with Silvergate and you're a participant in the SEN then you can transact with everybody else on the Silvergate exchange network . . . as you are doing that we are eliminating the banking friction I talked about earlier. **We are also eliminating counterparty risk because you know that you are dealing with counterparties that are also members of SEN that have been vetted by Silvergate**. So putting that together we've completely eliminated the friction, and **we've eliminated the counterparty risk**, we've brought the legacy 40-hour banking system into the 24/7, 365 cryptocurrency markets that never sleep.

171.    The statements highlighted in paragraph 170 were false, misleading, and omitted material facts.    Contrary to Lane's statements, Silvergate did <u>not</u> "eliminat[e] counterparty risk" through its "vetting."    *See* Section IV.D-F, *supra*.

172.    The statements highlighted in paragraph 170 also omitted material facts when made, including that Silvergate failed to vet prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention.    *See* Section IV.D-F, *supra*.

## 2.    September 2021 Barclays Investor Conference

173.    On September 14, 2021, Defendant Lane spoke at the Barclays Financial Services Conference for investors and securities analysts.    During the conference, Defendant Lane touted the Company's "vetting" of customers, stating that:

> **And by the way, if we can't get comfortable with a company's regulatory stature, then we don't bank them**. And that's really well-known. And so for a period of time, Silvergate was and it might still be true to this day, but we jokingly said that Silvergate was kind of the

good housekeeping seal of approval for the industry because **you will significantly reduce your counterparty risk if you were dealing with someone that also had an account with Silvergate**, because the market understood that **we were vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act,** *et cetera*.

174.   The statements highlighted in paragraph 173 were false, misleading, and omitted material facts.  Contrary to Lane's statements, (i) Silvergate would bank customers without doing the due diligence necessary to be "comfortable with a company's regulatory stature"; (ii) Silvergate's "vetting" did not "significantly reduce [an entity's] counterparty risk if [they] were dealing with someone that also had an account with Silvergate"; and (iii) Silvergate was not "vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act, *et cetera.*"  *See* Section IV.D-F, *supra*.

175.   The statements highlighted in paragraph 173 also omitted material facts when made, including that Silvergate failed to vet its prospective customers and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal

Reserve identified these deficiencies as Matters Requiring Immediate Attention.  *See* Section IV.D-F, *supra*.

### 3.    September 2021 Interview of Defendant Lane

176.    On September 24, 2021, Defendant Lane appeared on an episode of The Blockchain Interviews for investors.  During the interview, Lane stated that:

> We not only reduced the banking friction, we improved liquidity and **we reduced counterparty risk**, right. **Because folks that are transferring to each other have all been vetted by Silvergate**, by the regulatory compliance framework that I talked about a few minutes ago with BSA, AML, KYC. So it really became a game changer for the industry.

177.    The statements highlighted in paragraph 176 were false, misleading, and omitted material facts.  Contrary to Lane's statements, the Silvergate customers "transferring [funds] to each other" had <u>not</u> "been vetted by Silvergate, by the regulatory compliance framework . . . with BSA, AML, KYC."  *See* Section IV.D-F, *supra*.

178.    The statements highlighted in paragraph 176 also omitted material facts when made, including that Silvergate failed to vet its prospective customers and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal

controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 4. November 2021 Interview of Defendant Lane

179. On November 8, 2021, Lane appeared on "Roundtable: Banking in the Digital Age with Alan Lane," produced by Market Rebellion for investors. During the interview, Lane stated that the SEN Network "reduced counterparty risk because all of the customers who participate on the SEN, they've all been run through our regulatory compliance framework."

180. Lane's statement identified in paragraph 179 was false, misleading, and omitted material facts. Contrary to Lane's statement, "all of the customers who participate on the SEN" had <u>not</u> "been run through [Silvergate's] regulatory compliance framework." *See* Section IV.D-F, *supra*.

181. The statement identified in paragraph 179 also omitted material facts when made, including that Silvergate failed to vet its prospective customers and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and

(j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### D. False Statements in 2022

#### 1. June 2022 Interview of Defendant Lane

182. On June 2, 2022, Lane appeared on a podcast for investors produced by *Bloomberg* Podcasts. On the Podcast, Lane stated the following:

> What is Silvergate known for today? And that is a platform it's a global payments platform that is referred to as the SEN, which is an acronym. SEN stands for the Silvergate Exchange Network and what that is it is a two-sided network where we connect digital asset exchange platforms such as Coinbase and Gemini and Kraken and **FTX** . . . . **We've got all of them all of the major ones, anybody that is serious about regulation**. **And that's an important distinction because they have to satisfy not only their own legal and regulatory requirements but then we have to verify that that that their compliance programs are sound. . . .**

183. The statements highlighted in paragraph 182 were false, misleading, and omitted material facts. Contrary to Lane's statements, (i) FTX was <u>not</u> "serious about regulation"; and (ii) Silvergate did <u>not</u> "verify" that "FTX" and its other digital asset exchange platforms' "compliance programs are sound." *See* Section IV.D-F, *supra*.

184. The statements highlighted in paragraph 182 also omitted material facts when made, including that Silvergate failed to ensure prospective customers were serious about regulation and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did

not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate failed to perform these procedures, it approved clearly fraudulent customers to use the SEN Network that were anything but serious about regulation, including entities like FTX, Alameda, and North Dimension; and (j) because Silvergate failed to perform these procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

185. The statements highlighted in paragraph 182 omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers to ensure their compliance programs operated soundly, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed FTX to continue to embezzle money through the SEN Network when its customers diverted funds into the Silvergate accounts of Alameda and North Dimension that FTX employees then used to purchase homes and personal items in the Bahamas; (n) because Silvergate did not perform this monitoring, it allowed

entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (o) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 2. June 2022 Crypto + Banks: The Frontier of Money Movement Interview

186. On June 13, 2022, Silvergate's Managing Director of Digital Currency appeared on behalf of Silvergate on the program titled "Crypto + Banks: The Frontier of Money Movement." During the program, Silvergate stated that, when onboarding a customer, Silvergate is "really looking to understand that the [customer's] pillars of AML compliance are well-designed and functioning"; "evaluate[s] the source of wealth, the source of funds"; and "understand[s] the reasonableness of the trading patterns or the churn through [the customers'] fiat accounts."[149]

187. The statements identified in paragraph 186 were false, misleading, and omitted material facts. Contrary to these statements, (i) Silvergate did <u>not</u> "understand that the [customer's] pillars of AML compliance are well-designed and functioning"; (ii) did <u>not</u> "evaluate the source of [its customers'] wealth, the source of funds"; and (iii) did <u>not</u> "understand[] the reasonableness of the trading patterns or the churn through [the customers'] fiat accounts." *See* Section IV.D-F, *supra*.

---

[149] Benjamin Richman was Silvergate's Managing Director of Digital Currency from January 2020 through the end of the Class Period, and was specifically hired to oversee crypto customer growth for Silvergate and key client relationships, taking over the role from Reynolds. Defendant Lane told *CoinDesk* that Richman was the Bank's first hire in the "pure crypto space." Lane also told *CoinDesk* that hiring Richman purportedly showed Silvergate's commitment to serving a niche where most banks fear to tread, owing in part to the high costs of anti-money-laundering, know-your-customer and Bank Secrecy Act compliance. Throughout the Class Period, Richman publicly spoke on behalf of Silvergate numerous times, holding himself out as someone with intimate knowledge about the Company's business practices.

188.   The statements identified in paragraph 186 also omitted material facts when made, including that Silvergate failed to perform due diligence of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

189.   The statements identified in paragraph 186 omitted additional material facts when made, including that Silvergate did not monitor its customers to evaluate transaction activity or assess AML compliance, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate

did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention.  *See* Section IV.D-F, *supra*.

### 3.    June 2022 *CNBC* Interview of Defendant Lane

190.    On June 28, 2022, Defendant Lane participated on *CNBC* to discuss Silvergate's stock.  During the interview, Defendant Lane stated the following:

> Silvergate complies obviously with federal and state regulations. And we essentially, we need our customers – **we require them to comply as well**. **So, we only bank institutions that are serious about regulation**.

191.    Defendant Lane's statements highlighted in paragraph 190 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> "require [its customers] to comply" with "federal and state regulations"; and (ii) Silvergate did <u>not</u> "only bank institutions that are serious about regulation."  *See* Section IV.D-F, *supra*.

192.    The statements highlighted in paragraph 190 also omitted material facts when made, including that Silvergate failed to perform due diligence of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review

customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F.

193. The statements highlighted in paragraph 190 omitted additional material facts when made, including that Silvergate did not monitor its customers to assess customers' AML compliance, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because

Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention.  *See* Section IV.D-F, *supra*.

### 4.    November 2022 Public Letter from Defendant Lane

194.   On November 21, 2022, Defendant Lane published a signed public letter posted on Silvergate's website.   In the letter, Defendant Lane stated the following:

> **Compliance. Our business starts by knowing our customers, their business and the activity they plan to conduct at our institution**. Once we approve a new customer, **if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions**.

195.   Defendant Lane's statements highlighted in paragraph 194 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> conduct the necessary vetting to "know[] our customers, their business and the activity they plan to conduct at our institution"; and (ii) Silvergate did <u>not</u> "take immediate action up to and including terminating that relationship," with "No exceptions," if the "activity in their [customers'] account does not match the activity that [it] expect[ed] based on [Silvergate's] initial approval."  *See* Section IV.D-F, *supra*.

196.   The statements highlighted in paragraph 194 also omitted material facts when made, including that Silvergate failed to perform vetting to know its customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to

employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

197. The statements highlighted in paragraph 194 omitted additional material facts when made, including that Silvergate did not monitor its customers to assess customers' activity, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 5.    December 2022 Public Letter from Defendant Lane

198.    On December 5, 2022, Defendant Lane published a signed public letter, which was posted on Silvergate's website and filed with the SEC on Form 8-K.  In the letter, Defendant Lane stated:

> We take risk management and compliance extremely seriously. Silvergate operates in accordance with the Bank Secrecy Act and the USA PATRIOT Act. **For each and every account**, these laws require us to **determine the beneficial owner, the source of funds, and the purpose and expected use of funds**.

199.    Defendant Lane's statements highlighted in paragraph 198 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, Silvergate did <u>not</u> "determine the beneficial owner, the source of funds, and the purpose and expected use of funds" for "each and every account."  *See* Section IV.D-F, *supra*.

200.    The statements highlighted in paragraph 198 also omitted material facts when made, including that Silvergate did not vet its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews;  (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and

(j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

201.    In the December 2022 Letter, Defendant Lane also touted Silvergate's purported "monitoring" of its customers, stating:

> Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.
>
> **After accounts are open, we continue to monitor account activity** as part of our enhanced due diligence process on each of these accounts and to **take action when there are red flags**. By performing our risk management procedures and fulfilling our regulatory obligations, Silvergate plays a key role in helping law enforcement identify bad actors. We take this responsibility seriously.

202.    Defendant Lane's statements highlighted in paragraph 201 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> "monitor[] transaction activity for every account and identif[y] activity outside of the expected usage"; and (ii) Silvergate did <u>not</u> "take action when there are red flags." *See* Section IV.D-F, *supra*.

203.    The statements highlighted in paragraph 201 omitted additional material facts when made, including that Silvergate did not monitor its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and

activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

204.    Finally, in the December 2022 Letter, Defendant Lane made specific representations that Silvergate purportedly "conducted extensive due diligence on FTX and Alameda Research," assuring investors:

> **Silvergate conducted significant due diligence on FTX and its related entities including Alameda, both during the onboarding process and through ongoing monitoring,** in accordance with our risk management policies and procedures and the requirements outlined above.

205.    Defendant Lane's statements highlighted in paragraph 204 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, Silvergate did <u>not</u> "conduct[] significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring." *See* Section IV.D-F, *supra*.

206.    The statements highlighted in paragraph 204 also omitted material facts when made, including that Silvergate failed to vet FTX or its related entities, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify

customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate failed to perform these procedures, it approved FTX, Alameda, and North Dimension despite the fact that (1) Sam Bankman-Fried owned and controlled all three and ran his entities like a personal fiefdom, spending no time or effort to manage risk; (2) North Dimension was a fake electronics website created at Bankman-Fried's direction that did not even purport to be in the cryptocurrency industry, was full of typos, did not actually sell products, and had no employees or physical location; (3) the entities had a complete absence of internal controls or compliance programs; and (4) the entities had no accounting department or systems or controls to monitor money or assets, and instead used QuickBooks and a hodgepodge of other non-enterprise solutions as their internal accounting system; (j) because Silvergate did not perform these vetting procedures, it approved additional sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (k) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

207. The statements highlighted in paragraph 204 omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers to ensure their compliance programs operated soundly, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform

annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed FTX to continue to embezzle money through the SEN Network when its customers diverted funds into the Silvergate accounts of Alameda and North Dimension that FTX employees then used to purchase homes and personal items in the Bahamas; (n) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (o) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

## E. False Statements in 2023

### 1. January 2023 "Business Update" Call

208. On January 5, 2023, Defendant Lane spoke to investors and securities analysts during a "Business Update Call." During the investor call, an analyst from Morgan Stanley stated to Defendant Lane: "I was hoping you can provide a general overview on the steps you take on the AML, KYC side before you onboard a customer." In response, Defendant Lane stated:

> This question has been really well covered in the past. We obviously take our – what am I trying to say here? Sorry, I got distracted. **We have KYC requirements, which includes the initial onboarding. It then also includes monitoring transactions on an ongoing basis. And so a lot of – as you said, the misinformation out there is, candidly, very frustrating. We follow the Bank Secrecy Act, the**

**USA PATRIOT Act for every account that we open. And we conduct ongoing monitoring**.

209.    Defendant Lane's statements highlighted in paragraph 208 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> adhere to "KYC requirements," including during "initial onboarding"; and (ii) Silvergate did <u>not</u> "monitor[] transactions on an ongoing basis" or "conduct ongoing monitoring."  *See* Section IV.D-F, *supra*.

210.    The statements highlighted in paragraph 208 also omitted material facts when made, including that Silvergate did not get to know its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention.  *See* Section IV.D-F, *supra*.

211.    The statements highlighted in paragraph 208 omitted additional material facts when made, including that Silvergate did not monitor its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform

customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

212.    A host of facts, in addition to those discussed above, support a strong inference that Defendants Lane and Silvergate knew or, at minimum, were severely reckless in not knowing the truth about Silvergate's "vetting," "due diligence," and "ongoing monitoring."

213.    ***Defendant Lane repeatedly singled out the Bank's purported due diligence as a top reason to buy its stock.*** Professing to know what he was talking about, Defendant Lane stressed to investors over and over—on at least a dozen separate instances during the Class Period—the strength and importance of the Bank's purported due diligence and monitoring of its customers. In at least ten filings submitted to the SEC during the Class Period, Defendant Lane represented that the Bank maintained a "deep rooted commitment and proprietary approach to regulatory compliance." Silvergate's filings with the SEC further identified the

Bank's supposed "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers" as "a distinct competitive advantage for us" and a "meaningful barrier to entry against our potential competitors."[150]

214. Additionally, in their public presentations, Defendants Lane and Silvergate identified the Bank's "Leading Compliance Framework" to investors as one of the three, basic components of Silvergate's "Model."  *See* Figure 8, *infra*. Lane similarly identified the Bank's "Robust Compliance Framework" as one of the main "Investment Highlights" for shareholders.  *See* Figure 9, *infra*.  Lane impressed upon investors during his quarterly financial presentations that "our compliance process . . . is the cornerstone of our leading position today."[151]



**Figure 8.**  Slide from Silvergate, Registration Statement (Nov. 16, 2018).

---

[150] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[151] Silvergate, Investor Presentation (Jan. 28, 2021).



