SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JOHN P. STIGI III, Cal. Bar No. 208342
jstigi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:   310.228.3700
Facsimile:   310.228.3701

POLLY TOWILL, Cal. Bar. No. 120420
ptowill@sheppardmullin.com
JOHN M. LANDRY, Cal. Bar No. 194374
jlandry@sheppardmullin.com
333 South Hope Street, 43d Floor
Los Angeles, California 90071-1422
Telephone:   213.620.1780
Facsimile:   213.620.1398

Attorneys for Defendants SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, ANTONIO MARTINO, KAREN F. BRASSFIELD, PAUL D. COLUCCI, THOMAS C. DIRCKS, AANCHAL GUPTA, MICHAEL LEMPRES, SCOTT A. REED and COLLEEN SULLIVAN

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION. | Case No. 3:22-cv-01936-JES-MSB<br><br><u>CLASS ACTION</u><br><br>**REDACTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SILVERGATE DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>[*Notice of Motion and Motion, Declaration of John P. Stigi III, and Request for Judicial Notice filed concurrently herewith; [Proposed] Order lodged concurrently herewith*]<br><br>Date: November 29, 2023<br>Time: 9:00 a.m.<br>Dept: 4B<br><br>Hon. James E. Simmons. Jr. |

SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

II.    RELEVANT ALLEGATIONS AND BACKGROUND ...................................3

       A.     Silvergate's Business and Regulatory Environment.............................3

       B.     Plaintiffs' Claims and the Allegedly False and Misleading
              Statements ....................................................................................4

                     a.     Statements About Silvergate's Commitment to
                            Compliance......................................................................5

                     b.     Statements About Silvergate's Initial Diligence at
                            Onboarding ......................................................................6

                     c.     Statements About Silvergate's Ongoing Monitoring.........6

III.   LEGAL STANDARDS.............................................................................8

       A.     Motion to Dismiss Standards ..............................................................8

       B.     Heightened Pleading Standards in Securities Fraud Actions .................8

IV.    PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL TO STATE A
       CLAIM .................................................................................................9

       A.     Elements of Plaintiffs' Exchange Act Claims .......................................9

       B.     The CAC Fails to Plead Facts Sufficient to Support Its Falsity
              Theory ..........................................................................................10

              1.     The FE Allegations Are Not Reliable and Do Not Show
                     Silvergate's Statements Regarding Its Due Diligence Were
                     False or Misleading................................................................10

              2.     The Existence of FTX's Fraudulent Scheme Does Not
                     Suggest That Silvergate Performed No Diligence on FTX........14

              3.     Other Customers' Compliance Concerns Do Not Show the
                     Absence of Any Diligence......................................................15

              4.     Some Statements Are Non-Actionable Statement of
                     Opinion ...............................................................................17

       C.     Plaintiffs' Scienter Theory Is Implausible And Must Be Rejected ......18

              1.     Legal Standards for Pleading Scienter....................................18

              2.     Plaintiffs' Scienter Theory Is Implausible............................19

SMRH:4859-8029-0159.1

-i-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

3.    Even Assuming Plaintiffs' Theory Was Instead One of Mere Knowledge, Plaintiffs Fail to Plead a Strong Inference of Such Knowledge ...................................................... 24

a.    The FE Allegations Do Not Show Mr. Lane Was Actually Exposed To Information Showing Silvergate Performed No BSA Diligence ........................ 24

b.    Materiality of Statements Does Not Support a Strong Inference of Scienter............................................. 26

c.    ██████████████████████████████████ ...... 27

d.    Silvergate's Receipt of Customer Subpoenas Does Not Support a Strong Inference of Scienter .................... 28

4.    The Stronger Inference Is That Scienter Is Lacking.................. 29

D.    Plaintiffs Fail to State a Secondary Controlling Person Liability Claim for Violation of Section 20(a) ...................................................... 30

V.    PLAINTIFFS' SECURITIES ACT CLAIMS FAIL TO STATE A CLAIM ................................................................................................ 30

A.    Plaintiffs' Claims and The Four Public Offerings At Issue Here ......... 30

B.    Elements of Plaintiffs' Securities Act Claims ..................................... 30

1.    Section 11 .................................................................... 30

2.    Section 12 .................................................................... 31

3.    Section 15 .................................................................... 31

C.    The Heightened Pleading Standard Applies ........................................ 31

D.    Plaintiffs' Section 11 and 12 Claims Fail Because They Do Not Identify Any False or Misleading Statement ....................................... 33

E.    Plaintiffs' Section 12 Claim Fails Because No Silvergate Defendant Is Adequately Alleged to be a Statutory Seller .................. 33

1.    Statutory Seller Allegations Against the Individual Defendants Fail ............................................................. 33

2.    Statutory Seller Allegations Against Silvergate Fall Short ........ 35

F.    Plaintiffs' Section 15 Claim Fails ....................................................... 35

VI.    CONCLUSION .................................................................................... 36

SMRH:4859-8029-0159.1
Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

## TABLE OF AUTHORITIES

Page(s)

Cases

*In re Accuray, Inc. Sec. Litig.*
757 F. Supp. 2d 936 (N.D. Cal. 2010)......................................................................12, 22

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
568 U.S. 455 (2013) ...............................................................................................9

*In re Apple Sec. Litig.*
886 F.2d 1109 (9th Cir. 1989)...............................................................................17

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)...............................................................................................8

*In re Bare Escentuals, Inc. Sec. Litig.*
745 F. Supp. 2d 1052 (N.D. Cal. 2010)..............................................................32, 34

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)...............................................................................................8

*In re BofI Holding, Inc. Sec. Litig.*
2017 U.S. Dist. LEXIS 79062 (S.D. Cal. May 23, 2017) ....................................9

*Brody v. Transitional Hosps. Corp.*
280 F.3d 997 (9th Cir. 2002) ............................................................................9, 30

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*
637 F.3d 1047 (9th Cir. 2011)...............................................................................9

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*
2012 U.S. Dist. LEXIS 208436 (C.D. Cal. Feb. 16, 2012)....................33, 34, 35

*In re Cloudera, Inc. Sec. Litig.*
2021 U.S. Dist. LEXIS 99990 (N.D. Cal. May 25, 2021) ..............................30, 31

*Cnty. of Marin v. Deloitte Consulting LLP*
836 F. Supp. 2d 1030 (N.D. Cal. 2011)...............................................................17

*Curry v. Yelp Inc.*
2015 U.S. Dist. LEXIS 159001 (N.D. Cal. Nov. 24, 2015)...............................23

*Curry v. Yelp Inc.*
875 F.3d 1219 (9th Cir. 2017)...............................................................................19

*In re Cutera Sec. Litig.*
610 F.3d 1103 (9th Cir. 2010)...............................................................................17

*In re CytRx Corp. Sec. Litig.*
2015 U.S. Dist. LEXIS 91447 (C.D. Cal. July 13, 2015) ....................................35

-iii-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

SMRH:4859-8029-0159.1

*In re Daou Sys., Inc. Sec. Litig.*
411 F.3d 1006 (9th Cir. 2005)........................................................................31

*In re DDi Corp. Sec. Litig.*
2005 U.S. Dist. LEXIS 28216 (C.D. Cal. July 20, 2005) ...............................34

*Dura Pharms., Inc. v. Broudo*
544 U.S. 336 (2005) .........................................................................................2

*Erhart v. BofI Holding, Inc.*
612 F. Supp. 3d 1062 (S.D. Cal. 2020) .........................................................28

*Ernst & Ernst v. Hochfelder*
425 U.S. 185 (1976) .......................................................................................18

*Glazer Cap. Mgmt., LP v. Magistri*
549 F.3d 736 (9th Cir. 2008) .........................................................................24

*Gompper v. VISX, Inc.*
298 F.3d 893 (9th Cir. 2002) .........................................................................19

*Hampton v. Aqua Metals, Inc.*
2020 U.S. Dist. LEXIS 214010 (N.D. Cal. Nov. 16, 2020)............................22

*In re Harmonic Sec. Litig.*
2006 U.S. Dist. LEXIS 90450 (N.D. Cal. Dec. 11, 2006) ..............................33

*Hollinger v. Titan Cap. Corp.*
914 F.2d 1564 (9th Cir. 1990)........................................................................31

*Iron Workers Local 580 Joint Funds v. Nvidia Corp.*
2020 U.S. Dist. LEXIS 45259 (N.D. Cal. Mar. 16, 2020) ..............................22

*Johnson v. Costco Wholesale Corp.*
2020 U.S. Dist. LEXIS 150355 (W.D. Wash. Aug. 19, 2020) ........................11

*Knox v. Yingli Green Energy Holding Co. Ltd.*
242 F. Supp. 3d 950 (C.D. Cal. 2017)............................................................17

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*
2011 U.S. Dist. LEXIS 125203 (C.D. Cal. May 5, 2011)...........................34, 35

*Merck & Co. v. Reynolds*
559 U.S. 633 (2010) .......................................................................................26

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*
540 F.3d 1049 (9th Cir. 2008)....................................................................21, 25

*Nathanson v. Polycom, Inc.*
87 F. Supp. 3d 966 (N.D. Cal. 2015)..............................................................13

*Nguyen v. Endologix, Inc.*
962 F.3d 405 (9th Cir. 2020).....................................................................*passim*

*In re NVIDIA Corp. Sec. Litig.*
768 F.3d 1046 (9th Cir. 2014) .......................................................................9, 10, 12, 18

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*
774 F.3d 598 (9th Cir. 2014) ...............................................................................8, 16, 24

*In re Oracle Corp. Sec. Litig.*
627 F.3d 376 (9th Cir. 2010) ........................................................................................9

*Pinter v. Dahl*
486 U.S. 622 (1988) ......................................................................................31, 33, 35

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*
759 F.3d 1051 (9th Cir. 2014) ...................................................................................9, 25

*Prodanova v. H.C. Wainwright & Co., LLC*
993 F.3d 1097 (9th Cir. 2021) ...............................................................................18, 20, 24

*In re Rackable Sys., Inc. Sec. Litig.*
2010 U.S. Dist. LEXIS 2663 (N.D. Cal. Jan. 13, 2010) ...................................24

*Reiger v. Altris Software, Inc.*
1999 U.S. Dist. LEXIS 7949 (S.D. Cal. Apr. 30, 1999) ...................................27

*In re REMEC Inc. Sec Litig.*
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ...............................................................14

