# EXHIBIT F

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING SECOND INTERIM REPORT OF JOHN J. RAY III TO THE
INDEPENDENT DIRECTORS: THE COMMINGLING AND MISUSE OF
CUSTOMER DEPOSITS AT FTX.COM**

PLEASE TAKE NOTICE that, on April 9, 2023, FTX Trading, Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), filed the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1] with the United States Bankruptcy Court for the District of Delaware (the "Court").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* (the "Second Interim Report"), attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that copies of the Second Interim Report and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge from the website maintained by the Debtors' noticing and claims agent at https://restructuring.ra.kroll.com/FTX/. You may also obtain copies from the Court's website at www.deb.uscourts.gov for a fee.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

{1368.002-W0071376.}

Dated: June 26, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

{1368.002-W0071376.}

2

# **Exhibit A**

# SECOND INTERIM REPORT OF JOHN J. RAY III TO THE INDEPENDENT DIRECTORS:
# THE COMMINGLING AND MISUSE OF CUSTOMER DEPOSITS AT FTX.COM

June 26, 2023

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    THE FTX GROUP'S REPRESENTATIONS ABOUT THE PROTECTION OF CUSTOMER DEPOSITS ................................................................................................3

      A.     Background on the Separation of Customer and Corporate Funds.........................4

      B.     Statements to U.S. Officials, the Public and Other Third Parties ...........................5

III.   THE COMMINGLING OF CUSTOMER DEPOSITS .........................................................7

      A.     The Primary Deposit Accounts...................................................................10

      B.     Commingling of Funds from the Primary Deposit Accounts ...............................14

      C.     Lack of Commitment in Terms of Service to Protect Customer Deposits ............16

      D.     Falsity of Claim to Reconcile Trading Balances ......................................................17

IV.   THE ROLE OF ATTORNEY-1 IN FACILITATING THE COMMINGLING OF CUSTOMER DEPOSITS ................................................................................................17

      A.     False Statements to a U.S. Bank ...........................................................................18

      B.     Retaliation against an Employee Who Raised Concerns about Commingling ........................................................................................................19

      C.     Creation of the Sham Payment Agent Agreement................................................20

V.    USE OF COMMINGLED FUNDS FOR THE FTX GROUP'S OWN EXPENDITURES..........................................................................................................23

      A.     Political Donations................................................................................................24

      B.     "Charitable" Donations.......................................................................................25

      C.     Venture Investments and Acquisitions ...............................................................27

      D.     Luxury Real Estate in the Bahamas.....................................................................28

VI.   TOTAL LOSSES TO CUSTOMERS.................................................................................30

-i-

## I.    Introduction

The rise of the global digital asset industry has created novel opportunities and challenges for consumers, businesses, financial markets, regulators, and others.  Rapid advances in blockchain technology have made decentralized finance and digital asset transactions not only possible, but widely accessible and inexpensive for consumers.  At the same time, the industry has grappled with challenges common to all businesses that handle financial assets, which can be used to facilitate criminal activity, can be stolen by hackers and, as the FTX Group's collapse has revealed, can be misappropriated by those who have promised to protect them.[1]

The FTX Group portrayed itself as the vanguard of customer protection efforts in the crypto industry.  Its co-founder and CEO, Sam Bankman-Fried, claimed to support federal legislation to safeguard consumers' digital assets, and touted the FTX exchanges' purported procedures to protect fiat currency and crypto deposits, including in testimony he provided to the U.S. Senate.  In 2021, the FTX Group released, and urged Congress to read, its "key principles" for regulation of the crypto industry, which included the primary goals of "ensuring customer and investor protection, promoting market integrity, preventing financial crimes, and ensuring overall system safety and soundness."[2]  In an accompanying press release, Bankman-Fried declared "the protection of investors and the public as a top priority" for the FTX exchanges.

---

[1]    The "FTX Group" refers to FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries. "The Debtors" comprise the approximately one hundred entities associated with the FTX Group listed at https://restructuring.ra.kroll.com/FTX.

[2]    FTX International, *FTX Issues Key Principles for Market Regulation of Crypto-Trading Platforms*, PR NEWSWIRE (Dec. 3, 2021), https://www.prnewswire.com/news-releases/ftx-issues-key-principles-for-market-regulation-of-crypto-trading-platforms-301437175.html; FTX US, *FTX's Key Principles for Market Regulation of Crypto-Trading Platforms* (Dec. 3, 2021), https://www.ftxpolicy.com/posts/ftx-key-principles; *Examining Digital Assets - Risks, Regulation, and Innovation: Hearing before the. S. Comm. on Agric., Nutrition and Forestry*,

The image that the FTX Group sought to portray as the customer-focused leader of the digital age was a mirage.  In fact, as set forth in this report, from the inception of the FTX.com exchange, the FTX Group commingled customer deposits and corporate funds, and misused them with abandon.  Bankman-Fried, along with FTX.com's co-founder, Gary Wang, and Director of Engineering, Nishad Singh (the "FTX Senior Executives"), and others at their direction, used commingled customer and corporate funds for speculative trading, venture investments, and the purchase of luxury properties, as well as for political and other donations designed to enhance their own power and influence.

