**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Tel: (312) 629-3737

*Lead Counsel for Plaintiffs*
*and the proposed Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |
| | CLASS ACTION |
| | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE EXCHANGE ACT CLAIMS** |
| | Date: November 29, 2023 Time: 9:00 a.m. Dept: 4B Hon. James E. Simmons, Jr. |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................1

II.  SUMMARY OF THE ALLEGATIONS ...............................................3

   A.   Silvergate Targets the Cryptocurrency Industry To Drive Deposit Growth. ..............................................................................3

   B.   Silvergate Falsely Assures Investors that It Conducts Due Diligence on SEN Network Customers.................................................4

   C.   Unfortunately for Investors, Silvergate Did Not Vet, Perform Due Diligence on, or Monitor Its Customers.........................6

   D.   Investors Suffer as the Truth Emerges and Customers Pull Their Deposits from the SEN Network. ......................................9

III. ARGUMENT........................................................................................10

   A.   The Complaint Adequately Alleges Defendants' Material Misrepresentations and Omissions.........................................................10

      1.   Defendants Misrepresented the Bank's "Vetting" and "Initial Due Diligence" of Prospective Customers.............................................................................11

      2.   Defendants Misrepresented the Bank's "Ongoing Monitoring".................................................................13

      3.   Defendants Misrepresented the Bank's "Due Diligence" of FTX and Its Strict Customer Standards.....................................................................14

      4.   Defendants Improperly Attempt To Rewrite the Complaint's Allegations and Raise Factual Disputes that Cannot Be Resolved at this Stage ......................16

   B.   The Complaint Adequately Alleges Defendants' Scienter. ...............27

      1.   Defendants Fail To Offer a More Cogent and Compelling Opposing Inference of Scienter ..........................33

IV.  CONCLUSION.....................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) .......................................................*passim*

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .....................................................29

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008)...........................................................12

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................20, 21, 23, 28

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022)....................................................19, 33

*In re BofI Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)......................................26, 27, 32

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) ................................12, 19, 24, 34

*Bruce v. Suntech Power Holdings Co.*,
64 F. Supp. 3d 1365 (N.D. Cal. 2014)...........................................................27

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)..........................................12, 14, 15, 35

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023).....................................................35

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005)....................................................17

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
2023 WL 5496507 (9th Cir. Aug. 25, 2023) .....................................................10

*Erhart v. BofI Holding, Inc.*,
612 F. Supp. 3d 1062 (S.D. Cal. 2020) ............................................................. 31

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019).......................................................................29, 30

*In re Extreme Networks, Inc. Sec. Litig.*,
2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ....................................................21

*Farrar v. Workhorse Grp., Inc.*,
2021 WL 5768479 (C.D. Cal. Dec. 2, 2021)......................................................21

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................30

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................25

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ......................................................................10, 30

*Glazer Cap. Mgmt. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ....................................................18, 20, 23, 31

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)...............................................10, 19, 27, 31

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...............................................................................29

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010) ...............................................................................24

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d 381 (S.D.N.Y. 2022) ......................................................*passim*

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020)......................................................32

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..........................................................................2, 17

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008)..............................................................23

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...........................................................................24

*Longo v. OSI Sys., Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021)........................................................22

*Mandalevy v. BofI Holding, Inc.*,
2021 WL 794275 (S.D. Cal. Mar. 2, 2021) .........................................................33

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) .................................................................25

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)..............................................................................................30

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...............................................................32

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014)..............................................................20, 26

*Neborsky v. Valley Forge Composite Techs., Inc.*,
2014 WL 3767011 (S.D. Cal. July 29, 2014) ......................................................17

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................12, 13, 34

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
988 F. Supp. 2d 406 (S.D.N.Y. 2013) ..................................................................34

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ................................................................................33

*Okl. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ............................................................................21, 35

*Okl. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ........................................................................24

*Oregon Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ................................................................................18

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019)......................................................29

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .........................................................................10, 27

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ................................................................29

*In re RAIT Fin. Trust Sec. Litig.*,
  2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ......................................12, 19, 27

*Reiger v. Altris Software, Inc.*,
  1999 WL 540893 (S.D. Cal. Apr. 30, 1999) ......................................................31

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..............................................................34

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ..............................................28, 31

*Roberti v. OSI Sys, Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ...................................................29

*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) .................................................29, 30

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .............................................................................27

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ..........................................................................20

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ......................................................10, 27, 28, 35

*SEC v. City of Victorville*,
  2018 WL 3201676 (C.D. Cal. Jan. 24, 2018) ...................................................32

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
  2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) ...................................................15

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) .............................................................................27

*In re Silver Wheaton Corp. Sec. Litig.*,
  2016 WL 3226004 (C.D. Cal. June 6, 2016) .....................................................34

*Smilovits v. First Solar, Inc.*,
  2012 WL 6574410 (D. Ariz. Dec. 17, 2012) .....................................................31

*In re SolarWinds Corp. Sec. Litig.*,
   595 F. Supp. 3d 573 (W.D. Tex. 2022) ..............................................................21

*In re Splunk Inc. Sec. Litig.*,
   592 F. Supp. 3d 919 (N.D. Cal. 2022).................................................................20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).................................................................................27, 33

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) .....................................................................27, 31

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab.*
   *Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017).........................................................26

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009) .........................................................12

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ...................................................25

*In re Wells Fargo Sec. Litig.*,
   12 F.3d 922 (9th Cir. 1993) .............................................................................25

*Zhou v. Faraday Future Intel. Elec. Inc.*,
   2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) ..................................................23

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ...............................................30

**STATUTES**

Securities Exchange Act of 1934............................................................................1

**OTHER AUTHORITIES**

Fed. R. Evid. 801(d)(2) .......................................................................................24

## I.   <u>INTRODUCTION</u>

Part I of the Complaint alleges that Defendant Silvergate and its top executive, Defendant Lane, made false and misleading statements to investors in violation of the Securities Exchange Act of 1934 (the "Exchange Act").  Throughout the Class Period, Silvergate and Lane repeatedly represented that the Bank's specific "vetting," "due diligence," and "monitoring" procedures gave Silvergate a "distinct competitive advantage," allowing them to "know" their customers and "eliminating counterparty risk" for the Bank's customers transacting on Silvergate-approved cryptocurrency exchanges, including FTX, Binance and more.  Through these representations, Silvergate became the go-to bank for the red-hot cryptocurrency industry, and its deposits ballooned ten-fold.  Investors credited Defendants' representations, with Silvergate's stock price skyrocketing nearly twenty-fold.

In truth, however, Silvergate did not conduct the customer vetting, due diligence, or ongoing monitoring that Defendants touted.  The Complaint is backed by myriad sources, including, among others, the eyewitness accounts of numerous Silvergate former employees; exposés by investigative journalists; reports by securities analysts and U.S. senators; and ███████████████████████.  The evidence is overwhelming—even at the pleading stage—that Silvergate failed to conduct the represented due diligence and ongoing monitoring procedures that it emphasized to investors as mission-critical.  Former employees consistently reported that the Bank did not conduct site visits; lacked basic information about its Silvergate-approved cryptocurrency exchanges; never implemented necessary anti-money laundering ("AML") software to monitor client activity for red flags; and set wire limits and authorized transactions without requiring basic documentation.  ███ ███████████████████████████████████████ ████████████████████████████ the Bank failed to address for existing customers, including FTX—Silvergate's primary customer that single-handedly accounted for 17% of its overall deposits.  Had Silvergate done even a

fraction of the represented vetting, due diligence, and monitoring that it assured investors it did, the Bank would have readily discovered that its Silvergate-approved cryptocurrency exchange customers—including FTX, Binance, Huobi, and others—were outright shams stealing billions of dollars of funds from Silvergate's customers.

When the truth emerged, the DOJ opened an investigation into Silvergate's misconduct; a bipartisan group of U.S. senators lambasted Lane and Silvergate for their "severe due diligence failures" and "egregious failure" to "monitor for and report suspicious financial activity carried out by its clients"; and Silvergate was forced to shut down its Silvergate Exchange Network (the "SEN Network"), cease operations, fire its employees, and commence liquidation. Silvergate's stock price plummeted from over $225 to roughly $1 per share, wiping out billions in investor capital. While investors have suffered mightily, Defendant Lane has profited: unloading a remarkable $21 million of his personal shares—all before investors learned the truth and Silvergate's stock price crashed.

Unable to confront the Complaint's *actual* allegations and their *actual* statements to investors, Defendants devote the bulk of their Motion to desperately trying to rewrite them and pointing to documents well outside the pleading. Their approach is improper. As the Ninth Circuit has warned in reversing a dismissal of a securities class action, defendants are *not* permitted to "present their own version of the facts at the pleading stage," and district courts must not "accept those facts as uncontroverted and true." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); *see also* Pl's Opp. to Silvergate Defendants' RJN, filed concurrently.

