**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**COHEN MILSTEIN SELLERS
   & TOLL PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Tel: (312) 629-3737

*Lead Counsel for Plaintiffs
and the proposed Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |
| | CLASS ACTION |
| | UNDER SEAL |
| | **PLAINTIFFS' OPPOSITION TO THE SECURITIES ACT DEFENDANTS' MOTIONS TO DISMISS THE SECURITIES ACT CLAIMS** |
| | Date: November 29, 2023 |
| | Time: 9:00 a.m. |
| | Dept: 4B |
| | Hon. James E. Simmons, Jr. |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................1

II.    SUMMARY OF THE ALLEGATIONS.........................................................5

III.   ARGUMENT................................................................................................9

A.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 11 OF THE SECURITIES ACT....................................................11

    1.    Plaintiffs Have Standing To Assert Section 11 Claims ......................11

    2.    The Offering Documents Contained False and Misleading Statements and Omissions.................................................................17

B.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 12 OF THE SECURITIES ACT....................................................30

C.    PLAINTIFFS HAVE ADEQUATELY PLED VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT....................................................35

IV.   CONCLUSION...........................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Activision Sec. Litig.*,
621 F. Supp. 415 (N.D. Cal. 1985) ........................................................................17

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) .......................................................17

*In re AGS, Inc. Sec. Litig.*,
2022 WL 17406100 (D. Nev. Dec. 2, 2022) ...........................................................16

*Alameda v. Nuveen Mun. High Income Opportunity Fund*,
2009 WL 1424529 (N.D. Cal. May 20, 2009)........................................................25

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ......................................................................................9

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000) ......................................................................10

*In re Ariad Pharms., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016)...................................................................................13

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008)..................................................................22

*Baker v. SeaWorld Enter., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019).....................................................................18

*Berg v. Velocity Fin., Inc.*,
2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ..........................................................24

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................18, 29

*In re BofI Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016).................................................22, 23

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) ........................................................27

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ......................................................10

*Brown v. China Integrated Energy, Inc.*,
  2013 WL 12124124 (C.D. Cal. 2013) .......................................................10, 17

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009)..................................................................34, 35

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)....................................................28

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) ............................................................................26

*In re Countrywide Fin. Corp. Deriv. Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................22

*Crews v. Rivian Auto., Inc.*,
  2023 WL 4361098 (C.D. Cal. July 3, 2023)......................................................30

*In re CytRx Corp. Sec. Litig.*,
  2015 WL 5031232 (C.D. Cal. July 13, 2015)....................................................33

*In re DDi Corp. Sec. Litig.*,
  2005 WL 3090882 (C.D. Cal. July 21, 2005)................................15, 21, 32, 34

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ............................................................................21

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura
    Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) .........................................................................32, 33

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016)............................................10, 12, 31

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..............................................................25

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................9

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ......................................................................22, 27

*In re Harmonic, Inc. Sec. Litig.*,
  2006 WL 3591148 (N.D. Cal. Dec. 11, 2006)........................................................34

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1982).............................................................................................1, 11

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ...................................................................................11

*In re Honest Co. Sec. Litig.*,
  615 F. Supp. 3d 1149 (C.D. Cal. 2022) ...................................................................23

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................................18, 19

*In re Juniper Networks, Inc. Sec. Litig.*,
  264 F.R.D. 584 (N.D. Cal. 2009).............................................................................15

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022) ................................................................22, 25

*Khoja v. Orexigen Theraps., Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................................29

*Knollenberg v. Harmonic, Inc.*,
  152 F. App'x 674 (9th Cir. 2005)........................................................................10, 34

*In re Laser Arms Corp. Sec. Litig.*,
  794 F. Supp. 475 (S.D.N.Y. 1989) ...........................................................................17

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020)......................................................................24

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011).............................................................33

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ......................................................................26

*McFarland v. Memorex Corp.*,
  493 F. Supp. 631 (N.D. Cal. 1980)...........................................................................17

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) .......................................................................15, 16, 17

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ........................................................................30

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................23

*In re Nat'l Golf Props., Inc. Sec. Litig.*,
    2003 WL 23018761 (C.D. Cal. Mar. 19, 2003)........................................33, 34

*Neborsky v. Valley Forge Composite Techs., Inc.*,
    2014 WL 3767011 (S.D. Cal. July 29, 2014) ...............................................21

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) .........................................................................16

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................22

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
    2023 WL 5419147 (2d Cir. Aug. 23, 2023) ...................................................32

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ......................................................................24

*In re Portal Software, Inc. Sec. Litig.*,
    2006 WL 2385250 (N.D. Cal. 2006) .......................................................34, 35

*In re Progenity, Inc. Sec. Litig.*,
    2023 WL 219345 (S.D. Cal. Jan. 13, 2023) ..................................................26

*In re Qualcomm Inc. Sec. Litig.*,
    2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ...............................................23

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ......................................................................22

*In re RAIT Fin. Trust Sec. Litig.*,
    2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)......................................22, 25, 26

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010) .........................................................................27

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) .................................................................24

*Rieckborn v. Jefferies LLC*,
81 F. Supp. 3d 902 (N.D. Cal. 2015) .......................................................31

*S.E.C. v. Todd*,
642 F. 3d 1207 (9th Cir. 2011) ................................................................35

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ........................................................3, 18, 21

*Scott v. ZST Digital Networks, Inc.*,
896 F. Supp. 2d 877 (C.D. Cal. 2012) .....................................................13

*Slack Techs., LLC v. Pirani*,
598 U.S. 759 (2023).............................................................................13, 14

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017) ...............................11, 12, 13, 14

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ...................................................................10

*In re Surebeam Corp. Sec. Litig.*,
2005 WL 5036360 (S.D. Cal. 2005).........................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................................9

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016)....................................................13

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019)......................................................24

*In re Violin Memory, Inc. Sec. Litig.*,
2015 WL 1968766 (N.D. Cal. Apr. 30, 2015)..............................30, 31, 32

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2017 WL 3058563 (N.D. Cal. July 19, 2017) .....................................15, 16

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
    259 F.R.D. 490 (W.D. Wash. 2009) .......................................................9, 31, 32

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) .......................................................22

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)....................................................26

*In re Wells Fargo Sec. Litig.*,
    12 F.3d 922 (9th Cir. 1993) ...........................................................................4, 26

*Yates v. Municipal Mortgage & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ..............................................................................13

*In re YayYo, Inc. Sec. Litig.*,
    2021 WL 2766894 (C.D. Cal. July 2, 2021)......................................................10

*In re Zynga Inc. Sec. Litig.*,
    2014 WL 721948 (N.D. Cal. Feb. 25, 2014) .....................................................13

## I.    **<u>INTRODUCTION</u>**

Part II of the Complaint alleges violations of the Securities Act of 1933 (the "Securities Act"). The Securities Act imposes strict liability on issuers, underwriters, and signatories of registration statements and prospectuses that contain false or materially misleading statements and omissions. Claims under the Securities Act impose a "relatively minimal burden on plaintiff" at the pleading stage, with liability for any misleading statements or omissions "virtually absolute." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1982). For these claims, there is no requirement that Plaintiffs plead or prove scienter, reliance, or causation. *Id.* All that a plaintiff must plead is (1) that the Offering Documents contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material. 15 U.S.C. § 77k(a).

Plaintiffs have amply pled violations of the Securities Act. In 2021, Silvergate and its underwriters, top executives, and directors completed in quick succession four public offerings of Silvergate securities, collecting $1.339 billion from investors in exchange. The materials used to solicit investors (the "Offering Documents") contained false and misleading statements touting the Bank's "due diligence" and "ongoing monitoring of customer activities." The Offering Documents assured prospective investors that the Bank conducted "extensive regulatory compliance diligence"; performed "thorough reviews . . . as part of [that] due diligence process"; and, once onboarded, performed "ongoing monitoring of customer activities." The Offering Documents further represented that, for Silvergate's cryptocurrency exchange customers, the Bank performed "enhanced procedures to screen and monitor these customers, which include, but are not limited to, … a system of 'red flags' specific to various customer types and activities [and] customer risk scoring with risk factors specific to the digital-currency industry." ¶337.

These statements were false, misleading, and omitted material facts. The Complaint's detailed allegations are supported by a host of corroborating sources—

including first-hand accounts of Silvergate former employees; exposés by investigative journalists; reports by securities analysts and U.S. senators; and ███████████████████████. Even at the pleading stage, the evidence is overwhelming that Silvergate failed to conduct the due diligence and ongoing monitoring procedures that it represented it did in the Offering Documents. Former employees have consistently reported that Silvergate did not conduct site visits, a basic and necessary component of due diligence; lacked basic information about its Silvergate-approved cryptocurrency exchanges, including what its customers did, their owners, and their management structures; never implemented necessary anti-money laundering ("AML") software to monitor client activity for "red flags"; set wire limits and authorized transactions without even basic documentation; and never refused to bank or terminate any customer accounts. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ Had Silvergate done even a fraction of the represented onboarding, due diligence, and ongoing monitoring that it promised investors in the Offering Documents, the Bank would have readily discovered that its Silvergate-approved cryptocurrency exchange customers were utter shams stealing billions of dollars of customers' funds through Silvergate's SEN Network.

