UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IN RE:                                    )
SILVERGATE CAPITAL CORPORATION            )
SECURITIES LITIGATION,                    )
                                          )   No. 22-CV-1936-JES-MSB
                                          )
                                          )   November 29, 2023
                                          )
                                          )   Courtroom 4B
_____)         San Diego, California

TRANSCRIPT OF PROCEEDINGS
(Motion Hearing)


BEFORE THE HONORABLE JAMES E. SIMMONS JR., DISTRICT JUDGE


COURT REPORTER:            AMANDA M. LeGORE
                           RDR, CRR, CRC, FCRR, CACSR
                           U.S. District Court
                           333 West Broadway, Suite 420
                           San Diego, CA 92101
                           amanda_legore@casd.uscourts.gov

Reported by Stenotype:  Transcribed by Computer

APPEARANCES:

FOR THE PLAINTIFF:        JONATHAN USLANER
                         LAUREN MICHELLE CRUZ
                         Bernstein, Litowitz, Berger, et al.,
                         2121 Avenue of the Stars
                         Suite 2575
                         Los Angeles, CA   90067
                         (310)819-3480
                         jonathanu@blbglaw.com
                         lauren.cruz@blbglaw.com


                         BRENDAN SCHNEIDERMAN
                         STEPHEN BUNCH
                         Cohen Milstein Sellers & Toll PLLC
                         1100 New York Avenue NW
                         Fifth Floor
                         Washington, DC   20005
                         (781)572-0456
                         bschneiderman@cohenmilstein.com


                         CAROL GILDEN
                         Cohen Milstein Sellers & Toll PLLC
                         190 S. LaSalle Street, Suite 1705
                         Chicago, IL   60603
                         (312)357-0370
                         egilden@cohenmilstein.com



FOR DEFENDANT
SILVERGATE:              JOHN STIGI III
                         Sheppard Mullin Richter & Hampton (LA)
                         1901 Avenue of the Stars, Suite 1600
                         Los Angeles, CA   90067
                         (310)228-3700
                         jstigi@sheppardmullin.com



FOR DEFENDANT DENNIS
FRANK:                   JONATHAN SHAPIRO
                         Goodwin Procter LLP
                         Three Embarcadero Center, Suite 2800
                         San Francisco, CA   94111
                         (415)733-6202
                         jshapiro@goodwinlaw.com

APPEARANCES:   (continued)


FOR DEFENDANT GOLDMAN
SACHS & CO. LLC:            JASON HEGT
                           Latham & Watkins LLP
                           1271 Avenue of the Americas
                           New York, NY 10020
                           (212)906-1200
                           jason.hegt@lw.com

(Wednesday, November 29, 2023; 9:01 a.m.)

P R O C E E D I N G S

THE CLERK:  Calling matter number one, 22-CV-1936, In Re Silvergate Capital Corporation Securities Litigation, for a motion hearing.

THE COURT:  All right.  Good morning, everyone.

THE ATTORNEYS:  Good morning, your Honor.

THE COURT:  Excuse me while I log into my computer for a moment.

(Pause, referring.)

THE COURT:  All right.  So this matter is on calendar.  There are multiple motions before the Court.

There -- I'll break them into different groups, as the parties have identified in their motions.

There's the Silvergate defendants' motions to dismiss.  The Frank and Campbell motions to dismiss.  And the underwriter defendants' motions to dismiss, along with the request for judicial notice from each of those defendant groups.

And then there's the plaintiffs' opposition to each of those motions to dismiss.  Well, the plaintiff lumped the opposition to the Exchange Act claims and Security Act claims. And then there's the opposition to the request for judicial

notice that was filed by each of the defendants as well.

I've reviewed all of the motions.  I reviewed the sealed documents that was also submitted, because I know the motions were redacted in several parts.  I reviewed everything.

I do have a few questions.  And I have a tentative for one of the claims.  And, frankly, I have some questions I would like the parties to clear up on the other.

So I'm going to lump them into the Exchange Act claims versus Security Act claims.  And here's my concern about -- the Exchange Act claims, my tentative is to deny the motion with regards to the Exchange Act claims for both Mr. Lane as well as for Silvergate.  I believe that the main dispute is more of a factual dispute that the Court has been asked to decide, which the Court cannot decide at this stage of the proceedings.  That's why I have the tentative, but I am able to be persuaded otherwise.  So I say it's a tentative but it's not a strong tentative.  And I'll let the parties argue further on that issue.

And in regards to the Securities Acts claims, I don't have a tentative.  And I don't have a tentative for this reason.  Based on the arguments of the parties, it is -- the Court believes that FRCP 9B pleading is required.  Because even though the acts themself don't require -- aren't alleging fraud but the entire complaint in the -- the Security Act claims are based on the alleged fraud of Silvergate and the misstatements

that the plaintiffs cite, which are based in fraud.  So based on that, the Court believes that the Security Act claims should be -- have heightened pleading as well.

And based on that belief, the Court is not sure that the heightened pleading has been met in regards to the underwriter defendant group, as well as to the Frank and -- excuse me.  Make sure I get this -- Frank and Robins -- Frank and Campbell -- excuse me -- defendant groups.

So that's my concerns.  That's my questions.  You can frame your arguments accordingly.  And these are the defendants' motions, so I'll let the defendants address the motions first.  And I'll let the -- whoever wants to go first can go first.

ATTORNEY STIGI:  Well, good morning, your Honor. We're on opposite sides from where we were.

THE COURT:  Yes.

ATTORNEY STIGI:  Okay.  Okay.  Your Honor, John Stigi from Sheppard Mullin, representing Silvergate Capital Corporation, as well as the -- what we call the Silvergate defendants in this case.

Your Honor read the papers, and so I don't want to to -- to rehash all of that.  And thank you for that.

I'll be focusing on the -- just on the '34 Act piece of this.  Mr. Hegt, from Latham, I think will be the one addressing the '33 Act or Securities Act issues.

THE COURT:  Okay.

ATTORNEY STIGI:  I will -- just because you mentioned that -- your concern with the '33 Act piece on Rule 9(b), affected the underwriter defendants and the two individuals, does that also mean it affects Silvergate and the other Silvergate --

THE COURT:  Well, obviously, it affects both.  But no 9(b) is required for the Exchange Act claims.  So it's not necessarily -- make sure I'm not mixing these up.  Yes.  For the Exchange Act claims, under 20, 10B, and 20A, 9(b) is required of the pleadings.  So the question is, frankly, whether it's been met or not.