**Figure 9.** Slide from Lane's quarterly investor PowerPoint Presentations.

215.    What's more, Defendant Lane falsely described—in detail—the specific due diligence practices that the Bank supposedly performed as a reason to buy the Bank's stock.  Each quarter, in investor presentations, Lane identified as an "Investment Highlight" the Bank's "Robust Compliance Framework," and Lane falsely detailed to investors what the Bank's compliance process supposedly consisted of—including a "review of [the] organization's culture of compliance," a "site visit," a review of the organization's "BSA/AML Program," "Enhanced Due Diligence," and "Counterparty Review[s]."[152]

216.    That Defendant Lane, the Company's chief spokesperson on the topic, repeatedly—and falsely—represented to investors the details and importance of the Bank's due diligence for years strengthens the scienter inference.  Either Lane knew his statements were false or, at minimum, was severely reckless in not finding out the truth before repeatedly speaking to investors on the subject.

---

[152] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-93-
Case No. 22-cv-01936

217. ***Defendants Lane and Silvergate flouted the Bank's stated commitments to diligence processes and procedures.*** Despite repeatedly assuring investors that customer diligence was its top priority and a primary reason to buy the Bank's stock, Lane and Silvergate disregarded these processes and procedures for years and in every meaningful respect. Silvergate's former employees have reported that the Bank performed no onboarding diligence, including no site visits, no confirmation of requested wire limits, and no review of customers' compliance programs or culture; performed no monitoring, including no transaction monitoring; performed no quarterly or annual reviews; had no policies and procedures in place to address the cryptocurrency industry; had no training in place for Silvergate employees on KYC or compliance specific to the cryptocurrency industry; and never performed customer diligence on major cryptocurrency exchange customers, including FTX. *See* Section IV.D, *supra*. These former employee accounts are corroborated and further demonstrated by the fact that Silvergate permitted onto the SEN Network fraudulent and sham entities, entities that lacked compliance controls, unlicensed entities, and entities that engaged in widespread money laundering and other illegal activities, including FTX and its related entities, Binance, Huobi, Nexo, Hamilton Opportunity Fund SPC and Hamilton Investment Management Ltd., Virgil Sigma Fund and VQR, Bittrex, Paxos and OSL Digital, and many others. *See, e.g.*, Section IV.E-F, *supra*. The Bank's lack of vetting, due diligence, and monitoring were so bad, in fact, that—when the Federal Reserve found out—it issued a confidential report identifying these deficiencies as Matters Requiring Immediate Attention. *See* ¶¶78-82. And, when it first learned the truth, the DOJ initiated an ongoing investigation, and a bipartisan group of senators sent letters to Lane and Silvergate lambasting them for their basic failures. *See* ¶¶133, 141.

218. That Defendants Lane and Silvergate so extremely failed to conduct these customer diligence procedures, while repeatedly and publicly emphasizing the importance of each of them, strengthens the inference of scienter.

219. ***Silvergate received regular subpoenas from the U.S. Attorney's Office concerning the activity of its cryptocurrency customers, including Alameda.*** FE 4, Silvergate's VP of Deposit Operations, explained how, beginning in 2018, Silvergate received 10 to 20 subpoenas per month from the U.S. Attorney's office. The subpoenas related to customers' wires that came into Silvergate, including for Alameda. FE 4 contrasted her experience at Silvergate with another bank she used to work for, which would, instead, receive one or two subpoenas a month—and usually just spouses serving subpoenas against each other. FE 4 noted that, when she later saw the news reports about Alameda, FE 4 thought, "Oh my God, I remember them, we got subpoenas on them."

220. FE 4 knew about these subpoenas because, in her role as Silvergate's VP of Deposit Operations, she received them and dealt with many special agents. Each month, FE 4 informed the Bank's most senior management of the subpoenas, including Dina Matias, Silvergate's Senior Vice President, Operations Administrator, who reported to Elaine Hetrick, Silvergate's Chief Administrative Officer. As FE 4 explained, these subpoenas should have raised red flags to Silvergate and its management.

221. ***The Federal Reserve identified the Bank's due diligence deficiencies as Matters Requiring Immediate Attention.*** The Federal Reserve gave private feedback to Silvergate that its compliance was insufficient, identifying these failures as "Matters Requiring Immediate Attention." *See* ¶¶78-82. These MRIAs were provided directly to Silvergate's top management and board, including Alan Lane, by the first quarter of 2022, and specifically related to Silvergate's lack of basic program requirements for vetting, onboarding, ongoing due diligence, ongoing monitoring, screening process and SAR filings. *See* ¶¶78-79. These findings were so serious that Silvergate retained third-party contractors to address the MRIAs— and all of them agreed with the Federal Reserve that Silvergate lacked the appropriate controls around due diligence and KYC. *See* ¶82.

222.  Silvergate and Lane kept the Federal Reserve's findings a closely guarded secret from investors.  Indeed, even <u>after</u> their receipt of the Federal Reserve's findings, Defendant Lane and Silvergate <u>continued</u> to falsely tout Silvergate's due diligence, including falsely representing that Silvergate "really look[ed] to understand that [its customers'] pillars of AML compliance are well-designed and functioning"; "evaluate[s] the source of wealth, the source of funds"; and "understand[s] the reasonableness of the trading patterns or the churn through [the customers'] fiat accounts."  Lane and Silvergate also continued to tell investors—even <u>after</u> being reprimanded by the Federal Reserve—that "Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage," and "take[s] action when there are red flags."  Lane further continued to impress upon investors, as late as 2023, that Silvergate followed "KYC requirements," including "initial onboarding" and "monitoring transactions on an ongoing basis."

223.  Lane and Silvergate's receipt of the Federal Reserve's reports identifying the Bank's deficiencies as Matters Requiring Immediate Attention, as well as the Bank's third-party contractors' reports agreeing with the Federal Reserve's findings, further strengthens the scienter inference.  Even more, that Silvergate and Lane continued to falsely tout the Bank's compliance procedures and conceal the truth—even <u>after</u> the Federal Reserve confidentially identified these deficiencies—adds to the scienter inference.

224.  ***Defendants Silvergate and Lane knew the devastating potential consequences of a failure to conduct the represented diligence on its customers.*** Defendant Lane knew what both KYC and AML diligence required, stating that they are "ways of kind of saying the same thing, which is making sure that you know who your customers are and making sure that you're not in any way providing funding,

financing etc. for illicit activity."[153]  Lane further knew—and recognized publicly—that Silvergate would suffer "really severe" fines if it failed to conduct the represented due diligence, stating that "[y]ou can essentially put the entire bank at jeopardy."[154]

225.  Given the importance of KYC and AML, it is impossible to believe that Lane did not know that the Bank—contrary to his statements to investors—did not actually vet, conduct due diligence on, or monitor its cryptocurrency exchange customers.  To the extent that Lane did not look to find out whether it did so, he was, at minimum, severely reckless for his failure to obtain such information, particularly before speaking to investors on this critical subject.

226.  ***Defendant Lane emphasized his purported personal involvement in the Bank's monitoring and due diligence.***  Defendant Lane represented to investors that he was a hands-on executive, personally involved in monitoring the activity at the Bank and on the SEN Network.  For example, in a September 24, 2021 interview on *The Blockchain Interview Series*, he emphasized: "*I* watch the number of transactions [on the SEN Network], *I* watch the dollar value of transactions, *I* watch our deposit levels, *I* watch FX transactions, *I* watch SEN leverage."[155]

227.  Defendant Lane further told investors that he—along with his Silvergate colleagues—was personally involved in vetting the customers on the SEN Network.  During a September 14, 2021 Barclays Financial Services Conference, for example, Lane stated that "if *we* can't get comfortable with a company's regulatory stature, then *we* don't bank them" and "that *we* were vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act, *et cetera*."[156]

---

[153] *What Bitcoin Did: Banking the Corporate Unbanked with Alan Lane* (July 30, 2019).
[154] *Id.*
[155] *The Blockchain Interview series hosted by Dan Weiskopf featuring Alan Lane of Silvergate*, ETF Think Tank (Sept. 24, 2021).
[156] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

During a *CNBC* interview, he again emphasized that "*we* only bank institutions that are serious about regulation."[157]  And, again, in a December 5, 2022 public letter, Lane represented that "*we* conducted extensive due diligence on FTX and Alameda Research" and "*we* continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."[158]

228.  Having identified himself as intimately involved in the SEN Network and the Bank's due diligence, Defendant Lane knew or, at minimum, was severely reckless in not knowing, of the Bank's failure to vet, conduct due diligence on, and monitor its customers and their activity.

229.  ***Many of Defendants' misrepresentations were made in direct response to questions by financial analysts, who were intently focused on Silvergate's purported due diligence.***  Defendants' misstatements to investors concerning Silvergate's due diligence were trusted and repeated—often verbatim—in publicly-available research reports published by prominent financial analysts deciding whether to recommend Silvergate's stock.  Among others, J.P. Morgan, Compass Point Research & Trading, and Craig-Hallum Capital Group highlighted in their analyst reports Silvergate's "due diligence" in advising that investors "BUY" the Bank's stock.  For example, in its analyst reports, Compass Point included a three-page description of Silvergate's purported "regulatory compliance," "due diligence and onboarding processes," and "selective[ness] in the customer onboarding process"—concluding that Silvergate's "compliance capabilities" are "a distinct competitive advantage and . . . a meaningful barrier to entry."

230.  Additionally, many of Defendants' misrepresentations at issue in this case were made in response to analyst inquiries.  For example, on September 14,

---

[157] *CNBC* Interview by Squawk on the Street with Alan Lane, CEP, Silvergate (June 28, 2022).
[158] Silvergate, Form 8-K (Dec. 5, 2022).

2021, in response to questioning from a Barclays analyst, Lane falsely responded, "if we can't get comfortable with a company's regulatory stature, then we don't bank them" and "we were vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act, *et cetera*."[159]    Again, on January 5, 2023, in response to questioning from a Morgan Stanley analyst about "the steps you take on the AML/KYC side before you onboard a customer," Lane falsely represented that "for every account that we open . . . we conduct ongoing monitoring."[160]    As another example, on July 30, 2019, in response to questioning during the podcast *What Bitcoin Did Podcast*, Lane stated that "if you get an account at Silvergate, then we've gone through the process of vetting you" and "we're kind of like the good housekeeping seal of approval."[161]

231.    That Defendant Lane made many of the false and misleading representations at issue in this case in direct response to questions from concerned analysts and market participants further strengthens the scienter inference.

232.    ***Defendants' misrepresentations concerned its core businesses.***    The SEN Network, by Lane's own account, was Silvergate's "flagship product" and "what [Silvergate was] known for in this ecosystem."[162]    By indiscriminately allowing entities onto its SEN Network without conducting the represented due diligence, Lane transformed Silvergate from a small, local bank into a behemoth in the banking sector, with over $14 billion in deposits by 2021.    As Lane admitted during a Barclays Financial Services Conference, "all of that growth has really been on the back of SEN."    Lane later added that the SEN Network has been "the driver

---

[159] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

[160] "Silvergate Capital Corp. at Business Update Call" (Jan. 5, 2023).

[161] *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[162] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

of our strategy over the last several years" and that "98% or 99%" of Silvergate's deposits were crypto-related.[163]

233. That Defendants' false and misleading statements concerned the centerpiece of its business—and the source of nearly all of its $14 billion in deposits—further strengthens the scienter inference.

234. **_FTX was one of Silvergate's most important customers._** Silvergate benefitted significantly by not conducting diligence on FTX and, instead, approving its participation on the SEN Network. FTX was a major source of the Bank's deposits—with approximately 17% of the Bank's overall deposits—about $2.11 billion—coming alone from FTX and its related entities. Silvergate recognized FTX's import to the Bank during media interviews, with Lane singling out "FTX" as one of the three "major" exchanges approved to use the SEN Network and praising it for being "serious about regulation."[164] Silvergate also identified FTX, by name, on its website as one of its most important customers (_see_ Figure 2, _supra_) and even featured a quote from FTX's now-infamous CEO, Bankman-Fried, promoting FTX and Silvergate (_see id._, _supra_). As the financial press noted, "this cozy relationship" between FTX and Silvergate "boosted Silvergate's status and share price."[165]

235. Silvergate's utter failure to vet, conduct due diligence on, and monitor its most important customer—which was singlehandedly responsible for over 17% of its deposits—would hardly go unnoticed by Silvergate's executives, including Defendant Lane.

---

[163] Oppenheimer Blockchain Digital Assets Summit - The Evolution of Digital Assets (Nov. 18, 2021); Market Rebellion, _Roundtable: Banking in the Digital Age with Alan Lane_ (Nov. 8, 2021).
[164] _Silvergate CEO Alan Lane On the Business of Stablecoin_, Bloomberg Podcasts (June 2, 2022).
[165] _CoinGeek_, "Feds probe Silvergate bank's ties to FTX, SBF vs. CZ cage-match documentary" (Feb. 6, 2023).

236. ***Defendants Lane and Silvergate issued specific denials about Silvergate's failure to conduct due diligence on FTX.*** Beginning in November 2022, investors and analysts began questioning whether—in light of developing news reports—Silvergate actually performed due diligence on FTX and Alameda. In response to these inquiries, Defendants Lane and Silvergate doubled down. They made specific and unequivocal representations that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures."[166] In response to specific concerns from securities analysts about the Bank's due diligence on FTX and related entities, Lane assured investors: "We have KYC requirements, which includes the initial onboarding. It then also includes monitoring transactions on an ongoing basis. And so a lot of – as you said, the misinformation out there is, candidly, very frustrating. . . . [W]e conduct ongoing monitoring."[167]

237. That Defendant Lane continued to make specific misrepresentations and conceal the truth—even <u>after</u> the revelations emerged about FTX—yet further strengthens the scienter inference in this case.

238. ***Defendant Lane netted many millions of dollars as a result of his misrepresentations.*** As discussed above (*see* Section IV.A, *supra*), Silvergate began banking cryptocurrency exchanges to increase its deposits. Without increased deposits, the Bank would have remained a small, community bank. Silvergate and Lane were able to generate increased deposits by onboarding sham entities without vetting, conducting due diligence, or monitoring—including FTX, North Dimension, Alameda, Binance.US, Huobi, Nexo, Hamilton Opportunity Fund SPC and Hamilton Investment Management Ltd., Virgil Sigma Fund and VQR, Bittrex, Paxos and OSL Digital, and many others. Their plan worked: by the end of

---

[166] Silvergate, Form 8-K (Dec. 5, 2022).
[167] "Silvergate Capital Corp. Business Update Call" (Jan. 5, 2023).

September 2022, deposits from crypto customers ballooned to $11.9 billion, constituting over 90% of the Bank's overall deposit base.