*In re Rigel Pharm., Inc. Sec. Litig.*
697 F.3d 869 (9th Cir. 2012) ...................................................................................8, 32

*Ronconi v. Larkin*
253 F.3d 423 (9th Cir. 2001) ...................................................................................8, 24

*Rosenzweig v. Azurix Corp.*
332 F.3d 854 (5th Cir. 2003) ........................................................................................34

*Rubke v. Capitol Bancorp Ltd.*
551 F.3d 1156 (9th Cir. 2009) ...............................................................................31, 33

*S. Ferry LP # 2 v. Killinger*
399 F. Supp. 2d 1121 (W.D. Wash. 2005) ...............................................................21, 25, 28

*Santa Fe Indus., Inc. v. Green*
430 U.S. 462 (1977) ........................................................................................................2

*In re Silicon Graphics Inc. Sec. Litig.*
183 F.3d 970 (9th Cir. 1999) ...................................................................................3, 18, 21

*In re Splash Tech. Holdings, Inc. Sec. Litig.*
160 F. Supp. 2d 1059 (N.D. Cal. 2001).......................................................................17, 18

*In re Stac Elecs. Sec. Litig.*
89 F.3d 1399 (9th Cir. 1996) ......................................................................................30

SMRH:4859-8029-0159.1
Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
   551 U.S. 308 (2007) ........................................................................................... 19, 29

*Torres v. Paredes*
   2023 U.S. Dist. LEXIS 98722 (S.D. Cal. June 6, 2023) ...................................... 8

*In re Vantive Corp. Sec. Litig.*
   283 F.3d 1079 (9th Cir. 2002) ...................................................................... 21, 23

*Veal v. LendingClub*
   423 F. Supp. 3d 785 (N.D. Cal. 2019) ............................................................... 27

*In re VeriFone Sec. Litig.*
   11 F.3d 865 (9th Cir. 1993) ................................................................................. 8

*Callan v. Motricity Inc.,*
   2013 U.S. Dist. LEXIS 7448 (W.D. Wash. Jan. 17, 2013),
   *aff'd sub nom. Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) ...... 16

*Waterford Twp. Police v. Mattel, Inc.*
   321 F. Supp. 3d 1133 (C.D. Cal. 2018) ............................................................. 18

*Welgus v. TriNet Grp., Inc.*
   2017 U.S. Dist. LEXIS 207777 (N.D. Cal. Dec. 18, 2017) ......................... 22, 23

*Wu Grp. v. Synopsys, Inc.,*
   2005 U.S. Dist. LEXIS 42351 (N.D. Cal. Aug. 10, 2005) ............................... 23

*In re Zillow Grp., Inc. Sec. Litig.*
   2019 U.S. Dist. LEXIS 67197 (W.D. Wash. Apr. 19, 2019) ............................ 26

*Zucco Partners, LLC v. Digimarc Corp.*
   552 F.3d 981 (9th Cir. 2009) ..................................................................... *passim*

Statutes, Rules and Regulations

12 C.F.R. § 21.11 ..................................................................................................... 16

12 C.F.R. § 261.2 ..................................................................................................... 27

12 C.F.R. § 261.20(a) .............................................................................................. 27

15 U.S.C. § 77k ........................................................................................................ 30

15 U.S.C. § 77*l*(a)(2) ............................................................................................... 31

15 U.S.C. § 77*o* ....................................................................................................... 31

15 U.S.C. § 78t(a) ................................................................................... 8, 9, 10, 18, 19

15 U.S.C. § 78u-4(b)(1) .......................................................................... 8, 9, 10, 18, 19

Fed. R. Civ. P. 9(b) ................................................................................... 8, 32, 33

SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

The Silvergate Defendants[1] respectfully submit this memorandum of points and authorities in support of their motion to dismiss plaintiffs' Consolidated Amended Class Action Complaint (the "CAC").

## I. INTRODUCTION

Silvergate Capital is the publicly traded holding company of Silvergate Bank (the "Bank," and together with Silvergate Capital, "Silvergate"). The Bank is a highly regulated financial institution, subject to exacting supervision and regular examinations by the Federal Reserve and the California Department of Financial Protection and Innovation ("DFPI") (CAC ¶¶ 78, 263; Request for Judicial Notice ("RJN") Ex. A (Form 10-K, filed Feb. 28, 2022 ("2021 Form 10-K"), at 4, 31)), as well as routine reviews and audits by independent public accountants.

Starting in 2014, Silvergate began to focus on serving the burgeoning cryptocurrency industry. It recognized and specifically disclosed the risks and uncertainties surrounding the relatively undeveloped regulatory landscape for the new industry. (*See*, *e.g.*, *id.* (2021 Form 10-K, at 22, 29, and 31).) Among the Bank's customers were FTX, Alameda Research and North Dimension, entities controlled by Samuel Bankman-Fried. (CAC ¶¶ 8, 93.) As this Court is no doubt aware, the United States has indicted Bankman-Fried for committing a massive financial fraud, *specifically including bank fraud*. Among the main victims of Bankman-Fried's fraud identified in the indictment is "Bank 1": Silvergate Bank. As set forth in the Superseding Indictment Against Sam Bankman-Fried ("Indictment"), Bankman-Fried "told [the Bank] a false story" to "overcome" Silvergate's refusal to open a bank account for FTX without extensive due diligence. (*See id.* ¶ 100; RJN, Ex. B ¶¶ 16-19; *see also* Ex. C (Order Denying Motion to Dismiss Indictment at 4, 20, 21, 24) (Bankman-Fried

---

[1] The Silvergate Defendants include Silvergate Capital Corporation and Alan J. Lane (the "Exchange Act Defendants"), and Antonio Martino, Karen F. Brassfield, Paul D. Colucci, Thomas C. Dircks, Aanchal Gupta, Michael Lempres, Scott A. Reed and Colleen Sullivan (together, with Mr. Lane, the "Individual Defendants").

SMRH:4859-8029-0159.2    MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

engaged in bank fraud by making "false representations" designed to "disguise the true nature of an account," thereby inducing the Bank to open the account).)

In late 2022, the cryptocurrency risks Silvergate had disclosed started coming true. A "run on the bank" ensued, creating a crisis of confidence about the Bank's ability to continue operating. The price of Silvergate's stock fell. Plaintiffs sued.

In this action, putative classes of purchasers of Silvergate stock seek to recover their investment losses by alleging claims against Silvergate and its management for violations of the federal securities laws. The federal securities laws, however, are not "a scheme of investor's insurance" (*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) and do not permit recovery for alleged internal corporate mismanagement. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474-79 (1977). To recover investment losses under the federal securities laws, plaintiffs must plead and prove that Silvergate made false or misleading statements or omissions about the Bank's business and, in the case of the antifraud provisions, that Silvergate and its management made such statements or omissions with an intent to deceive investors.

Plaintiffs predicate their claims upon allegations that Silvergate misrepresented to investors its commitment to, and compliance with, rules surrounding due diligence the Bank was required to perform on its customers. Plaintiffs do *not* allege merely that Silvergate managed the Bank's customer diligence procedures poorly or that its procedures were insufficient. Rather, plaintiffs insist that Silvergate performed *no diligence whatsoever*. According to plaintiffs — and the emphasis in the following is in the original — Silvergate "did not vet its customers, did not perform site visits, did not know its customers' businesses, did not review its customers' compliance pro-grams, did not review its customers' culture of compliance, did not have compliance policies to address the cryptocurrency industry, did not provide compliance training to employees specific to the cryptocurrency industry, did not perform daily or periodic reviews, did not perform customer risk scoring, and did not monitor its clients' trans-

SMRH:4859-8029-0159.2

-2-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

action activity." (CAC ¶ 7.)  Stripped of its rhetoric, the CAC reduces to the supposition that because FTX committed a fraud by evading the Bank's diligence measures in order to abuse its banking services, those diligence measures must have never existed at all and the Silvergate Defendants must have lied about it.

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") to deter these types of "fraud by hindsight" claims. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).  As demonstrated below, the CAC does not contain sufficient particularized allegations of well-pleaded facts to support plaintiffs' claims.  Nor is plaintiffs' theory of securities fraud even plausible, given that the Bank is a highly regulated financial institution, subject to regular oversight by regulators and auditors, none of whom it is alleged to have misled and, if anything, according to the United States, itself was a victim of Bankman-Fried's bank fraud. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (Court need not "check [its] disbelief at the door" when considering a motion to dismiss where plaintiffs' securities fraud "theory does not make a whole lot of sense").  The Court should dismiss this opportunistic "stock drop case."

## II. RELEVANT ALLEGATIONS AND BACKGROUND

### A. Silvergate's Business and Regulatory Environment

Silvergate is incorporated in Maryland and headquartered in La Jolla, California.  Mr. Lane is the Chief Executive Officer and a director of Silvergate (CAC ¶ 24) and Mr. Martino is Silvergate's Chief Financial Officer.  (*Id.* ¶ 329.) Ms. Brassfield, Ms. Sullivan and Messrs. Campbell, Colucci, Dircks, Frank, Gupta, Lempres and Reed are Silvergate directors.  (*Id.*)

As alleged in the CAC, the Bank was a "local community lending bank" until it recognized that the market lacked a financial institution committed to the growing and under-serviced cryptocurrency industry.  (*Id.* ¶ 24.)  Plaintiffs allege Silvergate made the strategic decision to fill that gap, went "all in" on the cryptocurrency industry and eventually became the "go-to" bank for the industry.  (*Id.* ¶¶ 24, 32.)

SMRH:4859-8029-0159.2
Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

By December 2021, the Bank's customer base grew from 35 cryptocurrency exchange customers in September 2019 to 94 (*id.* ¶ 32), and by June 30, 2022, to over 100. (RJN, Ex. D (Form 10-Q, filed Aug. 8, 2022), at 55.) Commensurate with the Bank's success, Silvergate's stock also increased in value. (CAC ¶ 1.)

Silvergate recognized and disclosed in great detail the risks and uncertainties surrounding the relatively undeveloped regulatory landscape for the new cryptocurrency industry. (*See*, *e.g.*, RJN Ex. A (2021 Form 10-K, at 22, 29, 31); *see also* Underwriter Defendants' Motion to Dismiss, Background, D.) As a registered bank holding company, Silvergate was subject to regular examinations by the Board of Governors of the Federal Reserve, and as a "highly regulated bank" the Bank was subject to supervision and regular examinations by the Federal Reserve and the California DFPI. (CAC ¶¶ 78, 263; RJN Ex. A (2021 Form 10-K, at 4, 31).)