The FTX Senior Executives did not commingle and misuse customer deposits by accident.  Commingling and misuse occurred at their direction, and by their design.  Bankman-Fried, with the assistance of a senior FTX Group attorney ("Attorney-1") and others, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to the Bahamas, in a continual effort to enable and avoid detection of their wrongdoing.  In doing so, they showed little of the concern for customers that they publicly professed.

Based on the Debtors' current analysis, as of the petition date, approximately $8.7 billion in customer-deposited assets was misappropriated from the FTX.com exchange, the vast majority of which was in the form of cash and stablecoin.[3]  The Debtors' ongoing work to trace and recover assets, and maximize recoveries for stakeholders, has been complicated by the

---

117th Cong. (2022) (testimony of Sam Bankman-Fried), https://www.agriculture.senate.gov/imo/media/doc/Testimony_Bankman-Fried_0209202211.pdf

[3]    The FTX exchanges did not distinguish or differentiate between cash and stablecoin held in customer accounts, but treated them collectively as "e-money."  As a result of this lack of recordkeeping, the Debtors are unable to provide a breakdown of the cash and stablecoin in a customer account.

extensive commingling and misuse of funds that occurred there.  Notwithstanding extensive work by experts in forensic accounting, asset tracing and recovery, and blockchain analytics, among other areas, it is extremely challenging to trace substantial assets of the Debtors to any particular source of funding, or to differentiate between the FTX Group's operating funds and deposits made by its customers.

Like the First Interim Report, this second interim report is issued in furtherance of the Debtors' stated objectives for the bankruptcy, including transparency.[4]  In issuing it, the Debtors intend to provide transparency both about facts they have uncovered about the operation of FTX.com, and important issues they are navigating as they seek to maximize recoveries.  Also like the First Interim Report, this report reflects the Debtors' current understanding based on their analysis to date.  It is important to recognize that this analysis is ongoing, incomplete and subject to change.  The Debtors will continue to provide reporting on their analysis and findings as their work progresses.

## II.    The FTX Group's Representations about the Protection of Customer Deposits

The FTX Group touted a commitment to protecting customer deposits from misuse or misallocation, and publicly championed legislative and regulatory efforts to protect crypto industry customers.  Through its website, social media, and in statements and submissions to Congress, regulators and other third parties, the FTX Group represented that it maintained a

---

[4]    These goals are:  (1) implementation of controls, (2) asset protection and recovery, (3) transparency and investigation, (4) efficiency and coordination with any non-U.S. proceedings and (5) maximization of value.  First Day Declaration of John Ray III, Dkt. 24 ("First Day Declaration") ¶ 6; *see also* First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, April 9, 2023, *available at* https://restructuring.ra.kroll.com/FTX/Home- DownloadPDF?id1=MTQ5MDc2OQ%3D%3D&i d2=0, ("First Interim Report") at 1-2.

enhanced [due diligence] process. And I don't want to bother with that right now; it's almost lunchtime. . . . But everyone wants to serve a research institute.[13]

To evade banks' restrictions, at the direction of the FTX Senior Executives, FTX Group funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research Ltd. ("Alameda") and other affiliates, and made misrepresentations to banks about the purpose for which it was using the accounts. At the same time, also at the FTX Senior Executives' direction, the FTX Group used those accounts for many other purposes, commingling and misusing vast sums of customer and corporate funds in the process. Simply put, as a former Alameda employee explained to the Debtors, the FTX Group made no meaningful distinction between customer funds and Alameda funds.

Because the commingling and misuse of FTX.com customer deposits occurred for several years, it is extraordinarily challenging to trace the source of funding for particular FTX Group transactions, or to differentiate between FTX Group operating funds and FTX.com customer deposits. This section describes some of the Debtors' ongoing analysis to attempt to trace the sources and uses of customer funds, focusing primarily on several U.S. dollar-denominated accounts that the FTX Group used to receive customer deposits and fund customer withdrawals, including accounts in the names of Alameda Research Ltd. ("Alameda-4456" and "Alameda-4605"), North Dimension, Inc. ("North Dimension-8738" and "North Dimension-8746"), and FTX Digital Markets Ltd. ("FTX DM") ("FTX DM-2564" and "FTX DM-2549") (collectively, the "Primary Deposit Accounts").[14] These accounts were at all times controlled

---

[13]     Real Vision Finance, *Building an Arbitrage Infrastructure for Traders*, FULL EPISODE with Sam Bankman-Fried, CEO of FTX, YOUTUBE (June 2, 2021), https://www.youtube.com/watch?v=YLCnGXawUj0.