Defendants cannot escape the well-pleaded claims. Courts have repeatedly found that misstatements to investors touting a bank's vetting and due diligence procedures are actionable under the federal securities laws when, like here, those procedures are not what Defendants told investors. *See infra* at Section III.A.1-3. Indeed, ████████████████████████████████████████ ██████████████, and even *after* the public revelations about FTX in November 2022,

Silvergate and Lane brazenly *continued* to falsely assure investors that there were "no exceptions" to the Bank's stated customer standards and that its "know-your-customer" ("KYC") procedures were followed "for each and every account," including FTX specifically. Silvergate and Lane knew or, at minimum, were deliberately reckless in not knowing that the Bank failed to conduct the specific procedures that they so often touted to investors.

The Court should deny Defendants' Motion, and the Parties' factual disputes should be resolved on a full record.

## II.    SUMMARY OF THE ALLEGATIONS

### A.    Silvergate Targets the Cryptocurrency Industry To Drive Deposit Growth.

For most of its 35-year history, Silvergate was a local community lending bank with a few hundred million dollars in deposits. ¶26. After the financial crisis, investors lost faith in local banks and moved their deposits to larger banks. *Id.* This caused an existential crisis for Silvergate because deposits were its lifeblood. *Id.*[1]

To jumpstart deposits, Silvergate turned to the cryptocurrency industry that was seeing record-breaking growth. ¶27. Silvergate eyed as customers the world's largest cryptocurrency exchanges—entities that created and sold the cryptocurrencies. ¶¶27-28. Traditional banks had shunned these entities, fearing they might be scams used to steal customers' funds, commit fraud, or facilitate money laundering. Defendants Silvergate and Lane, on the other hand, welcomed them with open arms, claiming that the Bank's "secret sauce" "vetting," "due diligence," and "monitoring" safely enabled it to do so. ¶¶29-31, 36.

Silvergate actively promoted the SEN Network, which allowed Silvergate-approved cryptocurrency exchanges and other approved customers to

---

[1] Unless otherwise noted, citations to "¶_" are to the Complaint (ECF No. 43), "Mot. _" are to the Silvergate Defendants' Memorandum (ECF No. 66-1), emphasis is added, and internal citations, alterations, and quotations are omitted.

instantaneously transact among themselves.  ¶30.  Defendants told the public that they could trust the cryptocurrency exchanges transacting on the SEN Network because each had achieved Silvergate's "good housekeeping seal of approval": Silvergate had carefully "vetted" each prospective customer and continued ongoing "monitoring" of each customer's activity, eliminating any "counterparty risk."  ¶31.

Within a few years, the SEN Network became Silvergate's "flagship product" and "what [Silvergate was] known for."  ¶32.  Cryptocurrency customers flocked to the Bank; consumers poured money into Silvergate's "vetted" and "monitored" cryptocurrency exchange customers; and Silvergate's deposits soared over $14 billion as it became the go-to bank of the cryptocurrency industry.  ¶¶26-33.

### B.    Silvergate Falsely Assures Investors that It Conducts Due Diligence on SEN Network Customers.

In SEC filings, media interviews, and conference calls with investors and securities analysts, Defendants emphasized their purported "vetting," "due diligence," and "monitoring" as a chief reason to buy Silvergate stock.  ¶¶34-45.

*Vetting and Due Diligence*: Defendants stressed to investors that before approving customers to use the SEN Network, the Bank performed extensive "vetting" and "due diligence" that purportedly included, "at a minimum, detailed reviews of each customer's ownership, management team, business activities, and the geographies in which they operate."  ¶¶38-41.  Lane and Silvergate emphasized that the Bank's "vetting" and "due diligence" included extensive "compliance reviews" of each customer's "culture of compliance," anti-money laundering programs, and a "site visit."  ¶¶38-43.

Defendants assured investors that this "enhanced due diligence" enabled the Bank to develop "a deep knowledge of our clients," to gain an "understanding of their compliance programs," and to ensure that each customer's "compliance programs are sound."  ¶¶39, 41-42, 55.  It also enabled the Bank, "for each and every account," to "determine the beneficial owner, the source of funds, and the purpose

and expected use of funds." ¶40. "First and foremost," according to Silvergate and Lane, through these procedures, the Bank developed an understanding of a "customer's business" and "what [the] customers are doing." *Id.*

***Ongoing Monitoring***: Lane and Silvergate underscored to investors that once Silvergate-approved customers were operating on the SEN Network, the Bank continued to keep a close watch on their activity through "ongoing monitoring." ¶¶42-43. This "ongoing monitoring" purportedly entailed "transaction monitoring," "enhanced due diligence" with "customer counterparty reviews," and daily, quarterly, and annual "reviews." *Id.* Defendants assured investors that Silvergate "monitors transaction activity for every account and identifies activity outside of the expected usage," taking quick action in the face of any "red flags." ¶42.

***Strict Customer Standards and Diligence of FTX***: Time and again, Defendants also represented to investors that the Bank's vetting and ongoing monitoring ensured Silvergate "only bank[ed] institutions who are also serious about regulation," with Lane reiterating that "if we can't get comfortable with a company's regulatory stature, then we don't bank them." ¶44. Likewise, Defendants assured investors that the Bank would take swift and severe action "if the activity in their [customers'] account does not match the activity that we expect based on our initial approval," which included "terminating that relationship. No exceptions." ¶45.

Silvergate repeatedly pointed to one particular customer: FTX, a cryptocurrency exchange that single-handedly constituted 17% of the Bank's overall deposits. ¶89. Silvergate singled out FTX on its website, displaying FTX's logo and a "testimonial" from FTX's then-CEO, Sam Bankman-Fried, about how "hard" it was "to overstate" Silvergate's importance to FTX. *Id.* Defendants also singled out FTX to investors, assuring investors that Silvergate had performed its "secret sauce" vetting and due diligence on FTX; as a result, Lane represented to investors, FTX was "serious about regulation" and its "compliance programs are sound." ¶91. Even *after* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████, and even *after* the market began to learn about the "unusually close" ties between two of Silvergate's customers, FTX and Alameda, Defendants *continued* to tout that Silvergate performed its due diligence procedures on "each and every account" and that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda, both during the onboarding process and through ongoing monitoring." ¶¶198, 204. Defendant Lane even quelled concerns from analysts about Silvergate's "AML" and "KYC" procedures in light of the concerning revelations about FTX, with Lane calling the "misinformation" about Silvergate "very frustrating," and highlighting that Silvergate performed "initial onboarding" and "ongoing monitoring" for "every account that we open." ¶208.

The market trusted Defendants' Class Period representations, with analysts lauding the Bank's "vetting" and "ongoing monitoring" as a reason to "BUY" the stock. ¶¶46-47. On the back of Defendants Lane's and Silvergate's repeated representations, Silvergate's stock price jumped nearly 1,300% in just over a year from the start of the Class Period and continued its meteoric rise to as high as $227 per share during the Class Period—a nearly 1,900% increase in just two years. ¶48.

## C. Unfortunately for Investors, Silvergate Did Not Vet, Perform Due Diligence on, or Monitor Its Customers.

Contrary to Defendants' repeated Class Period representations, the Bank did not perform the "vetting," "due diligence," or "monitoring" they had touted. Instead, the Bank indiscriminately approved cryptocurrency exchanges to bank at Silvergate and to transact on the SEN Network, enabling these entities to use Silvergate's "seal of approval" to bilk customers and investors out of billions of dollars. Myriad sources, including Silvergate's own former employees, corroborated these facts:

- **FE2**, a "BSA [Bank Secrecy Act] Analyst," explained that Silvergate would bank anyone and never close accounts; the Bank did not know half of its customers (including what they did, their owners, or their management

structures); suspicious activity reports piled up; no site visits were performed; and the Bank's Chief Operating Officer halted requests to exit concerning customers. ¶¶59-62, 67, n.46. FE2 ultimately quit because Silvergate had no culture of compliance. ¶62.

- **FE5**, a "FRCM Initial Due Diligence Manager," detailed how  Silvergate had never said "no" to a prospective client; instead, onboarding was "slopped through," the paperwork lacked information on the customer, what it did, what its sources of wealth were, and its jurisdictions, and the flow of funds did not make sense, and no one did anything about suspicious or anomalous activity. ¶¶83-87.