Investors who purchased their shares in the Offerings lost everything. Silvergate's stock price has plummeted to near-zero—and there is no possibility of it ever rebounding. The DOJ has opened an investigation into Silvergate's wrongdoing; a bipartisan group of U.S. senators has chastised Silvergate for its "severe due diligence failures" and "egregious failure" to "monitor for and report suspicious financial activity carried out by its clients"; and Silvergate was forced to shut down its SEN Network, cease operations, fire its employees, and commence liquidation. Even more, the Federal Reserve has now imposed a cease-and-desist order documenting ████████████████████ that its prior examinations

"identified numerous deficiencies, including with respect to both safety and soundness and compliance with banking laws and regulations."[1]

The Complaint readily establishes standing for the Securities Act claims. Plaintiff Bucks County purchased its shares in the January 2021 Offering (¶¶418, 446), and Plaintiffs Indiana and Local 793 purchased shares in the December 2021 Offering (¶¶419, 447). All three Plaintiffs submitted sworn certifications that they purchased their shares at the offering price and on the dates of the Offerings. Defendants' speculation aimed at disputing these well-grounded allegations is factually baseless and, in any event, cannot be credited at the pleading stage.

The Complaint also adequately pleads false and misleading statements under Section 11 of the Securities Act—whether evaluated under Rule 8 or 9(b). Contrary to the Bank's representations in the Offering Documents, Silvergate did <u>not</u> conduct "extensive regulatory compliance diligence," "thorough reviews … as part of [that] due diligence process," or "monitoring of customer activities." Nor did the Bank employ the "system of 'red flags'" or "customer risk scoring" that it specifically represented to investors it did in the Offering Documents. These statements were patently false. And even if not literally false (which they were), they were at minimum misleading for the failure to disclose material facts. As the Ninth Circuit has repeatedly held, "once defendants chose to tout positive information to the market, they were bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). In touting their "due diligence process" and "monitoring of customer activities" in the Offerings, Defendants were duty-bound—but failed—to disclose, among other things, that Silvergate failed to conduct site visits, a basic and necessary component

---

[1] Order to Cease and Desist against Silvergate Capital Corp. and Silvergate Bank by Federal Reserve System, Docket No. 23-003 (May 23, 2023), at p. 2, *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20230601a1.pdf.

of the due diligence process; did not verify customer ownership; did not know its customers, including FTX, Binance, and many other cryptocurrency exchange customers that were utter shams; failed to monitor customer activity; set wire limits and authorized transactions without basic documentation; and never refused to bank or terminate customer accounts.

The Complaint does not plead "fraud by hindsight." As the Ninth Circuit has explained in rejecting a similar argument, "this is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted by [the Defendants]." *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993). Nor can Defendants avoid liability by pointing to their "cautionary language" or "risk warnings." Nowhere in them did Defendants remotely disclose the true facts about Silvergate's failure to conduct the represented onboarding, due diligence, or ongoing monitoring. The law is clear that, absent such disclosures, Silvergate's "risk warnings" do not immunize them from liability. This is particularly so where, as here, the "risk warnings" *themselves* falsely and misleadingly downplayed the "risks" and contained specific, false assurances about the Bank's "extensive regulatory compliance diligence."

Finally, the Complaint adequately alleges claims under Section 12 of the Securities Act, as well. Each of the Securities Act Defendants qualifies as "statutory sellers"—which extends to those who "sell" or "solicit" sales. The Underwriter Defendants sold and passed title to the securities and, accordingly, plainly are "statutory sellers." Silvergate issued the securities and thus, by definition (*see* SEC Rule 159A) is a "statutory seller." And the Securities Act Executive and Director Defendants signed the very Offering Documents at issue and, accordingly, qualify as statutory sellers. Defendants' fact-based arguments to the contrary are wrong and, in any event, cannot be resolved now, at the pleading stage.

## II.   <u>SUMMARY OF THE ALLEGATIONS</u>

The Securities Act Defendants conducted four public offerings of Silvergate securities to investors in January, March, July, and December 2021 (the "Offerings"), raising $1.339 billion. ¶¶331-36.[2] Plaintiffs purchased in two of the Offerings: Bucks County acquired securities in the January 2021 Offering, and Indiana and Local 793 acquired securities in the December 2021 Offering. ¶¶418-19. The January and March 2021 Offerings were completed pursuant to the same January 2021 Registration Statement, and the July and December 2021 Offerings were completed pursuant to an amendment to the January 2021 Registration Statement. All four Offerings were completed pursuant to registration statements and prospectuses that contained identical misrepresentations and omissions to investors.

The Offering Documents for each Offering contained identical misrepresentations and omissions regarding Silvergate's onboarding due diligence and ongoing monitoring of customers. Specifically, the Offering Documents stated that Silvergate performed "thorough reviews . . . as part of [its] due diligence process" in connection with its "onboarding new customers or monitoring existing customers"; performed "ongoing monitoring of customer activities"; conducted "extensive regulatory compliance diligence"; and maintained a "deep-rooted commitment and proprietary approach to regulatory compliance." ¶336. The Offering Documents further represented that the Bank conducted, for cryptocurrency exchanges, "enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency

---

[2] Citations to "¶_" are to the Complaint (ECF No. 48), "SI Br." are to the Silvergate Defendants' Motion (ECF No. 66-1), "UW Br." are to the Underwriters' Motion (ECF No. 71-1), and "Dir. Br." are to the Outside Directors' Motion (ECF No. 70); emphasis is added; and citations, alterations, and quotations are omitted. To the extent the Securities Act Defendants incorporate arguments from the Exchange Act Defendants, Plaintiffs also incorporate their opposition to those arguments.

activities, a system of 'red flags' specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our third-party transaction monitoring system, [and] customer risk scoring with risk factors specific to the digital-currency industry." *Id*.

These statements were false, misleading, and omitted material facts. Silvergate did not conduct the represented due diligence and ongoing monitoring, and instead indiscriminately approved cryptocurrency exchanges to bank at Silvergate and transact on the SEN Network, as corroborated by (among other things) the Bank's former employees:

- **FE2**, a "BSA [Bank Secrecy Act] Analyst," explained that Silvergate would bank anyone and never close accounts; that the Bank did not know half of its customers (including what they did, their owners, or their management structures); suspicious activity reports piled up; site visits were not performed; and the Bank's Chief Operating Officer halted requests to exit concerning customers. ¶¶390-92. FE2 ultimately quit because Silvergate had no culture of compliance. ¶393.

- **FE5**, a "FRCM Initial Due Diligence Manager" explained that ██████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████ Before August 15, 2022, Silvergate had never said "no" to a prospective client; instead, onboarding was "slopped through"; the paperwork lacked information on the customer, what it did, what its sources of wealth were, and its jurisdictions, and the flow of funds did not make sense; and no one did anything about suspicious or anomalous activity. ¶¶355-58.

- **FE1**, an SVP, Finance Manager who interacted directly with Defendant Lane and Silvergate's Controller, attended monthly meetings with other senior executives (including the executive responsible for BSA and other compliance), and had 30 years of banking experience, explained that during her tenure, the Bank conducted no vetting and she saw no monitoring of SEN Network participants. ¶¶346-48. She explained that had Silvergate prioritized such "know your client" procedures (which it did not), she would have known about them, including through discussions at monthly executive meetings she and Defendant Lane attended, and because the Bank would have established practices, policies, and employee training; instead, the Bank's focus was on sales and getting clients, not compliance. ¶¶346-48, 385-87.

- **FE3**, a digital banking manager who was responsible for the SEN Network, including onboarding, and attended meetings with Defendant Lane, said that even in 2022, the "gates were open" to the SEN Network: no compliance or research was done. ¶¶338-39, 343-44. She also confirmed that Silvergate performed no ongoing monitoring, including no customer counterparty reviews, annual or daily company reviews, or BSA or AML monitoring, among other things; and never implemented AML software to search for red flags. ¶¶384, 388-89.