ATTORNEY STIGI:  Right.

So the question I had, your Honor, before I get into the '34 Act piece, it wasn't clear to me if the -- if you are -- if your concern is that the '33 Act claim was not pled in accordance with Rule 9(b), would that affect all of the defendants on the '33 Act piece?  Or just the ones you mentioned?

THE COURT:  It will affect all of the defendants.

But here's the Court's real concern in regards to the other two defendant group of underwriters, as well as the two individual defendants.  Especially the two individual defendants who retired and left the company at some point in time.

And based on the information in the complaint, they're -- they're being held to account for these charges based on them signing the registration statement; as opposed to any additional acts that were committed.  So that's my big -- it's more of a factual concern for me, for those individuals.

But, obviously, 9(b) would apply to all, especially to your -- your defendant, your client group as well.

ATTORNEY STIGI:  Okay.  Forgive me.  I was just trying to make sure I understood --

THE COURT:  Okay.

ATTORNEY STIGI:  -- what you mentioned.

Anyway, let me address, if I could, the '34 Act claims.

As we explain in our briefs, your Honor, the theory of the case, as pled -- certainly, as -- as we read it -- was that Silvergate, despite being highly regulated and having a staff dedicated to compliance, diligence, and --

THE COURT:  And I'm sorry.  I don't mean to interrupt.

ATTORNEY STIGI:  Yeah.

THE COURT:  And I understand the argument regarding the regulation by both the Federal Reserve as well as the state of California, the local agency that does the regulations.  But the problem -- and I don't doubt or discount any of that.  But that's more of a factual dispute with the -- in my opinion, of

the false -- alleged false statements that the plaintiffs are alleging.

And -- well, here's the ultimate question, I guess, it will all come down to.  And, obviously, that will be if the Court proceeds on the tentative that I had indicated earlier. Whether there would be sufficient information to survive summary judgment motion, I don't know, because I don't know what the facts are going to uncover.

But potentially, with all of the claims that you're making in regards to the regulation, potentially that might be enough that it may not survive summary judgment.  But I can't prejudge that without knowing what discovery comes out.

ATTORNEY STIGI:  Understood.  Totally understand your Honor's view on that.

I think, though, that -- and what I would like to really emphasize is that unlike, you know, a typical case, we have the PSLRA.

THE COURT:  Yes.

ATTORNEY STIGI:  Which -- and your Honor certainly acknowledged Rule 9(b) here.  The PSLRA, as you know, takes it one step further.  Well, two steps further, if I could.

There's two pieces to the PSLRA.  Right?  There's 78U-4B1 and B2.  B1 has three pieces.

THE COURT:  I'm sorry for interrupting again.

But I know you addressed this in your motion and the

plaintiff responds to this, and I would love to hear a little bit more from both sides regarding the scienter element that's required under PSLRA.  Because it's a close call, frankly, as to whether the scienter that is required to be imputed on the Silvergate defendants is sufficient based on the pleadings, based on the former employees that are referenced by the plaintiffs.  Especially when looking at their actual relationship.  Especially to Mr. Lane, in regards to imputing the knowledge upon him that would be required.

ATTORNEY STIGI:  So -- yes.  And so B2, of course, is the scienter piece.  And then the *Tellabs* case tells us what that means.  Right?  What scienter means.

But the other piece I do want to highlight here, your Honor, is it's in B -- 78U-4B1.  And it's the provision of that part of the PSLRA which states that if an allegation regarding the statement or omission is made on information and belief, the claim shall state with particularity all facts on which that belief is formed.

Now, it's that piece of 78U-4B1, which applies to any allegation made on information and belief.  It's what we call the all-facts requirement.  It applies both to falsity and scienter.  Because, of course, any allegation in this case made by a lead plaintiff, the representative plaintiff, is going to be made on information and belief.

But here, I think, is the important point.  There are

some allegations of former employees which, themselves, are made on information and belief.  For example, for several of them, the belief that they would have known a fact if it existed.  That's a statement of belief.  Call it speculative. But let's stay focused on the -- on -- on the PSLRA.

That is a statement of belief.  So what facts are alleged to support that statement of belief?  And, here, we don't have anything.  Or at least not enough.  We don't have enough about whether the position of that former employee would put them in a position to know the thing they say they don't know.

We don't have, as your Honor noted, details about communications -- direct communications about the very issues that we're talking about here with Mr. Lane.  At most, if memory serves -- and I don't want to belabor it.  We go through it in our briefs on some of the details here.  But the FEs attended large meetings where Mr. Lane may have been there. And they say compliance or diligence never came up.

None of that connects the dots sufficiently under the PSLRA.  And I would commend your Honor to *Endologics*, to *Zucco,* to *Metzler*.  To any number of Ninth Circuit decisions that parse through these FE or CW allegations with that level of detail, to see if those dots are connected.  To -- to actually show the information, the alleged true information is actually in the head of the speaker.

So that's an important point.  And so when analyzing the FEs, if there's ever a -- an allegation attributed to an FE that is essentially on information and belief, you've got to look at this next level of facts in order to satisfy the all-facts requirement.

And here's -- here's something else I would just like to mention.  Again, within the all-facts requirement.  The Ninth Circuit certainly makes clear that if the plaintiff doesn't meet the all-facts requirement -- and there was some litigation, years ago, as to whether "all facts" meant the word "all."  It's sufficient facts from which the Court can allow the -- the claim to proceed.

But what does that mean?  What is sufficiency of facts in a case like this?  And the -- the answer to that is found in *Tellabs*, and in cases such as *Ronconi* and *Vantive*.  Those are two Ninth Circuit decisions.

*Tellabs* tells us that those facts for the scienter piece, those facts must give rise to an inference of scienter that is both cogent and at least as compelling as any opposing inferences.

What is "cogent?"  Well, *Merriam-Webster* will say cogent is persuasive, plausible, sensible.  A cogent inference is one that -- we use "plausible" in our belief, but it's "cogency."

And that's when we come back to the implausibility of

a theory of scienter that would say that a bank would spend three and a half years doing no diligence -- right? -- no compliance, and no monitoring.  That it would be undisclosed for three and a half years by regulators -- by auditors.  By one of 400 employees never blowing the whistle over three and a half years.  That is an implausible theory.  Or, more to the point, a theory that is not cogent under -- under *Tellabs*.  And so the question is are there enough facts pled to lead to a cogent theory of scienter here.  And, as we explained, we don't believe it is.