239.   When Silvergate's deposits skyrocketed, so too did its stock price. Between the end of 2019 and November 2021, Silvergate's stock price increased more than twenty-fold.  As the *Financial Times* observed in a December 2022 report, "Barely 10 months after listing on the New York Stock Exchange at the end of 2019, at $12 a share, Silvergate's share price had climbed to more than $200."[168]

240.   Defendant Lane capitalized on the Company's misrepresentations, and the resultant soaring stock price.  At the same time that he was making glowing representations about the Bank's due diligence and monitoring, he was selling his own shares.  Indeed, Lane sold 249,560 of his personal Silvergate shares during the Class Period—a whopping 76.96% of the total number of shares of Silvergate stock that he owned and could sell during the entire Class Period.  None of these sales were made pursuant to a Rule 10b5-1 trading plan, and Lane never once purchased any shares in the open market during the Class Period.  Lane's insider sales included, among others, a sale of 75,000 shares at over $100 per share on June 8, 2021 for $7.9 million; a sale of 75,000 shares at over $100 per share on June 9, 2021 for $8 million; a sale of 11,250 shares at over $100 per share on June 10, 2021 for $1.13 million; a sale of 1,375 shares at over $215 per share on November 19, 2021 for over $300,000; and sales of 16,314 shares on July 21, 2022 at over $90 per share for another $1.5 million.  In total, through his Class Period insider sales, Lane netted for himself a remarkable $21.2 million.

241.   Lane's well-timed, insider sales have irked investors—and justifiably so.  On February 3, 2023, Zacks Investment Research issued a report, titled *A Stock with Troubling Insider Selling Trends*, blasting Lane for his sales.  As the analyst explained, "Alan Lane, President and CEO of Silvergate, sold all his shares . . .  in

[168] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).

July and has yet to purchase any back"; meanwhile, "the company has experienced more than $8 billion in client withdrawals after revelations came to light that Silvergate was involved in business dealings with the now defunct crypto exchange FTX and its sister company Alameda Research and is now facing a DOJ fraud investigation."[169]

242.    In addition to his well-timed insider sales, Defendant Lane's salary nearly tripled during the Class Period as a result of his misrepresentations and the resulting increase in Silvergate's deposits and stock price.  Between 2019 and 2022, Lane's salary jumped from $700,000 to $1.9 million.

243.    That Lane made over $21 million in insider stock sales and $1.2 million extra pay as a result of his misrepresentations further supports the scienter inference.

244.    The foregoing facts particularly when considered collectively (as they must be) support a strong inference of Silvergate's and Lane's scienter.

## VII.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

245.    The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class.  There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein.

246.    During the Class Period, Plaintiffs and the Class members purchased or otherwise acquired Silvergate common stock at artificially inflated prices, and were damaged thereby when the price of Silvergate common stock declined as the truth leaked out and in response to the partial disclosures.  Throughout the Class Period, the price of Silvergate common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Silvergate common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants.  Throughout the disclosure

---

[169] Zacks, "A Stock with Troubling Insider Selling Trends" (Feb. 3, 2023).

period, Defendants mitigated Silvergate's stock price declines by making additional false assurances concerning the alleged fraud, as described herein.

247. On November 2, 2022, the publication *CoinDesk* released an investigative report that described the "unusually close" ties between two of Silvergate's customers, FTX and Alameda, as reflected in a leaked internal Alameda financial document. *CoinDesk* noted that "even though [FTX and Alameda] are two separate businesses," Alameda's balance sheet included billions of dollars of FTT— *i.e.*, the cryptocurrency token issued and owned by FTX.[170]

248. Just five days later, after the market closed on November 7, 2022, Silvergate announced the sudden and unexplained replacement of its "Chief Risk Officer," Tyler Pearson. FTX also announced during trading hours the next day that it had agreed to sell itself to Binance because of FTX's liquidity crisis in the wake of the news of its connection to Alameda.

249. Social media erupted, immediately connecting Pearson's replacement to FTX and questioning Silvergate's failure to conduct due diligence on and monitor FTX. Marcus Aurelius Research posted a snapshot of Silvergate's website with a quote from Sam Bankman-Fried that read, "Life as a crypto firm can be divided up into before Silvergate and after Silvergate—it's hard to overstate how much it revolutionized banking for blockchain companies." Marcus Aurelius Research captioned the post, "How long until the new $SI 'Risk officer' takes this down?" Likewise, Marc Cohodes, a popular market commentator and corporate watchdog, explained in a November 8, 2022 post commenting on this news, "When FTX is your largest customer this is a Major problem."[171]

250. Other market commentators were also concerned, with S&P Global publishing an article that "[s]hares of Silvergate Capital Corp. . . . continued to

---

[170] *CoinDesk*, "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" (Nov. 2, 2022).
[171] Post by Marc Cohodes (Nov. 8, 2022).

plunge Nov. 9 as their customer, cryptocurrency exchange FTX Trading Ltd., is allegedly facing a liquidity crunch" and warned of Silvergate's exposure to FTX.

251.   In response to this news, the price of Silvergate's stock fell over a three-day period.  On November 8, 2022, the price fell by $11.54 per share, or 22.65%, to close at $39.42 on November 8, 2022, erasing more than $365 million in market capitalization, on trading volume of 8 million shares, more than 10-times the number of shares traded the previous day.  As investors continued to digest the news, the price of Silvergate's stock continued to plummet, dropping by $4.73 per share, or 12.00%, to close at $34.69, representing another $149.8 million decline in market capitalization on November 9, 2022, on continued abnormally high trading volume of 7.7 million shares, and by an additional $2.01 per share, or 5.79%, comprising an additional $63.6 million decline in market capitalization on November 10, 2022, on continued high trading volume of 7.2 million shares.

252.   As part of their continuing misrepresentations and attempts to reassure the market, Silvergate and Defendant Lane attempted to isolate FTX as a single customer among its many SEN Network participants, issuing a statement assuring the market that "FTX represented less than 10%" of Silvergate's total deposits from "all digital asset customers."  The Company also stated that the SEN Network was "fully operational and continues to function as designed," adding that "[w]e are a key infrastructure provider with an established track record, which gives our customers the confidence they need during times like these."

253. Analysts continued to credit the Company's statements that it performed vetting, due diligence, and monitoring on its SEN Network customers and that the FTX fraud was an isolated event among its customers.  For example, J.P. Morgan analysts accepted Silvergate's denials, repeating in their analyst reports Lane's statements that "all participants in the SEN are vetted by Silvergate" and "need[] to pass compliance checks."

254.    Additional analysts credited Silvergate's assurances.  For example, Canaccord Genuity analysts stated in an analyst report that Silvergate was "relatively immune from FTX fallout" and also pointed out that Silvergate "has over 100 other crypto exchanges as customers" that rely on the SEN Network.  Canaccord also reiterated its "BUY" rating for Silvergate and a $150 price target.  Bank of America, although it downgraded its rating of Silvergate's stock because the FTX/Alameda situation was a "black eye on the broader crypto market."  The analysts also reported, "SI has a comprehensive risk mgmt. framework in place."  Further, citing the Company's false assurances, J.P. Morgan analysts emphasized that while they knew "FTX is a customer of Silvergate," Silvergate had issued "no disclosure that Alameda Research is a client of Silvergate."

255.    Then, on November 15, 2022, Marcus Aurelius Research revealed additional facts raising concerns about Silvergate's vetting, diligence, and monitoring of its customers.  Specifically, Marcus Aurelius Research revealed that Silvergate had been implicated in a $425 million money laundering operation by a South American cryptocurrency crime ring linked to smugglers and drug traffickers.  Marcus Aurelius Research posted, "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers.  Affidavit from investigation into crypto crime ring linked to smugglers/drug traffickers."  That same day, Marc Cohodes publicly compared Silvergate's KYC and AML compliance to that of the banks who did "business with Madoff."

256.    On this news, the price of Silvergate's stock fell by an additional $6.13 per share, or 17.27%, to close at $29.36 on November 15, 2022, resulting in a loss of $194.1 million in market capitalization, with trading volume rising to 8.5 million shares, more than four times the daily average for the previous 30 days.

257.    The next day, on November 16, 2022, *Vox* issued a report showing a recent message exchange with FTX's former CEO, Bankman-Fried, acknowledging

that people could wire money to Alameda's bank account to get money to FTX, and that "people wired $8 billion to Alameda." That same day, after markets closed, Silvergate disclosed a $2.1 billion reduction in deposits, after "excluding all deposits from FTX and its related entities."

258. On November 17, 2022, EventLongShort, another popular analyst and corporate watchdog, issued a series of postings detailing that, when FTX's customers wanted to transfer funds, they were directed "to send the funds to their bank [at] Silvergate" and that, even though "one should expect the beneficiary account" to be FTX, instead "the beneficiary account on the Silvergate/FTX wire instructions appear[ed] to be Alameda accounts."[172] EventLongShort added that "the accounts FTX customers were told to wire funds to appear to be the Silvergate bank accounts of Alameda Research Ltd and North Dimension Inc, a subsidiary of Alameda."

259. In addition, on November 17, 2022, analysts at The Bear Cave published a newsletter casting further doubt on Silvergate's representations. In particular, The Bear Cave elaborated on Silvergate's connection to the South American money-laundering operation, reporting that hundreds of millions of dollars were laundered through Silvergate's SEN Network, emphasizing Silvergate's lack of customer monitoring given "[t]he accounts were receiving funds in the same pattern as those . . . used to facilitate the laundering of illicit funds." This operation began in September 2021 and ended in June 2022. Silvergate did not report suspicious activity on these accounts until federal investigators requested documents.

260. On this news, the price of Silvergate's common stock fell by $3.44 per share, or 10.98%, to close at $27.90 on November 17, 2022, representing a $108.9

---

[172] Post by EventLongShort (Nov. 17, 2022).

million drop in market capitalization, on continued high trading volume of 7.8 million shares.

261.    Then after hours on Thursday, November 17, 2022, FalconX, a cryptocurrency exchange platform focused on risk management for institutional clients, revealed that it would no longer engage with Silvergate due to the elevated risk associated with the SEN Network, stating that its decision was "consistent with other market players."

262.    On this news, the price of Silvergate's common stock fell by $3.00, or 10.75%, to close at $24.90, representing a $95 million drop in market capitalization on November 18, 2022, with trading volume rising to 10.5 million shares.

263.    Based on Lane and Silvergate's repeated assurances, however, analysts and investors continued to credit Defendants' false assurances that it performed vetting, due diligence, and monitoring on SEN Network participants.  For example, on November 21, 2022, J.P. Morgan analysts dismissed concerns about Silvergate's "risks from an anti-money laundering (AML) perspective in facilitating over $1 trillion in payments" on the SEN Network, citing Silvergate's purported compliance, vetting, and onboarding efforts.  The analysts emphasized that, to participate in the SEN Network, "a participant needs to be an institution such as a cryptocurrency exchange or institutional investor participating in the digital asset ecosystem" and "needs to pass compliance checks before onboarding as a Silvergate client to access real-time payments capabilities on the SEN."  "In other words," the analysts concluded, "all participants in the SEN are vetted by Silvergate and, with Silvergate being a highly regulated bank, this provides regulator access to address any concerns over AML."

264.    After trading closed on November 28, 2022, *Bloomberg News*'s Crypto Market Structure Reporter (Yuqi Yang) and *Bloomberg*'s Finance Reporter (Max Reyes) published an article based on the accounts of people familiar with FTX, describing how Silvergate solved FTX's inability to get access to traditional banking

sources by allowing Alameda Research to become a Silvergate customer and then allowing FTX customers to wire funds to Alameda.[173] *Bloomberg News* further reported that "FTX customers were instructed to send wire transfers via Alameda, which was allowed to have accounts at Silvergate" and that some "FTX customers continued to send wire transfers as recently as this year."

265.    Silvergate and Defendant Lane immediately responded with efforts to quell investors' concerns.  Among other things, they issued a statement on the evening of November 28, 2022 stating, "Recently, Silvergate has been the subject of false and misleading statements."

266.    On December 1, 2022, The Bear Cave published another report, providing additional evidence of Silvergate's failure to vet its customers. Specifically, The Bear Cave's report described Silvergate's involvement in a money laundering operation in December 2018.  The Bear Cave cited a July 2021 plea agreement between DOJ and Joel Greenberg, who has since been convicted of embezzlement, that describes how Greenberg used Silvergate's SEN Network to launder $200,000.  The report highlighted Silvergate's failure to identify and report 40 suspicious transactions that occurred over a four-day period.

267.    On this news, the price of Silvergate's common stock fell by $2.21 per share, or 8.06%, to close at $25.22 with a drop in market capitalization of $70 million on December 1, 2022, on trading volume of 5.6 million shares.

268.    On December 5, 2022, before the markets opened, Morgan Stanley issued an analyst report revealing facts concerning Silvergate's "massive financial pressure in the aftermath of the FTX exchange's collapse," and lowering its rating for the Bank to "Underweight."

269.    On this news, the price of Silvergate's common stock fell by $2.25, or 8.49%, to close at $24.24, representing a $71.2 million drop in market capitalization

---

[173] *Bloomberg*, "FTX Received Some Customer Deposits Via Bank Accounts Held by Alameda" (Nov. 28, 2022).

on December 5, 2022, on trading volume of 3.5 million shares.  As *CNBC* reported, "Shares dipped 3% after Morgan Stanley downgraded Silvergate Capital to underweight from equal weight, saying a 'high level of uncertainty' remains around the stock following the FTX collapse."

270.   The next day, before the market opened on December 6, 2022, it was revealed that late the night before, Senators Elizabeth Warren, John Kennedy, and Roger Marshall sent Defendant Lane a request for information about Silvergate's relationship with FTX and Alameda, casting further doubt on the Company's vetting, due diligence, and monitoring of its customers.  The letter stated that "Silvergate's failure to take adequate notice of [the FTX] scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program," adding that Silvergate's facilitation of FTX's transfer of customer funds to Alameda "reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."  The same morning, *NBC News* reported that an investment manager provided testimony to the Senate Banking Committee about statements made to him by a former FTX employee confirming that as FTX's primary banking partner, Silvergate was implicated in the transfers of FTX customer funds between other Bankman-Fried controlled entities, including Alameda.

271.   On this news, the price of Silvergate's common stock fell by $1.14, or 4.70%, to close at $23.10, representing an additional $36.1 million drop in market capitalization on December 6, 2022, with trading volume rising to 10 million shares, nearly three-times the number of shares traded the previous day.  *CoinDesk* reported that "Crypto Bank Silvergate Slides Further After Letter from Sen. Warren."

272.   Defendant Lane, nevertheless, again attempted to quiet investors' concerns, issuing a "public letter" "to set the record straight about Silvergate's role in the digital asset ecosystem" and to blame recent reports on "speculation" and

"misinformation."[174]  In his public letter, Defendant Lane again represented (falsely) that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements."  Defendant Lane also insisted that the Bank "monitors transaction activity for every account and identifies activity outside of the expected usage."  He further emphasized that the Company continues "to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."

273.  On December 13, 2022, the SEC and Commodity Futures Trading Commission ("CFTC") both filed civil actions against Bankman-Fried.  The complaints stated that FTX directed customers to deposit fiat currency into U.S. bank accounts controlled by Alameda.  The complaints revealed that "some or all of those bank accounts were opened in the name of an entity called North Dimension, a Delaware-registered wholly-owned subsidiary of Alameda," and the shell company used by FTX and Alameda to misappropriate customer funds using Silvergate's SEN Network.

274.  On this news, the price of Silvergate's common stock fell by $2.53, or 11.90%, to close at $18.73 on December 13, 2022, with market capitalization plummeting an additional $80.1 million with trading volume rising to 11.9 million shares, more than double the number of shares traded the previous day.