## B. Plaintiffs' Claims and the Allegedly False and Misleading Statements

This action has its genesis in the downfall of FTX. Its gravamen is that defendants misrepresented that the Bank performed due diligence on its customers, both before onboarding them and on an ongoing basis. Plaintiffs assert that, despite Silvergate's representations regarding its due diligence practices, the Bank deliberately conducted *no* due diligence whatsoever on its customers. Plaintiffs assert claims for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against the Exchange Act Defendants and Section 20(a) of the Exchange Act against Mr. Lane ("Exchange Act Claims"). Plaintiffs also assert claims for violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act") against the Silvergate Defendants, and Section 15 of the Securities Act against the Individual Defendants ("Securities Act Claims").[2]

---

[2] Plaintiffs are purported purchasers of Silvergate stock and seek to represent two classes: (1) "all persons and entities who purchased or otherwise acquired the publicly traded stock of [Silvergate] between November 7, 2019 through March 21, 2023" and were damaged thereby; and (2) "all persons and entities who purchased Silvergate securities in or traceable to Silvergate's series of securities offerings

Plaintiffs allege three general categories of false and misleading statements to support their Exchange Act and Securities Act Claims:  Silvergate's (1) commitment to compliance, (2) initial due diligence and onboarding and (3) ongoing monitoring.

### a.    Statements About Silvergate's Commitment to Compliance

As a financial institution, the Bank was subject to the Bank Secrecy Act ("BSA"), its Anti-Money Laundering ("AML") provisions and Know-Your-Customer ("KYC") requirements.  (CAC ¶¶ 35, 225.)  Plaintiffs allege that Silvergate misrepresented its commitment to regulatory compliance with BSA/AML rules.  For example, the CAC alleges Silvergate stated that it: (i) represented the "good housekeeping seal of approval" (*id.* ¶¶ 1, 152, 173); (ii) took its risk management procedures and regulatory obligations "seriously" (*id.* ¶¶ 4, 44, 91, 190, 201, 227); (iii) had a "robust risk management and regulatory compliance framework" and "deep-rooted" commitment to regulatory compliance (*id.* ¶¶ 3, 36, 44, 210, 215); and (iv) considered its vetting process as its "secret sauce" of its leadership position that provided it a "distinct competitive advantage."  (*Id.* ¶¶ 1, 36, 91, 161, 214; *see also id.* ¶¶ 44, 45, 151, 166, 170, 173, 176, 179, 194, 201.)

Plaintiffs allege these statements were false when made because, they contend, Silvergate "did not vet, perform due diligence on, or monitor" its customers (*id.* ¶¶ 2, 7, 50), "utter[ly] failed to do so" with respect to FTX (*id.* ¶ 235) and "indiscriminately" approved risky customers.  (*Id.* ¶¶ 7, 50, 232.)  Plaintiffs also allege these statements were misleading because defendants failed to disclose that Silvergate chose not to vet its customers, both at onboarding and as part of ongoing monitoring.  (*See, e.g., id.* ¶¶ 154, 157, 167, 168, 192, 193.)[3]

---

completed during 2021."  (CAC ¶¶ 317, 461.)

[3] Plaintiffs' Securities Act Claims challenge a more limited set of statements regarding Silvergate's commitment to regulatory compliance.  (CAC ¶ 336 (referencing Silvergate's "extensive regulatory compliance diligence" and "deep-rooted commitment and proprietary approach to regulatory compliance").)  Plaintiffs claim these statements, too, were false and misleading because in reality, Silvergate "performed

### b.      Statements About Silvergate's Initial Diligence at Onboarding

Plaintiffs next challenge statements about Silvergate's "vetting" of prospective customers, including, for example:  (i) that Silvergate "comprehensively investigates prospective customers" (*id.* ¶¶ 39, 155, 198, 208); (ii) statements outlining the specific BSA-related due diligence Silvergate performed on prospective customers (*id.* ¶¶ 37, 40, 41, 155, 161, 186, 198); and (iii) that it conducted extensive diligence on FTX and its related entities at onboarding.  (*Id.* ¶¶ 91, 204, 227.)

Plaintiffs allege that these statements were false and misleading because, they contend, Silvergate: (i) performed no site visits; (ii) allowed clients to dictate wire limits without supporting documentation; (iii) did not have compliance policies to address the digital currency industry; (iv) provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (v) did not review customers' culture of compliance; (vi) did not review customers' BSA/AML Programs to ensure they were sound; (vii) did not verify customer ownership; and (viii) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud through their Silvergate accounts and the SEN.  (*Id.* ¶¶ 154, 157, 164, 168, 172, 175, 178, 181, 184, 188, 192, 196, 200, 206, 210.)  Plaintiffs also allege that Silvergate failed to disclose that, "because Silvergate failed to perform these procedures, it approved FTX, Alameda, and North Dimension" despite the existence of purportedly suspicious activities and characteristics.  (*Id.* ¶ 206.)[4]

### c.      Statements About Silvergate's Ongoing Monitoring

Plaintiffs also challenge Silvergate's statements about the ongoing diligence it

---

no due diligence before onboarding customers to the SEN Network and no ongoing monitoring of customer activities on the SEN Network."  (*Id.* ¶ 337.)

[4] Plaintiffs' Securities Act Claims challenge a more limited set of statements regarding Silvergate's diligence processes for prospective new customers.  (CAC ¶ 336 (referencing the "thorough reviews" Silvergate performs in onboarding new customers.))  Plaintiffs claim this statement was likewise false and misleading because in reality, Silvergate "performed no due diligence before onboarding customers to the SEN Network," including with respect to FTX.  (*Id.* ¶¶ 92, 337.)

SMRH:4859-8029-0159.2

performed on its customers, including that it: (i) performed daily transaction monitoring, daily BSA/AML alerts monitoring, enhanced due diligence, customer counterparty reviews, negative news reviews, and periodic reviews (*id.* ¶ 161); (ii) conducted ongoing monitoring of customer activities (*id.* ¶¶ 158, 201, 208); (iii) had a system of "red flags" specific to various customer types and activities (*id.* ¶¶ 42, 43); and (iv) conducted "significant due diligence on FTX and its related entities" through ongoing monitoring. (*Id.* ¶ 204.)

Plaintiffs allege that Silvergate's statements regarding its ongoing diligence were false when made because in reality, Silvergate "did <u>not</u> conduct" any of the represented ongoing monitoring of its customers, including FTX. (*Id.* ¶¶ 92, 159, 163, 206 (emphasis in original).) They also challenge these statements as misleading because defendants failed to disclose that Silvergate did not perform ongoing monitoring of its customers, and that Silvergate did *not*: (i) perform daily BSA/AML alerts monitoring; (ii) perform daily news monitoring; (iii) perform customer counterparty reviews; (iv) perform negative news reviews; (v) perform quarterly account activity reviews; (vi) perform customer risk scoring; (vii) perform annual company reviews; (viii) perform anomaly testing and detection; (viiii) evaluate customers' ability to actively monitor the flow of funds of their own customers; (x) implement AML software designed to detect red flags specific to various customer types and activities; (xi) close accounts when employees raised concerns about suspicious activity; (xii) investigate reports from customers and other banks about unauthorized transaction requests; and (xiii) it allowed entities, including FTX, to continue to commit fraud, embezzlement and money-laundering through their Silvergate accounts despite red flags. (*Id.* ¶¶ 160, 165, 169, 185, 189, 193, 197, 203, 207, 211.)[5]

---

[5] Plaintiffs' Securities Act Claims challenge a more limited set of statements regarding Silvergate's ongoing monitoring. (CAC ¶ 336) (referencing the "thorough reviews" Silvergate performs as part of its due diligence process in connection with monitoring existing customers and the "enhanced procedures to screen and monitor" cryptocurrency exchanges, including, among other things, system monitoring rules tailored to digital currency activities and a system of "red flags" specific to various

SMRH:4859-8029-0159.2

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

### III.  LEGAL STANDARDS

#### A.    Motion to Dismiss Standards

To survive a motion to dismiss, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Torres v. Paredes*, 2023 U.S. Dist. LEXIS 98722, at *7 (S.D. Cal. June 6, 2023) (Simmons, J.) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).  This determination is a "context-specific task" that requires the court to draw on its "judicial experience and common sense."  *Iqbal*, 556 U.S. at 679. Although a court must generally accept the factual allegations in the pleadings as true, it need not accept as true "[c]onclusory allegations of law and unwarranted inferences" (*In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993) (citations omitted)) and is not bound by a complaint's legal conclusions, deductions and opinions couched as facts.  *Twombly*, 550 U.S. at 545; *accord Torres*, 2023 U.S. Dist. LEXIS 98722, at *8.

#### B.    Heightened Pleading Standards in Securities Fraud Actions

Securities fraud claims must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the PSLRA.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); 15 U.S.C. § 78u-4(b)(2)(A).  These heightened pleading requirements are "an unusual deviation from the usually lenient requirements of federal rules pleading.  In few other areas are motions to dismiss for failure to state a claim upon which relief can be granted so powerful." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).  The complaint must identify

---

customer types and activities.))  Plaintiffs claim these statements, too, were false and misleading, and omitted material facts, because in reality, Silvergate performed "no ongoing monitoring of customer activities on the SEN Network." (*Id.* ¶ 337.)

SMRH:4859-8029-0159.2

the "who, what, when, where, and how" of the fraud, "as well as what is false or misleading about" it and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted).

Additionally, the PSLRA imposes a heightened pleading requirement for securities fraud actions under Section 10(b) and Rule 10b-5, requiring that both falsity and scienter be pled with particularity. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 476 (2013); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)).  If the complaint does not contain such allegations, it must be dismissed.  15 U.S.C. § 78u-4(b)(3)(A); *see In re BofI Holding, Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 79062, at *50 (S.D. Cal. May 23, 2017) ("The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'").

## IV.  PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL TO STATE A CLAIM

### A.  Elements of Plaintiffs' Exchange Act Claims

To state a Section 10(b) claim, a plaintiff must allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Endologix*, 962 F.3d at 413.  To satisfy the first element, plaintiffs must "demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)  (citation omitted).  An omission is actionable when it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("Rule 10b-5 prohibits *only* misleading and untrue statements, not statements

SMRH:4859-8029-0159.2

-9-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

that are incomplete") (citation omitted).