[14]     The accounts described here and throughout this report refer to the last four digits of the relevant entities' account number for simplicity.

crypto derivatives exchange services and is also owned by Samuel Bankman-Fried."  Given this

observation, the representative asked whether the account would "be[] used to settle trades for

their derivatives exchange platform (FTX Trading)?"

Rather than tell the truth to the bank—*i.e.*, that it not only intended to, but had in

fact been using the Alameda account for FTX.com customer transactions for nearly a year—the

FTX Group lied.  Specifically, at the direction of a senior FTX Group executive, an Alameda

employee falsely responded that "customers occasionally confuse FTX and Alameda" but that

"all incoming/outgoing wires are to settle trades with Alameda Research."

Thereafter, in an effort to avoid scrutiny, the FTX Group incorporated a new,

wholly owned entity called North Dimension Inc. ("North Dimension").  North Dimension's

purpose was to enable the FTX Group to obtain bank accounts through which it could operate the

FTX.com exchange.  To obtain the accounts, as set forth in Section IV.A, at the direction of a

senior FTX Group attorney, Attorney-1, the FTX Group falsely represented to a bank that North

Dimension was a crypto trading firm with substantial operations, when in fact North Dimension

was a shell company with no operations.  Beginning in April 2021, the FTX Group opened North

Dimension-8738 and -8746, two of the Primary Deposit Accounts, and began instructing

FTX.com customers to wire funds to them.[16]

By at least September 2021, however, certain customers' banks had begun

questioning, and sometimes rejected, wires to or from the North Dimension accounts.  An

internal document created by the FTX Group in November 2021 listed the "known banks that

---

[16]     Notwithstanding these instructions, some customers continued to send their deposits to
Alameda bank accounts, which continued to accept them.

false information to be conveyed to customers, banks, auditors, investors, and other third parties, including as set forth in the following examples.

### A. False Statements to a U.S. Bank

As discussed above, after U.S. banks started rejecting wires involving customers to and from certain Alameda bank accounts, the FTX Group lied to a U.S. bank ("Bank-1") to induce it to open new accounts in the name of North Dimension, which the FTX Group falsely claimed was a crypto trading firm. In fact, the FTX Senior Executives, Attorney-1 and other senior FTX Group employees secretly intended to use, and did use, the North Dimension accounts to receive customer deposits and fund customer withdrawals for FTX.com. Attorney-1 and Bankman-Fried played leading roles in carrying out this deception.

Specifically, Attorney-1 instructed an FTX Group employee to copy and paste into the application for North Dimension's bank accounts the information that Alameda had previously submitted on its own applications to open its bank accounts. The employee did so, and as a result, the application submitted to Bank-1 falsely represented that North Dimension "operates a cryptocurrency trading business." In response to a due diligence questionnaire that Bank-1 required as part of the application process for trading businesses, the FTX Group further falsely described North Dimension as a proprietary and OTC trading firm with 2,000 counterparties and average monthly trading volume of $10 million. Bankman-Fried signed and certified that this response to the bank's questionnaire was correct and complete to the best of his knowledge and belief.

In fact, as Attorney-1 and Bankman-Fried well knew, the information provided to Bank-1 about North Dimension was false. Unlike Alameda, which was a crypto trading and market-making firm with employees, operations and trading activity, North Dimension had no business operations or employees. Attorney-1, who had assisted in incorporating North

Dimension, was also identified to Bank-1 in a false and misleading fashion as North Dimension's General Counsel and Chief Compliance Officer.

Although Attorney-1, Bankman-Fried and others also knew that they intended to use a North Dimension account to process customer deposits and withdrawals for the FTX exchanges, that information was not disclosed on the application to open the account. Further, in response to Bank-1's question in the application, "Is the business a money services business (MSB)?" the FTX Group falsely responded "No." But as Attorney-1 well knew, the FTX Group intended to use the North Dimension account to receive and pay funds to customers, and thus was acting as a money services business.

Attorney-1 also knowingly directed others to create a false and misleading corporate register of members and managers to be provided to Bank-1 in connection with the North Dimension application. Specifically, after Bank-1 asked for a copy of the register, Attorney-1 directed a law firm to create a register. Attorney-1 provided the law firm with the names of the individuals to be identified as members or managers of North Dimension. The register of members was subsequently provided to Bank-1 in order to give North Dimension, a purely shell company, a false air of legitimacy.

### B. Retaliation against an Employee Who Raised Concerns about Commingling

After a less senior attorney at the FTX Group discovered and raised concerns that North Dimension accounts were being used to fund FTX exchange customer withdrawals, Attorney-1 fired the attorney, who had been hired less than three months earlier.

Specifically, in early 2022, an FTX Group attorney observed a lack of internal documentation and recordkeeping regarding the FTX Group's corporate organization and intercompany relationships. In the course of investigating, the attorney learned that Alameda owned North Dimension, and that the FTX Group was using North Dimension accounts to fund