- **FE1**, an SVP, Finance Manager, who interacted directly with Defendant Lane and Silvergate's Controller, attended monthly meetings with other senior executives (including the executive responsible for BSA and other compliance), and had 30 years of banking experience, explained that during her tenure, the Bank conducted no vetting and she saw no monitoring of SEN Network participants. ¶¶51-57, n.45. She explained that had Silvergate prioritized such "know your client" procedures (which it did not), she would have known about them, including through discussions at monthly executive meetings she and Defendant Lane attended, and because the Bank would have established practices, policies, and employee training; instead, the Bank's focus was about sales and getting clients, not compliance. ¶¶51, 54, 56-57.

- **FE3**, a digital banking manager who was responsible for the SEN Network, including onboarding, and attended meetings with Lane, said that even in 2022 the "gates were open" to the SEN Network: no compliance or research was done. ¶¶63-65, 68-69, n.47. She also confirmed that Silvergate performed no ongoing monitoring, with no customer counterparty reviews, annual or daily company reviews, or BSA or AML monitoring, among other things; and never implemented AML software to search for red flags. ¶¶70-76.

Former employees, including FE2, FE3, FE5, and FE6, uniformly confirmed that, contrary to Defendants' specific assurances that Silvergate's vetting included "site visits," Silvergate performed <u>no</u> "site visits" of its customers, notwithstanding their critical importance to the vetting and due diligence process. ¶¶67, 86.

The Complaint also details Silvergate's complete failure to vet, perform due

diligence on, or monitor its major cryptocurrency exchange customers, including FTX. ¶¶88-108. FTX's fraud was simple: when customers sought to purchase cryptocurrency from FTX, they were directed to wire their fiat currency into the Silvergate-approved accounts of two entities that were not FTX—namely, "North Dimension" and "Alameda"—and then FTX and its founder, Sam Bankman-Fried, embezzled that money from Silvergate without crediting the customers' cryptocurrency accounts. ¶¶93, 103. Through this scheme, FTX stole more than $8 billion. ¶93. Had Silvergate actually conducted the "vetting," "due diligence," and "ongoing monitoring" of FTX that Defendants represented, these sham entities would never have been allowed on the SEN Network. ¶¶94-108.

North Dimension was a fake online electronics retailer, with no employees, no physical location, and a website that did not actually sell products, displayed inexplicable and bizarre product pricing, and was rife with misspellings. ¶¶95-98. Meanwhile, Alameda Research was North Dimension's parent company, and Silvergate received numerous subpoenas from the U.S. Attorney's office concerning wires to Alameda at Silvergate. ¶¶219-20. Alameda was required by law to have been operated independently of FTX, but was instead entirely controlled by Bankman-Fried. ¶¶99-102. FTX had no record-keeping or internal controls whatsoever, no CFO, and all three of these sham entities had the same address— which Silvergate would have readily seen had it conducted a site visit. ¶¶99-106.

Just like FTX, Silvergate failed to vet, conduct due diligence on, or monitor its other major exchange customers as well, including the examples detailed in the Complaint. ¶¶109-27. As *New York Magazine* would later note, "Silvergate has been the go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy." ¶109. Marc Cohodes, a famed corporate watchdog and market participant, rightfully added, Silvergate was not a banking platform; it was "a publicly traded crime scene." *Id.*

Had Silvergate performed its purported "vetting," "due diligence," and

"ongoing monitoring," these facts would have been readily apparent. For example, Binance.US's purported address was nothing more than an enormous warehouse; while Huobi had no compliance controls and allowed customers to create fake accounts and wire funds using obviously fake names like "Taylor Swift" and "Borat." ¶¶113-15, 119. And when Florida's Money Laundering Task Force conducted a review of Silvergate's own records, it readily found that the Silvergate-approved exchanges were utilizing the SEN Network to launder hundreds of millions of dollars to "shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details." ¶¶126-27.

### D.    Investors Suffer as the Truth Emerges and Customers Pull Their Deposits from the SEN Network.

The world gradually learned the true facts about Silvergate's failure to vet, perform due diligence on, or monitor its customers through the disclosures detailed in the Complaint. ¶¶128-49. As it did, Silvergate's customers fled the SEN Network, and its stock price crashed almost 100%, plummeting to just $1.47 per share and wiping out over $2 billion in shareholder value. ¶148. A bipartisan group of U.S. senators lambasted Defendants Silvergate and Lane for their "severe due diligence failures" and "egregious failure" to "monitor for and report suspicious financial activity carried out by [the Bank's] client." ¶¶133, 146. And Silvergate was ultimately required to discontinue the SEN Network, cease operations, and fire nearly all of its employees. ¶¶143, 146. Thereafter, the Bank was forced into liquidation and failed even to file its 2022 Annual Report. ¶¶143, 146-49. The DOJ is conducting an ongoing investigation into the Bank, and the Federal Reserve recently imposed a cease-and-desist order ████████████████ stating that its prior examinations "identified numerous deficiencies, including with respect to both safety and soundness and compliance with banking laws and regulations."[2]

---

[2] Order to Cease and Desist against Silvergate Capital Corp. and Silvergate Bank by

## III.   ARGUMENT

Courts evaluating motions to dismiss securities class action complaints must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).  "[A] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021).  A district court is "not sitting as a trier of fact"; "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

### A.   The Complaint Adequately Alleges Defendants' Material Misrepresentations and Omissions.

"A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 2023 WL 5496507, at *7 (9th Cir. Aug. 25, 2023).  Once choosing to "tout positive information to the market, [defendants] are bound to do so in a manner that [won't] mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

Assessments of whether a statement is misleading and whether adverse facts are adequately disclosed "are peculiarly ones for the trier of fact." *Alphabet*, 1 F.4th at 700.  "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005).

As discussed below and detailed in the Complaint, Plaintiffs here sufficiently allege numerous actionable misstatements and omissions.  *See* ¶¶150-211.

---

Federal Reserve System, Docket No. 23-003 (May 23, 2023), at p. 2, *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20230601a1.pdf.

### 1. Defendants Misrepresented the Bank's "Vetting" and "Initial Due Diligence" of Prospective Customers

Defendants specifically assured investors that they "comprehensively investigate[d] prospective customers" through extensive "vetting [of] all of our customers" and "initial due diligence." *E.g.*, ¶¶155, 161-62, 166, 173. Defendants Silvergate and Lane stressed the supposed robustness of these "vetting" and "due diligence" processes, touting the "rigor of satisfying our KYC, our diligence process," which ensured that Silvergate developed "a deep knowledge of our clients" and "eliminated counterparty risk." *E.g.*, ¶¶152, 166, 170, 173, 176, 179, 186, 201.

Silvergate and Lane included detailed representations to investors about what the Bank's "vetting" and "due diligence" supposedly entailed: "at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate." ¶155. "For each and every account," Silvergate would also "determine the beneficial owner, the source of funds, and the purpose and expected use of funds," and, importantly, conduct a "Site Visit." ¶¶161-62, 198. It also purportedly conducted "compliance reviews," and "reviews of customer policies and procedures regarding the BSA" and "transaction monitoring systems," which purportedly provided Silvergate the ability to "verify" that customers' "compliance programs are sound." ¶¶155, 161-62, 166, 182.

These statements were false, misleading, and omitted material facts. In truth, Silvergate did *not* vet its prospective customers (*e.g.*, ¶¶51-54, 59, 64-66, 83, 95-102, 110-11, 121-23); did *not* know its prospective customers or their businesses (*id.*); did *not* perform site visits on prospective customers (*e.g.*, ¶¶53, 67, 86, 115); did *not* determine the beneficial owners of its prospective customers (*e.g.*, ¶¶83, 111); did *not* know the source, purposes and use of its prospective customers' funds (*e.g.*, ¶¶53, 59, 83); did *not* review the compliance programs of prospective customers (*e.g.*, ¶¶83, 106, 116-17, 119, 124); did *not* have policies and procedures to comply with know-your-customer requirements (*e.g.*, ¶73); and *never* refused to

bank a prospective client (*e.g.*, ¶¶53, 83).  These allegations are supported by the accounts of multiple former Silvergate employees (¶¶50-87), the sham entities that Silvergate allowed to participate on the SEN Network (¶¶88-127), and the findings of ████████████, U.S. senators, and investigative journalists (¶¶128-47).

Courts have repeatedly found that statements to investors falsely touting a bank's vetting and due diligence are actionable under the federal securities laws. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *3, *7, *10-12 (S.D. Cal. May 23, 2017) ("*BofI I*") (finding actionable statements touting BofI's "high credit quality standards," "loan underwriting standards," and "compliance infrastructure"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150 (S.D. Cal. 2008) (finding actionable statements that "Accredited was committed to a disciplined approach that focused on credit quality"); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 387-90, 395-96 (S.D.N.Y. 2022) (finding actionable statements that Deutsche Bank's "KYC procedures start with intensive checks before accepting a client" and "[w]e have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance"); *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *6 (E.D. Pa. Dec. 22, 2008) (finding actionable RAIT's statements touting how "credit underwriting involves an extensive due diligence process"); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1211 (W.D. Wash. 2009) (finding actionable WaMu's statements about being "disciplined and vigilant in [its] underwriting standards," and having "excellent processes, policies, underwritings, standards"); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1071-73 (C.D. Cal. 2008) (finding actionable Countrywide's statements that it "actively managed credit risk [and] applied more stringent underwriting standards for riskier loans"); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (finding actionable New Century's statements that it had "strict underwriting and risk management disciplines").