The FEs confirmed that the Bank did not conduct the "enhanced procedures to screen and monitor" cryptocurrency exchanges represented in the Offering Documents. For example, FE3 never saw the Bank use "a system of 'red flags' specific to various customer types and activities," and explained that the Bank had purchased AML software to do this, but it was never implemented and never even placed on the active project list. ¶388. FE 3 also explained that "customer risk scoring with risk factors specific to the digital-currency industry" did not exist at Silvergate, and she would expect to be aware of such a process if it existed. ¶384. Similarly, FE1 was not aware of the Bank using such "customer risk scoring," and she never saw the Bank perform any type of "enhanced procedures to screen and monitor [crypto customers]." ¶385.

Multiple former employees, including FE2, FE3, FE5, and FE6, confirmed that, contrary to Defendants' assurances that Silvergate's vetting included "extensive regulatory compliance diligence," "thorough reviews" in onboarding, and "enhanced procedures" to screen exchanges, Silvergate did not even perform "site visits" of its customers, notwithstanding their critical importance to the vetting and due diligence process. ¶¶341-43, 358.

The Complaint also details Silvergate's failure to perform due diligence on and monitor its major exchange customers, including FTX. ¶¶361-71. FTX's misconduct was straightforward: when customers sought to purchase cryptocurrency from FTX, they were directed to wire their fiat currency into the Silvergate-approved accounts of two entities that were not FTX—"North Dimension" and "Alameda"—and then FTX and its founder, Sam Bankman-Fried, embezzled that money from

Silvergate without crediting the customers' cryptocurrency accounts. ¶396. Through this scheme, FTX stole more than $8 billion. *Id*. Had Silvergate actually conducted the "due diligence" and "ongoing monitoring" of FTX that the Offering Documents had represented, these sham entities would never have been allowed on the SEN Network. ¶¶361-71.

North Dimension was a fake online electronics retailer, with no employees, no physical location, and a website that did not actually sell products, displayed inexplicable and bizarre product pricing, and was rife with misspellings. ¶¶368-71. Meanwhile, Alameda was North Dimension's parent company, and it was so lacking in controls that it "had difficulty understanding what its positions were, let alone hedging or accounting for them." ¶¶364, 397. Alameda was required by law to have been operated independently of FTX but was instead entirely controlled by Bankman-Fried. ¶¶361, 364. FTX had no record-keeping or internal controls whatsoever, no CFO, and all three of these sham entities had the same address—which Silvergate would have readily seen had it conducted a site visit. ¶¶361-67.

Just like FTX, Silvergate failed to conduct due diligence on and monitor its other major exchange customers as well, including the examples detailed in the Complaint. ¶¶372-83. For example, Binance's purported address was nothing more than an enormous warehouse; while Huobi had no compliance controls and allowed customers to create fake accounts and wire funds using obviously fake names like "Taylor Swift" and "Borat." ¶¶376-77. And when Florida's Money Laundering Task Force conducted a review of Silvergate's own records, it easily found that the Silvergate-approved exchanges were utilizing the SEN Network to launder hundreds of millions of dollars to "shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details." ¶¶404-05. Had Silvergate performed its purported "due diligence" and "ongoing monitoring," these facts would have been readily apparent.

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████

When the public learned that Silvergate did not perform the represented due diligence and ongoing monitoring, the fallout was swift. Cryptocurrency exchange customers announced that they would immediately stop accepting or initiating payments through Silvergate. ¶413. On March 8, 2023, Silvergate announced "its intent to wind down operations and voluntarily liquidate the Bank." *Id*. Silvergate's stock price plummeted to approximately $1 per share. ¶414.

## III.   <u>ARGUMENT</u>

When considering motions to dismiss, the Court "must . . . accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[A] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Rule 8's "notice-pleading" standard applies to the Securities Act claims, as they do not "sound in fraud." Whether a Securities Act claim "sounds in fraud" is assessed on a defendant-by-defendant basis. *See In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. 2009) ("Rule 9(b) applies only to those defendants also accused in the underlying fraud."). The Complaint specifically disclaims any and all allegations of fraud for each Defendant (¶¶318, 416-17, 436, 457); the Securies Act claims are kept entirely separate from the Exchange Act claims and involve a different theory of liability (¶¶317-460); and the

allegations do not incorporate by reference any of the Exchange Act claims or allegations (¶318).[3] Moreover, courts consistently hold that a Securities Act claim does not "sound in fraud" against an underwriter, executive, or director defendant who—like the Underwriter and Executive and Director Defendants here (other than Lane)—are ***not*** named as Exchange Act defendants, ***not*** mentioned in the Exchange Act claims, and ***not*** alleged in the Complaint to have acted with fraudulent intent or participated in any fraudulent scheme. *See, e.g.*, *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *17 (C.D. Cal. June 9, 2016) (Securities Act claims against underwriters "need only meet the standards imposed by Rule 8"); *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *7 (S.D. Cal. 2005) (claims against underwriter defendants are "not subject to Rule 9(b)'s pleading requirements" when the complaint does not "contain any allegations of fraud or intentional behavior" against them); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 440 (S.D.N.Y. 2000) (claims against underwriter defendants "do not sound in fraud" when the complaint does not contain allegations that underwriters "acted fraudulently" and "does not allege a Rule 10b-5 claim" against the underwriters).[4]

Additionally, "the scienter requirement of Rule 9(b) does not apply to Section 11 claims,' *even when* a section 11 claim sounds in fraud." *Brown v. China Integrated Energy, Inc.*, 2013 WL 12124124, at *12 (C.D. Cal. 2013); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.3 (9th Cir. 1996) ("Of course, the scienter requirement of Rule 9(b) does not apply to Section 11 claims, as such claims may be based on negligent or innocent misstatements or omissions.").

---

[3] *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020) (Rule 9(b) inapplicable when plaintiff "made an effort to plead a non-fraudulent basis for" Securities Act claims).

[4] Defendants' authorities are in accord. *See, e.g.*, Dir. Br. 6, 9 (citing *Fouad v. Isilon Systems, Inc.*, 2008 WL 5412397, at *3 (W.D. Wash. Dec. 29, 2008) (Rule 8 applied to defendants who were only named as Securities Act defendants); *In re YayYo, Inc. Sec. Litig.*, 2021 WL 2766894, at *1 (C.D. Cal. July 2, 2021) (same).

In this case, whether evaluated under Rule 8 or 9(b), the Complaint amply pleads violations of the Securities Act.

## A. THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 11 OF THE SECURITIES ACT

Section 11 of the Securities Act places a "relatively minimal burden on a plaintiff" at the pleading stage. *Huddleston*, 459 U.S. at 382. To state a claim under Section 11, a plaintiff need only allege: (1) that the Offering Documents contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material. 15 U.S.C. § 77k(a). Plaintiffs bringing claims under Section 11 are not required to plead (or prove) scienter, reliance, or loss causation. *Id*. For this reason, as the Ninth Circuit has explained, liability for misrepresentations and omissions under the Securities Act is "virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 382; *see also Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) ("Section 11 [of the Securities Act]'s liability provisions are expansive—creating virtually absolute liability").

### 1. Plaintiffs Have Standing To Assert Section 11 Claims

Section 11 confers standing on "any person who purchases a security issued under a materially false or misleading registration statement." *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1113 (E.D. Cal. 2017) (citing 15 U.S.C. § 77k). "When a materially false or misleading registration statement was issued in connection with a secondary offering," a plaintiff need only plead they purchased "from the pool of shares issued in the secondary offering, rather than from the pool of previously issued shares." *Id*. A plaintiff can also eliminate the inference that their shares were from the pool of previously issued shares by alleging 'that they purchased their shares on the date of the Secondary Offering at the offering price.'" *Id*. at 1114.

Consistent with Ninth Circuit law, the Complaint specifically alleges that the Plaintiffs purchased both directly "in" and "pursuant to" the January 2021 and December 2021 Offerings and at the Offering price. *See, e.g.*, ¶421 (alleging Plaintiff's "purchases of shares in the 2021 Offerings and pursuant to the 2021 Offering Documents"). The Complaint details how Plaintiff Bucks County purchased shares of Silvergate common stock "*in* the January 2021 Offering," and further states that the purchases occurred "on January 22, 2021 at the public offering price" and "*pursuant to* the January 2021 Offering." ¶¶418, 446. Likewise, the Complaint details how Plaintiffs Indiana and Local 793 purchased their shares "*in* the December 2021 Offering," and further states that the purchases occurred "on December 7, 2021 at the public offering price" and "*pursuant to* the December 2021 Offering." ¶¶419, 447. The Complaint further attaches and incorporates by reference sworn certifications by these same Plaintiffs that confirms the precise dates and prices at which they bought these securities in the January 2021 and December 2021 Offerings. *See* ¶¶17, 20; ECF Nos. 16-3, 43-1. Nothing more is required to allege their standing to assert claims under the Securities Act for these two offerings.