And that's not a factual dispute, your Honor.  It's the absence of facts pled that matters.  And -- and the *Lipton* case, which is cited in *Endologics* -- if memory serves -- talks about that.  And that, also, was with respect to *Silicon Graphics*, which says that when you look at a securities complaint, the absence of those additional details matters as to whether the inference -- the strong inference of scienter can be met here.

There's one other piece of this.  And I mentioned *Ronconi* and *Vantive*.  That also provides the Court with guidance as to what it means for there to be sufficient facts to support the inference of scienter.  And, frankly, it applies to falsity as well.

And, in those cases, the Court dismissed the complaints because the alleged true facts -- in this case it

would be the -- whatever facts are -- are attributed to former employees, or whatever else.  The alleged true facts in those cases were not necessarily inconsistent with the alleged false statements.

Those two cases -- and they've been applied many times since then.  Again *Endologics* and scienter on *Ronconi* most recently.  Those cases provide guidance to the Court as to what is sufficient.  Do the FE allegations -- the factual ones, not the belief ones -- the factual ones, do they provide facts that are necessarily inconsistent with the alleged false statements?

Although here, of course, with a do-nothing theory.  Right?  The -- the theory of the case that the -- the true facts, if you will, are that the bank did nothing in terms of diligence, monitoring, and compliance.  Do those facts provide a cogent and compelling inference of that?  Are they consistent with the do-nothing theory?  And -- and they are not.

Now, the plaintiffs, in their opposition, argue that that was not their theory of the case.  That it was not a do-nothing theory.  It was a not-a-good-enough theory.

Okay.  I can address that as well.  Let's assume, for the sake of argument, the theory is they didn't -- that the bank didn't do enough in terms of diligence, compliance, and monitoring.

Okay.  That theory, less implausible, that can

happen.  But then the question is do the six former employees out of -- I don't know how many current former employees, as the bank is in wind-down, do they provide the necessary facts, the sufficient facts that are necessarily and consistent with the statements?

And, here again, *Ronconi* and *Vantive* provide a lot of help for the analysis here.  After all, a bank can have -- or a company can have -- robust procedures.  That's not a guarantee to be perfect.  No one would think that.  No investor would think that could be -- of course, there are express warnings that systems are not a guarantee against any -- any flaw or -- or room for improvement.  And some of the FEs, themselves, talk about improvements being made to various compliance procedures.

So under either theory, do nothing or not good enough, the -- the FE allegations -- not a factual dispute. We're very clear.  We're not saying -- we're not arguing -- certainly, at this stage of the proceedings -- that the former employees are lying.  Or that they -- that there is a factual dispute here.  It's a sufficiency argument, your Honor.

THE COURT:  And I get the distinction.  And I know that you went -- broke down each former employee individually. And one of which was not even there during the class period, who worked in the unit that would have done the diligence that the bank is alleged to have not done or not done to a good enough level.

And it brings up some good questions -- and I'll obviously talk to the plaintiffs about in regards to some of the statements of these former employees.  Especially, like you said, in regards to these former employees have to have sufficient information to connect the scienter element to Mr. Lane.  Which, frankly, is -- is not the strongest.  And we'll have more discussions about that when I speak with -- when the plaintiffs argue.

ATTORNEY STIGI:  And that specific point is especially relevant to the not-good-enough theory of the case.

You can imagine the world if -- if the bank literally did nothing -- right?  Mr. Lane hired a BSA department to sit and twiddle their thumbs for three and a half years.  I mean, that would be a pretty obvious thing if that happened.

Not good enough -- again, *Ronconi*, come back to that.  Great statement in *Ronconi*:  Problems and difficulties are the daily work of business people.  The fact that they exist is -- does not necessarily make a fraud.  You've got to compare the statement, the alleged true facts, look for necessary -- necessary inconsistency.  Then look at cogency.  Then look at the relative compelling nature of the inference of fraud versus not fraud.

Those steps need to be taken for each statement, each former employee, each other allegation to support an inference here.  And the Ninth Circuit cases do that.  Just, again, for

guidance as to the process here of analyzing all of the allegations for their sufficiency.

The -- just make sure --

(Pause, referring.)

ATTORNEY STIGI:  Have a couple of points here.
Theory.  Yeah.

So the -- the couple of other points, just with -- focus on the former employees, as we should.  That's the meat of the -- of the case.

There are other allegations that plaintiffs make in terms of the existence of the FTX fraud and what happened there.  A handful of other customers that the plaintiffs allege also had difficulties.

Most of those, if not all of those nonFE allegations to support an inference of fraud here, are fundamentally hindsight.

THE COURT:  I agree with you.

ATTORNEY STIGI:  And so -- and, again, fraud by hindsight being the main culprit that the PSLRA was intended to -- to defeat.

I mean, coming back to the all-facts requirement, I believe it's *Silicon Graphics* which indicated that this all-facts requirement is the most important piece of the PSLRA to guard against claims of fraud by hindsight.

So at bottom, Judge, our view is that the more

compelling inference here, more compelling inference of scienter or fraud, is actually what the government itself alleged in Superseding Indictment of Mr. Bankman-Fried.

Now, Mr. Bankman-Fried committed bank fraud against Silvergate, and did so precisely to evade Silvergate's diligence monitoring and compliance profit -- processes.

And any factual issues with whether those processes were good enough only get to be litigated after the plaintiffs have met their burden under the PSLRA to provide that cogent and compelling inference that somehow the bank was either complicit with or was separately committing some fraud when this unfortunate event happened.

I would compel -- or, excuse me, commend the Court to the *Smallen* case from the Tenth Circuit.  Fairly recent decision.  We cited it in our briefs.  It's Tenth Circuit, but it's still upon the PSLRA, with the same rigor as the Ninth Circuit.

That case is -- is most interesting because it involved a bank.  It involved compliance procedures.  And it involved fraud using the bank's compliance or -- or evading the bank's compliance procedures.  It involved a bank that actually was -- was hit with fines, et cetera.  And, yet, the court granted the motion to dismiss.

I think looking for guidance here, again, on the process, we've got plenty of Ninth Circuit discussions that

show how far you go through; all of the different steps.  And certainly courts that have acknowledged that just because a bank's processes were used for fraud doesn't mean that they were, (A), insufficient at all, necessarily.  Again, necessary inconsistency.  Or make a fraud of the statements.