275.  Silvergate and Defendant Lane continued to issue false public denials to stop the price of Silvergate's stock from falling further.  For example, in response to the U.S. senators' findings, Lane wrote, "In accordance with our risk management policies and procedures, Silvergate conducted significant due diligence on FTX and

---

[174] Silvergate, Form 8-K (Dec. 5, 2022).

its related entities, including Alameda Research, both during the onboarding process and through ongoing monitoring."[175]

276.   On January 5, 2023, a day after a federal judge ordered the seizure of about $93 million of FTX funds held at Silvergate, Silvergate released select preliminary fourth quarter financial metrics in an intra-quarter update. In the release, Silvergate disclosed that the collapse of FTX had led other customers to withdraw their deposits from the Bank, causing its deposits to decrease by more than 60% or $8.1 billion in the fourth quarter—a bank run that *The Wall Street Journal* dubbed "worse than Great Depression-era runs." The same day, Silvergate held a conference call with analysts and investors to discuss the intra-quarter update. On that call, Defendant Lane acknowledged that there was a "crisis of confidence" impacting Silvergate, with customers withdrawing 60% of the Bank's total deposits (over $8.1 billion), and that it was forced to lay off 40% of its employees.[176]

277.   On this news, the price of Silvergate's common stock fell by $9.38, or 42.73%, to close at $12.57 on January 5, 2023, erasing $297 million in market capitalization, on record high trading volume of 30.3 million shares, more than five-times the average daily volume for the previous 30 trading days. *CNBC* reported that "Silvergate Capital tanks more than 40% after crypto bank discloses massive fourth-quarter withdrawals."

278.   Next, on February 2, 2023, *Bloomberg* broke the news after the market had closed that the DOJ's Fraud Section was examining Silvergate's hosting of accounts connected to FTX and its CEO Sam Bankman-Fried.[177]  Investors were again shocked, with *Cryptonews* reporting that following the news of the DOJ's

---

[175] Letter from Lane to Warren, Kennedy, and Marshall (Dec. 19, 2022).
[176] Silvergate, Costs Associated with Exit or Disposal Activities (Form 8-K) (Jan. 5, 2023).
[177] *Bloomberg*, "Silvergate Faces US Fraud Probe Over FTX and Alameda Dealings" (Feb. 2, 2023).

investigation, 'Silvergate shares took a nosedive."[178] *CoinDesk* likewise reported that Silvergate shares "fell sharply after the market close" following "the publication of a Bloomberg article reporting the U.S. Department of Justice's fraud unit was looking into the crypto bank's dealings with the now-bankrupt FTX and Alameda Research."[179] *CoinDesk* further noted that "Silvergate shares were down 28% in after-hours trading to $15.06, wiping out almost all of its 29% rally during the day's session following a Federal Reserve-related rally in cryptocurrencies and crypto stocks."

279.    On this news, the price of Silvergate's common stock fell by 28%, as noted by *CoinDesk*, on record high trading volume of 41.24 million shares.

280.    On February 16, 2023, *Reuters* published an investigative report based on bank records obtained from Binance, showing that Binance transferred $400 million in 2020 and 2021 from its Silvergate accounts to a trading firm called Merit Peak, which was controlled by Binance's founder and CEO Zhao. These transfers also showed that Silvergate's failure to monitor permitted clients like Binance's and FTX's CEO to use Silvergate-approved entities to funnel funds from their customers deposits on the cryptocurrency exchanges to their personal accounts. *TheStreet* tied *Reuters*'s report on Binance's access to Silvergate accounts to Silvergate's "Due Diligence Failures," and reported, "The information from *Reuters* immediately prompted many experts to say that this episode is reminiscent of FTX and Alameda Research."[180]

281.    On this news, the price of Silvergate's common stock fell by $4.97, or 22.27%, to close at $17.35 on February 16, 2023, erasing an additional $157.3 million in market capitalization on trading volume of 29.4 million shares.

---

[178] *Cryptonews*, "Silvergate Bank Stock Plunges After Report of DOJ Investigation into Ties with FTX and Alameda" (Feb. 3, 2023).
[179] *CoinDesk*, "Silvergate Stock Tanks on Report of DOJ Probe Tied to FTX, Alameda Dealings" (Feb. 2, 2023).
[180] *TheStreet*, "Crypto Bank Silvergate Goes Out of Business" (Mar. 9, 2023).

282.   On March 1, 2023, after the markets closed, Silvergate announced that it needed to make the "risk-based decision" to discontinue the SEN Network altogether.  Silvergate also announced that it was delaying its filing of its annual financial report on Form 10-K, stating that recent events left it at risk of being "less than well-capitalized" and that it was evaluating its ability to operate as a "going concern."  In its filing, Silvergate stated that "[s]ubsequent to December 31, 2022, a number of circumstances have occurred which will negatively impact the timing and the unaudited results previously reported in the Earnings Release."  The Company also disclosed that it was "currently in the process of reevaluating its businesses and strategies in light of the business and regulatory challenges it currently faces."  Silvergate also warned about its "ability to retain digital asset customers" including resulting from "regulatory and other inquiries and investigations against or with respect to the Company, investigations from our banking regulators, congressional inquiries and investigations from the U.S. Department of Justice."

283.   These revelations further stunned investors.  As analysts at *Wall Street on Parade* observed, the Bank's disclosure "stands in rather stark contrast to Silvergate's website lauding how the company is . . . 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'"

284.   On this news, the price of Silvergate's common stock fell by $7.81, or 57.72%, to close at $5.72 on March 2, 2023, resulting in a loss of $247.2 million in market capitalization, on record high trading volume of 57.8 million shares, nearly double the total number of shares outstanding.  *CNBC* reported that "Shares in Silvergate Capital plunge in pre-market trading after delaying its annual report."  J.P. Morgan downgraded its rating on Silvergate's stock to "underweight" and withdrew its price target.

285.   Unable to trust the Bank's "seal of approval" any longer, the Bank's remaining customers continued to flee and pull their deposits from Silvergate.  *Reuters* reported that "[a] slew of cryptocurrency heavyweights," including

Coinbase and Galaxy Digital, had "ditched" Silvergate as their banking partner after Silvergate's latest filing "raised questions about its ability to stay in business."

286.  Two days later, on March 8, 2023, after the markets had closed, Silvergate announced that it needed to wind down operations and voluntarily liquidate Silvergate Bank.[181]

287.  On this news, the value of Silvergate's common stock fell by $2.07, or 42.16%, to close at $2.84, erasing an additional $65.5 million in market capitalization on March 9, 2023, on soaring trading volume of 71.3 million shares. By that date, Silvergate's market capitalization stood at a mere $89.9 million, representing a loss of 94.4% of the market value of Silvergate's common stock in only four months.   *TheStreet* that "[t]he California bank's stock fell nearly 44% on Wall Street after it announced it was going out of business."[182]

288.  Just weeks later, on March 20, 2023, Silvergate announced that it had received a non-compliance notice days earlier from the NYSE, informing the Company that, "as the Company had not timely filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the '10-K'), the NYSE will closely monitor the status of the Company's late filing and related public disclosures for up to a six-month period from its due date."   The Company further disclosed that the NYSE warned that future delayed filings could lead to "suspension and delisting procedures."

289.  On this news, the value of Silvergate's common stock fell by another 12.5%, to close at $1.47 on March 21, 2023, erasing an additional $6.7 million in market capitalization on trading volume of over 12.8 million shares.

---

[181] Press Release, Silvergate, "Silvergate Capital Corporation Announces Intent to Wind Down Operations and Voluntarily Liquidate Silvergate Bank" (Mar. 8, 2023).
[182] *TheStreet*, "Silvergate Bank Collapses" (Mar. 9, 2023).

290.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Silvergate's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

291.   The stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.  It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Silvergate common stock.  It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed.

292.   The timing and magnitude of the price declines in Silvergate securities, Defendants' post-Class Period revelations, and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII.    PRESUMPTION OF RELIANCE

293.   Plaintiffs are entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    Silvergate's stock was actively traded in an efficient market on the NYSE;

(b)    Silvergate's stock traded at high weekly volumes;

(c)    as a regulated issuer, Silvergate filed periodic public reports with the SEC;

(d)    Silvergate regularly communicated with public investors by means of established market communication mechanisms,

including through regular dissemination of press releases and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e)     the market reacted promptly to public information disseminated by Silvergate;

(f)     Silvergate securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(g)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Silvergate's securities; and

(h)     without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired Silvergate common stock between the time the Exchange Act Defendants misrepresented or omitted material facts and the time the true facts were disclosed.

294.   Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Silvergate's stock, and are entitled to a presumption of reliance on the Exchange Act Defendants' materially false and misleading statements and omissions during the Class Period.

295.   A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

296.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading

statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

297.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Silvergate who knew that the statement was materially false or misleading when made.

## X.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I – Violation of § 10(b) of the Exchange Act
### (Against Silvergate and Defendant Lane)

298.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

299.   This count is asserted on behalf of all members of the Class against Defendant Silvergate and Defendant Lane for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

300.   During the Class Period, the Exchange Act Defendants disseminated, furnished information for inclusion in, or approved the false statements specified above, which they knew or, at minimum, were severely reckless in not knowing were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

301.  The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Silvergate common stock during the Class Period.

302.  The Exchange Act Defendants, individually and in concert, directly and indirectly, used the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with severe recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Silvergate common stock, which were intended to, and did:

(a)    deceive the investing public, including Plaintiffs and the Class, regarding, among other things, Silvergate's customer onboarding and monitoring due diligence and regulatory compliance framework;

(b)    artificially inflate and maintain the market price of Silvergate common stock; and

(c)    cause Plaintiffs and other members of the Class to purchase Silvergate common stock at artificially inflated prices and suffer losses when the true facts became known and/or the risks materialized.

303.  The Exchange Act Defendants are liable for all materially false or misleading statements made during the Class Period, as alleged above.

304.  As described above, the Exchange Act Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive,

manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Silvergate stock, were either known to the Exchange Act Defendants or were so obvious that the Exchange Act Defendants should have been aware of them.

305. Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Silvergate common stock, which inflation was removed from its price when the true facts became known.

306. The Exchange Act Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had the Exchange Act Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Silvergate securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to the Exchange Act Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Silvergate's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by the Exchange Act Defendants' material misstatements and omissions, would cause the price of Silvergate securities to decline.

307. Accordingly, as a result of their purchases of Silvergate common stock during the Class Period, Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

308. By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

309. This claim is brought within the applicable statute of limitations

## COUNT II – Violation of § 20(a) of the Exchange Act
## (Against Defendant Lane)

310.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

311.   As alleged above, Defendant Silvergate and Defendant Lane each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

312.   This count is asserted on behalf of all members of the Class against Defendant Lane for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

313.   At all relevant times, Defendant Lane acted as a controlling person of Silvergate within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

314.   By virtue of Defendant Lane's control and authority as the Company's most senior officer, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual due diligence, and his power to control the materially false and misleading public statements about the Company during the Class Period, Defendant Lane had the authority to influence and control, and did influence and control, directly and indirectly, the decision-making and the activities of the Company and its employees, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein.  Defendant Lane was provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

315.  In addition, Defendant Lane spoke to investors on behalf of the Company during the Class Period.  Therefore, he was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Silvergate during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein.

316.  By reason of the aforementioned conduct, Defendant Lane is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Defendant Silvergate is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class.

## **PART TWO - CLAIMS UNDER THE SECURITIES ACT OF 1933**

317.  In this Part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on violations of the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased Silvergate stock in or traceable to Silvergate's securities offerings conducted on or about January 20, 2021, March 18, 2021, July 28, 2021, and December 6, 2021 (collectively, the "2021 Offerings"), and were damaged thereby.

318.  In this Part of the Complaint, Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.  For the avoidance of doubt, Plaintiffs disclaim all allegations of fraud or intentional misconduct included in Part One of this Complaint, and no portion of the Exchange Act allegations (¶¶1-316) are realleged or incorporated herein.

## XI.    JURISDICTION AND VENUE

319.  The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

320.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

321.    Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  The acts and conduct complained of herein occurred in substantial part in this District.

322.    In connection with the acts and conduct alleged in this Complaint, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities market.

## XII.    THE SECURITIES ACT DEFENDANTS

323.    In addition to Defendants Silvergate and Lane, each of the following Defendants is statutorily liable under the Securities Act for the materially untrue statements or omissions contained in and incorporated in the 2021 Offering Documents.

324.    **Underwriter Defendants.**    The following investment banks were underwriters of the offerings of Silvergate securities issued by way of the registration statements that contained the materially untrue and misleading statements and omitted material facts: the Underwriter Defendants Canaccord Genuity LLC ("Canaccord"); Citigroup Global Markets Inc ("Citigroup"); Compass Point Research & Trading, LLC ("Compass"); Craig-Hallum Capital Group LLC ("Craig-Hallum"); Goldman Sachs & Co. LLC ("Goldman"); J.P. Morgan Securities LLC ("J.P. Morgan"); Keefe, Bruyette & Woods, Inc. ("Keefe"); UBS Securities LLC ("UBS"); and Wedbush Securities Inc. ("Wedbush").

325.    Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, and Keefe were the underwriters of the January 2021 Offering.

326.    Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, Keefe, and Wedbush were the underwriters of the March 2021 Offering.

327.    Underwriter Defendants Citigroup, Goldman, J.P. Morgan, Keefe, and UBS were the underwriters of the July 2021 Offering.

328.    Underwriter Defendants Compass, Craig-Hallum, Goldman, J.P. Morgan, Keefe, and Wedbush were the underwriters of the December 2021 Offering.

329.    **The Securities Act Executive and Director Defendants.**    The following Defendants were signatories of the registration statements that contained materially untrue and misleading statements and omitted material facts: Defendants Alan J. Lane (CEO and Director); Antonio Martino (CFO); Karen F. Brassfield (Director); Robert C. Campbell (Director); Paul D. Colucci (Director); Thomas C. Dircks (Director); Dennis S. Frank (Director); Aanchal Gupta (Director); Michael Lempres (Director); Scott A. Reed (Director); and Colleen Sullivan (Director).

330.    Each of the Securities Act Executive and Director Defendants signed the registration statements for each of the January 2021 Offering, March 2021 Offering, July 2021 Offering, and December 2021 Offering, with the exception of Aanchal Gupta, who was a signatory to the registration statement for the July 2021 and December 2021 Offerings.

## XIII.    THE OFFERING DOCUMENTS CONTAINED FALSE OR MISLEADING STATEMENTS AND OMISSIONS

331.    During 2021, the Securities Act Defendants offered and sold shares of Silvergate stock to investors through a series of securities offerings (the "2021 Offerings").  In exchange for the shares sold through the 2021 Offerings, Silvergate received $1.339 billion.

332.    On January 20, 2021, Silvergate issued a Registration Statement (the "January 2021 Registration Statement") and a Preliminary Prospectus Supplement, which was supplemented on January 25, 2021 (the "January 2021 Prospectus"). Each filing incorporated by reference Silvergate's 2019 Annual Report on Form 10-K and Silvergate's 2020 Quarterly Reports on Form 10-Q (collectively, the "January 2021 Offering Documents" for the "January 2021 Offering").  Silvergate completed

the January 2021 Offering on January 26, 2021, selling 4,563,493 shares of common stock with gross proceeds of $287.50 million.

333.   On March 9, 2021, Silvergate filed a Prospectus Supplement to conduct an "at the market" offering pursuant to the January 2021 Registration Statement that incorporated by reference Silvergate's 2020 Annual Report on Form 10-K (the "March 2021 Offering Documents" for the "March 2021 Offering").   Silvergate completed the March 2021 Offering by May 18, 2021, selling 2,793,826 shares of common stock with gross proceeds of $300 million.