Section 20(a) of the Exchange Act creates liability for "controlling persons." 15 U.S.C. § 78t(a).  To establish a Section 20(a) claim, a plaintiff must first prove a primary violation of underlying federal securities laws, and then show the defendant exercised actual power over the primary violator.  *NVIDIA*, 768 F.3d at 1052.

**B.    The CAC Fails to Plead Facts Sufficient to Support Its Falsity Theory**

To show falsity, plaintiffs claim Silvergate performed *no* due diligence on its customers.  To support that assertion, plaintiffs rely upon:  (1) anecdotal complaints and criticisms of six unnamed former Silvergate employees (the "FEs") (CAC ¶¶ 50-86); (2) FTX's collapse in November 2022 and the revelation of its scheme (*id.* ¶¶ 88-108); and (3) reference to a handful of other entities that banked at Silvergate but had alleged compliance problems.  (*Id.* ¶¶ 109-127.)  These allegations are not sufficient to support plaintiffs' assertions that Silvergate performed *no* due diligence, and thus fail to satisfy the PSLRA's standards of pleading with particularity how and why Silvergate's statements allegedly were false or misleading when made.  *See* 15 U.S.C. § 78u-4(b)(1).  In addition, plaintiffs attempt to premise their falsity claim on certain statements that are non-actionable as a matter of law.

**1.    The FE Allegations Are Not Reliable and Do Not Show Silvergate's Statements Regarding Its Due Diligence Were False or Misleading**

The CAC relies heavily upon purported statements from six unnamed FEs to support the inference that "in truth" Silvergate performed *no* diligence on its customers.  (CAC ¶¶ 51-87.)  Under the PSLRA, allegations attributed to confidential witnesses ("CWs," here referred to as "FEs") must be scrutinized for their "reliability."  *Zucco*, 552 F.3d at 995.  The source of the statements "must be described with sufficient particularity to establish their reliability and personal knowledge."  *Id*.  This prong of the FE test analyzes whether the complaint provides "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Id*.  The CAC does not do so.  If anything, the

CAC's descriptions of the FEs undermine a finding that they were positioned to have knowledge sufficient to meet the PSLRA's exacting standards.  But even if the Court were to deem the FE allegations sufficiently reliable, those allegations do not support plaintiffs' assertion that Silvergate's statements regarding its due diligence were false or misleading when made.

*FE1*.  FE1's central complaint is that she personally "never saw," "never heard" and was "not aware" of Silvergate's represented diligence efforts.  (CAC ¶¶ 51-53, 55-57.)  This is not surprising given the CAC's description of FE1's role at the Bank as a Finance Manager overseeing "[t]reasury and financial planning and analysis" (*id.* ¶ 51 n.45), which provides no support for how she would have obtained the knowledge attributed to her regarding the Bank's BSA compliance and diligence procedures.[6]  The CAC eliminates all doubt that FE1 is speculating rather than sharing any first-hand knowledge by alleging merely that if such diligence had occurred, she "would have known about it."  (*Id.* ¶¶ 51, 53.)[7]  This is insufficient to meet the PSLRA's exacting standards.  *See Zucco*, 552 F.3d at 995; *see also Johnson v. Costco Wholesale Corp.*, 2020 U.S. Dist. LEXIS 150355, at *12-13 (W.D. Wash. Aug. 19, 2020) (disregarding CW allegations based upon assumptions not grounded in personal

---

[6]  Plaintiffs do not allege that FE1 had visibility into the Bank's BSA function or that any of her supervisors had any BSA-related role.  If anything, the CAC's description of her finance role makes it improbable FE1 had visibility into the Bank's BSA function and diligence procedures.  Pursuant to FFIEC guidance, the BSA function is segregated from a bank's operational and finance functions "to avoid conflicts of interest" so that "objectivity is maintained."  (RJN, Ex. O (Federal Financial Institutions Examination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* (available at https://bsaaml.ffiec.gov/manual), at 157).)  Indeed, FE1 was so far removed from the BSA function that she misstates Kathleen Fraher's title as the Chief BSA Officer when in fact, Ms. Fraher's title during FE1's short tenure at the Bank was Executive Vice President and Chief Operating Officer.  (RJN, Ex. P (Ms. Fraher's Form 4, filed Nov. 11, 2021).)

[7]  FE1, FE3 and FE6 similarly claim, according to plaintiffs, that they did not see any site visits occur, and so allegedly speculate that they must not have been conducted by any of the Bank's other 400+ employees.  (CAC ¶¶ 53, 67; RJN Ex. E (Form 10-Q, filed Nov. 7, 2022, at 48) (identifying average full-time employee headcount of 404 for three months ended Sept. 30, 2022).)

knowledge). By definition, an individual does not have personal knowledge of purported occurrences she "never saw," "never heard" or of which she was "not aware."

*FE2*. FE2 is the *only* FE alleged to have worked (as a low-level analyst) in the Bank's BSA unit, but he left months *before* the start of the Class Period. (CAC ¶ 59 n.46.) For this reason, his purported observations cannot be probative of the state of Silvergate's BSA compliance and diligence procedures at the times the alleged statements were made. *See NVIDIA*, 768 F.3d at 1061 (rejecting CW who left before alleged product defect arose or worked in an unrelated area).[8] In fact, FE2's supposed observations contradict plaintiffs' "no diligence" theory by affirmatively pleading that Silvergate *did* perform at least some of the represented diligence. (CAC ¶ 59 (allegation that Silvergate had "other [BSA] analysts" in addition to FE2 shows the Bank devoted personnel to the task of investigating BSA alerts); *id.* ¶ 61 (complaining he did not agree with some of management's "determinations" with respect to "identified suspicious activity" confirms the Bank's diligence procedures in fact "identified" suspicious activity, as designed, and that management addressed them, even if FE2 did not always agree with their determinations).)

*FE3*. FE3, upon whom the CAC relies most heavily, was a digital banking manager who handled account maintenance for SEN accounts. (*Id.* ¶ 64 n.47.) As with FE1, it is not probable that FE3 had visibility into the Bank's BSA function and due diligence procedures, and so was not positioned to know the information alleged. Per plaintiffs, FE3 also bases some of her purported knowledge upon vague hearsay. (*See id.* ¶¶ 75, 67 (FE3 spoke to anonymous "Relationship Managers," without

---

[8] Regardless, FE2's alleged opinions that, prior to the start of the Class Period, Silvergate "seemed to bank" everyone (CAC ¶ 59), he "felt like" the Bank was conducting diligence simply as a "check the box" activity (*id.*) and he "d[id] not believe" a lot of action was taken regarding suspicious activity (*id.* ¶ 61) do not support plaintiffs' implausible theory that the Bank performed *no* due diligence and accepted customers "indiscriminately." *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 944 (N.D. Cal. 2010) (CW allegations based upon speculative opinion "cannot substitute for the specific facts necessary to plead falsity").

SMRH:4859-8029-0159.2

-12-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

identifying how many managers she spoke with or even what types of accounts for which they were responsible).)  This does not satisfy the PSLRA's reliability standard.  *See Zucco*, 552 F.3d at 995-98; *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 973 (N.D. Cal. 2015) (discounting CW allegations based upon "uncorroborated hearsay and office gossip and other 'impressions [from] witnesses who lacked direct access to the [CFOs].'")  FE3, who allegedly helped add already-approved customers, purportedly stated that her "group was given a list of accounts and names to authorize." (CAC ¶ 64.)  Plaintiffs do not specify who or what group allegedly provided the list of approved names.[9]  Likewise, FE3's assertion that there was "no one to tell even if her team found suspicious activity" (*id.* ¶¶ 75, 389) is contradicted by FE2's allegations that the Bank had an entire team of BSA analysts and managers.  (*Id.* ¶¶ 59, 61, 391.)  FE3 also is the only FE alleged to have personal knowledge relevant to FTX specifically, and claims she had such knowledge because she handled wire limit changes for the accounts and personally "saw no ongoing monitoring" of the accounts.  (*Id.* ¶ 76.)  As with FE1, FE3 merely speculates that "she would at least be aware of such monitoring if it existed." (*Id.*)  Once again, "would've been" assumptions falls short of the PSLRA's standards.  *See Zucco*, 552 F.3d at 996.

*FE4*.  FE4's position as a VP of Deposit Operations (CAC ¶ 77 n.50) provides no support for how FE4 would have obtained the knowledge she purports to have regarding the Bank's BSA compliance and due diligence procedures.  FE4 allegedly recalls receiving "subpoenas related to customers' wires," including for Alameda.  (*Id.* ¶ 219.)  FE4 is not alleged to elaborate on what, if anything, was suspicious about a bank receiving subpoenas, much less these subpoenas in particular.  The CAC offers

---

[9] FE3 also purportedly was told by FE6 that "instead of asking the customers to fill out their own beneficial ownership paperwork, Silvergate employees . . . filled out the paperwork." (CAC ¶¶ 65, 66.)  Even if true, neither FE3 nor plaintiffs explain why allowing Silvergate employees to perform the clerical task of a scrivener filling out paperwork is inconsistent with any of Silvergate's statements regarding its diligence practices, much less *per se* improper.

-13-

absolutely no support for the notion that because a government agency requests information regarding a customer, a bank should be able to deduce from the mere receipt of the subpoena that something is amiss.  FE4 also allegedly stated that Silvergate failed to investigate reports of wrongdoing.  (*Id.* ¶ 77.)  But no alleged facts suggest FE4 would, given her role, have direct knowledge of any investigation or lack thereof.

*FE5.* ███████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Such transparency and consultation with outside consultants or auditors negates an inference of scienter.  *In re REMEC Inc. Sec Litig.*, 702 F Supp. 2d 1202, 1245-46 (S.D. Cal. 2010) (citing *In re Cirrus Logic Secs. Litig.,* 946 F. Supp. 1446, 1465 (N.D. Cal. 1996) (review and approval by auditor "would have negated any inference of scienter.")).