## 2. Defendants Misrepresented the Bank's "Ongoing Monitoring"

Defendants Lane and Silvergate further assured investors during the Class Period that Silvergate continued, once its customers were onboarded, to keep a close watch on their activity through the Bank's "ongoing monitoring." ¶¶150, 158, 161-62, 166, 204, 208. Specifically, Lane repeatedly represented to investors, "After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags." ¶201. He emphasized that Silvergate "monitors transaction activity for every account and identifies activity outside of the expected usage." *Id.*

Lane and Silvergate made further representations to investors about the specifics of the Bank's "ongoing monitoring" program. ¶¶161-62. In PowerPoint presentations delivered to investors each and every financial quarter for two years, Lane represented that the Bank's "ongoing monitoring" included daily "BSA/AML alerts"; "enhanced due diligence," including "customer counterparty reviews"; and "periodic reviews" of the customers, including "quarterly account activity reviews" and "annual company reviews." ¶¶161-62. Defendants assured investors that the Bank would take swift action if Silvergate's "ongoing monitoring" indicated any improper activity, telling investors that, "if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions." ¶194.

These statements were false, misleading, and omitted material facts. In truth, Silvergate did *not* monitor its customers' activity (*e.g.*, ¶¶55, 57, 68-70, 73, 93, 103-04, 112-13, 125, 132, 134, 142); did *not* activate AML software that was supposed to flag suspicious customer activity (*e.g.*, ¶74); did *not* conduct anomaly detection of suspicious activity (*e.g.*, ¶¶74-75); did *not* require supporting documentation for wire limits (*e.g.*, ¶¶68-69); did *not* require customers to provide basic information for wires (*e.g.*, ¶85); did *not* investigate reports of unauthorized transactions received

from originating banks (*e.g.*, ¶¶76-77); and did *not* take action or close accounts when suspicious activity was identified (*e.g.*, ¶¶60-61, 84).  These allegations are again supported by the accounts of multiple Silvergate employees (¶¶50-86), the well-documented and fraudulent activities that cryptocurrency exchange customers performed on the SEN Network (¶¶88-127), and the findings of ██████████, U.S. senators, and journalists (¶¶128-47).

Courts have repeatedly found that statements touting a bank's "monitoring" of its business and customers are actionable where, as here, they do not reflect reality. *See, e.g.*, *Countrywide*, 554 F. Supp. 2d at 1054, 1072 (finding actionable Countrywide's statements that it was "actively monitoring the delinquency and default experience"); *Karimi*, 607 F. Supp. 3d at 387-88 (finding actionable Deutsche Bank's statements that "[o]ur KYC procedures" include "regular reviews" and "ongoing monitoring and regular review of all existing business relationships").

### 3. Defendants Misrepresented the Bank's "Due Diligence" of FTX and Its Strict Customer Standards

Silvergate also specifically represented to investors that it had performed its vetting and due diligence on FTX, assuring investors that FTX was "serious about regulation." ¶¶150, 182, 190, 204. Specifically, in a June 2022 public interview, Defendant Lane singled out FTX, by name, as one of Silvergate's four "major" cryptocurrency exchange customers who was "serious about regulation," explaining to investors "that's an important distinction because [the Silvergate-approved exchanges] have to satisfy not only their own legal and regulatory requirements but then we have to verify that their compliance programs are sound."  ¶182.  Again, in December 2022, Lane singled out FTX and represented to investors that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda, both during the onboarding process and through ongoing monitoring." ¶¶135, 204. Defendants repeatedly reassured investors that if Silvergate could not "get comfortable with a company's regulatory stature, then we don't bank them" and

"we only bank institutions that are serious about regulation." ¶¶173, 190, 227.

These statements were false, misleading, and omitted material facts. Silvergate did *not* conduct the represented vetting and due diligence of FTX; did *not* verify that the FTX compliance program was sound; did *not* conduct ongoing monitoring of FTX; and did *not* ensure that FTX was "serious about regulation." *See* ¶¶76, 88-108, 182-85. As the industry press later recounted, "Silvergate's lackadaisical approach to oversight of who/what was transacting on the 24/7 SEN platform was on full display in its approval of North Dimension—a fake electronics retailer set up by FTX to facilitate payments to/from its U.S. customers." ¶104. Members of Congress likewise found, and told Defendant Lane: "Your bank's involvement in the transfer of FTX customer funds to Alameda Research reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients." ¶108.

Silvergate's statements touting FTX's and the other exchange customers' "serious[ness] about regulation" and its "significant due diligence" of FTX were false, misleading, and actionable. ¶¶91, 107-08, 135-36, 182, 204; *see Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021) ("Defendants' statements concerning its due diligence could have given a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."); *Countrywide*, 554 F. Supp. 2d at 1054, 1072 (finding actionable Countrywide's statement that it "only retained high credit quality mortgages in its loan portfolio"); *Karimi*, 607 F. Supp. 3d at 387-88 (finding actionable Deutsche Bank's statements touting its "due diligence," and "effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance").

### 4. Defendants Improperly Attempt To Rewrite the Complaint's Allegations and Raise Factual Disputes that Cannot Be Resolved at this Stage

Faced with the Complaint's detailed allegations, Defendants ask the Court to accept their counterfactual narrative and rule at the pleading stage and as a matter of law that they misled no one and omitted nothing. Their attempt fails.

*First*, Defendants ignore their *actual* statements to investors and, instead, try to boil the Complaint down to the sole allegation that Silvergate did "*no* diligence." Mot. 2, 4, 10, 13-16. In employing this tactic, Defendants omit that they did not just tell investors that they conducted "*some* diligence," however scant and meaningless; rather, they told investors—specifically and repeatedly—that they "comprehensively investigate[d] prospective customers," which included "site visits," "compliance reviews," "ongoing monitoring," and much more—all of which "eliminated" risk. ¶¶150-211. These specific representations were patently false and misleading, even accepting Defendants' self-serving assertion (which Plaintiffs dispute) that the Bank conducted "some due diligence."

For example, Silvergate told investors that it conducted "site visits" before onboarding new customers (¶¶161-62), but it did *not*, and, indeed, had *no* policies or procedures for site visits (¶¶67, 86). A simple site visit would have uncovered that many of Silvergate's "approved" customers were shams: North Dimension had no physical location (¶98); Binance was a shell entity whose address was a warehouse (¶¶114-15); and Nexo Capital's shell companies had only P.O. boxes (¶121). Likewise, Silvergate told investors that it "confirmed" customers' "registration [and] licensing" (¶¶161-62), but it did *not* (¶53), and as a result, it banked, among others, Binance, which failed to register with the U.S. Treasury Department (¶110), and Nexo Capital, which failed to register with the SEC (¶121). Silvergate further represented to investors that it reviewed prospective customers' "policies and procedures regarding customer compliance" and "transaction

monitoring systems" (¶155), but it did *not* (¶¶52, 70), and as a result, it banked FTX and Huobi despite their having *no* internal controls, compliance programs, or accounting systems (¶¶100-08, 119).  Silvergate also told investors that it conducted "ongoing monitoring," but again it did *not* (¶74), and as a result, it authorized FTX, Binance, and other Silvergate-approved customers to misdirect tens of billions of dollars through the SEN Network (¶¶93, 104, 132).

Moreover, contrary to Defendants' assertions, Silvergate did not conduct due diligence, onboarding, or monitoring.  While Defendants may disagree with that assertion—and take the position that their supposed actions amounted to "due diligence," "onboarding," or "monitoring"—this is a quintessential factual dispute that cannot be resolved as a matter of law on a motion to dismiss.  *See, e.g.*, *Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 WL 3767011, at *5 (S.D. Cal. July 29, 2014) (refusing to resolve definitional dispute and explaining that, "in deciding a Rule 12(b)(6) motion, the Court is bound to accept factual allegations contained in the [Complaint] as true"); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *12 n.14 (C.D. Cal. July 21, 2005) ("Defendants also quibble over the definition of 'customer' and 'customer base.'  These types of arguments are more appropriate for summary judgment or trial than a Rule 12(b)(6) motion to dismiss.").