Courts have repeatedly held that these *identical* allegations satisfy the standing requirement at the pleading stage. *See, e.g.*, *Marrone Bio Innovations*, 243 F. Supp. 3d at 1113-15 (allegations that plaintiffs "purchased MBII securities ... in the secondary offering" and "purchased on the date of the offering at the offer price" sufficient to plead standing); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *18 (C.D. Cal. June 9, 2016) (allegations that plaintiffs "purchased shares" on "the date of the SPO" and "at the offering price" sufficient to plead standing).

Ignoring the Complaint's actual standing allegations and well-settled case law, Defendants contend that Plaintiffs lack standing to assert a Securities Act claim for *any* of the Offerings. Their arguments fail.

***First***, Defendants' entire challenge to Plaintiffs' standing is based on inapposite cases—those in which the plaintiff, unlike here, did *not* allege that they

purchased their shares in the offerings and did *not* allege that they purchased their shares at the offering price. For example, Defendants erroneously point to the Ninth Circuit's decision in *Century Aluminum*, 729 F.3d 1104 (9th Cir. 2013). But in that case, unlike here, plaintiffs did *not* argue "that they bought directly in the secondary offering," but instead "concede[d] that they purchased in the aftermarket" and further conceded that they did *not* buy the shares at the offering price. *Id*. at 1107 ("[N]one of the plaintiffs bought shares at the offering price."). Likewise, in *In re Ariad Pharmaceuticals, Inc. Securities Litigation*, 842 F.3d 744, 756 (1st Cir. 2016), "the complaint expressly preclude[d]" the possibility that plaintiff purchased in the offering and "instead alleg[ed] that the named plaintiffs all bought their shares 'on the open market'" while "none of them paid the offering price." Similarly, in *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029 (N.D. Cal. 2016), plaintiffs did not allege that they purchased in any offering. *See Marrone Bio Innovations*, 243 F. Supp. 3d at 1114 (distinguishing *Magnachip* on the basis that plaintiffs there did not allege they purchased shares in the secondary offering and, therefore, finding "*Magnachip's* analysis (just like *Century Aluminum's*) is of limited value").[5] Here, in stark contrast to all of Defendants' authorities, the Plaintiffs specifically alleged that they *did* purchase in the January and December 2021 Offerings and *did* purchase their shares at the offering prices.

Equally misplaced is Defendants' reliance on *Slack Technologies, LLC v. Pirani*, 598 U.S. 759, 770 (2023) (UW Br. 7-8; Dir. Br. 7-8). In *Slack*, the plaintiff asserted claims based on purchases of "unregistered securities" that bore "minimal relationship to a defective registration statement." *Id*. at 768. The Supreme Court

---

[5] Defendants' other cases (UW Br. 14 n.9) are likewise inapposite. In *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 886 (C.D. Cal. 2012) and *In re Zynga Inc. Securities Litigation*, 2014 WL 721948, at *3-4 (N.D. Cal. Feb. 25, 2014), the plaintiffs did not allege to have purchased in the relevant offerings, while in *Yates v. Municipal Mortgage & Equity, LLC*, 744 F.3d 874, 900 n.13 (4th Cir. 2014), the shares were not purchased at the offering price.

reiterated the not "particularly novel" view that the plaintiff could not assert a Securities Act claim based on the purchase of "unregistered securities." *Id*. at 770. Here, unlike in *Slack*, Plaintiffs' claims do not concern "unregistered securities" that bear "minimal relationship to a defective registration statement"; rather, Plaintiffs' claims concern *registered* shares issued pursuant to a *registration* statement.

*Second*, Defendants make a host of fact-based assertions and speculate that, contrary to the allegations in the Complaint, it is still possible that Plaintiffs did not purchase their shares in the Offerings. UW Br. 11; Dir. Br. 8 n.3. As a legal matter, Defendants' fact-based assertions "are inappropriate at the pleading stage." *Marrone Bio Innovations*, 243 F. Supp. 3d at 1114. And as a factual matter, there is zero reason to doubt the Complaint's allegations. Bucks County filed a sworn certification that it purchased its shares on January 22, 2021 at $63.00 per share price—the exact same price of the shares offered in the January 2021 Offering. Likewise, Indiana and Local 793 filed sworn certifications that they purchased their shares on December 7, 2021 at $145.00 per share price—the exact same price of the shares sold in the December 2021 Offering. Meanwhile, Silvergate's share price on the open-market on these same dates significantly exceeded the prices paid by Bucks County, Indiana and Local 793 for their shares in the Offerings, rendering it factually impossible (notwithstanding Defendants' speculation) that the shares were purchased in the open market.[6]

*Third*, contrary to Defendants' assertion (UW Br. 7-13; Dir. Br. 7-9), Plaintiffs also have standing to assert claims on behalf of class members who purchased their shares in the March 2021 and July 2021 Offerings. Like the January and December 2021 Offerings, the March 2021 and July 2021 Offerings were both

---

[6] Defendants attempt to confuse this issue with "facts" outside the Complaint and the irrelevant distinction between when plaintiff purchased (the trade dates of January 7 and December 22, 2021) and the settlement or delivery dates that followed. UW Br. 10-11, n.6. Settlement dates are always later than trade dates. In any event, such fact disputes must await a full record. *Marrone Bio*, 243 F. Supp. 3d at 1114.

completed pursuant to the same January 2021 Registration Statement used to offer shares to Plaintiff Bucks County in the January 2021 Offering. ¶¶332-35.[7] All of these Offering Documents include the same false and misleading statements and omissions, and all implicate the same "set of concerns." *See Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015).

Consistent with the Ninth Circuit's decision in *Melendres*, numerous courts have held that a lead plaintiff may represent absent class members that purchased other securities where, as here, the alleged harm is caused by the *same* alleged misstatements in the *same* documents. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 3058563, at *4 (N.D. Cal. July 19, 2017) (rejecting "argument that Plaintiff lacks standing to represent other putative class members who purchased VWGoAF bonds in different tranches or offerings"); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (rejecting argument that plaintiff lacked standing to represent the interests of purchasers of different securities where the alleged harm stemmed from the same false financial statements); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *6 (C.D. Cal. July 21, 2005) (rejecting argument that plaintiff lacked standing to represent purchasers of different securities in the same offering with the same offering documents).

These authorities are consistent with the general rule, endorsed by the Ninth Circuit in *Melendres*, that plaintiffs in a class action have standing to represent absent class members who share claims that implicate the "same set of concerns." *See Melendres*, 784 F.3d 1254, at 1262 (citing *Gratz v. Bollinger*, 539 U.S. 244, 267

---

[7] The January 2021 Registration Statement was a "shelf registration" from which the Company made multiple offerings. Thereafter, Silvergate issued a prospectus supplement for the March 2021 and December 2021 Offerings and a post-effective amendment for the July 2021 Offering. Those prospectus supplements and post-effective amendments are all deemed to be "part" of the initial shelf registration statement. 15 U.S.C. § 77b(a)(8); 17 C.F.R. § 229.512.

(2003)). In rejecting Defendants' same challenge here at the pleading stage, courts in the Circuit have noted that the Ninth Circuit's decision in "*Melendres* clearly forecloses Defendants' argument that Plaintiff lacks standing to represent other putative class members who purchased [securities] in different tranches or offerings." *Volkswagen*, 2017 WL 3058563, at *4.[8]

Defendants' challenge to Plaintiffs' standing to represent purchasers in the March 2021 and July 2021 Offerings is also misguided because it raises a host of arguments that concern issues of class certification—*not* the sufficiency of the pleadings. Courts have repeatedly explained, in accordance with *Melendres*, that "'the question whether [a plaintiff] may be allowed to present claims on behalf of others who have similar, but not identical, interests depends ***not*** on standing, but on an assessment of typicality and adequacy of representation,'" to be decided at the class certification stage. *Volkswagen*, 2017 WL 3058563, at *4 (quoting *Melendres*). Recognizing that these challenges concern issues of class certification (not the sufficiency of the pleadings), courts regularly defer to the class certification stage the fact-based question of "whether [plaintiff] can bring claims on behalf of absent class members" who bought shares in a different offering or different securities under the same offering documents. *See Volkswagen*, 2017 WL 3058563, at *4 (N.D.

---

[8] Other courts are in accord. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) ("[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."). Defendants' cases are also in accord. *See* Dir. Br. 14, 17; UW 25 (citing *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *25 (N.D. Cal. Dec. 18, 2017) (finding *Melendres* forecloses the argument that plaintiff could not represent class of investors who purchased in a different offering when the offering documents were "alleged to contain the same false statements").

Cal. July 19, 2017) (same).[9] There is no reason to do otherwise here.