So I'll rest there, unless your Honor has other questions.

THE COURT:  I do not.  Thank you.

ATTORNEY USLANER:  Good morning, your Honor.

THE COURT:  I think the defendant is going to argue the other side of the --

ATTORNEY USLANER:  Would you like to hear both first, and then I can address -- whatever your Honor --

THE COURT:  Well, I'll hear both arguments first, and then we can address them.

ATTORNEY USLANER:  That is fine.  Thank you, your Honor.

ATTORNEY HEGT:  Good morning, your Honor.  Jason Hegt from Latham Watkins for the underwriter defendants.

I'll begin with your Honor's tentative.  And, of course, we -- we agree on the 9(b) point.  And just to make the record a bit further, I think the Ninth Circuit's been very clear.  It's *Rubke v. Capital Bancorp*, 551 F.3d 1156, that -- where there are the same factual allegations in both the Exchange Act and the Securities Act claim.  The claim sounds in

fraud, then 9(b) applies.

And, here, the relevant alleged misstatements and the Securities Act claim -- and I'm going to come to them in a second -- are in paragraph 336 of the complaint.  There's five categories:  A, B, C, D, and E.  And those overlap, respectively, with paragraphs 3, 50, and 42 from the Exchange Act claims.

So there is one-to-one matching in the subject matter of misstatements.  The -- the confidential witnesses, the former employees are the same, supporting both.  So, in our view, this is squarely within *Rubke*, and the same factual allegations in 9(b) applies.

We think the claim would fail under either, of course.  But particularly under Rule 9(b), there is nothing alleged about what our clients did, knew, saw, heard about any of these statements.  We are -- the underwriter defendants are noted as being underwriters of certain -- some of the offerings, and then there are sort of formulaic recitations of the claim that falls far short under Rule 9(b).  And -- and, again, for reasons I'll walk through under -- under Rule 8, as well.

The -- a couple of things, just to talk about the sort of general falsity question under either 9(b) or Rule 8.  Let's -- let's take a look at some of the statements.

So, for example, going to paragraph 336 of the

complaint, one of the claims is that Silvergate -- the complaint alleges that Silvergate had, quote, thorough reviews as part of its due diligence process -- sorry.  I don't know if your Honor is trying to get to the --

THE COURT:  No.  You can go ahead.  I'm catching up.  I'm running a little slow, but I have a copy with me.

ATTORNEY HEGT:  Okay.  And the complaint, essentially, attempts to show that this statement and the other five from the offering materials are false in two ways.  Right?  It's, number one, adverse customer events that occurred after the statements were published.  And, number two, the former employees.  I'm going to talk about each one in turn.

The adverse customer events -- this is what we just talked about.  It's hindsight, of course.  But more to the point -- and I'm focused on the offerings materials because the Securities Act claims turn on the offering materials.  Right?  We talked a bit about, sort of, three and a half years of statements.  That's true of the 10B claim.  The Securities Act claim is very narrow.  It is -- these are the offering documents (indicating item).  They must allege a material misstatement in these offering documents, and it's a very narrow set of statements.

And so if you look at what the offering documents actually said -- and that's Exhibit A, which is -- sorry to make your Honor go to another document.  But it's ECF 71-4, at

page 27.  That's where the "thorough reviews" language comes from.  But what the -- what the document actually says -- and I can pause, if you're --

THE COURT:  No, no.  I actually read it last night, so you can continue.

ATTORNEY HEGT:  Okay.  What the document actually says -- and this is excerpted.  But it begins by saying, well, we believe that our risk management and compliance framework, which also includes -- and here's where the complaint begins --

> "Thorough reviews we conduct as part of our due
> diligence process, either in connection with
> on-boarding new customers or monitoring existing
> customers."

The complaint ends but the offering document continues, to say:

> "While we believe the process just described is
> reasonably designed to detect any such illicit
> activities conducted by potential or existing
> customers, we cannot ensure that we will be able
> to detect any such illicit activity -- illegal
> activity in all instances."

In other words -- right? -- far from proving plaintiffs' point that customer misconduct must mean there were no procedures in place, Silvergate in fact -- the very disclosures they're challenging warn, we have procedures, and

there may still be incidents of customer misconduct.  And so that really leaves plaintiffs, in our view, relying on the former employees.

And, again, through the lens of the offering materials -- these offering materials were 2021.  Each of them -- and we'll talk about some of the differences between them.  But there were four offerings:  January, March, July, and December.  Each involved a slightly different group of defendants.

But the point is that's the time period we're talking about.  And they have to allege, for each of the offerings, there was something materially misstated at the time of each individual offering.

The former employees simply don't line up with the offering.  So we talked about that.  How they don't line up with the class period more generally.  But it is even more stark with regard to the offerings.

So former employee 1 and 2 stopped working at the bank before the first offering.  And that's -- former employee 1 stopped in December of 2019.  Former employee 2 stopped in June of 2019.  So, you know, more than a year before, in the case of each.

Former employee 3 and 5 didn't join until after the 2021 offerings.  In some cases, substantially later.  One was May of '22.  One was March of '22.  And the others, one was

there for a ten-year period.  The other was there, I think -- I don't have that one with me.  But there's no allegation that what they saw was relevant to what was disclosed at the time of these particular offering documents.

So, for example, FE 4 was there for a ten-year period.  And alleged that at some point during that period, Silvergate did not investigate when it received reports of unauthorized transactions.

The complaint doesn't say one instance of when that had happened.  Doesn't say if that changed over time.  There's nothing that would connect that.  So even under Rule 8, there's just nothing that would connect that to the statements that are in the offering materials.  And certainly, under Rule 9(b), there's absolutely nothing that would say what it is that our clients saw, knew, did with regard to that information.

So I'll sort of pause there on the falsity points, unless the Court has any questions on that.

THE COURT:  I do not.

ATTORNEY HEGT:  So that -- the other point -- and maybe I'll wait until our colleagues have addressed it.

But the other point that we think is significant on the '33 Act claims is the trace and point that's in our briefing.  And I just wanted to mention it in case the Court had any questions.  But I may reserve on that issue until the plaintiffs have raised it.  I think the -- the central point,

from our perspective -- again, it comes back to -- unlike the 10B claim, which can be brought by any holder -- any purchaser, excuse me, of the securities during the class period, these claims are limited.