334.   On July 28, 2021, Silvergate filed with the SEC an amendment to the January 2021 Registration Statement and Prospectus (the "July 2021 Registration Statement") and a Preliminary Prospectus Supplement, which was further supplemented on July 30, 2021 (the "July 2021 Prospectus").   Each filing incorporated by reference Silvergate's 2020 Annual Report on Form 10-K and Silvergate's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (collectively, the "July 2021 Offering Documents" for the "July 2021 Offering"). Silvergate completed the July 2021 Offering on August 4, 2021, issuing 8,000,000 depositary shares each representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A, with gross proceeds of $200 million.

335.   On December 6, 2021, Silvergate issued a press release announcing that it would conduct another offering pursuant to the July 2021 Registration Statement and filed a Preliminary Prospectus Supplement to the July 2021 Prospectus, which was further supplemented on December 8, 2021 (the "December 2021 Prospectus") that incorporated by reference Silvergate's 2020 Annual Report on Form 10-K and Silvergate's 2021 Quarterly Reports on Form 10-Q (collectively, the "December 2021 Offering Documents" for the "December 2021 Offering").   Silvergate completed the December 2021 Offering on December 9, 2021, issuing 3,806,895

shares of common stock with gross proceeds of $552 million in the December 2021 Offering.

336.    The materials presented to investors in connection with the Offerings (the "2021 Offering Documents") contained "untrue statement[s] of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."    Specifically, Silvergate falsely and misleadingly represented, while omitting material facts, the following in the 2021 Offering Documents:

(a)    Silvergate conducts "extensive regulatory compliance diligence"; [183]

(b)    Silvergate has a "deep-rooted commitment and proprietary approach to regulatory compliance";[184]

(c)    Silvergate performs "thorough reviews . . . as part of [its] due diligence process" in connection with its "onboarding new customers or monitoring existing customers";[185]

(d)    Silvergate performs "ongoing monitoring of customer activities";[186] and

(e)    Silvergate conducts, for cryptocurrency exchanges, "enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency activities, a system of 'red flags' specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our

---

[183] January 2021 Prospectus; March 2021 Prospectus; July 2021 Prospectus; December 2021 Prospectus; Silvergate, Quarterly Reports (May 12, 2020, Aug. 11, 2020, Nov. 10, 2020, May 11, 2021, Aug. 10, 2021, Nov. 9, 2021); Silvergate, Annual Report (Mar. 8, 2021).

[184] January 2021 Registration Statement; July 2021 Registration Statement; January 2021 Prospectus; March 2021 Prospectus; July 2021 Prospectus; December 2021 Prospectus; Silvergate, Annual Reports (Mar. 10, 2020, Mar. 8, 2021).

[185] Silvergate, Annual Reports (Mar. 10, 2020, Mar. 8, 2021).

[186] *Id.*

third-party transaction monitoring system, customer risk scoring with risk factors specific to the digital-currency industry."[187]

337.   These statements were false and misleading, and omitted material facts, for a number of reasons.  In truth, the Company had anything but a "deep-rooted commitment" to regulatory compliance.  Indeed, far from "thorough reviews" or "enhanced procedures" for screening and monitoring cryptocurrency exchange customers, Silvergate performed no due diligence before onboarding customers to the SEN Network and no ongoing monitoring of customer activities on the SEN Network.  These facts are corroborated by the accounts of Silvergate's former employees, the fraudulent activities that cryptocurrency exchange customers performed on the SEN Network, and the findings of the Federal Reserve, U.S. senators, and investigative journalists.

338.   Silvergate did not conduct the represented due diligence on its customers.  Instead, when customers wanted to join the SEN Network, "the gates were open," explained FE 3.[188]  If customers wanted to join the SEN Network, FE 3's group was given a list of accounts and names to authorize.  There was no compliance or research done on a customer at the time it wanted to join the SEN Network; nobody in management reviewed or approved those requests.

339.   FE 3 explained that Silvergate did not perform due diligence on the identity of the customers that were allowed to join SEN.  In fact, instead of asking the customers to fill out their own beneficial ownership paperwork, Silvergate employees (and not the customers) filled out the paperwork.  FE 3 explained that FE

---

[187] *Id.*

[188] FE 3 was a digital banking manager at Silvergate from the beginning of March 2022 until the end of November 2022 and reported to Dina Matias, Silvergate's Senior Vice President, Operations Administrator.  FE 3 was responsible for the SEN Network, including onboarding customers to the SEN Network, handling account maintenance, account changes, monthly account fee analysis, limit changes, and adding and moving accounts.

6, Silvergate's Private Client Manager II, told FE 3 that relationship managers were told to fill out the beneficial ownership forms for the customers.

340.   FE 6, Silvergate's Private Client Manager II, also confirmed that he and other Silvergate employees filled out beneficial ownership forms for the customers (*i.e.*, not the customers), and they were told to do so by Silvergate management.[189] FE 6 explained that at Silvergate, whether the form was new or needed to be recertified, it fell to the private client managers to fill out the form, instead of the customer itself.  This was the policy across the board at Silvergate, and it existed throughout FE 6's entire time at Silvergate.  He explained that bank employees should not have been filling out the beneficial ownership forms.

341.   Silvergate also failed to perform site visits before onboarding customers to the SEN Network.  FE 3 stated that Silvergate did not perform site visits of SEN Network participants.  FE 3 explained that, when she joined Silvergate, she asked about "site visits" because she was concerned about working for a crypto bank; she spoke to Silvergate's Relationship Managers with whom she worked, and they told FE 3 that Silvergate "never, ever did a site visit."

342.   Also consistent with FE 3's account, multiple other former Silvergate employees said that Silvergate did not perform "site visits" of the Bank's customers and SEN Network participants.

343.   FE 2 said that Silvergate did not conduct site visits and added that site visits are important because you need to understand that a customer is an actual business and that you are not just banking a shell company.  Likewise, FE 6 confirmed that he did not know of any actual site visits taking place by Silvergate.

344.   FE 3 explained that Silvergate also did not ask for supporting documentation for customers' wire limits.  FE 3 explained that new clients could

---

[189] FE 6 was a private client manager at Silvergate from November 2020 until January 2023.  In that role, he was the liaison for larger clients and managed day-to-day account maintenance activities such as transfers, inquiries, and adding and removing signers.

dictate to Silvergate whatever wire limits they wanted, and Silvergate gave it to them and never checked if the customer could cover it. FE 3 described how she reached out to Silvergate's front office, and was told—including by Christie Hicks, Silvergate's Client Support Manager—that Silvergate just asks customers what they want for a wire limit and gives it to them. FE 3 recounted how she had a phone conversation with Dina Matias concerning a $250 million wire limit for a customer that only had $70,000 in their account. FE 3 explained that she questioned why Silvergate would give a $250 million wire limit to someone with $70,000 in their account but was screamed by Ms. Matias at when she asked.

345. FE 3 was told by several of her colleagues—including Christie Hicks, Silvergate's Client Support Manager—that Silvergate did not get the proper documentation to validate wire limits. "We just give them whatever they want," they told FE 3.

346. Also like FE 3, FE 1, a Senior Vice President, Finance Manager at Silvergate, explained that Silvergate did not vet existing customers before adding them to the SEN Network.[190] FE 1 did not see any efforts by Silvergate to get to know their customers or to make sure they were complying with the law.

347. FE 1 was aware that Silvergate conducted no customer vetting of participants on the SEN Network based on meetings she attended with other senior executives and her 30 years of banking experience. FE 1 has worked at multiple banks over her 30 years of banking experience, including Wells Fargo for 19 years in various roles, where she was very aware of the existence of their compliance

---

[190] FE 1 joined Silvergate in March 2019 and stopped working at the Bank the week before Christmas in December 2019. She originally reported to Regan Lauer, who hired her, then briefly to Kellie VavRosky, then to Alan Lane, and then to Antonio Martino. She worked directly with Alan Lane from September to November 2019. Her responsibilities included overseeing Treasury and financial planning and analysis ("FP&A"). She worked closely with the Controller, and she worked on Silvergate's initial public offering.

practices, including AML and KYC programs.  Other banks have established practices and policies in place, FE 1 explained.

348.  Silvergate lacked any commitment to regulatory compliance.  When asked if Silvergate had a deep-rooted commitment to regulatory compliance, FE 3 also said, "Not at all."  Likewise, FE 1 explained that Silvergate's focus was all about sales and getting clients, not compliance.  FE 1 said if these were subjects of discussion, someone at her level—a senior vice president of the organization— would have known about it.  FE 1 said that ever since Silvergate turned towards crypto, there was no focus on anything like KYC.  FE 1 worked closely with Megan Collins, Silvergate's Controller from late 2016 to January 2020, and attended senior meetings led by Kathleen Fraher, Silvergate's then-Vice President, "Compliance and BSA Officer."  During these meetings, they discussed everything of importance to the Bank—which did not include compliance.  FE 1 did not recall any discussion of prioritizing compliance.  She said, "It was not a focus in the least. It was all, 'Rah rah, we got these new crypto customers.'"

349.  Further, FE 3 explained that she did not see anything at Silvergate like compliance policies or controls designed to address the digital currency industry. She added that she never saw Silvergate implement policies and procedures to comply with AML and KYC requirements.  In fact, during 2022, FE 3 tried to find policies concerning KYC on Silvergate's "intranet," and she could find no procedures regarding beneficial ownership or KYC.  FE 3 confirmed that all policies concerning bank processes were on Silvergate's intranet, but she could never find policies concerning compliance processes.

350.  When the Federal Reserve eventually learned of Silvergate's failure to vet, perform due diligence on, or monitor its customers, the Federal Reserve took significant action.  FE 5 explained that the Federal Reserve gave private feedback to

Silvergate that its compliance was insufficient.[191] FE 5 further explained that, in the first quarter of 2022, the Federal Reserve sent Silvergate a report identifying Matters Requiring Immediate Attention (or "MRIAs").

351. According to the Federal Reserve, "Matters Requiring Immediate Attention" are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization; and (4) in the case of consumer compliance examinations, matters that have the potential to cause significant consumer harm."[192]

352. FE 5 explained that Matters Requiring Immediate Attention provided to Silvergate related to onboarding. The nature of the concerns was around Silvergate's lack of basic program requirements for vetting and onboarding. FE 5 added that the Federal Reserve also provided Silvergate with MRIAs related to ongoing due diligence. The MRIAs said that things were either lacking or not proceduralized. FE 5 further noted that, regarding Silvergate's ongoing monitoring, the Federal Reserve said it was not sufficient. FE 5 added that he knows that the regulators also found deficiencies with Silvergate's screening process and SAR filings.

---

[191] FE 5 worked at Silvergate from May 2022 until May 2023 as a "FRCM Initial Due Diligence Manager." During his over decade-long banking career, he has held roles as an enhanced due diligence manager, ongoing due diligence manager, and AML risk compliance officer at four other major banks. FE 5 received reports from Silvergate's consultants, including K2, who had summarized the MRIAs in their reports. While employed at Silvergate, FE 5 had access to Silvergate's records from before his employment.

[192] Supervisory Considerations for the Communication of Supervisory Findings, https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

353.  FE 5 further stated that the regulators came back at the end of June 2022 to check progress.  FE 5 explained that the MRIAs were still going to stick—*i.e.*, they were going to remain in place—and FE 5 believes Silvergate was going to have even more MRIAs issued to it; however, Silvergate voluntarily started closing down before that ever occurred.

354.  FE 5 explained that, after the Federal Reserve issued its MRIAs, Silvergate retained third-party contractors, including the consulting firm, K2.  FE 5 explained that the contractors agreed that Silvergate lacked the appropriate controls around due diligence and KYC, and his team used their analyses to write up procedures.  FE 5 explained that he and his team worked on the procedures and had to give them to regulators by June 20, 2022.  FE 5 explained that Silvergate rolled out the new diligence processes on August 15, 2022.

355.  FE 5 agreed that, prior to August 15, 2022, Silvergate did not know its customers.  FE 5 also agreed that, prior to August 15, 2022, Silvergate did not review potential customers at the onboarding stage to determine whether they had an appropriate culture of compliance.  He knows this because, in his role at the Company, he read narratives and cases and was finding "all the garbage that was slopped through."  When he looked at Silvergate's paperwork from before August 2022, FE 5 could not tell who the customer was, what they did, what the sources of wealth were, or where the jurisdictions were, and the flow of funds did not make sense.  FE 5 added that, before May 2022, the Bank never said "no" to a client, which he knows from his looking at the Company's records.  FE 5 further explained that there was no record of any prospective client ever not being approved by Silvergate.

356.  FE 5 also agreed that, prior to August 15, 2022, when employees raised concerns about or identified suspicious or anomalous activity, Silvergate did not do anything about it.  FE 5 further agreed that, before August 15, 2022, Silvergate lacked a focus on compliance.

357.  FE 5 explained that, specifically with regard to Binance, there were a lot of red flags.  Among them, Binance had a big issue with the "wire rule."  The "wire rule" provides that you are supposed to include certain information in a wire when you complete it, including the originator and where the funds are going.  FE 5 explained that there were a lot of wires with Binance and Silvergate's other crypto-exchange customers where the information was just blank.  FE 5 explained that Silvergate was supposed to reject those or strongly discipline customers, including suspending their accounts, and insist customers include the information.  But, FE 5 explained, nobody at Silvergate took a hard enough line with customers to say Silvergate was going to suspend accounts unless customers included all the information on the wires.  FE 5 noted that this continued to be a problem even after August 15, 2022.

358.  FE 5 agreed that, prior to August 15, 2022, Silvergate did not do site visits.  FE 5 noted that there was also nothing written in Silvergate's procedure for site visits anywhere.  FE 5 said site visits are important to make sure a company is real and not a shell company or a front.  FE 5 elaborated with an example: if a company says it is a gas station, you need to make sure it is actually a gas station, that there are things on the shelves and people work there.  You need to make sure it is not just a dusty shop where nothing has been moved that is a front for drug money.  FE 5 agreed that it was shocking that Silvergate did not conduct site visits, adding that if you would not travel to where the prospective customer is located, then you should not do business with a customer located there.

359.  FE 5 explained that, following its receipt of the MRIAs and with the Federal Reserve breathing down its neck, Silvergate put in place new procedures on August 15, 2022.  Following the implementation of Silvergate's new procedures on August 15, 2022, FE 5's team wanted to go through any customers that had not gone through Silvergate's new onboarding process when those customers were previously onboarded and have an automatic look back apply the new procedures for those

customers as if those customers were being onboarded anew.  FE 5 explained that Silvergate did not do that, even though FE 5's boss agreed with the recommendation that Silvergate should.  FE 5 explained it would be industry standard for Silvergate to look back and apply the new procedures as if they were new customers; yet, Silvergate did not do this.

360.   In addition to these former employee accounts, the fact that Silvergate failed to perform onboarding due diligence is corroborated by the various sham entities that the Company onboarded.  If Silvergate had conducted the diligence represented in the 2021 Offering Documents, these entities never would have been allowed to bank at Silvergate and participate on the SEN Network.

361.   **FTX** was a cryptocurrency exchange founded by the now-infamous fraudster, Sam Bankman-Fried.  Silvergate approved FTX to participate on its SEN Network.  FTX and its related entities (North Dimension and Alameda) comprised approximately $2.1 billion in deposits—*i.e.*, over 17% of Silvergate's overall, Bank-wide deposits.[193]  Had Silvergate conducted the represented diligence, it would have discovered that FTX and its entities were frauds with no compliance or internal controls.  Silvergate would also have learned the truth about Alameda.  FTX and Alameda are separate legal entities and, accordingly, supposed to—and legally required by law to—operate independently; however, in reality, FTX and Alameda were operated as if they were one and the same.  Bankman-Fried controlled both entities, and both entities shared the same address—2000 Center Street, Suite 400, Berkeley, California.