### 2.    The Existence of FTX's Fraudulent Scheme Does Not Suggest That Silvergate Performed No Diligence on FTX

The CAC's falsity theory (that Silvergate performed *no* due diligence on its customers, including FTX) is based in large part upon the fact that those procedures did not catch the fraud perpetrated by Bankman-Fried — the very definition of a "fraud by hindsight."  Plaintiffs theorize that because FTX managed to effectuate its

---

[10] At the barest minimum, FE5's agreement that by at least August 2022 Silvergate was focused on compliance (CAC ¶¶ 83, 84) means that any challenged statements after August 2022 admittedly could not be and were not false or misleading.

SMRH:4859-8029-0159.1
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

scheme undetected by Silvergate, Silvergate must not have conducted any BSA-related due diligence on FTX or its related entities.  (CAC ¶¶ 88-108.)[11]

Plaintiffs allege that Silvergate "would have" discovered several purportedly blatant red flags regarding FTX's account activities had it actually performed *any* BSA due diligence on FTX.  (*See*, *e.g.*, *id.* ¶¶ 94, 100, 104.)  They cite as examples Silvergate's alleged failure to flyspeck North Dimension's purportedly "fake" website that had "misspellings" and included "sale" prices on items that were above their "regular prices."  (*Id.* ¶¶ 95-97).  None of this shows that Silvergate conducted *no* diligence on North Dimension, or any other FTX entity, because they do not address, much less refute, the fact that Bankman-Fried lied to Silvergate and deceived Silvergate both in its initial account applications and during the course of Silvergate's due diligence, just as he lied to and deceived the rest of the world as the United States has alleged and FTX's new CEO has confirmed.  (*See* RJN, Ex. B (Indictment ¶¶ 16-19) (alleging Bankman-Fried "told [Silvergate] a false story" to "overcome" Silvergate's refusal to open a bank account for FTX without extensive due diligence); Ex. F (Second Interim Report at 2, 8, 11, 18) (detailing Bankman-Fried's "False Statements to a U.S. Bank," including his "lies" in North Dimension's account application and in response to the Bank's specific questions as part of its ongoing monitoring).)

### 3. Other Customers' Compliance Concerns Do Not Show the Absence of Any Diligence

Plaintiffs allege that because Silvergate banked a handful of other customers alleged to have BSA-related compliance concerns "corroborate[s]" that Silvergate failed to conduct *any* diligence on its customers.  (CAC ¶ 109.)  Here, too, plaintiffs' speculative "fraud by hindsight" theory (which they repeat over 40 times in the CAC)

---

[11] John J. Ray III, FTX's new CEO (CAC ¶ 101) has explained that, "[n]otwithstanding extensive work by experts in forensic accounting, asset tracing and recovery, and blockchain analytics," it remains "extremely challenging" to trace substantial assets to any particular funding source and/or FTX customer deposits. (RJN Ex. F (Second Interim Report at 3)).)

SMRH:4859-8029-0159.1

-15-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

is that "had Silvergate" performed its represented diligence, it "would have" discovered certain purported red flags about its customers. (*See*, *e.g.*, *id.* ¶¶ 8, 92, 94, 104, 112, 114, 116-122.) Plaintiffs identify nine Bank customers which "ended up under investigation, shut down, fined, or in bankruptcy." (*Id.* ¶ 109.) From there, they allege in a conclusory fashion that Silvergate "did not perform due diligence" on these specific entities. (*Id.* ¶¶ 111, 119, 121-25.)[12] That just nine Bank customers developed compliance concerns does not sufficiently support plaintiffs' assertion that Silvergate performed no due diligence whatsoever throughout the class period. *See Apollo Grp.*, 774 F.3d at 608 (where a plaintiff predicates a fraud claim upon alleged undisclosed improper internal compliance practices, he must plead facts showing more than just "isolated instances" of misconduct in order to support a strong inference of "widespread deception"). Thus, these allegations do not permit the inference plaintiffs seek because they do not provide a sufficient sample to establish that Silvergate failed to perform *any* due diligence across the board.

These allegations are particularly unavailing in light of Silvergate's extensive risk disclosures, which repeatedly warned that its compliance procedures could not detect all potential misconduct. (*See*, *e.g.*, RJN Ex. A (2021 Form 10-K, at 22, 31); *see also* Underwriter Defendants' Motion to Dismiss, Background, D.) The claim that these disclosed risks ultimately materialized with respect to some of Silvergate's customers does not mean that Silvergate performed *no* due diligence or compliance on its customers. To the contrary, it reflects a materialization of the known risks about which Silvergate expressly warned. *See*, *e.g.*, *Callan v. Motricity Inc.*, 2013 U.S. Dist. LEXIS 7448, at *28 (W.D. Wash. Jan. 17, 2013), *aff'd sub nom. Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) (dismissing Section 11 claim for failing to

---

[12] Plaintiffs do not (and cannot) allege that Silvergate did not itself discover the alleged negative information about these clients. Silvergate is prohibited by law from disclosing the existence of a Suspicious Activity Report and whether it de-risked any customers due to suspicious behavior. 12 C.F.R. § 21.11.

SMRH:4859-8029-0159.1

adequately plead falsity where "contemporaneous disclosures adequately informed investors" of risks that later materialized).

### 4. Some Statements Are Non-Actionable Statement of Opinion

"Puffing statements are optimistic statements by corporate executives that 'are generally not capable of objective verification, and lack a standard against which a reasonable investor could expect them to be pegged.'" *Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 961 (C.D. Cal. 2017). Such vague, generalized assertions of corporate optimism or statements of "mere puffing" are not actionable under the federal securities laws. *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *Cnty. of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1038 (N.D. Cal. 2011).

Here, at least five of the CAC's alleged misstatements constitute non-actionable puffery.[13] Statements that Silvergate's account approval process was "kind of like the good housekeeping seal of approval" (CAC ¶¶ 152, 173) are not actionable because they are general statements of corporate optimism that are not objectively verifiable. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (dismissing as non-actionable references to, *e.g.*, "strong" demand, "better than expected" or "robust" results). Similarly, in context, the statement that Silvergate "comprehensively investigates prospective customers" (CAC ¶ 155) is not actionable because the full text of that statement explained that Silvergate investigates prospective customers "according to the level *it* deems necessary and appropriate" based on the customer's categorization. (RJN Ex. G (Prospectus, filed Nov. 8, 2019, at 8) (emphasis added).) Likewise, statements that Silvergate's diligence procedures provided it with a "competitive advantage" (CAC ¶¶ 36, 213, 229), characterizing Silvergate's risk management and compliance framework as "robust"

---

[13] When a single claim is based upon multiple alleged disclosure violations, a statement-by-statement analysis is appropriate. *See, e.g.*, *In re Apple Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

(*id.* ¶ 161), or explaining what the Bank's diligence and monitoring processes were "designed to" accomplish (*id.* ¶ 166) by their very terms convey subjective, non-verifiable statements of optimism and belief in Silvergate's business. This is quintessential non-actionable puffery. *See Splash Tech.*, 160 F. Supp. 2d at 1076-77.

In sum, with respect to each alleged misstatement, plaintiffs fail to allege, with particularity, the reason or reasons the statement is false or misleading and reliable facts supporting plaintiffs' theory of falsity, *i.e.*, that Silvergate performed *no* due diligence. For this reason alone, the Court should grant this motion.

**C.    Plaintiffs' Scienter Theory Is Implausible And Must Be Rejected**

**1.    Legal Standards for Pleading Scienter**

The PSLRA requires that a plaintiff "state with particularity" facts giving rise to a strong inference that each defendant acted with the required state of mind, *i.e.* scienter. 15 U.S.C. § 78u-4(b)(2). "Scienter" refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To meet this "exacting" pleading obligation, plaintiffs must allege defendants "made false or misleading statements either intentionally or with deliberate recklessness." *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1151, 1156 (C.D. Cal. 2018). The recklessness standard "is actually much closer to one of intent" (*NVIDIA*, 768 F.3d at 1053), as the statement must constitute an "extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers [by the alleged omission was] that is either known to the defendant or so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991; *see also Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021) ("To meet the PSLRA's high burden for pleading scienter, a complaint cannot rely on "mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."); *Silicon Graphics*, 183 F.3d at 976 (Ninth Circuit "continue[s] to view [deliberate recklessness] as a form of intentional or knowing misconduct").

SMRH:4859-8029-0159.1

The inference of scienter must also be "strong."  15 U.S.C. § 78u-4(b)(2).  "The PSLRA's 'strong inference' requirement has teeth."  *Endologix*, 962 F.3d at 414.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  Under *Tellabs*, courts must evaluate *all* inferences reasonably arising from the facts in determining which inference is more compelling.  *Id.*; *accord Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) ("[T]he court must consider all reasonable inferences . . . including inferences unfavorable to the plaintiffs.").

### 2.    Plaintiffs' Scienter Theory Is Implausible

Plaintiffs' liability theory is based upon an alleged elaborate deceptive scheme by which Silvergate, in exchange for deposit business, secretly performed *no* BSA/AML due diligence on any prospective or current customers for the sake of allowing any entity wanting to use its banking services for a criminal purpose to do so even though this scheme by Silvergate would no doubt result in its own destruction. Plaintiffs theorize that Silvergate management, from the outset of Silvergate's efforts to serve the crypto industry as a public company, intentionally embarked on a doomed path of disregarding all regulatory BSA/AML requirements, which conduct they admittedly knew would have "devastating" consequences.  (CAC ¶ 224.) Layered on top of this theory is the fact that Silvergate is a highly regulated financial institution, subject to regular, comprehensive examinations by its regulators and auditors, none of whom Silvergate is alleged to have misled.  Plaintiffs allege that management knew they could not escape the "devastating" consequences once Silvergate's regulators discovered their absolute failure to "vet" Bank customers.  (*Id.*) Plaintiffs point to no rational motive for this self-destructive behavior.[14]  Because

---

[14] On top of that, the United States indicted Bankman-Fried for conspiring to defraud FTX's financial institutions, which included Silvergate.  FTX admittedly lied to

SMRH:4859-8029-0159.1

the theory is implausible on its face, the Court need not even consider it, much less weigh it against any competing inferences. *Endologix*, 962 F.3d at 408 ("Allegations that are implausible do not create a strong inference of scienter.").

In *Endologix*, the Ninth Circuit rejected a similar theory of scienter that was implausible. There, plaintiffs alleged that a medical device company promised FDA approval it knew would not occur in order to temporarily inflate its stock price. 692 F.3d at 407. Plaintiffs' theory depended upon the supposition "that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the device's] 'intractable' migration problem was revealed." *Id.* That supposition, the Court reasoned, "did not make a whole lot of sense" (*id.* at 415), rejecting the theory as having "no basis in logic or common experience." *Id.* at 407-08.