***Second***, Defendants ask the Court to accept their say-so that Silvergate was an innocent "victim" of FTX and other customers, who "deceived Silvergate" "by evading the Bank's diligence measures."  Mot. 1-3, 14-15.  Once again, Defendants' self-serving assertions are well outside the Complaint, belied by its detailed allegations, and cannot be credited at this stage.  *Orexigen*, 899 F.3d at 1003.  The truth is that Silvergate failed to conduct the represented due diligence and vetting of prospective customers, including the specific investigative steps it promised.  ¶¶50-127.  Thus, this is far from, as Defendants contend, merely an accusation that Silvergate "did not catch" that FTX was a complete sham.  Mot. 14.  Had Silvergate conducted even a fraction of the due diligence and monitoring that it claimed to have

done, it would have readily discovered that its Silvergate-approved crypto-exchanges were sham entities bilking innocent customers of billions of dollars. *Id.*

Equally fact-bound and improper is Defendants' assertion that—although Silvergate failed to conduct diligence for nine notorious shams discussed in the Complaint—Silvergate conducted diligence for *every other* customer. Mot. 15-16. To start, this argument ignores the mountain of well-pleaded allegations demonstrating that Silvergate's failures were fundamental, systemic, and widespread (¶¶50-127), making completely inapposite Defendants' citation (Mot. 16) to the "isolated instances" at issue in *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 608 (9th Cir. 2014).[3] Defendants' assertion also ignores that these confirmed scammers were *not* just ordinary minnows, but whales; FTX *alone* accounted for *17%* of Silvergate's total deposits, and all were central to Silvergate's deposit growth strategy. ¶¶26-33, 89.

It also challenges belief that the only "nine" customers Silvergate did not investigate happen to also be the same "nine" that have been revealed as notorious scams. If Defendants' counterfactual narrative were to be credited, Silvergate would have to be the unluckiest bank in history. The more plausible inference—and the inference to which Plaintiffs are entitled—is that Silvergate did not investigate its customers as it claimed, as detailed in the Complaint and corroborated by myriad sources. ¶¶51-86; *see Glazer Cap. Mgmt. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) (pleading falsity is subject to a "*reasonable inference* standard of plausibility"). "The PSLRA and Rule 9(b) only require that [l]ead [p]laintiff provide particularized reasons why a statement was false or misleading at the time

---

[3] Even Defendants' contention that the Complaint only points to "nine" customers is perplexing, as these scammers comprised far more than nine Silvergate-approved customers. *See, e.g.*, ¶93 (FTX; North Dimension; Alameda); ¶113 (Binance.US; Merit Peak; Key Vision Development Limited); ¶122 (Hamilton Opportunity Fund SPC; Hamilton Investment Management Ltd); ¶125 (Paxos Global PTE LTD; Paxos Trust Company LLC; OSL Digital LTD; OSL SG PTE LTD); ¶126 (10 companies).

it was made, not that [l]ead [p]laintiff prove its entire case in the complaint and without the benefit of reasonable inferences." *BofI I*, 2017 WL 2257980, at *12.

***Third***, Defendants rest on Silvergate's "risk disclosures" to the effect that it "could not detect all potential misconduct." Mot. 16. In doing so, Defendants ignore that courts consistently hold that risk disclosures must "precise[ly]" and "directly address" the misrepresentations (*In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *7 (N.D. Cal. Jan. 6, 2022)), and may not themselves omit material information (*Immune Response*, 375 F. Supp. 2d at 1034). Courts examine "whether the cautionary language 'discredit[s] the [alleged misstatement] so obviously that the risk of real deception drops to nil.'" *BioMarin*, 2022 WL 164299, at *7.

Far from "directly addressing" the misstatements and dropping the risk of deception to nil, Silvergate's purported "risk disclosures" *repeated* the Bank's misstatements, falsely assuring investors that "our risk management and compliance framework … includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers)" and "we have developed enhanced screening procedures to screen and monitor" customers. Ex. A at 22, 31. None of Silvergate's "risk warnings" remotely disclosed the truth—that Silvergate failed to conduct the represented vetting, diligence, and monitoring—or corrected Defendants' misstatements. *See, e.g.*, *Alphabet*, 1 F.4th at 702 (holding that disclaimer that "operations and financial results are subject to various risks and uncertainties" was materially misleading); *Karimi*, 607 F. Supp. 3d at 396 (holding that "disclaimers that the [b]ank might fail to implement its policies cannot sufficiently cure the misinformation conveyed by descriptions of policies and procedures"); *RAIT*, 2008 WL 5378164, at *6 (finding "disclosure of the fact that RAIT's investments inherently carry risks does not mean that a reasonable investor would find unimportant the fact that RAIT's credit underwriting and monitoring practices are incapable of detecting risk").

On this record, "whether the disclosures Defendants point to were sufficient to reveal to investors [the omissions] … that form the basis of [p]laintiff's claims is one that cannot be resolved at this stage of the litigation." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 946 (N.D. Cal. 2022); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (refusing to accept contention that purported disclosures revealed the truth to investors as a matter of law). As the Ninth Circuit has cautioned, as a general rule, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

*Fourth*, Defendants question the "reliability" of Silvergate's former employees. Mot. 10-14. But at this stage, the Complaint need only identify the FEs with "sufficient particularity to establish their reliability and personal knowledge." *Glazer*, 63 F.4th at 767. "The Ninth Circuit has held that numbering the confidential witnesses and describing the witnesses' job description and responsibilities constitutes a 'large degree of specificity,' especially where the witnesses' exact title is used." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014).

The Complaint identifies the FEs with sufficient particularity: it lists each FE's job title, description, tenure, and supervisors. ¶¶51, 58-59, 63, 66, 77-78 nn.45-48, nn.50-51. It also readily meets the Ninth Circuit's "plausibility" standard: each of the witnesses "would know, or could reasonably deduce" the facts to which they attested. *Berson*, 527 F.3d at 985 ("[A]ny number of company employees would be in a position to infer" the undisclosed facts.).

For example, FE2 was a "BSA Analyst" from October 2017 to June 2019 (¶¶ 58-59 n.46)—*i.e.*, a member of the very department that Silvergate contends was supposed to vet and diligence prospective customers (Mot. 12-13). As FE2 explained, the Bank lacked information concerning what its customers did, their owners, and their management structures, and about half of Silvergate's customers were not even known by the Bank. ¶59. FE2 further attested that Silvergate

indiscriminately banked every prospective customer, regardless of their compliance programs, and never closed any customer accounts. ¶¶59-62. FE2 also reported that Silvergate did not conduct site visits. ¶67. FE2 further averred that complaints about suspicious customer activity were ignored, with FE2 quitting because Silvergate lacked a culture of compliance. ¶¶60-62. Likewise, FE5, an "FRCM Initial Due Diligence Manager" in the "BSA group," reported that, prior to August 15, 2022, Silvergate did not review potential customers at the onboarding stage to determine whether they had an appropriate culture of compliance (¶83); lacked documentation reflecting who the customer was, what it did, and what its sources of wealth were (*id.*); never rejected a prospective client (*id.*); never conducted site visits (¶¶67, 86); lacked written procedures describing even how to conduct site visits (*id.*); and did not take any action when employees raised concerns about suspicious or anomalous activity (¶¶84-85). FE2's and FE5's accounts "corroborate each other," which "further supports the reliability of their statements." *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at \*27 (N.D. Cal. Mar. 21, 2018).

FE2's and FE5's accounts are further corroborated by the other FEs. Contrary to Defendants' contentions (Mot. 10-14), the additional FE accounts cannot be cast aside simply because of their job titles. The Ninth Circuit in *Berson* made clear that what matters is whether it is "plausible" that the witness "would know, or could reasonably deduce" or "infer" the undisclosed facts—not the job title standing alone. 527 F.3d at 985 (rejecting "quibble" over witnesses' titles).[4] The Complaint amply