### 2. The Offering Documents Contained False and Misleading Statements and Omissions

Section 11 imposes strict liability on every person who issues, underwrites, or signs offering materials for securities that contain an untrue or misleading statement *or* omission. 15 U.S.C. § 77k(a).[10] "Section 11 thus creates two ways" to establish liability: "one focusing on what the statement says and the other on what it leaves out." *Omnicare*, 135 S. Ct. at 1323. A statement or omission is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in

[9] Defendants' citations (UW Br. 13-14 n.9) are not on point. In *In re AGS, Inc. Securities Litigation*, 2022 WL 17406100, at *3 (D. Nev. Dec. 2, 2022), the absent class members purchased under different registration statements. And in *In re Wells Fargo Mortgage-Backed Certificates Litigation*, Judge Illston relied on the fact that the Ninth Circuit had not yet adopted the concept that a plaintiff could prosecute a class action based on claims it may not be able to advance individually. 712 F. Supp. 2d 958, 965 (N.D. Cal. 2010). Since that time, the Ninth Circuit specifically adopted the "class certification approach" in *Melendres*.

[10] Defendants Frank and Campbell contend (Dir. Br. 1, 3.), without authority, that they should be excused from Section 11 liability because they are now "retired." Not so. *See, e.g.*, *China Integrated*, 2013 WL 12124124, at *12 (imposing Section 11 liability on retired director who signed registration statement). Equally incorrect is the Underwriters' assertion that they were only "market makers" and not underwriters for the March 2021 Offering. UW Br. 15-16. The March 2021 Offering Documents identified the Underwriters by name as "agents" who would sell the shares on Silvergate's behalf, and stated that each "may be deemed to be an 'underwriter' within the meaning of the Securities Act" and that the "underwriters named in the prospectus supplement will be considered as underwriters of the securities offered by the prospectus supplement." UW Ex. D at 321, 344, 378. *See also Delayed or Continuous Offering & Sale of Sec.*, Release No. 6334 (Aug. 6, 1981) (defining "statutory underwriter" to include a "market maker" who sells shares as the "agent" in an at-the-market offering). The Underwriters' role here is far from their cited cases. *See, e.g.*, UW Br. 14-17 (citing, *e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (underwriters never "held themselves out" publicly for the offering)); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 645 (N.D. Cal. 1980) (distinguishing underwriters "identified" in offering documents from "warrantholders" who only sold to underwriters).

a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

The Supreme Court and the Ninth Circuit have emphasized that "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc.*, 563 U.S. at 44, 131 S. Ct. 1309. "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Arena Pharm.*, 840 F.3d at 705-06 (quoting *Berson*, 527 F.3d at 987 (alteration in original)).

"Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Baker v. SeaWorld Enter., Inc.*, 423 F. Supp. 3d 878, 936 (S.D. Cal. 2019) (quoting *S.E.C. v. Todd*, 642 F. 3d 1207, 1220 (9th Cir. 2011)). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005). Here, the Complaint identifies a series of false and misleading statements and omissions in the Offering Documents, and specifically identifies why they were false and what facts they omitted. *See* ¶¶331-406. The Offering Documents represented that Silvergate, in onboarding customers, conducted "extensive regulatory compliance diligence"; performed "thorough reviews … as part of [that] due diligence process"; and, once onboarded, performed "ongoing monitoring of customer activities." ¶336. Additionally, the Offering Documents specifically represented that, for Silvergate's cryptocurrency exchange customers, the Bank performed "enhanced procedures to screen and monitor these customers, which include[d], but [we]re not limited to, system monitoring rules tailored to digital currency activities, a system of 'red flags' specific to various customer types and activities [and] customer risk scoring with risk factors specific to the digital-currency industry." *Id*.

PLAINTIFFS' OPPOSITION TO SECURITIES ACT MOTION TO DISMISS          18          Case No. 22-cv-1936-JES-MSB

These representations were false, misleading, and omitted material facts. Far from "thorough reviews" and "enhanced procedures" for screening and monitoring cryptocurrency exchange customers, Silvergate performed <u>no</u> due diligence before onboarding customers to the SEN Network and <u>no</u> ongoing monitoring of customer activities on the SEN Network. ¶¶337-406. In truth, and undisclosed to investors, Silvergate did *not* perform thorough reviews of its prospective customers (*e.g.*, ¶¶338-82); did not have enhanced procedures to screen or monitor cryptocurrency customers (*see, e.g.*, ¶¶349, 385); did *not* know its prospective customers or their businesses (*id.*); did *not* perform site visits on prospective customers (*e.g.*, ¶¶341-43, 358, 376, 379); did *not* determine the beneficial owners of its prospective customers (*see, e.g.*, ¶¶339-40); did *not* know the source, purposes and use of its prospective customers' funds (*see, e.g.*, ¶¶355, 377-78, 379, 390); did *not* review the compliance programs of prospective customers (*see, e.g.*, ¶¶355, 377-78, 380, 390, 397, 401-02); did *not* have policies and procedures to comply with know-your-customer requirements (*see, e.g.*, ¶347); *never* refused to bank a prospective client (*see, e.g.*, ¶¶355, 390); did *not* monitor its customers' activity (*see, e.g.*, ¶¶384-406); did not have system monitoring rules tailored to digital currency activities (*see, e.g.*, ¶387); did *not* have a system of red flags to detect suspicious customer activity (*see, e.g.*, ¶¶356, 387-89, 391-92, 399); did *not* require supporting documentation for wire limits (*see, e.g.*, ¶¶344-45); did *not* require customers to provide basic information for wires (*see, e.g.*, ¶¶357, 398); did *not* investigate reports of unauthorized transactions received from originating banks (*see, e.g.*, ¶394); did *not* take action or close accounts when suspicious activity was identified (*see, e.g.*, ¶¶391-92, 356-57); and did *not* have a deep rooted commitment to regulatory compliance (*see, e.g.*, ¶¶348, 393). These facts are corroborated by the accounts of Silvergate's former employees, the sham entities allowed on the SEN Network, the fraudulent activities performed on the SEN Network, ██████████████████████, U.S. senators, and investigative journalists.

PLAINTIFFS' OPPOSITION TO
SECURITIES ACT MOTION TO DISMISS

19

Case No. 22-cv-1936-JES-MSB

Faced with the Complaint's detailed allegations, Defendants contend that the Court should hold—at the pleading stage, no less—that the Offering Documents misled no one and omitted nothing. Their arguments fail.

*First*, borrowing a tactic from the Exchange Act Defendants' playbook (*see* UW Br. 21-22; Dir. Br. 9-17), the Securities Act Defendants improperly attempt to recast their challenged statements and the relevant inquiry on this motion. The relevant inquiry is whether Silvergate's Offering Documents contained a misrepresentation or omission—not whether Silvergate conducted *any* due diligence whatsoever. The Offering Documents specifically represented that Silvergate conducted "extensive regulatory compliance diligence"; "thorough reviews . . . as part of [that] due diligence process"; and "ongoing monitoring of customer activities." ¶336. With respect to Silvergate's cryptocurrency exchange customers, in particular, the Offering Documents went even further and specifically stated that Silvergate's "enhanced procedures to screen and monitor these customers include[d], but are not limited to, . . . a system of 'red flags' specific to various customer types and activities [and] customer risk scoring with risk factors specific to the digital-currency industry." *Id*. The Complaint contains ample facts demonstrating that each of these representations was false and misleading: the Bank did *not* perform "regulatory compliance diligence," did *not* conduct "thorough reviews … as part of [that] due diligence," and did *not* use a "system of 'red flags'" to monitor customer activity. Accordingly, even if the Court were to accept Defendants' self-serving factual assertion that Silvergate did *some* modicum of "due diligence" (which Plaintiffs vigorously dispute) Defendants' specific representations would *still* be untrue. These statements would also still be misleading by omission because, as the Ninth Circuit holds, in choosing to tout the Bank's "due diligence," Defendants were obligated to "disclos[e] adverse information that cuts against the positive information"—including, for example, that the Bank failed to perform site visits, did not know its customers, approved wire limits and transactions without

20

basic documentation, and never refused to bank a customer or terminated an account. *See Arena Pharm.*, 840 F.3d at 705-06.