Now, I don't -- the plaintiffs are the master of their complaint.  They chose to bring not a 10B claim against my clients.  They chose to bring a Section 11 claim.  And that requires connecting back to these offering documents (indicating).

There's a debate about whether plaintiffs purchased directly in the offering.  There's a lot of back and forth.

THE COURT:  I noticed there's declarations, at least in the complaint, regarding two of the plaintiffs purchasing during the offering period.  And one -- I'm trying to recall off the top of my head.  Because, like I said, I read the complaint again -- the consolidated amended complaint last night.  But one was, I think, Bucks County, purchasing, I believe, in January of 2021.

And the other -- I can't recall the other plaintiff. But they purchased, I believe, in December of 2021.  And I believe the plaintiffs are trying to have a represented class for the other two periods that were -- that there were postings.

And I believe the Bucks County purchase, on the day at the -- the price that was -- that -- the price that was

actually listed for the offering that day.

So I understand your argument.  But there was some information in the consolidated amended complaint that there were offering purchases on the days or during the periods of the offering periods, for the price that they were listed for.

ATTORNEY HEGT:  That's right.  And I think there are a number of cases saying that that's not sufficient.  I think that the -- the most extensive of which recently is Judge Tigar, from the Northern District, in *Magnachip*.  And the *Skillz*, as well, makes the same point, actually.  That's more recent.

But to step back on this point, *Century Aluminum* is the governing framework here.  And it sets out two ways that you can show Section 11 standing, one of which is purchase directly in the offering.  And if not, if you're in the aftermarket, you have to trace back.

There's a very easy way to show directly in the offering.  My clients were the underwriters of all of those offerings.  You allege you purchased from them.  Right?  We have the shares on moment one.  And it's very conspicuous that there is no -- they purchased directly in, but plaintiffs are not able -- and we don't think are able -- to allege that they purchased from our clients.

The Fourth Circuit, in a case --

THE COURT:  I know you're going to go to the Fourth

Circuit case.  While you're looking for that, what about the *Bio Innovations* cases?  I know it's an Eastern District case.  So it's persuasive.  It's not binding on this Court.

But it talks about when you purchase within the offering period, there is a strong inference that the Court can draw that you purchased the shares on the date of the secondary offering, at the offering price, that that's sufficient at least to survive the motion-to-dismiss phase.

ATTORNEY HEGT:  Yeah.  So I think two things on that.  One, I think the -- the *Marrone* case, itself, was disagreeing with *Magnachip*, and, you know, I think the reasoning in *Marrone* is -- you know, it's a paragraph or two.  And I'm not sure there's a whole lot there for me to -- I am not sure where the Court was on that.  There's not a lot I can say or respond to it.

THE COURT:  Like I said, it's not binding.  It's just persuasive but it's not binding on this Court.  So --

ATTORNEY HEGT:  What I would say is, since *Marrone*, there's been an important development in the area, which is the *Slat* case that went up to the Supreme Court.  Right?

I mean, there -- perhaps before that -- that case there was a disagreement or differing views.  And, clearly, right -- I think that was -- I can't remember the judge.  But that Judge Tigar and the *Morrison* judge had differing views on *Century Aluminum* and tracing.

The Ninth Circuit itself, in *Slack*, had differing views.  Right?  That was a divided panel that went up.  The Supreme Court sent it back -- 9-0 -- and said -- slightly different context.  But they said no.  It -- and the Slack plaintiff claimed he purchased on day 1 of the direct listing.  He said he bought 30,000 shares on the day of the direct listing.  And he bought, you know, some later, after that.

And the Supreme Court said that's not enough.  You have to not -- not just show that it's possible that you've got new shares.  You've got to -- and this language was in *Century Aluminum* as well.  And it said you have to exclude the possibility -- yeah, you have to plead facts that, quote, tend to exclude the possibility that shares came from the pool of previously issued shares.  That's *Century Aluminum*, 729 F.3d at 1108.

So, you know, to the extent there was a -- a -- you know, two differing threads there -- and your Honor's right.  There were.  We think that the *Slack* decision breaks the tie.

And so, you know, briefly, the -- there's two offerings in which the plaintiffs claim to have purchased directly in.  Right?  There's a -- and the *Conagra* case from the Northern District of Illinois is another one on this point, which is directly -- and it's just reciting the legal standard.  A fact that would show you purchased directly in would be to allege -- and plaintiffs must know for whom they purchased.

Right?  We're having this whole debate.  And they have a binder full of things that they're about to give you, of all sorts of stuff outside of the complaint.  Offering prices on -- market prices on the day, and a number of ways to back into what should be a very simple thing.  If you purchase directly in the offering -- lots of cases have this -- an allegation that they purchased directly from my clients.  Absent that, we're in the aftermarket scenario contemplated in *Century Aluminum*.

And so I think our view is that there's no -- that's the two offerings where they claimed to purchase.  The two where they don't gives an easier case.  Right?  There's no -- that's March and July.

Each offering needs to be evaluated on its own.  Each has different defendants.  Each is a separate registration statement.  There was a bit of back and forth.

THE COURT:  And understanding.  But if the Court finds that at least one has been -- occurred, isn't that sufficient to support the one cause of action?

ATTORNEY HEGT:  No, your Honor.  Because each -- it has to be with regard to each registration statement.

So, in other words, there is no -- to take an example -- and I may get the defendants wrong.  But there is no cause of action against Citibank, if they're not in the one where -- if they were not an underwriter of the one where plaintiffs have standing.  Right?  The individuals changed as

well.

So, you know, it's not -- I understand, you know, plaintiffs have sort of blurred it together in the complaint, but there are different financial institutions and different individuals on each registration statement.  And, you know, the facts evolve a bit over time.  Right?  So whether they're -- that's not what we're here to do today.  But we could get to a place, down the road, where -- if any claim survived, where, you know, the statement was true as of this date but not true as of another.

So, no.  I mean I think each registration statement is judged on its own.  And the -- the -- not to get too deep into the weeds on this and put everyone to sleep.  But that it's -- it's item 512 of regulation SK, which is the S.E.C. rule.  The parties cite this a bit.  But it's very clear.  And it says:

> "For purposes of determining any liability under the Securities Act of 1933 each such post-effective amendment" --

-- meaning each prospectus that amends the registration statement, so each of the offering documents that we're dealing with --

-- "shall be deemed to be a new registration statement relating to the securities offered therein."