---

[193] On November 16, 2022, Silvergate issued a press release disclosing that as of November 15, 2022, its "[a]verage quarter-to-date digital asset customer deposits" were "approximately $9.8 billion, excluding all deposits from FTX and its related entities."  This was a $2.1 billion reduction from the $11.9 billion that the Company had reported five days earlier for "deposits from all digital assets customers," which included FTX deposits.  *Compare* Press Release, "Silvergate Provides Statements on FTX Exposure (Nov. 11, 2022) *with*, Press Release, "Silvergate Provides Mid-Quarter Update and Announces Participation in Oppenheimer's 5th Blockchain & Digital Assets Summit" (Nov. 16, 2022).

362.   The fact that FTX was a complete ruse would have been obvious to Silvergate, had it actually conducted the represented diligence.  FTX had no CFO, a wildly inexperienced C-suite of Bankman-Fried's cronies, and a Chief Regulatory Officer who had been caught on tape aiding and abetting fraud in his previous position as General Counsel of Ultimate Bet, an online gambling site.[194]  Bankman-Fried ran the multibillion-dollar cryptocurrency exchange as a "personal fiefdom."[195]

363.   As FTX's new CEO, John Ray, has detailed in his testimony to Congress: at FTX, there was an "absolute concentration of control in the hands of a very small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money or assets."[196]  Additionally, FTX "did not keep appropriate books and records, or security controls, with respect to its digital assets."  Mr. Ray added, "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."  This is a strong statement coming from Ray, who has "over 40 years of legal and restructuring experience" and has overseen the clean-up of "several of the largest corporate failures in history," including being hired to guide Enron through its bankruptcy proceedings 20 years ago.

364.   Mr. Ray admitted in his testimony to Congress that, at FTX, "there was an absence of any management. You need records, you need controls, and you need to separate people's money. It's simple."  When asked if FTX had significant risk

---

[194] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022); *Business Insider*, "Chamath Palihapitiya said Sam Bankman-Fried once pitched him, but after the investor suggested changes like forming a board, FTX told him to get lost" (Nov. 15, 2022).

[195] Law360, "FTX Pledges Better Books, Celsius Faulted for Asset Mingling" (Nov. 23, 2022).

[196] Written Testimony of Mr. John J. Ray III, CEO, FTX Debtors, House Financial Services Committee (Dec. 13, 2022).

management systems, Ray responded that "there were virtually no internal controls and no separateness whatsoever" between FTX and another, Bankman-Fried owned Company and Silvergate client, Alameda, the parent company of North Dimension. He further testified that Bankman-Fried owned 90% of Alameda and there was "no distinction whatsoever" in governance between FTX and Alameda.[197]

365.    Asked to compare the FTX fraud to prior corporate disasters he has cleaned up, Mr. Ray said that FTX's collapse "is unusual in the sense that literally there's no record-keeping whatsoever [at FTX].  Mr. Ray added, in amazement: "They use[d] Quickbooks. A multibillion-dollar company using Quickbooks."  He elaborated that FTX "used QuickBooks as their accounting system and relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities."[198]  Worse yet, Ray has now documented that "[a]pproximately 80,000 transactions were simply left as unprocessed accounting entries in catch-all QuickBooks accounts titled 'Ask My Accountant.'"  Mr. Ray concluded that FTX is "one of the worst [entities] from a documentation standpoint" and "[i]t's really unprecedented in terms of the lack of documentation."[199]

366.    Bankman-Fried has himself now publicly admitted that he made zero effort to manage risk at FTX: "I wasn't even trying, like, I wasn't spending any time

_____

[197] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[198] Ray explained "QuickBooks was not designed to address the needs of a large and complex business like that of the FTX Group, which handled billions of dollars of securities, fiat currency, and cryptocurrency transactions across multiple continents and platforms," First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov 11, 2022), ECF No. 1241-1 at 13.

[199] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

or effort trying to manage risk on FTX."[200]  He added, "If I had been spending an hour a day thinking about risk management on FTX, I don't think [the collapse of FTX] would have happened."[201]  Bankman-Fried has also admitted that there was a "massive failure of oversight of risk management" at FTX.[202]  And FTX's new CEO, Mr. Ray, has confirmed these admissions, testifying that FTX's systems for accounting, audit, cash management, cybersecurity, risk management, and data protection "did not exist to an appropriate degree" or "did not exist" at all.[203]

367.  These stark admissions from FTX's most senior insiders about FTX's complete absence of any internal compliance programs are directly contrary to Silvergate's statements in the 2021 Offering Documents that Silvergate performed onboarding due diligence on its customers.

368.  ***North Dimension*** was a fake online electronics retailer, that Bankman-Fried founded in August 2020 to receive customer funds for FTX at Silvergate. Silvergate approved North Dimension to participate on its SEN Network.  Had Silvergate conducted the represented diligence described in the 2021 Offering Documents, it also would have discovered that North Dimension was a sham.  On its website, North Dimension claimed to sell mobile phones, laptops, watches and other personal electronics; yet, in reality, there was no actual way to purchase anything from North Dimension.  Clicking the links on its website to buy products "sold" at North Dimension generated a typo-filled, incoherent pop-up response to "Get A Quote," which stated: "Fee [sic] free to send a message. We collaborate with ambitious brands and people; we'd love to build something great together."[204]

---

[200] *Wall Street Journal*, "Sam Bankman-Fried 'Wasn't Even Trying' to Manage Risk at FTX, He Says" (Dec. 1, 2022).
[201] *Id*.
[202] *Id*.
[203] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.
[204] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).

**Figure 10.**  Screenshot of North Dimension's website.[205]

369.   If that was not enough, North Dimension's address, which was listed in plain sight on its website, was the <u>same</u> address as FTX's address: 2000 Center St., Suite 400 Berkeley California.  Worse yet, as *NBC* would later note following its investigation, North Dimension's website was "rife with misspellings and bizarre product prices; for example, item listings sometimes showed 'sale' prices that were hundreds of dollars above a regular price."[206]  The "About Us" section of North Dimension's website displayed text that "may have been written by a not-too-smart artificial intelligence," with North Dimension describing itself as a "World top E-commerce site for consumer electronics in order to provide the lowest costs for authentic items from the world's most reputable brands."[207]

---

[205] Web archive of North Dimension's website (as of Nov. 11, 2022).
[206] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).
[207] *Cointelegraph*, "Here's what SBF's fake electronics outlet 'North Dimension' looks like" (Dec. 30, 2022).



**Figure 11.** Screenshots of North Dimension's website.[208]

370.   In addition to not actually selling electronics products and being rife with misspellings, North Dimension's item listings for known products showed "sale" prices that were often hundreds of dollars above the "regular" price.  For example, an 11-inch iPad (again misspelled)—listed as a "Cell Phone"—inexplicably displayed a "sale" price of $899 and an "original" price of $410.

**Figure 12.** Screenshot of North Dimension's website.[209]

371.   Far from an "online electronics retailer," North Dimension was an utter sham created and controlled by FTX's CEO, Sam Bankman-Fried, to fraudulently

---

[208] Web archive of North Dimension's website (Nov. 11, 2022).
[209] *Id.*

divert billions of dollars of customer funds intended for FTX.  North Dimension had no employees, other than Bankman-Fried, and no physical location.  It had no actual business operations outside of its bank account at Silvergate and was nothing more than a Silvergate-approved sham allowed to fleece innocent customers out of billions of their hard-earned dollars.

372.  ***Binance*** was a cryptocurrency exchange, with approximately one-third of its users based in the United States.  Notwithstanding its substantial U.S.-customer base, Binance did not register with the Treasury Department, as is required by the Bank Secrecy Act for "financial companies with 'substantial' business in the United States."[210]    Instead, Binance and its owner, Zhaou Changpeng, created Binance.US—a U.S.-based exchange.  Binance.US. then registered itself with the Treasury Department, representing that Binance.US was "fully independent" from Binance.

373.  Silvergate approved Binance.US to join its SEN Network in November 2020.[211]  Silvergate did not perform due diligence on Binance.US. before it permitted it to join the SEN Network.  Those who have conducted due diligence on Binance.US have readily uncovered facts demonstrating that it is <u>not</u> "fully independent" from Binance; in fact, they are one and the same.  As U.S. senators explained in a bipartisan letter, "While Mr. Zhao has claimed that Binance.US, is a 'fully independent entity,' in reality, he controls the company as a '*de facto* subsidiary' of Binance," with "Binance's Cayman Islands holding company ke[eping] custody of Binance.US customers' digital wallets."[212]  The *Wall Street Journal* likewise found that "Binance and Binance.US have been much more

---

[210] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).
[211] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).
[212] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

intertwined than the companies have disclosed, mixing staff and finances and sharing an affiliated entity that bought and sold cryptocurrencies."[213]  *Reuters* also concluded that "Binance created Binance.US as a *de facto* subsidiary in 2019 in order to draw the scrutiny of U.S. regulators away from the global exchange."

374.   If it had conducted the due diligence represented in the 2021 Offering Documents, Silvergate would also have learned that Binance and its executives controlled Binance.US's finances at Silvergate.   When it conducted its review, *Reuters* readily found evidence that Binance's executives, including its finance executive Susan Li, had access to Binance.US's Silvergate account.  The bipartisan group of U.S. senators similarly concluded that, "in truth, 'the global Binance exchange, which is not licensed to operate in the United States, controlled the finances of Binance.US, despite maintaining that the American entity is entirely independent and operates as its 'US Partner.'"[214]

375.   Had Silvergate actually performed the represented due diligence on these entities (as it told investors it had), it would have realized that they were nothing more than sham entities created to evade U.S. laws and funnel funds from Binance.US to Binance and Zhao.  Indeed, "Mr. Zhao 'decline[d] to disclose the location or entity behind his own exchange [at Binance]' in what many regard as a blatant attempt to dodge the world's financial regulators, serve 'users without licenses,' and violate anti-money laundering laws."[215]

---

[213] *Wall Street Journal*, "Texts From Crypto Giant Binance Reveal Plan to Elude U.S. Authorities" (Mar. 5, 2023).
[214] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).
[215] *Id.*

376.  Additionally, a simple "site visit" to the address provided for Key Vision Development Limited (Office 22 Alpha Centre, Providence, Mahe, Seychelles), or even a search using "Google Earth" for the address, would have made plain that it was the address for a massive warehouse—not the business office of an entity transacting in hundreds of millions of dollars in cryptocurrency:

 

**Figure 13.**  Images of Key Vision Limited Development's purported address.[216]

377.  ***Huobi Global*** was a Seychelles-based cryptocurrency exchange, founded in China.  Silvergate approved Huobi to participate on its SEN Network. Had Silvergate conducted the diligence represented in the 2021 Offering Documents, it would have discovered a slew of troubling facts, including that Huobi lacked compliance controls.  For example, in December 2020, investigators at the forensics company CipherBlade conducted a review of Huobi's controls.  Their review "demonstrated how simple it was to create false accounts" at Huobi and transact on the exchange, which created conditions ripe for money laundering and other illegal transfers.[217]  As CipherBlade found, exchange participants at Huobi

---

[216] Post by Stefan Luebeck, a cryptocurrency market analyst at BTC-ECHO, dated Feb. 16, 2023; Google Earth Image Search.
[217] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

could wire funds using phony information, including obviously false names and photographs of themselves, such as "Taylor Swift" and "Borat." Other investigators similarly concluded that Huobi "fail[ed] to perform stringent background checks" and "know-your-customer (KYC) processes" on customers, making it a "'gateway for money laundering and other gray activities.'"[218]

378. If Silvergate had actually conducted due diligence on Huobi, it also would have found that "Huobi Global had not taken any action against the links that were made between Huobi and the darknet marketplace Hydra."[219] In October 2021, investigators of the National Bureau of Economic Research in Cambridge, Massachusetts issued a report "show[ing] that the highest volume entities interacting directly with Hydra Market users are non-KYC exchanges, including Binance and Huobi which are two of the largest exchanges worldwide."[220] The DOJ has described Hydra as "the world's largest and longest-running darknet market," with Hydra having received in total around $5.2 billion in cryptocurrency.[221] Aurelius Capital Value rightfully summed it up correctly when it questioned Silvergate associating with Huobi: it is impossible "to find a way to harmonize the formal due diligence procedure that Silvergate uses with Huobi's onboarding process."[222]

379. ***Nexo Capital Inc.*** was a cryptocurrency lending firm that Silvergate also approved to bank and operate on its SEN Network. Silvergate did not perform the represented due diligence on Nexo. Had Silvergate performed the due diligence on Nexo represented in the 2021 Offering Documents, it would have learned that

---

[218] *Verdict*, "Dirty bitcoin: Exchanges' KYC laxity eases money laundering – report" (Oct. 27, 2021).
[219] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).
[220] National Bureau of Economic Research, *Blockchain Analysis of the Bitcoin Market*, (October 2021).
[221] Press Release, DOJ, "Justice Department Investigation Leads to Shutdown of Largest Online Darknet Marketplace" (Apr. 5, 2022).
[222] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

Nexo failed to register with the SEC, as required by law. Following its review of Nexo, the SEC "charged Nexo with failing to register its retail crypto lending product before offering it to the public, bypassing essential disclosure requirements designed to protect investors." Prosecutors that have conducted due diligence on Nexo have also learned, as reported by *Reuters*, that "Nexo has been operating through many companies, many of which were just 'post boxes.'"[223] The SEC has forced Nexo to cease and desist, with Nexo required to pay $45 million in fines to the SEC and state regulators.[224]

380. **Miles Guo** (a/k/a Ho Wan Kwok) owned two entities approved by Silvergate: "Hamilton Opportunity Fund SPC" and "Hamilton Investment Management Ltd." Silvergate did not perform the represented due diligence on Guo or his entities. Had Silvergate performed the represented due diligence on Guo or his entities, it would have found what the SEC and others readily discovered: "Guo was a serial fraudster" who "took advantage of the hype and allure surrounding crypto and other investments to victimize thousands and fund his and his family's lavish lifestyle."[225] Guo—who is currently under arrest in the United States—operated through "fraudulent and fictious businesses" that "connected dozens of interrelated entities," allowing Guo "to solicit, launder, and misappropriate victim funds."[226] On September 18, 2022, the DOJ seized over $389 million from Guo's accounts at Silvergate, including Hamilton Opportunity Fund SPC (Silvergate Account Numbers: 5090037713, 5090037705, 5090037754, 5090042770,

---

[223] *Reuters*, "Bulgaria launches probe of crypto lender Nexo, raids sites" (Jan. 12, 2023).
[224] Press Release, SEC, "Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product" (Jan. 19, 2023).
[225] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023).
[226] Sealed Indictment, *United States v. Ho Wan Kwok*, No. 23-cr-118 (S.D.N.Y. Mar. 6, 2023).