Here, too, it would be "inevitable" for Silvergate to be victimized and used for criminal purposes, including short-lived Ponzi schemes, and its regulators and the public to discover Silvergate's calculated failure to perform *any* due diligence. Although "mere motive and opportunity" is not even enough to show scienter in this Circuit (*see Prodanova*, 993 F.3d at 1108), such motive and opportunity is entirely lacking here. As the CAC says, Mr. Lane acknowledged, the penalties and fines for failing to adhere to BSA and AML requirements "can be really severe. You can essentially put the entire bank at jeopardy." (CAC ¶ 35.) Mr. Lane thus stood to lose far more from failing to conduct appropriate diligence than to gain by misrepresenting Silvergate's diligence procedures, particularly as it was inevitable that the Federal Reserve would no doubt observe any deficiencies in the Bank's BSA

---

Silvergate in its account applications and in response to direct questions from Silvergate. (RJN Ex. F (Second Interim Report at 2, 8, 11, 18).) It is implausible that the government would bring those charges if the Bank had insight into the fraud being perpetrated upon it, much less if it was a co-conspirator with Bankman-Fried.

SMRH:4859-8029-0159.1
Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

program.[15]  That Mr. Lane knew the "inevitable" result would have such "devastating" consequences further precludes a plausible inference of scienter on his part. (*Id.* ¶ 224.)  Plaintiffs' theory that defendants set out to "mislead[] the market all the way up to the point that defendants were 'unable to avoid the inevitable' . . . does not make a whole lot of sense." *Endologix*, 962 F. 3d at 415

Plaintiffs suggest a motive on Mr. Lane's part because he sold stock at a profit during the class period.  (CAC ¶ 240.)  But the handful of stock sales by Mr. Lane during the Class Period do not support a strong inference of scienter.  The Ninth Circuit has repeatedly emphasized that "[i]nsider stock sales are not inherently suspicious," and "become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (quoting *Ronconi*, 253 F.3d at 435).  In making this determination, courts consider:  "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).  The CAC does not allege sufficient facts that would allow the Court to strongly infer that Mr. Lane's stock sales were suspicious based on this standard.

First, plaintiffs' unsupported (and unsupportable) allegation that Mr. Lane sold 76.96%[16] of his shares during the more than three-year Class Period (CAC ¶ 240) is



[16] Plaintiffs' calculation appears to include shares that were withheld to cover tax liabilities in connection with the vesting of stock options and restricted stock units (*i.e.*, transaction code "F" on SEC Form 4).  (RJN, Exs. H, I (Form 4s filed Nov. 30, 2020 and Nov. 23, 2021).)  Such "tax-related withholdings neither give rise to nor support an inference of scienter" (*S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1144 (W.D. Wash. 2005), *vacated in part on other grounds by* 542 F.3d 776 (9th Cir. 2008)), and so are not appropriate for inclusion in the calculation.

-21-
SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

insufficient, standing alone, to support a strong inference of scienter. *See Vantive*, 283 F.3d at 1093; *Silicon Graphics*, 183 F.3d at 987-88. Moreover, Mr. Lane did not sell all of his granted shares, but retained stock, further diminishing any scienter inference. (*See*, *e.g.*, RJN Ex. J (Form 4 for Alan Lane, filed June 10, 2021) (showing Mr. Lane retained 11,113 shares directly and over 230,000 shares indirectly on June 10, 2021)); *Hampton v. Aqua Metals, Inc.*, 2020 U.S. Dist. LEXIS 214010, at *50 (N.D. Cal. Nov. 16, 2020) (retention of holdings contradicts inference of scienter).

Second, the timing of Mr. Lane's stock sales is not at all suspicious. The CAC focuses on five purported sales by Mr. Lane: three in June 2021 (seventeen months before FTX's collapse); one in November 2021; and one in July 2022. (CAC ¶ 240.) The June 2021 sales occurred shortly after the January 2021 Offering, which entailed a 90-day "lock-up period" that prevented Mr. Lane from selling any stock until April 2021. (RJN, Ex. K (Prospectus, filed Jan. 25, 2021, at S-30).) The fourth and fifth sales took place in November 2021 and July 2022 respectively, slightly before and just after the December 2021 Offering, which involved a 60-day lock-up period that prevented Mr. Lane from selling any stock until February 2022. (RJN Ex. L (Prospectus, filed Dec. 8, 2021, at S-23).) District courts in the Ninth Circuit routinely hold that stock sales around public offerings, "a time when shareholders traditionally trade stock," are not suspicious. *Accuray*, 757 F. Supp. 2d at 933; *see also Welgus v. TriNet Grp., Inc.*, 2017 U.S. Dist. LEXIS 207777, at *58-61 (N.D. Cal. Dec. 18, 2017) (allegations that corporate "insiders" sold $474 million in shares eight months following the company's public offering did not raise a strong inference of scienter). The fact that Mr. Lane's sales occurred shortly after Silvergate held multiple public offerings, with corresponding lock-up periods, further undermines a strong inference of scienter.[17] Mr. Lane's options were also soon expiring. (RJN, Ex. J.) The sale of

---

[17] Only one of these five alleged "sales" — the smallest one — occurred around the time Silvergate's stock reached its peak in November 2021, further undercutting any inference of scienter. *See Iron Workers Local 580 Joint Funds v. Nvidia Corp.*, 2020 U.S. Dist. LEXIS 45259, at *41-42 (N.D. Cal. Mar. 16, 2020) (insider stock

SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

stock at or near the scheduled expiration of options is "perfectly reasonable" and is not suspicious, further undermining any strong inference of scienter. *Wu Grp. v. Synopsys, Inc.*, 2005 U.S. Dist. LEXIS 42351, *33 (N.D. Cal. Aug. 10, 2005).

Finally, the CAC fails to include *any* trading history for Mr. Lane that would enable the Court to compare his trading activity before and during the Class Period, and thus determine whether or not his Class Period trading activity was suspicious. The Ninth Circuit has made clear that "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco*, 552 F.3d at 1005 (quoting *Vantive*, 283 F.3d at 1095-96). Indeed, "[e]ven if the defendant's trading history is simply not available for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history." *Id.*; *see also Curry v. Yelp Inc.*, 2015 U.S. Dist. LEXIS 159001, at *52-53 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017). This is true even when historical trading data does not exist because the class period begins on or shortly after the date of a company's IPO. *See id.*; *see also Welgus*, 2017 U.S. Dist. LEXIS 207777, at *58-61 (holding amendment would be futile because defendants were subject to a series of "lock-up agreements" that prevented them from trading following the IPO, "so there was no pattern to compare the trades to"). Plaintiffs' failure to provide *any* allegations regarding Mr. Lane's trading history before the Class Period, let alone the "meaningful" history required by the Ninth Circuit, prevents his stock sales from supporting an inference of scienter, particularly when contrasted against the anticipated "devastating" result for Silvergate (and Mr. Lane) if plaintiffs' theory were plausible.[18]

---

sale made before the peak stock price did not support an inference of scienter even where the sale was "highly unusual"); *see also Accuray*, 757 F. Supp. 2d at 950-51. Further, this was not even a "sale," as it was a withholding for tax purposes for a vested RSU. (RJN Ex. I (Form 4 for Alan Lane, filed Nov. 23, 2021).)

[18] Further, the length of the Class Period — more than 175 weeks — makes the timing of Mr. Lane's stock sales less relevant to the scienter analysis. *Vantive*, 283 F.3d at 1092 (plaintiffs failed to allege scienter where they selected "an unusually long class

SMRH:4859-8029-0159.1
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

### 3. Even Assuming Plaintiffs' Theory Was Instead One of Mere Knowledge, Plaintiffs Fail to Plead a Strong Inference of Such Knowledge

To satisfy the PSLRA's "exacting" standards, a plaintiff must "allege scienter with respect to each of the individual defendants." *Apollo Grp.*, 774 F.3d at 607. Mr. Lane, Silvergate's "chief spokesperson" (CAC ¶ 216), made every statement challenged in the CAC except two. (See *id.* ¶¶ 166, 186.) Yet, the CAC makes *no* attempt to show the purported knowledge of falsity by either of the two other statement-makers, nor does it contain any scienter allegations as to either of them. To prevail on their claims against the Exchange Act Defendants, plaintiffs must thus establish Mr. Lane's scienter.[19] They do not do so.

The CAC's scienter allegations all fail to support the requisite *strong* (*i.e.*, cogent and compelling) inference that Mr. Lane actually knew, at the time he spoke, that Silvergate was not conducting *any* diligence on *any* of its customers, much less that he knowingly or intentionally intended to mislead investors. *Prodanova*, 993 F.3d at 1108. In fact, they often support the opposite inference.

#### a. The FE Allegations Do Not Show Mr. Lane Was Actually Exposed To Information Showing Silvergate Performed No BSA Diligence

The second prong of the test for allegations attributed to confidential informants is that the statements "must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. The FE allegations do not meet this standard because their allegations that they did not see or were not aware of the due diligence being conducted do not support a strong inference that Mr. Lane somehow knew no diligence was being performed. *See, e.g.*, *Ronconi*, 253 F.3d at 430.

---

period of sixty-three weeks" and explaining that "less weight should be given to the timing of the sales when the class period is prolonged").

[19] Plaintiffs cannot save their failure to allege Mr. Lane's scienter by relying upon purported knowledge of falsity by other Silvergate employees who are not alleged to have made any false statements, such as Dina Matias (CAC ¶ 220) or Christie Hicks. (*Id.* ¶ 69.) *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (rejecting the notion of "collective scienter").

SMRH:4859-8029-0159.1

FE1 and FE3 are the only FEs alleged to have had any contact with Mr. Lane. *See In re Rackable Sys., Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 2663, at *22 (N.D. Cal. Jan. 13, 2010) (rejecting former employee allegations when they had no "interaction or communication with any of the defendants"). Neither FE, however, actually served in the Bank's BSA unit; and their sole alleged contact with Mr. Lane is that FE1 reported to him for just two months before the start of the Class Period (CAC ¶ 51 n.45) and FE1 and FE3 attended some meetings that Mr. Lane also attended. (*Id.* ¶¶ 56, 71.) Neither FE alleges they communicated with Mr. Lane about any BSA-related issues and neither sheds light on Mr. Lane's actual knowledge or exposure to Silvergate's purported lack of diligence processes. The FEs simply note that compliance was not discussed at the few meetings FE1 attended with Mr. Lane, nor, unsurprisingly, at the unknown number of meetings FE3 attended with him, the agenda for which included "issues concerning revenue, how well the Bank was doing, and new hires." (*Id.* ¶ 71.) These allegations do not show, much less give rise to a strong inference, that Mr. Lane knew that the Bank did not take its compliance obligations seriously.