---

[4] *See also Okl. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 207-09 (5th Cir. 2023) (reversing dismissal when construction manager had "personal and relevant, even if not comprehensive, knowledge about Riverside's financial health"); *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 585 (W.D. Tex. 2022) (crediting FEs who "did not directly work with SolarWinds' security protocols, nor interface directly with the security team," because "a trier of fact could infer" that they "may have been aware"); *Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at \*5 (C.D. Cal. Dec. 2, 2021) ("[P]lausible that an Executive Director of Human Resources would have a basic knowledge of whether

explains why these additional corroborating FEs were in positions to know. FE1 was a high-ranking executive (Senior Vice President), involved in the Company's IPO, worked closely with Lane and Megan Collins (Silvergate's Controller), and attended monthly senior-level meetings led by Kathleen Fraher (Silvergate's VP responsible for BSA and other Compliance). ¶¶51, 56. FE1 specifically and repeatedly stated that, *if they had existed*, she would have been aware of the Bank's monitoring and vetting processes, including through her senior-level role, attendance at senior-level meetings, and her 30 years of banking experience. ¶¶51, 53-54, 56. FE3 did not merely "handle[] account maintenance" (Mot. 12); rather, she was the Digital Banking Manager responsible for the SEN Network. ¶¶63-65, 76. FE3's group was specifically tasked with onboarding customers to the SEN Network and, accordingly, had first-hand knowledge of the account she provided, including that there was no compliance or research done on a customer when they wanted to join the SEN Network. ¶64. FE3 personally handled wire limit changes, including for FTX, Alameda, and North Dimension, and, accordingly, had a firm grasp of the fact that Silvergate allowed clients to dictate wire limits without validation. ¶¶68-70, 76. FE3 also personally attended meetings during which it was discussed that the Bank had not implemented AML software to flag suspicious customer activity. ¶¶74-76. FE4, Silvergate's VP of Operations for over a decade, had a firm basis to provide her account as well, including because she personally received the reports of unauthorized transactions from other banks and the dozens of subpoenas issued by the U.S. Attorney's office concerning the Silvergate-approved customers. ¶77. And FE6, like FE3, personally filled out the paperwork that should have contained

[defendants'] manufacturing facility had automation or not."); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *9 n.10 (C.D. Cal. Mar. 31, 2021) ("While this particular CW did not have first-hand knowledge of the Albanian contract, she did have knowledge of the group of executives who controlled the contracts.").

information on customers' beneficial ownership. ¶¶65-66.[5] On these facts, it is certainly "plausible" that these FEs would know—or, at minimum, could reasonably "deduce" or "infer"—what they averred. *Berson*, 527 F.3d at 985.

Additionally, the FE accounts are further corroborated by the Complaint's additional factual allegations, including investigative journalist reports of Silvergate's deficient due diligence and vetting (¶¶128-34), revelations about the sham entities that Silvergate allowed to participate on the SEN Network (¶¶88-127), and ████████████████████████████████████. *See Glazer*, 63 F.4th at 767 (FE allegations considered alongside "corroborating facts").

Courts in this Circuit recognize that FE allegations, such as those here, are to be "taken as true at this stage," and "Defendants' arguments as to the credibility of the [FEs'] statements … raise issues of fact that are better addressed at a later stage of litigation." *Zhou v. Faraday Future Intel. Elec. Inc.*, 2022 WL 13800633, at *10 (C.D. Cal. Oct. 20, 2022). "[T]he PSLRA in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls. That is reserved for the jury." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008).

Defendants, nevertheless, also improperly attempt to rely upon extrinsic evidence to attack the credibility of their FEs. Mot. 11 nn.6-7 (citing RJN Exs. E, O-P). For example, Defendants claim that FFIEC guidance required Silvergate's BSA function to be "segregated" from employees such as FEs 1, 3, 4, and 5. But Defendants misstate the content of the very "guidance" that they cite. In fact, their guidance makes plain that personnel responsible for BSA compliance should *not* be "precluded from close interaction with the management and staff of the various

---

[5] Defendants now contend (Mot. 13 n.9) that it was *proper* for Silvergate employees to fill out important customer diligence forms instead of ensuring the customers themselves certified the correct information. ¶¶65-66. Defendants' self-serving and counterfactual narrative that these employees were acting merely as faithful "scrivener[s]" (Mot. 13 n.9) directly contradicts the allegations of impropriety.

business lines." RJN Ex. O at 161-62. Defendants' alternative version of the facts, in which the FEs cited in the Complaint were terribly confused, is fanciful, at best, and, in any event, cannot be credited at this stage.[6]

*Fifth*, Defendants insist the FE accounts should be disregarded because each FE did not work at Silvergate for every single day of the Class Period. Mot. 10-14. But that is not the standard. Each FE worked at Silvergate for at least nine months, and at least one of the FEs worked at Silvergate for the entire Class Period, plus the eight months leading up to it. Further, the tenures of the two FEs in Silvergate's BSA department—FE2 and FE5—bookend the Class Period. In these circumstances, it is implausible that the consistently deficient conditions observed by the FEs throughout the Class Period were magically cured and then reappeared before or after the tenure of any particular FE. Rather, at the pleading stage, Plaintiffs are entitled to the "reasonable inference that no changes had been made in the interim." *BofI I*, 2017 WL 2257980, at *11-12; *see also Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (finding district court erred in rejecting "reasonable inference in the plaintiffs' favor" that risk-management problem described by FE also existed seven months earlier).

*Sixth*, Defendants contend that their statements suddenly became true after August 2022, ███████████████████████████████████. Mot. 14 & n.10. This argument ignores that, at minimum, Defendants' misrepresentations over the prior years of the Class Period remained uncorrected. It further ignores that the Bank's tardily introduced diligence processes were *never* applied to then-existing customers (over the objection of FE5 and his

---

[6] Defendants incorrectly invoke "hearsay." Mot. 12-13. Statements by Silvergate's employees to the FEs are *not* hearsay but a well-recognized exception: statements by a party-opponent under FRE 801(d)(2). And FE accounts *can* be based on "hearsay." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *Okl. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 n.5 (9th Cir. 2019).

PLAINTIFFS' OPPOSITION TO                          24                    CASE NO. 22-CV-1936-JES-MSB
EXCHANGE ACT MOTION TO DISMISS

boss) and, as a result, *all* of the previously approved sham entities (including FTX, Binance, and others) continued to transact on the SEN Network.  ¶¶78-87.

Contrary to Defendants' assertion, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Mot. 27 n.21) did not give Silvergate license to continue to make false representations about its "vetting," "due diligence," and "monitoring," all the while failing to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  As courts have explained in rejecting this identical contention, "even if the ▮▮▮▮▮▮▮▮▮▮ [finding] itself was confidential, 'upon choosing to speak, one must speak truthfully about material issues.'" *In re Wells Fargo & Co. Sec. Litig,* 2021 WL 4482102, at *13 (S.D.N.Y. Sept. 30, 2021).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is no excuse for Defendants continuing to tout the Bank's "vetting," "due diligence," and "monitoring" ▮▮▮▮▮▮▮▮, to quell concerns about the Bank's procedures in light of revelations about FTX (¶¶162, 182-211), or to omit the serious deficiencies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the very "vetting" that it continued to tout.

*Seventh*, the Complaint nowhere alleges "fraud by hindsight"—a label for allegations about a "failure to predict" the future, *not* "misstatements of existing fact." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010).  "[T]his is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted by [the Defendants]." *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993).  "Fraud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809 (C.D. Cal. 2011).

*Eighth*, Defendants try to wave away fragments of some of their misstatements as mere corporate fluff. Mot. 17-18.[7]  As a threshold matter, claims of "puffery" provide a basis for dismissal only where "the statement is so obviously

---

[7] Defendants do not challenge as puffery (nor could they) the misstatements identified in ¶¶158, 170, 176, 179, 182, 186, 190, 194, 198, 201, 204, 208.

unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan*, 36 F. Supp. 3d at 967. Determining materiality "entail[s] fact-intensive assessments that are more properly left to the jury." *Id.* at 966. Nevertheless, Defendants try to reduce the securities laws to a semantic exercise by improperly plucking out of context partial snippets of their statements to investors and adverbs and adjectives like "comprehensively" and "robust." Mot. 16-17. But "the Court may not assess the statements listed in the [complaint] in a vacuum, plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017); *see also In re BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *9 (S.D. Cal. Sept. 27, 2016) ("*BofI II*") ("[T]aking a few of [p]laintiffs' allegations out of context and labeling them as puffery is not sufficient to undermine [p]laintiffs' detailed allegations that *BofI*'s actual lending practices fell short of the standards *BofI* represented to investors.").

For example, Defendants' statement to investors that Silvergate "comprehensively investigates prospective customers according to the level it deems necessary and appropriate," continues—in the same paragraph—to describe specific investigative steps that Silvergate purportedly conducted "at minimum" for all customers, plus additional "more extensive" steps for cryptocurrency exchanges. ¶155; RJN Ex. G at 120-21. Likewise, Defendants' statement to investors touting the Bank's "Robust Compliance and Risk Management" is a heading for a slide that lists many specific investigative steps (such as "site visits") that the Bank represented (falsely) that it took. ¶¶161-62. And Defendants' statements touting Silvergate's "good housekeeping seal of approval" were part of larger statements describing Silvergate's due diligence and customer standards—the balance of which Defendants do not even attempt to argue are puffery. ¶¶152, 173. None of the challenged statements, read as a whole (as they must be), are puffery. *See Karimi*,

607 F. Supp. 3d at 392-94 (holding that statements about "intensive" and "strict" KYC and AML policies were not puffery); *RAIT*, 2008 WL 5378164, at *6 (holding that "statement claiming that RAIT's 'credit underwriting involves an extensive due diligence process'" was not puffery).[8]  Instead, where, as here, "Defendants repeatedly represented, in a variety of forums, that [they]" took corporate actions "when the defendants had, in fact" not taken those corporate actions, their statements are "neither aspirational nor general" and are therefore actionable.  *BofI II*, 2016 WL 5390533, at *9.