Moreover, contrary to Defendants' assertions, the Complaint alleges (because it is true) that Silvergate did not conduct any meaningful due diligence, onboarding, or monitoring. While Defendants may disagree with those assertions—and take the position that their actions amounted to "due diligence," "onboarding" or "monitoring"—this is a factual dispute that cannot be resolved as a matter of law on a motion to dismiss, but rather must be resolved on a full record. *Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 WL 3767011, at *5 (S.D. Cal. July 29, 2014) (refusing to resolve definitional dispute and explaining that, "in deciding a Rule 12(b)(6) motion, the Court is bound to accept factual allegations contained in the [Complaint] as true"); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *12 n.14 (C.D. Cal. July 21, 2005) ("Defendants also quibble over the definition of 'customer' and 'customer base.' These types of arguments are more appropriate for summary judgment or trial than a Rule 12(b)(6) motion to dismiss."). As the Ninth Circuit has cautioned, as a general rule, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

***Second***, Defendants next conveniently attempt to recast their specific representations in the Offering Documents as "immaterial," "aspirational," "vague," "unverifiable," and "feel good monikers." Dir. Br. 10, 12; UW Br. 22 n.12. Their litigation tactic fails. Defendants specifically represented in the Offering Documents that Silvergate conducted "regulatory compliance diligence" and completed "thorough reviews" as part of the Bank's "due diligence" process in connection with "onboarding new customers or monitoring existing customers" and that these procedures specifically included "but are not limited to," employing a "system of 'red flags,'" "proprietary technology tools," and "enhanced procedures to screen and monitor" its cryptocurrency exchange customers. ¶336. But the Bank did not

perform these specific procedures. There is nothing "aspirational," "vague," "feel good," or "unverifiable" about any of these representations—they are false statements of present fact included in the Offering Documents to induce investors to spend $1.34 billion to purchase Silvergate's securities. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (rejecting district court's finding that statements "about the current and past state of" the company that "address specific aspects of a company's operation" were immaterial puffery); *Glazer*, 63 F.4th at 770 (same).

Rejecting Defendants' same "immateriality" ploy here, courts have repeatedly found similar misstatements actionable under the federal securities laws—and not mere "puffery." *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *7 (S.D. Cal. Sept. 27, 2016) ("*BofI I*") (finding material statements about "unwavering focus on credit quality," "strong credit discipline" and "high quality credit standards"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (finding material statements about company being "committed to a disciplined" underwriting approach); *Karimi*, 607 F. Supp. 3d at 392-93 (finding material statements about KYC procedures, including "intensive checks," "effective procedures," and comprehensive compliance"); *RAIT*, 2008 WL 5378164, at *6 (finding material "statement claiming that RAIT's 'credit underwriting involves an extensive due diligence process'"); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1211 (W.D. Wash. 2009) (finding material statements about "disciplined" and "excellent" "underwriting standards"); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1072 (C.D. Cal. 2008) (finding material statements about "stringent underwriting standards"); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (finding material statements about "strict underwriting and risk management").

As these and other courts have explained, "determining whether a given statement is material entails fact-intensive assessments that are more properly left to

the jury." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). A statement is "puffery" only when "it is 'extremely unlikely to induce consumer reliance.'" *BofI I*, 2016 WL 5390533, at *9. "A court may grant a motion to dismiss on the basis that offered statements are 'puffery' only if it concludes that the statement is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022).[11] On the facts here, the court cannot find as a matter of law that Defendants' misstatements were "so obviously unimportant to a reasonable investor," particularly given that Silvergate itself boasted that its compliance procedures were "a distinct competitive advantage," analysts cited them as a reason to "BUY" the stock, and when the public learned the truth that Silvergate failed to perform these procedures, customers pulled their deposits, the stock price plummeted, and Silvergate was forced to liquidate. ¶¶407-14. As securities analysts observed, the Bank's eventual admissions at the end of the Class Period "stand[] in rather stark contrast" to Silvergate's statements "lauding how the company is 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'" ¶414.

Defendants' cited authorities are readily distinguishable. The only case to which Defendants point that relates to actual due diligence concerns statements that a bank "extoled the virtues of its underwriting practice through its use of 'disciplined due diligence,'" and the district court in that case specifically *rejected* a blanket rule about whether such statements were "puffery." *Berg v. Velocity Fin., Inc.*, 2021 WL

---

[11] Courts also have rejected the Defendants' attempt to focus on "various adjectives" plucked from context (UW Br. 22 n.12; Dir. 12-13 & n.4) to avoid their statements' reasonable meaning. *See In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022) (rejecting contention that an "invented" adjective made the offering documents' misstatements mere puffery); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *7 (S.D. Cal. Mar. 18, 2019) (rejecting "Defendants' invitation to remove the terms 'broad' and 'non-discriminatory' from their context in determining whether Defendants' statements amounted to mere puffery").

268250, at *3 (C.D. Cal. Jan. 25, 2021). Instead, the court found that in the context of that complaint, unlike here, there were no allegations that the company had "utterly failed to meet" its purportedly "disciplined due diligence" standard, and therefore the statements were not actionable. *Id*. at *4. Defendants also rely, to no avail, on cases involving alleged misstatements of a different ilk: those that are "inherently aspirational" and "future tense" such as "[w]e want to be a company known for its ethical leadership" (*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017)); "we aim to build the defining brand of our generation and to promote a company culture based on our unique values" (*In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 765 (N.D. Cal. 2020)); "wishing it had 'a crystal ball,' that Intuitive 'will come out stronger' and 'in a pretty good position' despite the economic crisis" (*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)); and "[o]ur priority is to reaffirm our commitment to trust, compliance and risk management" (*Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019)). In stark contrast, the Silvergate Defendants' statements at issue are present-tense and purport to describe Silvergate's specific processes that enabled it to safely secure $14 billion in deposits from crypto-exchanges.

*Third*, Defendants erroneously contend that the Offering Documents' "cautionary language" to the effect that the cryptocurrency industry is risky somehow immunizes them from liability for their misrepresentations and omissions about Silvergate's practices designed to address that risk. *See, e.g.*, UW Br. 19-20; Dir. Br. 13-14. But nowhere in their "cautionary language" did Defendants remotely disclose that—contrary to Silvergate's representations to investors about the Bank's "due diligence processes" and "thorough reviews"—the Bank, in reality, did <u>not</u> conduct due diligence and did <u>not</u> monitor the activity of its cryptocurrency exchange customers. *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 396 (S.D.N.Y. 2022) (holding that "disclaimers that the [b]ank might fail to

implement its policies cannot sufficiently cure the misinformation conveyed by descriptions of policies and procedures"); *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at \*6 (E.D. Pa. Dec. 22, 2008) (finding "disclosure of the fact that RAIT's investments inherently carry risks does not mean that a reasonable investor would find unimportant the fact that RAIT's credit underwriting and monitoring practices are incapable of detecting risk"). In fact, the "warnings" to which Defendants point about detecting illegal activity *repeated* the same misrepresentations at issue, with the "warning" assuring investors (falsely) that the Bank's "risk management and compliance framework . . . includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers)." UW Ex. A; UW Br. 24, Dir. Br. 17. *See Alameda v. Nuveen Mun. High Income Opportunity Fund*, 2009 WL 1424529, at \*7 (N.D. Cal. May 20, 2009) ("[T]he disclosures and warnings do not insulate [defendants] because the statements "create an impression of a state of affairs that differs in a material way from the one that actually exists.") (quoting *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002)).

*Fourth*, Defendants erroneously accuse Plaintiffs of pleading "fraud by hindsight." Dir Br. 17; UW Br. 24-25. But that label applies to allegations of a "failure to predict" the future. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (collecting cases). "[M]isstatements of existing fact," such as those at issue here, "are not mere fraud by hindsight." *Id.* "[T]his is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted by [the Defendants]." *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993); *see also Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (defendants' false claims that "policy was stricter than it really was" was not "fraud by hindsight").

The Complaint nowhere accuses Defendants of "failing to predict" the future. Quite the opposite, the Complaint challenges Defendants' failure to disclose then-

existing facts—startling ones—including that Silvergate did not conduct basic due diligence, onboarding or monitoring of its cryptocurrency exchange customers. Likewise, Plaintiffs are not alleging that Silvergate "failed to predict" that FTX, Binance and its other customers were sham entities engaging in billions of dollars of unauthorized transactions. Rather, Plaintiffs have alleged that Silvergate's approval of and failure to monitor obvious sham entities—including Alameda, Binance and others—demonstrates (along with the other evidence in the Complaint) that Silvergate failed to conduct the represented due diligence, onboarding and monitoring of these and other customers. As courts in this Circuit and elsewhere have explained, Defendants' incantation of "fraud-by-hindsight" "misses the mark" because "[f]raud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809 (C.D. Cal. 2011); *see also RAIT*, 2008 WL 5378164, at *5 (rejecting "fraud by hindsight" contention when Plaintiffs are claiming that the [registration statement] misrepresented the credit underwriting and monitoring processes that existed at the time of filing").[12]

***Finally***, Defendants contend that the Court should disregard the accounts of Silvergate's former employees because of the "timing" of their employment. UW Br. 22-24; Dir. Br. 11-12, 15-16. According to Defendants, it is *possible* that Silvergate (i) did not vet, due diligence, or monitor its cryptocurrency exchange customers, as FEs 1, 2, 3, and 4 all consistently averred; but (ii) began doing so immediately after FEs 1 and 2 were terminated, before the Offerings, and without the knowledge of FEs 3 and 4; and then (iii) stopped conducting due diligence and

---

[12] Defendants' cases (UW Br. 25), in which the omission was an overpayment that "was not 'determined and quantified'" until after the offering documents were published, *In re Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at *6 (S.D. Cal. Jan. 13, 2023), or in which the Section 10(b) complaint lacked any "source of contemporaneous information regarding what was actually going on" at the company, *Welgus*, 2017 WL 6466264, at *8, are inapposite.

monitoring shortly after the Offerings, and before FEs 5 and 6 joined the Company. Defendants' argument fails for a multitude of reasons.