And there are a number of cases that have dealt with it, one by one, because liability is registration statement by registration statement.

I mean, that was also another line in the Supreme Court *Slack* opinion, where they said, you know, liability is not on any or all registration statements.  Liability is on the registration statement.  That's why we have tracing.  Right?  In other words, you've got to -- the whole premise of the Securities Act is the claim only exists for the person who can walk into court and say I have identified a material misstatement in this book, and I purchased pursuant to this book (indicating).  And it doesn't -- it -- there's no transitive property that, you know, my friend purchased pursuant to a similar book, a similar statement a year later.  It's -- you know, we didn't pick this claim.  This is the claim that was brought.  But on the Section 11 claim, this is the framework that exists.

THE COURT:  All right.  Thank you.

ATTORNEY HEGT:  Thank you, your Honor.

ATTORNEY SHAPIRO:  If I may, your Honor, just on behalf of the retired directors?

THE COURT:  Sure.

ATTORNEY SHAPIRO:  Thank you.  I believe this will be briefly, because there's not much to say.

So as your Honor noted -- Dennis Frank, Robert

Campbell -- these are former directors.  They were very involved back in the Clinton administration, when the bank was founded.  But that's not this case.  In this case, they are alleged to have done precisely two things.  The first is sign a registration statement on January 20th, 2021.  And then they're alleged to have done it again; sign a registration statement on July 28, 2021.

And that's the only thing they're alleged to have done before they retired in June of 2022.  Which we also note, your Honor, was a full six months before Sam Bankman-Fried and FTX and all of that entered the lexicon, and nine months before the close of the class period.

We put before you, your Honor, a motion that has both a substantive reason why these very narrow rifle-shot claims against our clients -- Frank and Campbell -- should be dismissed, and a standing reason.

I won't address the substantive reason because we briefed it, and your Honor already addressed it with respect to 9(b).  Suffice to say we don't think that they pled contemporaneous falsity on those two dates:  January 20th, 2021, and July 28th, 2021.  We don't think they did it under 8(a).  We don't think that the plaintiffs have done that under the lower, but still meaningful 8(a) standard.

Certainly don't think they've done it under the Rule 9(b) standard.  And that's the subject of the prior argument

and your Honor's tentative.  So pushing aside the substantive argument.

We would also submit to the Court that Frank and Campbell should be dismissed because there's no standing to bring the two '33 Act claims against them.  And those two claims are brought under Section 12(a)(2) and Section 11.

As to 12(a)(2), they sued the wrong defendants.  You have to be a, quote, statutory seller, close quote.  We quote -- we've directed your Honor's attention to numerous authorities.  Signing a registration statement -- which is what things like senior status directors do all the time -- is never enough to be a statutory seller.  There needs to be a plus factor.  Personal gain, active solicitation, placing phone calls.

Give you one case, then move on.  The *FAT*, F-A-T *Brands* case, Central District of California, 2019, and others.  Just signing it is not enough to be a statutory seller.  And, on that basis, the Section 12(a)(2) claim -- which is Count IV -- ought be dismissed against Frank and Campbell.

As to the Section 11 claim, they have the wrong plaintiffs.  We've all heard about the tracing.  These gentlemen have only signed two of the four registration statements at issue in this case.  This tracing rule, this is like super-rigid technical test.  It's a super-high bar.  We don't write the law, but we certainly like to defend against it

because it's that hard and that explicit a standard.

So as to -- as to the two registration statements that Frank and Campbell signed, the July 20, 2021, registration, that one needs to leave the room because the plaintiffs aren't even alleging at the same price or that they bought anything out of that offering.  They're not even incanting the magic words.  Not that we would ever say that's enough.  But they haven't even said it.  So that's the July 20, 2021, registration statement.

And that leaves standing the Section 11 claim against Frank and Campbell, based on the January 2021 registration statement.  And on that one, Judge, we just submit that it just flunks the super-strict test.  Counsel's already argued it.  There were 18-plus million shares in the market before that statement.  They have no pleading basis that would pass muster, we think, under even 8(a), to connect their purchases to anything in January 2021, as opposed to the 18 million shares that were already floating out there.  That's the *Skillz* case, Skillz with a Z.  Also the *Magnachip* case.

And on that basis, your Honor, we would ask that the Court dismiss the claims against Mr. Frank and Mr. Campbell, the retired directors.

THE COURT:  Okay.  Thank you.

ATTORNEY SHAPIRO:  Thank you.

ATTORNEY USLANER:  Good morning, your Honor.

THE COURT:  Good morning.

ATTORNEY USLANER:  Jonathan Uslaner from the law firm of Bernstein, Litowitz, Berger & Grossmann, and for the lead plaintiffs.  I'm joined with my colleagues.

Your Honor, this case presents well-founded and straightforward violations of the federal securities laws. Arguments you've heard from defendants present fact-intensive disputes that cannot be resolved at the pleading stage.

The evidence, your Honor, is overwhelming, even at the pleading stage.

The defendant, Silvergate, failed to conduct the vetting and monitoring procedures that they specifically told investors were mission critical and the, quote, cornerstone to the bank's success.

Silvergate is now subject to a cease and desist order from the Federal Reserve, which explained that Silvergate, quote:

"Had been the subject of numerous deficiencies found by the Federal Reserve regarding the safety, soundness, and compliance with the banking rules and regulations."

Silvergate, during the class period, received a Federal Reserve reprimand in the form of an MRIA --

ATTORNEY STIGI:  Your Honor -- and forgive me.  But there's confidentiality concerns and, indeed, the motion to

seal. If we're going to get into any details on what Mr. Uslaner has said, we would ask the courtroom be cleared of any nonparties and counsel, if -- if we're going to go on with that.

ATTORNEY USLANER: We absolutely are going to go on with that, your Honor. To the extent your Honor is inclined to seal the courtroom, we'd be agreeable to that.

THE COURT: Well, I have several people in the audience. I don't know who is associated with whom, who's sitting in the audience.

I don't know if you have colleagues who are here with you or just sitting in the audience or not for either side.

ATTORNEY STIGI: I know we have several colleagues here, but I don't know everyone in the room.

THE COURT: Okay. So can you highlight who your colleagues are, and then we'll figure out who the other individuals are.

ATTORNEY STIGI: Yes. With me, Ms. Macarr from my office, and Mr. Bonino, who is a former general counsel of Silvergate; who is observing today.