5090042762, 5090042853, 5090037739, 5090042853) and Hamilton Investment Management Ltd. (Silvergate Account Number: 5090030288).[227]

381.    ***Virgil Sigma Fund LP and VQR Multistrategy Fund LP*** were two cryptocurrency hedge funds run by convicted felon Stefan Qin.  Both entities were also approved by Silvergate to participate on the SEN Network and authorized to set up twelve accounts at Silvergate.[228]  Silvergate did not perform the represented due diligence on these Silvergate-approved entities.  Had Silvergate conducted the due diligence it represented, it would have discovered that these entities operated a Ponzi scheme.  When the New York Field Office of Homeland Security Investigations Unit reviewed these entities, they readily found that "Virgil Sigma and VQR, two multimillion-dollar cryptocurrency investment funds, were . . . slush funds for Qin to live his extravagant lifestyle. Qin orchestrated this reprehensible criminal scheme for many years, making misrepresentations and false promises that coaxed investors into pouring millions of dollars into fraudulent cryptocurrency firms, all the while stealing the hard-earned money of his investors."[229]

382.    ***Bittrex, Inc.*** was a cryptocurrency exchange that Silvergate approved for its SEN Network and specifically highlighted, by name, on its website as one of its major customers.  Silvergate did not conduct the due diligence on Bittrex that it represented to investors in the 2021 Offering Documents.  Had Silvergate actually conducted due diligence of Bittrex, it would have discovered, as the Treasury Department has found, that Bittrex "violated multiple sanctions programs and failed

---

[227] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023); Press Release, USAO SDNY "Ho Wan Kwok, A/K/A "Miles Guo," Arrested For Orchestrating Over $1 Billion Dollar Fraud Conspiracy" (Mar. 15, 2023).

[228] *Business Insider*, "Silvergate had close ties to Sam Bankman-Fried's FTX and Alameda.  The crypto bank was also reportedly a favorite of other troubled clients including an Australian Ponzi criminal" (Jan. 24, 2023).

[229] Press Release, USAO SDNY, "Founder Of $90 Million Cryptocurrency Hedge Fund Charged With Securities Fraud And Pleads Guilty In Federal Court" (Feb. 4, 2021).

to adequately guard against money laundering." Among other things, Bittrex "failed to have a proper anti-money laundering program" and "unnecessarily exposed the U.S. financial system to threat actors."[230] Bittrex has now been required to pay $53 million for violating multiple U.S. sanctions programs, which was "the biggest fine on a crypto business by the Treasury Department."

383. In sum, if Silvergate had conducted the "extensive regulatory compliance diligence" and "thorough reviews . . . as part of [its] due diligence process" in connection with its "onboarding new customers" that it told investors it had in the 2021 Offering Documents (but which it had not), Silvergate would have seen—as investigators and U.S. senators uniformly have—that these entities were shams and should never have been allowed to participate on the SEN Network.

384. *Second*, Silvergate did not perform ongoing transaction monitoring of its SEN Network participants or "enhanced due diligence" of its cryptocurrency-exchange customers. Indeed, when asked whether Silvergate conducted enhanced ongoing monitoring, FE 3 replied, "Absolutely not." When asked whether Silvergate conducted enhanced due diligence, FE 3 replied, "Absolutely not." And as far as FE 3 was aware, "customer risk scoring, with risk factors specific to the digital-currency industry" did not exist at Silvergate, and she explained that, in her position at the Bank, she would expect to be aware of such a process, if it existed. FE 3 was in meetings with Lane and his direct reports; there was never anything stated about compliance during these regular meetings.

385. Likewise, FE 1 also did not see Silvergate monitoring of clients on the SEN Network. When asked whether FE 1 had seen "extensive regulatory compliance diligence" performed by Silvergate during her time at the Bank, FE 1 replied, "I did not." When asked whether she had seen Silvergate perform any type of "enhanced procedures to screen and monitor [crypto customers]" during her time

---

[230] *Decrypt*, "Treasury Fines Crypto Exchange Bittrex $53 Million for Sanctions Violations" (Oct. 11, 2022).

at Silvergate, she replied, "I did not."    When asked whether Silvergate "comprehensively investigat[ed] prospective customers" or conducted "customer risk scoring with risk factors specific to the digital-currency industry," FE 1 stated that she was not aware of any of that occurring at Silvergate.

386.  FE 1 also knew Silvergate had no ongoing monitoring because employees never received the training to do it.  FE 1 does not recall Silvergate having the employees take tests on KYC or anything else compliance-related.  Nor does FE 1 recall any training regarding KYC or specific crypto related compliance issues.

387.  When asked whether FE 1 had seen Silvergate conduct "thorough reviews we conduct as part of our due diligence process . . . designed to detect any such illicit activities conducted by our potential or existing customers [and] in the case of digital currency exchanges, their customers" during her time at Silvergate, FE 1 replied, "I did not."  Likewise, when asked whether she had seen Silvergate engage in "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers" or "system monitoring rules tailored to digital currency activities," FE 1 replied, "I did not."

388.  Silvergate also had no system of red flags.    When asked about Silvergate's public statements that it had a "system of red flags specific to various customer types and activities," FE 3 explained that Silvergate had purchased an AML software to do this, but it was never implemented.  FE 3 explained that the AML software was supposed to flag customer activity with sanctioned countries, excessive cash transactions, and other kinds of alerts; and the Company would be able to set the parameters on what the software should flag.  None of that was being done at Silvergate, explained FE 3.  FE 3 added that, during meetings, she heard it noted that the implementation of the AML software would be a project at some point, but it was never put on the active project list.  Further corroborating FE 3's account,

when asked whether she had seen "a system of 'red flags' specific to various customer types and activities," FE 1 replied, "I did not."

389.  FE 3 asked her colleagues in 2022 whether Silvergate was doing anomaly detection—*i.e.*, looking for suspicious activity.  She was told that they were not.  FE 3 then tried to create a report, based on a manual review, that would detect anomalous activity.  FE 3 recounted, however, there was no one to tell even if her team found suspicious activity, because, "Nobody cared."  FE 3 confirmed that— outside of her failed manual attempt—Silvergate did not perform any anomaly detection.

390.  FE 2 explained that about half of Silvergate's customers were not even known by the Bank.[231]  He would ask people at Silvergate what a business did, who the owners were, and what the management structure was, and Silvergate did not have that information.  Based on his experience and understanding, Silvergate banked everyone who wanted to be a customer and it seemed to bank everyone regardless of what their compliance programs were like.  FE 2 confirmed that any diligence was a "check the box" activity.  FE 2 reported he and his fellow analysts felt like they were checking boxes for the sake of it without the Bank actually being mindful of the risk they were absorbing.

391.  FE 2 stated that in his experience, Silvergate did not have a deep-rooted commitment to compliance and said that he does not believe a lot of action was taken regarding suspicious activity.  FE 2 explained that everyone in his department, including FE 2, mentioned concerns with respect to compliance to Jennifer Steinbock, a "BSA/Compliance Manager."  FE 2 recalled that he and his colleagues knew that there was frustration on the part of Steinbock regarding customers they believed should be exited, but would not be by order of Silvergate's Chief Operating

---

[231] FE 2 worked at Silvergate from October 2017 to June 2019 as a "BSA Analyst," reporting to Jennifer Steinbock.

Officer.  FE 2 agreed that determinations that the identified suspicious activity was "normal" were not justified and just an effort by Silvergate to keep the business.

392.   FE 2 remembers asking his Silvergate colleagues so many times, how many of these suspicious reports are we going to absorb, and he was told they would just keep re-reviewing them forever.  FE 2 explained that no Silvergate customer accounts were ever closed.

393.   FE 2 explained that he left Silvergate because he did not feel they had a culture of compliance.

394.   FE 4's account further corroborates Silvergate's lack of any ongoing monitoring of its customers.  FE 4 reported that when Silvergate received reports from customers and other banks of unauthorized transactions, the Bank would not investigate.[232]   FE 4 explained that even when the originating bank would tell Silvergate that the client had said a transaction was unauthorized, Silvergate did not investigate.  FE 4 said receiving these unauthorized transaction requests were a red flag but there was never any investigation by Silvergate to determine what happened with unauthorized transactions.

395.   In addition to these former employee accounts, the fact that Silvergate failed to perform ongoing monitoring of its customer activity is further corroborated by the fraudulent activities that cryptocurrency exchange customers performed on the SEN Network, and the findings of the Federal Reserve, U.S. senators, and investigative journalists.

396.   ***FTX, Alameda, and North Dimension.***  Silvergate did not conduct ongoing monitoring of FTX or its related entities.  Instead, Silvergate allowed Sam Bankman-Fried to use FTX and his other entities to dupe innocent customers out of billions of dollars.  Sam Bankman-Fried's and FTX's fraud of their customers was

---

[232] FE 4 worked at Silvergate from February 2011 to July 2021 as "VP of Deposit Operations."  She reported to Dina Matias, Silvergate's "Senior Vice President, Operations Administrator," who reported to Elaine Hetrick, Silvergate's Chief Administrative Officer.

simple. When customers wished to purchase cryptocurrency from FTX's account, they were directed to wire their fiat currency into the Silvergate-approved accounts of two entities that were <u>not</u> FTX—specifically, they were directed to wire their funds to "North Dimension" and "Alameda." None the wiser, innocent FTX customers wired more than $8 billion to the Silvergate-approved accounts of North Dimension and Alameda.[233] FTX's CEO, Sam Bankman-Fried, then absconded with those dollars from Silvergate, without crediting the customers' cryptocurrency accounts at FTX. Once FTX collapsed, FTX customers were left empty-handed and unable to free their money.

397. FTX and Alameda did not even have an accounting department.[234] Rather than being safely kept at Silvergate, FTX customer funds were diverted to Alameda and North Dimension, and then "used to purchase homes and other personal items for [Silvergate] employees and advisors" in the Bahamas. When FTX employees wanted to make such purchases, they needed only to "submit[] payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis."[235] "These informal, ephemeral messaging systems were used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all." Alameda even "had difficulty understanding what its positions were, let alone hedging or accounting for them," Ray has reported, including that "a June 2022 'Portfolio summary' purporting to model cryptocurrency positions held by Alameda Research stated, with respect to valuation inputs for certain tokens, that Alameda personnel should 'come up with some numbers? idk.'" As observed by Federico Lascano of Fiducient Advisors, the lack of "cash controls" at FTX "enabled

---

[233] *Vox*, "Sam Bankman-Fried tries to explain himself" (Nov. 16, 2022).
[234] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.
[235] *Id.*

customer funds to be freely transferred to Alameda," and "would have been an enormous red flag during the operational due diligence process."[236]

398.    FE 3 also handled wire limit changes for FTX, Alameda, and North Dimension.    FE 3 saw no ongoing monitoring of FTX, Alameda, or North Dimension.  In her role, she would at least be aware of such monitoring if it existed, said FE 3.    FE 3 explained that this monitoring should have included currency transaction reports, wire volumes, wire destinations, ACH exceeding limits, invalid or unauthorized return rates, and SEC codes, and activity between accounts.

399.    A bipartisan group of senators on the U.S. Senate Banking Committee later explained in a December 5, 2022 bipartisan letter to Defendant Lane: "Your bank's involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."[237]

400.    ***Binance***: Silvergate additionally failed to monitor Binance.US's activity, allowing transfers of hundreds of millions of dollars to the other entities of Binance's CEO, Zhao, without the permission—or even the knowledge—of Binance.US's employees.  As *Reuters* revealed, beginning in late 2020, $400 million of funds at Silvergate were transferred from Binance.US to a separate account controlled by Zhao "without [Binance.US's] knowledge."[238]    Funds were moved from Binance.US's account at Silvergate Bank to "Merit Peak," another shell entity owned approved by Silvergate.  Merit Peak then transferred funds to "Key Vision

---

[236] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022).  Mr. Lascano researches and performs operational due diligence on alternative investment managers.  Prior to joining Fudicient Advisors in 2022, Mr. Lascano worked in regulatory finance at NatWest Markets, the investment banking arm of NatWest Group based in the United Kingdom.
[237] Letter from Warren, Kennedy, and Marshall to Lane (Dec. 5, 2022).
[238] *Reuters,* "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

Development Limited," yet another sham entity that "held an account at Silvergate at the time" and that also "identified CEO Zhao as a director."[239]

401.   Had Silvergate actually performed the due diligence it represented to investors, it would also have discovered that these entities lack a compliance program.  Binance is, as the U.S. senators explained in their March 2023 bipartisan letter, "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders."  This conclusion is well-founded: "crypto researcher Chainalysis, hired by U.S. government agencies to track illegal flows, concluded in a 2020 report that Binance received criminal funds totaling $770 million in 2019 alone, more than any other crypto exchange."[240]  Even more, Binance's own Chief Compliance Officer admitted that its KYC checks were "weak", with Binance's CEO (Mr. Zhao) wanting "no kyc." "Binance.US was also in on the scheme: 'Almost half the U.S. compliance team quit by mid-2022 after a new U.S. boss was appointed by Zhao, . . . because the new chief pushed them to register users so swiftly that they couldn't conduct proper money laundering checks.'"[241]  In fact, Binance.US executives directed compliance personnel to "apply more lenient checks" to "VIP customers" who had been referred to the platform to increase its liquidity.  The U.S. senators further concluded that Binance maintained a "laughably weak anti-money laundering compliance program," with *Reuters* similarly finding that "the main Binance exchange let users open accounts and trade crypto anonymously by merely providing an email address."

402.  Silvergate would have found—as investigators and U.S. senators uniformly have—that "Binance and its related entities have purposefully evaded

---

[239] *Id.*

[240] *Reuters*, "How crypto giant Binance became a hub for hackers, fraudsters and drug traffickers" (June 6, 2022).

[241] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

regulators, moved assets to criminals and sanctions evaders, and hidden basic financial information from its customers and the public."[242]

403.    **Paxos and OSL Digital** are cryptocurrency exchanges approved by Silvergate.  The Bank did not conduct the represented due diligence on either of these cryptocurrency exchanges or monitor their activity.  As a result, these exchanges were able to launder $425 million between September 2021 and June 2022 from accounts held at Silvergate—namely, Paxos Global PTE LTD; Paxos Trust Company LLC; OSL Digital LTD; and OSL SG PTE LTD.[243]  Had Silvergate conducted the represented "ongoing monitoring" of the activity on its SEN Network, it would have detected the money laundering and not approved the cryptocurrency exchanges that facilitated such illegal activity.

404.    Florida's Money Laundering Task Force ("MLTF") conducted a review of "the records produced by Silvergate Bank" for these cryptocurrency exchanges.[244] MLTF readily found that these exchanges facilitated "the laundering of illicit funds." The Deputy Sheriff of Broward County, assigned to the MLTF, submitted an affidavit on August 23, 2022, following his review of the "the records produced by Silvergate Bank" and concluded that:

> "During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms [at Silvergate] into accounts held at different U.S. banks."

> "The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized . . . by the [Broward County Sheriff's Office Strategic Investigations Division, Money

---

[242] *Id.*

[243] *CryptoSlate*, "Silvergate records reveal $425M in transfers to South American money launderers" (Nov. 16, 2022).

[244] "Affidavit in Support of Probable Cause for Forfeiture," *In re: Seizure of Two Million Forty-Eight Thousand Two Hundred Twenty-Nine Dollars and 48/100 ($2,048,229.48) in United States Currency*, No. CACE-22-012446 (Cir. Ct., 17th Jud. Cir., Broward Cnty., Fla.).

Laundering Task Force] for being used to facilitate the laundering of illicit funds."

"In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same [Silvergate] records."

"In general, these companies all appeared to be shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details . . . ."[245]

405.  Had Silvergate actually monitored the activity on its platform (as it represented it had), it would have identified that these entities' transactions "were not consistent with the transaction patterns of thousands of other persons and businesses" and recognized that hundreds of millions of dollars was being wired from the Silvergate-approved exchanges to "shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details."[246]

406.  If Silvergate had conducted the "extensive regulatory compliance diligence" and "ongoing monitoring of customer activities" that it told investors it had in the 2021 Offering Documents (but which it had not), Silvergate would have seen—as investigators and U.S. senators uniformly have—the myriad "red flags" caused by these entities' transaction activity on the SEN Network.