The CAC further fails to include the necessary "detailed allegations" about Mr. Lane's "actual exposure" to the relevant information. *See S. Ferry*, 542 F.3d at 784 (where a complaint does not contain detailed allegations about the defendants' actual exposure to information, "the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware"). Although plaintiffs allege that Mr. Lane was "personally involved" in the Bank's monitoring procedures (CAC ¶ 227), they fail to point to any "specific information . . . related to the fraud" that was conveyed to him (*see Metzler*, 540 F.3d at 1068) and do not allege that, as CEO of a Bank with more than 400 employees, Mr. Lane had any direct oversight over the front-line BSA personnel. Nor does the CAC identify any "specific admissions" showing Lane had "detailed involvement in the minutia" of the Bank's customer diligence or monitoring. *Intuitive Surgical*, 759 F.3d

SMRH:4859-8029-0159.1

at 1062.  Plaintiffs' closest attempt is in paragraph 226 of the CAC, where they quote Mr. Lane saying that he personally watches the number and dollar value of SEN transactions, Bank deposit levels, foreign exchange transactions and SEN leverage.  But none of those functions relates to the onboarding or ongoing diligence Silvergate performed on its customers, or even to its BSA/AML/KYC compliance practices more generally.  Accordingly, they do not show Mr. Lane's "actual exposure" to the allegedly omitted information, *i.e.*, that the Bank did not perform *any* BSA-related diligence on its customers.[20]

### b.    Materiality of Statements Does Not Support a Strong Inference of Scienter

Plaintiffs allege that scienter may be strongly inferred because Mr. Lane repeatedly singled out the Bank's diligence as a top reason to buy its stock, knew the devastating potential consequences of a failure to conduct due diligence and provided much of the challenged information in direct response to questions from analysts.  (CAC ¶¶ 213, 224, 229.)  But these allegations at most underscore the materiality of the statements, and *not* Mr. Lane's supposed knowledge of their falsity.

The Supreme Court has rejected the notion that "facts that tend to show a materially false or misleading statement (or material omission) are ordinarily sufficient to show scienter as well." *Merck & Co. v. Reynolds*, 559 U.S. 633, 649 (2010).  The Supreme Court explained that in the Section 10(b) context, "the relation of factual falsity and state of mind is more context specific." *Id.* at 650; *see also In re Zillow Grp., Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 67197, at *53 (W.D. Wash. Apr. 19,

---

[20] Plaintiffs also construe Mr. Lane's statements like "*we* were vetting all of our customers . . ." and "*we* conducted extensive due diligence on FTX and Alameda" as admissions that he was "personally involved in vetting the customers" and "intimately involved" in the Bank's due diligence.  (CAC ¶¶ 227-28) (emphasis in original.)  Such a reading of a CEO's remarks about his Company's procedures is simply disingenuous.

SMRH:4859-8029-0159.1

2019) ("While the Court has ruled that Rascoff's statements . . . were materially misleading, it does not necessarily follow that they were also made with the requisite scienter."). Plaintiffs' attempt to conflate materiality with scienter thus fails to support a strong inference of scienter.

**c.** ████████████████████████████████████████████████

Plaintiffs allege that Silvergate "so extremely failed to conduct these customer diligence procedures" (CAC ¶ 218) ████████████████████████████████ ██████████████████████████████████████████████████.[21] The PSLRA's requirement for pleading particularized facts giving rise to a strong inference of scienter cannot be circumvented by conclusory assertions that a statement was so "profoundly false" that the speaker must have been aware of its falsity at the time it was made. *See Reiger v. Altris Software, Inc.*, 1999 U.S. Dist. LEXIS 7949 (S.D. Cal. Apr. 30, 1999). The alleged magnitude of Silvergate's purported diligence deficiencies provides no indication of how or when — or even whether — Mr. Lane became aware of any potential misstatements in his earlier statements. *See Veal v. LendingClub*, 423 F. Supp. 3d 785, 808-09 (N.D. Cal. 2019) ("The CAC fails to allege *when* (if ever) Defendants became aware of the alleged non-compliance with GLBA in advance of the FTC Complaint.") (emphasis in original). ████████████████████████████████████ does not show that Mr. Lane knew that Silvergate failed to conduct *any* diligence on its customers. ████████████ ████████████████████████████████████ These types of allegations not only constitute fraud by hindsight, but establish nothing more, at best, than ordinary negligence. *Reiger*, 1999 U.S. Dist. LEXIS 7949, at *26-27. ████████████ ████████████████████████████████████████████████████

---

[21] ████████████████████████████████████████████████ ████████████████████████████████████████████

-27-



" 22

**d.    Silvergate's Receipt of Customer Subpoenas Does Not Support a Strong Inference of Scienter**

Plaintiffs allege that scienter can be strongly inferred because, according to FE4, Silvergate received subpoenas relating to customer wires, including for Alameda. (*Id.* ¶ 219.)  Plaintiffs allege that these subpoenas "should have raised red flags to Silvergate and its management." (*Id.* ¶ 221.)  Yet they fail to explain why.  Banks receive subpoenas from governmental agencies every day, and the mere receipt of a subpoena does not demonstrate the existence of wrongdoing.  *See Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1100 (S.D. Cal. 2020).

The CAC is devoid of any allegation that Mr. Lane knew about the subpoenas in question.  At best, plaintiffs allege only that FE4 informed Silvergate's Operations Administrator about the existence of the subpoenas, but there is no allegation that Mr. Lane ever interacted with her, much less that they ever specifically discussed these subpoenas.  The CAC offers no facts to "bridge the gap" between the existence of subpoenas — which are not even indicative of wrongdoing in and of themselves — to Mr. Lane's knowledge of wrongdoing.  *See, e.g., S. Ferry*, 542 F.3d at 786 ("[P]laintiffs did not offer details that would bridge the gap between the existence of

---

22

believed the enhanced procedures remained deficient after August 2022, and do not allege that he sold any stock after implementing the new procedures in August 2022, as would be expected if he believed Silvergate's measures remained deficient.

the reports and actual knowledge on the part of the defendants.").

### 4.    The Stronger Inference Is That Scienter Is Lacking

The counter-inference that a certain number of the Bank's customers who were subjected to its BSA/AML due diligence and monitoring procedures circumvented those procedures is significantly stronger.  In fact, Silvergate disclosed this exact risk and repeatedly cautioned investors that its diligence procedures were not infallible.  (*See* RJN Exs. M, N (Form 10-K, filed Mar. 10, 2020 ("2019 Form 10-K"), at 24; Form 10-K, filed Mar. 8, 2021 ("2020 Form 10-K"), at 22) (warning that, while Silvergate believes its risk management and compliance framework is reasonably designed to detect illicit activities, "we cannot ensure that we will be able to detect any such illegal activity in all instances.")).[23]

In sum, the CAC's allegations, whether taken individually or holistically, fall short of establishing an inference of scienter that is at least as compelling as the opposing "plausible, nonculpable explanation[]" (*Tellabs*, 551 U.S. 323-24) that a bank customer turned out to be an imposter who defrauded the Bank, just as he defrauded an entire industry.  (*See* RJN Ex. B, Indictment ¶¶ 16-19).  In fact, the non-fraudulent inference is more cogent and compelling:  Silvergate accurately described its diligence procedures, but Bankman-Fried effectuated a fraudulent scheme designed precisely to evade those procedures.  The Court should thus grant the Exchange Act Defendants' motion to dismiss the CAC.

---

[23] *See also* RJN Ex. M, 2019 Form 10-K, at 39-40; Ex. N, 2020 Form 10-K, at 33-34 (qualifying that, although "[w]e believe these enhanced procedures adequately screen and monitor our customers . . . given the rapid developments in digital currency markets and technologies, there can be no assurance that these enhanced procedures will be adequate to detect or prevent money laundering activity"); RJN Ex. A, 2021 Form 10-K, at 2 (clearly identifying "the adequacy of our risk management framework" as a factor that "could cause our financial performance to differ materially from that expressed in such forward-looking statements").

SMRH:4859-8029-0159.1

-29-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

**D.     Plaintiffs Fail to State a Secondary Controlling Person Liability Claim for Violation of Section 20(a)**

If the underlying primary violation of federal securities law is insufficiently alleged, the Section 20(a) claim fails as well.  *Endologix*, 962 F.3d at 419.  Because plaintiffs fail to state a violation of Section 10(b), plaintiffs also fail to state a controlling person liability claim against Mr. Lane under Section 20(a).

**V.  PLAINTIFFS' SECURITIES ACT CLAIMS FAIL TO STATE A CLAIM**

**A.     Plaintiffs' Claims and The Four Public Offerings At Issue Here**

In "Part Two" of the CAC, plaintiffs assert claims against the Silvergate Defendants, as well as certain underwriters, for violations of the Securities Act based upon five statements made in offering materials[24] that relate to:  (1) Silvergate's commitment to BSA compliance; (2) its due diligence practices in onboarding new customers; and (3) its due diligence practices throughout the life of a customer's relationship.  (CAC ¶ 336.)  Plaintiffs claim these five statements were false, misleading, and omitted facts because, as with the Exchange Act claims, Silvergate performed "no due diligence before onboarding customers . . . and no ongoing monitoring of customer activities on the SEN Network."  (*Id.* ¶ 337.)

**B.     Elements of Plaintiffs' Securities Act Claims**

**1.     Section 11**

To state a Section 11 claim, the plaintiff must plead that:  (1) the registration statement contained an omission or misrepresentation; and (2) the omission or misrepresentation was material.  15 U.S.C. § 77k; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996).  To qualify as an actionable omission, "it is not enough that the registration statement omitted material facts."  *In re Cloudera, Inc. Sec. Litig.*, 2021 U.S. Dist. LEXIS 99990, at *59 (N.D. Cal. May 25, 2021.)  Rather, an actionable

---

[24] Plaintiffs' Securities Act Claims are based upon statements made in connection with four public offerings of Silvergate stock in January, March, July and December 2021 (collectively, the "Offerings").  (CAC ¶¶ 332-35.)