## B.    The Complaint Adequately Alleges Defendants' Scienter.

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness."  *Schueneman*, 840 F.3d at 705.  "Recklessly turning a blind eye to impropriety is equally culpable conduct."  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).  A "strong inference of scienter" "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007).  The relevant question is "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Quality Sys.*, 865 F.3d at 1144.  Further, corporate executives' scienter "is imputed to the Company."  *Immune Response*, 375 F. Supp. 2d at 1024.[9]

---

[8] Defendants also point to statements about the Bank's "competitive advantage" (Mot. 17), but those are not even pleaded as actionable misstatements.

[9] In citing *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 988 (9th Cir. 1999) (Mot. 3, 18, 22), Defendants ignore that the Ninth Circuit recognized, after *Tellabs*, that *Silicon Graphics* was "too demanding and focused too narrowly" on individual allegations.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1373 n.5 (N.D. Cal. 2014) (recognizing *Tellabs* abrogated *Silicon Graphics*).

The Complaint alleges a series of particularized allegations that collectively give rise to a strong inference of scienter, including that Silvergate and Lane acted with, at minimum, "deliberate recklessness." *Schueneman*, 840 F.3d at 705.

***First***, the central importance of vetting, due diligence, monitoring, and cryptocurrency exchanges to Silvergate's business strategy and to the success of its "flagship" SEN Network (¶232) underscores the inference that Defendants knew, or were deliberately reckless in not knowing, about Silvergate's lack of these processes. *See Alphabet*, 1 F.4th at 706 (scienter when the "importance of the information" was "highly material to Google's operations"). The success of the SEN Network as "the driver" of Silvergate's growth strategy from a few hundred million to $14 billion in deposits, rested upon Silvergate's purported customer vetting, diligence, and monitoring of SEN Network participants. ¶232. Defendants Silvergate and Lane went so far as to single out compliance as (i) one of only three elements of Silvergate's "Model"; (ii) one of five "Investment Highlights"; (iii) a "competitive advantage"; (iv) the "cornerstone" of Silvergate's "leading position"; and (v) Silvergate's "secret sauce" of success. ¶¶36, 214-15. Lane likewise knew, as he told investors, that Silvergate's failure to conduct such due diligence could subject Silvergate to "really severe" fines and "put the entire bank at jeopardy." ¶224. Nearly 100% of Silvergate's deposits—its primary source of income—were crypto-related, with FTX a key customer responsible for 17% of these deposits. ¶¶232-35. Given these facts, "it would be absurd to suggest" that Lane did not know that Silvergate did not conduct due diligence on, vet, or monitor its clients. *Berson*, 527 F.3d at 989; *see also Robb v. Fitbit Inc.*, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (scienter strengthened by importance of product to "revenue stream").

***Second***, the Court can infer that Defendant Lane knew or was deliberately reckless in not knowing the true facts because he "displayed an intimate knowledge" when he "repeatedly" spoke to investors about the Bank's purported "regulatory compliance framework," "vetting," "onboarding," and "ongoing monitoring," and

how Silvergate "only bank[ed] institutions that are serious about regulation." ¶¶173, 176, 179, 190, 204, 208; *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258-60 (W.D. Wash. 2009). Lane, in fact, spoke on at least *a dozen separate occasions* in detail about the purported strength and importance of the Bank's due diligence and monitoring of its customers (¶213), delivering investor presentations every quarter for two years that purported to detail Silvergate's "due diligence" and "ongoing monitoring" (¶162). "[I]t would be at least actionably reckless to reassure the public about these matters at all" without knowledge on the subject. *S. Ferry*, 687 F. Supp. 2d at 1260; *see also Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (similar); *Roberti v. OSI Sys, Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) (scienter adequately pled when "Defendants touched on the specific issue … in their public statements").[10]

Defendant Lane's statements are even more indicative of scienter because many were made "in response to questions from analysts" (*In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019)), with Lane "explicitly den[ying]" concerns raised in media reports (*Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009)). Defendant Lane falsely responded to targeted analyst questions when, for example, he said, "we were vetting all of our customers," "we don't bank them" if "we can't get comfortable," and "for every account that we open … we conduct ongoing monitoring." ¶230. Lane also explicitly denied concerns about FTX, impressing upon analysts that "the misinformation out there [about the Bank's vetting and monitoring of FTX] is, candidly, very frustrating.… [W]e conduct ongoing monitoring." ¶236. That Lane gave "unequivocal" responses

---

[10] *See also In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 741 (N.D. Cal. 2022) (scienter pleaded when "the individual defendants personally reported facts about the company that are alleged to be completely at odds with reality"); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (holding that "it strains credulity that" executive would not have known information, "particularly where [he] opined on [it]" in his public statements).

"in the face of direct questioning" underscores the inference that he knew what he was talking about or was reckless in not knowing. *S. Ferry*, 687 F. Supp. 2d at 1258-60; *see also Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552-53 (S.D.N.Y. 2017) (scienter inferred when defendant knows it is "a subject about which investors and analysts often inquired").

***Third***, Defendant Lane's statements admitted his personal involvement: he made first-person references specifically about *his* "vetting," "extensive due diligence," and "monitoring." ¶¶226-27. Several of Lane's misstatements about due diligence and customer standards were made in the first person (using "I" or "we"), such as his statements that "*I* watch" transaction data for the SEN Network, "*we*" vet customers, and "*we* don't bank" certain customers. ¶¶226-27. Lane's use of the term "we" is amply "sufficient to demonstrate [his] access to the relevant [information]" at this stage. *McKesson*, 411 F. Supp. 3d at 602; *see also S. Ferry*, 687 F. Supp. 2d at 1258-60 (defendant "maintained that he knew what he was talking about" because he said "we" did or did not take actions).

Courts have also readily rejected Defendants' self-serving contention that Lane did not mean to convey personal involvement (Mot. 26 n.20); whether such "we" "statements suggest personal knowledge or just knowledge on the part of some employee at [the company] is a question of fact not appropriate for resolution on a motion to dismiss." *McKesson*, 411 F. Supp. 3d at 602. "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact." *Gilead*, 536 F.3d at 1057.[11]

***Fourth***, Defendant Lane surely knew, or was reckless in not knowing, that Silvergate did not conduct the represented "vetting," "due diligence," and "ongoing monitoring" ██████████████████████████████████████████████

---

[11] Defendants' citations (Mot. 26-27) to *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010), and *In re Zillow Group, Inc. Securities Litigation*, 2019 WL 1755293, at *18 (W.D. Wash. Apr. 19, 2019) say nothing to contradict that Lane's putting himself forward as knowledgeable supports materiality and an inference of his scienter.

██████████████████████████████████████████████████████

████████████████████████████████████████ is "classic evidence of scienter." *Immune Response*, 375 F. Supp. 2d at 1022; *VeriFone*, 704 F.3d at 710 (scienter when defendants were "on notice that there might be issues" and yet "reassured investors" there were not); *Glazer*, 63 F.4th at 766 (similar proposition). And Defendants are wrong in asserting ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████[12]

Further bolstering the scienter inference is Silvergate's receipt of tens of subpoenas every month from the U.S. Attorney's office. ¶219. FE4 informed executives (a SVP and the CAO) of these subpoenas, and it is a reasonable inference that those executives informed Lane. ¶220; *see Fitbit*, 2017 WL 219673, at *6-7 (finding a "cogent and compelling" inference that information regarding important products would have been shared among top executives). Defendants' assertion that a bank's receipt of this many subpoenas is perfectly normal (Mot. 28) is unsupported and, at best, raises a factual dispute unfit for resolution now. "[F]actual disputes about specific, plausible allegations are not sufficient to dismiss a claim." *Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *7 (D. Ariz. Dec. 17, 2012).[13]

---

[12] *Reiger v. Altris Software, Inc.*, 1999 WL 540893 (S.D. Cal. Apr. 30, 1999) (Mot. 27), involved claims against an *outside auditor* based on nothing more than the magnitude of the company's multiple accounting errors revealed in a significant restatement. By stark contrast, here, Plaintiffs point to ████████████████████ ██████████████████████████████████████████████████████ ██████████, in addition to contemporaneous facts, including witness accounts and other information showing he was at least reckless in making his misstatements. ██████████████████████████████████████████

[13] *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062 (S.D. Cal. 2020) (Mot. 28), is a summary judgment opinion in a wrongful termination case that nowhere says it is normal for a bank to receive tens of criminal subpoenas per month.