To start, Defendants' entire challenge ignores the relevant legal standard on this motion. While anything is *possible*, that is not the legal standard at the pleading stage. As the Ninth Circuit has emphasized, pleading falsity is subject to a "*reasonable inference* standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023). Here, the tenures of the two FEs in Silvergate's BSA department—FE2 and FE5—were before and after the Offerings, and the other FEs were employed during the Offerings. There is no reason—logically or legally—to find that the consistently deficient conditions observed by the FEs were magically cured and then reappeared before or after the tenure of any particular FE or Offering. Rather, at the pleading stage, Plaintiffs are entitled to the "reasonable inference that no changes had been made in the interim." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *11-12 (S.D. Cal. May 23, 2017) ("*BofI II*"); *see also Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (accepting "reasonable inference in the plaintiffs' favor" that risk-management problem FE described also existed seven months earlier).

Defendants' "timing" challenge also ignores that (i) two of the FEs *were* employed at the time of each Offering; (ii) FE 5 had access to Silvergate's records from before his employment (n.51), and his day-to-day work specifically entailed reviewing that paperwork, ████████████████████████ ████████████████████████████; (iii) the very nature of the deficiencies— *i.e.*, the absence of due diligence, onboarding, and monitoring—do not get cured and then dismantled overnight and in secret; and (iv) one often learns facts during their employment about workplace conditions that preceded their official start date.[13] The

---

[13] Defendants' cited authorities (Dir. Br. 11, UW Br. 22) do not require a different

more plausible inference—and the inference to which Plaintiffs are entitled at the pleading stage—is that Silvergate did not cure the deficiencies that the FEs identified during the Class Period. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Defendants also urge the Court to ignore FE 4's account because the allegations are supposedly not "temporally specific." UW Br. 23; Dir. Br. 15. According to Defendants' say-so and speculation, FE 4 *possibly* was speaking about conditions prior to the Offerings—as early as 2011—when she averred that Silvergate failed to conduct any ongoing monitoring. But Defendants' factual gymnastics read statements into FE 4's account that are not there: FE 4 did not cabin her account to any particular incident, and certainly never indicated that she was talking about matters that happened twelve years ago. To the contrary, FE 4 was speaking of a continuous and ongoing failure on Silvergate's part that existed throughout her tenure, specifically stating that there was "*never* any investigation by Silvergate to determine what happened with unauthorized transactions." Defendants' attempt to rewrite FE 4's account—and create "temporal ambiguity" where none exists—fails as a factual matter and, in any event, cannot be credited at this stage. *Khoja v. Orexigen Theraps., Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (defendants cannot "present their own version of the facts at the pleading stage").

---

outcome, and indeed even support a finding that these FE allegations bolster the Complaint. *See, e.g., City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) ("Pre-Class Period CW accounts can support and corroborate other statements regarding [defendant's] Sale Practices."). Moreover, *Avila v. LifeLock Inc.*, is readily distinguishable because the former employee accounts were assessed for pleading scienter under the Exchange Act, which is not required here. 2016 WL 4157358, at *4 (D. Ariz. Aug. 3, 2016).

Equally baseless is Defendants' attempted attack on FE 4's and FE 6's "roles." Dir. Br. 16-17. The Ninth Circuit in *Berson* rejected such an attack, holding that what matters is whether it is "plausible" that the witness "would know, or could reasonably deduce" or "infer" the undisclosed facts—not their job title standing alone. 527 F.3d at 985. FE4, Silvergate's VP of Operations for over a decade, *personally* received the reports of unauthorized transactions from other banks that Silvergate never reviewed. ¶394. And FE6, Silvergate's Private Client Manager II, *personally* filled out the paperwork that should have contained information on customers' beneficial ownership. ¶340. On these facts, it is certainly "plausible" that these FEs would know—or, at minimum, could reasonably "deduce" or "infer"— what they averred. *Berson*, 527 F.3d at 985.[14]

Additionally, contrary to what Defendants say (UW Br. 23-24; Dir. Br. 16 n. 7), the Complaint specifically alleges that "site visits" *are* a key and necessary tool for conducting due diligence. As FE 5 detailed, "site visits are important to make sure a company is real and not a shell company or a front" and "it was shocking that Silvergate did not conduct site visits, adding that if you would not travel to where the prospective customer is located, then you should not do business with a customer located there." ¶358. Additionally, the Complaint specifically demonstrates the significance of site visits: had Silvergate actually conducted this important and basic step of the due diligence process, it never would have banked FTX, North Dimension, Binance, and the other obvious sham entities. *See, e.g.*, ¶¶361, 368-71 (Alameda and North Dimension shared the same address as FTX); ¶376 (Binance's

---

[14] Defendants reach far outside the Complaint to rewrite FE6's account as merely reciting "whose hand typed the information" on beneficial ownership forms to argue that it was in fact "contemplated by regulation" that Bank employees would fill out customer forms. UW Br. 24; Dir. Br. 16. What 31 C.F.R. § 1010.230 actually says, however, is that the Bank can properly obtain the information "provided the individual [*i.e.*, the customer] certifies, to the best of the individual's knowledge, the accuracy of the information." FE6's account specifically notes the lack of such certification and the impropriety of the Bank's approach. ¶340.

PLAINTIFFS' OPPOSITION TO                    29                    Case No. 22-cv-1936-JES-MSB
SECURITIES ACT MOTION TO DISMISS

Key Vision Development Limited address was a massive warehouse—not the business office of an entity transacting in hundreds of millions of dollars in cryptocurrency).

**B.   THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 12 OF THE SECURITIES ACT**

Section 12(a)(2) claims may be asserted against statutory sellers, *i.e.*, anyone who "offers or sells a security," "by means of a prospectus" that contains an untrue statement or omission of material fact. 15 U.S.C. § 77l(a)(2). The Ninth Circuit has stated that, like Section 11, "Section 12(a)(2) is a virtually absolute liability provision." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Here, the Complaint amply states a claim under Section 12 because (a) the Offering Documents contained untrue statements and omissions of material fact, and (b) the Defendants are each "statutory sellers."

***First***, as discussed above (*see supra* at Section III.A.2), the Offering Documents issued in connection with the 2021 Offerings contained untrue statements and omissions of material fact. "The 'misstatement or omission' requirement under Section 12(a)(2) is materially identical to that under Section 11." *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *16 (C.D. Cal. July 3, 2023).

***Second***, the Securities Act Defendants named in the Section 12 count are "statutory sellers" because each offered or sold securities to Class members. A statutory seller includes not only traditional sellers—*i.e.*, individuals who pass title to another—but also certain individuals who engage in the solicitation of sales. *In re Violin Memory, Inc. Sec. Litig.*, 2015 WL 1968766, at *3 (N.D. Cal. Apr. 30, 2015).

***The Underwriter Defendants are statutory sellers.*** The Underwriter Defendants are statutory sellers because each directly passed title to Plaintiffs and Class members in the 2021 Offerings. The January, July and December 2021 Offerings were "firm commitment" offerings, through which the Underwriter

Defendants purchased shares from Silvergate and then sold them directly to shareholders. *See* Ex. B, ECF No. 71-5, at 168; Ex. E, ECF No. 71-8, at 437; Ex. F, ECF No. 71-9, at 497. The Underwriter Defendants also purchased and passed title to Class members of the securities issued in the March 2021 Offering. *See* Ex. D, ECF No. 71-7, at 321. *See Violin Memory*, 2015 WL 1968766, at *4 (finding underwriters who passed title through a firm commitment offering were statutory sellers under Section 12).[15]

The Underwriter Defendants are also statutory sellers because they solicited sales of Silvergate securities in the 2021 Offerings for their own financial benefit. The Complaint alleges that each Underwriter "promoted, solicited, and/or sold millions of Silvergate securities to Plaintiffs and members of the Class" and were "motivated by their own financial interests." ¶444. No more is required to allege that the Underwriters were "statutory sellers" under Section 12 at this stage. *See, e.g.*, *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *18 (C.D. Cal. June 9, 2016) (finding underwriter who "offered, promoted, and sold" securities in the secondary offering in which the plaintiff purchased shares were statutory sellers under Section 12); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 926 (N.D. Cal. 2015) (finding underwriters who transferred title to class members, solicited purchases, and were financially benefitted thereby were statutory sellers under Section 12 (collecting cases)); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (finding underwriters who "solicited and sold WaMu securities to members of the Class" were statutory sellers under Section 12(a)(2)).