ATTORNEY SHAPIRO: And, your Honor, Mr. Thompson, sitting right here, is a client of mine.

THE COURT: Okay. And --

AUDIENCE MEMBER: I'm associated with -- with a party, Mr. Alan Lane.

THE COURT:  What do you mean by "associated with"?

AUDIENCE MEMBER:  Counsel.

THE COURT:  Okay.  All right.  And that's my law clerk.  So it looks like everybody who's currently in the courtroom are associated with this case.  So the Court will order --

Do we have people listening in on line?

THE CLERK:  No.

THE COURT:  Okay.  We don't have anybody listening in.  So the Court will order that this section of the proceeding will be sealed.  The transcript will be sealed as well.  And then you can go into your arguments regarding to information that has been sealed already.

And once you complete that argument, then I will unseal the transcript.  And then we'll continue with the argument, for -- for the rest of the argument.

ATTORNEY USLANER:  Thank you, your Honor.

THE COURT:  Thank you.

(Whereupon, sealed proceedings were held and not transcribed herein.)

THE COURT:  So we are going to unseal the transcript from this point forward.

Thank you.

ATTORNEY HEGT:  And that's actually a perfect segue of a lot of what we've been discussing has nothing to do with

the Security Act claims.  Right?  There were -- and I started jotting them down.

Starting with some of the alleged false statements.

I heard John -- Mr. Uslaner say things like "mission critical," "cornerstone of success."  Those aren't phrases that appear in this -- in these documents (indicating).  Right?  So -- and not to be, again, very literal about it.  But the claim on the '33 Act was what was in the written material.

And the claims -- the phrases in the written material were quite narrow.  So to put aside a lot of the phrases that were -- were mentioned in argument, and return to the written material -- for example -- right? -- we looked at Exhibit A, page 27.  That was the thorough reviews one.

And it said, you know, we believe -- I don't have it in front of me at this point.  But, you know, we believe that the -- the reviews are thorough, but they may not detect all instances of -- of customer misconduct.

Again, then limiting to just looking at that statement, what is alleged that renders that false?  We've got six confidential witnesses, four of whom didn't even work at the bank at the time.  So there was all of this discussion about what the CWs knew, and what meetings they might have been in.  Two-thirds of them weren't even at the bank at the time the offering documents were published.  And nothing that they've said renders any of those statements materially false

or misleading.  And so from our perspective -- right? -- there -- the other phrase I wrote down was "mountain of evidence?"

The Securities Act claims are, you know, barely two dozen pages at the back of the complaint.  And most of it is just repeating the statements from the earlier part of the complaint.  There is not a lot there on those -- on those narrow statements.  I mean, they don't come anywhere close on 9(b) or -- or, frankly, even under Rule 8.  Although, under *Rubke*, I think we're very, very clearly in Ninth Circuit -- in Rule 9(b) territory.

And that should be the end, on -- on the Securities Act claims.  But I will address, just very briefly, a couple of points on tracing; if your Honor will indulge me.

So on -- excuse me.  On standing, rather.

So turning to the plaintiffs' binder -- and, first, I'm going to talk about standing under Section 11 for the two offerings in which plaintiffs allege to have purchased.

Looking at paragraph 418 as an example.

THE COURT:  Tab 2?

ATTORNEY HEGT:  Sorry.  Tab 2.  That's right.

THE COURT:  Thank you.

ATTORNEY HEGT:  There's no factual allegation there that says -- and they've highlighted this in red.  It's simply asserting a legal conclusion.  We purchased in the offering is

what they want the Court to conclude.  Those aren't -- those aren't facts.  Right?

What's highlighted in red is what they want you to find.

The fact that might get the Court there is what the *Conagra* case said or what the Fourth Circuit case I mentioned earlier said; which would be, you know, we've got a whole binder and a blizzard of facts as a substitute for what they can't allege.  Which is in the offering -- meant us.  We did the offering.  The underwriters were the ones who conducted the offering.  It's our names that are on the cover of the prospectus.  And if you purchased in the offering, you purchased from us.  There's no other -- there's no other way to purchase directly in the offering.  The securities title was passed to us, and if you wanted to purchase in the offering, you purchased through us.

This is what the Fourth Circuit said was a poor choice of words to avoid pleading a direct purchase.

The date issue doesn't save the claim, either, and that's two reasons.  One, so that their -- their pleading in paragraph 418 that they purchased on January 22nd, that if you look at paragraph 332 -- which was the paragraph the plaintiffs cited you to -- that says that the prospectus supplement that we're talking about was published on January 25th.

So, in other words -- this is the point.  They

purchased before the document was available; before the statement was published, before -- in other words, the purchase couldn't have possibly been made on something that didn't exist yet.  Right?  And there is -- this is precisely why the tracing requirement exists.

Nobody doubts that they purchased on -- at least at the pleading stage -- on the date they claim.  But they haven't offered anything to say, "I purchased in reliance on this document."  And, in fact, the pleading undermines it because the pleading says the prospective supplement came out on January 25th, and they are alleging that they purchased three days before.  Right?  Time-space continuum, they could not have purchased in reliance on the words that hadn't yet been published.

And -- and, third, they make the point about, well, we purchased at the offering price.  That's in tab 4.  And they bring in data that's not alleged anywhere in the complaint or, frankly, even in the opposition about what the market was doing on the day when they purchased.

Number one, I think there's sort of hardly a better admission that the complaint, as pled, doesn't get them there.

Number two, this is all just a very circuitous route to avoid saying, "We've lost from the underwriters."  You know, the street -- Wall Street did the offering.  We went to one of those banks.  We get this allegation all the time:  I bought

from Citibank.  We don't have that here.  And, instead, what we have is this sort of inference off the offering price on this day before the relevant statements were published.

And I think this is addressed in *Century Aluminum* where they make the point that -- give me a second, your Honor.  This is 729 F.3d at 1107.

"Most trading is done through brokers who neither know nor care whether they're getting newly registered or old shares.  And many brokerage houses do not identify specific shares with particular accounts but, instead, treat the account as having an undivided interest in the house's position."

So we don't know who sold plaintiffs their Silvergate stock.  I think we can all probably, at this point, fairly assume it wasn't any of my clients.

But whoever sold to them may have had a number of existing shares at one price and -- and, you know, open market shares at another.