## XIV.    THE MISSTATEMENTS AND OMISSIONS WERE MATERIAL

407.  The challenged statements in the 2021 Offering Documents are material.  Facts demonstrating that the statements are material include:

---

[245] *Id.*
[246] *Id.*

408. **First**, the Company, itself, has admitted the materiality of the misrepresented facts. In its Annual Report filed with the SEC on Form 10-K, Silvergate stated that its represented compliance procedures provided "a distinct competitive advantage for [the Bank], and provide a meaningful barrier to entry against [its] potential competitors."[247] Silvergate further stated that its SEN Network was "[i]nstrumental to [Silvergate's] leadership position and growth strategy," and the SEN Network "enabled [Silvergate] to focus on significantly growing [its] noninterest bearing deposit product for digital currency industry participants," which provided Silvergate with "the majority of [its] funding over the last two years."

409. **Second**, Silvergate's representations about its vetting, diligence, and monitoring were important to analysts. For example, in an October 16, 2020 analyst report recommending that investors "BUY" Silvergate stock, Compass Point included a three-page detailed description of the Bank's "regulatory compliance," "due diligence and onboarding processes," and "selective[ness] in the customer onboarding process," identifying Silvergate's "compliance capabilities" as "a distinct competitive advantage and . . . a meaningful barrier to entry." The analyst report further highlighted the Company's "proprietary compliance capabilities" for "ongoing monitoring of customer activities" and outlined the measures involved in the Company's "due diligence and onboarding processes"—such as "detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate"—as well as the "more extensive processes" in place for cryptocurrency exchanges, including "reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding the Bank Secrecy Act (BSA), consumer compliance, information security, Dodd-Frank Wall Street Reform and Consumer

---

[247] Silvergate, Annual Report (Mar. 10, 2020).

Protection Act, prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

410.    Additionally, a December 2, 2020 Craig-Hallum analyst report advising investors to "BUY" Silvergate stock stated that Silvergate's SEN Network was the "centerpiece" of the Bank and, as it grew, "it became a de-facto due-diligence arm and quasi-gate keeper."  Similarly, in a December 2021 report, J.P. Morgan analysts noted that, "[w]ith Silvergate completing due diligence related to KYC and AML (when it onboards new clients to the SEN platform), the company effectively reduces counterparty risks for its clients."

411.    **Third**, Silvergate's purported compliance procedures were critical to Silvergate's ability to secure bank deposits.  Silvergate's stated adherence to strict standards attracted customers by supposedly reducing counterparty risk.  As analysts at Wedbush observed, the SEN Network purported to solve "major issues that had existed in the digital currency market" by "reducing counterparty risk."  A report by analysts at Canaccord Genuity further emphasized, "the core SEN value proposition of removing counter-party risk has become table stakes in institutional crypto trading."

412.    **Fourth**, the materiality of the misrepresented and omitted information is further demonstrated by the fact that the Federal Reserve reprimanded Silvergate when it discovered the Bank's failure to vet, perform due diligence on, and monitor its clients.  The Federal Reserve went so far, in fact, as to issue a non-public report identifying these deficiencies as "Matters Requiring Immediate Attention"—with which Silvergate's third-party contractors agreed.

413.    **Fifth**, the materiality of the misrepresented and omitted facts is further demonstrated by the fact that, after customers learned the truth about Silvergate's failure to conduct the represented diligence and monitoring, its customers pulled their deposits and left the Bank.  Cryptocurrency exchange customers such as Coinbase, Galaxy Digital, Paxos, Circle Internet Financial, and Gemini each

announced that they would immediately stop accepting or initiating payments through Silvergate.  As a result, on March 8, 2023, Silvergate announced "its intent to wind down operations and voluntarily liquidate the Bank."

414.  ***Finally***, the investor reaction to the revelation of the truth about Silvergate's "vetting," "due diligence," and "monitoring" demonstrates the materiality of Defendants' statements.  The market was shocked when investors learned that Silvergate failed to perform the compliance and due diligence procedures that the Company had described.  As analysts at *Wall Street on Parade* observed, the Bank's eventual admissions at the end of the Class Period "stand[] in rather stark contrast" to Silvergate's statements "lauding how the company is 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'"  Silvergate's stock price has plummeted to approximately $1 per share today—well below the offering price for Silvergate stock.

## XV.    CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III - Violations of § 11 of the Securities Act
### in Connection with the 2021 Offerings
### (Against Silvergate, Executive and Director Defendants, and Underwriter Defendants)

415.  Plaintiffs repeat and reallege the allegations above in paragraphs 317 to 414 relating only to the Securities Act claims as if fully set forth herein.

416.  This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the 2021 Offerings, and were damaged thereby.  For purposes of this count, Plaintiffs affirmatively state that they do not allege that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.  This claim is based solely in strict liability and negligence.

417.   Defendants' liability under this count is predicated on the participation of each Defendant in conducting these Offerings based on the 2021 Offering Documents, which contained untrue statements and omissions of material fact.  This count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants named in this count acted with intentional, reckless, or otherwise fraudulent intent.

418.   As set forth in its respective PSLRA certification (attached hereto), Bucks County acquired common stock pursuant to the January 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein.  Bucks County purchased 660 shares of Silvergate common stock on January 22, 2021 at the public offering price in the January 2021 Offering.

419.   As set forth in their respective PSLRA certifications, Indiana (attached hereto) and Local 793 (ECF No. 16-3) each acquired common stock pursuant to the December 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein.  Indiana purchased 14,200 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering.  Local 793 purchased 591 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering.

420.   The 2021 Offering Documents all contained the same untrue statements of material fact and all omitted the same facts necessary to make the statements in them not misleading.  *See* ¶¶331-36.  Each was false and misleading for the same reasons.  *See* ¶¶337-406.

421.   Through their purchases of shares in the 2021 Offerings and pursuant to the 2021 Offering Documents, which all contained the same misstatements and omissions, Lead Plaintiffs Indiana and Local 793 and Plaintiff Bucks County have standing to bring these claims on behalf of themselves and those persons who also purchased shares in or traceable to the 2021 Offerings.

422.    Defendant Silvergate was the issuer for the 2021 Offerings, within the meaning of Section 11 of the Securities Act.

423.    The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Lane, Lempres, Martino, Reed, and Sullivan each signed the January 2021 Registration Statement—which formed the January 2021 and March 2021 Offering Documents—as a senior officer and/or director of Silvergate within the meaning of Section 11 of the Securities Act.  The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Gupta Lane, Lempres, Martino, Reed, and Sullivan each signed the July 2021 Registration Statement—which formed the July 2021 and December 2021 Offering Documents—as a senior officer and/or director of Silvergate within the meaning of Section 11 of the Securities Act.

424.    The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, and Keefe each were underwriters for the January 2021 Offering within the meaning of Section 11 of the Securities Act.

425.    The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, Keefe, and Wedbush each were underwriters for the March 2021 Offering within the meaning of Section 11 of the Securities Act.

426.    The Underwriter Defendants Citigroup, Goldman, J.P. Morgan, Keefe, and UBS each were underwriters for the July 2021 Offering within the meaning of Section 11 of the Securities Act.

427.    The Underwriter Defendants Compass, Craig-Hallum, Goldman, J.P. Morgan, Keefe, and Wedbush each were underwriters for the December 2021 Offering within the meaning of Section 11 of the Securities Act.

428.    The Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public which were contained in the 2021 Offering Documents, which misrepresented or failed to disclose the

material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

429.    In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants named in this count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

430.    None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2021 Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

431.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the 2021 Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

432.    As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the securities pursuant and/or traceable to the 2021 Offering Documents.

433.    By reason of the foregoing, the Defendants named in this Count are liable to the members of the Class who acquired registered securities pursuant to or traceable to the 2021 Offering Documents.

434.    This claim was brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the 2021 Offering Documents.

**COUNT IV - Violations of § 12(a)(2) of the Securities Act**
**in Connection with the 2021 Offerings**
**(Against Silvergate, Executive and Director Defendants, and Underwriter**
**Defendants)**

435. Plaintiffs repeat and reallege the allegations above in paragraphs 317 to 434 relating only to the Securities Act claims as if fully set forth herein.

436. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the 2021 Offerings, and were damaged thereby. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Silvergate or the Underwriter Defendants acted with intentional, reckless, or otherwise fraudulent intent, which are not elements of a Section 12(a)(2) claim. This claim is based solely in strict liability and/or negligence.

437. Defendants' liability under this count is predicated on their statutory liability for making untrue and materially misleading statements or omissions in the 2021 Offerings Documents.

438. Plaintiffs bring this claim on behalf of members of the Class pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Defendant Silvergate and the Underwriter Defendants.

439. The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Lane, Lempres, Martino, Reed, and Sullivan each signed the January 2021 Registration Statement, which formed the January 2021 and March 2021 Offering Documents and contained the January 2021 Prospectus. The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Gupta Lane, Lempres, Martino, Reed, and Sullivan each signed the July 2021 Registration Statement, which formed the July 2021 and December 2021 Offering Documents and contained the July 2021 Prospectus.

440.   The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, and Keefe each were underwriters for the January 2021 Offering.

441.   The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, Keefe, and Wedbush were the underwriters for the March 2021 Offering.

442.   The Underwriter Defendants Citigroup, Goldman, J.P. Morgan, Keefe, and UBS each were underwriters for the July 2021 Offering.

443.   The Underwriter Defendants Compass, Craig-Hallum, Goldman, J.P. Morgan, Keefe, and Wedbush each were underwriters for the December 2021 Offering.

444.   The Defendants named in this count were statutory sellers and offerors and/or solicitors of purchases of the Silvergate securities registered in the 2021 Offerings and sold by means of the prospectuses within the 2021 Offering Documents.  By means of the defective 2021 Offering Documents, each Defendant named in this count promoted, solicited, and/or sold millions of Silvergate securities to Plaintiffs and members of the Class.  Silvergate and the Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, Silvergate and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the 2021 Offerings by means of the materially false and misleading 2021 Offering Documents.

445.   Silvergate and the Underwriter Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public which were contained in the 2021 Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

446.   As set forth in its respective PSLRA certification (attached hereto), Bucks County acquired common stock pursuant to the January 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged

herein. Bucks County purchased 660 shares of Silvergate common stock on January 22, 2021 at the public offering price in the January 2021 Offering. The misstatements in the January 2021 Offering Documents were repeated in the March 2021, July 2021, and December 2021 Offering Documents.

447. As set forth in their respective PSLRA certifications, Indiana (attached hereto) and Local 793 (ECF No. 16-3) each acquired common stock pursuant to the December 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Indiana purchased 14,200 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering. Local 793 purchased 591 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering. The misstatements in the December 2021 Offering Documents were repeated in the January 2021, March 2021 and July 2021 Offering Documents.

448. The 2021 Offering Documents all contained the same untrue statements of material fact and all omitted the same facts necessary to make the statements in them not misleading. *See* ¶¶331-36. Each was false and misleading for the same reasons. *See* ¶¶337-406.

449. Through their purchases of shares in the 2021 Offerings, which all contained the same misstatements and omissions, Lead Plaintiff Indiana and Local 793 and Plaintiff Bucks County have standing to bring these claims on behalf of themselves and those persons who also purchased shares in the 2021 Offerings.

450. In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

451. None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2021 Offering Documents were accurate and complete in all

material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

452.  Class members did not know, nor in the exercise of reasonable diligence could they have known, that the 2021 Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

453.  As a direct and proximate result of the Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of securities pursuant and/or traceable to the 2021 Offering Documents.

454.  This claim was brought within one year after the untrue statements and omissions were or could have been discovered, and within three years after the issuance of the 2021 Offering Documents.  By reason of the foregoing, the Defendants named in this count have violated Section 12(a)(2) of the Securities Act.

455.  By reason of the foregoing, the Defendants named in this count are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased Silvergate securities pursuant and/or traceable to the January 2021 Offering Documents, and who were damaged thereby.

### COUNT V - Violation of § 15 of the Securities Act in Connection with the 2021 Offerings (Against the Executive and Director Defendants)

456.  Plaintiffs repeat and reallege the allegations above in paragraphs 317 to 455 relating only to the Securities Act claims as if fully set forth herein.

457.  This count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the 2021 Offering Documents. This count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the 2021 Offering Documents are excluded from

this count.  For purposes of asserting this count, Plaintiffs do not allege that the Securities Act Executive and Director Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

458.  This count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who have asserted claims pursuant to Sections 11 and 12(a), against the Securities Act Executive and Director Defendants.

459.  The Securities Act Executive and Director Defendants were at all relevant times controlling persons of Silvergate within the meaning of Section 15 of the Securities Act.  Each of the Securities Act Executive and Director Defendants served as the most senior executive officers and directors of Silvergate at the time of the 2021 Offerings.  The Securities Act Executive and Director Defendants participated at all relevant times in the operation and management of Silvergate, and conducted and participated, directly and indirectly, in the conduct of Silvergate's business affairs.  As directors and officers of a publicly owned company, the Securities Act Executive and Director Defendants had a duty to disseminate accurate and truthful information with respect to Silvergate.  Because of their positions of control and authority as directors and officers of Silvergate, the Securities Act Executive and Director Defendants were able to, and did, control the contents of the 2021 Offering Documents, which contained materially untrue financial information and omissions.

460.  By reason of the foregoing, the Securities Act Executive and Director Defendants are liable under Section 15 of the Securities Act, to the same extent that the Securities Act Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class.

## XVI.    CLASS ACTION ALLEGATIONS

461.  Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of (i) all persons or

entities that purchased or otherwise acquired shares of Silvergate Class A common stock between November 7, 2019 through March 21, 2023, inclusive, and who were damaged thereby (the "Class Period"); and (ii) all persons or entities who purchased Silvergate stock in or traceable to Silvergate's securities offerings conducted through the 2021 Offerings, and were damaged thereby.  Excluded from the Class are Defendants, directors and officers of Silvergate, and their families and affiliates.

462.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the class members.  During the Class Period, Silvergate had more than 39 million shares of stock outstanding, owned by many thousands of investors.

463.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Silvergate's common stock was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

464.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

465.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

466.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XVII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.     awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XVIII.     JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated:  May 11, 2023                 Respectfully submitted,

/s/ Carol V. Gilden                          /s/ Jonathan D. Uslaner
**COHEN MILSTEIN SELLERS**          **BERNSTEIN LITOWITZ BERGER**
**& TOLL PLLC**                              **& GROSSMANN LLP**
Carol V. Gilden (admitted *pro hac vice*)    Jonathan D. Uslaner (Bar No. 256898)
cgilden@cohenmilstein.com          jonathanu@blbglaw.com
190 S. LaSalle Street, Suite 1705    Lauren M. Cruz (Bar No. 299964)
Chicago, IL 60603                    lauren.cruz@blbglaw.com
Tel: (312) 629-3737                  2121 Avenue of the Stars, Suite 2575
                                     Los Angeles, CA 90067
                                     Tel: (310) 819-3470
-and-

                                     -and-
Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
S. Douglas Bunch (admitted *pro hac*    John J. Rizio-Hamilton (*pro hac vice*
*vice*)                               pending)
dbunch@cohenmilstein.com             johnr@blbglaw.com
                                     Nicole Santoro (*pro hac vice* pending)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jan Messerschmidt (admitted *pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (admitted *pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice* forthcoming)
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

nicole.santoro@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the proposed Class*