SMRH:4859-8029-0159.1

-30-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

### 2. Section 12

To allege a Section 12 violation, a plaintiff must plead that: "(1) the defendant is a statutory seller; (2) the sale was effected by means of a prospectus or oral communication; and (3) the prospectus or oral communication contained a material misstatement or omission." 15 U.S.C. § 77*l*(a)(2).  The same legal standard for pleading an actionable omission applicable to Section 11 claims (*see* Section V.B.1, *supra*), applies to Section 12 claims.  *Cloudera*, 2021 U.S. Dist. LEXIS 99990, at *60.  Section 12(a)(2) imposes liability only on the person who "offers or sells" the security." 15 U.S.C. § 77*l*(a)(2).  A person can be a statutory "seller" under Section 12 only by: (1) directly passing title to the security to the plaintiff; or (2) actively soliciting the sale to serve his own financial interest or the financial interest of the securities' owner.  *Pinter v. Dahl*, 486 U.S. 622, 642-44 (1988).  Because the language of the statute "focuses on the defendants' relationship with the plaintiff-purchaser" (*id.* at 651), the second *Pinter* category does not include those who merely "participate in soliciting the purchase."  *Id.* at 650-51 n.27; *see also id.* at 643 n.21.  Rather, the alleged facts must show that the defendant engaged in direct, *active* solicitation.  *See, e.g.*, *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1029 (9th Cir. 2005).

### 3. Section 15

Section 15, as with Section 20(a) of the Exchange Act, allows claims against parties who are "controlling persons" for a primary violation of the Securities Act. 15 U.S.C. § 77*o*; *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) ("controlling person analysis" for Section 15 is the same as Section 20(a)).

## C. The Heightened Pleading Standard Applies

Section 11 and 12 claims "sound in fraud" when they employ the "same factual allegations" as those used to "allege fraudulent conduct under Section 10(b) of the Exchange Act," *i.e.*, both allege a "unified course of fraudulent conduct."  *Rubke v.*

-31-

*Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). That is the case here. Plaintiffs challenge substantially the same statements under both the Exchange Act and the Securities Act and base their challenge on a "unified course of fraudulent conduct."

"[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its Section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *Rigel*, 697 F.3d at 885-86 (holding that Rule 9(b) applied when the plaintiff's Section 11 claim "relie[d] on the same alleged misrepresentations . . . central to the plaintiff's Section 10(b) fraud claim" even though the plaintiff "disclaimed in its complaint any allegation of fraud in connection with the section 11 cause of action"). Here, while plaintiffs separate the CAC into two and attempt to disclaim any fraudulent theory (CAC ¶¶ 318, 416, 436), there is an "obvious overlap" between them. *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010). In fact, plaintiffs copy and paste most of their Exchange Act allegations into the "separate" Securities Act section. (*Compare, e.g.*, CAC ¶¶ 51, 52, 59, 60, 63, 65, 67, 68, 77, 82, 84, 86 (Exchange Act allegations) *with id.* ¶¶ 346, 339, 341, 344, 346, 348, 354, 358, 385, 390, 391, 394 (identical Securities Act allegations).)

Here, the conduct alleged for the Securities Act claims "is so substantively similar to the conduct pled" for the Exchange Act claims that it is virtually impossible to distinguish between the two and Rule 9(b)'s heightened pleading standards thus apply to the Securities Act Claims. *Bare Escentuals*, 745 F. Supp. 2d at 1068; (*compare* CAC ¶¶ 1, 7 (Exchange Act claims based on alleged falsity of statements regarding Silvergate's due diligence of Bank customers because the Bank in fact performed *no* diligence and *no* ongoing monitoring of its customers) *with id.* ¶ 337 (Securities Act claims based on alleged falsity of similar statements for the same reasons).) Moreover, the nature of the alleged omissions compels the conclusion that plaintiffs' theory sounds in fraud. Plaintiffs theorize that the Bank performed *no* diligence on

any of its customers, and managed to hide that fact from regulators for years. As a highly regulated financial institution, the Bank simply cannot have done so — and gotten away with it for years — innocently or negligently. Rather, to have a complete absence of controls as plaintiffs proffer would require a conscious effort, including, for example, hiring multiple BSA analysts and a devoted BSA manager to create the appearance of a working BSA Department (*see id.* ¶¶ 59-60), but in fact having all of that staff perform "no" BSA monitoring or alerts.

**D.      Plaintiffs' Section 11 and 12 Claims Fail Because They Do Not Identify Any False or Misleading Statement**

Plaintiffs rely upon virtually identical allegations by the same six FEs, the same handful of other Bank customers with purported compliance problems and the hindsight fact of FTX's ultimate collapse to support their claim of falsity. For the reasons set forth above demonstrating that the CAC fails to meet the heightened pleading requirements under Rule 9(b) and the PSLRA for pleading falsity for purposes of plaintiffs' Exchange Act Claims (*see* Section IV.A, *supra*), the CAC fails to meet the heightened pleading requirements under Rule 9(b) for pleading falsity for purposes of plaintiffs' Securities Act claims. *See Rubke*, 551 F.3d at 1161.

**E.      Plaintiffs' Section 12 Claim Fails Because No Silvergate Defendant Is Adequately Alleged to be a Statutory Seller**

**1.      Statutory Seller Allegations Against the Individual Defendants Fail**

Officers of issuers are not automatic statutory sellers under Section 12(a)(2). *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 208436, at *17-18 (C.D. Cal. Feb. 16, 2012). Under *Pinter*, they must directly and actively solicit the sale to the plaintiff in order to serve their own or the securities owner's financial interests. Regarding the Individual Defendants, the CAC alleges only that they signed the Registration Statements (CAC ¶¶ 329, 330, 439), and asserts generically that they "promoted, solicited, and/or sold millions of Silvergate securities to Plaintiffs and members of the Class." (*Id.* ¶ 444.)

These allegations are insufficient because neither describes what, if anything, the Individual Defendants did to directly and actively solicit investors, much less the plaintiffs themselves. That they "signed the Registration Statement" (*id.* ¶ 329) is irrelevant. *See*, *e.g.*, *In re Harmonic Sec. Litig.*, 2006 U.S. Dist. LEXIS 90450, at *40-41 (N.D. Cal. Dec. 11, 2006) (dismissing Section 12 claims against individual defendants who only drafted the prospectus, permitted the use of their names and "order[ed] it to be signed"); *In re DDi Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 28216, at *62 (C.D. Cal. July 20, 2005); *see also Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 871 (5th Cir. 2003) (rejecting "signing the registration statement suffices for solicitation").

The only other allegation in the CAC purporting to show the Individual Defendants engaged in any solicitation is its single conclusory allegation that they "promoted, solicited, and/or sold millions of Silvergate securities to Plaintiffs and members of the Class." (CAC ¶ 444.) But no non-conclusory factual allegations identify what, if anything, *any* individual actually did to "promote," "solicit" or "sell" to any investors, much less plaintiffs themselves. *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at *37 (C.D. Cal. May 5, 2011) (allegations that defendants "promoted" the sale are insufficient, and plaintiffs "must include very specific allegations of solicitation, including direct communication with plaintiffs" in order to state a claim). Plaintiffs' vague and generic allegation here is insufficient to meet the pleading requirement of direct and active solicitation to state a cause of action against them under Section 12(a)(2).[25]

To leave no doubt, plaintiffs concede implicitly that the Individual Defendants did not actively solicit any stock sales to further their own or the securities' owner's interests, as required to state a claim against them. (CAC ¶ 444) (alleging that only

---

[25] Even under notice pleading standards, the CAC's conclusory allegations fall short, and courts routinely hold that such barebones allegations fail to allege a Section 12 claim. *See*, *e.g.*, *China Intelligent Lighting*, 2012 U.S. Dist. LEXIS 208436, at *16; *Bare Escentuals*, 745 F. Supp. 2d at 1073.

SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

"Silvergate and the Underwriter Defendants" — and *not* any of the Individual Defendants — were "motivated by their own financial interests").

### 2.    Statutory Seller Allegations Against Silvergate Fall Short

Plaintiffs do not allege Silvergate directly transferred title of its securities to them.  Thus, plaintiffs must allege facts showing that Silvergate actively solicited the sale of shares for its own financial gain or that of the securities' owner.  *Pinter*, 486 U.S. at 647; *see also In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *51-52 (C.D. Cal. July 13, 2015); *Maine State Ret. Sys.*, 2011 U.S. Dist. LEXIS 125203, at *34-39 (dismissing Section 12 claim against issuer because plaintiffs fail to include "include very specific allegations of solicitation, including direct communication with Plaintiffs").  The CAC does not allege that Silvergate took any actions other than those purportedly attributable to its executives and directors.  (CAC ¶ 444.)  As discussed above, the CAC does not allege any actual solicitation conduct by them and so even they are not adequately alleged to be statutory sellers.  As a result, neither is Silvergate.  *See*, *e.g.*, *CytRx*, 2015 U.S. Dist. LEXIS 91447, at *51-52.[26]

### F.    Plaintiffs' Section 15 Claim Fails

Plaintiffs' Section 15 claim for relief is predicated upon a violation of Sections 11 and 12(a)(2).  Because plaintiffs fail to state a primary claim under Sections 11 or 12(a)(2), they necessarily fail to state a secondary claim under Section 15.  *See China Intelligent Lighting*, 2012 U.S. Dist. LEXIS 126033, at *15.

//

//

//

//

//

---

[26] The Silvergate Defendants also join in, and incorporate by reference, the defendant underwriters' motion to dismiss plaintiffs' Securities Act Claims.

SMRH:4859-8029-0159.1

-35-

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC

## VI.  CONCLUSION

For the foregoing reasons, the Court should grant the Silvergate Defendants' motion to dismiss and dismiss the CAC in its entirety.

Dated:  July 10, 2023          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By: _____/s John P. Stigi III_____
JOHN P. STIGI III
POLLY TOWILL
Attorneys for the SILVERGATE DEFENDANTS
Email:  jstigi@sheppardmullin.com

SMRH:4859-8029-0159.1

Case No. 3:22-CV-01936-JES-MSB
MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
SILVERGATE DEFENDANTS' MOTION TO DISMISS CAC