*Lastly*, neither "motive" nor "suspicious stock sales" are required to "raise a strong inference of scienter." *Alphabet*, 1 F.4th at 707.  Nevertheless, the inference of scienter is strengthened where, as here, Defendants were motivated to conceal Silvergate's true vetting, due diligence, and monitoring of its exchange customers using the SEN Network.  By doing so, Silvergate's much-needed deposits swelled to $14 billion while Defendant Lane sold nearly 77% of his holdings (noted by analysts as "troubling"), reaped over *$21.2 million*, and collected a salary that nearly tripled before the truth was exposed.  ¶¶238-43.

Defendants say Lane's sales were not "unusual" because he did not sell before the Class Period when the shares were not publicly traded.  Mot. 21-23.  This timing provides him no respite from an inference of scienter for a massive selloff.  *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187 (C.D. Cal. 2007) (argument about lack of "pre-Class Period" sales rendered "effectively meaningless" when "no trading period … with which to compare the sales").  And even when individual allegations, "considered separately," do not carry the day, they contribute to the "totality of the allegations."  *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020).[14]

---

[14] Plaintiffs "need only plead a single materially false misrepresentation to survive a motion to dismiss." *BofI II*, 2016 WL 5390533, at *8.  In any event, the reasons discussed above apply to establish Silvergate's and Lane's scienter as to the two statements made by Silvergate's then-Chief Strategy Officer, responsible for communicating with investors and the Federal Reserve (¶166 n.148), and then-Managing Director of Digital Currency, responsible for crypto customer growth and key client relationships (¶186 n.149).  Lane is liable for these statements (and his scienter can also be imputed to Silvergate) as he had the ability to control and influence these statements. ¶314; *see* also *SEC v. City of Victorville*, 2018 WL 3201676, at *4 (C.D. Cal. Jan. 24, 2018) (finding it "consistent with" *ChinaCast* that an executive's "role in preparing the challenged statements" was sufficient "to impute his knowledge" to the corporate entity (collecting cases)).

### 1. Defendants Fail To Offer a More Cogent and Compelling Opposing Inference of Scienter

Defendants' attempts (Mot. 18-29) to overcome the strong inference of scienter with their own counterfactual narrative fails.

*First*, Defendants assert (Mot. 19-23) that Plaintiffs' theory of scienter is "implausible," pointing to *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). But Defendants' reliance on *Endologix* is misplaced. The Complaint here nowhere includes allegations that Defendants knowingly "embarked on a doomed path" that "would no doubt result in its own destruction." Mot. 19. Unlike *Endologix*, getting caught for misrepresenting the Bank's due diligence, vetting, and monitoring practices here was far from "inevitable." 962 F.3d at 415; *see also BioMarin*, 2022 WL 164299, at *14 (distinguishing *Endologix* because there was no allegation that defendants "were convinced" FDA would deny approval). Defendants' reliance on *Endologix* also ignores that, there, plaintiffs failed to allege any benefit to defendants from the misrepresentations—*e.g.*, no increased profits or insider sales. 962 F.3d at 415. In contrast, the Complaint here alleges that Silvergate's misrepresentations caused customers—none the wiser—to transact on the SEN Network, causing Silvergate's deposits to soar to $14 billion. The Complaint further alleges that Defendant Lane reaped over $20 million in insider sales while his salary tripled. These facts put this case squarely on-point with cases that distinguish *Endologix* and find scienter plausible because Defendants "had something to gain." *See, e.g.*, *Mandalevy v. BofI Holding, Inc.*, 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021).

*Second*, Defendants' purported "counter-inference" (Mot. 29) is improperly drawn from documents well outside the Complaint. *See supra* at 2, 17. As *Tellabs* demands, the court must continue "constantly assuming the plaintiff's allegations to be true" and may only consider inferences that can be "draw[n] from the facts alleged." 551 U.S. at 324, 326-27. Moreover, Defendants' theory cannot be squared with the evidence: even if FTX was able to lie to the Bank, that does not explain

away the many FE accounts; the other blatant shams approved to transact on the SEN Network and bilk billions of dollars of customer funds; the findings of investigative journalists and U.S. senators; the ongoing DOJ investigation; ███████ ███████████████████ and, more recent, cease-and-desist order.  Indeed, even assuming *arguendo* that FTX did lie to Silvergate (which the Court cannot do at this stage), ultimately it was Silvergate's own lack of vetting, monitoring, and diligence that allowed any lie to remain uncorrected.

*Third*, Defendants mistakenly contend that the existence of regulators and an auditor "negates an inference of scienter." Mot. 3-4, 14, 19-20.  To start, Defendants ask this Court to presuppose, without any basis in the Complaint, that the auditors examined Defendants' specific misstatements as part of their audit of the Company's financials.  Moreover, even if they did, auditors "will not shield [defendants] from liability." *New Century*, 588 F. Supp. 2d at 1231; *see also In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (collecting cases).[15]  In addition, *all* banks are subject to supervisory regulation, and this does not immunize banks from liability for misrepresentations to investors (nor mean they cannot commit fraud), or alter the applicable standard on a motion to dismiss. *See generally BofI I*, 2017 WL 2257980.  Moreover, Defendants' contention that Silvergate received a clean bill of health from its regulators likewise ignores ███ ████, the cease-and-desist order, and the ongoing government investigations. ¶¶133, 141; *supra* at 1-2, 9.  ███████████████████████████

---

[15] In *In re REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010) (Mot. 14), a summary judgment decision, the defendant offered "affirmative evidence," that with "full access to conduct a thorough, professional, and independent audit," the auditor found the company's goodwill impairment assumptions reasonable. *Id.* at 1245-46.  Defendants here do not and cannot offer *any* of this evidence.  "At this stage in the litigation, there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements." *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013).

PLAINTIFFS' OPPOSITION TO                              34                      CASE NO. 22-CV-1936-JES-MSB
EXCHANGE ACT MOTION TO DISMISS

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

*Finally*, Defendants argue that the FEs do not allege sufficient "contact" with Lane, and thus are not "indicative of scienter." Mot. 24-25. But the FEs *did* have contact with Lane, including FE1 and FE3, and in any event, there is no requirement that an FE have "contact" with a defendant to allege scienter. The PSLRA does not demand that an FE "be a fly on every relevant wall—or directly deliver every relevant presentation—to plead allegations supporting an inference of scienter." *Six Flags*, 58 F.4th at 216 n.18. Courts have repeatedly held that FE allegations may contribute to a strong inference of scienter, even if the FEs never "interacted personally" with the individual defendants. *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *13 (C.D. Cal. July 3, 2023); *see also Countrywide*, 554 F. Supp. 2d at 1059-60 (strong inference of scienter though FEs had not "spoken or had other contact" with defendants). This is particularly true where, as here, the Complaint alleges that Lane acted with, at minimum, deliberate recklessness when he made his misstatements—which is enough to allege scienter under Ninth Circuit law. *See Schueneman*, 840 F.3d at 705; *Alphabet*, 1 F.4th at 707 ("Allegations of … information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter.").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. If, however, the Court grants any part of the Motion, Plaintiffs request leave to amend under Federal Rule of Civil Procedure 15.[16]

---

[16] Because the Complaint states a violation of Section 10(b), the Court should deny the motion to dismiss the Section 20(a) claim against Defendant Lane. Mot. 30.

Dated:  September 8, 2023

Respectfully submitted,

*/s/ Carol V. Gilden\**
**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden (*pro hac vice*)
cgilden@cohenmilstein.com
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Tel: (312) 629-3737

*-and-*

Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
S. Douglas Bunch (*pro hac vice*)
dbunch@cohenmilstein.com
Jan Messerschmidt (*pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (*pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500
Washington, DC 20005
Tel: (202) 408-4600

*-and-*

Christina D. Saler (*pro hac vice*)
csaler@cohenmilstein.com
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

*/s/ Jonathan D. Uslaner*
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*-and-*

John J. Rizio-Hamilton (*pro hac vice* pending)
johnr@blbglaw.com
Shane D. Avidan (*pro hac vice* pending)
shane.avidan@blbglaw.com
Nicole Santoro (*pro hac vice* pending)
nicole.santoro@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the proposed Class*

*All electronic signatures ("*/s/*") are signed with consent of counsel pursuant to Section 2(F)(4) of this Court's Electronic Case Filing Administrative Policies and Procedures Manual, as of July 24, 2023.

PLAINTIFFS' OPPOSITION TO EXCHANGE ACT MOTION TO DISMISS

36

CASE NO. 22-CV-1936-JES-MSB