In response to the Complaint's allegations, the Underwriter Defendants contend that Plaintiffs should have been more specific about which Underwriter sold

---

[15] Defendants' cases are once again in accord. *See, e.g.*, Dir. Br. 6 (citing *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *7 (W.D. Wash. Dec. 29, 2008) (finding underwriters who "passed title of the securities pursuant to a firm commitment underwriting" were statutory sellers under Section 12)).

securities to which named plaintiff. UW 14-15. But courts routinely reject this precise contention. *See Violin Memory*, 2015 WL 1968766, at *4 (rejecting defendants' argument that plaintiffs must plead which particular underwriter sold them the securities for Section 12 claim); *DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *19 (C.D. Cal. July 20, 2005) (same); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 509 (W.D. Wash. 2009) (same). Indeed, the Second Circuit rejected Defendants' very argument last month in *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 2023 WL 5419147, at *1 (2d Cir. Aug. 23, 2023). There, the underwriters argued, as here, that "the purchaser of a security must in its pleadings specifically identify which underwriter sold the security at issue in order to have standing to sue that underwriter." *Id.* at *14. In rejecting Defendants' precise argument, the Second Circuit explained that the plaintiff had "adequately established standing under Section 12(a)(2) by alleging that they purchased securities pursuant to the 'pertinent offering documents' or in the relevant offerings underwritten by the [underwriter] defendants." *Id*. at *15.

***Silvergate is a statutory seller*.** Silvergate is a statutory seller because under SEC Rule 159A, "the issuer of the securities" is a seller. Under SEC Rule 159A, "seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities." *See* 17 C.F.R. § 230.159A(a). SEC Rule 159A is clear that an issuer remains a statutory seller "regardless of the underwriting method used to sell the issuer's securities," such as a firm commitment sale, like here. *Id*.; *see Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 139-40 (2d Cir. 2017) (applying Rule 159A).[16]

---

[16] Defendants' cited case is in accord. *See* Dir. Br. 4 (citing *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012) (collecting cases that have accepted the SEC's rule that "an issuer qualifies as a statutory seller because by 'offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed,' the issuer 'can be viewed as soliciting purchases of the issuer's registered securities'")).

In its motion, Silvergate entirely ignores SEC Rule 159A in asserting that Silvergate must pass title directly to the Plaintiffs to qualify as a statutory seller. For its incorrect proposition, Silvergate relies on *Maine State Retirement System v. Countrywide Financial Corp.*, 2011 WL 4389689, at \*10 (C.D. Cal. May 5, 2011), in which the district court incorrectly found that SEC Rule 159A conflicted with *Pinter*. *Id*. at \*10. Courts have since repeatedly rejected this incorrect assertion. As the Second Circuit most recently explained in discussing SEC Rule 159A's validity: "*Pinter* acknowledged that, given the lack of clear guidance from Congress, statutory seller must include "[a]t the very least . . . the owner who passed title, or other interest in the security, to the buyer for value." *Nomura*, 873 F.3d at 139-40. Moreover, *Pinter* "observed Section 12 'is *not* limited to persons who pass title' for value and that related statutory terms 'are expansive enough' for Section 12 'to encompass the entire selling process,'" such as issuers. *Id*. at 140.[17]

In any event, even if Silvergate were not a statutory seller by virtue of being the issuer, Defendant Silvergate is also a statutory seller by virtue of its officers and directors signing the defective offering materials. ¶444; s*ee, e.g.*, *In re Nat'l Golf Props., Inc. Sec. Litig.*, 2003 WL 23018761, at \*8-11 (C.D. Cal. Mar. 19, 2003) (accepting allegations that issuer was statutory seller under Section 12 based on the active solicitation of a director who signed the defective registration statement).

***The Securities Act Executive and Director Defendants are statutory sellers***. The Securities Act Executive and Director Defendants are each statutory sellers because they all signed the Offering Documents and therefore solicited purchases of Silvergate securities in the 2021 Offerings. ¶¶444-45. "Many courts have found the registration statement is itself a solicitation document" and "the act of signing a

---

[17] Silvergate also relies on *In re CytRx Corp. Securities Litigation*, 2015 WL 5031232 (C.D. Cal. July 13, 2015) (Silvergate Br. 35), but there the plaintiff did not purchase shares in the relevant offering but merely "during the offering period." *Id*. at \*15.

registration statement . . . is at least suggestive of solicitation activity." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009); *see also In re Nat'l Golf Props., Inc. Sec. Litig.*, 2003 WL 23018761, at *8-11 (C.D. Cal. Mar. 19, 2003) (accepting allegations that director who signed defective registration statement (and issuer through him) actively solicited and were therefore statutory sellers under Section 12); *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. 2006) (accepting allegations that director who signed and prepared the false prospectus was statutory seller under Section 12).

In their motions, the Securities Act Executive and Director Defendants attempt to argue that their signature on the very documents that solicitated the sales of the securities at issue is "irrelevant" and fails "as a matter of law." Silvergate Br. 33-34; Dir. Br. 6-7. But Defendants base their reading of "the law" on outdated case law from decades ago, and which noted that courts at the time were mixed on the issue of whether a signature on defective offering documents was sufficient to plead solicitation. *See, e.g.*, *In re Harmonic, Inc. Sec. Litig.*, 2006 WL 3591148, at *13-14 (N.D. Cal. Dec. 11, 2006); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *18 n.17 (C.D. Cal. July 21, 2005). As noted above, many other courts have now weighed in, and courts now routinely find a signature sufficient to allege solicitation by officers and directors. *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 n. 3 (N.D. Cal. 2009) (collecting authority that far outweighs the authority cited by Defendants here, including *Harmonic* and *Rosenzweig*). And none of Defendants' other cited cases involved or addressed whether an officer or director who signed the defective offering document is a statutory seller under Section 12.[18]

---

[18] *See* Dir. Br. 7; SI Br. 34 (citing *Mehedi v. View, Inc.*, 2023 WL 3592098, at *12 (N.D. Cal. May 22, 2023); *In re AGS, Inc. Sec. Litig.*, 2022 WL 17406100, at *4 (D. Nev. Dec. 2, 2022); *In re Alliance Equip. Lease Program Sec. Litig.*, 2002 WL 34451621, at *9 (S.D. Cal. Oct. 15, 2002); *Countrywide*, 2011 WL 4389689, at *10).

At this stage in the litigation, Plaintiffs have adequately alleged each Defendant qualifies as a statutory seller. *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (the question of solicitation "is a factual question which should generally be left to the jury"); *Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. 2006) (same).

## C. PLAINTIFFS HAVE ADEQUATELY PLED VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

To state a control person claim, "the issue is whether the defendant exercised power or control over the primary violator, and the plaintiff need not show that the defendant was a culpable participant in the violation." *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id*. Plaintiffs allege that the Securities Act Defendants controlled Silvergate and "were able to, and did, control the contents of the 2021 Offering Documents." ¶¶456-60. Defendants do not challenge that they were "controlling persons" under the meaning of Section 15. Dir. Br. 17-18; SI Br. 35. Defendants' only challenge to the Section 15 claim is that Plaintiffs do not cite a primary violation. *Id*. Because Plaintiffs have pled primary Securities Act violations (as detailed above), Plaintiffs have adequately stated claims under Section 15.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions should be denied in their entirety. If, however, the Court grants any part of those Motions, Plaintiffs request leave to amend under Federal Rule of Civil Procedure 15.

Dated: September 8, 2023

Respectfully submitted,

*/s/ Carol V. Gilden\**

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Carol V. Gilden (*pro hac vice*)
cgilden@cohenmilstein.com
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Tel: (312) 629-3737

-and-

Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
S. Douglas Bunch (*pro hac vice*)
dbunch@cohenmilstein.com
Jan Messerschmidt (*pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (*pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice*)
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

*/s/ Jonathan D. Uslaner*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

John J. Rizio-Hamilton (*pro hac vice* pending)
johnr@blbglaw.com
Shane D. Avidan (*pro hac vice* pending)
shane.avidan@blbglaw.com
Nicole Santoro (*pro hac vice* pending)
nicole.santoro@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the proposed Class*

\*All electronic signatures ("*/s/*") are signed with consent of counsel pursuant to Section 2(F)(4) of this Court's Electronic Case Filing Administrative Policies and Procedures Manual, as of July 24, 2023.