And -- and as in *Century Aluminum*, treated every account as, quote, having an undivided interest in the house position.  I mean, we don't -- we don't really know how they came to get the price they did or from whom.  That's absent.  Right?

And that's, I think, our point here.  Which is that

it's very easy to plead that you bought directly in the offering, plead that you bought from the underwriters who did the offering.  We don't -- we don't have that here.

So moving from January and December -- unless your Honor has questions on those --

THE COURT:  I do not.

ATTORNEY HEGT:  -- to just turn to the two offerings in which we all agree that no plaintiff made any purchase.

Your Honor asks a question about tracing.  And I think -- we talked about *Melendrez*, which dealt with Article III standing.

So there's a difference between Article III standing, and statutory standing.  We agree that the allegations they've made give them Article III standing on all of the offerings.

We don't challenge Article III standing.  We're challenging statutory standing.  The *ACS* case that we cite in our briefing is from just last year, and noted the difference.  And it said, "Statutory standing is a very different inquiry.  You can't just -- there's no transitive properties to sort of -- you know, similarity that would give you statutory standing.

And, in fact -- not to come back to our old friend *Century Aluminum*.  But one of the less-noticed parts of that case was that the district court, in *Century Aluminum*, actually dismissed under 12(b)(2) for a lack of standing.  And the Ninth

Circuit said that wasn't correct.  That's what you would do if there was no Article III standing.  There is Article III standing.  What they don't have is statutory standing.

And so at the very end of *Century Aluminum*, for anyone who happened to make it to the end of that very interesting opinion, is a section that says, "This is 12(b)(6), this is statutory standing, and this is different."

And so put another way, *Melendrez* -- which had nothing to do with the securities laws.  It was a -- a Fourth Amendment search case -- did nothing to abrogate the statutory standing requirements in *Century Aluminum*; in *Slack* from the Supreme Court case.  So that is still there.  There's no purchase in the March or July offerings, and those claims are out.

And then I think -- just to look through my notes.

Oh, one last point, just to respond briefly on Section 12 because I think there was some back and forth.

Section 11 is the tracing point.  Section 12 is sort of who is the seller.  And the points have collapsed a little bit because of where we are on Section 11.  We've made the argument that we didn't sell, and I think it's -- you know, like I said, I think fairly clear at this point that our clients are not alleged to have been the seller.

So *Pinter v. Dahl* is the governing standard on Section 12.  And there's two ways to do it.  You directly pass

title or successfully solicit.  No allegation, here, that we pass title.  In fact, the complaint says -- excuse me, the opposition, at page 31, the furthest they can go, is it says, we -- we may have passed title to members of the class.  But no allegation that we passed title to anyone in this room.  So I think prong one under *Pinter* is nonexistent.

Successfully solicited, there's no allegation that we -- we did that.  Right?

The mere publication of -- and this is the Eleventh Circuit, *Foster Jessup* case.  The mere publication of an offering document that then someone happens to purchase is not the successful solicitation.  And the reason we know that is if Congress intended every underwriter to be liable under Section 10 -- 12, just the way they are under Section 11, the law would say that.  Right?  But underwriters are liable under Section 11.  Sellers are liable under Section 12.

So the mere act of publishing a prospectus or a registration statement does not create Section 12 liability. They have to allege something.  Or they could -- as we keep coming back to, or they could allege one of us sold it to them. But we just -- we don't have that allegation.

And so I think, with that -- mostly because I am out of room on my notepad, I think, unless the Court has any other questions --

THE COURT:  No questions.

Before we hear from the last defense counsel, I do want to have the plaintiff respond to the issue that was brought up regarding paragraph 332 on the consolidated amended complaint. But only that discussion that was brought up regarding the prospectus.

ATTORNEY USLANER: Thank you, your Honor.

Your Honor, you heard that my clients purportedly bought the securities prior to the prospectus supplements being published. That is not true.

The fact of the matter is that the date of the prospectus supplement, as listed in the complaint, is when this was filed with the S.E.C.

The prospectus supplements were published to investors days before my clients' purpose --

THE COURT: Where is that listed in the complaint?

ATTORNEY USLANER: It's -- it is contained with respect to the -- it is contained in the documents that are incorporated by reference in the complaint, which, your Honor, for this -- for this one --

THE COURT: Which is that?

ATTORNEY USLANER: -- is tab 7.

So if you look at tab 7 of the document -- of what we provided, your Honor -- which is a document incorporated by reference into the complaint. It's the prospectus supplement at issue in the case.

(Pause, referring.)

THE COURT:  Excuse me for a second.

ATTORNEY USLANER:  No problem.

THE COURT:  Oh, you said tab 7.  I'm there.  Okay.

ATTORNEY USLANER:  Yes.  So if you look at tab 7, that's the prospectus supplement.

And the prospectus supplement, your Honor, is dated -- if you look at the second page of the document -- is dated January 21st, 2021.

And this is the document incorporated by reference in the complaint.  The prospectus supplement is issued three days before the offering is done.

So you heard counsel, unfortunately, provide incorrect information about when the prospectus supplement was published.  Additionally, with respect to the registration statement, which is the subject of the Section 11 claim --

THE COURT:  I only want you to address the supplement.

ATTORNEY USLANER:  Okay.  Absolutely, your Honor.

So the documents incorporated by reference show that, indeed, it was published prior to the purchase dates.

Thank you, your Honor.

THE COURT:  All right.  Thank you.

ATTORNEY SHAPIRO:  Your Honor, as we heard nothing new or different in plaintiffs' arguments with respect to

defendants Campbell and Frank, we have no rebuttal.

THE COURT:  All right.  Well, I want to thank all of you.  These were very well-written -- well-written briefs that the Court received from all parties.  And I certainly appreciate it, the information the parties provided.

I am going to take this matter under submission.  I will get out a written order as quickly as I possibly can.

And I want to thank all of you, again, for your time and for your arguments today.

ATTORNEY USLANER:  Thank you, your Honor.

THE ATTORNEYS:  Thank you, your Honor.

THE CLERK:  This court is now in recess.

THE COURT:  And I will hand the binder back to the plaintiffs, as well.

And you do not need to wait for me because I need to log out, so --

MR. STIGI:  Okay.  We appreciate your time.

(Conclusion of proceedings at 10:55 a.m.)

--oOo--

I certify, by signing below, that the foregoing is a correct stenographic transcript of the oral proceedings had in the above-entitled matter this 4th day of December, 2023.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore_____

AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290