# EXHIBIT A

# EXHIBIT A

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
858.720.8900 main
858.509.3691 fax
www.sheppardmullin.com

858.876.3559 direct
jstigi@sheppardmullin.com

May 30, 2025

File Number:  87ZH-368527

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

TO: ALL ADDRESSES IDENTIFIED IN THE ATTACHED EXHIBIT A

Re:    Notice of Proposed Class Action Settlement (28 U.S.C. § 1715)
       *In re Silvergate Capital Corporation Securities Litigation*
       Case No. 3:22-cv-01936-JES-MSB (S.D. Cal.)

Dear Sir/Madam:

We are counsel to defendant Silvergate Capital Corporation ("Silvergate Capital") in the above-referenced action.  Pursuant to the notice provisions of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b), and the Stipulation and Agreement of Settlement in the above-referenced action, Silvergate Capital, on behalf of itself and defendants Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank, Robert Campbell, Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC and Wedbush Securities Inc. (collectively, the "Defendants"), hereby provide notice of a proposed class action settlement in the above-entitled action.  On May 21, 2025, the plaintiffs in the action filed an unopposed motion for preliminary approval of the proposed settlement, and on May 22, 2025, the Court entered an order preliminarily approving the settlement and authorizing the dissemination of the notice of settlement.

CAFA lists eight items that must be provided in connection with any proposed class action settlement.  Each of these items is addressed below, and the corresponding documents are contained in the enclosed CD.  The information below is provided based on the status of the action as of the date of this notice and on information currently available to Silvergate Capital.  Silvergate Capital reserves the right to supplement this notice and to provide additional information at a future date.

**A.    28 U.S.C. § 1715(b)(1):  a copy of the complaint and any materials filed with the complaint and any amended complaints.**

Complaints

1. The original complaint in *Rosa v. Silvergate Capital Corp., Alan J. Lane, and Antonio Martino*, Case No. 3:22-cv-01936-CAB-MSB (S.D. Cal.), filed on December 7, 2022, is contained in the enclosed CD as **Exhibit A**.

**SheppardMullin**

May 30, 2025
Page 2

2.  The original complaint in *Guz v. Silvergate Capital Corp. et. al*, Case No. 3:22-cv-01968-AJB-BGS (S.D. Cal.), filed on December 13, 2022, is contained in the enclosed CD as **Exhibit B**.

On January 5, 2023, the Court consolidated the two actions under the *Rosa* case (together referred to as *In re Silvergate Capital Corporation Securities Litigation*, Case No. 3:22-cv-01936-CAB-MSB).

3.  The original complaint in *Thomas v. Silvergate Capital Corp., et. al*, Case No. 3:23-cv-00043-LL-NLS (S.D. Cal.), filed on January 10, 2023, is contained in the enclosed CD as **Exhibit C**.

On January 17, 2023, the Court consolidated the *Thomas* case with the consolidated securities action.

4.  The original complaint in *International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario v. Silvergate Capital Corp., et. al*, Case No. 3:23-cv-00099-RSH-DEB (S.D. Cal.), filed on January 19, 2023, is contained in the enclosed CD as **Exhibit D**.

On February 14, 2023, the Court consolidated the *International Union* case with the consolidated securities action.

5.  The consolidated amended complaint, filed on May 11, 2023, is contained in the enclosed CD as **Exhibit E**.

**B.      28 U.S.C. § 1715(b)(2):  notice of any scheduled judicial hearing in the class action.**

6.  On May 21, 2025, the plaintiffs in the action filed an Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Settlement Class. The Notice of Plaintiffs' Unopposed Motion, Memorandum of Points and Authorities in Support thereof and accompanying exhibits are contained in the enclosed CD as **Exhibit F**.

7.  On May 22, 2025, the Court entered an order preliminarily approving the settlement and authorizing the dissemination of the notice of settlement.  The Court's Order is contained in the enclosed CD as **Exhibit G.**  The Order set a settlement hearing for November 19, 2025, at 9:00 a.m. in Courtroom 4B, before the Honorable James E. Simmons Jr. at the United States District Court for the Southern District of California, Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, California 92101.  The parties thereafter requested that the settlement hearing be advanced to an earlier date.  By order entered on the docket only on May 29, 2025, the Court reset the settlement hearing to September 3, 2025, at 9:00 a.m. in Courtroom 4B at the United States District Court for

**SheppardMullin**

May 30, 2025
Page 3

the Southern District of California, Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, California 92101.

**C.      28 U.S.C. § 1715(b)(3):  any proposed or final notification to class members.**

8.  The following drafts are included within **Exhibit F:**
(1) Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses;

(2) Proof of Claim and Release Form; and

(3) Summary Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses.

These documents notify the class members of the proposed settlement of the class action and the settlement fairness hearing, briefly explain the process of requesting exclusion from the settlement and explain how to obtain further information about the settlement.

**D.       28 U.S.C. § 1715(b)(4):  any proposed or final class action settlement.**

9.  The final Stipulation and Agreement of Settlement executed by the parties, including all exhibits, is contained in the enclosed CD as part of **Exhibit F**.

**E.      28 U.S.C. § 1715(b)(5):  any settlement or other agreement contemporaneously made between class counsel and counsel for defendants.**

10. The parties to the settlement have also entered into a separate confidential agreement, called the "Supplemental Agreement," which is referred to at paragraph 42 of the Stipulation and Agreement of Settlement (included within **Exhibit F**), which provides that defendants shall have the option to terminate the settlement in the event that requests for exclusion from the settlement exceed certain agreed-upon criteria.  This agreement remains confidential and has not been included with the enclosed materials.  Should you require additional information about the Supplemental Agreement, please contact me and we will coordinate with counsel for the Lead Plaintiffs to make all reasonable efforts to address your questions, subject to the confidentiality provision.

**F.      28 U.S.C. § 1715(b)(6):  any final judgment or notice of dismissal.**

11. The court has not yet issued any final judgment or notice of dismissal.

**SheppardMullin**

May 30, 2025
Page 4

**G.** **28 U.S.C. § 1715(b)(7): a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement.**

12. In this securities class action, the names and state residences of the class members will not be known until after notice of the settlement is given and potential class members submit claim forms, so it is not feasible at this time to provide a reasonable estimate of the number of class members residing in each State or the estimated proportionate share of the claims of such class members to the entire settlement. Class members who properly submit claim forms and supporting documentation will receive their *pro rata* share of the net settlement fund.

**H.** **28 U.S.C. § 1715(b)(8): any written judicial opinion relating to the materials described in 28 U.S.C. § 1715(b) subparagraphs (3) through (6).**

13. None exist aside from the Order granting preliminary approval of the settlement, which is **Exhibit G.**

If you have any questions about this notice or the documents enclosed herewith, please do not hesitate to contact me at (858) 876-3559.

Respectfully submitted,

John P. Stigi III
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


SMRH:4913-6398-5734.2

Enclosures: Service List; CD

-5-

# EXHIBIT A

*IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION*

**CAFA NOTICE SERVICE LIST**

**ALABAMA**
Steve Marshall, Esq.
Attorney General's Office
State of Alabama
501 Washington Avenue
Montgomery, AL 36104

**ALASKA**
Treg Taylor, Esq.
Office of the Alaska Attorney General
1031 West 4th Avenue
Suite 200
Anchorage, AK 95501-1994

**AMERICAN SAMOA**
Gwen Tauiliili-Langkilde, Esq.
Attorney General of American Samoa
Department of Legal Affairs
Executive Office Bldg.
3rd Floor
P.O. Box 7
Utulei, AS 96799

**ARIZONA**
Kris Mayes, Esq.
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004

**ARKANSAS**
Tim Griffin, Esq.
Arkansas Attorney General's Office
323 Center Street
Suite 200
Little Rock, AR 72201

**CALIFORNIA**
CAFA Coordinator.
Office of the Attorney General
Consumer Protection Section
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

-6-

**COLORADO**
Phil Weiser, Esq.
Office of the Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 7th Floor
Denver, CO 80203

**CONNECTICUT**
William Tong, Esq.
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106

**DELAWARE**
Kathy Jennings, Esq.
Department of Justice
State of Delaware
820 N. French Street, 5th Floor
Wilmington, DE 19801

**DISTRICT OF COLUMBIA**
Brian Schwalb, Esq.
Office of the Attorney General
for the District of Columbia
Office of Consumer Protection
400 6th Street, NW
Washington, DC 20001

**FLORIDA**
James Uthmeier, Esq.
Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

**GEORGIA**
Chris Carr, Esq.
Office of Attorney General
State of Georgia
40 Capitol Square, SW
Atlanta, GA 30334

**GUAM**
Douglas B. Moylan, Esq.
Office of the Attorney General of Guam
Bank of Hawaii Building
134 W. Soledad Avenue 4th Floor, Suite 412
Hagatna, GU 96910

**HAWAII**
Anne E. Lopez, Esq.
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813

**IDAHO**
Raul Labrador, Esq.
Office of the Attorney General
State of Idaho
700 W. Jefferson Street, Suite 210
P.O. Box 83720
Boise, ID 83720-0010

**ILLINOIS**
Kwame Raoul, Esq.
Office of the Attorney General
State of Illinois
115. S. LaSalle Street
Chicago, IL 60603

**INDIANA**
Todd Rokita, Esq.
Office of the Indiana Attorney General
Indiana Government Center South
302 W. Washington Street, 5th Floor
Indianapolis, IN 46204

**IOWA**
Brenna Bird, Esq.
Office of the Attorney General
Iowa Department of Justice
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319-0106

**KANSAS**
Kris Kobach, Esq.
Kansas Attorney General Office
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612

**KENTUCKY**
Russell Coleman, Esq.
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601

**LOUISIANA**
Liz Murrill, Esq.
Office of Attorney General
Lousiana Attorney General's Office
Consumer Protection Section
1885 N. Third Street, 4th Floor
Baton Rouge, LA 70802

**MAINE**
Aaron Frey, Esq.
Office of the Attorney General
6 State House Station
Augusta, ME 04333

**MARYLAND**
Anthony G. Brown, Esq.
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202

**MASSACHUSETTS**
Andrea Joy Campbell, Esq.
Office of Attorney General
1 Ashburton Place, 20th Floor
Boston, MA 02108

**MICHIGAN**
Dana Nessel, Esq.
Michigan Department of Attorney General
G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI 48909

**MINNESOTA**

Keith Ellison, Esq.
Office of Minnesota Attorney General Keith Ellison
445 Minnesota Street, Suite 1400
St. Paul, MN 55101

**MISSISSIPPI**

Lynn Fitch, Esq.
Attorney General State of Mississippi
P.O. Box 220
Jackson, MS 39205

**MISSOURI**

Andrew Bailey, Esq.
Missouri Attorney General's Office
Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102

**MONTANA**

Austin Knudsen, Esq.
Office of the Attorney General
Justice Building, Third Floor
215 North Sanders
P.O. Box 201401
Helena, MT 59620-0151

**NEBRASKA**

Mike Hilgers, Esq.
Attorney General's Office
2115 State Capitol
Lincoln, NE 68509

**NEVADA**

Aaron D. Ford, Esq.
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701

**NEW HAMPSHIRE**

John M. Formella, Esq.
Office of the Attorney General
Department of Justice
33 Capitol Street
Concord, NH 03301

**NEW JERSEY**
Matthew J. Platkin, Esq.
Office of the Attorney General
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625-0080

**NEW MEXICO**
Raul Torrez, Esq.
Office of the Attorney General
P.O. Box 1508
Santa Fe, NM 87501

**NEW YORK**
CAFA Coordinator
Office of the Attorney General
28 Liberty Street, 15th Floor
New York, NY 10005

**NORTH CAROLINA**
Jeff Jackson, Esq.
Office of the Attorney General
Department of Justice
9001 Mail Service Center
Raleigh, NC 27699-9001

**NORTH DAKOTA**
Drew H. Wrigley, Esq.
Office of Attorney General
600 East Boulevard Avenue, Dept. 125
Bismarck, ND 58504

**NORTHERN MARIANA ISLANDS**
Edward E. Manibusan, Esq.
Office of the Attorney General
Commonwealth of the Northern Mariana Islands
2nd Floor Hon. Juan A. Sablan Memorial Bldg.
Caller Box 10007, Capitol Hill
Saipan, MP 96950

**OHIO**
Dave Yost, Esq.
Attorney General's Office
30 East Broad Street, 14th Floor
Columbus, OH 43215

-11-

**OKLAHOMA**
Genter Drummond, Esq.
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

**OREGON**
Dan Rayfield, Esq.
Office of the Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

**PENNSYLVANIA**
David W. Sunday, Jr., Esq.
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120

**PUERTO RICO**
Janet Parra-Mercado, Esq.
Secretary of Justice
Departamento de Justicia
Apartado 9020192
San Juan, PR 00902-0192

**RHODE ISLAND**
Peter F. Neronha, Esq.
Office of the Attorney General
150 South Main Street
Providence, RI 02903

**SOUTH CAROLINA**
Alan Wilson, Esq.
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, SC 29211

**SOUTH DAKOTA**
Martin J. Jackley, Esq.
Office of Attorney General
1302 E Hwy 14 Suite 1
Pierre, SD 57501

**TENNESSEE**
Jonathan Skrmetti, Esq.
Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202

**TEXAS**
Ken Paxton, Esq.
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

**UNITED STATES ATTORNEY GENERAL'S OFFICE**
Pamela Bondi, Esq.
United States Attorney General's Office
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**UTAH**
Derek Brown, Esq.
Office of the Attorney General
P.O. Box 142320
Salt Lake City, UT 84114-2320

**VERMONT**
Charity Clark, Esq.
Office of the Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609

**VIRGINIA**
Jason Miyares, Esq.
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

**VIRGIN ISLANDS**
Ghordon C. Rhea, Esq.
Attorney General of the Virgin Islands
3438 Krondprindsens
Gade GERS Building, 2nd Floor
St. Thomas, VI 00802

**WASHINGTON**
Nick Brown, Esq.
Office of the Attorney General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

**WEST VIRGINIA**
Patrick Morrisey, Esq.
Office of the Attorney General
State Capitol Complex, Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305

**WISCONSIN**
Josh Kaul, Esq.
Office of the Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

**WYOMING**
Bridget Hill, Esq.
Wyoming Attorney General
Kendrick Building
2320 Capitol Avenue
Cheyenne, WY 82002

**U.S. DEPARTMENT OF TREASURY**
Office of the Comptroller of the Currency
U.S. Department of Treasury, Director, Litigation Division
400 7th Street, SW
Washington, D.C. 20219

**U.S. DEPARTMENT OF TREASURY – NEW YORK REGIONAL OFFICE**
Office of the Comptroller of the Currency
U.S. Department of Treasury, New York Regional Office
7 Times Square
New York, NY 10036

**FEDERAL RESERVE BANK OF NEW YORK**
Richard Ostrander
General Counsel
Federal Reserve Bank of New York
33 Liberty Street
New York, NY 10045

-14-

**FEDERAL RESERVE BANK OF SAN FRANCISCO**
Laura Monfredini
Federal Reserve Bank of San Francisco
Executive Vice President and General Counsel
101 Market Street
San Francisco, CA 94105

**FEDERAL RESERVE**
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue NW
Washington, D.C. 20551

Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles H. Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN ROSA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, and ANTONIO MARTINO<br><br>Defendants. | Case No. **'22CV1936 CAB MSB**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Steven Rosa ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Silvergate Capital Corporation ("Silvergate" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Silvergate; and (c) review of other publicly available information concerning Silvergate.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Silvergate is a digital currency company. Its platform, the Silvergate Exchange Network ("SEN"), provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

3. On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers."

4. On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

5. On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposure to recently collapsed cryptocurrency exchange FTX, including Silvergate. The article highlighted the connection linking Silvergate to a money laundering operation that transferred $425 million off cryptocurrency trading platforms.

6. On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

7. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm; and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this

CLASS ACTION COMPLAINT

2

Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

11. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12. Plaintiff Steven Rosa, as set forth in the accompanying certification, incorporated by reference herein, purchased Silvergate securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13. Defendant Silvergate is incorporated under the laws of Maryland with its principal executive offices located in La Jolla, California. Silvergate's Class A common stock trade on the New York Stock Exchange ("NYSE") under the symbol "SI," and its depository shares, each representing a 1/40th interest in a share of 5.375% fixed rate non-cumulative perpetual preferred stock, Series A trade under the symbol "SI PRA."

14. Defendant Alan J. Lane ("Lane") was the Company's Chief Executive Officer ("CEO") at all relevant times.

15. Defendant Antonio Martino ("Martino") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Lane and Martino (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with

copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17. Silvergate is a digital currency company. Its platform, the Silvergate Exchange Network ("SEN"), provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

### Materially False and Misleading

### Statements Issued During the Class Period

18. The Class Period begins on November 9, 2021.[1] On that day, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021, stating that "the Company's disclosure controls and procedures were effective as of September 30, 2021."

19. On February 28, 2022, Silvergate filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K touted the platform's compliance with regulatory requirements, stating "[a]s of December 31, 2021, we had over 300 prospective digital currency customer leads in various stages

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

of our customer onboarding process and pipeline, which includes *extensive regulatory compliance diligence*." The 2021 10-K reiterated that "[o]ur solutions and services are built on our deep-rooted commitment and proprietary approach to regulatory compliance," and that the Company has developed compliance capabilities, which "include *ongoing monitoring of customer activities* and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

20. The 2021 10-K also stated that the Company has policies to comply with applicable regulations regarding money laundering:

> ***Anti-Terrorism, Money Laundering Legislation and OFAC***
>
> \*          \*          \*
>
> ***The Bank has established appropriate anti-money laundering and customer identification programs.*** The Bank also maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act. The Bank otherwise has implemented policies and procedures to comply with the foregoing requirements.
>
> \*          \*          \*
>
> ***The Bank has implemented policies and procedures to comply with the foregoing requirements.***

21. The 2021 10-K contained the following risk related to the Digital Currency Industry, the ability to use digital currency to engage in illegal transactions, and how the Company's risk management and compliance framework are meant to combat this risk:

> ***The characteristics of digital currency have been, and may in the future continue to be, exploited to facilitate illegal activity such as fraud, money laundering, tax evasion and ransomware scams; if any of our customers do so or are alleged to have done so, it could adversely affect us.***
>
> Digital currencies and the digital currency industry are relatively new and, in many cases, lightly regulated or largely unregulated. Some types of digital currency have characteristics, such as the speed with which digital currency transactions can be conducted, the ability to conduct transactions without the involvement of regulated intermediaries, the

ability to engage in transactions across multiple jurisdictions, the irreversible nature of certain digital currency transactions and encryption technology that anonymizes these transactions, that make digital currency particularly susceptible to use in illegal activity such as fraud, money laundering, tax evasion and ransomware scams. Two prominent examples of marketplaces that accepted digital currency payments for illegal activities include Silk Road, an online marketplace on the dark web that, among other things, facilitated the sale of illegal drugs and forged legal documents using digital currencies and AlphaBay, another darknet market that utilized digital currencies to hide the locations of its servers and identities of its users. Both of these marketplaces were investigated and closed by U.S. law enforcement authorities. U.S. regulators, including the SEC, Commodity Futures Trading Commission (the "CFTC"), and Federal Trade Commission (the "FTC"), as well as non-U.S. regulators, have taken legal action against persons alleged to be engaged in Ponzi schemes and other fraudulent schemes involving digital currencies. In addition, the Federal Bureau of Investigation has noted the increasing use of digital currency in various ransomware scams.

***While we believe that our risk management and compliance framework, which includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers), is reasonably designed to detect any such illicit activities*** conducted by our potential or existing customers (or, in the case of digital currency exchanges, their customers), we cannot ensure that we will be able to detect any such illegal activity in all instances. Because the speed, irreversibility and anonymity of certain digital currency transactions make them more difficult to track, fraudulent transactions may be more likely to occur. We or our banking counterparties may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. If one of our customers (or in the case of digital currency exchanges, their customers) were to engage in or be accused of engaging in illegal activities using digital currency, we could be subject to various fines and sanctions, including limitations on our activities, which could also cause reputational damage and adversely affect our business, financial condition and results of operations.

(First emphasis in original.)

22.     The 2021 10-K also contained the following risk factor purporting to warn that the Company would be at risk of enforcement actions if Silvergate failed to institute proper anti-money laundering programs:

***Financial institutions, such as the Bank, face risks of noncompliance and enforcement actions related to the Bank Secrecy Act and other anti-money laundering statutes and regulations (in particular, as such statutes and regulations relate to the digital currency industry).***

The Bank Secrecy Act, USA Patriot Act, FinCEN and other laws and regulations ***require financial institutions, among other duties, to***

CLASS ACTION COMPLAINT

6

*institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate.* To administer the Bank Secrecy Act, FinCEN is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration and the IRS. There is also increased scrutiny of compliance with the sanctions programs and rules administered and enforced by the Treasury Department's Office of Foreign Assets Control.

Our compliance with the anti-money laundering laws is in part dependent on our ability to adequately screen and monitor our customers for their compliance with these laws. Customers associated with our digital currency initiative may represent an increased compliance risk given the prevalence of money laundering activities using digital currencies. *We have developed enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency activities, a system of "red flags" specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our third-party transaction monitoring system, customer risk scoring with risk factors specific to the digital-currency industry, and the use of various blockchain monitoring tools. We believe these enhanced procedures adequately screen and monitor our customers associated with the digital currency initiative for their compliance with anti-money laundering laws;* however, given the rapid developments in digital currency markets and technologies, there can be no assurance that these enhanced procedures will be adequate to detect or prevent money laundering activity. If regulators determine that our enhanced procedures are insufficient to address the financial crimes risks posed by digital currencies, the digital currency initiative may be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

*To comply with regulations, guidelines and examination procedures in this area, we have dedicated significant resources to our anti-money laundering program.* If our policies, procedures and systems are deemed deficient, we could be subject to liability, including fines and regulatory actions such as restrictions on our ability to pay dividends and the inability to obtain regulatory approvals to proceed with certain aspects of our business plans, including acquisitions and de novo branching.

23. The 2021 10-K stated that management determined that "as of December 31, 2021, the Company maintained effective internal control over financial reporting . . . ."

24. On May 5, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended March 31, 2022 (the "1Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K. The 1Q22 10-Q also

CLASS ACTION COMPLAINT

7

reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of March 31, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes ***extensive regulatory compliance diligence***."

25. The 1Q22 10-Q stated that there were no changes to the Company's internal control over financial reporting and affirmed that "the Company's disclosure controls and procedures were effective as of March 31, 2022."

26. On August 8, 2022, the Company filed its Form 10-Q with the SEC for the period ended June 30, 2022 (the "2Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.

27. The 2Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of June 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

28. The 2Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of June 30, 2022."

29. On November 1, 2022, Silvergate held an investor presentation, which was filed as Exhibit 99.1 to a Form 8-K filed with the SEC the same day. It stated the following about compliance and risk management.



30. On November 7, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended September 30, 2022 (the "3Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K. The 3Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of September 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

31. The 3Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of September 30, 2022."

32. On November 16, 2022, Silvergate issued a press release providing, among other things, a mid-quarter update. The press release stated:

> "Silvergate's platform, including our risk management and compliance infrastructure, was built to support our clients during times of market volatility and transformation," said Alan Lane, CEO of Silvergate.

33. The above statements identified in ¶¶ 18-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm  and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

34. On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers." The tweet contained a link to an August 2022 forfeiture application for probable cause filed in Broward County, Florida. The forfeiture application connected Silvergate to a money laundering operation and stated, in relevant part:

> In June 2022, *your Affiant subpoenaed bank account records for multiple digital cryptocurrency trading platforms held at Silvergate Bank*. The records for those accounts held in the name of OSL Digital LTD, OSL SG PTE LTD, Paxos Global PTE LTD, and Paxos Trust Company LLC. In these records were the wire transfer payment details from the various operating accounts which represented the funds being transferred off the respective cryptocurrency platforms and into the US financial system.
>
> Your Affiant examined the records produced by Silvergate Bank found the following:
>
> (i) *During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms into accounts held at different US banks.*

CLASS ACTION COMPLAINT

10

(ii) The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized (discussed above) by the MLTF for being used to facilitate the laundering of illicit funds

(iii) In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same records

35. On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

36. On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposures to recently collapsed cryptocurrency exchange FTX, including Silvergate. In addition to the money laundering operation linked to Silvergate that transferred $425 million off cryptocurrency trading platforms, it drew attention to potential violations of Silvergate's anti-nepotism policy:

In February 2022, Silvergate, which has ~$13 billion in deposits, boasted that its exchange network "recently crossed $1 trillion in cumulative payment volumes [and] is integral to the everyday operations of our digital currency customers."

Last week, Silvergate replaced its Chief Risk Officer with its Chief Operating Officer. The former Chief Risk Officer was Tyler Pearson. Mr. Pearson is the son-in-law of Silvergate's CEO Alan Lane. Silvergate's Bank Manager of Correspondent Banking is Jason Brenier. Mr. Brenier is also the son-in-law of Silvergate's CEO Alan Lane. And Silvergate's Chief Technology Officer, Chris Lane, is the son of Alan Lane. In its most recent proxy filing, Silvergate said the employments were in compliance with its "Anti-Nepotism Policy."

37. On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

CLASS ACTION COMPLAINT

11

## CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Silvergate's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Silvergate shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Silvergate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Silvergate; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

44. The market for Silvergate's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Silvergate's securities relying upon the integrity of the market price of the Company's securities and market information relating to Silvergate, and have been damaged thereby.

45. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Silvergate's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Silvergate's business, operations, and prospects as alleged herein.

46. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

47. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

48. During the Class Period, Plaintiff and the Class purchased Silvergate's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

49. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set

forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Silvergate, their control over, and/or receipt and/or modification of Silvergate's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Silvergate, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## <u>(FRAUD-ON-THE-MARKET DOCTRINE)</u>

50. The market for Silvergate's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period. On November 19, 2021, the Company's share price closed at a Class Period high of $219.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Silvergate's securities and market information relating to Silvergate, and have been damaged thereby.

51. During the Class Period, the artificial inflation of Silvergate's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Silvergate and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the

Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

52. At all relevant times, the market for Silvergate's securities was an efficient market for the following reasons, among others:

(a) Silvergate shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Silvergate filed periodic public reports with the SEC and/or the NYSE;

(c) Silvergate regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Silvergate was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

53. As a result of the foregoing, the market for Silvergate's securities promptly digested current information regarding Silvergate from all publicly available sources and reflected such information in Silvergate's share price. Under these circumstances, all purchasers of Silvergate's securities during the Class Period suffered similar injury through their purchase of Silvergate's securities at artificially inflated prices and a presumption of reliance applies.

54. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's

business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

55. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Silvergate who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

56. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Silvergate's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

58. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Silvergate's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Silvergate's financial well-being and prospects, as specified herein.

60. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Silvergate's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Silvergate and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business

which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

61. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

62. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Silvergate's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately

refraining from taking those steps necessary to discover whether those statements were false or misleading.

63. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Silvergate's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Silvergate's securities during the Class Period at artificially high prices and were damaged thereby.

64. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Silvergate was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Silvergate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

65. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

67. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68. Individual Defendants acted as controlling persons of Silvergate within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70. As set forth above, Silvergate and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered

damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 7, 2022

By: */s/ Pavithra Rajesh*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**HOLZER & HOLZER, LLC**
Corey D. Holzer
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
(770) 392-0090 (ph)
(888) 508-6832 (toll-free)
(770) 392-0029 (fax

*Attorneys for Plaintiff Steven Rosa*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Steven Rosa, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Silvergate Capital Corporation ("Silvergate") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Silvergate securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Silvergate securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Silvergate securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed** <u>12/06/2022</u>
**(Date)**



**(Signature)**

Steven Rosa
**(Type or Print Name)**

**Steven Rosa's Transactions in Silvergate Capital Corporation (SI)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 11/26/2021 | Bought | 76 | $197.0000 |
| 12/2/2021 | Bought | 24 | $193.0000 |
| 12/2/2021 | Bought | 30 | $191.5000 |
| 12/3/2021 | Bought | 70 | $186.0000 |
| 12/3/2021 | Bought | 100 | $168.5000 |
| 12/9/2021 | Bought | 100 | $158.0000 |
| 12/9/2021 | Bought | 100 | $151.0000 |
| 12/9/2021 | Bought | 100 | $148.0000 |
| 12/20/2021 | Bought | 100 | $132.0000 |
| 1/5/2022 | Bought | 100 | $139.0000 |
| 1/21/2022 | Bought | 200 | $99.0000 |

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
STEVEN ROSA, Individually and on Behalf of All Others Similarly Situated

**(b)** County of Residence of First Listed Plaintiff    Lake County, Florida
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Glancy Prongay & Murray LLP, 1925 Century Park East, Suite 2100, Los Angeles, CA 90067; (310) 201-9150

### DEFENDANTS
SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, and ANTONIO MARTINO

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**'22 CV 1936 CAB MSB**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &     Pharmaceutical     Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) |     Liability   ☐ 368 Asbestos Personal     Injury Product ☐ 340 Marine     Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product     Liability   **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending     Product Liability | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   ☐ 380 Other Personal |     Relations | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ |
| ☐ 196 Franchise |     Injury     Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) |     Exchange |
| | ☐ 362 Personal Injury -   ☐ 385 Property Damage     Medical Malpractice     Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate     Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Accommodations   ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 |     Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty     Employment | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities -   **Other:**     Other   ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | ☐ 448 Education   ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| |   ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| |   ☐ 560 Civil Detainee -     Conditions of     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Private Securities Litigation Reform Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5)
Brief description of cause:
Securities Fraud - Violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5; PSLRA

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE    Dec 7, 2022

SIGNATURE OF ATTORNEY OF RECORD    s/Pavithra Rajesh

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRIC COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB GUZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, and ANTONIO MARTINO<br><br>Defendants. | Case No. __'22CV1968 AJB BGS__<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jacob Guz ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Silvergate Capital Corporation ("Silvergate" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Silvergate; and (c) review of other publicly available information concerning Silvergate.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Silvergate is a digital currency company. Its platform, the Silvergate Exchange Network ("SEN"), provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

3. On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers."

1

4. On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

5. On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposure to recently collapsed cryptocurrency exchange FTX, including Silvergate. The article highlighted the connection linking Silvergate to a money laundering operation that transferred $425 million off cryptocurrency trading platforms.

6. On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

7. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm; and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this

11. Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

## PARTIES

12. Plaintiff Jacob Guz, as set forth in the accompanying certification, incorporated by reference herein, purchased Silvergate securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13. Defendant Silvergate is incorporated under the laws of Maryland with its principal executive offices located in La Jolla, California. Silvergate's Class A common stock trade on the New York Stock Exchange ("NYSE") under the symbol "SI," and its depository shares, each representing a 1/40th interest in a share of 5.375% fixed rate non-cumulative perpetual preferred stock, Series A trade under the symbol "SI PRA."

14. Defendant Alan J. Lane ("Lane") was the Company's Chief Executive Officer ("CEO") at all relevant times.

15. Defendant Antonio Martino ("Martino") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Lane and Martino (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

### SUBSTANTIVE ALLEGATIONS

**Background**

17. Silvergate is a digital currency company. Its platform, the SEN, provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

**Materially False and Misleading Statements Issued During the Class Period**

18. The Class Period begins on November 9, 2021.[1] On that day, the Company filed its quarterly report on Form 10-Q for the period ended September

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

4

30, 2021, stating that "the Company's disclosure controls and procedures were effective as of September 30, 2021."

19. On February 28, 2022, Silvergate filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K touted the platform's compliance with regulatory requirements, stating "[a]s of December 31, 2021, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes **extensive regulatory compliance diligence**." The 2021 10-K reiterated that "[o]ur solutions and services are built on our deep-rooted commitment and proprietary approach to regulatory compliance," and that the Company has developed compliance capabilities, which "include **ongoing monitoring of customer activities** and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

20. The 2021 10-K also stated that the Company has policies to comply with applicable regulations regarding money laundering:

> ***Anti-Terrorism, Money Laundering Legislation and OFAC***
>
> \* \* \*
>
> ***The Bank has established appropriate anti-money laundering and customer identification programs.*** The Bank also maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act. The Bank otherwise has implemented policies and procedures to comply with the foregoing requirements.
>
> \* \* \*
>
> ***The Bank has implemented policies and procedures to comply with the foregoing requirements.***

21. The 2021 10-K contained the following risk related to the Digital Currency Industry, the ability to use digital currency to engage in illegal

5

transactions, and how the Company's risk management and compliance framework are meant to combat this risk:

*The characteristics of digital currency have been, and may in the future continue to be, exploited to facilitate illegal activity such as fraud, money laundering, tax evasion and ransomware scams; if any of our customers do so or are alleged to have done so, it could adversely affect us.*

Digital currencies and the digital currency industry are relatively new and, in many cases, lightly regulated or largely unregulated. Some types of digital currency have characteristics, such as the speed with which digital currency transactions can be conducted, the ability to conduct transactions without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, the irreversible nature of certain digital currency transactions and encryption technology that anonymizes these transactions, that make digital currency particularly susceptible to use in illegal activity such as fraud, money laundering, tax evasion and ransomware scams. Two prominent examples of marketplaces that accepted digital currency payments for illegal activities include Silk Road, an online marketplace on the dark web that, among other things, facilitated the sale of illegal drugs and forged legal documents using digital currencies and AlphaBay, another darknet market that utilized digital currencies to hide the locations of its servers and identities of its users. Both of these marketplaces were investigated and closed by U.S. law enforcement authorities. U.S. regulators, including the SEC, Commodity Futures Trading Commission (the "CFTC"), and Federal Trade Commission (the "FTC"), as well as non-U.S. regulators, have taken legal action against persons alleged to be engaged in Ponzi schemes and other fraudulent schemes involving digital currencies. In addition, the Federal Bureau of Investigation has noted the increasing use of digital currency in various ransomware scams.

*While we believe that our risk management and compliance framework, which includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers), is reasonably designed to detect any such illicit activities* conducted by our potential or existing customers (or, in the case of digital currency exchanges, their customers), we cannot ensure that we will be able to detect any such

6

illegal activity in all instances. Because the speed, irreversibility and anonymity of certain digital currency transactions make them more difficult to track, fraudulent transactions may be more likely to occur. We or our banking counterparties may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. If one of our customers (or in the case of digital currency exchanges, their customers) were to engage in or be accused of engaging in illegal activities using digital currency, we could be subject to various fines and sanctions, including limitations on our activities, which could also cause reputational damage and adversely affect our business, financial condition and results of operations.

(First emphasis in original.)

22.   The 2021 10-K also contained the following risk factor purporting to warn that the Company would be at risk of enforcement actions if Silvergate failed to institute proper anti-money laundering programs:

*Financial institutions, such as the Bank, face risks of noncompliance and enforcement actions related to the Bank Secrecy Act and other anti-money laundering statutes and regulations (in particular, as such statutes and regulations relate to the digital currency industry).*

The Bank Secrecy Act, USA Patriot Act, FinCEN and other laws and regulations *require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate.* To administer the Bank Secrecy Act, FinCEN is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration and the IRS. There is also increased scrutiny of compliance with the sanctions programs and rules administered and enforced by the Treasury Department's Office of Foreign Assets Control.

Our compliance with the anti-money laundering laws is in part dependent on our ability to adequately screen and monitor our customers for their compliance with these laws. Customers associated

7

with our digital currency initiative may represent an increased compliance risk given the prevalence of money laundering activities using digital currencies. *We have developed enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency activities, a system of "red flags" specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our third-party transaction monitoring system, customer risk scoring with risk factors specific to the digital-currency industry, and the use of various blockchain monitoring tools. We believe these enhanced procedures adequately screen and monitor our customers associated with the digital currency initiative for their compliance with anti-money laundering laws;* however, given the rapid developments in digital currency markets and technologies, there can be no assurance that these enhanced procedures will be adequate to detect or prevent money laundering activity. If regulators determine that our enhanced procedures are insufficient to address the financial crimes risks posed by digital currencies, the digital currency initiative may be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

*To comply with regulations, guidelines and examination procedures in this area, we have dedicated significant resources to our anti-money laundering program.* If our policies, procedures and systems are deemed deficient, we could be subject to liability, including fines and regulatory actions such as restrictions on our ability to pay dividends and the inability to obtain regulatory approvals to proceed with certain aspects of our business plans, including acquisitions and de novo branching.

23. The 2021 10-K stated that management determined that "as of December 31, 2021, the Company maintained effective internal control over financial reporting . . . ."

24. On May 9, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended March 31, 2022 (the "1Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K. The 1Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's

8

compliance with regulatory requirements, stating "[a]s of March 31, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes *extensive regulatory compliance diligence*."

25. The 1Q22 10-Q stated that there were no changes to the Company's internal control over financial reporting and affirmed that "the Company's disclosure controls and procedures were effective as of March 31, 2022."

26. On August 8, 2022, the Company filed its Form 10-Q with the SEC for the period ended June 30, 2022 (the "2Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.

27. The 2Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of June 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

28. The 2Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of June 30, 2022."

29. On November 1, 2022, Silvergate held an investor presentation, which was filed as Exhibit 99.1 to a Form 8-K filed with the SEC the same day. It stated the following about compliance and risk management.



Robust compliance and risk management framework

30. On November 7, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended September 30, 2022 (the "3Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K. The 3Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of September 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

31. The 3Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of September 30, 2022."

32. On November 16, 2022, Silvergate issued a press release providing, among other things, a mid-quarter update. The press release stated:

> "Silvergate's platform, including our risk management and compliance infrastructure, was built to support our clients during times of market volatility and transformation," said Alan Lane, CEO of Silvergate.

33. The above statements identified in ¶¶ 18-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed

to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

34.     On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers." The tweet contained a link to an August 2022 forfeiture application for probable cause filed in Broward County, Florida.  The forfeiture application connected Silvergate to a money laundering operation and stated, in relevant part:

> In June 2022, *your Affiant subpoenaed bank account records for multiple digital cryptocurrency trading platforms held at Silvergate Bank*. The records for those accounts held in the name of OSL Digital LTD, OSL SG PTE LTD, Paxos Global PTE LTD, and Paxos Trust Company LLC. In these records were the wire transfer payment details from the various operating accounts which represented the funds being transferred off the respective cryptocurrency platforms and into the US financial system.

> Your Affiant examined the records produced by Silvergate Bank found the following:

> (i)     *During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms into accounts held at different US banks.*

11

(ii)  The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized (discussed above) by the MLTF for being used to facilitate the laundering of illicit funds

(iii)  In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same records

35.  On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

36.  On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposures to recently collapsed cryptocurrency exchange FTX, including Silvergate.  In addition to the money laundering operation linked to Silvergate that transferred $425 million off cryptocurrency trading platforms, it drew attention to potential violations of Silvergate's anti-nepotism policy:

> In February 2022, Silvergate, which has ~$13 billion in deposits, boasted that its exchange network "recently crossed $1 trillion in cumulative payment volumes [and] is integral to the everyday operations of our digital currency customers."

> Last week, Silvergate replaced its Chief Risk Officer with its Chief Operating Officer. The former Chief Risk Officer was Tyler Pearson. Mr. Pearson is the son-in-law of Silvergate's CEO Alan Lane. Silvergate's Bank Manager of Correspondent Banking is Jason Brenier. Mr. Brenier is also the son-in-law of Silvergate's CEO Alan Lane. And Silvergate's Chief Technology Officer, Chris Lane, is the son of Alan Lane. In its most recent proxy filing, Silvergate said the employments were in compliance with its "Anti-Nepotism Policy."

12

37.   On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

38.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Silvergate's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Silvergate shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Silvergate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

13

41.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Silvergate; and

c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

43.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

43.   The market for Silvergate's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Silvergate's securities relying upon the integrity of the market price of the Company's securities and market information relating to Silvergate, and have been damaged thereby.

14

44. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Silvergate's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Silvergate's business, operations, and prospects as alleged herein.

45. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

46. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47. During the Class Period, Plaintiff and the Class purchased Silvergate's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations

15

made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

48. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Silvergate, their control over, and/or receipt and/or modification of Silvergate's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Silvergate, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

49. The market for Silvergate's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period. On November 19, 2021, the Company's share price closed at a Class Period high of $219.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Silvergate's securities and market information relating to Silvergate, and have been damaged thereby.

16

50. During the Class Period, the artificial inflation of Silvergate's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Silvergate and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

51. At all relevant times, the market for Silvergate's securities was an efficient market for the following reasons, among others:

a) Silvergate shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, Silvergate filed periodic public reports with the SEC and/or the NYSE;

c) Silvergate regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d) Silvergate was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

17

52. As a result of the foregoing, the market for Silvergate's securities promptly digested current information regarding Silvergate from all publicly available sources and reflected such information in Silvergate's share price. Under these circumstances, all purchasers of Silvergate's securities during the Class Period suffered similar injury through their purchase of Silvergate's securities at artificially inflated prices and a presumption of reliance applies.

53. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

54. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-

looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Silvergate who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

55.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56.  During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Silvergate's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

57.  Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Silvergate's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

19

58. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Silvergate's financial well-being and prospects, as specified herein.

59. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Silvergate's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Silvergate and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

60. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all

20

relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

61. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Silvergate's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Silvergate's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Silvergate's securities during the Class Period at artificially high prices and were damaged thereby.

63. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Silvergate was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Silvergate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

64. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

66. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67. Individual Defendants acted as controlling persons of Silvergate within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual

22

Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

69. As set forth above, Silvergate and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

23

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: December 13, 2022

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

GROSSMAN LLP
Stanley M. Grossman
(*pro hac vice* application forthcoming)
Judd B. Grossman
(*pro hac vice* application forthcoming)
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997
sgrossman@grossmanllp.com
jgrossman@grossmanllp.com

*Attorneys for Plaintiff*

24

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Jacob Guz, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Silvergate Capital Corporation ("Silvergate") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Silvergate securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Silvergate securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Silvergate securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed ___12/17/2022___
    (Date)

_____
            (Signature)

___JACOB GUZ___
    (Type or Print Name)

**Silvergate Capital Corporation (SI)**                                                              **Jacob Guz**

**List of Purchases and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 5/9/2022 | 200 | $92.7500 |
| Purchase | Common Stock | 5/10/2022 | 200 | $85.7500 |
| Purchase | Common Stock | 5/11/2022 | 200 | $77.0000 |
| Purchase | Common Stock | 5/12/2022 | 200 | $60.0000 |
| Purchase | Common Stock | 5/16/2022 | 200 | $70.0000 |
| Purchase | Common Stock | 7/22/2022 | 100 | $86.7500 |
| Purchase | Common Stock | 8/9/2022 | 1,000 | $99.6500 |
| Purchase | Common Stock | 8/17/2022 | 1,000 | $99.0000 |
| Purchase | Common Stock | 10/21/2022 | 1,000 | $52.3000 |
| Purchase | Common Stock | 11/7/2022 | 1,000 | $51.0000 |
| Sale | Common Stock | 7/18/2022 | (1,000) | $70.2500 |
| Sale | Common Stock | 7/28/2022 | (1,000) | $91.2500 |
| Sale | Common Stock | 8/10/2022 | (100) | $104.0000 |
| Sale | Common Stock | 10/21/2022 | (1,000) | $54.0000 |
| Purchase | C 20220916 85 | 9/1/2022 | 10 | $5.5000 |
| Sale | C 20220916 85 | 9/2/2022 | (10) | $8.2000 |

JS 44 (Rev. 10/20)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JACOB GUZ, Individually and On Behalf of All Others Similarly Situated | SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, and ANTONIO MARTINO |

**(b)** County of Residence of First Listed Plaintiff   New York County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Diego County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jennifer Pafiti, Pomerantz LLP, 1100 Glendon Avenue, 15th Floor, Los Angeles, CA 90024, T.: (310) 405-7190

Attorneys *(If Known)*

'22 CV 1968 AJB BGS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [x] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | | [ ] 862 Black Lung (923) | |
| | | | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| | | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

Brief description of cause:
Violations of the federal securities laws.

**VII. REQUESTED IN COMPLAINT:**
- [x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes   [ ] No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*

JUDGE   Cathy Ann Bencivengo

DOCKET NUMBER   3:22-cv-01936-CAB-MSB

DATE   Dec 13, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Jennifer Pafiti

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John Thomas, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, and ANTONIO MARTINO,<br><br>Defendants. | No. **'23 CV 0043 LL    NLS**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Plaintiff John Thomas ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Silvergate Capital Corporation ("Silvergate" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Silvergate; and (c) review of other publicly available information concerning Silvergate.

## **NATURE OF THE ACTION**

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and January 5, 2023, inclusive (the "Class Period"). Plaintiff pursues claims against Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Silvergate is a digital currency company. Its platform, the Silvergate Exchange Network ("SEN"), provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and real estate lending, mortgage warehouse lending, and commercial business lending.

3. On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affidavit from investigation into crypto crime ring linked to smugglers/drug traffickers."

1

4. On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

5. On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposure to recently collapsed cryptocurrency exchange FTX, including Silvergate. The article highlighted the connection linking Silvergate to a money laundering operation that transferred $425 million off cryptocurrency trading platforms.

6. On this news, the Company's Class A common stock fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

7. Then, on January 4, 2023, the Company issued a press release announcing that it would release select financial metrics before market open on Thursday, January 5, 2023, and would then host a business update conference call at 8:00 a.m. Eastern Time.

8. On January 5, 2023, before the domestic stock markets opened, Silvergate issued a press release in which, in pertinent part, it disclosed that total deposits from digital asset customers had declined to $3.8 billion as of December 31, 2022, compared to $11.9 billion as of September 30, 2022, a decline of roughly 68%. In the same release, Silvergate acknowledged that there was a "crisis of confidence" across the cryptocurrency or digital asset ecosystem.

9. That same day, *The Wall Street Journal* released an article titled "Silvergate's Deposit Run is Worse Than Great Depression-Era Runs," in which it noted that bank runs from 1930-1933 averaged deposit declines of nearly 38%, and that only a few (9 out of a sample size of 67) had deposit declines exceeding 50%. It further noted that during the 2008 crisis, deposit losses were substantially smaller than the losses faced by Silvergate.

2

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

10. On this news, the Company's Class A common stock fell more than $9 per share, from a closing price of $21.95 on January 4, 2023, to $12.57 on January 5, 2023 on unusually heavy volume, a drop of 42.73%.

11. Throughout the class period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm; and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

12. The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Exchange Act (15 U.S.C. §78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Judicial District. In addition, the Company's principal executive offices are located in this District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national exchange.

## **PARTIES**

16.    Plaintiff John Thomas, as set forth in the accompanying certification, incorporated by reference herein, purchased Silvergate securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.    Defendant Silvergate is incorporated under the laws of Maryland with its principal executive offices located in La Jolla, California. Silvergate's Class A common stock trade on the New York Stock Exchange ("NYSE") under the symbol "SI," and its depository shares, each representing a 1/40th interest in a share of 5.375% fixed rate non-cumulative perpetual preferred stock, Series A trade under the symbol "SI PRA."

18.    Defendant Alan J. Lane ("Lane") was the Company's Chief Executive Officer ("CEO") at all relevant times.

19.    Defendant Antonio Martino ("Martino") was the Company's Chief Financial Officer ("CFO") at all relevant times.

20.    Defendants Lane and Martino (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be

misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The individual defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Silvergate is a digital currency company. Its platform, the Silvergate Exchange Network ("SEN"), provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

### Materially False and Misleading
### Statements Issued During the Class Period

22.     The Class Period begins on November 9, 2021.[1] On that day, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021, stating that "the Company's disclosure controls and procedures were effective as of September 30, 2021."

23.     On February 28, 2022, Silvergate filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K touted the platform's compliance with regulatory requirements, stating "[a]s of December

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

5

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

31, 2021, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes *extensive regulatory compliance diligence*." The 2021 10-K reiterated that "[o]ur solutions and services are built on our deep-rooted commitment and proprietary approach to regulatory compliance," and that the Company has developed compliance capabilities, which "include *ongoing monitoring of customer activities* and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

24.　The 2021 10-K also stated that the Company has policies to comply with applicable regulations regarding money laundering:

> ***Anti-Terrorism, Money Laundering Legislation and OFAC***
>
> ＊　　　＊　　　＊
>
> The Bank has established appropriate anti-money laundering and customer identification programs. The Bank also maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act. The Bank otherwise has implemented policies and procedures to comply with the foregoing requirements.
>
> ＊　　　＊　　　＊
>
> ***The Bank has implemented policies and procedures to comply with the foregoing requirements.***

25.　The 2021 10-K contained the following risk related to the Digital Currency Industry, the ability to use digital currency to engage in illegal transactions, and how the Company's risk management and compliance framework are meant to combat this risk.

> ***The characteristic of digital currency have been, and may in the future continue to be, exploited to facilitate illegal activity such as fraud, money***

6

*laundering, tax evasion and ransomware scams; if any of our customers do so or are alleged to have done so, it could adversely affect us.*

Digital currencies and the digital currency industry are relatively new and, in many cases, lightly regulated or largely unregulated. Some types of digital currency have characteristics, such as the speed with which digital currency transactions can be conducted, the ability to conduct transactions without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, the irreversible nature of certain digital currency transactions and encryption technology that anonymizes these transactions, that make digital currency particularly susceptible to use in illegal activity such as fraud, money laundering, tax evasion and ransomware scams. Two prominent examples of marketplaces that accepted digital currency payments for illegal activities include Silk Road, an online marketplace on the dark web that, among other things, facilitated the sale of illegal drugs and forged legal documents using digital currencies and AlphaBay, another darknet market that utilized digital currencies to hide the locations of its servers and identities of its users. Both of these marketplaces were investigated and closed by U.S. law enforcement authorities. U.S. regulators, including the SEC, Commodity Futures Trading Commission (the "CFTC"), and Federal Trade Commission (the "FTC"), as well as non-U.S. regulators, have taken legal action against persons alleged to be engaged in Ponzi schemes and other fraudulent schemes involving digital currencies. In addition, the Federal Bureau of Investigation has noted the increasing use of digital currency in various ransomware scams.

*While we believe that our risk management and compliance framework, which includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers), is reasonably designed to detect any such illicit activities* conducted by our potential or existing customers (or, in the case of digital currency exchanges, their customers), we cannot ensure that we will be able to detect any such illegal activity in all instances. Because the speed, irreversibility and anonymity of certain digital currency transactions make them more difficult to track, fraudulent transactions may be more likely to occur. We or our banking counterparties may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. If one of our customers (or in the case of digital currency exchanges, their customers) were to engage in or be

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

accused of engaging in illegal activities using digital currency, we could be subject to various fines and sanctions, including limitations on our activities, which could also cause reputational damage and adversely affect our business, financial condition and results of operations.

(First emphasis in original.)

26.    The 2021 10-K also contained the following risk factor purporting to warn that the Company would be at risk of enforcement actions if Silvergate failed to institute proper anti-money laundering programs:

> ***Financial institutions, such as the Bank, face risks of noncompliance and enforcement actions related to the Bank Secrecy Act and other anti-money laundering statutes and regulations (in particular, as such statutes and regulations relate to the digital currency industry).***
>
> The Bank Secrecy Act, USA Patriot Act, FinCEN and other laws and regulations ***require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate***. To administer the Bank Secrecy Act, FinCEN is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration and the IRS. There is also increased scrutiny of compliance with the sanctions programs and rules administered and enforced by the Treasury Department's Office of Foreign Assets Control.
>
> Our compliance with the anti-money laundering laws is in part dependent on our ability to adequately screen and monitor our customers for their compliance with these laws. Customers associated with our digital currency initiative may represent an increased compliance risk given the prevalence of money laundering activities using digital currencies. ***We have developed enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency activities, a system of "red flags" specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our third-party transaction monitoring system, customer risk scoring with risk factors specific to the digital-***

8

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*currency industry, and the use of various blockchain monitoring tools. We believe these enhanced procedures adequately screen and monitor our customers associated with the digital currency initiative for their compliance with anti-money laundering laws*; however, given the rapid developments in digital currency markets and technologies, there can be no assurance that these enhanced procedures will be adequate to detect or prevent money laundering activity. If regulators determine that our enhanced procedures are insufficient to address the financial crimes risks posed by digital currencies, the digital currency initiative may be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

*To comply with regulations, guidelines and examination procedures in this area, we have dedicated significant resources to our anti-money laundering program.* If our policies, procedures and systems are deemed deficient, we could be subject to liability, including fines and regulatory actions such as restrictions on our ability to pay dividends and the inability to obtain regulatory approvals to proceed with certain aspects of our business plans, including acquisitions and de novo branching.

27. The 2021 10-K stated that management determined that "as of December 31, 2021, the Company maintained effective internal control over financial reporting. . . ."

28. On May 5, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended March 31, 2022 ("the 1Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K. The 1Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of March 31, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes *extensive regulatory compliance diligence*."

29. The 1Q22 10-Q stated that there were no changes to the Company's

9

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

internal control over financial reporting and affirmed that "the Company's disclosure controls and procedures were effective as of March 31, 2022."

30. On August 8, 2022, the Company filed its Form 10-Q with the SEC for the period ended June 30, 2022 (the "2Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.

31. The 2Q22 10-Q also reaffirmed statements from the 2021 10-K touting

32. the Company's platform's compliance with regulatory requirements, stating "[a]s of 14 June 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

33. The 2Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of June 30, 2022."



10

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

34. On November 1, 2022, Silvergate held an investor presentation, which was filed as Exhibit 99.1 to a Form 8-K filed with the SEC the same day. It stated the following about compliance and risk management.

35. On November 7, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended September 30, 2022 (the "3Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K. The 3Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of September 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

36. The 3Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of September 30, 2022."

37. On November 16, 2022, Silvergate issued a press release providing, among other things, a mid-quarter update. The press release stated:

> "Silvergate's platform, including our risk management and compliance infrastructure, was built to support our clients during times of market volatility and transformation," said Alan Lane, CEO of Silvergate.

38. The above statements identified in ¶¶ 18-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory

11

scrutiny and face damages, including penalties and reputational harm and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

39.     On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers." The tweet contained a link to an August 2022 forfeiture application for probable cause filed in Broward County, Florida. The forfeiture application connected Silvergate to a money laundering operation and stated, in relevant part:

> In June 2022, *your Affiant subpoenaed bank account records for multiple digital cryptocurrency trading platforms held at Silvergate Bank*. The records for those accounts held in the name of OSL Digital LTD, OSL SG PTE LTD, Paxos Global PTE LTD, and Paxos Trust Company LLC. In these records were the wire transfer payment details from the various operating accounts which represented the funds being transferred off the respective cryptocurrency platforms and into the US financial system.
>
> Your Affiant examined the records produced by Silvergate Bank found the following:
> (i)     *During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms into accounts held at different US banks.*
>
> (ii)    The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized (discussed above) by the MLTF for being used to facilitate the laundering of illicit funds
>
> (iii) In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patters of thousands of other persons and businesses using the same digital currency trading platforms contained in the same records.

40. On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

41. On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposures to recently collapsed cryptocurrency exchange FTX, including Silvergate. In addition to the money laundering operation linked to Silvergate that transferred $425 million off cryptocurrency trading platforms, it drew attention to potential violations of Silvergate's anti-nepotism policy:

In February 2022, Silvergate, which has ~$13 billion in deposits, boasted that its exchange network "recently crossed $1 trillion in cumulative payment volumes [and] is integral to the everyday operations of our digital currency customers."

Last week, Silvergate replaced its Chief Risk Officer with its Chief Operating Officer. The former Chief Risk Officer was Tyler Pearson. Mr. Pearson is the son-in-law of Silvergate's CEO Alan Lane. Silvergate's Bank Manager of Correspondent Banking is Jason Brenier. Mr. Brenier is also the son-in-law of Silvergate's CEO Alan Lane. And Silvergate's Chief Technology Officer, Chris Lane, is the son of Alan Lane. In its most recent proxy filing, Silvergate said the employments were in compliance with its "Anti-Nepotism Policy."

42. On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

43. Then, on January 5, 2023, the Company made the aforementioned

13

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

disclosure regarding the dramatic decline in the amount of deposits, resulting in a 43% decline in the stock price.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Silvergate's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Silvergate shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Silvergate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

14

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

48. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the class. Among the questions of law and fact common to the class are:

(a) whether the federal securities laws were violated by Defendant's acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Silvergate; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

49. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

50. The market for Silvergate's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Silvergate's securities relying upon the integrity of the market price of the Company's securities and market information relating to Silvergate, and have been damaged thereby.

51. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Silvergate's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts

15

necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Silvergate's business, operations, and prospects as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

53.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

54.     During the Class Period, Plaintiff and the Class purchased Silvergate's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## SCIENTER ALLEGATIONS

55. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Silvergate, their control over, and/or receipt and/or modification of Silvergate's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Silvergate, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

56. The market for Silvergate's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period. On November 19, 2021, the Company's share price closed at a Class Period high of $219.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Silvergate's securities and market information relating to Silvergate, and have been damaged thereby.

57. During the Class Period, the artificial inflation of Silvergate's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused

17

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

to be made a series of materially false and/or misleading statements about Silvergate's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Silvergate and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58. At all relevant times, the market for Silvergate's securities was an efficient market for the following reasons, among others:

(a) Silvergate shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Silvergate filed periodic public reports with the SEC and/or the NYSE;

(c) Silvergate regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Silvergate was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59. As a result of the foregoing, the market for Silvergate's securities promptly digested current information regarding Silvergate from all publicly available sources and reflected such information in Silvergate's share price. Under

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

these circumstances, all purchasers of Silvergate's securities during the Class Period suffered similar injury through their purchase of Silvergate's securities at artificially inflated prices and a presumption of reliance applies.

60.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set

forth above, that requirement is satisfied here.

## <u>NO SAFE HARBOR</u>

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of

19

those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Silvergate who knew that the statement was false when made.

## First Claim

## Violation of Section 10(b) of The Exchange Act

## and Rule 10b-5 Promulgated Thereunder

## Against All Defendants

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Silvergate's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

64.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Silvergate's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Silvergate's financial well-being and prospects, as specified herein.

66.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Silvergate's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Silvergate and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

67.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations,

21

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

68.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Silvergate's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Silvergate's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Silvergate's securities during the Class Period at artificially high prices and were damaged thereby.

22

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

70. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Silvergate was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Silvergate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## Second Claim

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

73. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74. Individual Defendants acted as controlling persons of Silvergate within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

23

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76. As set forth above, Silvergate and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

24

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 10, 2023                    **THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

25

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silvergate Capital Corporation The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis not to exceed one-third of the recovery and will advance all costs and expenses. All payments of fees and expenses shall be made only after Court review and approval. The Silvergate Capital Corporation Retention Agreement provided to the Plaintiff is incorporated by reference herein and is effective, upon execution and delivery by The Rosen Law Firm P.A.

**First Name:** John
**Middle Initial:** E
**Last Name:** Thomas
**Mailing Address:** Redacted
**City:**
**State:**
**Zip Code:**
**Country:**
**Phone:**
**Email Address:**

Plaintiff certifies that:

1. Plaintiff has reviewed a complaint and authorized its filing or the filing of an amended complaint.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Purchases:**

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | | | |

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | | | |

**Sales:**

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | | | |

**I have not sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, except if set forth below.**
Not applicable

I declare and certify under penalty of perjury, under the laws of the United States of America, that the foregoing information is true and correct. **YES**

By Signing below and submitting this certification form electronically, I intend to sign and execute this certification pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Date of signing: 01/09/2023 10:59:11 at Eastern Standard Time, USA

## SCHEDULE A

## JOHN THOMAS TRANSACTIONS

| PURCHASES | | | SALES | | |
|---|---|---|---|---|---|
| Date Purchased | Shares | Price per Share | Date Sold | Shares | Price per Share |
| 2/24/2022 | 50 | ($100.00) | 1/13/2022 | 9 | ($135.00) |

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 793, MEMBERS PENSION BENEFIT TRUST OF ONTARIO, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SILVERGATE CAPITAL CORPORATION, ALAN J. LANE, ANTONIO MARTINO, KATHLEEN M. FRAHER, BENJAMIN C. REYNOLDS, DENNIS S. FRANK, MICHAEL LEMPRES, KAREN F. BRASSFIELD, ROBERT C. CAMPBELL, PAUL D. COLUCCI, THOMAS C. DIRCKS, SCOTT REED, COLLEEN SULLIVAN, AANCHAL GUPTA, GOLDMAN SACHS & CO. LLC, KEEFE, BRUYETTE & WOODS, INC., CANACCORD GENUITY LLC, COMPASS POINT RESEARCH & TRADING, LLC, CRAIG-HALLUM CAPITAL GROUP LLC, J.P. MORGAN SECURITIES LLC, and WEDBUSH SECURITIES LLC, <br><br> Defendants. | Case No. **'23CV0099 RSH DEB** <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>CLASS ACTION</u> <br><br> DEMAND FOR JURY TRIAL |

Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Silvergate Capital Corporation ("Silvergate" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Silvergate; and (d) other public information regarding the Company.

## I.  **INTRODUCTION**

1. Plaintiff brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired: (a) Silvergate Class A Common stock between November 11, 2020 and January 5, 2022, inclusive (the "Class Period"); (b) Silvergate Class A common stock pursuant and/or traceable to the Company's secondary public offering ("SPO") conducted on or around January 20, 2021 (the "January SPO"); and/or (c) Silvergate Class A common stock pursuant and/or traceable to the Company's SPO conducted on or around December 6, 2021 (the "December SPO," and together with the January SPO, the "Offerings").

2. The claims asserted herein are alleged against Silvergate, certain of the Company's senior officers, members of Silvergate's Board of Directors, and the underwriters of the Offerings (collectively, "Defendants"), and arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3. Silvergate is a holding company for the U.S. federal and state chartered subsidiary bank, Silvergate Bank. Through Silvergate Bank, Silvergate functions as a depository, and recently a lender, for all major cryptocurrency platforms, including

- 1 -

some of the more prominent exchanges such as Coinbase, Genesis, and, until recently, FTX.

4. A critical component of Silvergate's cryptocurrency business is its one-of-a-kind service called the Silvergate Exchange Network (the "SEN"). The SEN is the cryptocurrency world's closest approximation to the SWIFT banking system, which allows Silvergate customers to send U.S. dollars and euros between eligible counterparty SEN accounts at any time of day using the Company's application programming interface.

5. As a federally regulated banking institution, Silvergate is subject to a wide variety of federal regulations, including anti-terrorism and anti-money laundering ("AML") legislation by the Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCen"), including the Bank Secrecy Act ("BAS") and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA Patriot Act") of 2001. Among other things, those statutes impose requirements on regulated banks to establish Know Your Customer ("KYC") collection protocols, file reports for customer deposits or withdrawals, and create a protocol for suspicious activity that might indicate money laundering or other illegal activity.

6. Throughout the Class Period, Silvergate repeatedly touted its "strong regulatory compliance program"—including its anti-money laundering policies and KYC procedures—as a foundation for its growth. In connection with both the January SPO and the December SPO, Silvergate stated that it: maintained a robust compliance framework; was in compliance with all material aspects of applicable laws and legislation; had established appropriate AML and KYC compliance programs; and was prepared to accommodate deposit inflows and outflows and as such maintained a highly liquid balance sheet. Silvergate also repeatedly represented that its "vision and advanced approach to compliance" was a foundation for its growth and offered a competitive edge against other institutions who wished

- 2 -

to enter the cryptocurrency banking market. As a result of these misrepresentations, shares of Silvergate stock traded at artificially inflated prices throughout the Class Period.

7. The truth began to emerge on November 7, 2022, after the market closed, when Silvergate announced the sudden and unexplained demotion of its Chief Risk Officer, Tyler Pearson—the son-in-law of CEO Alan J. Lane. The Company replaced Pearson with Kathleen Fraher, who was then serving as Chief Operating Officer. Social media commenters noted Silvergate's exposure to FTX and Alameda Research LLC ("Alameda") and questioned whether Pearson's demotion indicated a lack of adequate oversight of Silvergate's regulatory compliance. In response to this news, the price of Silvergate stock declined by $11.54 per share, or 22.6%, from a closing price of $50.96 per share on November 7, 2022, to a closing price of $39.42 per share on November 8, 2022, on unusually high trading volume.

8. Over the ensuing months, additional disclosures regarding the Company's lax compliance practices reached investors, further impacting the price of Silvergate stock.

9. Then, on January 5, 2023, the Company disclosed that the collapse of FTX had led to a run on Silvergate Bank, causing its deposits to decline by $8.1 billion, or over 68%, over the three months ending in December 2022. This led to an acute liquidity crunch, which forced Silvergate to sell off illiquid securities for a loss of over $700 million and to borrow $4.3 billion in short-term advances from Federal Home Loan Banks. In response to this news, the price of Silvergate stock declined by $9.38 per share, or 42.7%, from a closing price of $21.95 per share on January 4, 2023 to a closing price of $12.57 per share on January 5, 2023, on unusually high trading volume.

- 3 -

10.   All told, disclosures of Silvergate's deficient compliance procedures and protocols caused the Company's stock price to decline from $50.96 per share on November 7, 2022, to just $12.57 per share on January 5, 2023.

11.   As a result of Defendants' actions detailed herein, Plaintiff and other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

12.   The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.   Venue is proper in this District under Section 22 of the Securities Act 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Silvergate's principal executive office is located in La Jolla, California, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

15.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Plaintiff

16.   Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario is a Canadian Registered Pension Plan

- 4 -

that provides retirement benefits to crane and heavy equipment operators, other skilled workers, and their families. As indicated in the certification submitted herewith, Plaintiff purchased shares of Silvergate Class A Common Stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Issuer Defendant**

17.    Defendant Silvergate is a holding company for its U.S. federal and state chartered subsidiary bank, Silvergate Bank. Incorporated in Maryland, the Company maintains its corporate headquarters at 4250 Executive Square, Suite 300, La Jolla, California. Silvergate mainly serves the cryptocurrency industry—its customers include cryptocurrency exchanges, institutional investors, and stablecoin issuers. Silvergate's common stock trades on NYSE under ticker symbol "SI." As of October 31, 2022, Silvergate had over 31.65 million shares of Class A common stock outstanding, owned by hundreds or thousands of investors.

**C.    Officer Defendants**

18.    Defendant Alan J. Lane ("Lane") is, and was at all relevant times, Silvergate's Chief Executive Officer ("CEO") and a Director of the Company. Defendant Lane reviewed and signed both the January SPO Registration Statement (defined herein) and the Shelf Registration Statement (defined herein).

19.    Defendant Antonio Martino ("Martino") is, and was at all relevant times, Silvergate's Chief Financial Officer ("CFO"). Defendant Martino reviewed and signed both the January SPO Registration Statement and the Shelf Registration Statement.

20.    Defendant Kathleen M. Fraher ("Fraher") is, and was at all relevant times, one of Silvergate's senior executive officers. From 2018 until November 7, 2022, Defendant Fraher served as Chief Operating Officer of the Company and Silvergate Bank. Since November 7, 2022, Defendant Fraher serves as Chief Risk Officer of the Company and Silvergate Bank.

21. Defendant Benjamin C. Reynolds ("Reynolds") is, and was at all relevant times, one of Silvergate's executive officers. Defendant Reynolds was Executive Vice President and Director of Corporate Development of Silvergate Bank from February 2019 to January 2021, when he was then appointed Chief Strategy Officer of the Company. Defendant Reynolds was named President of Silvergate on November 7, 2022.

22. Defendants Lane, Martino, Fraher, and Reynolds are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions with Silvergate, possessed the power and authority to control the contents of Silvergate's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Silvergate and the Officer Defendants are collectively referred to herein as the "Exchange Act Defendants."

D. **Director Defendants**

23. Defendant Dennis S. Frank ("Frank") was the Chairman of the Board of Directors of Silvergate from November 1996 to June 2021, and is presently a Director of Silvergate. Defendant Frank reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Frank signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

- 6 -

24.     Defendant Michael Lempres ("Lempres") is, and was at all relevant times, a Director of Silvergate and has been Chairman of the Board of Directors of Silvergate since June 2021. Defendant Lempres reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Lempres signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

25.     Defendant Karen F. Brassfield ("Brassfield") is, and was at all relevant times, a Director of Silvergate. Defendant Brassfield reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Brassfield signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on her behalf as attorney-in-fact.

26.     Defendant Robert C. Campbell ("Campbell") is, and was at all relevant times, a Director of Silvergate. Defendant Campbell reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Campbell signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

27.     Defendant Paul D. Colucci ("Colucci") is, and was at all relevant times, a Director of Silvergate. Defendant Colucci reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Colucci signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

28.     Defendant Thomas C. Dircks ("Dircks") is, and was at all relevant times, a Director of Silvergate. Defendant Dircks reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Dircks signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

29.     Defendant Scott Reed ("Reed") is, and was at all relevant times, a Director of Silvergate. Defendant Reed reviewed the January SPO Registration

Statement and the Shelf Registration Statement. Defendant Reed signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

30. Defendant Colleen Sullivan ("Sullivan") is, and was at all relevant times, a Director of Silvergate. Defendant Sullivan reviewed the January SPO Registration Statement and the Shelf Registration Statement. Defendant Sullivan signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on her behalf as attorney-in-fact.

31. Defendant Aanchal Gupta ("Gupta") has served as a Director of Silvergate since June 2021. Defendant Gupta reviewed the Shelf Registration Statement and authorized John M. Bonino to sign the Shelf Registration Statement on her behalf as attorney-in-fact.

32. Defendants Lane, Martino, Frank, Lempres, Brassfield, Campbell, Colucci, Dircks, Reed, Sullivan, and Gupta are collectively referred to herein as the "Director Defendants." Each of the Director Defendants, except for Defendant Gupta, signed the January SPO Registration Statement, and all of the Director Defendants signed the Shelf Registration Statement.

### E. Underwriter Defendants

33. Defendant Goldman Sachs & Co. LLC ("Goldman") served as an underwriter and joint book-running manager of the January SPO and the December SPO, and sold millions of Silvergate shares in the Offerings. As an underwriter of the Offerings, Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

34. Defendant Keefe, Bruyette & Woods, Inc. ("KBW") served as an underwriter and joint book-running manager of the January SPO and the December SPO, and sold millions of Silvergate shares in the Offerings. As an underwriter of the Offerings, KBW was responsible for ensuring the truthfulness and accuracy of

the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

35. Defendant Canaccord Genuity LLC ("Canaccord") served as an underwriter and joint book-running manager of the January SPO and sold hundreds of thousands of Silvergate shares in the January SPO. As an underwriter of the January SPO, Canaccord was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials.

36. Defendant Compass Point Research & Trading, LLC ("Compass") served as an underwriter of the Offerings and sold hundreds of thousands of Silvergate shares in the Offerings. As an underwriter of the Offerings, Compass was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

37. Defendant Craig-Hallum Capital Group LLC ("Craig-Hallum") served as an underwriter of the Offerings and sold hundreds of thousands of Silvergate shares in the Offerings. As an underwriter of the Offerings, Craig-Hallum was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

38. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter and joint book-running manager for the December SPO and sold hundreds of thousands of Silvergate shares in the December SPO. As an underwriter of the December SPO, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the December SPO Offering Materials.

39. Defendant Wedbush Securities LLC ("Wedbush") served as an underwriter for the December SPO and sold hundreds of thousands of Silvergate

shares in the December SPO. As an underwriter for the December SPO, Wedbush was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the December SPO Offering Materials.

40. Defendants Goldman, KBW, Canaccord, Compass, Craig-Hallum, J.P. Morgan, and Wedbush are collectively referred to herein as the "Underwriter Defendants." Silvergate, the Director Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

## IV. BACKGROUND

41. Silvergate was founded in 1988 as a community bank in southern California. In 2008, Silvergate's current CEO, Alan J. Lane, joined the Company and quickly began devising plans for expansion. By early 2013, Lane saw an opportunity to grow Silvergate's business by shifting focus to the burgeoning cryptocurrency industry. Over the next several years, Silvergate went "all in" on cryptocurrencies.

42. During the Class Period, Silvergate's SEN provided payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Given the ease with which the SEN allowed parties to instantly transfer currency from one account to another, Silvergate became a de facto clearinghouse for many of the largest cryptocurrency investors in the world.

43. By late 2020, Silvergate's most notable clients included prominent exchanges such as Binance, Coinbase, Genesis, Gemini, and FTX. As a result of the SEN's popularity, the Company experienced exponential growth, increasing from 46,063 transactions representing $32.7 billion in deposits in 2019 to 230,815 transactions representing $135.7 billion in deposits by the end of 2020.

44. As a federally regulated banking institution, Silvergate is subject to strict regulations aimed at, among other things, creating a protocol for identifying suspicious activity that might indicate potential money laundering operations and

other illegitimate activities by its customers and having procedures for reporting this kind of illicit behavior to relevant authorities.

45. According to Europol, cryptocurrency has been increasingly used to facilitate criminal activities and to launder criminal proceeds. In addition to using cryptocurrencies to obfuscate money flows as part of increasingly complex money laundering schemes, cryptocurrencies are increasingly used by criminals as a means of payment or as an investment fraud currency.

46. FinCen's Final Rule on Customer Due Diligence Requirements for Financial Institutions requires that banks establish and maintain written policies and procedures for anti-money laundering and KYC protocols. Specifically, FinCen's customer identification rules require that Silvergate maintain a written Customer Identification Program appropriate for the bank's size and type of business that, at a minimum, includes "risk-based procedures for verifying the identity of each customer" that enable the bank to "form a reasonable belief that it knows the true identity of each customer" in light of the "bank's assessment of the relevant risks, including those presented by the various types of accounts maintained by the bank, the various methods of opening accounts provided by the bank, the various types of identifying information available, and the bank's size, location, and customer base." 31 C.F.R. §§ 1020.220(a)(1), (2).

47. The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council ("FFIEC Manual") summarizes industry sound practices and examination procedures for customer due diligence on accounts that present a higher risk for money laundering and terrorist financing.

48. The FFIEC Manual sets forth a matrix for identifying high risk accounts that require enhanced due diligence. Such accounts include accounts that have "large and growing customers base in a wide and diverse geographic area;" or "[a] large number of noncustomer funds transfer transactions and payable upon proper identification [] transactions;" and "[f]requent funds from personal or business

accounts to or from higher-risk jurisdictions, and financial secrecy havens or jurisdictions," such as Silvergate's deposit accounts.

49. Silvergate is required to comply with heightened due diligence for its deposit accounts. According to the FFIEC Manual, Silvergate's due diligence is required to include assessments to determine the purpose of the account, ascertain the source and funding of the capital, identify account control persons and signatories, scrutinize the account holders' business operations, and obtaining adequate explanations for account activities.

50. Additionally, Silvergate's general customer due diligence program is required to include protocols to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and furnish a means for the bank to notice unusual or suspicious transactions for each customer.

51. Silvergate's customer due diligence process must be able to identify any of a series of money laundering "red flags" as set forth in the FFIEC Manual, including: (a) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (b) repetitive or unusual funds transfer activity; (c) funds transfers sent or received from the same person to or from different accounts; (d) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (e) transactions inconsistent with the account holder's business; (f) customer use of a personal account for business purposes; (g) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (h) multiple high-value payments or transfers between shell companies without a legitimate business purpose. The due diligence process must also enable Silvergate to take appropriate action once such "red flags" are identified.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

52. The Class Period begins on November 11, 2020, which is the first

trading day after Silvergate filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2020. In that Form 10-Q, Silvergate assured investors of its rigorous approach to regulatory compliance, stating that "our vision and advanced approach to compliance complement the SEN and empower us to extend our leadership position in the industry by developing additional infrastructure solutions and services that will facilitate growth in our business." Silvergate further stated that its ability to "[p]rovid[e] infrastructure solutions and services to the digital currency industry [] require[s] specialized compliance capabilities and a management team with a deep understanding of both the digital currency and the financial services industries" and, as such, given the "regulatory complexity," the cost and difficulty of ensuring such compliance serves as a "barrier to entry" for other banks.

53. On January 20, 2021, Silvergate issued a press release announcing that it would conduct the January SPO, through which the Company would offer $200 million worth of shares of Class A common stock to investors, and that the Company expects to grant the underwriters a 30-day option to purchase up to an additional $30 million of shares of Class A common stock.

54. On January 20, 2021, Silvergate filed with the SEC a Registration Statement on Form S-3ASR, Automatic Shelf Registration Statement of Securities of Well-Known Seasoned Issuers (the "January SPO Registration Statement").

55. On January 20, 2021, Silvergate filed with the SEC a Prospectus on Form 424B5 (the "January SPO Prospectus" and, collectively with the January Registration Statement and the January SPO Underwriting Agreement (defined below), the "January SPO Offering Materials").

56. On January 25, 2021, Silvergate filed with the SEC a Form 8-K, attaching the Underwriting Agreement by and among Silvergate and Goldman, KBW and Canaccord, dated January 21, 2021 (the "January SPO Underwriting Agreement").

57.    On January 26, 2021, Silvergate announced the completion of the January SPO.  Through the January SPO, and upon the decision of Defendants Goldman, KBW, Canaccord, Compass, and Craig-Hallum to exercise their option to purchase additional shares, Silvergate sold over 4.5 million shares of Silvergate Class A common stock at a price of $63 per share, resulting in gross proceeds of $287.50 million.

58.    The January SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

59.    In the January SPO Prospectus, Silvergate assured investors that it carefully vetted all customers using its platform, stating "[a]s of December 31, 2020, we had over 200 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

60.    The January SPO Registration Statement also reiterated that Silvergate "leverage[s] [its] technology platform and [its] management team's expertise to develop solutions for many of the largest U.S. digital currency exchanges and investors around the globe," solutions which "are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance."

61.    The January SPO Offering Materials also included representations that, from the onset of its cryptocurrency pursuits, the Company understood the complexity of the regulatory environment presented in the cryptocurrency industry. Specifically, the January SPO Prospectus stated that: "we believe that the market opportunity for digital currencies, the need for infrastructure solutions and services and the regulatory complexity have all expanded significantly since 2013," and as such, Silvergate's "ability to address these market dynamics over the past seven years has provided [it] with a first-mover advantage within the digital currency

- 14 -

industry that is the cornerstone of [its] leadership position today."

62. In the January SPO Underwriting Agreement, which was filed with the SEC as part of the January SPO Offering Materials, Silvergate stated that "[t]he Company and each of its subsidiaries are in compliance in all material respects with all applicable laws administered by . . . a 'Regulatory Authority' including, without limitation, the Federal Reserve, the FDIC, the California Department of Financial Protection and Innovation ("CDFPI"), the Consumer Financial Protection Bureau, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") and the Financial Crimes Enforcement Network of the U.S. Department of the Treasury."

63. On January 21, 2021, Silvergate held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2020. During that call, in response to a question about Silvergate's rapid growth and the addition of new institutions to the SEN, Defendant Reynolds responded that Silvergate was continuing to "stick to [its] compliance and risk framework for evaluating those clients, and [it is] not loosening up there at all."

64. On March 8, 2021, Silvergate filed its annual report on Form 10-K with the SEC for the year ended December 31, 2020 (the "2020 Annual Report"). In the 2020 Annual Report, Silvergate stated that it had "established appropriate anti-money laundering and customer identification programs" and "maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act." The 2020 Annual Report also represented that Silvergate had "implemented policies and procedures to comply with" such requirements.

65. Although the 2020 Annual Report acknowledged risks related to the cryptocurrency industry, including that digital currency may be "exploited to facilitate illegal activity such as fraud, money laundering, tax evasion and

- 15 -

ransomware scams," Silvergate claimed that its compliance framework was sufficient "to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate."

66. In the 2020 Annual Report, Silvergate further highlighted its "enhanced procedures to screen and monitor" customers "associated with [its] digital currency initiative" which Silvergate admitted "may represent an increased compliance risk given the prevalence of money laundering activities using digital currencies," but assured investors that the Company had "dedicated significant resources to [its] anti-money laundering program," in order "to comply with regulations, guidelines and examination procedures in this area." Silvergate also stated that it "believes these enhanced procedures adequately screen and monitor [its] customers associated with the digital currency initiative for their compliance with anti-money laundering laws."

67. The 2020 Annual Report further stated that Silvergate's "solutions and services are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance . . . these capabilities are a distinct competitive advantage for [it], and provide a meaningful barrier to entry against [its] potential competitors, as there is not currently a well-established and easily navigable regulatory roadmap for competitors to serve digital currency industry customers."

68. In the 2020 Annual Report, Silvergate also assured investors that the Company "manage[s] [its] securities portfolio and cash to maintain adequate liquidity and to ensure the safety and preservation of invested principal, with a secondary focus on yield and return." In that regard, the 2020 Annual Report also stated that Silvergate "maintain[ed] high levels of liquidity for [its] customers who operate in the digital currency industry" and, "[i]n addition, to the extent that SEN participants fully withdraw funds from the Bank, no material liquidity issues or borrowing needs would arise since the majority of SEN participants deposits are held in liquid assets, such as available-for-sale securities and cash, or used to fund short-

- 16 -

term mortgage warehouse loans."

69. On July 7, 2021, Silvergate announced a new partnership with Elliptic, a crypto asset risk management firm, to support its compliance framework. In the announcement, Defendant Fraher stated that "[m]ost banks take a one-size-fits-all stance when it comes to crypto businesses deeming them too risky to bank. This is a narrow view as the digital currency industry continues to grow . . . [a]pplying rigorous controls to risk-based KYC and due diligence is possible through the depth and accuracy of risk exposure data that Elliptic provides on crypto businesses."

70. On July 28, 2021, Silvergate filed with the SEC a Post-Effective Amendment to Form S-3 Registration Statement (the "Shelf Registration Statement") to register an indeterminate number of shares of Class A common stock, among other securities, which became effective upon filing,

71. On December 6, 2021, Silvergate issued a press release announcing that it would conduct the December SPO, through which the Company would offer for sale approximately 3,310,344 shares of Silvergate's Class A common stock, and that the Company expects to grant the underwriters a 30-day option to purchase up to an additional 496,551 shares of Class A common stock. The press release stated that the December SPO would be pursuant to the Shelf Registration Statement that the Company filed in July 2021.

72. On December 6, 2021, Silvergate filed a prospectus supplement for the December SPO with the SEC on Form 424B5 (the "December SPO Prospectus," and, collectively with the December SPO Underwriting Agreement (defined below) and the Shelf Registration Statement, the "December SPO Offering Materials").

73. On December 8, 2021, Silvergate filed with the SEC a Form 8-K, attaching the Underwriting Agreement by and among Silvergate and Goldman, J.P. Morgan, and KBW, dated December 6, 2021 (the "December SPO Underwriting Agreement").

74. On December 9, 2021, Silvergate completed the December SPO.

Through the December SPO, and upon the decision of Defendants Goldman, J.P. Morgan, KBW, Compass, Craig-Hallum, and Wedbush to exercise their option to purchase additional shares, Silvergate sold more than 3.8 million shares of common stock at $145 per share, resulting in approximately $552 million in gross proceeds.

75. The December SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

76. The December SPO Prospectus reiterated that Silvergate's "solutions are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance," and stated that its vision and advanced approach to compliance empowered the Company be in a leadership position. The Company stated that: "we believe that the market opportunity for digital currencies, the need for infrastructure solutions and services and the regulatory complexity have all expanded significantly since 2013," and as such, Silvergate's "ability to address these market dynamics over the past seven years has provided [it] with a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

77. The December SPO Prospectus further stated that from the onset of its cryptocurrency pursuits, in 2013, the Company understood the complexity of the regulatory environment presented in the cryptocurrency industry, stating that: "[p]roviding infrastructure solutions and services to the digital currency industry [] require[s] specialized compliance capabilities and a management team with a deep understanding of both the digital currency and the financial services industries," and that Silvergate's "ability to address these market dynamics over the past seven years has provided [it] with a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

78. In the December SPO Underwriting Agreement, which was filed with the SEC as part of the December SPO Offering Materials, Silvergate further claimed

- 18 -

that "[t]he Company and each of its subsidiaries are in compliance in all material respects with all applicable laws administered by . . . a 'Regulatory Authority' including, without limitation, the Federal Reserve, the FDIC, the California Department of Financial Protection and Innovation ("CDFPI"), the Consumer Financial Protection Bureau, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") and the Financial Crimes Enforcement Network of the U.S. Department of the Treasury."

79. On January 18, 2022, Silvergate held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2021. On that call, Defendant Martino stated that Silvergate's total risk-based capital ratio reflects that "a large proportion of [the Company's] deposits are held in cash and in high grade and highly liquid securities."

80. On February 28, 2022, Silvergate filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 Annual Report"). The 2021 Annual Report repeated the same false and misleading statements set forth above in ¶¶ 64-68.

81. The 2021 Annual Report also claimed that Silvergate's onboarding process "includes extensive regulatory compliance diligence" and its "solutions and services are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance." In addition, Silvergate claimed that "these capabilities are a distinct competitive advantage for [the Company], and provide a meaningful barrier to entry against our potential competitors."

82. In the 2021 Annual Report, Silvergate assured that the Company "manage[s] [its] securities portfolio and cash to maintain adequate liquidity and to ensure the safety and preservation of invested principal, with a secondary focus on yield and return." In addition, the 2021 Annual Report claimed that Silvergate "maintain[ed] high levels of liquidity for [its] customers who operate in the digital currency industry" and, "[i]n addition, to the extent that SEN participants fully

- 19 -

withdraw funds from the Bank, no material liquidity issues or borrowing needs would arise since the majority of SEN participants deposits are held in liquid assets, such as available-for-sale securities and cash, or used to fund short-term mortgage warehouse loans."

83. The 2021 Annual Report again noted that SEN is the primary profit driver for the Company and claimed that "[t]his unique source of funding is a distinct advantage over most traditional financial institutions and allows us to generate revenue from a conservative portfolio of investments in cash, short term securities and certain types of loans that we believe generate attractive risk-adjusted returns." The 2021 Annual Report further claimed that "[o]ur deposits serve as the primary funding source for lending, investing and other general banking purposes, and one of the key elements of our financial success is our low-cost deposit base."

84. On June 2, 2022, Defendant Lane appeared on the Bloomberg podcast, Odd Lots. During the podcast, Defendant Lane assured investors that Silvergate only works with exchanges that are serious about regulatory requirements, stating that we work with "anybody that is serious about regulation. And that's an important distinction, because they have to satisfy not only their own legal and regulatory requirements, but then we have to verify that their compliance programs are sound."

85. On November 7, 2022, Silvergate filed its quarterly report for the third quarter ending September 30, 2022 with the SEC on Form 10-Q. In that report, Silvergate highlighted the Company's compliance with regulatory requirements, stating "[a]s of September 30, 2022, we had over 300 prospective digital asset customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence." The report also claimed that "the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of September 30, 2022."

86. The statements set forth in ¶¶ 52, 59-69, 76-85 were materially false

and misleading. In truth, Silvergate had not established appropriate anti-money laundering and customer identification programs, and its regulatory compliance framework lacked sufficient controls and procedures to detect money laundering and other fraudulent conduct, including an egregious fraud perpetrated by Silvergate customers FTX and Alameda. Moreover, Silvergate had significant exposure to FTX and Alameda in that it was sure to face regulatory scrutiny for a failure to detect or report on FTX's and Alameda's fraudulent conduct. The reality is Silvergate's regulatory framework did not offer a competitive edge, rather it attracted bad actors that used Silvergate's platform in furtherance of fraud and other criminal activity. Lastly, the Company's statements that it maintained sufficient liquid assets to protect against a bank run are false as Silvergate held its investments in illiquid securities.

87. On November 2, 2022, CoinDesk published documents showing Alameda—a trading firm focused on cryptocurrencies and founded by FTX founder Sam Bankman-Fried—was holding almost 40% of Alameda's assets in FTT, a proprietary coin issued by FTX. This disclosure triggered a sell-off of FTT coins that materially reduced the value of that currency, as well as a massive exit of customers from FTX. Over the next several days, FTX and Alameda were exposed for conducting a massive embezzlement scheme, FTX was forced to seek bankruptcy protection, and, eventually, Bankman-Fried was indicted for fraud, among other crimes.

88. Silvergate, as one of the cryptocurrency industry's leading banking institutions, was also impacted by FTX's collapse and the growing ramifications for the Company's other customers. Indeed, Silvergate was one of FTX and Alameda's largest banking partners, as Silvergate's SEN was used to facilitate trades for FTX and Alameda.

## VI. THE TRUTH EMERGES

89. The truth about Silvergate's deficient compliance procedures and protocols began to emerge on the evening of November 7, 2022, when Silvergate

- 21 -

announced the sudden and unexplained demotion of its Chief Risk Officer, Tyler Pearson, who is the son-in-law of Silvergate's CEO, Defendant Lane. The Company replaced Pearson with the Company's then-Chief Operating Officer, Defendant Fraher, who had also previously served as Vice President, Chief Compliance and Bank Secrecy Act Officer for Silvergate Bank.

90. The following day, November 8, 2022, social media erupted over Pearson's demotion, noting that this was an indication of lack of adequate oversight of Silvergate's regulatory compliance, as well as exposure to the FTX/Alameda fraud. Marcus Aurelius Value Research ("AV Research") tweeted a snapshot of Silvergate's website with a quote from Sam Bankman-Fried that read, "[l]ife as a crypto firm can be divided up into before Silvergate and after Silvergate—it's hard to overstate how much it revolutionized banking for blockchain companies." The tweet was accompanied by a caption that read, "[h]ow long until the new $SI 'Risk officer' takes this down?" These disclosures caused the price of Silvergate stock to decline by 22.6%, from a closing price of $50.96 per share on November 7, 2022, to a closing price of $39.42 on November 8, 2022.

91. On November 9, 2022, *S&P Global* published an article warning of Silvergate's exposure to FTX. That article quoted BTIG, LLC ("BTIG"), analysts Mark Palmer and Andrew Harte stating that "FTX is 'among the most prominent users' of Silvergate's SEN Network." These disclosures caused the price of Silvergate stock to decline by 12%, from a closing price of $39.42 per share on November 8, 2022, to a closing price of $34.69 per share on November 9, 2022.

92. In response to these allegations, Silvergate released a statement assuring investors that "as a prudentially regulated bank" the Company maintains "a strong capital position in excess of the well-capitalized status required by federal banking regulations." and that its underwritten bitcoin collateralized loans "continue[] to perform as expected with zero losses and zero forced liquidations." In addition, Defendant Reynolds told Mark Palmer of BTIG that "FTX's challenges

have had no direct impact on the company."

93. The statements set forth above in ¶ 92 were materially false and misleading. In truth, Silvergate had not established appropriate anti-money laundering and customer identification programs, and its regulatory compliance framework lacked sufficient controls and procedures to detect money laundering and other fraudulent conduct, including an egregious fraud perpetrated by Silvergate customers FTX and Alameda. Moreover, Silvergate had significant exposure to FTX and Alameda that exposed the Company to significant regulatory scrutiny for a failure to detect or report on FTX's and Alameda's fraudulent conduct. As a result, Silvergate was also exposed to a loss of confidence from other customers, which triggered an exodus of depositors from its platform.

94. Then on November 15, 2022, AV Research revealed that Silvergate was implicated in a $425 million money laundering operation by a South American cryptocurrency crime ring linked to smugglers and /drug traffickers. AV Research tweeted, "[r]ecently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers." That same day, Marc Cohodes, a short seller famous for exposing corporate fraud, publicly compared Silvergate's know-your-customer and anti-money laundering compliance to that of the "banks who did business with Madoff."

95. These disclosures caused the price of Silvergate stock to decline by 17.3%, from a closing price of $35.49 per share on November 14, 2022, to a closing price of $29.36 per share on November 15, 2022.

96. On November 15, after the market closed, BTIG analysts Mark Palmer and Andrew Harte reported that "assertion[s] about SI floated through social media today" including "that the company does not perform know-your-customer (KYC) or anti-money laundering (AML) screening, as supposedly evidenced by the fact that it accepted deposits from FTX." The analysts offered reassurance from Silvergate's

- 23 -

President, Reynolds, who noted that "the extent of SI's relationship with FTX was limited to deposits, adding that depositors, unlike borrowers, do not submit to the company all of their business records for review." Reynolds further commented that "SI as a highly regulated bank with a California state charter and membership in the Federal Reserve System has its controls, including its KYC and AML policies, reviewed on a regular basis."

97. On November 17, 2022, short seller The Bear Cave, published a newsletter providing additional details on Silvergate's connection to the South American money-laundering operation reporting that hundreds of millions of dollars were laundered through Silvergate's SEN platform, emphasizing Silvergate's lack of compliance monitoring and reporting protocols given "[t]he accounts were receiving funds in the same pattern as those . . . used to facilitate the laundering of illicit funds." This operation began in September 2021 and ended in June 2022. Silvergate did not report suspicious activity on these accounts until federal investigators requested documents.

98. Despite the misleading assurances provided by President Reynolds in ¶ 96, these disclosures caused the price of Silvergate stock to decline by 11%, from a closing price of $31.34 per share on November 16, 2022, to a closing price of $27.90 per share on November 17, 2022.

99. The following day, November 18, 2022, FalconX, a cryptocurrency exchange platform focused on risk management for institutional clients, revealed that it would no longer engage with Silvergate due to the elevated risk associated with the SEN platform, stating that its decision was "consistent with other market players."

100. As a result of this disclosure, the price of Silvergate shares declined by 10.7%, from a closing price of $27.90 per share on November 17, 2022, to a closing price of $24.90 per share on November 18, 2022.

101. On November 28, 2022, Bloomberg published a report implicating

Silvergate as a key facilitator of the FTX/Alameda fraud. The article revealed that FTX customers "wired $8 billion to Alameda" over the years and that customers were wiring these funds using Alameda accounts at Silvergate.

102. These disclosures caused the price of Silvergate shares to decline by 11.1%, from a closing price of $29.14 per share on Friday, November 25, 2022, to a closing price of $25.90 per share on Monday, November 28, 2022.

103. Then, on December 1, 2022, The Bear Cave published another report, providing additional evidence of Silvergate's involvement in a money laundering operation in December of 2018. The Bear Cave cited a July 2021 plea agreement between the Department of Justice and Joel Greenberg, who has since been convicted of embezzlement, that describes how Greenberg used Silvergate's SEN platform to launder $200,000. The report highlighted Silvergate's failure to identify and report 40 suspicious transactions that occurred over a four-day period.

104. These disclosures caused the price of Silvergate stock to decline by 8.1%, from a closing price of $27.43 per share on November 30, 2022, to a closing price of $25.22 per share on December 1, 2022.

105. On December 5, 2022, before the market opened, Silvergate issued select preliminary fourth quarter 2022 financial metrics and hosted a business update conference call. Before market opened, Morgan Stanley analyst, Manan Gosalia, lowered Silvergate's recommendation grade from equal weight to underweight, citing Silvergate's exposure to "massive financial pressure in the aftermath of the FTX exchange's collapse" and ensuing litigation.

106. These disclosures caused the price of Silvergate stock to decline by 8.5%, from a closing price of $26.49 per share on December 2, 2022, to a closing price of $24.24 on December 5, 2022.

107. On December 5, 2022, after the market closed, Defendant Lane wrote in a letter filed with the SEC that the Company has "robust risk management controls," emphasizing that the Company continues "to monitor account activity as

part of our enhanced due diligence process on each of these accounts and to take action when there are red flags," and insisting that the Company takes its risk management and compliance responsibilities "extremely seriously." Further highlighting that the Company "conducted extensive due diligence on FTX and Alameda Research." Also assuring investors that Silvergate is "purpose[ly] built" to "support [its] customers not only during periods of growth but also in periods of volatility – that is, [its] business is designed to accommodate deposit inflows and outflows under a range of market conditions."

108. The statements set forth above in ¶ 107 were materially false and misleading. In truth, Silvergate had not established appropriate anti-money laundering and customer identification programs, and its regulatory compliance framework lacked sufficient controls and procedures to detect money laundering and other fraudulent conduct, including an egregious fraud perpetrated by Silvergate customers FTX and Alameda. Moreover, Silvergate was implicated in multi-million-dollar money laundering operations using its SEN platform, that Silvergate either failed to detect or failed to report. At the least, Silvergate faces regulatory scrutiny for a failure to detect or report on FTX's and Alameda's fraudulent conduct. As a result, Silvergate was also exposed to a loss of confidence from other customers, which triggered a mass exodus of depositors from its platform rendering the business unprofitable.

109. On the morning of December 6, 2022, it was revealed that on December 5, 2022, Senators Elizabeth Warren and John Kennedy, and Representative Roger Marshall sent Defendant Lane a request for information about Silvergate's relationship with FTX and Alameda casting further doubt on whether the Company maintained effective regulatory and compliance procedures and controls. Specifically, the letter stated that "Silvergate's failure to take adequate notice of [the FTX] scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program."

- 26 -

110.   The same morning, NBC News reported that an investment manager provided testimony to the Senate Banking Committee of statements made to him by a former FTX employee confirming that as FTX's primary banking partner, Silvergate was implicated in the transfers of FTX customer funds between other Bankman-Fried controlled entities, including Alameda.

111.   These disclosures caused the price of Silvergate stock to decline by 4.7%, from a closing price of $24.24 per share on December 5, 2022, to a closing price of $23.10 per share on December 6, 2022.

112.   On December 13, 2022, the SEC and the Commodity Futures Trading Commission ("CFTC") both filed civil actions against Bankman-Fried. According to the complaints, FTX directed customers to deposit fiat currency into U.S. bank accounts controlled by Alameda. Importantly, the complaints revealed that "some or all of those bank accounts were opened in the name of the entity called North Dimension, a Delaware-registered wholly-owned subsidiary of Alameda." North Dimension was a shell company used by FTX and Alameda to misappropriate customer funds using Silvergate's SEN network.

113.   These disclosures caused the price of Silvergate stock to decline by 11.9%, from a closing price of $21.26 per share on December 12, 2022, to a closing price of $18.73 on December 13, 2022.

114.   On January 5, 2023, a day after a federal judge ordered the seizure of about $93 million of FTX funds held at Silvergate, the Company released select preliminary fourth quarter financial metrics in an intra quarter update. In the release, Silvergate disclosed that the collapse of FTX had led to a run on the bank, causing its deposits to decrease by more than 60% or $8.1 billion in the fourth quarter—a bank run that *The Wall Street Journal* dubbed "worse than great depression-era runs."

115.   The same day, Silvergate held a conference call with analysts and investors to discuss the intra-quarter update. On that call, Defendant Lane

acknowledged that there was a "crisis of confidence" across the cryptocurrency or digital asset ecosystem. To ensure it had enough capital for future deposit outflows, Silvergate sold $5.2 billion worth of illiquid mortgage-backed securities, taking a loss of over $700 million. The Company also revealed that it had tapped $4.3 billion in short term financing in from Federal Home Loan Banks to further shore up its depleted balance sheet.

116. These disclosures caused the price of Silvergate stock to decline by 42.7%, from a closing price of $21.95 per share on January 4, 2023, to a closing price of $12.57 per share on January 5, 2023.

117. In response to these disclosures, on January 9, 2023, analyst David Chiaverini of Wedbush Securities reported that if the bank had invested in three-month treasury bills instead of three-year mortgage-backed securities, Silvergate's "tangible book value would be closer to $46/share instead of our new estimate of $9/share."

## VII. LOSS CAUSATION

118. During the Class Period, as detailed herein, Silvergate and the Officer Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These misleading statements and omissions artificially inflated the price of Silvergate shares and operated as a fraud or deceit on the Class (as defined below). Later, when the alleged misrepresentations and fraudulent conduct were disclosed to the market on November 7, 2022, November 9, 2022, November 15, 2022, November 17, 2022, November 18, 2022, November 28, 2022, December 1, 2022, December 5, 2022, December 13, 2022, and January 5, 2023, the price of Silvergate shares fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of Silvergate shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

119. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired: (a) Silvergate Class A Common stock during the Class Period; (b) Silvergate Class A common stock pursuant and/or traceable to the January SPO; and/or (c) Silvergate Class A common stock pursuant and/or traceable to the December SPO (collectively, the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Silvergate and their families and affiliates.

120. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of October 31, 2022, Silvergate had over 31.65 million shares of common stock outstanding, owned by hundreds or thousands of investors.

121. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Securities Act and/or the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether the Officer Defendants and Director Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) Whether the Exchange Act Defendants knew or recklessly

- 29 -

disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Silvergate common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

122.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Exchange Act Defendants wrongful conduct.

123.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

124.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Joinder of all Class members is impracticable.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

125.   Silvergate's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

126.   The Exchange Act Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Silvergate who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or

- 30 -

forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X. PRESUMPTION OF RELIANCE

127. At all relevant times, the market for Silvergate common stock was an efficient market for the following reasons, among others:

(a) Silvergate shares met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Silvergate filed periodic public reports with the SEC and NYSE;

(c) Silvergate regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Silvergate was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

128. As a result of the foregoing, the market for Silvergate shares promptly digested current information regarding Silvergate from all publicly available sources and reflected such information in the price of Silvergate common stock. Under these circumstances, all purchasers of Silvergate common stock during the Class Period suffered similar injury through their purchase of Silvergate common stock at artificially inflated prices and the presumption of reliance applies.

129. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose

material adverse information regarding Silvergate's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Company's regulatory adequacy and liquid assets, that requirement is satisfied here.

## XI. SCIENTER ALLEGATIONS

130. As alleged herein, the Exchange Act Defendants acted with scienter since the Exchange Act Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding Silvergate, their control over, and/or receipt and/or modification of Silvergate's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Silvergate, participated in the fraudulent scheme alleged herein.

## XII. CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act**

**and SEC Rule 10b-5 Promulgated Thereunder**

**(Against the Exchange Act Defendants)**

131. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

132. During the Class Period, the Exchange Act Defendants carried out a

- 32 -

plan, scheme, and course of conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Silvergate Class A common stock at artificially inflated prices.

133. The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134. The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

135. During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136. The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. The Exchange Act Defendants engaged in this misconduct to conceal Silvergate's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

137. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Silvergate stock at artificially inflated prices and were harmed when the truth about Silvergate negatively impacted the price of

the Company's stock. Plaintiff and the Class would not have purchased Silvergate stock at the prices they paid, or at all, had they been aware that the market prices for Silvergate common stock had been artificially inflated by the Exchange Act Defendants' fraudulent course of conduct.

138. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

139. By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

### (Against the Officer Defendants)

140. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141. The Officer Defendants acted as controlling persons of Silvergate within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Silvergate, the Officer Defendants had the power and ability to control the actions of Silvergate and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## COUNT III

### For Violations of Section 11 of the Securities Act

### (Against the Securities Act Defendants)

142. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

- 34 -

143. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and/or December SPO and who were damaged thereby.

144. The January SPO Offering Materials and the December SPO Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

145. Silvergate is the registrant for the Offerings and as the issuer of the shares is strictly liable to Plaintiff and members of the Class for the misstatements and omissions in the January SPO Offering Materials and the December SPO Offering Materials.

146. The Securities Act Defendants are responsible for and are liable for the contents and dissemination of the January SPO Offering Materials and/or December SPO Offering Materials.

147. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the January SPO Offering Materials and/or the December SPO Offering Materials were true and without omissions of any material facts and were not misleading.

148. By reason of the conduct alleged herein, each Securities Act Defendant violated Section 11 of the Securities Act.

149. The value of Silvergate common stock has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and/or December SPO.

150. At the time of their purchases of Silvergate common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public through the January SPO and the December SPO and the time Plaintiff commenced this action.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act

### (Against the Underwriter Defendants)

151. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

152. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and December SPO and who were damaged thereby.

153. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

154. The Underwriter Defendants were statutory sellers of Silvergate shares that were registered in the January SPO pursuant to the January SPO Registration Statement and the December SPO pursuant to the Shelf Registration Statement and sold by means of the January SPO Offering Materials and December SPO Offering Materials. By means of the January SPO Offering Materials and/or December SPO Offering Materials, the Underwriter Defendants sold millions of Silvergate shares

through the January SPO and December SPO to members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the January SPO and/or the December SPO by means of the materially false and misleading Offering Materials.

155. The January SPO Offering Materials and December SPO Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

156. Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

157. By the reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased Silvergate Class A common shares in and/or traceable to the January SPO and/or the December SPO, and who were damaged thereby.

## COUNT V

### For Violations of Section 15 of the Securities Act

### (Against the Director Defendants)

158. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

159. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and/or the December SPO and who were damaged thereby.

160. The Director Defendants were controlling persons of Silvergate by

virtue of their positions as directors and/or senior officers of Silvergate. The Director Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major stockholders of Silvergate.

161. The Director Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

162. The Director Defendants acted as controlling persons of Silvergate within the meaning of Section 15 of the Securities Act. By reason of their voting power, ownership, rights as against Silvergate, and/or specific acts, the Director Defendants had the power to control Silvergate's operations and its decision-making processes. By reason of such control, Director Defendants are liable under Section 15 of the Securities Act.

163. By virtue of the conduct alleged herein, the Director Defendants are liable for the above-stated wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## XIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV. **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: January 19, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Jonathan D. Uslaner
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

-and-

HANNAH ROSS
(hannah@blbglaw.com)
JOHN RIZIO-HAMILTON
(johnr@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario*

- 39 -

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Joseph Redshaw, on behalf of International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am a Trustee of Local 793 and I am authorized to sign this certification on its behalf. I have reviewed the complaint and authorize its filing by counsel.

2. Local 793 did not purchase or sell the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Local 793 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 793's transactions in the Silvergate Capital Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5. Local 793 has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Firemen's Retirement System of St. Louis v. Telos Corporation*, No. 22-cv-135 (E.D. Va.)

6. Local 793 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for appointment as lead plaintiff or was not appointed lead plaintiff:

   *Doyle v. Reata Pharmaceuticals, Inc.*, No. 21-cv-987 (E.D. Tex.)

7. Local 793 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 793's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of January, 2023.

_____
Joseph Redshaw, Trustee
*International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario*

**International Union of Operating Engineers, Local No. 793,**
**Members Pension Benefit Trust of Ontario**
**Transactions in Silvergate Capital Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/5/2021 | 189 | $215.1600 |
| Purchase | 11/8/2021 | 3,355 | $216.3138 |
| Purchase | 12/7/2021 | 591 | $145.0000 |
| Purchase | 1/25/2022 | 1,602 | $99.9691 |
| Purchase | 10/19/2022 | 1,845 | $54.1443 |
| | | | |
| Sale | 1/10/2022 | (81) | $119.0068 |
| Sale | 1/28/2022 | (99) | $92.4932 |
| Sale | 2/8/2022 | (85) | $120.1310 |
| Sale | 3/28/2022 | (873) | $152.0319 |
| Sale | 4/1/2022 | (513) | $149.3628 |
| Sale | 4/11/2022 | (546) | $125.2589 |
| Sale | 11/10/2022 | (5,385) | $32.8950 |

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

**COHEN MILSTEIN SELLERS
    & TOLL PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
Tel:    (312) 629-3737

*Lead Counsel for Plaintiffs
and the Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br>Hon. James E. Simmons, Jr. |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          Case No. 22-cv-01936

# TABLE OF CONTENTS

                                                                                  Page

PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF
        1934 .................................................................................................2

I.      INTRODUCTION ........................................................................2

II.     JURISDICTION AND VENUE ....................................................7

III.    THE EXCHANGE ACT PARTIES ..............................................7

        A.      The Plaintiffs ...................................................................7

        B.      The Exchange Act Defendants ..........................................9

IV.     FACTUAL BACKGROUND.........................................................10

        A.      Silvergate Targets the Cryptocurrency Industry To Drive
                Deposits. ..........................................................................10

        B.      Silvergate Assures Investors That It Vets, Conducts Due
                Diligence on and Monitors All of Its Customers. ..............13

        C.      Investors Trusted the Exchange Act Defendants'
                Representations, and Silvergate's Stock Price Soared........19

        D.      In Truth, Silvergate Did Not Vet, Perform Due Diligence on, or
                Monitor Its Customers.......................................................21

        E.      Silvergate Failed To Vet, Conduct Due Diligence on, or
                Monitor FTX and Its Related Entities...............................33

        F.      Silvergate Failed To Vet, Conduct Due Diligence on, and
                Monitor Its Other Major Exchange Customers...................42

        G.      Customers and Investors Learn That Silvergate Did Not Vet,
                Perform Due Diligence On, or Monitor Its SEN Network
                Participants. .....................................................................52

V.      THE EXCHANGE ACT DEFENDANTS' FALSE AND
        MISLEADING STATEMENTS AND OMISSIONS ...................62

        A.      False Statements in 2019....................................................64

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                          -i-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                 Case No. 22-cv-01936

1. July 2019 Interview of Defendant Lane ...................................64

2. Initial Registration Statement ......................................65

B. False Statements in 2020.................................................67

1. August 2020 Investor Presentation ...........................67

2. August 2020 Canaccord Investor Conference ..........................70

C. False Statements in 2021 .................................................72

1. February 2021 Interview of Defendant Lane..........................72

2. September 2021 Barclays Investor Conference......................73

3. September 2021 Interview of Defendant Lane .........................75

4. November 2021 Interview of Defendant Lane ........................76

D. False Statements in 2022.................................................77

1. June 2022 Interview of Defendant Lane.................................77

2. June 2022 Crypto + Banks: The Frontier of Money Movement Interview ...............................................................79

3. June 2022 *CNBC* Interview of Defendant Lane ......................81

4. November 2022 Public Letter from Defendant Lane ...............83

5. December 2022 Public Letter from Defendant Lane................85

E. False Statements in 2023.................................................89

1. January 2023 "Business Update" Call ....................................89

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER .....................................91

VII.  ADDITIONAL LOSS CAUSATION ALLEGATIONS ...........................103

VIII. PRESUMPTION OF RELIANCE ............................................................116

IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .........................................117

X.    CAUSES OF ACTION UNDER THE EXCHANGE ACT.......................118

COUNT I – VIOLATION OF § 10(B) OF THE EXCHANGE ACT
(AGAINST SILVERGATE AND DEFENDANT LANE)........................118

COUNT II – VIOLATION OF § 20(A) OF THE EXCHANGE ACT
(AGAINST DEFENDANT LANE) ............................................................121

PART TWO - CLAIMS UNDER THE SECURITIES ACT OF 1933 .................122

XI.    JURISDICTION AND VENUE .................................................................122

XII.   THE SECURITIES ACT DEFENDANTS ...............................................123

XIII.  THE OFFERING DOCUMENTS CONTAINED FALSE OR
       MISLEADING STATEMENTS AND OMISSIONS ................................124

XIV.   THE MISSTATEMENTS AND OMISSIONS WERE MATERIAL.........154

XV.    CAUSES OF ACTION UNDER THE SECURITIES ACT .......................157

COUNT III - VIOLATIONS OF § 11 OF THE SECURITIES ACT IN
       CONNECTION WITH THE 2021 OFFERINGS (AGAINST
       SILVERGATE, EXECUTIVE AND DIRECTOR DEFENDANTS,
       AND UNDERWRITER DEFENDANTS)..................................................157

COUNT IV - VIOLATIONS OF § 12(A)(2) OF THE SECURITIES ACT
       IN CONNECTION WITH THE 2021 OFFERINGS (AGAINST
       SILVERGATE, EXECUTIVE AND DIRECTOR DEFENDANTS,
       AND UNDERWRITER DEFENDANTS)..................................................161

COUNT V - VIOLATION OF § 15 OF THE SECURITIES ACT IN
       CONNECTION WITH THE 2021 OFFERINGS (AGAINST THE
       EXECUTIVE AND DIRECTOR DEFENDANTS) ..................................164

XVI.   CLASS ACTION ALLEGATIONS ..........................................................165

XVII.  PRAYER FOR RELIEF ...........................................................................167

XVIII. JURY TRIAL DEMAND .........................................................................167

Lead Plaintiffs Indiana Public Retirement System; Boston Retirement System; Public School Teachers' Pension & Retirement Fund of Chicago; International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario; and UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust; and additional Plaintiff Bucks County Employees Retirement Fund (collectively "Plaintiffs") by and through their counsel, bring two sets of claims in this action.

First, as set forth in **Part I** of the Complaint, Plaintiffs assert claims under the Securities Exchange Act of 1934 (the "Exchange Act") individually and on behalf of all persons and entities who purchased or otherwise acquired the publicly traded stock of Silvergate Capital Corporation ("Silvergate," the "Bank," or the "Company") between November 7, 2019 through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby. As to these Exchange Act claims, Plaintiffs allege that throughout the Class Period, Defendant Silvergate and its Chief Executive Officer, Alan Lane ("Lane"), made a series of statements that they knew or, at minimum, were severely recklessly in not knowing were materially false or misleading.

Second, as set forth separately in **Part II** of the Complaint, Plaintiffs assert claims under the Securities Act of 1933 (the "Securities Act") individually and on behalf of all persons and entities who purchased Silvergate securities in or traceable to Silvergate's series of securities offerings completed during 2021 (the "2021 Offerings"). As to these Securities Act claims, Plaintiffs allege that the Securities Act Defendants are strictly liable for the materially false and misleading statements in the 2021 Offering Documents. These Securities Act claims are based solely on strict liability and negligence and, as to these Securities Act claims, Plaintiffs disclaim any allegations of fraud.

The allegations in this Complaint are based upon Plaintiffs' personal knowledge as to themselves and their own acts and upon information and belief as

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-1-

Case No. 22-cv-01936

to all other matters. Plaintiffs' information and belief are also based on the independent investigation of its counsel. This investigation included, among other things, a review and analysis of: (i) Silvergate's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts; (iii) transcripts of Silvergate investor conference calls; (iv) Silvergate investor presentations; (v) press releases and media reports; (vi) securities pricing data; (vii) interviews of former Silvergate employees, some of whom were afraid to provide Lead Counsel with information for fear of retaliation by Silvergate; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

**PART ONE: CLAIMS UNDER THE
SECURITIES EXCHANGE ACT OF 1934**

## I. INTRODUCTION

1. In just a few years, Silvergate went from a local community lending bank to the go-to bank of the world's $600 billion cryptocurrency industry. Silvergate's deposits ballooned 10-fold; its stock price skyrocketed almost 20-fold; and its top executives profited handsomely. But Silvergate achieved these results through deception, giving the Silvergate "seal of approval" to and bringing aboard as "Silvergate-approved" customers some of the biggest sham entities in American history. All the while, Silvergate and its CEO, Alan Lane, time-and-again assured the public that the Bank conducted extensive vetting, due diligence, and monitoring of customers—which supposedly was Silvergate's "secret sauce" that provided it a "distinct competitive advantage." Customers and investors alike trusted these representations, pouring in their deposits and sending the stock price soaring.

2. When the public eventually learned the truth—*i.e.*, that Silvergate did not vet, perform due diligence on, or monitor its customers—Silvergate's customers

fled and its stock price tumbled almost 100%. The Bank was forced into liquidation; its employees were nearly all fired; the DOJ is conducting an investigation; Silvergate failed to file its annual report with the SEC; and a bipartisan group of U.S. senators lambasted Lane and Silvergate for their "severe due diligence failures" and "egregious failure" to "monitor for and report suspicious financial activity carried out by its clients."

3.     The Class Period begins on November 7, 2019. On that date, Silvergate and Lane completed their IPO and listed Silvergate's shares on the New York Stock Exchange. To boost the Company's stock price, Lane and Silvergate stressed to investors from the outset that the Bank had a "robust risk management and regulatory compliance framework" and a "deep-rooted commitment and proprietary approach to regulatory compliance." They emphasized that Silvergate "comprehensively investigates prospective customers" and that its "due diligence and onboarding processes include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate." They added that, once onboarded, Silvergate-approved customers were subject to non-stop monitoring, which included "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

4.     Lane and Silvergate repeated and amplified these representations over the next months and years during the Class Period. They repeatedly highlighted the Bank's extensive "vetting" and "initial due diligence" of customers, which included a thorough review of customers' "culture of compliance," "anti-money laundering programs," and "site visits" by the Bank's personnel. Lane and Silvergate also impressed upon investors that their "ongoing monitoring" consisted of "daily transaction monitoring." Lane trumpeted that, through this vetting and monitoring, they achieved "a deep knowledge of [their] clients"—with Lane telling investors that, at Silvergate, "we only bank institutions that are serious about regulation," and

that, if they could not "get comfortable with a company's regulatory stature," then they do "not bank them."

5. These representations were critical to attract cryptocurrency customers to the Bank—and to drive deposits. Participants in the cryptocurrency industry believed, based on Lane and his colleagues' repeated assurances, that Silvergate's customers had, indeed, been vetted and were being closely monitored. This was an important benefit to prospective Silvergate customers—and a key reason why cryptocurrency exchanges wanted to bank at Silvergate. Per Lane's representations, the Bank's cryptocurrency exchange customers could point to Silvergate's "seal of approval" to gain customer confidence and generate more business. Lane specifically highlighted this "seal of approval" when speaking to customers, stressing that Silvergate eliminated "counterparty risk" for the entities that dealt with Silvergate's "vetted" customers.

6. Lane's assurances were also important to investors deciding whether to buy the Company's stock. Investors and securities analysts at major Wall Street firms—including Wells Fargo, J.P. Morgan, and Bank of America—highlighted Lane's representations about the Bank's "vetting" and "monitoring" of its customers. They identified the Bank's "vetting" and "monitoring" as a "distinct competitive advantage" when recommending that investors "BUY" Silvergate stock. On the back of Lane's representations, Silvergate's stock price soared during the Class Period, increasing by 1400%—over $200 per share.

7. Unknown to investors at the time, Silvergate did not vet, perform due diligence of, or monitor its clients. Rather, to drive deposits, Silvergate indiscriminately banked cryptocurrency entities—many of which were outright shams that fleeced innocent customers of billions of dollars. Multiple former Silvergate employees have explained that the Bank did not prioritize compliance, did not vet its customers, did not perform site visits, did not know its customers' businesses, did not review its customers' compliance programs, did not review its

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-4-

Case No. 22-cv-01936

customers' culture of compliance, did <u>not</u> have compliance policies to address the cryptocurrency industry, did <u>not</u> provide compliance training to employees specific to the cryptocurrency industry, did <u>not</u> perform daily or periodic reviews, did <u>not</u> perform customer risk scoring, and did <u>not</u> monitor its clients' transaction activity. Instead, wire limits of hundreds-of-millions of dollars were blindly authorized, anti-money laundering software was never implemented, suspicious and anomalous activity was ignored, subpoenas from the U.S. government concerning customers' wire activity piled up, any monitoring was simply a "check the box" activity, and, when employees pushed back, they were told "nobody cared" and reprimanded by the Bank's management. And when the Federal Reserve eventually found out, it sent Lane and the Bank confidential reports reprimanding them and identifying these deficiencies as "Matters Requiring Immediate Attention"—of which Lane and Silvergate told investors nothing.

8. The Bank's major "approved" customers included FTX, a cryptocurrency exchange that single-handedly constituted over 17% of the Bank's overall deposits and that was singled out on Silvergate's website, featuring a "testimonial" from FTX's then-CEO, Sam Bankman-Fried. Silvergate and Lane specifically and repeatedly assured investors that the Bank "conducted significant due diligence on FTX and its related entities including Alameda Research" when, in truth, they did not. Had Silvergate actually conducted due diligence on FTX or its related entities (Alameda and North Dimension), it would have readily discovered that these entities were shams. For example, consumers seeking to purchase FTX cryptocurrency were told to send their money to North Dimension. But North Dimension was nothing more than a fake website posing as an online electronics retailer, which listed the same address as FTX, had no staff or operations, and was replete with misspellings and absurd product offerings and prices. FTX's then-CEO, Sam Bankman-Fried, used North Dimension and Alameda (which was an equally

blatant fraud) to siphon billions of dollars that Bankman-Fried and his cronies used as their own.

9. Silvergate's other approved customers included Binance.US, Huobi Global, Nexo Capital, and Bittrex, among others. Each of these entities was an egregious fraud—as investigative journalists and regulators would readily show later. For example, had Silvergate actually vetted, conducted due diligence on, and monitored its customers, it would have learned that Binance.US was controlled by Binance, "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders." As a group of U.S. senators later explained in their bipartisan report, Binance.US was a "blatant attempt to dodge the world's financial regulators, serve 'users without licenses,' and violate anti-money laundering laws."

10. Investors eventually learned the truth about Silvergate's failure to vet, conduct due diligence on, or monitor its "Silvergate-approved" customers. Beginning in November 2022, reports emerged that FTX—Silvergate's most important customer—was a clear fraud that stole billions of dollars from consumers. Over the following weeks and months, investigative journalists uncovered facts demonstrating Silvergate's failure to vet, perform due diligence on, and monitor FTX, as well as Binance.US and many of the Bank's other customers. Soon thereafter, a bipartisan group of U.S. senators wrote to Lane chastising Silvergate and Lane for what "appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."

11. As customers learned the truth about Silvergate's "vetting"—and that the Bank's "seal of approval" was worthless—they pulled their deposits and left the Bank. Silvergate's deposits shrank by 60% within weeks. News then broke that the DOJ had opened an investigation into Silvergate's misconduct. Following this revelation, Silvergate's remaining customers also withdrew their deposits and announced they would bank elsewhere. Shortly thereafter, Silvergate discontinued

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-6-
Case No. 22-cv-01936

its SEN Network, ceased operations, and fired its remaining employees. The Company weeks later announced its intention to wind down and liquidate Silvergate Bank altogether.

12. Investors have suffered immensely as a result of Defendants' misrepresentations. Silvergate's stock, which exceeded $225 per share during the Class Period, now trades at barely above $1.

## II.     JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The acts and conduct complained of herein occurred in substantial part in this District.

16. In connection with the acts and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities market.

## III.     THE EXCHANGE ACT PARTIES

### A.     The Plaintiffs

17. Lead Plaintiff Indiana Public Retirement System ("Indiana") is a pension fund operated for the benefit of over 517,000 active and retired members, representing more than 1,300 employers, including public universities, schools, municipalities and state agencies. As of June 30, 2022, Indiana managed more than $42.4 billion in assets. Indiana purchased shares of Silvergate common stock during

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-7-
Case No. 22-cv-01936

the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Exhibit A, attached hereto.

18. Lead Plaintiff Boston Retirement System ("Boston") is a governmental defined benefit plan that provides retirement benefits for employees, and their beneficiaries, of the City of Boston, Boston Planning & Development Agency, Boston Housing Authority, Boston Public Health Commission, and Boston Water & Sewer Commission. As of September 30, 2022, Boston managed approximately $5.7 billion in net assets on behalf of more than 34,000 members and their beneficiaries. Boston purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* ECF No. 16-3.

19. Lead Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") is a public pension fund that provides for the financial security of a group of dedicated individuals who serve, or have served, the Chicago Public Schools/Charter Schools through a career in public service. As of June 30, 2022, Chicago Teachers managed over $12.1 billion in assets for the benefit of its approximately 92,390 active and retired members. Chicago Teachers purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* ECF No. 16-3.

20. Lead Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793") is a Canadian Registered Pension Plan that provides retirement benefits to crane and heavy equipment operators, other skilled workers, and their families. Local 793 manages over $2.5 billion ($3.5 billion CAN) in assets for the benefit of more than 18,000 active and retired members. Local 793 purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* ECF No. 16-3.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-8-
Case No. 22-cv-01936

21. Lead Plaintiff UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust ("Wespath"), supervises and administers retirement plans, investment funds, and health and welfare benefit plans for active and retired clergy and lay employees of the United Methodist Church. Wespath manages over $29.8 billion in assets for the benefit of more than 100,000 participants. Wespath purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Exhibit A, attached hereto.

22. Additional Plaintiff Bucks County Employees Retirement Fund ("Bucks County") provides pension benefits to more than 1,700 retired employees of Bucks County, Pennsylvania. As of January 2023, Bucks County managed more than $913 million in assets. Bucks County purchased shares of Silvergate common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Exhibit A, attached hereto.

**B.    The Exchange Act Defendants**

23. Defendant Silvergate Capital Corporation was incorporated in Maryland and, along with its wholly owned subsidiary Silvergate Bank, operated and maintained its corporate headquarters at 4250 Executive Square, Suite 300, La Jolla, California. Silvergate's common stock is publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SI."

24. Defendant Alan J. Lane ("Lane") served as Silvergate's CEO and a member of its Board of Directors at all relevant times. Lane changed Silvergate Bank from a local community lending bank into the go-to bank for cryptocurrency exchanges and participants in the crypto industry. Lane was Silvergate's chief spokesperson with investors and securities analysts, regularly touting and detailing Silvergate's "robust compliance framework" and professing to know what he was

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-9-
Case No. 22-cv-01936

talking about. As the Bank's deposits ballooned and Silvergate's stock price skyrocketed, Defendant Lane unloaded $21.2 million of his personal Silvergate stock during the Class Period at tremendous profits.

25. Defendants Silvergate and Lane are collectively referred to as the "Exchange Act Defendants."

## IV. FACTUAL BACKGROUND

### A. Silvergate Targets the Cryptocurrency Industry To Drive Deposits.

26. For most of its 35-year history, Silvergate was a local community lending bank focused on financing small real-estate deals. Silvergate had only a handful of branches, 40 employees, and a few hundred million dollars in deposits. Over time, it became increasingly challenging for Silvergate to attract deposits— which were its primary source of income. Scarred by the financial crisis and its aftermath, consumers were wary of local banks, and turned instead to larger, more established banking institutions to deposit their funds. This created an existential threat for Silvergate. Lane put it bluntly: the Bank "needed deposits."[1]

27. To jumpstart its deposits, Lane and Silvergate directed their attention to the red-hot cryptocurrency industry. In 2017, the crypto industry saw record-breaking growth rates. Consumers and investors were eager to convert their fiat currency (*i.e.*, national currencies, such as U.S. Dollars or Euros) into cryptocurrency (*i.e.*, digital currencies, such as Bitcoin, Ethereum, COIN, and FTT). Market demand pushed the market cap for the cryptocurrency industry over $600 billion, and the price of cryptocurrencies skyrocketed as a result.[2]

28. By 2018, there were dozens of different cryptocurrencies sold and exchanged on "cryptocurrency exchanges." These cryptocurrency exchanges

---

[1] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).

[2] *InvestNet*, "Cryptocurrency Growth Trends & Industry Performance" (May 26, 2018).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-10-

Case No. 22-cv-01936

created and sold their own, branded cryptocurrency. For example, the cryptocurrency exchange Coinbase created and sold the cryptocurrency "COIN," and the cryptocurrency exchange FTX created and sold the cryptocurrency "FTT." Investors purchased billions of dollars of these and other cryptocurrencies from these exchanges, with the exchanges acting like brokers—*i.e.*, storing the cryptocurrency and allowing investors to buy and sell from the exchange and with others.

29. Over time, the owners of these cryptocurrency exchanges increasingly needed a bank willing to house the U.S. dollars and other fiat currency that consumers paid them in exchange for their cryptocurrency, as well as to conduct wire transfers among the consumers buying and selling cryptocurrency on their exchanges. But the cryptocurrency exchanges faced a problem: traditional, larger banks were reticent to accept them as clients. Traditional, larger banks were concerned that cryptocurrency exchanges might be scams—*i.e.*, their owners might be using the cryptocurrency exchanges to steal customer funds, commit fraud, or facilitate money laundering. As the *Financial Times* explained in their article "Silvergate: from tiny local lender to bank behind the crypto boom," cryptocurrency "had been linked to money laundering and illegal drugs," and "major financial institutions refused to bank crypto exchanges and started blocking transfers by customers to buy cryptocurrencies."[3] Defendant Lane was aware of all of this, publicly admitting that the creators of these cryptocurrency exchanges "were being shunned by the broader banking ecosystem."[4]

30. Silvergate and Defendant Lane were, nevertheless, willing—and, in fact, eager—to open their doors to cryptocurrency exchanges and their creators. Silvergate's former President recounted, "We needed deposits and Alan [Lane] started seeing that companies like Coinbase were getting kicked out of

---

[3] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).

[4] *Fintech Nexus USA 2022*, "Why Every Bank Needs a Crypto Strategy, with Alan Lane, CEO, Silvergate Bank (Full Session)" (June 8, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -11-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                Case No. 22-cv-01936

banks."[5]  To entice these "kicked out" cryptocurrency exchanges and their customers to bank at Silvergate, Lane and Silvergate created and actively promoted the Silvergate Exchange Network (the "SEN Network").  The SEN Network provided a 24-hour, 7-days-a-week platform for Silvergate-approved cryptocurrency exchanges and Silvergate's other approved customers to instantaneously transact among themselves.

31.     Defendants Lane and Silvergate told prospective customers that, by banking with Silvergate and joining the SEN Network, they would receive a meaningful benefit—namely, Silvergate's "good housekeeping seal of approval."[6]  This "seal of approval" was important to cryptocurrency exchanges and the Bank's other cryptocurrency customers.  As advertised, it meant that Silvergate, after carefully "vetting" the prospective customer and "monitoring" its activity, determined that the cryptocurrency exchange was a legitimate entity with sound controls and in compliance with state and federal laws and regulations.  This "seal of approval," Lane publicly represented, "eliminated counterparty risk" for those entities and individuals who transacted with the Silvergate-approved cryptocurrency exchanges and customers, as these counterparties could rest assured that Silvergate conducted thorough due diligence and monitored the activity of the Silvergate-approved entities.[7]

32.     Defendant Lane's efforts to promote Silvergate and the SEN Network worked.  Within just a few years, the SEN Network became, by Lane's own account, Silvergate's "flagship product" and "what [Silvergate was] known for in this

---

[5] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).

[6] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

[7] *See, e.g.*, *Real Vision Finance*, "Silvergate: The Banking Solution of the Future" (Feb. 1, 2021).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                      -12-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

ecosystem."[8] It was "the driver of [Silvergate's] strategy," with the Bank "all in" on cryptocurrency, according to Lane and his colleagues.[9] Silvergate's customers increasingly included cryptocurrency exchanges—with 35 cryptocurrency exchange customers by September 2018; and 94 by December 2021.

33. As consumers poured their money into Silvergate's "vetted" and "monitored" cryptocurrency exchange customers, the Bank's deposits ballooned. Silvergate went from a small, local bank—with just $1.4 billion in deposits by the end of 2018—to the heavyweight in the cryptocurrency sector—with over $14 billion in deposits by 2021. "All of that growth," Lane acknowledged, "ha[d] really been on the back of SEN."[10]

**B. Silvergate Assures Investors That It Vets, Conducts Due Diligence on and Monitors All of Its Customers.**

34. Investors deciding whether to buy Silvergate's stock were laser-focused—and for good reason—on the "vetting," "due diligence," and "monitoring" that Silvergate purportedly performed on its cryptocurrency customers, including the Silvergate-approved cryptocurrency exchanges. If participants in the cryptocurrency industry lost faith in the quality of Silvergate's "vetting," "due diligence," or "monitoring," they would invariably lose faith in the SEN Network and Silvergate's cryptocurrency exchange customers themselves. If that were to occur, there was a real risk that the Bank's customers would pull their deposits from the Bank or even leave the Bank and cease using the SEN Network altogether. Such

---

[8] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[9] *See, e.g.*, "Silvergate Capital Corp. at Oppenheimer Blockchain Digital Assets Summit - The Evolution of Digital Assets" (Nov. 18, 2021); *Roundtable: Banking in the Digital Age with Alan Lane*, Market Rebellion (Nov. 8, 2021).

[10] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

a result would be catastrophic to Silvergate because, as Lane acknowledged, by 2021, "98% or 99%" of the Bank's deposits "related to crypto."[11]

36. Silvergate also could face devastating fines and crippling regulatory action for violating "know-your-customer" ("KYC") and "anti-money laundering" ("AML") banking rules if it did not carefully vet and monitor its customers. Lane understood all of this too. As he publicly acknowledged at the time, the KYC and AML requirements "mak[e] sure that you know who your customers are and mak[e] sure that you're not in any way providing funding, financing etc. for illicit activity…. The penalties are fines and they can be really severe. You can essentially put the entire bank at jeopardy."[12]

36. With investors focused on the subject, Lane and Silvergate repeatedly singled out the Bank's "deep-rooted commitment and proprietary approach to regulatory compliance" as a chief reason to purchase Silvergate's stock.[13] In presentations to investors, Lane identified the Bank's "robust compliance framework" as an "Investment Highlight," with the Bank's careful "vetting" and "monitoring" of the Silvergate-approved customers providing "a distinct competitive advantage for us, and provid[ing] a meaningful barrier to entry against our potential competitors."[14] Silvergate's "compliance process," Lane and Silvergate added, gave the Bank a "first-mover advantage within the digital currency industry" and was the "cornerstone of our leadership position today."[15] They further told investors that "our compliance and due diligence is our secret sauce that has gotten us to where we are today."[16]

---

[11] *Roundtable: Banking in the Digital Age with Alan Lane*, Market Rebellion (Nov. 8, 2021).

[12] *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[13] *See, e.g.*, Silvergate, Annual Report (Mar. 10, 2020).

[14] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).

[15] *See, e.g.*, Silvergate, Annual Report (Mar. 8, 2021).

[16] Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).

37.     To inspire further investor confidence, Lane and Silvergate detailed to investors the precise ways that the Bank purportedly "vetted" and conducted "due diligence" on prospective customers before approving them.  They also detailed the "ongoing monitoring" supposedly done on the Bank's customers, as well as, "in the case of digital currency exchanges, their customers."[17]   Defendants Lane and Silvergate made these representations repeatedly—in SEC filings, media interviews, and during conference calls with investors and analysts, as further detailed below.

38.     ***Vetting and Diligence***: Over and over, Lane and Silvergate told investors that the Bank adhered to a strict "vetting" and "diligence" process before deciding whether to permit customers to bank at Silvergate and participate on the SEN Network.  During a July 30, 2019 interview, for example, Defendant Lane stated that, "if you get an account at Silvergate, then we've gone through the process of vetting you."[18]   Defendant Lane reiterated during investor calls and interviews throughout 2021 that the "members of SEN . . . have been vetted by Silvergate" and that "folks that are transferring to each other [on the SEN Network] have all been vetted by Silvergate."[19]   Silvergate and Lane emphasized this message through the remainder of the Class Period, telling investors that "we were vetting all of our customers" and that all of the participants "on SEN have gone through a similar due diligence process."[20]

39.     Silvergate and Lane stressed the supposed robustness of these "vetting" and "due diligence" processes.  Time and again, they told investors that the Bank "comprehensively investigate[d] prospective customers," conducted "thorough

---

[17] *See, e.g.*, Silvergate, Annual Report (Mar. 8, 2021).

[18] *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[19] *Real Vision Finance*, "Silvergate: The Banking Solution of the Future" (Feb. 1, 2021); *The Blockchain Interview series hosted by Dan Weiskopf featuring Alan Lane of Silvergate*, ETF Think Tank (Sept. 24, 2021).

[20] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).

reviews . . . as part of our due diligence process . . . to detect any such illicit activities conducted by our potential or existing customers (or, in the case of digital currency exchanges, their customers)" and, as a result, developed "a deep knowledge of our clients."[21]

40.     Silvergate and Lane also made detailed representations to investors about what the Bank's "vetting" and "due diligence" supposedly included. "First and foremost," according to Silvergate and Lane, they would develop an "understand[ing] [of the] customer's business" and an "understanding [of] what [the] customers are doing."[22]  This would "include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate."[23]  "For each and every account," Silvergate would also "determine the beneficial owner, the source of funds, and the purpose and expected use of funds."[24]

41.     ***Compliance Reviews***: Silvergate and Lane further represented to investors that the Bank conducted "compliance reviews" for prospective customers and, as a result of those reviews, had an "understanding of their compliance programs."[25]  According to Lane, these compliance reviews "verify" that the Bank's customers' "compliance programs are sound."[26]  Silvergate also represented to investors that it looked "to understand that the pillars of [the customer's] AML

---

[21] *See, e.g.*, Silvergate, Prospectus Supplement (Nov. 8, 2019); Silvergate, Annual Report (Mar. 10, 2020); Silvergate, Registration Statement (Nov. 16, 2018); "Silvergate Capital Corp. at Canaccord Genuity Growth Conference" (Aug. 12, 2020).

[22] *See, e.g.*, Silvergate, Regulation FD Disclosure Financial (Form 8-K) (Oct. 29, 2020); "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).

[23] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).

[24] Silvergate, Form 8-K (Dec. 5, 2022).

[25] *See, e.g.*, Silvergate, Investor Presentation (Jan. 28, 2021); "Q3 FY 2020 Silvergate Capital Corp. Earnings Conference Call" (Oct. 26, 2020).

[26] *Silvergate CEO Alan Lane on the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -16-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                   Case No. 22-cv-01936

compliance are well designed and functioning."[27]  This supposedly would include "evaluating [the prospective customer's] ability to actively monitor the flow of funds of their own customers."[28]  It would also include, according to Lane, a "review of [the] organization's culture of compliance" and, importantly, a "Site Visit."[29] Additionally, the Bank's reviews of its cryptocurrency exchange customers supposedly included an examination of their "policies and procedures regarding the BSA [Bank Secrecy Act], consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as [their] transaction monitoring systems and audit results."[30]

42.    ***Monitoring of Activity***: Lane and Silvergate further assured investors that Silvergate kept a close watch on their Silvergate-approved customers' activity through the Bank's "ongoing monitoring" and "transaction monitoring."[31]  Lane told investors that, "[a]fter accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."[32]  He emphasized that Silvergate "monitors transaction activity for every account and identifies activity outside of the expected usage."[33]

43.    Lane and Silvergate made further representations to investors about the specifics of the Bank's "ongoing monitoring" program.  In quarterly PowerPoint presentations to investors (*see, e.g.*, Figure 1, *infra*), Lane represented that the Bank's "ongoing monitoring" included daily "anti-money-laundering alerts," "enhanced due diligence," "customer counterparty reviews," "periodic reviews" of

---

[27] *See, e.g.*, Interview, "Crypto + Banks: The Frontier of Money Movement" (June 13, 2022).
[28] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[29] *See, e.g.*, Silvergate, Investor Presentation (Jan. 28, 2021).
[30] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[31] *See, e.g.*, Silvergate, Investor Presentation (Jan. 28, 2021).
[32] *See, e.g.*, Silvergate, Form 8-K (Dec. 5, 2022).
[33] *See, e.g.*, *id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                         -17-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          Case No. 22-cv-01936

the customers, "quarterly account activity reviews" and "annual reviews" of the customers.  Silvergate's "ongoing monitoring" also supposedly included the Bank's use of "a system of 'red flags' specific to various customer types and activities."[34]



**Figure 1.**  Quarterly Silvergate PowerPoint presentation to investors.

44.  ***Strict Customer Standards***: Defendants Lane and Silvergate bolstered these representations with additional assurances that, if Silvergate discovered adverse facts about prospective customers during the due diligence and vetting processes, they refused to bank them.  Lane and Silvergate told investors that the Bank was "highly selective in our customer onboarding process to ensure the integrity of the platform."[35]  Lane added that "we require [customers] to comply [with federal and state regulations]" and "we only bank institutions who are also serious about regulation."[36]  He explained that, "if we can't get comfortable with a company's regulatory stature, then we don't bank them. And that's really well-

[34] *See, e.g.*, Silvergate, Prospectus (Nov. 6, 2019).
[35] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[36] *See, e.g.*, *CNBC Television*, "We actually welcome increased crypto scrutiny: Silvergate Bank CEO" (June 28, 2022).

known."[37]  Silvergate further told investors that "we serve only customers that represent the best business opportunity for Silvergate to operate safely, soundly, and compliantly."[38]  Lane reiterated that "they have to satisfy not only their own legal and regulatory requirements, but then we have to verify that their compliance programs are sound."[39]

45.  Likewise, Defendants Lane and Silvergate assured investors that the Bank would take swift and severe action if Silvergate's "ongoing monitoring" indicated any improper activity.  In a November 21, 2022 letter to investors, for example, Lane represented that, "if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions."[40]

### C.  Investors Trusted the Exchange Act Defendants' Representations, and Silvergate's Stock Price Soared.

46.  The market trusted Lane's and Silvergate's repeated representations and highlighted Silvergate's "robust compliance framework" as a reason to buy the Bank's stock.  For example, when Compass Point initiated coverage on Silvergate's stock and told investors to "BUY" in a November 18, 2019 analyst report, its analysts echoed Defendants' representations about Silvergate's "compliance capabilities," repeating Lane's statements to investors that Silvergate conducted "ongoing monitoring of customer activities and evaluat[ed] a market participant's ability to actively monitor the flow of funds of their own customers."  The Compass Point analysts similarly adopted and repeated Lane's representations about Silvergate's "due diligence" and "onboarding process" for its customers.

---

[37] *See, e.g.*, "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

[38] "Silvergate Capital Corp. at Canaccord Genuity Growth Conference" (Aug. 12, 2020).

[39] *Silvergate CEO Alan Lane on the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).

[40] "A letter to our customers" (Nov. 21, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                        -19-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

47. Investors continued to rely on Lane and Silvergate's representations during the Class Period. In their October 26, 2020 analyst report, Canaccord Genuity's analysts also told investors to "BUY" Silvergate's stock and increased their per-share price target from $19 to $26, lauding Silvergate as "firing on all cylinders" as a result of its "vetting and onboarding processes." In their June 14, 2021 report, Goldman Sachs's analysts upped their price target for Silvergate's stock even further to $120 per share and highlighted the supposed robustness of Silvergate's "KYC/AML controls."[41] J.P. Morgan's analysts repeated Lane's pitch to investors: "With Silvergate completing due diligence related to KYC and AML (when it onboards new clients to the SEN platform), the company effectively reduces counterparty risks for its clients."[42] Wells Fargo's analysts likewise recommended that investors "BUY" Silvergate's stock in their June 13, 2022 analyst report, also repeating Lane's representations that Silvergate "provides the vetting platform that essentially eliminates counterparty risk, as both sides of any transaction that takes place on the SEN need to be [Silvergate] clients."[43]

48. On the back of Defendant Lane's and Silvergate's repeated representations, Silvergate's stock price soared. The Bank's stock jumped nearly 1300% in just over a year from the start of the Class Period. It then continued its sharp rise, climbing as high as $227 per share during the Class Period—a nearly 1900% increase in just two years.

49. But as analysts and investors would ultimately learn, Lane's and Silvergate's assurances that the Bank performed "vetting," "due diligence," and "ongoing monitoring" of its Silvergate-approved customers were false, misleading,

[41] Goldman Sachs, "Differentiated high growth bank with leverage to crypto but valuation keeps us on sidelines: Initiate at Neutral with a $120 price target" (June 14, 2021).
[42] J.P. Morgan, "JPM's 2021 Crypto Economy Forum: Silvergate an Indispensable Banking Partner in Crypto Ecosystem" (Dec. 1, 2021).
[43] Wells Fargo Securities, LLC, "SI: Carving Out Niche Role as Banker to Crypto Ecosystem; Initiate at Overweight" (June 13, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT -20-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS   Case No. 22-cv-01936

and omitted material facts. Silvergate did not conduct vetting, due diligence, or monitoring, and its approved customers included "fraudsters" and "sketchy companies and individuals who used Silvergate to move a trillion dollars into—and out of—crypto markets all over the world."[44] As these facts became known, the DOJ commenced an investigation (which remains ongoing), the Company was ultimately forced to cease the Bank's operations and liquidate, Silvergate's stock price crashed, and Silvergate's investors lost billions.

## D. In Truth, Silvergate Did Not Vet, Perform Due Diligence on, or Monitor Its Customers.

50. Contrary to Silvergate's and Lane's repeated representations during the Class Period, the Bank did not perform "vetting," "due diligence," or "monitoring" on Silvergate's approved customers. Instead, the Bank indiscriminately approved cryptocurrency exchanges to bank at Silvergate and to transact on the SEN Network, enabling these entities to use Silvergate's "seal of approval" to bilk customers and investors out of billions of dollars. These facts have been confirmed by, among other things, Silvergate's former employees.

51. Former Employee ("FE") 1 was a Senior Vice President, Finance Manager at the Bank. She worked and interacted directly with Defendant Lane.[45] FE 1 explained that Silvergate did not vet existing customers before adding them to the SEN Network. FE 1 did not see any efforts by Silvergate to get to know their customers or to make sure they were complying with the law. FE 1 explained that Silvergate's focus was all about sales and getting clients, not compliance. FE 1 said

---

[44] *New York Magazine*, "The Crypto Industry's Favorite Bank Is in Deep Trouble" (Jan. 24, 2023).

[45] FE 1 joined Silvergate in March 2019 and stopped working at the Bank the week before Christmas in December 2019. She originally reported to Regan Lauer, who hired her, then briefly to Kellie VavRosky, then to Alan Lane, and then to Antonio Martino. She worked directly with Alan Lane from September to November 2019. Her responsibilities included overseeing Treasury and financial planning and analysis ("FP&A"). She worked closely with the Controller, and she worked on Silvergate's initial public offering.

if these were subjects of discussion, someone at her level—a senior vice president of the organization—would have known about it.

52. When asked whether she had seen "extensive regulatory compliance diligence" performed by Silvergate during her time at the Bank, FE 1 replied, "I did not." When asked whether she had seen Silvergate perform any type of "enhanced procedures to screen and monitor [crypto customers]" during her time at Silvergate, she replied, "I did not." When asked whether Silvergate "comprehensively investigated prospective customers" or conducted "customer risk scoring with risk factors specific to the digital-currency industry," FE 1 stated that she was not aware of any of that occurring at Silvergate.

53. FE 1 also never heard of Silvergate conducting any of the specific onboarding measures that Lane and Silvergate had claimed repeatedly to customers and investors that they performed, including: "a review of the organization's culture of compliance, a review of its BSA/AML program, confirming its money transmitter registration and licensing, reviewing its independent audits and exams, performing site visits, and reviewing the prospective customer's information security." FE 1 likewise never saw "detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate." Furthermore, she did not hear of the Bank performing "reputation reviews of prospective customers" or "compliance reviews for prospective customers." FE 1 again said that, if these were subjects of discussion, someone at her level—a senior vice president—would have known about it.

54. FE 1 was aware that Silvergate conducted no customer vetting of participants on the SEN Network based on meetings she attended with other senior executives and her 30 years of banking experience. FE 1 has worked at multiple banks over her 30 years of banking experience, including Wells Fargo for 19 years in various roles, where she was very aware of the existence of their compliance

practices, including AML and KYC programs. Other banks have established practices and policies in place, FE 1 explained.

55. FE 1 also did not see Silvergate monitoring its clients on the SEN Network. FE 1 reported that Silvergate did not perform daily BSA/AML alerts monitoring of its customers, daily news monitoring on its customers, customer counterparty reviews, negative news reviews on its customers, or quarterly account activity reviews of its customers. When asked whether FE 1 had seen Silvergate conduct "thorough reviews . . . as part of our due diligence process . . . designed to detect any such illicit activities conducted by our potential or existing customers [and] in the case of digital currency exchanges, their customers" during her time at Silvergate, FE 1 replied, "I did not." Likewise, when asked whether she had seen Silvergate engage in "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers" or "system monitoring rules tailored to digital currency activities," FE 1 replied, "I did not." Finally, when asked whether she had seen "a system of 'red flags' specific to various customer types and activities," FE 1 replied, "I did not."

56. Silvergate did not prioritize compliance, notwithstanding its representations to investors about its robust practices in this area or the critical nature of compliance in banking, particularly when dealing with cryptocurrency transactions and KYC/AML requirements. FE 1 said that ever since Silvergate turned towards crypto, there was no focus on anything like KYC. FE 1 worked closely with Megan Collins, Silvergate's Controller from late 2016 to January 2020, and attended senior meetings led by Kathleen Fraher, Silvergate's then-Vice President, "Compliance and BSA Officer." FE 1 estimated that these meetings happened monthly, and Lane attended about 75% of them. During these meetings, they discussed everything of importance to the Bank—which did not include compliance. FE 1 did not recall any discussion of prioritizing compliance. She said, "It was not a focus in the least. It was all, 'Rah rah, we got these new crypto

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-23-
Case No. 22-cv-01936

customers.'" FE 1 explained that in connection with her work (in particular given the fact that she attended senior level meetings), if or to the extent the Company truly prioritized KYC principles, she would have known about it.

57.      FE 1 also knew Silvergate had no ongoing monitoring because employees never received the training to do it. FE 1 does not recall Silvergate having the employees take tests on KYC or anything else compliance-related. Nor does FE 1 recall any training regarding KYC or specific crypto-related compliance issues.

58.      FE 1's account is further corroborated by the accounts provided by FE 2, who worked as a "BSA analyst" at Silvergate from October 2017 to June 2019; FE 3, who served as a digital banking manager at Silvergate in 2022; FE 4, who was a VP of Deposit Operations from 2011 to July 2021; and FE 5, who was a "FRCM Initial Due Diligence Manager" from May 2022 to May 2023.

59.      FE 2 explained that about half of Silvergate's customers were not even known by the Bank.[46] He would ask people at Silvergate what a business did, who the owners were, and what the management structure was, and Silvergate did not have that information. Based on his experience and understanding, Silvergate banked everyone who wanted to be a customer and seemed to bank everyone regardless of what their compliance programs were like. FE 2 confirmed that any diligence was a "check the box" activity. FE 2 reported that he and his fellow analysts felt like they were checking boxes for the sake of it without the Bank actually being mindful of the risk they were absorbing.

60.      FE 2 stated that, in his experience, Silvergate did not have a deep-rooted commitment to compliance and said that he does not believe a lot of action was taken regarding suspicious activity. FE 2 explained that everyone in his department, including FE 2, mentioned concerns with respect to compliance to Jennifer Steinbock, the Silvergate "BSA/Compliance Manager." FE 2 recalled that he and

---

[46] FE 2 worked at Silvergate from October 2017 to June 2019 as a "BSA Analyst," reporting to Jennifer Steinbock.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -24-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                 Case No. 22-cv-01936

his colleagues knew that there was frustration on the part of Steinbock regarding customers they believed should be exited but would not be by order of Silvergate's Chief Operating Officer.

61. FE 2 remembers asking his Silvergate colleagues so many times, how many of these suspicious reports are we going to absorb, and he was told they would just keep re-reviewing them forever. FE 2 agreed that any determinations that the identified suspicious activity was "normal" were not justified and just an effort by Silvergate to keep the business. FE 2 explained that no Silvergate customer accounts were ever closed.

62. FE 2 explained that he left Silvergate because he did not feel they had a culture of compliance.

63. As for FE 3, when asked if Silvergate had a deep-rooted commitment to regulatory compliance, FE 3 also said, "Not at all."[47]

64. FE 3 explained that, when customers wanted to join the SEN Network, "the gates were open." If customers wanted to join the SEN Network, FE 3's group was given a list of accounts and names to authorize. There was no compliance or research done on a customer at the time it wanted to join the SEN Network; nobody in management reviewed or approved those requests.

65. FE 3 explained that Silvergate did not perform due diligence on the identity of the customers that were allowed to join SEN. In fact, instead of asking the customers to fill out their own beneficial ownership paperwork, Silvergate employees (and not the customers) filled out the paperwork. FE 3 explained that

---

[47] FE 3 was a digital banking manager at Silvergate from the beginning of March 2022 until the end of November 2022 and reported to Dina Matias, Silvergate's Senior Vice President, Operations Administrator. FE 3 was responsible for the SEN Network, including onboarding customers to the SEN Network, handling account maintenance, account changes, monthly account fee analysis, limit changes, and adding and moving accounts.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
-25-
Case No. 22-cv-01936

FE 6, Silvergate's Private Client Manager II, told FE 3 that relationship managers were told to fill out the beneficial ownership forms for the customers.

66. FE 6 confirmed that he and other Silvergate employees filled out beneficial ownership forms (*i.e.*, <u>not</u> the customers), and they were told to do so by Silvergate management.[48] FE 6 explained that at Silvergate, whether the form was new or needed to be recertified, it fell to the private client managers to fill out the form, instead of the customer itself. This was the policy across the board at Silvergate, and it existed throughout FE 6's entire time at Silvergate. He explained that bank employees should not have been filling out the beneficial ownership forms.

67. Multiple former Silvergate employees said that Silvergate did not perform "site visits" of the Bank's customers and SEN Network participants. FE 2 said that Silvergate did not conduct site visits and added that site visits are important because you need to understand that a customer is an actual business and that you are not just banking a shell company. Likewise, FE 6 confirmed that he did not know of any actual site visits taking place by Silvergate. FE 3 explained that, when she joined Silvergate, she asked about "site visits" because she was concerned about working for a crypto bank; she spoke to Silvergate's Relationship Managers with whom she worked, and they told FE 3 that Silvergate "never, ever did a site visit." FE 5 confirmed that Silvergate did not conduct site visits, and there was nothing written in procedure for site visits anywhere, before August 15, 2022.

68. FE 3 explained that Silvergate also did not ask for supporting documentation for customers' wire limits. FE 3 explained that new clients could dictate to Silvergate whatever wire limits they wanted, and Silvergate gave it to them and never checked if the customer could cover it. FE 3 described how she reached out to Silvergate's front office, and was told—including by Christie Hicks,

---

[48] FE 6 was a private client manager at Silvergate from November 2020 until January 2023. In that role, he was the liaison for larger clients and managed day-to-day account maintenance activities such as transfers, inquiries, and adding and removing signers.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                         -26-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                       Case No. 22-cv-01936

Silvergate's Client Support Manager—that Silvergate just asks customers what they want for a wire limit and gives it to them. In fact, FE 3 recounted how she had a phone conversation with Dina Matias concerning a $250 million wire limit for a customer that only had $70,000 in their account. FE 3 explained that she questioned why Silvergate would give a $250 million wire limit to someone with $70,000 in their account, but was screamed at by Ms. Matias when she asked.

69. FE 3 was told by several of her colleagues—including Christie Hicks, Silvergate's Client Support Manager—that Silvergate did not get the proper documentation to validate wire limits. "We just give them whatever they want," they told FE 3.

70. FE 3's account further corroborates that Silvergate did not conduct the represented "enhanced ongoing monitoring" or "enhanced due diligence" of its cryptocurrency exchange customers. When asked whether Silvergate conducted enhanced ongoing monitoring, FE 3 replied, "Absolutely not." Likewise, when asked whether Silvergate conducted enhanced due diligence, FE 3 replied, "Absolutely not." And as far as FE 3 was aware, "customer risk scoring, with risk factors specific to the digital-currency industry" did not exist at Silvergate; and she explained that in her position at the Bank, she would expect to be aware of such a process, if it existed.

71. FE 3 was also in meetings with Lane and his direct reports. The meetings happened about once a month and covered issues concerning revenue, how well the Bank was doing, and new hires. Notwithstanding Lane's public statements to investors that "compliance is at the forefront of everything we do,"[49] there was never anything stated about compliance during these regular internal meetings with Lane's direct reports.

_____

[49] *Bitcoin for Corporations Strategic Vendor: Silvergate*, MicroStrategy (Feb. 8, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          -27-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      Case No. 22-cv-01936

72.     FE 3 further confirmed that Silvergate did not perform the specific types of "ongoing monitoring" that Silvergate and Lane represented to investors during the Class Period.  When asked whether Silvergate conducted customer counterparty reviews, FE 3 replied, "Absolutely not."   When asked whether Silvergate conducted annual company reviews, FE 3 replied, "Absolutely not." When asked if Silvergate did not perform daily BSA or AML monitoring, FE 3 replied, "That is consistent with my understanding."  When asked if Silvergate did not perform daily news monitoring, FE 3 also replied, "That is consistent with my understanding."  When asked if Silvergate conducted negative news reviews, FE 3 replied, "Not at all."  When asked whether Silvergate conducted quarterly account activity reviews, FE 3 replied, "Absolutely not."  In addition to her own experience, FE 3 knew because she spoke with managers who would be responsible for that if it occurred, including Ellen Hansen, Mitchel Sanderson, and Kacy Pendergrass.

73.     FE 3 explained that she did not see anything at Silvergate like compliance policies or controls designed to address the digital currency industry. She added that she never saw Silvergate implement policies and procedures to comply with AML and KYC requirements.  In fact, during 2022, FE 3 tried to find policies concerning KYC on Silvergate's intranet, and she could find no procedures regarding beneficial ownership or KYC.  FE 3 confirmed that all policies concerning bank processes were on Silvergate's intranet, but she could never find policies concerning compliance processes.

74.     When asked about Silvergate's public statements that it had a "system of red flags specific to various customer types and activities," FE 3 explained that Silvergate had purchased an AML software to do this, but it was never implemented. FE 3 explained that the AML software was supposed to flag customer activity with sanctioned countries, excessive cash transactions, and other kinds of alerts; and the Company would be able to set the parameters on what the software should flag. None of that was being done at Silvergate, explained FE 3.  FE 3 added that, during

meetings, she heard it noted that the implementation of the AML software would be a project at some point, but it was never put on the active project list.

75.     FE 3 asked her colleagues in 2022 whether Silvergate was doing anomaly detection—*i.e.*, looking for suspicious activity.  She was told that they were not.  FE 3 then tried to create a report, based on a manual review, that would detect anomalous activity.  FE 3 recounted, however, there was no one to tell even if her team found suspicious activity, because, "Nobody cared."  FE 3 confirmed that—outside of her failed manual attempt—Silvergate did not perform any anomaly detection.

76.     FE 3 had direct knowledge about Silvergate's failure to monitor FTX and its related entities.  FE 3 handled wire limit changes for FTX, Alameda, and North Dimension.  FE 3 saw no ongoing monitoring of FTX, Alameda, or North Dimension.  In her role, she would at least be aware of such monitoring if it existed, explained FE 3.  FE 3 added that this monitoring should have included currency transaction reports, wire volumes, wire destinations, ACH exceeding limits, invalid or unauthorized return rates, and activity between accounts.

77.     Additionally, FE 4 described how, when Silvergate received reports from customers and other banks of unauthorized transactions, Silvergate would not investigate.[50]  FE 4 explained that even when the originating bank would tell Silvergate that the client had said a transaction was unauthorized, Silvergate did not investigate.  FE 4 said receiving these unauthorized transaction requests was a red flag, but there was never any investigation by Silvergate to determine what happened with unauthorized transactions.

78.     When the Federal Reserve eventually learned of Silvergate's failure to vet, perform due diligence on, or monitor its customers, the Federal Reserve took

---

[50] FE 4 worked at Silvergate from February 2011 to July 2021 as "VP of Deposit Operations."  She reported to Dina Matias, Silvergate's "Senior Vice President, Operations Administrator," who reported to Elaine Hetrick, Silvergate's Chief Administrative Officer.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                                  -29-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    Case No. 22-cv-01936

significant action. FE 5 explained that the Federal Reserve gave private feedback to Silvergate that its compliance was insufficient.[51] FE 5 further explained that, in the first quarter of 2022, the Federal Reserve sent Silvergate a report identifying Matters Requiring Immediate Attention (or "MRIAs").

79. According to the Federal Reserve, "Matters Requiring Immediate Attention" are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization; and (4) in the case of consumer compliance examinations, matters that have the potential to cause significant consumer harm."[52] When issued, Matters Requiring Immediate Attention are directed to a bank's most senior executives and board of directors, and must specifically state that "'The board of directors (or executive-level committee of the board), or banking organization **is required to immediately . . . .**'" take the actions specified by the Federal Reserve.[53]

80. FE 5 explained that the Matters Requiring Immediate Attention provided to Silvergate related to onboarding, among other things. The nature of the concerns was around Silvergate's lack of basic program requirements for vetting and onboarding. FE 5 added that the Federal Reserve also provided Silvergate with

---

[51] FE 5 worked at Silvergate from May 2022 until May 2023 as a "FRCM Initial Due Diligence Manager." During his over decade-long banking career, he has held roles as an enhanced due diligence manager, ongoing due diligence manager, and AML risk compliance officer at four other major banks. FE 5 received reports from Silvergate's consultants, including K2, who had summarized the MRIAs in their reports. While employed at Silvergate, FE 5 had access to Silvergate's records from before his employment.

[52] Supervisory Considerations for the Communication of Supervisory Findings, https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

[53] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-30-

Case No. 22-cv-01936

MRIAs related to ongoing due diligence.  The MRIAs said that things were either lacking or not proceduralized.  FE 5 further noted that, regarding Silvergate's ongoing monitoring, the Federal Reserve said it was not sufficient.  FE 5 added that he knows that the regulators also found deficiencies with Silvergate's screening process and SAR filings.

81.     FE 5 further stated that the regulators came back at the end of June 2022 to check progress.  FE 5 explained that the MRIAs were still going to stick—*i.e.*, they were going to remain in place—and FE 5 believes Silvergate was going to have even more MRIAs issued to it; however, Silvergate voluntarily started closing down before that ever occurred.

82.     FE 5 explained that, after the Federal Reserve issued its MRIAs, Silvergate retained third-party contractors, including the consulting firm, K2.  FE 5 explained that the contractors agreed that Silvergate lacked the appropriate controls around due diligence and KYC, and his team used their analyses to write up procedures.  FE 5 explained that he and his team worked on the procedures and had to give them to regulators by June 20, 2022.  FE 5 explained that Silvergate rolled out the new diligence processes on August 15, 2022.

83.     FE 5 agreed that, prior to August 15, 2022, Silvergate did not know its customers.  FE 5 also agreed that, prior to August 15, 2022, Silvergate did not review potential customers at the onboarding stage to determine whether they had an appropriate culture of compliance.  He knows this because, in his role at the Company, he read narratives and cases and was finding "all the garbage that was slopped through."  When he looked at Silvergate's paperwork from before August 2022, FE 5 could not tell who the customer was, what they did, what the sources of wealth were, or where the jurisdictions were, and the flow of funds did not make sense. FE 5 added that, before May 2022, the Bank never said "no" to a client, which he knows from his looking at the Company's records.  FE 5 further explained that there was no record of any prospective client ever not being approved by Silvergate.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-31-

Case No. 22-cv-01936

84.     FE 5 also agreed that, prior to August 15, 2022, when employees raised concerns about or identified suspicious or anomalous activity, Silvergate did not do anything about it.  FE 5 further agreed that, before August 15, 2022, Silvergate lacked a focus on compliance.

85.     FE 5 explained that, specifically with regard to Binance, there were a lot of red flags.  Among them, Binance had a big issue with the "wire rule."  The "wire rule" provides that you are supposed to include certain information in a wire when you complete it, including the originator and where the funds are going.  FE 5 explained that there were a lot of wires with Binance and Silvergate's other crypto-exchange customers where the information was just blank.  According to FE 5, Silvergate was supposed to reject those or strongly discipline customers, including suspending their accounts, and insist customers include the information.  But, FE 5 explained, nobody at Silvergate took a hard enough line with customers to say Silvergate was going to suspend accounts unless customers included all the information on the wires.  FE 5 noted that this continued to be a problem even after August 15, 2022.

86.     FE 5 agreed that, prior to August 15, 2022, Silvergate did not do site visits. FE 5 noted that there was also nothing written in Silvergate's procedure for site visits anywhere.  FE 5 said site visits are important to make sure a company is real and not a shell company or a front.  FE 5 elaborated with an example: if a company says it is a gas station, you need to make sure it is actually a gas station, that there are things on the shelves and people work there.  You need to make sure it is not just a dusty shop where nothing has been moved that is a front for drug money.  FE 5 agreed that it was shocking that Silvergate did not conduct site visits, adding that if you would not travel to where the prospective customer is located, then you should not do business with a customer located there.

87.     FE 5 explained that, following its receipt of the MRIAs and with the Federal Reserve breathing down its neck, Silvergate put in place new procedures on

August 15, 2022. Following the implementation of Silvergate's new procedures on August 15, 2022, FE 5's team wanted to go through any customers that had not gone through Silvergate's new onboarding process when those customers were previously onboarded and have an automatic look back to apply the new procedures for those customers as if those customers were being onboarded anew. FE 5 explained that Silvergate did not do that, even though FE 5's boss agreed with the recommendation that Silvergate should. FE 5 explained it would be industry standard for Silvergate to look back and apply the new procedures as if they were new customers; yet, Silvergate did not do this. Nor, of course, did it disclose the Federal Reserve's findings or any of these critical facts to investors.

**E. Silvergate Failed To Vet, Conduct Due Diligence on, or Monitor FTX and Its Related Entities.**

88. Additional facts corroborate the accounts provided by Silvergate's former employees. These facts show—among other things—that Silvergate failed to vet, conduct due diligence on, and monitor its most critical customer—the crypto-exchange FTX, which was an outright sham that Silvergate and its "seal of approval" enabled to defraud customers of billions of dollars.

89. FTX and its related entities alone comprised approximately $2.1 billion in deposits—*i.e.*, over 17% of Silvergate's overall, Bank-wide deposits.[54] Recognizing FTX's significance to the Bank and its bottom line, Defendants Lane and Silvergate prominently highlighted Silvergate's relationship with FTX. On its website, Silvergate displayed FTX's logo and included the below "testimonial" from

[54] On November 16, 2022, Silvergate issued a press release disclosing that as of November 15, 2022, its "[a]verage quarter-to-date digital asset customer deposits" were "approximately $9.8 billion, excluding all deposits from FTX and its related entities." This was a $2.1 billion reduction from the $11.9 billion that the Company had reported five days earlier for "deposits from all digital assets customers," which included FTX deposits. *Compare* Press Release, "Silvergate Provides Statements on FTX Exposure (Nov. 11, 2022) *with*, Press Release, "Silvergate Provides Mid-Quarter Update and Announces Participation in Oppenheimer's 5th Blockchain & Digital Assets Summit" (Nov. 16, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-33-
Case No. 22-cv-01936

FTX's Founder and CEO, Sam Bankman-Fried about how "hard" it was "to overstate" Silvergate's importance to FTX:

 

**Figure 2**.  Screenshot of Silvergate's website.[55]

90.    As the industry publication *CoinGeek* rightly observed, FTX's and Silvergate's "cozy relationship . . . boosted Silvergate's status and share price."[56]

91.    Silvergate repeatedly assured investors that it had performed its "secret sauce" vetting and due diligence on FTX and its related entities, as well as its other cryptocurrency exchange customers, prior to allowing them to bank at Silvergate and participate on the SEN Network.  For example, Defendant Lane publicly singled out FTX, by name, in a June 2022 public interview as one of Silvergate's four "major" cryptocurrency exchange customers—all of whom, Lane represented, were "serious about regulation."[57]  During that same interview, Lane further assured investors "that's an important distinction because [the Silvergate-approved exchanges] have to satisfy not only their own legal and regulatory requirements but then we have to verify that their compliance programs are sound."[58]

---

[55] https://web.archive.org/web/20220511235432/https://www.silvergate.com/solutions/digital-currency/sen; https://web.archive.org/web/20221022144431/https://www.silvergate.com/.

[56] *CoinGeek*, "Feds probe Silvergate bank's ties to FTX, SBF vs. CZ cage-match documentary" (Feb. 6, 2023).

[57] *Silvergate CEO Alan Lane on the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).

[58] *Id*.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-34-
Case No. 22-cv-01936

92.    In reality, Silvergate did <u>not</u> conduct diligence on FTX or its related entities and did <u>not</u> "verify that their compliance programs are sound." Instead, Silvergate allowed and enabled Sam Bankman-Fried to use FTX and his other entities to dupe innocent customers out of billions of dollars.

93.    Sam Bankman-Fried's and FTX's fraud of their customers was simple. When customers sought to purchase cryptocurrency from FTX's account, they were directed to wire their U.S. dollars or other fiat currency into the Silvergate-approved accounts of two entities that were <u>not</u> FTX—specifically, they were directed to wire their funds to "North Dimension" and "Alameda." None the wiser, innocent FTX customers wired more than $8 billion to the Silvergate-approved accounts of North Dimension and Alameda.[59] FTX's CEO, Sam Bankman-Fried, then absconded with those dollars from Silvergate, without crediting the customers' cryptocurrency accounts at FTX. Once FTX collapsed, FTX customers were left empty-handed and unable to find or free their money.

94.    All three entities—North Dimension, Alameda, and FTX—were shams, which would have been obvious to Silvergate had it actually conducted "vetting," "due diligence," or "ongoing monitoring" of its approved customers.

95.    *North Dimension* was a fake online electronics retailer. On its website, North Dimension claimed to sell mobile phones, laptops, watches and other personal electronics. But there was no actual way to purchase anything from North Dimension. Clicking the links on its website to buy products "sold" at North Dimension generated a typo-filled, incoherent pop-up response to "Get A Quote," which stated: "Fee [*sic*] free to send a message. We collaborate with ambitious brands and people; we'd love to build something great together."[60]

---

[59] *Vox*, "Sam Bankman-Fried tries to explain himself" (Nov. 16, 2022); *Financial Times*, "FTX balance sheet, revealed" (Nov. 12, 2022).
[60] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).

**Figure 3**.  Screenshot of North Dimension's website.[61]

96.     If that were not enough of a "red flag" for Silvergate, North Dimension's address, which was listed in plain sight on its website, was the same address as FTX's address: 2000 Center St., Suite 400, Berkeley, California.  *See* Figure 4, *infra*.  Worse yet, as *NBC* would later note following its investigation, North Dimension's website was "rife with misspellings and bizarre product prices; for example, item listings sometimes showed 'sale' prices that were hundreds of dollars above a regular price."[62]  The "About Us" section of North Dimension's website displayed text that "may have been written by a not-too-smart artificial intelligence," with North Dimension describing itself as a "World top E-commerce site for consumer electronics in order to provide the lowest costs for authentic items from the world's most reputable brands."[63]

---

[61] Web archive of North Dimension's website (as of Nov. 11, 2022).

[62] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).

[63] *Cointelegraph*, "Here's what SBF's fake electronics outlet 'North Dimension' looks like" (Dec. 30, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          -36-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                       Case No. 22-cv-01936



**Figure 4**. Screenshots of North Dimension's website.[64]

97. In addition to not actually selling electronics products and being rife with misspellings, North Dimension's website included "sale" prices on item listings that were hundreds of dollars <u>above</u> the "regular" prices. For example, an 11-inch iPad—listed as a "Cell Phone"—inexplicably displayed a "sale" price of $899 and an "original" price of $410.



**Figure 5**. Screenshot of North Dimension's website.[65]

98. Far from an "online electronics retailer," North Dimension was an utter sham created and controlled by FTX's CEO, Sam Bankman-Fried, to fraudulently divert billions of dollars of customer funds intended for FTX. North Dimension had no employees, other than Bankman-Fried, and no physical location. It had no actual

---

[64] Web archive of North Dimension's website (Nov. 11, 2022).
[65] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-37-
Case No. 22-cv-01936

business operations and was nothing more than a Silvergate-approved sham allowed to fleece innocent customers out of billions of their hard-earned dollars.

99.    ***Alameda Research*** was North Dimension's parent company, and also a Silvergate-approved customer.  Silvergate approved Alameda to open a Silvergate account in 2018, when FE 2 and FE 4 were at the Bank.  FTX and Alameda are separate legal entities and, accordingly, supposed to—and legally required by law to—operate independently.  Nevertheless, FTX and Alameda were operated as if they were one and the same.  Bankman-Fried controlled both entities and, as with North Dimension, FTX and Alameda shared the same address—2000 Center Street, Suite 400, Berkeley, California.  Also, as with North Dimension, FTX's unsuspecting customers were directed to wire (and did wire) billions of dollars of funds to Alameda's Silvergate-approved accounts when, in reality, they wanted to send their money to FTX.

100.    Sam Bankman-Fried has now been criminally indicted, three of his associates have pled guilty, and FTX has gone bankrupt.  The fact that FTX was a complete ruse would have been obvious to Silvergate, had it actually conducted the represented diligence.  Bankman-Fried ran the multibillion-dollar cryptocurrency exchange as a "personal fiefdom."[66]  FTX had no CFO, a wildly inexperienced C-suite of Bankman-Fried's cronies, and a "Chief Regulatory Officer" who had been caught on tape aiding and abetting fraud in his previous position as General Counsel of Ultimate Bet, an online gambling site.[67]

101.    As FTX's new CEO, John Ray, has admitted in his remarks to Congress: at FTX, there was an "absolute concentration of control in the hands of a

---

[66] *Law360*, "FTX Pledges Better Books, Celsius Faulted for Asset Mingling" (Nov. 23, 2022).

[67] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022); *Business Insider*, "Chamath Palihapitiya said Sam Bankman-Fried once pitched him, but after the investor suggested changes like forming a board, FTX told him to get lost" (Nov. 15, 2022).

very small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money or assets."[68] FTX's new CEO has further admitted that FTX "did not keep appropriate books and records, or security controls, with respect to its digital assets."[69] FTX's new CEO also added, "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[70] These are strong admissions coming from Mr. Ray, who has "over 40 years of legal and restructuring experience" and has overseen the clean-up of "several of the largest corporate failures in history," including Enron.[71]

102. FTX's new CEO, Mr. Ray, also admitted in his testimony to Congress that, at FTX, "there was an absence of any management," adding, "You need records, you need controls, and you need to segregate people's money. It's simple." When asked if FTX had significant risk management systems, Ray responded that "there were virtually no internal controls and no separateness whatsoever" between FTX and Alameda, the parent company of North Dimension. Ray further testified that Bankman-Fried owned 90% of Alameda, and there was "no distinction whatsoever" in governance between FTX and Alameda.[72]

103. As Mr. Ray summarized, FTX's fraud "[was]n't sophisticated whatsoever. This is just plain old embezzlement. . . . This is just taking money from customers and using it for your own purpose."[73] Rather than being safely kept at

---

[68] Written Testimony of Mr. John J. Ray III, CEO, FTX Debtors, House Financial Services Committee (Dec. 13, 2022).

[69] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.

[70] *Id.*

[71] *Id.*

[72] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[73] *Id.*

Silvergate, FTX customer funds were diverted to two other Silvergate-approved entities (North Dimension and Alameda), and then "used to purchase homes and other personal items for [Silvergate] employees and advisors" in the Bahamas. When FTX employees wanted to make such purchases, they needed only to "submit[] payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis."[74] As observed by Federico Lascano of Fiducient Advisors, the lack of "cash controls" at FTX "enabled customer funds to be freely transferred to Alameda," and "would have been an enormous red flag during the operational due diligence process."[75]

104. Had Silvergate monitored FTX, Alameda, or North Dimension, it would have seen the $8 billion from FTX customers (intended to be deposited into FTX accounts to be traded on the FTX Exchange) transferred, instead, into North Dimension's account. As the industry press later recounted, "Silvergate's lackadaisical approach to oversight of who/what was transacting on the 24/7 SEN platform was on full display in its approval of North Dimension—a fake electronics retailer set up by FTX to facilitate payments to/from its U.S. customers—based solely on assurances of propriety from [Sam Bankman-Fried]."[76]

---

[74] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.

[75] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022). Mr. Lascano researches and performs operational due diligence on alternative investment managers. Prior to joining Fudicient Advisors in 2022, Mr. Lascano worked in regulatory finance at NatWest Markets, the investment banking arm of NatWest Group based in the United Kingdom.

[76] *CoinGeek*, "'Crypto' firms unbank themselves from struggling Silvergate" (Mar. 3, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-40-
Case No. 22-cv-01936

105. FTX's new CEO further explained that, at FTX, "literally there's no record-keeping whatsoever."[77] Mr. Ray added, in amazement: "They use[d] Quickbooks. A multibillion-dollar company using Quickbooks." He elaborated that FTX "used QuickBooks as their accounting system and relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities."[78] Ray further noted that, at FTX, "[a]pproximately 80,000 transactions were simply left as unprocessed accounting entries in catch-all QuickBooks accounts titled 'Ask My Accountant.'"[79] Mr. Ray concluded that FTX is "one of the worst [entities] from a documentation standpoint" and "it's really unprecedented in terms of the lack of documentation."[80]

106. Bankman-Fried has himself now publicly admitted that he made zero effort to manage risk at FTX: "I wasn't even trying, like, I wasn't spending any time or effort trying to manage risk on FTX."[81] He added, "If I had been spending an hour a day thinking about risk management on FTX, I don't think [the collapse of FTX] would have happened."[82] Bankman-Fried has also admitted that there was a "massive failure of oversight of risk management" at FTX.[83] And FTX's new CEO,

[77] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[78] Ray explained "QuickBooks was not designed to address the needs of a large and complex business like that of the FTX Group, which handled billions of dollars of securities, fiat currency, and cryptocurrency transactions across multiple continents and platforms," First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov 11, 2022), ECF No. 1241-1 at 13.

[79] *Id.*

[80] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[81] *Wall Street Journal*, "Sam Bankman-Fried 'Wasn't Even Trying' to Manage Risk at FTX, He Says" (Dec. 1, 2022).

[82] *Id.*

[83] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-41-
Case No. 22-cv-01936

Mr. Ray, has confirmed these admissions, testifying that FTX's systems for accounting, audit, cash management, cybersecurity, risk management, and data protection "did not exist to an appropriate degree" or "did not exist" at all.[84]

107. These stark admissions from FTX's most senior insiders about FTX's complete absence of any internal compliance programs are directly contrary to Silvergate's and Defendant Lane's public assurances that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring" and that Silvergate "verif[ied]" that FTX's "compliance programs are sound."

108. Silvergate's "vetting," "due diligence," and "ongoing monitoring" was supposed to protect against this very type of misconduct. Unfortunately for investors, Defendants Lane and Silvergate utterly failed to perform any of them. If they had, Silvergate would have—as it repeatedly reassured investors in such circumstances—"refused to bank" FTX and its related entities. As a bipartisan group of senators of the U.S. Senate Banking Committee later explained in a December 5, 2022 letter to Defendant Lane: "Your bank's involvement in the transfer of FTX customer funds to Alameda Research reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."[85]

**F.      Silvergate Failed To Vet, Conduct Due Diligence on, and Monitor Its Other Major Exchange Customers.**

109. Additional facts corroborate that, contrary to their statements to investors, Defendants Silvergate and Lane failed to conduct "regulatory compliance diligence" on prospective customers and failed to "vet[] all of [the Bank's] customers from KYC, anti-money laundering, Bank Secrecy Act." As *New York*

---

[84] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.

[85] Letter from Warren, Kennedy, and Marshall to Lane (Dec. 5, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-42-

Case No. 22-cv-01936

*Magazine* would later note, "Silvergate has been the go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy." Marc Cohodes, a famed corporate watchdog and market participant rightfully added, Silvergate was not a banking platform; it was "a publicly traded crime scene."

110. ***Binance*** is a cryptocurrency exchange, with approximately one-third of its users based in the United States. Notwithstanding its substantial U.S. customer base, Binance did not register with the U.S. Department of the Treasury ("Treasury Department"), as is required by the Bank Secrecy Act for "financial companies with 'substantial' business in the United States."[86] Instead, Binance and its owner, Changpeng Zhaou, created Binance.US—a U.S.-based exchange—and registered it with the Treasury Department as "fully independent" from Binance.

111. Silvergate approved Binance.US to bank at Silvergate and join its SEN Network in November 2020.[87] Silvergate did not perform due diligence on Binance.US. Those who have conducted due diligence on Binance.US have readily uncovered facts demonstrating that it is not "fully independent" from Binance; in fact, they are one and the same. As U.S. senators clearly explained in a bipartisan letter, "While Mr. Zhao has claimed that Binance.US, is a 'fully independent entity,' in reality, he controls the company as a '*de facto* subsidiary' of Binance," with "Binance's Cayman Islands holding company ke[eping] custody of Binance.US customers' digital wallets."[88] The *Wall Street Journal* likewise found that "Binance and Binance.US have been much more intertwined than the companies have disclosed, mixing staff and finances and sharing an affiliated entity that bought and

---

[86] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).
[87] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).
[88] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

sold cryptocurrencies."[89]  *Reuters* also concluded that "Binance created Binance.US as a *de facto* subsidiary in 2019 in order to draw the scrutiny of U.S. regulators away from the global exchange."

112.  If it had actually conducted due diligence, Silvergate would also have learned that Binance and its executives controlled Binance.US's finances at Silvergate.  When it conducted its review, *Reuters* readily found that Binance's executives, including its finance executive Susan Li, had key access to Binance.US's Silvergate account.  The bipartisan group of U.S. senators similarly concluded that, "in truth, 'the global Binance exchange, which is not licensed to operate in the United States, controlled the finances of Binance.US, despite maintaining that the American entity is entirely independent and operates as its 'US Partner.'"[90]

113.  Silvergate additionally failed to monitor Binance.US's activity, allowing transfers of hundreds of millions of dollars to Zhao's other entities without the permission—or even the knowledge—of Binance.US's employees.  As *Reuters* revealed, beginning in late 2020, $400 million of funds at Silvergate were transferred from Binance.US to a separate account controlled by Zhao "without [Binance.US's] knowledge."[91]  Funds were moved from Binance.US's account at Silvergate to "Merit Peak," another shell entity owned by Zhao and approved by Silvergate as a customer.  Merit Peak then transferred funds to "Key Vision Development Limited," yet another sham entity that "held an account at Silvergate at the time" and that also "identified CEO Zhao as a director."[92]

114.  Had Silvergate actually performed the represented due diligence on these entities (as it told investors it had) or monitored their activity on its platform

---

[89] *Wall Street Journal*, "Texts From Crypto Giant Binance Reveal Plan to Elude U.S. Authorities" (Mar. 5, 2023).

[90] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[91] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

[92] *Id.*

(as it told investors it did), it would have realized that they were nothing more than sham entities created to evade U.S. laws and funnel funds from Binance.US to Binance and Zhao. Indeed, "Mr. Zhao 'decline[d] to disclose the location or entity behind his own exchange [at Binance]' in what many regard as a blatant attempt to dodge the world's financial regulators, serve 'users without licenses,' and violate anti-money laundering laws."[93]

115. Additionally, a simple "site visit" to the address provided for Key Vision Development Limited (Office 22 Alpha Centre, Providence, Mahe, Seychelles), or even a search using "Google Earth" for the address, would have made plain that it was the address for a massive warehouse—not the business office of an entity transacting in hundreds of millions of dollars in cryptocurrency:[94]



**Figure 6.** Images of Key Vision Limited Development's purported address.[95]

---

[93] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[94] Post by Stefan Luebeck, a cryptocurrency market expert, dated Feb. 16, 2023; Google Earth Image Search.

[95] Post by Stefan Luebeck, a cryptocurrency market analyst at BTC-ECHO, dated Feb. 16, 2023; Google Earth Image Search.

116.    If Silvergate had actually performed the due diligence it represented to investors, it would also have discovered that these Binance entities lacked any compliance program.  Binance is, as the U.S. senators explained in their March 2023 bipartisan letter, "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders."  This conclusion is well-founded: "crypto researcher Chainalysis, hired by U.S. government agencies to track illegal flows, concluded in a 2020 report that Binance received criminal funds totaling $770 million in 2019 alone, more than any other crypto exchange."[96]  And Binance's own Chief Compliance Officer admitted that its KYC checks were "weak," with Binance's CEO (Mr. Zhao) wanting "no kyc."[97]

117.    Actual vetting and monitoring by Silvergate would have further shown that "Binance.US was also in on the scheme: 'Almost half the U.S. compliance team quit by mid-2022 after a new U.S. boss was appointed by Zhao, . . . because the new chief pushed them to register users so swiftly that they couldn't conduct proper money laundering checks.'"[98]    Binance.US executives directed compliance personnel to "apply more lenient checks" to "VIP customers" who had been referred to the platform to increase its liquidity.[99]  The bipartisan group of U.S. senators rightfully concluded that Binance maintained a "laughably weak anti-money laundering compliance program," with *Reuters* similarly finding that, "the main Binance exchange let users open accounts and trade crypto anonymously by merely providing an email address."[100]

---

[96] *Reuters*, "How crypto giant Binance became a hub for hackers, fraudsters and drug traffickers" (June 6, 2022).
[97] *Reuters*, "SPECIAL REPORT-Crypto giant Binance kept weak money-laundering checks even as it promised tougher compliance, documents show" (Jan. 21, 2022).
[98] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).
[99] *Id.*
[100] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                          -46-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          Case No. 22-cv-01936

118. In sum, if Silvergate had conducted the "extensive regulatory compliance diligence" and "vetting" that it told investors it had (but which it had not), Silvergate would have found—as investigators and U.S. senators uniformly have—that "Binance and its related entities have purposefully evaded regulators, moved assets to criminals and sanctions evaders, and hidden basic financial information from its customers and the public."[101]

119. **_Huobi Global_** was a Seychelles-based cryptocurrency exchange, founded in China. Silvergate approved Huobi to bank at Silvergate and participate on its SEN Network, assuring investors it had conducted "enhanced due diligence" on it. In reality, Silvergate had not. Had Silvergate conducted the represented diligence, it would have discovered a slew of troubling facts, including that Huobi lacked compliance controls. For example, in December 2020, investigators at the forensics company CipherBlade conducted a review of Huobi's controls. Their review "demonstrated how simple it was to create false accounts" at Huobi and transact on the exchange, which created conditions ripe for money laundering and other illegal transfers.[102] Customers transacting on the Huobi exchange could wire funds using phony information, including obviously false names and photographs of themselves, such as "Taylor Swift" and "Borat." Other investigators similarly concluded that Huobi "fail[ed] to perform stringent backgrounds checks" and "know-your-customer (KYC) processes" on customers, making it a "'gateway for money laundering and other gray activities.'"[103] Public company investigator Aurelius Capital Value summed it up correctly when it questioned Silvergate

---

[101] _Id._
[102] _Coin Edition_, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).
[103] _Verdict_, "Dirty bitcoin: Exchanges' KYC laxity eases money laundering – report" (Oct. 27, 2021).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -47-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

associating with Huobi: it is impossible "to find a way to harmonize the formal due diligence procedure that Silvergate uses with Huobi's onboarding process."[104]

120.   If Silvergate had actually conducted due diligence, it also would have found that "Huobi Global had not taken any action against the links that were made between Huobi and the darknet marketplace Hydra."[105]   In October 2021, investigators of the National Bureau of Economic Research in Cambridge, Massachusetts issued a report "show[ing] that the highest volume entities interacting directly with Hydra Market users are non-KYC exchanges, including . . . Huobi."[106] The U.S. Justice Department has described Hydra as "the world's largest and longest-running darknet market," with Hydra having received in total around $5.2 billion in cryptocurrency.[107]

121.   *Nexo Capital Inc.* was a cryptocurrency lending firm that Silvergate also approved to bank and operate on its SEN Network.  Silvergate did not perform the represented due diligence on Nexo.  If Silvergate had performed due diligence on Nexo, it would have learned that Nexo failed to register with the SEC, as required by law.  Following its review of Nexo, the SEC "charged Nexo with failing to register its retail crypto lending product before offering it to the public, bypassing essential disclosure requirements designed to protect investors."[108]  Prosecutors that have conducted due diligence on Nexo have also learned, as reported by *Reuters*, that "Nexo has been operating through many companies, many of which were just

---

[104] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).
[105] *Id.*
[106] National Bureau of Economic Research, *Blockchain Analysis of the Bitcoin Market* (October 2021).
[107] Press Release, DOJ, "Justice Department Investigation Leads to Shutdown of Largest Online Darknet Marketplace" (Apr. 5, 2022).
[108] Press Release, SEC, "Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product" (Jan. 19, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -48-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS            Case No. 22-cv-01936

'post boxes.'"[109]  Indeed, the SEC has forced Nexo to cease and desist and required it to pay $45 million in fines to the SEC and state regulators.[110]

122.  ***Miles Guo*** (a/k/a Ho Wan Kwok) owned two entities approved by Silvergate: Hamilton Opportunity Fund SPC (Silvergate Account Numbers: 5090037713, 5090037705, 5090037754, 5090042770, 5090042762, 5090042853, 5090037739, 5090042853) and Hamilton Investment Management Ltd (Silvergate Account Number: 5090030288).  Silvergate did not perform the represented due diligence on Guo or his entities.  Had Silvergate performed the represented due diligence on Guo or his entities, it would have found what the SEC and others readily discovered: "Guo was a serial fraudster" who "took advantage of the hype and allure surrounding crypto and other investments to victimize thousands and fund his and his family's lavish lifestyle."[111]  Guo—who is currently under arrest in the United States—operated through "fraudulent and fictitious businesses" that "connected dozens of interrelated entities," allowing Guo "to solicit, launder, and misappropriate victim funds."[112]  On September 18, 2022, the DOJ seized over $389 million from Guo's accounts at Silvergate, including Hamilton Opportunity Fund SPC and Hamilton Investment Management Ltd.[113]

123.  ***Virgil Sigma Fund LP and VQR Multistrategy Fund LP*** were two cryptocurrency hedge funds run by convicted felon Stefan Qin.  Both entities were also approved by Silvergate to participate on the SEN Network and authorized to set

---

[109] *Reuters*, "Bulgaria launches probe of crypto lender Nexo, raids sites" (Jan. 12, 2023).

[110] Press Release, SEC, "Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product" (Jan. 19, 2023).

[111] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023).

[112] Sealed Indictment, *United States v. Ho Wan Kwok*, No. 23-cr-118 (S.D.N.Y. Mar. 6, 2023).

[113] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023); Press Release, USAO SDNY, "Ho Wan Kwok, A/K/A "Miles Guo," Arrested For Orchestrating Over $1 Billion Dollar Fraud Conspiracy" (Mar. 15, 2023).

up twelve accounts at Silvergate.[114] Silvergate did not perform the represented due diligence on these Silvergate-approved entities. If Silvergate had conducted the due diligence and the monitoring it represented, it would have discovered that these entities operated a Ponzi scheme. When the New York Field Office of Homeland Security Investigations Unit reviewed these entities, they readily found that "Virgil Sigma and VQR, two multimillion-dollar cryptocurrency investment funds, were . . . slush funds for Qin to live his extravagant lifestyle. Qin orchestrated this reprehensible criminal scheme for many years, making misrepresentations and false promises that coaxed investors into pouring millions of dollars into fraudulent cryptocurrency firms, all the while stealing the hard-earned money of his investors."[115]

124. **Bittrex, Inc.** was a cryptocurrency exchange that Silvergate approved for its SEN Network and specifically highlighted, by name, on the Bank's website as one of its major customers. Silvergate did not conduct the due diligence on Bittrex that it represented to investors. Had Silvergate actually conducted due diligence on Bittrex, it would have discovered, as the Treasury Department has found, that Bittrex "violated multiple sanctions programs and failed to adequately guard against money laundering."[116] Among other things, Bittrex "failed to have a proper anti-money laundering program" and "unnecessarily exposed the U.S. financial system to threat actors."[117] Bittrex has now been required to pay $53 million for violating multiple

---

[114] *Business Insider*, "Silvergate had close ties to Sam Bankman-Fried's FTX and Alameda. The crypto bank was also reportedly a favorite of other troubled clients including an Australian Ponzi criminal" (Jan. 24, 2023).

[115] Press Release, USAO SDNY, "Founder Of $90 Million Cryptocurrency Hedge Fund Charged With Securities Fraud And Pleads Guilty In Federal Court" (Feb. 4, 2021).

[116] *Decrypt*, "Treasury Fines Crypto Exchange Bittrex $53 Million for Sanctions Violations" (Oct. 11, 2022).

[117] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT      -50-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      Case No. 22-cv-01936

U.S. sanctions programs, which was "the biggest fine on a crypto business by the Treasury Department."[118]

125.   ***Paxos and OSL Digital*** were cryptocurrency exchanges approved by Silvergate.  The Bank did not conduct the represented due diligence on either of these cryptocurrency exchanges or monitor their activity.  As a result, these exchanges were able to launder $425 million between September 2021 and June 2022 from four, Silvergate-approved accounts: Paxos Global PTE LTD.; Paxos Trust Company LLC; OSL Digital LTD; and OSL SG PTE LTD.[119]  If Silvergate had conducted the represented "ongoing monitoring" of the activity on its SEN Network, it would have detected the money laundering and not approved the cryptocurrency exchanges that facilitated such illegal activity.

126.   Florida's Money Laundering Task Force ("MLTF") conducted a review of "the records produced by Silvergate Bank" for these cryptocurrency exchanges.[120] MLTF readily found that these exchanges facilitated "the laundering of illicit funds." The Deputy Sherriff of Broward County, assigned to the MLTF, submitted an affidavit on August 23, 2022, following his review of the "the records produced by Silvergate Bank" and concluded that:

> "During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms [at Silvergate] into accounts held at different US banks."

> "The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized . . . by the [Broward County Sheriff's Office Strategic Investigations Division, Money

---

[118] *Id.*

[119] *CryptoSlate*, "Silvergate records reveal $425M in transfers to South American money launderers" (Nov. 16, 2022).

[120] "Affidavit in Support of Probable Cause for Forfeiture," *In re: Seizure of Two Million Forty-Eight Thousand Two Hundred Twenty-Nine Dollars and 48/100 ($2,048,229.48) in United States Currency*, No. CACE-22-012446 (Cir. Ct., 17th Jud. Cir., Broward Cnty., Fla.).

Laundering Task Force] for being used to facilitate the laundering of illicit funds."

"In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies <u>were not consistent</u> with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same [Silvergate] records."

"In general, these companies all appeared to be shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details . . . ."[121]

127. Had Silvergate actually monitored the activity of its customers and on its SEN Network (as it represented it had), it also would have identified that these entities' transactions "were not consistent with the transaction patterns of thousands of other persons and businesses" and recognized that hundreds of millions of dollars were being wired from the Silvergate-approved exchanges to "shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details."[122]

### G. Customers and Investors Learn That Silvergate Did Not Vet, Perform Due Diligence On, or Monitor Its SEN Network Participants.

128. The world gradually learned the true facts about Silvergate's failure to vet, perform due diligence on, and monitor its customers—including FTX. On November 2, 2022, the publication *CoinDesk* released an investigative report that described the "unusually close" ties between two of Silvergate's customers, FTX and Alameda, as reflected in a leaked internal Alameda financial document. *CoinDesk* noted that "even though [FTX and Alameda] are two separate businesses," Alameda's balance sheet included billions of dollars of FTT—*i.e.*, the

---

[121] *Id.*
[122] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-52-
Case No. 22-cv-01936

cryptocurrency token issued and owned by FTX.[123]   This revelation sparked the ultimate collapse of FTX and Alameda as complete frauds.

129.   Just five days later, on November 7, 2022, Silvergate announced the sudden replacement of Tyler Pearson, the Bank's Chief Risk Officer.  In addition to being Silvergate's "Chief Risk Officer," Pearson was also Defendant Lane's son-in-law.   Commentators erupted following the news of Pearson's replacement, connecting it to Silvergate's failure to conduct diligence on FTX and related entities. Marc Cohodes, a popular market commentator and corporate watchdog, explained in a November 8, 2022 post commenting on this news, "When FTX is your largest customer this is a Major problem."[124]  Marcus Aurelius Research echoed this, asking rhetorically, "How long until the new [Silvergate] 'Risk Officer' takes [Sam Bankman-Fried's testimonial] down" from the Bank's website.[125]

130. Over the subsequent days and weeks, further reports emerged connecting FTX's misconduct to Silvergate, and exposing Silvergate's lack of customer diligence and monitoring.  For example, on November 15, 2022, it was revealed that Silvergate was implicated in a $425 million money laundering operation by a South American cryptocurrency crime ring linked to smugglers and drug traffickers.  Marcus Aurelius Research explained that "[r]ecently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers."[126]

131.   Two days later, EventLongShort, another popular analyst and corporate watchdog, issued a series of postings detailing "why Silvergate $SI may be in a

---

[123] *CoinDesk*, "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" (Nov. 2, 2022).
[124] Post by Marc Cohodes (Nov. 8, 2022).
[125] Post by Marcus Aurelius Research (Nov. 8, 2022).
[126] Post by Marcus Aurelius Research (Nov. 15, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -53-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

whole heap of KYC/AML trouble with the FTX collapse."[127]  *See* Figure 7, *infra*. EventLongShort explained that, when FTX's customers wanted to transfer funds, they were directed "to send the funds to their bank [at] Silvergate" and that, even though "one should expect the beneficiary account" to be FTX, instead "the beneficiary account on the Silvergate/FTX wire instructions appear[ed] to be Alameda accounts." EventLongShort added that "the accounts FTX customers were told to wire funds to appear to be the Silvergate bank accounts of Alameda Research Ltd and North Dimensions Inc, a subsidiary of Alameda." A host of market participants flooded Twitter and other social media platforms with examples reflecting these exact wire instructions. EventLongShort went on to explain why these "huge red flags" pointed to failures at Silvergate:



**EventLongShort** @EventLongShort · Nov 17, 2022  ···
And because these were $SI bank accounts, they had to see all the transfers out from Alameda to FTX and SBF.  Huge red flags should have gone off.  Regulators will undoubetdly start with $SI in following the cash.



**EventLongShort** @EventLongShort · Nov 17, 2022  ···
This is a big problem for $SI who under KYC rules were required to know that Alameda and North Dimension were NOT FTX.com / FTX Trading Ltd. They were seperate companies. Yet, they were facilitating customers depositing into FTX.com thru Alameda.



**EventLongShort** @EventLongShort · Nov 17, 2022  ···
Silvergate should have NEVER been taking FTX customer deposits into Alameda, a legally seperate company.  Why would Silvergate ever enable this?



**EventLongShort** @EventLongShort · Nov 17, 2022  ···
The easy answer is the deposit growth was so massive and attractive they just ignored KYC and AML requirements.  Also, possible they were concerned about do biz w/ FTX directly, as it was banned in the US.  So Alameda was way around that

---

[127] Post by EventLongShort (Nov. 17, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> EventLongShort @EventLongShort · Nov 17, 2022
> This is a big deal. Its like trying to send money to Amazon.com but Silvergate allowed you to send it to Blue Origin instead because Jeff Bezos owns both. Now you try and get your money back from Amazon, and they don't have it because...they never got it

**Figure 7.** Postings by corporate watchdog, EventLongShort.

132. Additional reports from other investigative journalists followed. *Bloomberg News*'s Crypto Market Structure Reporter (Yuqi Yang) and *Bloomberg*'s Finance Reporter (Max Reyes) published an article days later detailing how Silvergate utterly failed to vet, perform due diligence on, or monitor FTX, implicating Silvergate as a key facilitator of the fraud at FTX. On November 28, 2022, *Bloomberg* published a report based on the accounts of people familiar with FTX, which described how Silvergate solved FTX's inability to get access to traditional banking sources by allowing Alameda to become a Silvergate customer and then allowing FTX customers to wire funds to Alameda.[128] The article explained how FTX customers "wired $8 billion to Alameda" using Silvergate-approved accounts and quoted Alma Angotti (a former enforcer with the SEC and Treasury Department), who explained that "[i]t's very bad practice and risk management in any book to mingle your customer funds with counterparty funds and other funds."

133. Silvergate's failure to vet, conduct due diligence on, and monitor its Silvergate-approved customers also drew the ire of the U.S. government. On the morning of December 6, 2022, U.S. senators issued a bipartisan letter to Lane and Silvergate that questioned the Bank's relationship to Sam Bankman-Fried's entities, and specifically FTX and Alameda. The bipartisan letter expressed concerns "about the bank's role in facilitating the improper transfer of FTX customer funds to Alameda."[129] The senators scolded Silvergate for having "failed to apply" its

---

[128] *Bloomberg*, "FTX Received Some Customer Deposits Via Bank Accounts Held by Alameda" (Nov. 28, 2022).
[129] Letter from Warren, Kennedy, and Marshall to Lane (Dec. 5, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -55-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS            Case No. 22-cv-01936

purported diligence processes to Alameda and FTX and having done "nothing to halt these activities." The senators concluded: "Your bank's involvement in the transfer of FTX customer funds to Alameda reveals what appears to be <u>an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its client</u>." The U.S. senators further stated that "Silvergate's failure to take adequate notice of [the FTX] scheme suggests that it may have <u>failed to implement or maintain an effective anti-money laundering program</u>."

134. The same morning, Senior Financial Reporter for *NBC News Investigations*, Gretchen Morgenson, reported that Silvergate was FTX's primary banking partner. Morgenson's sources included a recorded conversation between an investment manager and a former top FTX employee with direct knowledge of the transactions. On the recording, which was shared with *NBC News* and brought to the attention of the U.S. Senate Banking Committee, the FTX insider "described transfers of funds between FTX's Silvergate account, which included FTX customers' money, and accounts belonging to other entities believed to be controlled by Bankman-Fried, including Alameda Research, the supposedly separate crypto trading operation."[130]

135. Even as the truth about FTX and Silvergate's lack of customer diligence started to come out, Silvergate and Lane tried to quiet investor and customer concerns. On December 5, 2022, Defendant Lane issued a public letter "to set the record straight about Silvergate's role in the digital asset ecosystem" and to blame recent reports on "speculation" and "misinformation."[131] In his public letter, Defendant Lane again represented (falsely) that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with

---

[130] *NBC News*, "Sen. Warren demands answers from Silvergate Bank about its business dealings with FTX" (Dec. 6, 2022).
[131] Silvergate, Form 8-K (Dec. 5, 2022).

our risk management policies and procedures and the requirements." Defendant Lane also insisted (falsely) that the Bank "monitors transaction activity for every account and identifies activity outside of the expected usage."

136. Defendant Lane also denied the U.S. senators' findings, stating (falsely) that "Silvergate has instituted, and consistently updates and improves, a robust compliance and risk management program that spans the life cycle of each client."[132] Lane likewise doubled down, stating (falsely) in that same letter to the U.S. senators that, "[i]n accordance with our risk management policies and procedures, Silvergate conducted significant due diligence on FTX and its related entities, including Alameda Research, both during the onboarding process and through ongoing monitoring."

137. Investors and financial analysts credited Lane's and Silvergate's denials—at least initially. For example, securities analysts at the investment firm J.P. Morgan accepted Lane's denials, repeating in their analyst reports Lane's statements that "all participants in the SEN are vetted by Silvergate" and "need[] to pass compliance checks."[133]

138. Notwithstanding Lane's denials, the truth continued to emerge. On December 13, 2022, FTX's new CEO, John Ray, testified before the U.S. House Financial Services Committee. During his testimony, he explained that the Silvergate-approved FTX lacked "virtually any of the systems or controls that are necessary for a company entrusted with other people's money or assets," each of which Silvergate's purported KYC diligence would have caught had any such diligence occurred. Mr. Ray further explained that FTX had "near-zero in terms of the corporate infrastructure and record-keeping that one would expect to find in a

---

[132] Letter from Lane to Warren, Kennedy, and Marshall (Dec. 19, 2022).
[133] J.P. Morgan, "Addressing Key Concerns and Separating Fact from Fiction; Downside Scenario and Buyback Analysis" (Nov. 21, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -57-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

multi-billion dollar international business."[134]   Silvergate failed to identify this "near-zero" infrastructure because it never bothered to vet, diligence or monitor FTX, Alameda, or North Dimension.

139.   As a result of the world gradually learning the true facts about Silvergate, participants on the SEN Network pulled their deposits and left the Bank. By January 6, 2023, customers had withdrawn 60% of the Bank's total deposits (over $8.1 billion), with Silvergate laying off 40% of its workforce.[135]

140.   Over the following days and months, investors continued to learn the true facts about Silvergate's lack of diligence and the sham entities that it approved on the SEN Network.  On January 24, 2023, *New York Magazine*'s Intelligencer published an article, titled "The Crypto Industry's Favorite Bank Is In Deep Trouble," which explained that Silvergate's SEN Network "includes alleged fraudsters like Bankman-Fried along with a slew of other sketchy companies and individuals who used Silvergate to move a trillion dollars into—and out of—crypto markets all over the world."[136]  *New York Magazine* described documents it obtained that showed that Silvergate was the "go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy," including FTX, Alameda, Binance, Huobi, Nexo, and Bittrex.

141.   Next, on February 2, 2023, news broke that the DOJ's Fraud Section was examining Silvergate's hosting of accounts connected to FTX and its CEO Sam Bankman-Fried.  *Bloomberg* told its readers that the DOJ investigation "adds to mounting scrutiny" of Silvergate, and *Reuters* noted that "[s]crutiny of Silvergate

---

[134] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[135] Silvergate, Costs Associated with Exit or Disposal Activities (Form 8-K) (Jan. 5, 2023).

[136] *New York Magazine*, "The Crypto Industry's Favorite Bank Is in Deep Trouble" (Jan. 24, 2023).

has been mounting in the wake of FTX's collapse."[137]  *Business Insider* added that the DOJ "wants to know just how deep [Silvergate's] ties with FTX ran," and further observed that "Silvergate has worked with more than a dozen crypto firms that have gone bankrupt, faced scrutiny or been under investigation, including FTX and Alameda."[138]

142.  Then, on February 16, 2023, *Reuters* published an investigative report based on bank records obtained from Binance.US, the cryptocurrency exchange approved by Silvergate to bank and participate on the SEN Network.  The records showed that Binance.US transferred $400 million, beginning in 2020 and throughout the first three months of 2021, from its Silvergate accounts to a trading firm called Merit Peak, which was controlled by Binance's global exchange founder, CEO Zhao.[139]  These $400 million transfers were not approved or authorized by Binance.US, and a portion of the funds were transferred to Key Vision Development Limited, another Silvergate-approved account in which CEO Zhao was a director. These transfers further demonstrated how Silvergate's failure to monitor allowed Binance's CEO—much like FTX's CEO—to use Silvergate-approved entities to fleece customers and siphon funds from the cryptocurrency exchanges to the executive's personal account.

143.  On March 1, 2023, Silvergate announced that it needed to make the "risk-based decision" to discontinue the SEN Network altogether.  That same day, Silvergate filed a Form 12b-25 with the SEC, in which the Company stated that it was "unable to file with the [SEC] its Annual Report on Form 10-K for the fiscal

---

[137] *Bloomberg*, "Silvergate Faces US Fraud Probe Over FTX and Alameda Dealings" (Feb. 2, 2023); *Reuters*, "U.S. prosecutors probe Silvergate's dealings with FTX. Alameda -source" (Feb. 2, 2023).

[138] *Business Insider*, "Silvergate had close ties to Sam Bankman-Fried's FTX and Alameda.  The crypto bank was also reportedly a favorite of other troubled clients including an Australian Ponzi criminal" (Jan. 24, 2023).

[139] *Reuters*, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

year ended December 31, 2022, within the prescribed time period."[140] Silvergate added that it could not meet the SEC's deadline because the Bank was "currently analyzing certain regulatory and other inquiries and investigations that are pending with respect to the Company" and that it was forced to conduct an "evaluation of the effectiveness of the Company's internal control over financial reporting."[141]

144. This news further stunned investors. As analysts at *Wall Street on Parade* observed, the Bank's latest revelation "stands in rather stark contrast to Silvergate's website lauding how the company is . . . 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'"[142]

145. The situation became even more dire for Silvergate's investors. The Bank's few remaining crypto-exchange customers (and their customers) were no longer able to trust Silvergate's vetting, diligence, or monitoring. Silvergate's "seal of approval" was no longer of any value. Accordingly, Silvergate's remaining customers—including Coinbase, Galaxy Digital, Paxos, Circle Internet Financial, Gemini—announced one-by-one that they had stopped accepting or initiating payments through Silvergate. As *CoinGeek* described it, "countless crypto firms are doing their damnedest to avoid being sucked into Silvergate's death spiral."[143]

146. A week later, on March 8, 2023, Silvergate announced "its intent to wind down operations and voluntarily liquidate the Bank."[144] Shortly thereafter, U.S. Senator Elizabeth Warren issued a statement rightfully criticizing Silvergate for its "severe due diligence failures" and its "risky, if not illegal activity." *CoinGeek*

---

[140] Silvergate, Notice of Late Filing of Form 10-K (Mar. 1, 2023).
[141] *Id.*
[142] *Wall Street on Parade*, "Weird Things Are Happening at Silvergate Bank and First Republic Bank" (Mar. 29, 2023).
[143] *CoinGeek*, "'Crypto' firms unbank themselves from struggling Silvergate" (Mar. 3, 2023).
[144] Press Release, Silvergate, "Silvergate Capital Corporation Announces Intent to Wind Down Operations and Voluntarily Liquidate Silvergate Bank" (Mar. 8, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     -60-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     Case No. 22-cv-01936

added that "[s]peculation is mounting over how long it will be before Silvergate CEO Alan Lane is perp-walked out of his offices by federal law enforcement." [145]

147. Just weeks later, on March 20, 2023, Silvergate announced that—in light of its inability to timely file its Annual Report owing to its business and regulatory challenges in the face of customers pulling their deposits from the Bank and investigations by its regulators, Congress, and the DOJ—the NYSE had sent a non-compliance notice to the Company days earlier. In the notice, the NYSE informed Silvergate that, "as the Company had not timely filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the '10-K'), the NYSE will closely monitor the status of the Company's late filing and related public disclosures for up to a six-month period from its due date."[146] The Company further disclosed that the NYSE warned that future delayed filings could lead to "suspension and delisting procedures."

148. Investors suffered immensely as a result of Lane's and Silvergate's misrepresentations and misconduct. All told, Silvergate's empty declarations about its "customer diligence," "vetting," and "ongoing monitoring" caused investors to suffer billions of dollars of losses. Market commentators correctly recounted: "The collapse of Silvergate Capital has been spectacular" and "even daredevils should avoid Silvergate Capital stock."[147] Indeed, the Bank's stock price—which soared above $225 per share—plummeted to $1.47 a share by the end of the Class Period, wiping out over $2 billion in shareholder value.

149. Silvergate's investors continue to suffer to this day. On May 11, 2023, the date of this filing, Lane and Silvergate halted trading in the Bank's stock and announced that—notwithstanding Silvergate's prior assurances—"it continues to be

---

[145] *CoinGeek*, "'Crypto' firms unbank themselves from struggling Silvergate" (Mar. 3, 2023).

[146] Silvergate, Form 8-K (Mar. 20, 2023).

[147] *InvestorPlace*, "Even Daredevils Should Avoid Silvergate Capital (SI) Stock" (Apr. 11, 2023).

unable to file with the SEC the 2022 Form 10-K and is unable to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2023." Worse yet, the Bank declared that it would never file with the SEC a 2022 Form 10-K (i.e., an annual report for 2022) or a 2023 Form 10-Q (i.e., a quarterly report). As for its stated justification for this remarkable declaration, Lane and Silvergate cited "continuous developments relating to the regulatory matters and other inquiries and investigations that are pending with respect to the Company and the Bank." While Lane and Silvergate did not say as much, the true reason they do not want to issue any more reports with the SEC is plain: they do not want to be forced to restate their prior SEC filings, admit facts that demonstrate that their prior statements to investors were false, and make any statement that subjects themselves to additional civil and criminal liability in connection with the ongoing regulatory investigations.

## V.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

150.    The Exchange Act Defendants made numerous materially false and misleading statements during the Class Period in violation of Sections 10(b) and 20(a) Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

(a)    Defendants Lane and Silvergate told investors that they performed extensive "vetting" of the Silvergate-approved customers, including "initial due diligence" to satisfy the Company's AML/KYC requirements such as "site visits" and reviewing the customers' "BSA/AML program." In reality, the Company conducted no actual vetting or diligence, had no policies or procedures for onboarding participants to the SEN Network, conducted no site visits, and did not ensure that its customers had a proper BSA/AML program.

(b)    Defendants Lane and Silvergate told investors that they performed extensive "ongoing monitoring" of the Silvergate-approved customers, including monitoring "transaction activity," performing "enhanced due diligence," and daily, quarterly, and annual "reviews." In truth, the Company performed no ongoing transaction monitoring,

no enhanced due diligence procedures, and had <u>no</u> system to perform daily, periodic, or annual reviews.

(c)     Defendants Lane and Silvergate told investors that "we don't bank" institutions that are not "serious about regulation" with "sound" compliance programs.  In reality, the Bank permitted entities to bank at Silvergate and participate on the SEN Network regardless of whether they had compliance programs—including FTX, Alameda, North Dimension, Binance, Huobi, Nexo, Bittrex, Paxos, and the many other Silvergate-approved cryptocurrency exchanges and customers that have been punished and charged by the DOJ and SEC.

(d)     Defendants Lane and Silvergate told investors that they performed "extensive due diligence" both during the "onboarding process" and "ongoing monitoring" of FTX and its related entities.  In reality, they did not.  Had Silvergate performed this diligence and monitoring, they would not have allowed these entities to bank at Silvergate or participate on the SEN Network.

151.   The Exchange Act Defendants also omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Once Defendants decided to tout the Company's purported vetting procedures, due diligence, ongoing monitoring, and strict customer standards, they were required to do so in a manner that did not mislead investors.  Among other things, Defendants misled investors by omitting that Silvergate: (i) performed <u>no</u> vetting or due diligence before allowing customers to open accounts at Silvergate; (ii) performed <u>no</u> ongoing monitoring of customers using the SEN Network; (iii) did <u>not</u> hold its SEN Network participants to strict customer standards; and, as a result (iv) permitted numerous sham businesses to bank at Silvergate and engage in fraudulent activity on the SEN Network. *See* Section IV.D-F, *supra*.

## A.     False Statements in 2019

### 1.     July 2019 Interview of Defendant Lane

152.   On July 30, 2019, Defendant Lane appeared on the industry podcast, *What Bitcoin Did Podcast*.  During the interview, Lane emphasized Silvergate's purported due diligence on the cryptocurrency companies that banked at Silvergate and participated on its SEN Network.  Specifically, he stated:

> [I]f you get an account at Silvergate, then we've gone through the process of vetting you. We joke that we're kind of like the good housekeeping seal of approval. If you've gone through the rigor of satisfying our KYC, our diligence process, we're intentional about it and you can have confidence that you have an account at Silvergate.

153.   The statements identified in paragraph 152 were false, misleading, and omitted material facts.  Contrary to his statements, (i) Silvergate did <u>not</u> "go[] through the process of vetting" the customers who obtained "an account at Silvergate"; (ii) there was no "rigor of satisfying [its] KYC, [or its] diligence process"; and, as a result, (iii) Silvergate was <u>not</u> "like the good housekeeping seal of approval." *See* Section IV.D-F, *supra*.

154.   The statements identified in paragraph 152 also omitted material facts when made, including that Silvergate failed to perform vetting of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not have compliance policies to address the digital currency industry; (d) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (e) Silvergate did not review customers' culture of compliance; (f) Silvergate did not review customers' BSA/AML Programs to ensure they were sound; (g) Silvergate did not verify customer ownership; and (h) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud through their Silvergate accounts and the SEN

Network, despite the fact that these entities had no internal controls and no compliance programs. *See* Section IV.D-F, *supra.*

### 2. Initial Registration Statement

155. On November 6, 2019, Silvergate issued its Prospectus ahead of its November 7, 2019 initial public offering. In the Prospectus, Defendants Lane and Silvergate represented that the Bank "comprehensively investigates prospective customers." Defendants Lane and Silvergate further represented that the Company's "due diligence and onboarding processes include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate." Additionally, Defendants Lane and Silvergate represented that "all our digital currency customers must submit to initial and continued due diligence by us." Defendants Lane and Silvergate also specifically represented that Silvergate's extensive due diligence on prospective cryptocurrency exchange clients included "reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding the BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

156. Defendants Lane and Silvergate's statements identified in paragraph 155 were false, misleading, and omitted material facts. Contrary to these statements, (i) Defendants did not "comprehensively investigate[] prospective customers"; (ii) they did not perform "due diligence and onboarding processes [that] include, at a minimum, detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate"; (iii) "all [of Silvergate's] digital currency customers" were not required to "submit to initial and continued due diligence by us"; and (iv) they did not perform "reputational reviews," "reviews of customer policies and procedures regarding the BSA" or "reviews of transaction monitoring systems and audit results." *See* Section IV.D-F, *supra.*

157. The statements identified in paragraph 155 also omitted material facts when made, including that Silvergate failed to perform vetting of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; and (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements. *See* Section IV.D-F, *supra*.

158. Additionally, Defendants Lane and Silvergate further represented to investors in the Prospectus that Silvergate's compliance efforts "include ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

159. Defendant Lane and Silvergate's statement identified in paragraph 158 was false, misleading, and omitted material facts. Contrary to the statement, Silvergate did <u>not</u> conduct "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers." *See* Section IV.D-F, *supra*.

160. The statement identified in paragraph 158 also omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring;

(c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; and (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags.  *See* Section IV.D-F, *supra*.

## B.     False Statements in 2020

### 1.     August 2020 Investor Presentation

161.  On August 10, 2020, Defendants Lane and Silvergate published a presentation for investors, which was also filed with the SEC on a Form 8-K signed by Defendant Lane.  The investor presentation contained the below slide, which was contained in nearly every Silvergate quarterly investor presentation thereafter.  The slide touted Silvergate's "compliance process" as "the cornerstone of our leadership today" and made a series of specific representations about the Bank's purported vetting, diligence and monitoring.  Specifically, Defendants Lane and Silvergate represented that the Company had a "Robust Compliance and Risk Management Framework" with specific procedures, including "initial due diligence" with "reputation reviews"; "compliance reviews" of customers' "culture of compliance," "BSA/AML Program," "Independent Audits & Exams," and a "site visit"; "ongoing monitoring" that included "Daily Transaction Monitoring" and "Daily" "BSA/AML

Alerts Monitoring"; "enhanced due diligence" with "Customer Counterparty Reviews" and "Negative News Reviews"; and "Periodic Reviews" with "Quarterly Account Activity Reviews" and "Annual Company Reviews."



162.  Lane and Silvergate included this same slide in Silvergate's investor presentations during nearly every subsequent financial quarter, including on November 20, 2020, January 28, 2021, May 5, 2021, August 3, 2021, November 8, 2021, February 14, 2022, May 10, 2022, and August 8, 2022.  Each of these slides was included in the investor presentations submitted on those dates to the SEC on Form 8-K, which were signed by Defendant Lane.

163.  The representations contained in Lane's quarterly investor PowerPoint slides, identified in paragraph 161, were false, misleading, and omitted material facts.  Contrary to Lane and Silvergate's representations, (i) Silvergate did <u>not</u> conduct the "initial due diligence" that it purported to conduct, including a "Compliance Review," "Review of Organization's Culture of Compliance," "BSA/AML Program," "Review Independent Audits & Exams," and "Site Visit"; (ii) Silvergate did <u>not</u> conduct "Ongoing Monitoring" of its customers, including the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-68-
Case No. 22-cv-01936

"Daily" monitoring it described, "Enhanced Due Diligence," and "Periodic Review"; and (iii) Silvergate did not conduct "Daily Transaction Monitoring." *See* Section IV.D-F, *supra*.

164. The representations contained in Lane's quarterly investor PowerPoint slides, identified in paragraph 161, also omitted material facts when made, including that Silvergate failed to perform vetting of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; and (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements. *See* Section IV.D-F, *supra*.

165. The representations contained in Lane's quarterly investor PowerPoint slides, identified in paragraph 161, omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-69-
Case No. 22-cv-01936

did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; and (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags. *See* Section IV.D-F, *supra*.

### 2. August 2020 Canaccord Investor Conference

166. On August 12, 2020, Silvergate and Defendant Lane participated in the Canaccord Genuity Growth Conference for investor and securities analysts. During Silvergate's prepared remarks, Silvergate's President stated the following on behalf of Silvergate:

> Our program includes, know your customer, enhanced due diligence and transaction monitoring processes, designed to illustrate a deep knowledge of our clients whether it be an exchange, an investor or software developer. Both our initial due diligence process and our ongoing monitoring processes are designed to ensure we serve only customers . . . to operate safely, soundly, and compliantly.[148]

---

[148] Ben Reynolds was Silvergate's President during the Class Period. From January 2019 to October 2022, he was Silvergate's Chief Strategy Officer. He oversaw a team that was responsible for "investor relations," among other things, and Reynolds also regularly communicated with Silvergate's regulators, including the Federal Reserve that sent an MRIA to the Bank concerning its deficient procedures. Before this role, he was the SVP of Business Development, credited with having invented and developed the SEN Network and the first dedicated employee serving digital asset clients. From November 2022 until March 2023, Reynolds was Silvergate's President. In his roles as Chief Strategy Officer and President, Reynolds spoke on behalf of Silvergate to investors and analysts numerous times, holding himself out as someone with intimate knowledge about the Company's business practices. Reynolds was laid off at the end of the Class Period.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  -70-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS  Case No. 22-cv-01936

167.    The statements identified in paragraph 166 were false, misleading, and omitted material facts.  Contrary to Silvergate's statements: (i) its program did <u>not</u> "include[], know your customer, enhanced due diligence and transaction monitoring processes, designed to illustrate a deep knowledge of our clients"; and (ii) Silvergate's "initial due diligence process and [its] ongoing monitoring processes" were <u>not</u> "designed to ensure [it] serve[d] only customers that represent the best business opportunity for Silvergate and to operate safely, soundly, and compliantly." *See* Section IV.D-F, *supra*.

168.    The statements identified in paragraph 166 also omitted material facts when made, including that Silvergate failed to know its prospective customers or perform diligence, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; and (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements.  *See* Section IV.D-F, *supra*.

169.    The statements identified in paragraph 166 omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative

news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; and (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags. *See* Section IV.D-F, *supra*.

## C. False Statements in 2021

### 1. February 2021 Interview of Defendant Lane

170. On February 1, 2021, Defendant Lane appeared in a video presentation for investors published by *Real Vision Finance*, titled "Silvergate: The Banking Solution of the Future." During the interview, in discussing the purported benefits of the SEN Network, Lane stated:

> [I]f you are a member of the SEN, you have an account with Silvergate and you're a participant in the SEN then you can transact with everybody else on the Silvergate exchange network . . . as you are doing that we are eliminating the banking friction I talked about earlier. **We are also eliminating counterparty risk because you know that you are dealing with counterparties that are also members of SEN that have been vetted by Silvergate**. So putting that together we've completely eliminated the friction, and **we've eliminated the counterparty risk**, we've brought the legacy 40-hour banking system into the 24/7, 365 cryptocurrency markets that never sleep.

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-72-
Case No. 22-cv-01936

171. The statements highlighted in paragraph 170 were false, misleading, and omitted material facts. Contrary to Lane's statements, Silvergate did not "eliminat[e] counterparty risk" through its "vetting." *See* Section IV.D-F, *supra*.

172. The statements highlighted in paragraph 170 also omitted material facts when made, including that Silvergate failed to vet prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 2. September 2021 Barclays Investor Conference

173. On September 14, 2021, Defendant Lane spoke at the Barclays Financial Services Conference for investors and securities analysts. During the conference, Defendant Lane touted the Company's "vetting" of customers, stating that:

> **And by the way, if we can't get comfortable with a company's regulatory stature, then we don't bank them.** And that's really well-known. And so for a period of time, Silvergate was and it might still be true to this day, but we jokingly said that Silvergate was kind of the

good housekeeping seal of approval for the industry because **you will significantly reduce your counterparty risk if you were dealing with someone that also had an account with Silvergate**, because the market understood that **we were vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act,** *et cetera*.

174. The statements highlighted in paragraph 173 were false, misleading, and omitted material facts. Contrary to Lane's statements, (i) Silvergate would bank customers without doing the due diligence necessary to be "comfortable with a company's regulatory stature"; (ii) Silvergate's "vetting" did not "significantly reduce [an entity's] counterparty risk if [they] were dealing with someone that also had an account with Silvergate"; and (iii) Silvergate was not "vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act, *et cetera.*" *See* Section IV.D-F, *supra*.

175. The statements highlighted in paragraph 173 also omitted material facts when made, including that Silvergate failed to vet its prospective customers and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-74-
Case No. 22-cv-01936

Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 3. September 2021 Interview of Defendant Lane

176. On September 24, 2021, Defendant Lane appeared on an episode of The Blockchain Interviews for investors. During the interview, Lane stated that:

> We not only reduced the banking friction, we improved liquidity and **we reduced counterparty risk**, right. **Because folks that are transferring to each other have all been vetted by Silvergate**, by the regulatory compliance framework that I talked about a few minutes ago with BSA, AML, KYC. So it really became a game changer for the industry.

177. The statements highlighted in paragraph 176 were false, misleading, and omitted material facts. Contrary to Lane's statements, the Silvergate customers "transferring [funds] to each other" had <u>not</u> "been vetted by Silvergate, by the regulatory compliance framework . . . with BSA, AML, KYC." *See* Section IV.D-F, *supra*.

178. The statements highlighted in paragraph 176 also omitted material facts when made, including that Silvergate failed to vet its prospective customers and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-75-
Case No. 22-cv-01936

controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

**4.     November 2021 Interview of Defendant Lane**

179.    On November 8, 2021, Lane appeared on "Roundtable: Banking in the Digital Age with Alan Lane," produced by Market Rebellion for investors. During the interview, Lane stated that the SEN Network "reduced counterparty risk because all of the customers who participate on the SEN, they've all been run through our regulatory compliance framework."

180.    Lane's statement identified in paragraph 179 was false, misleading, and omitted material facts. Contrary to Lane's statement, "all of the customers who participate on the SEN" had <u>not</u> "been run through [Silvergate's] regulatory compliance framework." *See* Section IV.D-F, *supra*.

181.    The statement identified in paragraph 179 also omitted material facts when made, including that Silvergate failed to vet its prospective customers and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-76-
Case No. 22-cv-01936

(j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### D. False Statements in 2022

#### 1. June 2022 Interview of Defendant Lane

182. On June 2, 2022, Lane appeared on a podcast for investors produced by *Bloomberg* Podcasts. On the Podcast, Lane stated the following:

> What is Silvergate known for today? And that is a platform it's a global payments platform that is referred to as the SEN, which is an acronym. SEN stands for the Silvergate Exchange Network and what that is it is a two-sided network where we connect digital asset exchange platforms such as Coinbase and Gemini and Kraken and **FTX** . . . . **We've got all of them all of the major ones, anybody that is serious about regulation**. **And that's an important distinction because they have to satisfy not only their own legal and regulatory requirements but then we have to verify that that that their compliance programs are sound. . . .**

183. The statements highlighted in paragraph 182 were false, misleading, and omitted material facts. Contrary to Lane's statements, (i) FTX was not "serious about regulation"; and (ii) Silvergate did not "verify" that "FTX" and its other digital asset exchange platforms' "compliance programs are sound." *See* Section IV.D-F, *supra*.

184. The statements highlighted in paragraph 182 also omitted material facts when made, including that Silvergate failed to ensure prospective customers were serious about regulation and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did

not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate failed to perform these procedures, it approved clearly fraudulent customers to use the SEN Network that were anything but serious about regulation, including entities like FTX, Alameda, and North Dimension; and (j) because Silvergate failed to perform these procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

185. The statements highlighted in paragraph 182 omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers to ensure their compliance programs operated soundly, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed FTX to continue to embezzle money through the SEN Network when its customers diverted funds into the Silvergate accounts of Alameda and North Dimension that FTX employees then used to purchase homes and personal items in the Bahamas; (n) because Silvergate did not perform this monitoring, it allowed

entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (o) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention.  *See* Section IV.D-F, *supra*.

### 2.   June 2022 Crypto + Banks: The Frontier of Money Movement Interview

186.   On June 13, 2022, Silvergate's Managing Director of Digital Currency appeared on behalf of Silvergate on the program titled "Crypto + Banks: The Frontier of Money Movement."  During the program, Silvergate stated that, when onboarding a customer, Silvergate is "really looking to understand that the [customer's] pillars of AML compliance are well-designed and functioning"; "evaluate[s] the source of wealth, the source of funds"; and "understand[s] the reasonableness of the trading patterns or the churn through [the customers'] fiat accounts."[149]

187.   The statements identified in paragraph 186 were false, misleading, and omitted material facts.  Contrary to these statements, (i) Silvergate did not "understand that the [customer's] pillars of AML compliance are well-designed and functioning"; (ii) did not "evaluate the source of [its customers'] wealth, the source of funds"; and (iii) did not "understand[] the reasonableness of the trading patterns or the churn through [the customers'] fiat accounts."  *See* Section IV.D-F, *supra*.

---

[149] Benjamin Richman was Silvergate's Managing Director of Digital Currency from January 2020 through the end of the Class Period, and was specifically hired to oversee crypto customer growth for Silvergate and key client relationships, taking over the role from Reynolds.  Defendant Lane told *CoinDesk* that Richman was the Bank's first hire in the "pure crypto space."  Lane also told *CoinDesk* that hiring Richman purportedly showed Silvergate's commitment to serving a niche where most banks fear to tread, owing in part to the high costs of anti-money-laundering, know-your-customer and Bank Secrecy Act compliance.  Throughout the Class Period, Richman publicly spoke on behalf of Silvergate numerous times, holding himself out as someone with intimate knowledge about the Company's business practices.

188. The statements identified in paragraph 186 also omitted material facts when made, including that Silvergate failed to perform due diligence of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

189. The statements identified in paragraph 186 omitted additional material facts when made, including that Silvergate did not monitor its customers to evaluate transaction activity or assess AML compliance, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate

did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 3.    June 2022 *CNBC* Interview of Defendant Lane

190.    On June 28, 2022, Defendant Lane participated on *CNBC* to discuss Silvergate's stock.  During the interview, Defendant Lane stated the following:

> Silvergate complies obviously with federal and state regulations. And we essentially, we need our customers – **we require them to comply as well**. **So, we only bank institutions that are serious about regulation**.

191.    Defendant Lane's statements highlighted in paragraph 190 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> "require [its customers] to comply" with "federal and state regulations"; and (ii) Silvergate did <u>not</u> "only bank institutions that are serious about regulation." *See* Section IV.D-F, *supra*.

192.    The statements highlighted in paragraph 190 also omitted material facts when made, including that Silvergate failed to perform due diligence of its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-81-
Case No. 22-cv-01936

customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F.

193. The statements highlighted in paragraph 190 omitted additional material facts when made, including that Silvergate did not monitor its customers to assess customers' AML compliance, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -82-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                        Case No. 22-cv-01936

Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention.  *See* Section IV.D-F, *supra*.

### 4.  November 2022 Public Letter from Defendant Lane

194.  On November 21, 2022, Defendant Lane published a signed public letter posted on Silvergate's website.  In the letter, Defendant Lane stated the following:

> **Compliance. Our business starts by knowing our customers, their business and the activity they plan to conduct at our institution**. Once we approve a new customer, **if the activity in their account does not match the activity that we expect based on our initial approval, we take immediate action up to and including terminating that relationship. No exceptions**.

195.  Defendant Lane's statements highlighted in paragraph 194 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> conduct the necessary vetting to "know[] our customers, their business and the activity they plan to conduct at our institution"; and (ii) Silvergate did <u>not</u> "take immediate action up to and including terminating that relationship," with "No exceptions," if the "activity in their [customers'] account does not match the activity that [it] expect[ed] based on [Silvergate's] initial approval." *See* Section IV.D-F, *supra*.

196.  The statements highlighted in paragraph 194 also omitted material facts when made, including that Silvergate failed to perform vetting to know its customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to

employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

197. The statements highlighted in paragraph 194 omitted additional material facts when made, including that Silvergate did not monitor its customers to assess customers' activity, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### 5.   December 2022 Public Letter from Defendant Lane

198.   On December 5, 2022, Defendant Lane published a signed public letter, which was posted on Silvergate's website and filed with the SEC on Form 8-K.  In the letter, Defendant Lane stated:

> We take risk management and compliance extremely seriously. Silvergate operates in accordance with the Bank Secrecy Act and the USA PATRIOT Act. **For each and every account**, these laws require us to **determine the beneficial owner, the source of funds, and the purpose and expected use of funds**.

199.   Defendant Lane's statements highlighted in paragraph 198 were false, misleading, and omitted material facts.  Contrary to Defendant Lane's statements, Silvergate did <u>not</u> "determine the beneficial owner, the source of funds, and the purpose and expected use of funds" for "each and every account." *See* Section IV.D-F, *supra*.

200.   The statements highlighted in paragraph 198 also omitted material facts when made, including that Silvergate did not vet its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews;  (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-85-
Case No. 22-cv-01936

(j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

201. In the December 2022 Letter, Defendant Lane also touted Silvergate's purported "monitoring" of its customers, stating:

> Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage.
>
> **After accounts are open, we continue to monitor account activity** as part of our enhanced due diligence process on each of these accounts and to **take action when there are red flags**. By performing our risk management procedures and fulfilling our regulatory obligations, Silvergate plays a key role in helping law enforcement identify bad actors. We take this responsibility seriously.

202. Defendant Lane's statements highlighted in paragraph 201 were false, misleading, and omitted material facts. Contrary to Defendant Lane's statements, (i) Silvergate did not "monitor[] transaction activity for every account and identif[y] activity outside of the expected usage"; and (ii) Silvergate did not "take action when there are red flags." *See* Section IV.D-F, *supra*.

203. The statements highlighted in paragraph 201 omitted additional material facts when made, including that Silvergate did not monitor its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-86-
Case No. 22-cv-01936

activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

204. Finally, in the December 2022 Letter, Defendant Lane made specific representations that Silvergate purportedly "conducted extensive due diligence on FTX and Alameda Research," assuring investors:

> **Silvergate conducted significant due diligence on FTX and its related entities including Alameda, both during the onboarding process and through ongoing monitoring,** in accordance with our risk management policies and procedures and the requirements outlined above.

205. Defendant Lane's statements highlighted in paragraph 204 were false, misleading, and omitted material facts. Contrary to Defendant Lane's statements, Silvergate did not "conduct[] significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring." *See* Section IV.D-F, *supra*.

206. The statements highlighted in paragraph 204 also omitted material facts when made, including that Silvergate failed to vet FTX or its related entities, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-87-
Case No. 22-cv-01936

customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate failed to perform these procedures, it approved FTX, Alameda, and North Dimension despite the fact that (1) Sam Bankman-Fried owned and controlled all three and ran his entities like a personal fiefdom, spending no time or effort to manage risk; (2) North Dimension was a fake electronics website created at Bankman-Fried's direction that did not even purport to be in the cryptocurrency industry, was full of typos, did not actually sell products, and had no employees or physical location; (3) the entities had a complete absence of internal controls or compliance programs; and (4) the entities had no accounting department or systems or controls to monitor money or assets, and instead used QuickBooks and a hodgepodge of other non-enterprise solutions as their internal accounting system; (j) because Silvergate did not perform these vetting procedures, it approved additional sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (k) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

207. The statements highlighted in paragraph 204 omitted additional material facts when made, including that Silvergate did not perform ongoing monitoring of its customers to ensure their compliance programs operated soundly, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-88-
Case No. 22-cv-01936

annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed FTX to continue to embezzle money through the SEN Network when its customers diverted funds into the Silvergate accounts of Alameda and North Dimension that FTX employees then used to purchase homes and personal items in the Bahamas; (n) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (o) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

### E.    False Statements in 2023

#### 1.   January 2023 "Business Update" Call

208.   On January 5, 2023, Defendant Lane spoke to investors and securities analysts during a "Business Update Call." During the investor call, an analyst from Morgan Stanley stated to Defendant Lane: "I was hoping you can provide a general overview on the steps you take on the AML, KYC side before you onboard a customer." In response, Defendant Lane stated:

> This question has been really well covered in the past. We obviously take our – what am I trying to say here? Sorry, I got distracted. **We have KYC requirements, which includes the initial onboarding. It then also includes monitoring transactions on an ongoing basis. And so a lot of – as you said, the misinformation out there is, candidly, very frustrating. We follow the Bank Secrecy Act, the**

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -89-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          Case No. 22-cv-01936

**USA PATRIOT Act for every account that we open. And we conduct ongoing monitoring**.

209. Defendant Lane's statements highlighted in paragraph 208 were false, misleading, and omitted material facts. Contrary to Defendant Lane's statements, (i) Silvergate did <u>not</u> adhere to "KYC requirements," including during "initial onboarding"; and (ii) Silvergate did <u>not</u> "monitor[] transactions on an ongoing basis" or "conduct ongoing monitoring." *See* Section IV.D-F, *supra*.

210. The statements highlighted in paragraph 208 also omitted material facts when made, including that Silvergate did not get to know its prospective customers, and that: (a) Silvergate performed no site visits; (b) Silvergate allowed clients to dictate wire limits without supporting documentation; (c) Silvergate did not perform reputational reviews; (d) Silvergate did not review customers' culture of compliance; (e) Silvergate did not review customers' BSA/AML Programs or transaction monitoring to ensure they existed and were sound; (f) Silvergate did not verify customer ownership; (g) Silvergate did not have compliance policies to address the digital currency industry; (h) Silvergate provided no training to employees on KYC or compliance specific to the cryptocurrency industry; (i) because Silvergate did not perform these vetting procedures, it approved sham entities to open accounts and commit fraud, embezzlement, and money-laundering through their Silvergate accounts and the SEN Network, despite the fact that these entities had no internal controls, no compliance programs, and avoided U.S. registration requirements; and (j) because Silvergate failed to perform these vetting procedures, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

211. The statements highlighted in paragraph 208 omitted additional material facts when made, including that Silvergate did not monitor its customers, and that: (a) Silvergate did not perform daily BSA/AML alerts monitoring; (b) Silvergate did not perform daily news monitoring; (c) Silvergate did not perform

customer counterparty reviews; (d) Silvergate did not perform negative news reviews; (e) Silvergate did not perform quarterly account activity reviews; (f) Silvergate did not perform customer risk scoring; (g) Silvergate did not perform annual company reviews; (h) Silvergate did not perform anomaly testing and detection; (i) Silvergate did not evaluate customers' ability to actively monitor the flow of funds of their own customers; (j) Silvergate did not implement AML software designed to detect red flags specific to various customer types and activities; (k) when individual employees would raise concerns about suspicious or anomalous activity, Silvergate management would not close accounts; (l) Silvergate did not investigate reports from customers and other banks about unauthorized transaction requests; (m) because Silvergate did not perform this monitoring, it allowed entities to continue to commit fraud, embezzlement, and money-laundering through their Silvergate accounts despite significant red flags; and (n) because Silvergate failed to perform this monitoring, the Federal Reserve identified these deficiencies as Matters Requiring Immediate Attention. *See* Section IV.D-F, *supra*.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

212. A host of facts, in addition to those discussed above, support a strong inference that Defendants Lane and Silvergate knew or, at minimum, were severely reckless in not knowing the truth about Silvergate's "vetting," "due diligence," and "ongoing monitoring."

213. ***Defendant Lane repeatedly singled out the Bank's purported due diligence as a top reason to buy its stock.*** Professing to know what he was talking about, Defendant Lane stressed to investors over and over—on at least a dozen separate instances during the Class Period—the strength and importance of the Bank's purported due diligence and monitoring of its customers. In at least ten filings submitted to the SEC during the Class Period, Defendant Lane represented that the Bank maintained a "deep rooted commitment and proprietary approach to regulatory compliance." Silvergate's filings with the SEC further identified the

Bank's supposed "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers" as "a distinct competitive advantage for us" and a "meaningful barrier to entry against our potential competitors."[150]

214. Additionally, in their public presentations, Defendants Lane and Silvergate identified the Bank's "Leading Compliance Framework" to investors as one of the three, basic components of Silvergate's "Model." *See* Figure 8, *infra*. Lane similarly identified the Bank's "Robust Compliance Framework" as one of the main "Investment Highlights" for shareholders. *See* Figure 9, *infra*. Lane impressed upon investors during his quarterly financial presentations that "our compliance process . . . is the cornerstone of our leading position today."[151]



**Figure 8.** Slide from Silvergate, Registration Statement (Nov. 16, 2018).

---

[150] *See, e.g.*, Silvergate, Registration Statement (Nov. 16, 2018).
[151] Silvergate, Investor Presentation (Jan. 28, 2021).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -92-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936



**Figure 9.** Slide from Lane's quarterly investor PowerPoint Presentations.

215. What's more, Defendant Lane falsely described—in detail—the specific due diligence practices that the Bank supposedly performed as a reason to buy the Bank's stock. Each quarter, in investor presentations, Lane identified as an "Investment Highlight" the Bank's "Robust Compliance Framework," and Lane falsely detailed to investors what the Bank's compliance process supposedly consisted of—including a "review of [the] organization's culture of compliance," a "site visit," a review of the organization's "BSA/AML Program," "Enhanced Due Diligence," and "Counterparty Review[s]."[152]

216. That Defendant Lane, the Company's chief spokesperson on the topic, repeatedly—and falsely—represented to investors the details and importance of the Bank's due diligence for years strengthens the scienter inference. Either Lane knew his statements were false or, at minimum, was severely reckless in not finding out the truth before repeatedly speaking to investors on the subject.

[152] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-93-
Case No. 22-cv-01936

217. ***Defendants Lane and Silvergate flouted the Bank's stated commitments to diligence processes and procedures.*** Despite repeatedly assuring investors that customer diligence was its top priority and a primary reason to buy the Bank's stock, Lane and Silvergate disregarded these processes and procedures for years and in every meaningful respect. Silvergate's former employees have reported that the Bank performed no onboarding diligence, including no site visits, no confirmation of requested wire limits, and no review of customers' compliance programs or culture; performed no monitoring, including no transaction monitoring; performed no quarterly or annual reviews; had no policies and procedures in place to address the cryptocurrency industry; had no training in place for Silvergate employees on KYC or compliance specific to the cryptocurrency industry; and never performed customer diligence on major cryptocurrency exchange customers, including FTX. *See* Section IV.D, *supra.* These former employee accounts are corroborated and further demonstrated by the fact that Silvergate permitted onto the SEN Network fraudulent and sham entities, entities that lacked compliance controls, unlicensed entities, and entities that engaged in widespread money laundering and other illegal activities, including FTX and its related entities, Binance, Huobi, Nexo, Hamilton Opportunity Fund SPC and Hamilton Investment Management Ltd., Virgil Sigma Fund and VQR, Bittrex, Paxos and OSL Digital, and many others. *See, e.g.*, Section IV.E-F, *supra.* The Bank's lack of vetting, due diligence, and monitoring were so bad, in fact, that—when the Federal Reserve found out—it issued a confidential report identifying these deficiencies as Matters Requiring Immediate Attention. *See* ¶¶78-82. And, when it first learned the truth, the DOJ initiated an ongoing investigation, and a bipartisan group of senators sent letters to Lane and Silvergate lambasting them for their basic failures. *See* ¶¶133, 141.

218. That Defendants Lane and Silvergate so extremely failed to conduct these customer diligence procedures, while repeatedly and publicly emphasizing the importance of each of them, strengthens the inference of scienter.

219. ***Silvergate received regular subpoenas from the U.S. Attorney's Office concerning the activity of its cryptocurrency customers, including Alameda.*** FE 4, Silvergate's VP of Deposit Operations, explained how, beginning in 2018, Silvergate received 10 to 20 subpoenas per month from the U.S. Attorney's office. The subpoenas related to customers' wires that came into Silvergate, including for Alameda. FE 4 contrasted her experience at Silvergate with another bank she used to work for, which would, instead, receive one or two subpoenas a month—and usually just spouses serving subpoenas against each other. FE 4 noted that, when she later saw the news reports about Alameda, FE 4 thought, "Oh my God, I remember them, we got subpoenas on them."

220. FE 4 knew about these subpoenas because, in her role as Silvergate's VP of Deposit Operations, she received them and dealt with many special agents. Each month, FE 4 informed the Bank's most senior management of the subpoenas, including Dina Matias, Silvergate's Senior Vice President, Operations Administrator, who reported to Elaine Hetrick, Silvergate's Chief Administrative Officer. As FE 4 explained, these subpoenas should have raised red flags to Silvergate and its management.

221. ***The Federal Reserve identified the Bank's due diligence deficiencies as Matters Requiring Immediate Attention.*** The Federal Reserve gave private feedback to Silvergate that its compliance was insufficient, identifying these failures as "Matters Requiring Immediate Attention." *See* ¶¶78-82. These MRIAs were provided directly to Silvergate's top management and board, including Alan Lane, by the first quarter of 2022, and specifically related to Silvergate's lack of basic program requirements for vetting, onboarding, ongoing due diligence, ongoing monitoring, screening process and SAR filings. *See* ¶¶78-79. These findings were so serious that Silvergate retained third-party contractors to address the MRIAs—and all of them agreed with the Federal Reserve that Silvergate lacked the appropriate controls around due diligence and KYC. *See* ¶82.

222. Silvergate and Lane kept the Federal Reserve's findings a closely guarded secret from investors. Indeed, even <u>after</u> their receipt of the Federal Reserve's findings, Defendant Lane and Silvergate <u>continued</u> to falsely tout Silvergate's due diligence, including falsely representing that Silvergate "really look[ed] to understand that [its customers'] pillars of AML compliance are well-designed and functioning"; "evaluate[s] the source of wealth, the source of funds"; and "understand[s] the reasonableness of the trading patterns or the churn through [the customers'] fiat accounts." Lane and Silvergate also continued to tell investors—even <u>after</u> being reprimanded by the Federal Reserve—that "Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage," and "take[s] action when there are red flags." Lane further continued to impress upon investors, as late as 2023, that Silvergate followed "KYC requirements," including "initial onboarding" and "monitoring transactions on an ongoing basis."

223. Lane and Silvergate's receipt of the Federal Reserve's reports identifying the Bank's deficiencies as Matters Requiring Immediate Attention, as well as the Bank's third-party contractors' reports agreeing with the Federal Reserve's findings, further strengthens the scienter inference. Even more, that Silvergate and Lane continued to falsely tout the Bank's compliance procedures and conceal the truth—even <u>after</u> the Federal Reserve confidentially identified these deficiencies—adds to the scienter inference.

224. ***Defendants Silvergate and Lane knew the devastating potential consequences of a failure to conduct the represented diligence on its customers.*** Defendant Lane knew what both KYC and AML diligence required, stating that they are "ways of kind of saying the same thing, which is making sure that you know who your customers are and making sure that you're not in any way providing funding,

financing etc. for illicit activity."[153]  Lane further knew—and recognized publicly— that Silvergate would suffer "really severe" fines if it failed to conduct the represented due diligence, stating that "[y]ou can essentially put the entire bank at jeopardy."[154]

225.  Given the importance of KYC and AML, it is impossible to believe that Lane did not know that the Bank—contrary to his statements to investors—did not actually vet, conduct due diligence on, or monitor its cryptocurrency exchange customers.  To the extent that Lane did not look to find out whether it did so, he was, at minimum, severely reckless for his failure to obtain such information, particularly before speaking to investors on this critical subject.

226.  ***Defendant Lane emphasized his purported personal involvement in the Bank's monitoring and due diligence.***  Defendant Lane represented to investors that he was a hands-on executive, personally involved in monitoring the activity at the Bank and on the SEN Network.  For example, in a September 24, 2021 interview on *The Blockchain Interview Series*, he emphasized: "***I*** watch the number of transactions [on the SEN Network], ***I*** watch the dollar value of transactions, ***I*** watch our deposit levels, ***I*** watch FX transactions, ***I*** watch SEN leverage."[155]

227.  Defendant Lane further told investors that he—along with his Silvergate colleagues—was personally involved in vetting the customers on the SEN Network.  During a September 14, 2021 Barclays Financial Services Conference, for example, Lane stated that "if ***we*** can't get comfortable with a company's regulatory stature, then ***we*** don't bank them" and "that ***we*** were vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act, *et cetera*."[156]

---

[153] *What Bitcoin Did: Banking the Corporate Unbanked with Alan Lane* (July 30, 2019).

[154] *Id.*

[155] *The Blockchain Interview series hosted by Dan Weiskopf featuring Alan Lane of Silvergate*, ETF Think Tank (Sept. 24, 2021).

[156] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

During a *CNBC* interview, he again emphasized that "*we* only bank institutions that are serious about regulation."[157] And, again, in a December 5, 2022 public letter, Lane represented that "*we* conducted extensive due diligence on FTX and Alameda Research" and "*we* continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."[158]

228. Having identified himself as intimately involved in the SEN Network and the Bank's due diligence, Defendant Lane knew or, at minimum, was severely reckless in not knowing, of the Bank's failure to vet, conduct due diligence on, and monitor its customers and their activity.

229. ***Many of Defendants' misrepresentations were made in direct response to questions by financial analysts, who were intently focused on Silvergate's purported due diligence.*** Defendants' misstatements to investors concerning Silvergate's due diligence were trusted and repeated—often verbatim—in publicly-available research reports published by prominent financial analysts deciding whether to recommend Silvergate's stock. Among others, J.P. Morgan, Compass Point Research & Trading, and Craig-Hallum Capital Group highlighted in their analyst reports Silvergate's "due diligence" in advising that investors "BUY" the Bank's stock. For example, in its analyst reports, Compass Point included a three-page description of Silvergate's purported "regulatory compliance," "due diligence and onboarding processes," and "selective[ness] in the customer onboarding process"—concluding that Silvergate's "compliance capabilities" are "a distinct competitive advantage and . . . a meaningful barrier to entry."

230. Additionally, many of Defendants' misrepresentations at issue in this case were made in response to analyst inquiries. For example, on September 14,

---

[157] *CNBC* Interview by Squawk on the Street with Alan Lane, CEP, Silvergate (June 28, 2022).

[158] Silvergate, Form 8-K (Dec. 5, 2022).

2021, in response to questioning from a Barclays analyst, Lane falsely responded, "if we can't get comfortable with a company's regulatory stature, then we don't bank them" and "we were vetting all of our customers from KYC, anti-money laundering, Bank Secrecy Act, *et cetera*."[159]  Again, on January 5, 2023, in response to questioning from a Morgan Stanley analyst about "the steps you take on the AML/KYC side before you onboard a customer," Lane falsely represented that "for every account that we open . . . we conduct ongoing monitoring."[160]  As another example, on July 30, 2019, in response to questioning during the podcast *What Bitcoin Did Podcast*, Lane stated that "if you get an account at Silvergate, then we've gone through the process of vetting you" and "we're kind of like the good housekeeping seal of approval."[161]

231.  That Defendant Lane made many of the false and misleading representations at issue in this case in direct response to questions from concerned analysts and market participants further strengthens the scienter inference.

232.  ***Defendants' misrepresentations concerned its core businesses.***  The SEN Network, by Lane's own account, was Silvergate's "flagship product" and "what [Silvergate was] known for in this ecosystem."[162]  By indiscriminately allowing entities onto its SEN Network without conducting the represented due diligence, Lane transformed Silvergate from a small, local bank into a behemoth in the banking sector, with over $14 billion in deposits by 2021.  As Lane admitted during a Barclays Financial Services Conference, "all of that growth has really been on the back of SEN."  Lane later added that the SEN Network has been "the driver

---

[159] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021).

[160] "Silvergate Capital Corp. at Business Update Call" (Jan. 5, 2023).

[161] *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

[162] "Silvergate Capital Corp. at Barclays Financial Services Conference" (Sept. 14, 2021); *Banking the Corporate Unbanked with Alan Lane*, What Bitcoin Did (July 30, 2019).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                        -99-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

of our strategy over the last several years" and that "98% or 99%" of Silvergate's deposits were crypto-related.[163]

233. That Defendants' false and misleading statements concerned the centerpiece of its business—and the source of nearly all of its $14 billion in deposits—further strengthens the scienter inference.

234. ***FTX was one of Silvergate's most important customers.*** Silvergate benefitted significantly by not conducting diligence on FTX and, instead, approving its participation on the SEN Network. FTX was a major source of the Bank's deposits—with approximately 17% of the Bank's overall deposits—about $2.11 billion—coming alone from FTX and its related entities. Silvergate recognized FTX's import to the Bank during media interviews, with Lane singling out "FTX" as one of the three "major" exchanges approved to use the SEN Network and praising it for being "serious about regulation."[164] Silvergate also identified FTX, by name, on its website as one of its most important customers (*see* Figure 2, *supra*) and even featured a quote from FTX's now-infamous CEO, Bankman-Fried, promoting FTX and Silvergate (*see id.*, *supra*). As the financial press noted, "this cozy relationship" between FTX and Silvergate "boosted Silvergate's status and share price."[165]

235. Silvergate's utter failure to vet, conduct due diligence on, and monitor its most important customer—which was singlehandedly responsible for over 17% of its deposits—would hardly go unnoticed by Silvergate's executives, including Defendant Lane.

---

[163] Oppenheimer Blockchain Digital Assets Summit - The Evolution of Digital Assets (Nov. 18, 2021); Market Rebellion, *Roundtable: Banking in the Digital Age with Alan Lane* (Nov. 8, 2021).

[164] *Silvergate CEO Alan Lane On the Business of Stablecoin*, Bloomberg Podcasts (June 2, 2022).

[165] *CoinGeek*, "Feds probe Silvergate bank's ties to FTX, SBF vs. CZ cage-match documentary" (Feb. 6, 2023).

236. ***Defendants Lane and Silvergate issued specific denials about Silvergate's failure to conduct due diligence on FTX.*** Beginning in November 2022, investors and analysts began questioning whether—in light of developing news reports—Silvergate actually performed due diligence on FTX and Alameda. In response to these inquiries, Defendants Lane and Silvergate doubled down. They made specific and unequivocal representations that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures."[166] In response to specific concerns from securities analysts about the Bank's due diligence on FTX and related entities, Lane assured investors: "We have KYC requirements, which includes the initial onboarding. It then also includes monitoring transactions on an ongoing basis. And so a lot of – as you said, the misinformation out there is, candidly, very frustrating. . . . [W]e conduct ongoing monitoring."[167]

237. That Defendant Lane continued to make specific misrepresentations and conceal the truth—even <u>after</u> the revelations emerged about FTX—yet further strengthens the scienter inference in this case.

238. ***Defendant Lane netted many millions of dollars as a result of his misrepresentations.*** As discussed above (*see* Section IV.A, *supra*), Silvergate began banking cryptocurrency exchanges to increase its deposits. Without increased deposits, the Bank would have remained a small, community bank. Silvergate and Lane were able to generate increased deposits by onboarding sham entities without vetting, conducting due diligence, or monitoring—including FTX, North Dimension, Alameda, Binance.US, Huobi, Nexo, Hamilton Opportunity Fund SPC and Hamilton Investment Management Ltd., Virgil Sigma Fund and VQR, Bittrex, Paxos and OSL Digital, and many others. Their plan worked: by the end of

---

[166] Silvergate, Form 8-K (Dec. 5, 2022).
[167] "Silvergate Capital Corp. Business Update Call" (Jan. 5, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    -101-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    Case No. 22-cv-01936

September 2022, deposits from crypto customers ballooned to $11.9 billion, constituting over 90% of the Bank's overall deposit base.

239. When Silvergate's deposits skyrocketed, so too did its stock price. Between the end of 2019 and November 2021, Silvergate's stock price increased more than twenty-fold. As the *Financial Times* observed in a December 2022 report, "Barely 10 months after listing on the New York Stock Exchange at the end of 2019, at $12 a share, Silvergate's share price had climbed to more than $200."[168]

240. Defendant Lane capitalized on the Company's misrepresentations, and the resultant soaring stock price. At the same time that he was making glowing representations about the Bank's due diligence and monitoring, he was selling his own shares. Indeed, Lane sold 249,560 of his personal Silvergate shares during the Class Period—a whopping 76.96% of the total number of shares of Silvergate stock that he owned and could sell during the entire Class Period. None of these sales were made pursuant to a Rule 10b5-1 trading plan, and Lane never once purchased any shares in the open market during the Class Period. Lane's insider sales included, among others, a sale of 75,000 shares at over $100 per share on June 8, 2021 for $7.9 million; a sale of 75,000 shares at over $100 per share on June 9, 2021 for $8 million; a sale of 11,250 shares at over $100 per share on June 10, 2021 for $1.13 million; a sale of 1,375 shares at over $215 per share on November 19, 2021 for over $300,000; and sales of 16,314 shares on July 21, 2022 at over $90 per share for another $1.5 million. In total, through his Class Period insider sales, Lane netted for himself a remarkable $21.2 million.

241. Lane's well-timed, insider sales have irked investors—and justifiably so. On February 3, 2023, Zacks Investment Research issued a report, titled *A Stock with Troubling Insider Selling Trends*, blasting Lane for his sales. As the analyst explained, "Alan Lane, President and CEO of Silvergate, sold all his shares . . . in

---

[168] *Financial Times*, "Silvergate: from tiny local lender to bank behind the crypto boom" (Dec. 9, 2022).

July and has yet to purchase any back"; meanwhile, "the company has experienced more than $8 billion in client withdrawals after revelations came to light that Silvergate was involved in business dealings with the now defunct crypto exchange FTX and its sister company Alameda Research and is now facing a DOJ fraud investigation."[169]

242. In addition to his well-timed insider sales, Defendant Lane's salary nearly tripled during the Class Period as a result of his misrepresentations and the resulting increase in Silvergate's deposits and stock price. Between 2019 and 2022, Lane's salary jumped from $700,000 to $1.9 million.

243. That Lane made over $21 million in insider stock sales and $1.2 million extra pay as a result of his misrepresentations further supports the scienter inference.

244. The foregoing facts particularly when considered collectively (as they must be) support a strong inference of Silvergate's and Lane's scienter.

## VII. ADDITIONAL LOSS CAUSATION ALLEGATIONS

245. The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (*i.e.*, stock price declines) described herein.

246. During the Class Period, Plaintiffs and the Class members purchased or otherwise acquired Silvergate common stock at artificially inflated prices, and were damaged thereby when the price of Silvergate common stock declined as the truth leaked out and in response to the partial disclosures. Throughout the Class Period, the price of Silvergate common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Silvergate common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants. Throughout the disclosure

---

[169] Zacks, "A Stock with Troubling Insider Selling Trends" (Feb. 3, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-103-
Case No. 22-cv-01936

period, Defendants mitigated Silvergate's stock price declines by making additional false assurances concerning the alleged fraud, as described herein.

247. On November 2, 2022, the publication *CoinDesk* released an investigative report that described the "unusually close" ties between two of Silvergate's customers, FTX and Alameda, as reflected in a leaked internal Alameda financial document. *CoinDesk* noted that "even though [FTX and Alameda] are two separate businesses," Alameda's balance sheet included billions of dollars of FTT—*i.e.*, the cryptocurrency token issued and owned by FTX.[170]

248. Just five days later, after the market closed on November 7, 2022, Silvergate announced the sudden and unexplained replacement of its "Chief Risk Officer," Tyler Pearson. FTX also announced during trading hours the next day that it had agreed to sell itself to Binance because of FTX's liquidity crisis in the wake of the news of its connection to Alameda.

249. Social media erupted, immediately connecting Pearson's replacement to FTX and questioning Silvergate's failure to conduct due diligence on and monitor FTX. Marcus Aurelius Research posted a snapshot of Silvergate's website with a quote from Sam Bankman-Fried that read, "Life as a crypto firm can be divided up into before Silvergate and after Silvergate—it's hard to overstate how much it revolutionized banking for blockchain companies." Marcus Aurelius Research captioned the post, "How long until the new $SI 'Risk officer' takes this down?" Likewise, Marc Cohodes, a popular market commentator and corporate watchdog, explained in a November 8, 2022 post commenting on this news, "When FTX is your largest customer this is a Major problem."[171]

250. Other market commentators were also concerned, with S&P Global publishing an article that "[s]hares of Silvergate Capital Corp. . . . continued to

---

[170] *CoinDesk*, "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" (Nov. 2, 2022).

[171] Post by Marc Cohodes (Nov. 8, 2022).

plunge Nov. 9 as their customer, cryptocurrency exchange FTX Trading Ltd., is allegedly facing a liquidity crunch" and warned of Silvergate's exposure to FTX.

251. In response to this news, the price of Silvergate's stock fell over a three-day period. On November 8, 2022, the price fell by $11.54 per share, or 22.65%, to close at $39.42 on November 8, 2022, erasing more than $365 million in market capitalization, on trading volume of 8 million shares, more than 10-times the number of shares traded the previous day. As investors continued to digest the news, the price of Silvergate's stock continued to plummet, dropping by $4.73 per share, or 12.00%, to close at $34.69, representing another $149.8 million decline in market capitalization on November 9, 2022, on continued abnormally high trading volume of 7.7 million shares, and by an additional $2.01 per share, or 5.79%, comprising an additional $63.6 million decline in market capitalization on November 10, 2022, on continued high trading volume of 7.2 million shares.

252. As part of their continuing misrepresentations and attempts to reassure the market, Silvergate and Defendant Lane attempted to isolate FTX as a single customer among its many SEN Network participants, issuing a statement assuring the market that "FTX represented less than 10%" of Silvergate's total deposits from "all digital asset customers." The Company also stated that the SEN Network was "fully operational and continues to function as designed," adding that "[w]e are a key infrastructure provider with an established track record, which gives our customers the confidence they need during times like these."

253. Analysts continued to credit the Company's statements that it performed vetting, due diligence, and monitoring on its SEN Network customers and that the FTX fraud was an isolated event among its customers. For example, J.P. Morgan analysts accepted Silvergate's denials, repeating in their analyst reports Lane's statements that "all participants in the SEN are vetted by Silvergate" and "need[] to pass compliance checks."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-105-
Case No. 22-cv-01936

254. Additional analysts credited Silvergate's assurances. For example, Canaccord Genuity analysts stated in an analyst report that Silvergate was "relatively immune from FTX fallout" and also pointed out that Silvergate "has over 100 other crypto exchanges as customers" that rely on the SEN Network. Canaccord also reiterated its "BUY" rating for Silvergate and a $150 price target. Bank of America, although it downgraded its rating of Silvergate's stock because the FTX/Alameda situation was a "black eye on the broader crypto market." The analysts also reported, "SI has a comprehensive risk mgmt. framework in place." Further, citing the Company's false assurances, J.P. Morgan analysts emphasized that while they knew "FTX is a customer of Silvergate," Silvergate had issued "no disclosure that Alameda Research is a client of Silvergate."

255. Then, on November 15, 2022, Marcus Aurelius Research revealed additional facts raising concerns about Silvergate's vetting, diligence, and monitoring of its customers. Specifically, Marcus Aurelius Research revealed that Silvergate had been implicated in a $425 million money laundering operation by a South American cryptocurrency crime ring linked to smugglers and drug traffickers. Marcus Aurelius Research posted, "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affidavit from investigation into crypto crime ring linked to smugglers/drug traffickers." That same day, Marc Cohodes publicly compared Silvergate's KYC and AML compliance to that of the banks who did "business with Madoff."

256. On this news, the price of Silvergate's stock fell by an additional $6.13 per share, or 17.27%, to close at $29.36 on November 15, 2022, resulting in a loss of $194.1 million in market capitalization, with trading volume rising to 8.5 million shares, more than four times the daily average for the previous 30 days.

257. The next day, on November 16, 2022, *Vox* issued a report showing a recent message exchange with FTX's former CEO, Bankman-Fried, acknowledging

that people could wire money to Alameda's bank account to get money to FTX, and that "people wired $8 billion to Alameda." That same day, after markets closed, Silvergate disclosed a $2.1 billion reduction in deposits, after "excluding all deposits from FTX and its related entities."

258. On November 17, 2022, EventLongShort, another popular analyst and corporate watchdog, issued a series of postings detailing that, when FTX's customers wanted to transfer funds, they were directed "to send the funds to their bank [at] Silvergate" and that, even though "one should expect the beneficiary account" to be FTX, instead "the beneficiary account on the Silvergate/FTX wire instructions appear[ed] to be Alameda accounts."[172] EventLongShort added that "the accounts FTX customers were told to wire funds to appear to be the Silvergate bank accounts of Alameda Research Ltd and North Dimension Inc, a subsidiary of Alameda."

259. In addition, on November 17, 2022, analysts at The Bear Cave published a newsletter casting further doubt on Silvergate's representations. In particular, The Bear Cave elaborated on Silvergate's connection to the South American money-laundering operation, reporting that hundreds of millions of dollars were laundered through Silvergate's SEN Network, emphasizing Silvergate's lack of customer monitoring given "[t]he accounts were receiving funds in the same pattern as those . . . used to facilitate the laundering of illicit funds." This operation began in September 2021 and ended in June 2022. Silvergate did not report suspicious activity on these accounts until federal investigators requested documents.

260. On this news, the price of Silvergate's common stock fell by $3.44 per share, or 10.98%, to close at $27.90 on November 17, 2022, representing a $108.9

---

[172] Post by EventLongShort (Nov. 17, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-107-
Case No. 22-cv-01936

million drop in market capitalization, on continued high trading volume of 7.8 million shares.

261. Then after hours on Thursday, November 17, 2022, FalconX, a cryptocurrency exchange platform focused on risk management for institutional clients, revealed that it would no longer engage with Silvergate due to the elevated risk associated with the SEN Network, stating that its decision was "consistent with other market players."

262. On this news, the price of Silvergate's common stock fell by $3.00, or 10.75%, to close at $24.90, representing a $95 million drop in market capitalization on November 18, 2022, with trading volume rising to 10.5 million shares.

263. Based on Lane and Silvergate's repeated assurances, however, analysts and investors continued to credit Defendants' false assurances that it performed vetting, due diligence, and monitoring on SEN Network participants. For example, on November 21, 2022, J.P. Morgan analysts dismissed concerns about Silvergate's "risks from an anti-money laundering (AML) perspective in facilitating over $1 trillion in payments" on the SEN Network, citing Silvergate's purported compliance, vetting, and onboarding efforts. The analysts emphasized that, to participate in the SEN Network, "a participant needs to be an institution such as a cryptocurrency exchange or institutional investor participating in the digital asset ecosystem" and "needs to pass compliance checks before onboarding as a Silvergate client to access real-time payments capabilities on the SEN." "In other words," the analysts concluded, "all participants in the SEN are vetted by Silvergate and, with Silvergate being a highly regulated bank, this provides regulator access to address any concerns over AML."

264. After trading closed on November 28, 2022, *Bloomberg News*'s Crypto Market Structure Reporter (Yuqi Yang) and *Bloomberg*'s Finance Reporter (Max Reyes) published an article based on the accounts of people familiar with FTX, describing how Silvergate solved FTX's inability to get access to traditional banking

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-108-
Case No. 22-cv-01936

sources by allowing Alameda Research to become a Silvergate customer and then allowing FTX customers to wire funds to Alameda.[173] *Bloomberg News* further reported that "FTX customers were instructed to send wire transfers via Alameda, which was allowed to have accounts at Silvergate" and that some "FTX customers continued to send wire transfers as recently as this year."

265. Silvergate and Defendant Lane immediately responded with efforts to quell investors' concerns. Among other things, they issued a statement on the evening of November 28, 2022 stating, "Recently, Silvergate has been the subject of false and misleading statements."

266. On December 1, 2022, The Bear Cave published another report, providing additional evidence of Silvergate's failure to vet its customers. Specifically, The Bear Cave's report described Silvergate's involvement in a money laundering operation in December 2018. The Bear Cave cited a July 2021 plea agreement between DOJ and Joel Greenberg, who has since been convicted of embezzlement, that describes how Greenberg used Silvergate's SEN Network to launder $200,000. The report highlighted Silvergate's failure to identify and report 40 suspicious transactions that occurred over a four-day period.

267. On this news, the price of Silvergate's common stock fell by $2.21 per share, or 8.06%, to close at $25.22 with a drop in market capitalization of $70 million on December 1, 2022, on trading volume of 5.6 million shares.

268. On December 5, 2022, before the markets opened, Morgan Stanley issued an analyst report revealing facts concerning Silvergate's "massive financial pressure in the aftermath of the FTX exchange's collapse," and lowering its rating for the Bank to "Underweight."

269. On this news, the price of Silvergate's common stock fell by $2.25, or 8.49%, to close at $24.24, representing a $71.2 million drop in market capitalization

---

[173] *Bloomberg*, "FTX Received Some Customer Deposits Via Bank Accounts Held by Alameda" (Nov. 28, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-109-
Case No. 22-cv-01936

on December 5, 2022, on trading volume of 3.5 million shares. As *CNBC* reported, "Shares dipped 3% after Morgan Stanley downgraded Silvergate Capital to underweight from equal weight, saying a 'high level of uncertainty' remains around the stock following the FTX collapse."

270. The next day, before the market opened on December 6, 2022, it was revealed that late the night before, Senators Elizabeth Warren, John Kennedy, and Roger Marshall sent Defendant Lane a request for information about Silvergate's relationship with FTX and Alameda, casting further doubt on the Company's vetting, due diligence, and monitoring of its customers. The letter stated that "Silvergate's failure to take adequate notice of [the FTX] scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program," adding that Silvergate's facilitation of FTX's transfer of customer funds to Alameda "reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients." The same morning, *NBC News* reported that an investment manager provided testimony to the Senate Banking Committee about statements made to him by a former FTX employee confirming that as FTX's primary banking partner, Silvergate was implicated in the transfers of FTX customer funds between other Bankman-Fried controlled entities, including Alameda.

271. On this news, the price of Silvergate's common stock fell by $1.14, or 4.70%, to close at $23.10, representing an additional $36.1 million drop in market capitalization on December 6, 2022, with trading volume rising to 10 million shares, nearly three-times the number of shares traded the previous day. *CoinDesk* reported that "Crypto Bank Silvergate Slides Further After Letter from Sen. Warren."

272. Defendant Lane, nevertheless, again attempted to quiet investors' concerns, issuing a "public letter" "to set the record straight about Silvergate's role in the digital asset ecosystem" and to blame recent reports on "speculation" and

"misinformation."[174]  In his public letter, Defendant Lane again represented (falsely) that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements."  Defendant Lane also insisted that the Bank "monitors transaction activity for every account and identifies activity outside of the expected usage."  He further emphasized that the Company continues "to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."

273.  On December 13, 2022, the SEC and Commodity Futures Trading Commission ("CFTC") both filed civil actions against Bankman-Fried.  The complaints stated that FTX directed customers to deposit fiat currency into U.S. bank accounts controlled by Alameda.  The complaints revealed that "some or all of those bank accounts were opened in the name of an entity called North Dimension, a Delaware-registered wholly-owned subsidiary of Alameda," and the shell company used by FTX and Alameda to misappropriate customer funds using Silvergate's SEN Network.

274.  On this news, the price of Silvergate's common stock fell by $2.53, or 11.90%, to close at $18.73 on December 13, 2022, with market capitalization plummeting an additional $80.1 million with trading volume rising to 11.9 million shares, more than double the number of shares traded the previous day.

275.  Silvergate and Defendant Lane continued to issue false public denials to stop the price of Silvergate's stock from falling further.  For example, in response to the U.S. senators' findings, Lane wrote, "In accordance with our risk management policies and procedures, Silvergate conducted significant due diligence on FTX and

[174] Silvergate, Form 8-K (Dec. 5, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-111-
Case No. 22-cv-01936

its related entities, including Alameda Research, both during the onboarding process and through ongoing monitoring."[175]

276. On January 5, 2023, a day after a federal judge ordered the seizure of about $93 million of FTX funds held at Silvergate, Silvergate released select preliminary fourth quarter financial metrics in an intra-quarter update. In the release, Silvergate disclosed that the collapse of FTX had led other customers to withdraw their deposits from the Bank, causing its deposits to decrease by more than 60% or $8.1 billion in the fourth quarter—a bank run that *The Wall Street Journal* dubbed "worse than Great Depression-era runs." The same day, Silvergate held a conference call with analysts and investors to discuss the intra-quarter update. On that call, Defendant Lane acknowledged that there was a "crisis of confidence" impacting Silvergate, with customers withdrawing 60% of the Bank's total deposits (over $8.1 billion), and that it was forced to lay off 40% of its employees.[176]

277. On this news, the price of Silvergate's common stock fell by $9.38, or 42.73%, to close at $12.57 on January 5, 2023, erasing $297 million in market capitalization, on record high trading volume of 30.3 million shares, more than five-times the average daily volume for the previous 30 trading days. *CNBC* reported that "Silvergate Capital tanks more than 40% after crypto bank discloses massive fourth-quarter withdrawals."

278. Next, on February 2, 2023, *Bloomberg* broke the news after the market had closed that the DOJ's Fraud Section was examining Silvergate's hosting of accounts connected to FTX and its CEO Sam Bankman-Fried.[177] Investors were again shocked, with *Cryptonews* reporting that following the news of the DOJ's

---

[175] Letter from Lane to Warren, Kennedy, and Marshall (Dec. 19, 2022).

[176] Silvergate, Costs Associated with Exit or Disposal Activities (Form 8-K) (Jan. 5, 2023).

[177] *Bloomberg*, "Silvergate Faces US Fraud Probe Over FTX and Alameda Dealings" (Feb. 2, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT -112-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     Case No. 22-cv-01936

investigation, 'Silvergate shares took a nosedive."[178] *CoinDesk* likewise reported that Silvergate shares "fell sharply after the market close" following "the publication of a Bloomberg article reporting the U.S. Department of Justice's fraud unit was looking into the crypto bank's dealings with the now-bankrupt FTX and Alameda Research."[179] *CoinDesk* further noted that "Silvergate shares were down 28% in after-hours trading to $15.06, wiping out almost all of its 29% rally during the day's session following a Federal Reserve-related rally in cryptocurrencies and crypto stocks."

279. On this news, the price of Silvergate's common stock fell by 28%, as noted by *CoinDesk*, on record high trading volume of 41.24 million shares.

280. On February 16, 2023, *Reuters* published an investigative report based on bank records obtained from Binance, showing that Binance transferred $400 million in 2020 and 2021 from its Silvergate accounts to a trading firm called Merit Peak, which was controlled by Binance's founder and CEO Zhao. These transfers also showed that Silvergate's failure to monitor permitted clients like Binance's and FTX's CEO to use Silvergate-approved entities to funnel funds from their customers deposits on the cryptocurrency exchanges to their personal accounts. *TheStreet* tied *Reuters*'s report on Binance's access to Silvergate accounts to Silvergate's "Due Diligence Failures," and reported, "The information from *Reuters* immediately prompted many experts to say that this episode is reminiscent of FTX and Alameda Research."[180]

281. On this news, the price of Silvergate's common stock fell by $4.97, or 22.27%, to close at $17.35 on February 16, 2023, erasing an additional $157.3 million in market capitalization on trading volume of 29.4 million shares.

---

[178] *Cryptonews*, "Silvergate Bank Stock Plunges After Report of DOJ Investigation into Ties with FTX and Alameda" (Feb. 3, 2023).

[179] *CoinDesk*, "Silvergate Stock Tanks on Report of DOJ Probe Tied to FTX, Alameda Dealings" (Feb. 2, 2023).

[180] *TheStreet*, "Crypto Bank Silvergate Goes Out of Business" (Mar. 9, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT -113-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS   Case No. 22-cv-01936

282. On March 1, 2023, after the markets closed, Silvergate announced that it needed to make the "risk-based decision" to discontinue the SEN Network altogether. Silvergate also announced that it was delaying its filing of its annual financial report on Form 10-K, stating that recent events left it at risk of being "less than well-capitalized" and that it was evaluating its ability to operate as a "going concern." In its filing, Silvergate stated that "[s]ubsequent to December 31, 2022, a number of circumstances have occurred which will negatively impact the timing and the unaudited results previously reported in the Earnings Release." The Company also disclosed that it was "currently in the process of reevaluating its businesses and strategies in light of the business and regulatory challenges it currently faces." Silvergate also warned about its "ability to retain digital asset customers" including resulting from "regulatory and other inquiries and investigations against or with respect to the Company, investigations from our banking regulators, congressional inquiries and investigations from the U.S. Department of Justice."

283. These revelations further stunned investors. As analysts at *Wall Street on Parade* observed, the Bank's disclosure "stands in rather stark contrast to Silvergate's website lauding how the company is . . . 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'"

284. On this news, the price of Silvergate's common stock fell by $7.81, or 57.72%, to close at $5.72 on March 2, 2023, resulting in a loss of $247.2 million in market capitalization, on record high trading volume of 57.8 million shares, nearly double the total number of shares outstanding. *CNBC* reported that "Shares in Silvergate Capital plunge in pre-market trading after delaying its annual report." J.P. Morgan downgraded its rating on Silvergate's stock to "underweight" and withdrew its price target.

285. Unable to trust the Bank's "seal of approval" any longer, the Bank's remaining customers continued to flee and pull their deposits from Silvergate. *Reuters* reported that "[a] slew of cryptocurrency heavyweights," including

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-114-
Case No. 22-cv-01936

Coinbase and Galaxy Digital, had "ditched" Silvergate as their banking partner after Silvergate's latest filing "raised questions about its ability to stay in business."

286. Two days later, on March 8, 2023, after the markets had closed, Silvergate announced that it needed to wind down operations and voluntarily liquidate Silvergate Bank.[181]

287. On this news, the value of Silvergate's common stock fell by $2.07, or 42.16%, to close at $2.84, erasing an additional $65.5 million in market capitalization on March 9, 2023, on soaring trading volume of 71.3 million shares. By that date, Silvergate's market capitalization stood at a mere $89.9 million, representing a loss of 94.4% of the market value of Silvergate's common stock in only four months. *TheStreet* that "[t]he California bank's stock fell nearly 44% on Wall Street after it announced it was going out of business."[182]

288. Just weeks later, on March 20, 2023, Silvergate announced that it had received a non-compliance notice days earlier from the NYSE, informing the Company that, "as the Company had not timely filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the '10-K'), the NYSE will closely monitor the status of the Company's late filing and related public disclosures for up to a six-month period from its due date." The Company further disclosed that the NYSE warned that future delayed filings could lead to "suspension and delisting procedures."

289. On this news, the value of Silvergate's common stock fell by another 12.5%, to close at $1.47 on March 21, 2023, erasing an additional $6.7 million in market capitalization on trading volume of over 12.8 million shares.

[181] Press Release, Silvergate, "Silvergate Capital Corporation Announces Intent to Wind Down Operations and Voluntarily Liquidate Silvergate Bank" (Mar. 8, 2023).
[182] *TheStreet*, "Silvergate Bank Collapses" (Mar. 9, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
-115-
Case No. 22-cv-01936

290. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Silvergate's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

291. The stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Silvergate common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed.

292. The timing and magnitude of the price declines in Silvergate securities, Defendants' post-Class Period revelations, and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII. PRESUMPTION OF RELIANCE

293. Plaintiffs are entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a) Silvergate's stock was actively traded in an efficient market on the NYSE;

(b) Silvergate's stock traded at high weekly volumes;

(c) as a regulated issuer, Silvergate filed periodic public reports with the SEC;

(d) Silvergate regularly communicated with public investors by means of established market communication mechanisms,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-116-
Case No. 22-cv-01936

including through regular dissemination of press releases and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Silvergate;

(f) Silvergate securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Silvergate's securities; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired Silvergate common stock between the time the Exchange Act Defendants misrepresented or omitted material facts and the time the true facts were disclosed.

294. Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Silvergate's stock, and are entitled to a presumption of reliance on the Exchange Act Defendants' materially false and misleading statements and omissions during the Class Period.

295. A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

296. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading

statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

297. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Silvergate who knew that the statement was materially false or misleading when made.

## X.   CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I – Violation of § 10(b) of the Exchange Act
### (Against Silvergate and Defendant Lane)

298. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

299. This count is asserted on behalf of all members of the Class against Defendant Silvergate and Defendant Lane for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

300. During the Class Period, the Exchange Act Defendants disseminated, furnished information for inclusion in, or approved the false statements specified above, which they knew or, at minimum, were severely reckless in not knowing were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

301. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Silvergate common stock during the Class Period.

302. The Exchange Act Defendants, individually and in concert, directly and indirectly, used the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with severe recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Silvergate common stock, which were intended to, and did:

    (a)    deceive the investing public, including Plaintiffs and the Class, regarding, among other things, Silvergate's customer onboarding and monitoring due diligence and regulatory compliance framework;

    (b)    artificially inflate and maintain the market price of Silvergate common stock; and

    (c)    cause Plaintiffs and other members of the Class to purchase Silvergate common stock at artificially inflated prices and suffer losses when the true facts became known and/or the risks materialized.

303. The Exchange Act Defendants are liable for all materially false or misleading statements made during the Class Period, as alleged above.

304. As described above, the Exchange Act Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-119-

Case No. 22-cv-01936

manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Silvergate stock, were either known to the Exchange Act Defendants or were so obvious that the Exchange Act Defendants should have been aware of them.

305. Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Silvergate common stock, which inflation was removed from its price when the true facts became known.

306. The Exchange Act Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had the Exchange Act Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Silvergate securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to the Exchange Act Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Silvergate's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by the Exchange Act Defendants' material misstatements and omissions, would cause the price of Silvergate securities to decline.

307. Accordingly, as a result of their purchases of Silvergate common stock during the Class Period, Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

308. By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

309. This claim is brought within the applicable statute of limitations

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-120-
Case No. 22-cv-01936

## COUNT II – Violation of § 20(a) of the Exchange Act
### (Against Defendant Lane)

310. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

311. As alleged above, Defendant Silvergate and Defendant Lane each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

312. This count is asserted on behalf of all members of the Class against Defendant Lane for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

313. At all relevant times, Defendant Lane acted as a controlling person of Silvergate within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

314. By virtue of Defendant Lane's control and authority as the Company's most senior officer, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual due diligence, and his power to control the materially false and misleading public statements about the Company during the Class Period, Defendant Lane had the authority to influence and control, and did influence and control, directly and indirectly, the decision-making and the activities of the Company and its employees, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein. Defendant Lane was provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-121-
Case No. 22-cv-01936

315. In addition, Defendant Lane spoke to investors on behalf of the Company during the Class Period. Therefore, he was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Silvergate during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein.

316. By reason of the aforementioned conduct, Defendant Lane is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Defendant Silvergate is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class.

## PART TWO - CLAIMS UNDER THE SECURITIES ACT OF 1933

317. In this Part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on violations of the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased Silvergate stock in or traceable to Silvergate's securities offerings conducted on or about January 20, 2021, March 18, 2021, July 28, 2021, and December 6, 2021 (collectively, the "2021 Offerings"), and were damaged thereby.

318. In this Part of the Complaint, Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims. For the avoidance of doubt, Plaintiffs disclaim all allegations of fraud or intentional misconduct included in Part One of this Complaint, and no portion of the Exchange Act allegations (¶¶1-316) are realleged or incorporated herein.

## XI.    JURISDICTION AND VENUE

319. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-122-
Case No. 22-cv-01936

320. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

321. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b). The acts and conduct complained of herein occurred in substantial part in this District.

322. In connection with the acts and conduct alleged in this Complaint, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities market.

## XII. THE SECURITIES ACT DEFENDANTS

323. In addition to Defendants Silvergate and Lane, each of the following Defendants is statutorily liable under the Securities Act for the materially untrue statements or omissions contained in and incorporated in the 2021 Offering Documents.

324. **Underwriter Defendants.** The following investment banks were underwriters of the offerings of Silvergate securities issued by way of the registration statements that contained the materially untrue and misleading statements and omitted material facts: the Underwriter Defendants Canaccord Genuity LLC ("Canaccord"); Citigroup Global Markets Inc ("Citigroup"); Compass Point Research & Trading, LLC ("Compass"); Craig-Hallum Capital Group LLC ("Craig-Hallum"); Goldman Sachs & Co. LLC ("Goldman"); J.P. Morgan Securities LLC ("J.P. Morgan"); Keefe, Bruyette & Woods, Inc. ("Keefe"); UBS Securities LLC ("UBS"); and Wedbush Securities Inc. ("Wedbush").

325. Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, and Keefe were the underwriters of the January 2021 Offering.

326. Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, Keefe, and Wedbush were the underwriters of the March 2021 Offering.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -123-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    Case No. 22-cv-01936

327. Underwriter Defendants Citigroup, Goldman, J.P. Morgan, Keefe, and UBS were the underwriters of the July 2021 Offering.

328. Underwriter Defendants Compass, Craig-Hallum, Goldman, J.P. Morgan, Keefe, and Wedbush were the underwriters of the December 2021 Offering.

329. **The Securities Act Executive and Director Defendants.** The following Defendants were signatories of the registration statements that contained materially untrue and misleading statements and omitted material facts: Defendants Alan J. Lane (CEO and Director); Antonio Martino (CFO); Karen F. Brassfield (Director); Robert C. Campbell (Director); Paul D. Colucci (Director); Thomas C. Dircks (Director); Dennis S. Frank (Director); Aanchal Gupta (Director); Michael Lempres (Director); Scott A. Reed (Director); and Colleen Sullivan (Director).

330. Each of the Securities Act Executive and Director Defendants signed the registration statements for each of the January 2021 Offering, March 2021 Offering, July 2021 Offering, and December 2021 Offering, with the exception of Aanchal Gupta, who was a signatory to the registration statement for the July 2021 and December 2021 Offerings.

## XIII. THE OFFERING DOCUMENTS CONTAINED FALSE OR MISLEADING STATEMENTS AND OMISSIONS

331. During 2021, the Securities Act Defendants offered and sold shares of Silvergate stock to investors through a series of securities offerings (the "2021 Offerings"). In exchange for the shares sold through the 2021 Offerings, Silvergate received $1.339 billion.

332. On January 20, 2021, Silvergate issued a Registration Statement (the "January 2021 Registration Statement") and a Preliminary Prospectus Supplement, which was supplemented on January 25, 2021 (the "January 2021 Prospectus"). Each filing incorporated by reference Silvergate's 2019 Annual Report on Form 10-K and Silvergate's 2020 Quarterly Reports on Form 10-Q (collectively, the "January 2021 Offering Documents" for the "January 2021 Offering"). Silvergate completed

the January 2021 Offering on January 26, 2021, selling 4,563,493 shares of common stock with gross proceeds of $287.50 million.

333. On March 9, 2021, Silvergate filed a Prospectus Supplement to conduct an "at the market" offering pursuant to the January 2021 Registration Statement that incorporated by reference Silvergate's 2020 Annual Report on Form 10-K (the "March 2021 Offering Documents" for the "March 2021 Offering"). Silvergate completed the March 2021 Offering by May 18, 2021, selling 2,793,826 shares of common stock with gross proceeds of $300 million.

334. On July 28, 2021, Silvergate filed with the SEC an amendment to the January 2021 Registration Statement and Prospectus (the "July 2021 Registration Statement") and a Preliminary Prospectus Supplement, which was further supplemented on July 30, 2021 (the "July 2021 Prospectus"). Each filing incorporated by reference Silvergate's 2020 Annual Report on Form 10-K and Silvergate's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 (collectively, the "July 2021 Offering Documents" for the "July 2021 Offering"). Silvergate completed the July 2021 Offering on August 4, 2021, issuing 8,000,000 depositary shares each representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A, with gross proceeds of $200 million.

335. On December 6, 2021, Silvergate issued a press release announcing that it would conduct another offering pursuant to the July 2021 Registration Statement and filed a Preliminary Prospectus Supplement to the July 2021 Prospectus, which was further supplemented on December 8, 2021 (the "December 2021 Prospectus") that incorporated by reference Silvergate's 2020 Annual Report on Form 10-K and Silvergate's 2021 Quarterly Reports on Form 10-Q (collectively, the "December 2021 Offering Documents" for the "December 2021 Offering"). Silvergate completed the December 2021 Offering on December 9, 2021, issuing 3,806,895

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-125-
Case No. 22-cv-01936

shares of common stock with gross proceeds of $552 million in the December 2021 Offering.

336.  The materials presented to investors in connection with the Offerings (the "2021 Offering Documents") contained "untrue statement[s] of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  Specifically, Silvergate falsely and misleadingly represented, while omitting material facts, the following in the 2021 Offering Documents:

(a)  Silvergate conducts "extensive regulatory compliance diligence";[183]

(b)  Silvergate has a "deep-rooted commitment and proprietary approach to regulatory compliance";[184]

(c)  Silvergate performs "thorough reviews . . . as part of [its] due diligence process" in connection with its "onboarding new customers or monitoring existing customers";[185]

(d)  Silvergate performs "ongoing monitoring of customer activities";[186] and

(e)  Silvergate conducts, for cryptocurrency exchanges, "enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency activities, a system of 'red flags' specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our

[183] January 2021 Prospectus; March 2021 Prospectus; July 2021 Prospectus; December 2021 Prospectus; Silvergate, Quarterly Reports (May 12, 2020, Aug. 11, 2020, Nov. 10, 2020, May 11, 2021, Aug. 10, 2021, Nov. 9, 2021); Silvergate, Annual Report (Mar. 8, 2021).

[184] January 2021 Registration Statement; July 2021 Registration Statement; January 2021 Prospectus; March 2021 Prospectus; July 2021 Prospectus; December 2021 Prospectus; Silvergate, Annual Reports (Mar. 10, 2020, Mar. 8, 2021).

[185] Silvergate, Annual Reports (Mar. 10, 2020, Mar. 8, 2021).

[186] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-126-

Case No. 22-cv-01936

> third-party transaction monitoring system, customer risk scoring with risk factors specific to the digital-currency industry."[187]

337.  These statements were false and misleading, and omitted material facts, for a number of reasons.  In truth, the Company had anything but a "deep-rooted commitment" to regulatory compliance.  Indeed, far from "thorough reviews" or "enhanced procedures" for screening and monitoring cryptocurrency exchange customers, Silvergate performed no due diligence before onboarding customers to the SEN Network and no ongoing monitoring of customer activities on the SEN Network.  These facts are corroborated by the accounts of Silvergate's former employees, the fraudulent activities that cryptocurrency exchange customers performed on the SEN Network, and the findings of the Federal Reserve, U.S. senators, and investigative journalists.

338.  Silvergate did not conduct the represented due diligence on its customers.  Instead, when customers wanted to join the SEN Network, "the gates were open," explained FE 3.[188]  If customers wanted to join the SEN Network, FE 3's group was given a list of accounts and names to authorize.  There was no compliance or research done on a customer at the time it wanted to join the SEN Network; nobody in management reviewed or approved those requests.

339.  FE 3 explained that Silvergate did not perform due diligence on the identity of the customers that were allowed to join SEN.  In fact, instead of asking the customers to fill out their own beneficial ownership paperwork, Silvergate employees (and not the customers) filled out the paperwork.  FE 3 explained that FE

---

[187] *Id.*

[188] FE 3 was a digital banking manager at Silvergate from the beginning of March 2022 until the end of November 2022 and reported to Dina Matias, Silvergate's Senior Vice President, Operations Administrator. FE 3 was responsible for the SEN Network, including onboarding customers to the SEN Network, handling account maintenance, account changes, monthly account fee analysis, limit changes, and adding and moving accounts.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    -127-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                     Case No. 22-cv-01936

6, Silvergate's Private Client Manager II, told FE 3 that relationship managers were told to fill out the beneficial ownership forms for the customers.

340. FE 6, Silvergate's Private Client Manager II, also confirmed that he and other Silvergate employees filled out beneficial ownership forms for the customers (*i.e.*, not the customers), and they were told to do so by Silvergate management.[189] FE 6 explained that at Silvergate, whether the form was new or needed to be recertified, it fell to the private client managers to fill out the form, instead of the customer itself. This was the policy across the board at Silvergate, and it existed throughout FE 6's entire time at Silvergate. He explained that bank employees should not have been filling out the beneficial ownership forms.

341. Silvergate also failed to perform site visits before onboarding customers to the SEN Network. FE 3 stated that Silvergate did not perform site visits of SEN Network participants. FE 3 explained that, when she joined Silvergate, she asked about "site visits" because she was concerned about working for a crypto bank; she spoke to Silvergate's Relationship Managers with whom she worked, and they told FE 3 that Silvergate "never, ever did a site visit."

342. Also consistent with FE 3's account, multiple other former Silvergate employees said that Silvergate did not perform "site visits" of the Bank's customers and SEN Network participants.

343. FE 2 said that Silvergate did not conduct site visits and added that site visits are important because you need to understand that a customer is an actual business and that you are not just banking a shell company. Likewise, FE 6 confirmed that he did not know of any actual site visits taking place by Silvergate.

344. FE 3 explained that Silvergate also did not ask for supporting documentation for customers' wire limits. FE 3 explained that new clients could

---

[189] FE 6 was a private client manager at Silvergate from November 2020 until January 2023. In that role, he was the liaison for larger clients and managed day-to-day account maintenance activities such as transfers, inquiries, and adding and removing signers.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-128-

Case No. 22-cv-01936

dictate to Silvergate whatever wire limits they wanted, and Silvergate gave it to them and never checked if the customer could cover it. FE 3 described how she reached out to Silvergate's front office, and was told—including by Christie Hicks, Silvergate's Client Support Manager—that Silvergate just asks customers what they want for a wire limit and gives it to them. FE 3 recounted how she had a phone conversation with Dina Matias concerning a $250 million wire limit for a customer that only had $70,000 in their account. FE 3 explained that she questioned why Silvergate would give a $250 million wire limit to someone with $70,000 in their account but was screamed by Ms. Matias at when she asked.

345. FE 3 was told by several of her colleagues—including Christie Hicks, Silvergate's Client Support Manager—that Silvergate did not get the proper documentation to validate wire limits. "We just give them whatever they want," they told FE 3.

346. Also like FE 3, FE 1, a Senior Vice President, Finance Manager at Silvergate, explained that Silvergate did not vet existing customers before adding them to the SEN Network.[190] FE 1 did not see any efforts by Silvergate to get to know their customers or to make sure they were complying with the law.

347. FE 1 was aware that Silvergate conducted no customer vetting of participants on the SEN Network based on meetings she attended with other senior executives and her 30 years of banking experience. FE 1 has worked at multiple banks over her 30 years of banking experience, including Wells Fargo for 19 years in various roles, where she was very aware of the existence of their compliance

---

[190] FE 1 joined Silvergate in March 2019 and stopped working at the Bank the week before Christmas in December 2019. She originally reported to Regan Lauer, who hired her, then briefly to Kellie VavRosky, then to Alan Lane, and then to Antonio Martino. She worked directly with Alan Lane from September to November 2019. Her responsibilities included overseeing Treasury and financial planning and analysis ("FP&A"). She worked closely with the Controller, and she worked on Silvergate's initial public offering.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -129-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        Case No. 22-cv-01936

practices, including AML and KYC programs. Other banks have established practices and policies in place, FE 1 explained.

348. Silvergate lacked any commitment to regulatory compliance. When asked if Silvergate had a deep-rooted commitment to regulatory compliance, FE 3 also said, "Not at all." Likewise, FE 1 explained that Silvergate's focus was all about sales and getting clients, not compliance. FE 1 said if these were subjects of discussion, someone at her level—a senior vice president of the organization—would have known about it. FE 1 said that ever since Silvergate turned towards crypto, there was no focus on anything like KYC. FE 1 worked closely with Megan Collins, Silvergate's Controller from late 2016 to January 2020, and attended senior meetings led by Kathleen Fraher, Silvergate's then-Vice President, "Compliance and BSA Officer." During these meetings, they discussed everything of importance to the Bank—which did not include compliance. FE 1 did not recall any discussion of prioritizing compliance. She said, "It was not a focus in the least. It was all, 'Rah rah, we got these new crypto customers.'"

349. Further, FE 3 explained that she did not see anything at Silvergate like compliance policies or controls designed to address the digital currency industry. She added that she never saw Silvergate implement policies and procedures to comply with AML and KYC requirements. In fact, during 2022, FE 3 tried to find policies concerning KYC on Silvergate's "intranet," and she could find no procedures regarding beneficial ownership or KYC. FE 3 confirmed that all policies concerning bank processes were on Silvergate's intranet, but she could never find policies concerning compliance processes.

350. When the Federal Reserve eventually learned of Silvergate's failure to vet, perform due diligence on, or monitor its customers, the Federal Reserve took significant action. FE 5 explained that the Federal Reserve gave private feedback to

Silvergate that its compliance was insufficient.[191] FE 5 further explained that, in the first quarter of 2022, the Federal Reserve sent Silvergate a report identifying Matters Requiring Immediate Attention (or "MRIAs").

351. According to the Federal Reserve, "Matters Requiring Immediate Attention" are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization; and (4) in the case of consumer compliance examinations, matters that have the potential to cause significant consumer harm."[192]

352. FE 5 explained that Matters Requiring Immediate Attention provided to Silvergate related to onboarding. The nature of the concerns was around Silvergate's lack of basic program requirements for vetting and onboarding. FE 5 added that the Federal Reserve also provided Silvergate with MRIAs related to ongoing due diligence. The MRIAs said that things were either lacking or not proceduralized. FE 5 further noted that, regarding Silvergate's ongoing monitoring, the Federal Reserve said it was not sufficient. FE 5 added that he knows that the regulators also found deficiencies with Silvergate's screening process and SAR filings.

---

[191] FE 5 worked at Silvergate from May 2022 until May 2023 as a "FRCM Initial Due Diligence Manager." During his over decade-long banking career, he has held roles as an enhanced due diligence manager, ongoing due diligence manager, and AML risk compliance officer at four other major banks. FE 5 received reports from Silvergate's consultants, including K2, who had summarized the MRIAs in their reports. While employed at Silvergate, FE 5 had access to Silvergate's records from before his employment.

[192] Supervisory Considerations for the Communication of Supervisory Findings, https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-131-
Case No. 22-cv-01936

353. FE 5 further stated that the regulators came back at the end of June 2022 to check progress. FE 5 explained that the MRIAs were still going to stick—*i.e.*, they were going to remain in place—and FE 5 believes Silvergate was going to have even more MRIAs issued to it; however, Silvergate voluntarily started closing down before that ever occurred.

354. FE 5 explained that, after the Federal Reserve issued its MRIAs, Silvergate retained third-party contractors, including the consulting firm, K2. FE 5 explained that the contractors agreed that Silvergate lacked the appropriate controls around due diligence and KYC, and his team used their analyses to write up procedures. FE 5 explained that he and his team worked on the procedures and had to give them to regulators by June 20, 2022. FE 5 explained that Silvergate rolled out the new diligence processes on August 15, 2022.

355. FE 5 agreed that, prior to August 15, 2022, Silvergate did not know its customers. FE 5 also agreed that, prior to August 15, 2022, Silvergate did not review potential customers at the onboarding stage to determine whether they had an appropriate culture of compliance. He knows this because, in his role at the Company, he read narratives and cases and was finding "all the garbage that was slopped through." When he looked at Silvergate's paperwork from before August 2022, FE 5 could not tell who the customer was, what they did, what the sources of wealth were, or where the jurisdictions were, and the flow of funds did not make sense. FE 5 added that, before May 2022, the Bank never said "no" to a client, which he knows from his looking at the Company's records. FE 5 further explained that there was no record of any prospective client ever not being approved by Silvergate.

356. FE 5 also agreed that, prior to August 15, 2022, when employees raised concerns about or identified suspicious or anomalous activity, Silvergate did not do anything about it. FE 5 further agreed that, before August 15, 2022, Silvergate lacked a focus on compliance.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-132-

Case No. 22-cv-01936

357. FE 5 explained that, specifically with regard to Binance, there were a lot of red flags. Among them, Binance had a big issue with the "wire rule." The "wire rule" provides that you are supposed to include certain information in a wire when you complete it, including the originator and where the funds are going. FE 5 explained that there were a lot of wires with Binance and Silvergate's other crypto-exchange customers where the information was just blank. FE 5 explained that Silvergate was supposed to reject those or strongly discipline customers, including suspending their accounts, and insist customers include the information. But, FE 5 explained, nobody at Silvergate took a hard enough line with customers to say Silvergate was going to suspend accounts unless customers included all the information on the wires. FE 5 noted that this continued to be a problem even after August 15, 2022.

358. FE 5 agreed that, prior to August 15, 2022, Silvergate did not do site visits. FE 5 noted that there was also nothing written in Silvergate's procedure for site visits anywhere. FE 5 said site visits are important to make sure a company is real and not a shell company or a front. FE 5 elaborated with an example: if a company says it is a gas station, you need to make sure it is actually a gas station, that there are things on the shelves and people work there. You need to make sure it is not just a dusty shop where nothing has been moved that is a front for drug money. FE 5 agreed that it was shocking that Silvergate did not conduct site visits, adding that if you would not travel to where the prospective customer is located, then you should not do business with a customer located there.

359. FE 5 explained that, following its receipt of the MRIAs and with the Federal Reserve breathing down its neck, Silvergate put in place new procedures on August 15, 2022. Following the implementation of Silvergate's new procedures on August 15, 2022, FE 5's team wanted to go through any customers that had not gone through Silvergate's new onboarding process when those customers were previously onboarded and have an automatic look back apply the new procedures for those

customers as if those customers were being onboarded anew. FE 5 explained that Silvergate did not do that, even though FE 5's boss agreed with the recommendation that Silvergate should. FE 5 explained it would be industry standard for Silvergate to look back and apply the new procedures as if they were new customers; yet, Silvergate did not do this.

360. In addition to these former employee accounts, the fact that Silvergate failed to perform onboarding due diligence is corroborated by the various sham entities that the Company onboarded. If Silvergate had conducted the diligence represented in the 2021 Offering Documents, these entities never would have been allowed to bank at Silvergate and participate on the SEN Network.

361. *FTX* was a cryptocurrency exchange founded by the now-infamous fraudster, Sam Bankman-Fried. Silvergate approved FTX to participate on its SEN Network. FTX and its related entities (North Dimension and Alameda) comprised approximately $2.1 billion in deposits—*i.e.*, over 17% of Silvergate's overall, Bank-wide deposits.[193] Had Silvergate conducted the represented diligence, it would have discovered that FTX and its entities were frauds with no compliance or internal controls. Silvergate would also have learned the truth about Alameda. FTX and Alameda are separate legal entities and, accordingly, supposed to—and legally required by law to—operate independently; however, in reality, FTX and Alameda were operated as if they were one and the same. Bankman-Fried controlled both entities, and both entities shared the same address—2000 Center Street, Suite 400, Berkeley, California.

---

[193] On November 16, 2022, Silvergate issued a press release disclosing that as of November 15, 2022, its "[a]verage quarter-to-date digital asset customer deposits" were "approximately $9.8 billion, excluding all deposits from FTX and its related entities." This was a $2.1 billion reduction from the $11.9 billion that the Company had reported five days earlier for "deposits from all digital assets customers," which included FTX deposits. *Compare* Press Release, "Silvergate Provides Statements on FTX Exposure (Nov. 11, 2022) *with*, Press Release, "Silvergate Provides Mid-Quarter Update and Announces Participation in Oppenheimer's 5th Blockchain & Digital Assets Summit" (Nov. 16, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -134-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        Case No. 22-cv-01936

362. The fact that FTX was a complete ruse would have been obvious to Silvergate, had it actually conducted the represented diligence. FTX had no CFO, a wildly inexperienced C-suite of Bankman-Fried's cronies, and a Chief Regulatory Officer who had been caught on tape aiding and abetting fraud in his previous position as General Counsel of Ultimate Bet, an online gambling site.[194] Bankman-Fried ran the multibillion-dollar cryptocurrency exchange as a "personal fiefdom."[195]

363. As FTX's new CEO, John Ray, has detailed in his testimony to Congress: at FTX, there was an "absolute concentration of control in the hands of a very small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money or assets."[196] Additionally, FTX "did not keep appropriate books and records, or security controls, with respect to its digital assets." Mr. Ray added, "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." This is a strong statement coming from Ray, who has "over 40 years of legal and restructuring experience" and has overseen the clean-up of "several of the largest corporate failures in history," including being hired to guide Enron through its bankruptcy proceedings 20 years ago.

364. Mr. Ray admitted in his testimony to Congress that, at FTX, "there was an absence of any management. You need records, you need controls, and you need to separate people's money. It's simple." When asked if FTX had significant risk

---

[194] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022); *Business Insider*, "Chamath Palihapitiya said Sam Bankman-Fried once pitched him, but after the investor suggested changes like forming a board, FTX told him to get lost" (Nov. 15, 2022).

[195] Law360, "FTX Pledges Better Books, Celsius Faulted for Asset Mingling" (Nov. 23, 2022).

[196] Written Testimony of Mr. John J. Ray III, CEO, FTX Debtors, House Financial Services Committee (Dec. 13, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-135-

Case No. 22-cv-01936

management systems, Ray responded that "there were virtually no internal controls and no separateness whatsoever" between FTX and another, Bankman-Fried owned Company and Silvergate client, Alameda, the parent company of North Dimension. He further testified that Bankman-Fried owned 90% of Alameda and there was "no distinction whatsoever" in governance between FTX and Alameda.[197]

365. Asked to compare the FTX fraud to prior corporate disasters he has cleaned up, Mr. Ray said that FTX's collapse "is unusual in the sense that literally there's no record-keeping whatsoever [at FTX]. Mr. Ray added, in amazement: "They use[d] Quickbooks. A multibillion-dollar company using Quickbooks." He elaborated that FTX "used QuickBooks as their accounting system and relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities."[198] Worse yet, Ray has now documented that "[a]pproximately 80,000 transactions were simply left as unprocessed accounting entries in catch-all QuickBooks accounts titled 'Ask My Accountant.'" Mr. Ray concluded that FTX is "one of the worst [entities] from a documentation standpoint" and "[i]t's really unprecedented in terms of the lack of documentation."[199]

366. Bankman-Fried has himself now publicly admitted that he made zero effort to manage risk at FTX: "I wasn't even trying, like, I wasn't spending any time

---

[197] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

[198] Ray explained "QuickBooks was not designed to address the needs of a large and complex business like that of the FTX Group, which handled billions of dollars of securities, fiat currency, and cryptocurrency transactions across multiple continents and platforms," First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov 11, 2022), ECF No. 1241-1 at 13.

[199] Investigating the Collapse of FTX, Part I: Hearing Before the House Financial Services Committee, 117th Cong. (2022) (Testimony of Mr. John J. Ray III CEO, FTX).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-136-
Case No. 22-cv-01936

or effort trying to manage risk on FTX."[200]  He added, "If I had been spending an hour a day thinking about risk management on FTX, I don't think [the collapse of FTX] would have happened."[201]  Bankman-Fried has also admitted that there was a "massive failure of oversight of risk management" at FTX.[202]  And FTX's new CEO, Mr. Ray, has confirmed these admissions, testifying that FTX's systems for accounting, audit, cash management, cybersecurity, risk management, and data protection "did not exist to an appropriate degree" or "did not exist" at all.[203]

367.    These stark admissions from FTX's most senior insiders about FTX's complete absence of any internal compliance programs are directly contrary to Silvergate's statements in the 2021 Offering Documents that Silvergate performed onboarding due diligence on its customers.

368.    *North Dimension* was a fake online electronics retailer, that Bankman-Fried founded in August 2020 to receive customer funds for FTX at Silvergate. Silvergate approved North Dimension to participate on its SEN Network.  Had Silvergate conducted the represented diligence described in the 2021 Offering Documents, it also would have discovered that North Dimension was a sham.  On its website, North Dimension claimed to sell mobile phones, laptops, watches and other personal electronics; yet, in reality, there was no actual way to purchase anything from North Dimension.  Clicking the links on its website to buy products "sold" at North Dimension generated a typo-filled, incoherent pop-up response to "Get A Quote," which stated: "Fee [sic] free to send a message. We collaborate with ambitious brands and people; we'd love to build something great together."[204]

---

[200] *Wall Street Journal*, "Sam Bankman-Fried 'Wasn't Even Trying' to Manage Risk at FTX, He Says" (Dec. 1, 2022).
[201] *Id.*
[202] *Id.*
[203] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.
[204] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).

**Figure 10.** Screenshot of North Dimension's website.[205]

369. If that was not enough, North Dimension's address, which was listed in plain sight on its website, was the <u>same</u> address as FTX's address: 2000 Center St., Suite 400 Berkeley California. Worse yet, as *NBC* would later note following its investigation, North Dimension's website was "rife with misspellings and bizarre product prices; for example, item listings sometimes showed 'sale' prices that were hundreds of dollars above a regular price."[206] The "About Us" section of North Dimension's website displayed text that "may have been written by a not-too-smart artificial intelligence," with North Dimension describing itself as a "World top E-commerce site for consumer electronics in order to provide the lowest costs for authentic items from the world's most reputable brands."[207]

---

[205] Web archive of North Dimension's website (as of Nov. 11, 2022).
[206] *NBC News*, "This little-known firm with a weird website was central to the misappropriation of FTX customers' money, regulators say" (Dec. 27, 2022).
[207] *Cointelegraph*, "Here's what SBF's fake electronics outlet 'North Dimension' looks like" (Dec. 30, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -138-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          Case No. 22-cv-01936



**Figure 11.** Screenshots of North Dimension's website.[208]

370. In addition to not actually selling electronics products and being rife with misspellings, North Dimension's item listings for known products showed "sale" prices that were often hundreds of dollars above the "regular" price. For example, an 11-inch iPad (again misspelled)—listed as a "Cell Phone"—inexplicably displayed a "sale" price of $899 and an "original" price of $410.

**Figure 12.** Screenshot of North Dimension's website.[209]

371. Far from an "online electronics retailer," North Dimension was an utter sham created and controlled by FTX's CEO, Sam Bankman-Fried, to fraudulently

---

[208] Web archive of North Dimension's website (Nov. 11, 2022).
[209] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-139-
Case No. 22-cv-01936

divert billions of dollars of customer funds intended for FTX. North Dimension had no employees, other than Bankman-Fried, and no physical location. It had no actual business operations outside of its bank account at Silvergate and was nothing more than a Silvergate-approved sham allowed to fleece innocent customers out of billions of their hard-earned dollars.

372. **_Binance_** was a cryptocurrency exchange, with approximately one-third of its users based in the United States. Notwithstanding its substantial U.S.-customer base, Binance did not register with the Treasury Department, as is required by the Bank Secrecy Act for "financial companies with 'substantial' business in the United States."[210] Instead, Binance and its owner, Zhaou Changpeng, created Binance.US—a U.S.-based exchange. Binance.US. then registered itself with the Treasury Department, representing that Binance.US was "fully independent" from Binance.

373. Silvergate approved Binance.US to join its SEN Network in November 2020.[211] Silvergate did not perform due diligence on Binance.US. before it permitted it to join the SEN Network. Those who have conducted due diligence on Binance.US have readily uncovered facts demonstrating that it is <u>not</u> "fully independent" from Binance; in fact, they are one and the same. As U.S. senators explained in a bipartisan letter, "While Mr. Zhao has claimed that Binance.US, is a 'fully independent entity,' in reality, he controls the company as a '_de facto_ subsidiary' of Binance," with "Binance's Cayman Islands holding company ke[eping] custody of Binance.US customers' digital wallets."[212] The _Wall Street Journal_ likewise found that "Binance and Binance.US have been much more

---

[210] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[211] _Reuters_, "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

[212] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-140-
Case No. 22-cv-01936

intertwined than the companies have disclosed, mixing staff and finances and sharing an affiliated entity that bought and sold cryptocurrencies."[213] *Reuters* also concluded that "Binance created Binance.US as a *de facto* subsidiary in 2019 in order to draw the scrutiny of U.S. regulators away from the global exchange."

374. If it had conducted the due diligence represented in the 2021 Offering Documents, Silvergate would also have learned that Binance and its executives controlled Binance.US's finances at Silvergate. When it conducted its review, *Reuters* readily found evidence that Binance's executives, including its finance executive Susan Li, had access to Binance.US's Silvergate account. The bipartisan group of U.S. senators similarly concluded that, "in truth, 'the global Binance exchange, which is not licensed to operate in the United States, controlled the finances of Binance.US, despite maintaining that the American entity is entirely independent and operates as its 'US Partner.'"[214]

375. Had Silvergate actually performed the represented due diligence on these entities (as it told investors it had), it would have realized that they were nothing more than sham entities created to evade U.S. laws and funnel funds from Binance.US to Binance and Zhao. Indeed, "Mr. Zhao 'decline[d] to disclose the location or entity behind his own exchange [at Binance]' in what many regard as a blatant attempt to dodge the world's financial regulators, serve 'users without licenses,' and violate anti-money laundering laws."[215]

---

[213] *Wall Street Journal*, "Texts From Crypto Giant Binance Reveal Plan to Elude U.S. Authorities" (Mar. 5, 2023).

[214] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

[215] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-141-
Case No. 22-cv-01936

376. Additionally, a simple "site visit" to the address provided for Key Vision Development Limited (Office 22 Alpha Centre, Providence, Mahe, Seychelles), or even a search using "Google Earth" for the address, would have made plain that it was the address for a massive warehouse—not the business office of an entity transacting in hundreds of millions of dollars in cryptocurrency:

 

**Figure 13.** Images of Key Vision Limited Development's purported address.[216]

377. ***Huobi Global*** was a Seychelles-based cryptocurrency exchange, founded in China. Silvergate approved Huobi to participate on its SEN Network. Had Silvergate conducted the diligence represented in the 2021 Offering Documents, it would have discovered a slew of troubling facts, including that Huobi lacked compliance controls. For example, in December 2020, investigators at the forensics company CipherBlade conducted a review of Huobi's controls. Their review "demonstrated how simple it was to create false accounts" at Huobi and transact on the exchange, which created conditions ripe for money laundering and other illegal transfers.[217] As CipherBlade found, exchange participants at Huobi

---

[216] Post by Stefan Luebeck, a cryptocurrency market analyst at BTC-ECHO, dated Feb. 16, 2023; Google Earth Image Search.

[217] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

could wire funds using phony information, including obviously false names and photographs of themselves, such as "Taylor Swift" and "Borat." Other investigators similarly concluded that Huobi "fail[ed] to perform stringent background checks" and "know-your-customer (KYC) processes" on customers, making it a "'gateway for money laundering and other gray activities.'"[218]

378. If Silvergate had actually conducted due diligence on Huobi, it also would have found that "Huobi Global had not taken any action against the links that were made between Huobi and the darknet marketplace Hydra."[219] In October 2021, investigators of the National Bureau of Economic Research in Cambridge, Massachusetts issued a report "show[ing] that the highest volume entities interacting directly with Hydra Market users are non-KYC exchanges, including Binance and Huobi which are two of the largest exchanges worldwide."[220] The DOJ has described Hydra as "the world's largest and longest-running darknet market," with Hydra having received in total around $5.2 billion in cryptocurrency.[221] Aurelius Capital Value rightfully summed it up correctly when it questioned Silvergate associating with Huobi: it is impossible "to find a way to harmonize the formal due diligence procedure that Silvergate uses with Huobi's onboarding process."[222]

379. *Nexo Capital Inc.* was a cryptocurrency lending firm that Silvergate also approved to bank and operate on its SEN Network. Silvergate did not perform the represented due diligence on Nexo. Had Silvergate performed the due diligence on Nexo represented in the 2021 Offering Documents, it would have learned that

---

[218] *Verdict*, "Dirty bitcoin: Exchanges' KYC laxity eases money laundering – report" (Oct. 27, 2021).

[219] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

[220] National Bureau of Economic Research, *Blockchain Analysis of the Bitcoin Market*, (October 2021).

[221] Press Release, DOJ, "Justice Department Investigation Leads to Shutdown of Largest Online Darknet Marketplace" (Apr. 5, 2022).

[222] *Coin Edition*, "Investigator Questions Huobi Global's Defective KYC Policies" (Dec. 30, 2022).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-143-

Case No. 22-cv-01936

Nexo failed to register with the SEC, as required by law. Following its review of Nexo, the SEC "charged Nexo with failing to register its retail crypto lending product before offering it to the public, bypassing essential disclosure requirements designed to protect investors." Prosecutors that have conducted due diligence on Nexo have also learned, as reported by *Reuters*, that "Nexo has been operating through many companies, many of which were just 'post boxes.'"[223] The SEC has forced Nexo to cease and desist, with Nexo required to pay $45 million in fines to the SEC and state regulators.[224]

380. ***Miles Guo*** (a/k/a Ho Wan Kwok) owned two entities approved by Silvergate: "Hamilton Opportunity Fund SPC" and "Hamilton Investment Management Ltd." Silvergate did not perform the represented due diligence on Guo or his entities. Had Silvergate performed the represented due diligence on Guo or his entities, it would have found what the SEC and others readily discovered: "Guo was a serial fraudster" who "took advantage of the hype and allure surrounding crypto and other investments to victimize thousands and fund his and his family's lavish lifestyle."[225] Guo—who is currently under arrest in the United States—operated through "fraudulent and fictious businesses" that "connected dozens of interrelated entities," allowing Guo "to solicit, launder, and misappropriate victim funds."[226] On September 18, 2022, the DOJ seized over $389 million from Guo's accounts at Silvergate, including Hamilton Opportunity Fund SPC (Silvergate Account Numbers: 5090037713, 5090037705, 5090037754, 5090042770,

---

[223] *Reuters*, "Bulgaria launches probe of crypto lender Nexo, raids sites" (Jan. 12, 2023).

[224] Press Release, SEC, "Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product" (Jan. 19, 2023).

[225] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023).

[226] Sealed Indictment, *United States v. Ho Wan Kwok*, No. 23-cr-118 (S.D.N.Y. Mar. 6, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT -144-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS Case No. 22-cv-01936

5090042762, 5090042853, 5090037739, 5090042853) and Hamilton Investment Management Ltd. (Silvergate Account Number: 5090030288).[227]

381. ***Virgil Sigma Fund LP and VQR Multistrategy Fund LP*** were two cryptocurrency hedge funds run by convicted felon Stefan Qin. Both entities were also approved by Silvergate to participate on the SEN Network and authorized to set up twelve accounts at Silvergate.[228] Silvergate did not perform the represented due diligence on these Silvergate-approved entities. Had Silvergate conducted the due diligence it represented, it would have discovered that these entities operated a Ponzi scheme. When the New York Field Office of Homeland Security Investigations Unit reviewed these entities, they readily found that "Virgil Sigma and VQR, two multimillion-dollar cryptocurrency investment funds, were . . . slush funds for Qin to live his extravagant lifestyle. Qin orchestrated this reprehensible criminal scheme for many years, making misrepresentations and false promises that coaxed investors into pouring millions of dollars into fraudulent cryptocurrency firms, all the while stealing the hard-earned money of his investors."[229]

382. ***Bittrex, Inc.*** was a cryptocurrency exchange that Silvergate approved for its SEN Network and specifically highlighted, by name, on its website as one of its major customers. Silvergate did not conduct the due diligence on Bittrex that it represented to investors in the 2021 Offering Documents. Had Silvergate actually conducted due diligence of Bittrex, it would have discovered, as the Treasury Department has found, that Bittrex "violated multiple sanctions programs and failed

---

[227] Press Release, SEC, "SEC Charges Exiled Chinese Businessman Miles Guo and His Financial Advisor William Je in $850 Million Fraud Scheme" (Mar. 15, 2023); Press Release, USAO SDNY "Ho Wan Kwok, A/K/A "Miles Guo," Arrested For Orchestrating Over $1 Billion Dollar Fraud Conspiracy" (Mar. 15, 2023).

[228] *Business Insider*, "Silvergate had close ties to Sam Bankman-Fried's FTX and Alameda. The crypto bank was also reportedly a favorite of other troubled clients including an Australian Ponzi criminal" (Jan. 24, 2023).

[229] Press Release, USAO SDNY, "Founder Of $90 Million Cryptocurrency Hedge Fund Charged With Securities Fraud And Pleads Guilty In Federal Court" (Feb. 4, 2021).

to adequately guard against money laundering." Among other things, Bittrex "failed to have a proper anti-money laundering program" and "unnecessarily exposed the U.S. financial system to threat actors."[230] Bittrex has now been required to pay $53 million for violating multiple U.S. sanctions programs, which was "the biggest fine on a crypto business by the Treasury Department."

383. In sum, if Silvergate had conducted the "extensive regulatory compliance diligence" and "thorough reviews . . . as part of [its] due diligence process" in connection with its "onboarding new customers" that it told investors it had in the 2021 Offering Documents (but which it had not), Silvergate would have seen—as investigators and U.S. senators uniformly have—that these entities were shams and should never have been allowed to participate on the SEN Network.

384. **Second**, Silvergate did not perform ongoing transaction monitoring of its SEN Network participants or "enhanced due diligence" of its cryptocurrency-exchange customers. Indeed, when asked whether Silvergate conducted enhanced ongoing monitoring, FE 3 replied, "Absolutely not." When asked whether Silvergate conducted enhanced due diligence, FE 3 replied, "Absolutely not." And as far as FE 3 was aware, "customer risk scoring, with risk factors specific to the digital-currency industry" did not exist at Silvergate, and she explained that, in her position at the Bank, she would expect to be aware of such a process, if it existed. FE 3 was in meetings with Lane and his direct reports; there was never anything stated about compliance during these regular meetings.

385. Likewise, FE 1 also did not see Silvergate monitoring of clients on the SEN Network. When asked whether FE 1 had seen "extensive regulatory compliance diligence" performed by Silvergate during her time at the Bank, FE 1 replied, "I did not." When asked whether she had seen Silvergate perform any type of "enhanced procedures to screen and monitor [crypto customers]" during her time

---

[230] *Decrypt*, "Treasury Fines Crypto Exchange Bittrex $53 Million for Sanctions Violations" (Oct. 11, 2022).

at Silvergate, she replied, "I did not." When asked whether Silvergate "comprehensively investigat[ed] prospective customers" or conducted "customer risk scoring with risk factors specific to the digital-currency industry," FE 1 stated that she was not aware of any of that occurring at Silvergate.

386. FE 1 also knew Silvergate had no ongoing monitoring because employees never received the training to do it. FE 1 does not recall Silvergate having the employees take tests on KYC or anything else compliance-related. Nor does FE 1 recall any training regarding KYC or specific crypto related compliance issues.

387. When asked whether FE 1 had seen Silvergate conduct "thorough reviews we conduct as part of our due diligence process . . . designed to detect any such illicit activities conducted by our potential or existing customers [and] in the case of digital currency exchanges, their customers" during her time at Silvergate, FE 1 replied, "I did not." Likewise, when asked whether she had seen Silvergate engage in "ongoing monitoring of customer activities and evaluating a market participant's ability to actively monitor the flow of funds of their own customers" or "system monitoring rules tailored to digital currency activities," FE 1 replied, "I did not."

388. Silvergate also had no system of red flags. When asked about Silvergate's public statements that it had a "system of red flags specific to various customer types and activities," FE 3 explained that Silvergate had purchased an AML software to do this, but it was never implemented. FE 3 explained that the AML software was supposed to flag customer activity with sanctioned countries, excessive cash transactions, and other kinds of alerts; and the Company would be able to set the parameters on what the software should flag. None of that was being done at Silvergate, explained FE 3. FE 3 added that, during meetings, she heard it noted that the implementation of the AML software would be a project at some point, but it was never put on the active project list. Further corroborating FE 3's account,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-147-
Case No. 22-cv-01936

when asked whether she had seen "a system of 'red flags' specific to various customer types and activities," FE 1 replied, "I did not."

389. FE 3 asked her colleagues in 2022 whether Silvergate was doing anomaly detection—*i.e.*, looking for suspicious activity. She was told that they were not. FE 3 then tried to create a report, based on a manual review, that would detect anomalous activity. FE 3 recounted, however, there was no one to tell even if her team found suspicious activity, because, "Nobody cared." FE 3 confirmed that—outside of her failed manual attempt—Silvergate did not perform any anomaly detection.

390. FE 2 explained that about half of Silvergate's customers were not even known by the Bank.[231] He would ask people at Silvergate what a business did, who the owners were, and what the management structure was, and Silvergate did not have that information. Based on his experience and understanding, Silvergate banked everyone who wanted to be a customer and it seemed to bank everyone regardless of what their compliance programs were like. FE 2 confirmed that any diligence was a "check the box" activity. FE 2 reported he and his fellow analysts felt like they were checking boxes for the sake of it without the Bank actually being mindful of the risk they were absorbing.

391. FE 2 stated that in his experience, Silvergate did not have a deep-rooted commitment to compliance and said that he does not believe a lot of action was taken regarding suspicious activity. FE 2 explained that everyone in his department, including FE 2, mentioned concerns with respect to compliance to Jennifer Steinbock, a "BSA/Compliance Manager." FE 2 recalled that he and his colleagues knew that there was frustration on the part of Steinbock regarding customers they believed should be exited, but would not be by order of Silvergate's Chief Operating

---

[231] FE 2 worked at Silvergate from October 2017 to June 2019 as a "BSA Analyst," reporting to Jennifer Steinbock.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-148-
Case No. 22-cv-01936

Officer. FE 2 agreed that determinations that the identified suspicious activity was "normal" were not justified and just an effort by Silvergate to keep the business.

392. FE 2 remembers asking his Silvergate colleagues so many times, how many of these suspicious reports are we going to absorb, and he was told they would just keep re-reviewing them forever. FE 2 explained that no Silvergate customer accounts were ever closed.

393. FE 2 explained that he left Silvergate because he did not feel they had a culture of compliance.

394. FE 4's account further corroborates Silvergate's lack of any ongoing monitoring of its customers. FE 4 reported that when Silvergate received reports from customers and other banks of unauthorized transactions, the Bank would not investigate.[232] FE 4 explained that even when the originating bank would tell Silvergate that the client had said a transaction was unauthorized, Silvergate did not investigate. FE 4 said receiving these unauthorized transaction requests were a red flag but there was never any investigation by Silvergate to determine what happened with unauthorized transactions.

395. In addition to these former employee accounts, the fact that Silvergate failed to perform ongoing monitoring of its customer activity is further corroborated by the fraudulent activities that cryptocurrency exchange customers performed on the SEN Network, and the findings of the Federal Reserve, U.S. senators, and investigative journalists.

396. ***FTX, Alameda, and North Dimension.*** Silvergate did <u>not</u> conduct ongoing monitoring of FTX or its related entities. Instead, Silvergate allowed Sam Bankman-Fried to use FTX and his other entities to dupe innocent customers out of billions of dollars. Sam Bankman-Fried's and FTX's fraud of their customers was

---

[232] FE 4 worked at Silvergate from February 2011 to July 2021 as "VP of Deposit Operations." She reported to Dina Matias, Silvergate's "Senior Vice President, Operations Administrator," who reported to Elaine Hetrick, Silvergate's Chief Administrative Officer.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT -149-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                Case No. 22-cv-01936

simple. When customers wished to purchase cryptocurrency from FTX's account, they were directed to wire their fiat currency into the Silvergate-approved accounts of two entities that were <u>not</u> FTX—specifically, they were directed to wire their funds to "North Dimension" and "Alameda." None the wiser, innocent FTX customers wired more than $8 billion to the Silvergate-approved accounts of North Dimension and Alameda.[233] FTX's CEO, Sam Bankman-Fried, then absconded with those dollars from Silvergate, without crediting the customers' cryptocurrency accounts at FTX. Once FTX collapsed, FTX customers were left empty-handed and unable to free their money.

397. FTX and Alameda did not even have an accounting department.[234] Rather than being safely kept at Silvergate, FTX customer funds were diverted to Alameda and North Dimension, and then "used to purchase homes and other personal items for [Silvergate] employees and advisors" in the Bahamas. When FTX employees wanted to make such purchases, they needed only to "submit[] payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis."[235] "These informal, ephemeral messaging systems were used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all." Alameda even "had difficulty understanding what its positions were, let alone hedging or accounting for them," Ray has reported, including that "a June 2022 'Portfolio summary' purporting to model cryptocurrency positions held by Alameda Research stated, with respect to valuation inputs for certain tokens, that Alameda personnel should 'come up with some numbers? idk.'" As observed by Federico Lascano of Fiducient Advisors, the lack of "cash controls" at FTX "enabled

---

[233] *Vox*, "Sam Bankman-Fried tries to explain himself" (Nov. 16, 2022).
[234] Declaration of John R. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068-JTD (Bankr. D. Del. Nov. 17, 2022), ECF No. 24.
[235] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     -150-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     Case No. 22-cv-01936

customer funds to be freely transferred to Alameda," and "would have been an enormous red flag during the operational due diligence process."[236]

398. FE 3 also handled wire limit changes for FTX, Alameda, and North Dimension. FE 3 saw no ongoing monitoring of FTX, Alameda, or North Dimension. In her role, she would at least be aware of such monitoring if it existed, said FE 3. FE 3 explained that this monitoring should have included currency transaction reports, wire volumes, wire destinations, ACH exceeding limits, invalid or unauthorized return rates, and SEC codes, and activity between accounts.

399. A bipartisan group of senators on the U.S. Senate Banking Committee later explained in a December 5, 2022 bipartisan letter to Defendant Lane: "Your bank's involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients."[237]

400. ***Binance***: Silvergate additionally failed to monitor Binance.US's activity, allowing transfers of hundreds of millions of dollars to the other entities of Binance's CEO, Zhao, without the permission—or even the knowledge—of Binance.US's employees. As *Reuters* revealed, beginning in late 2020, $400 million of funds at Silvergate were transferred from Binance.US to a separate account controlled by Zhao "without [Binance.US's] knowledge."[238] Funds were moved from Binance.US's account at Silvergate Bank to "Merit Peak," another shell entity owned approved by Silvergate. Merit Peak then transferred funds to "Key Vision

---

[236] *Fiducient Advisors*, "FTX – Lessons Learned from a Lack of Due Diligence" (Dec. 19, 2022). Mr. Lascano researches and performs operational due diligence on alternative investment managers. Prior to joining Fudicient Advisors in 2022, Mr. Lascano worked in regulatory finance at NatWest Markets, the investment banking arm of NatWest Group based in the United Kingdom.

[237] Letter from Warren, Kennedy, and Marshall to Lane (Dec. 5, 2022).

[238] *Reuters,* "Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao" (Feb. 16, 2023).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-151-
Case No. 22-cv-01936

Development Limited," yet another sham entity that "held an account at Silvergate at the time" and that also "identified CEO Zhao as a director."[239]

401. Had Silvergate actually performed the due diligence it represented to investors, it would also have discovered that these entities lack a compliance program. Binance is, as the U.S. senators explained in their March 2023 bipartisan letter, "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders." This conclusion is well-founded: "crypto researcher Chainalysis, hired by U.S. government agencies to track illegal flows, concluded in a 2020 report that Binance received criminal funds totaling $770 million in 2019 alone, more than any other crypto exchange."[240] Even more, Binance's own Chief Compliance Officer admitted that its KYC checks were "weak", with Binance's CEO (Mr. Zhao) wanting "no kyc." "Binance.US was also in on the scheme: 'Almost half the U.S. compliance team quit by mid-2022 after a new U.S. boss was appointed by Zhao, . . . because the new chief pushed them to register users so swiftly that they couldn't conduct proper money laundering checks.'"[241] In fact, Binance.US executives directed compliance personnel to "apply more lenient checks" to "VIP customers" who had been referred to the platform to increase its liquidity. The U.S. senators further concluded that Binance maintained a "laughably weak anti-money laundering compliance program," with *Reuters* similarly finding that "the main Binance exchange let users open accounts and trade crypto anonymously by merely providing an email address."

402. Silvergate would have found—as investigators and U.S. senators uniformly have—that "Binance and its related entities have purposefully evaded

---

[239] *Id.*

[240] *Reuters*, "How crypto giant Binance became a hub for hackers, fraudsters and drug traffickers" (June 6, 2022).

[241] Letter from Senators Warren, Van Hollen, and Marshall to Zhao and Shroder (Mar. 1, 2023).

regulators, moved assets to criminals and sanctions evaders, and hidden basic financial information from its customers and the public."[242]

403. ***Paxos and OSL Digital*** are cryptocurrency exchanges approved by Silvergate. The Bank did not conduct the represented due diligence on either of these cryptocurrency exchanges or monitor their activity. As a result, these exchanges were able to launder $425 million between September 2021 and June 2022 from accounts held at Silvergate—namely, Paxos Global PTE LTD; Paxos Trust Company LLC; OSL Digital LTD; and OSL SG PTE LTD.[243] Had Silvergate conducted the represented "ongoing monitoring" of the activity on its SEN Network, it would have detected the money laundering and not approved the cryptocurrency exchanges that facilitated such illegal activity.

404. Florida's Money Laundering Task Force ("MLTF") conducted a review of "the records produced by Silvergate Bank" for these cryptocurrency exchanges.[244] MLTF readily found that these exchanges facilitated "the laundering of illicit funds." The Deputy Sheriff of Broward County, assigned to the MLTF, submitted an affidavit on August 23, 2022, following his review of the "the records produced by Silvergate Bank" and concluded that:

> "During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms [at Silvergate] into accounts held at different U.S. banks."

> "The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized . . . by the [Broward County Sheriff's Office Strategic Investigations Division, Money

---

[242] *Id.*

[243] *CryptoSlate*, "Silvergate records reveal $425M in transfers to South American money launderers" (Nov. 16, 2022).

[244] "Affidavit in Support of Probable Cause for Forfeiture," *In re: Seizure of Two Million Forty-Eight Thousand Two Hundred Twenty-Nine Dollars and 48/100 ($2,048,229.48) in United States Currency*, No. CACE-22-012446 (Cir. Ct., 17th Jud. Cir., Broward Cnty., Fla.).

Laundering Task Force] for being used to facilitate the laundering of illicit funds."

"In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same [Silvergate] records."

"In general, these companies all appeared to be shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details . . . ."[245]

405. Had Silvergate actually monitored the activity on its platform (as it represented it had), it would have identified that these entities' transactions "were not consistent with the transaction patterns of thousands of other persons and businesses" and recognized that hundreds of millions of dollars was being wired from the Silvergate-approved exchanges to "shell companies, recently formed, with multiple things in common such as address, corporate officers, and other details."[246]

406. If Silvergate had conducted the "extensive regulatory compliance diligence" and "ongoing monitoring of customer activities" that it told investors it had in the 2021 Offering Documents (but which it had not), Silvergate would have seen—as investigators and U.S. senators uniformly have—the myriad "red flags" caused by these entities' transaction activity on the SEN Network.

## XIV.     THE MISSTATEMENTS AND OMISSIONS WERE MATERIAL

407. The challenged statements in the 2021 Offering Documents are material. Facts demonstrating that the statements are material include:

---

[245] *Id.*
[246] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-154-

Case No. 22-cv-01936

408. ***First***, the Company, itself, has admitted the materiality of the misrepresented facts. In its Annual Report filed with the SEC on Form 10-K, Silvergate stated that its represented compliance procedures provided "a distinct competitive advantage for [the Bank], and provide a meaningful barrier to entry against [its] potential competitors."[247] Silvergate further stated that its SEN Network was "[i]nstrumental to [Silvergate's] leadership position and growth strategy," and the SEN Network "enabled [Silvergate] to focus on significantly growing [its] noninterest bearing deposit product for digital currency industry participants," which provided Silvergate with "the majority of [its] funding over the last two years."

409. ***Second***, Silvergate's representations about its vetting, diligence, and monitoring were important to analysts. For example, in an October 16, 2020 analyst report recommending that investors "BUY" Silvergate stock, Compass Point included a three-page detailed description of the Bank's "regulatory compliance," "due diligence and onboarding processes," and "selective[ness] in the customer onboarding process," identifying Silvergate's "compliance capabilities" as "a distinct competitive advantage and . . . a meaningful barrier to entry." The analyst report further highlighted the Company's "proprietary compliance capabilities" for "ongoing monitoring of customer activities" and outlined the measures involved in the Company's "due diligence and onboarding processes"—such as "detailed reviews of each customer's ownership, management team, business activities and the geographies in which they operate"—as well as the "more extensive processes" in place for cryptocurrency exchanges, including "reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding the Bank Secrecy Act (BSA), consumer compliance, information security, Dodd-Frank Wall Street Reform and Consumer

---

[247] Silvergate, Annual Report (Mar. 10, 2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-155-

Case No. 22-cv-01936

Protection Act, prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

410. Additionally, a December 2, 2020 Craig-Hallum analyst report advising investors to "BUY" Silvergate stock stated that Silvergate's SEN Network was the "centerpiece" of the Bank and, as it grew, "it became a de-facto due-diligence arm and quasi-gate keeper." Similarly, in a December 2021 report, J.P. Morgan analysts noted that, "[w]ith Silvergate completing due diligence related to KYC and AML (when it onboards new clients to the SEN platform), the company effectively reduces counterparty risks for its clients."

411. *Third*, Silvergate's purported compliance procedures were critical to Silvergate's ability to secure bank deposits. Silvergate's stated adherence to strict standards attracted customers by supposedly reducing counterparty risk. As analysts at Wedbush observed, the SEN Network purported to solve "major issues that had existed in the digital currency market" by "reducing counterparty risk." A report by analysts at Canaccord Genuity further emphasized, "the core SEN value proposition of removing counter-party risk has become table stakes in institutional crypto trading."

412. *Fourth*, the materiality of the misrepresented and omitted information is further demonstrated by the fact that the Federal Reserve reprimanded Silvergate when it discovered the Bank's failure to vet, perform due diligence on, and monitor its clients. The Federal Reserve went so far, in fact, as to issue a non-public report identifying these deficiencies as "Matters Requiring Immediate Attention"—with which Silvergate's third-party contractors agreed.

413. *Fifth*, the materiality of the misrepresented and omitted facts is further demonstrated by the fact that, after customers learned the truth about Silvergate's failure to conduct the represented diligence and monitoring, its customers pulled their deposits and left the Bank. Cryptocurrency exchange customers such as Coinbase, Galaxy Digital, Paxos, Circle Internet Financial, and Gemini each

announced that they would immediately stop accepting or initiating payments through Silvergate. As a result, on March 8, 2023, Silvergate announced "its intent to wind down operations and voluntarily liquidate the Bank."

414. ***Finally***, the investor reaction to the revelation of the truth about Silvergate's "vetting," "due diligence," and "monitoring" demonstrates the materiality of Defendants' statements. The market was shocked when investors learned that Silvergate failed to perform the compliance and due diligence procedures that the Company had described. As analysts at *Wall Street on Parade* observed, the Bank's eventual admissions at the end of the Class Period "stand[] in rather stark contrast" to Silvergate's statements "lauding how the company is 'built on our deep-rooted commitment and proprietary approach to regulatory compliance.'" Silvergate's stock price has plummeted to approximately $1 per share today—well below the offering price for Silvergate stock.

## XV. CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III - Violations of § 11 of the Securities Act
### in Connection with the 2021 Offerings
### (Against Silvergate, Executive and Director Defendants, and Underwriter Defendants)

415. Plaintiffs repeat and reallege the allegations above in paragraphs 317 to 414 relating only to the Securities Act claims as if fully set forth herein.

416. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the 2021 Offerings, and were damaged thereby. For purposes of this count, Plaintiffs affirmatively state that they do not allege that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent. This claim is based solely in strict liability and negligence.

417. Defendants' liability under this count is predicated on the participation of each Defendant in conducting these Offerings based on the 2021 Offering Documents, which contained untrue statements and omissions of material fact. This count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants named in this count acted with intentional, reckless, or otherwise fraudulent intent.

418. As set forth in its respective PSLRA certification (attached hereto), Bucks County acquired common stock pursuant to the January 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Bucks County purchased 660 shares of Silvergate common stock on January 22, 2021 at the public offering price in the January 2021 Offering.

419. As set forth in their respective PSLRA certifications, Indiana (attached hereto) and Local 793 (ECF No. 16-3) each acquired common stock pursuant to the December 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Indiana purchased 14,200 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering. Local 793 purchased 591 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering.

420. The 2021 Offering Documents all contained the same untrue statements of material fact and all omitted the same facts necessary to make the statements in them not misleading. *See* ¶¶331-36. Each was false and misleading for the same reasons. *See* ¶¶337-406.

421. Through their purchases of shares in the 2021 Offerings and pursuant to the 2021 Offering Documents, which all contained the same misstatements and omissions, Lead Plaintiffs Indiana and Local 793 and Plaintiff Bucks County have standing to bring these claims on behalf of themselves and those persons who also purchased shares in or traceable to the 2021 Offerings.

422. Defendant Silvergate was the issuer for the 2021 Offerings, within the meaning of Section 11 of the Securities Act.

423. The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Lane, Lempres, Martino, Reed, and Sullivan each signed the January 2021 Registration Statement—which formed the January 2021 and March 2021 Offering Documents—as a senior officer and/or director of Silvergate within the meaning of Section 11 of the Securities Act. The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Gupta Lane, Lempres, Martino, Reed, and Sullivan each signed the July 2021 Registration Statement—which formed the July 2021 and December 2021 Offering Documents—as a senior officer and/or director of Silvergate within the meaning of Section 11 of the Securities Act.

424. The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, and Keefe each were underwriters for the January 2021 Offering within the meaning of Section 11 of the Securities Act.

425. The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, Keefe, and Wedbush each were underwriters for the March 2021 Offering within the meaning of Section 11 of the Securities Act.

426. The Underwriter Defendants Citigroup, Goldman, J.P. Morgan, Keefe, and UBS each were underwriters for the July 2021 Offering within the meaning of Section 11 of the Securities Act.

427. The Underwriter Defendants Compass, Craig-Hallum, Goldman, J.P. Morgan, Keefe, and Wedbush each were underwriters for the December 2021 Offering within the meaning of Section 11 of the Securities Act.

428. The Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public which were contained in the 2021 Offering Documents, which misrepresented or failed to disclose the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-159-

Case No. 22-cv-01936

material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

429. In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants named in this count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

430. None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2021 Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

431. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the 2021 Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

432. As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the securities pursuant and/or traceable to the 2021 Offering Documents.

433. By reason of the foregoing, the Defendants named in this Count are liable to the members of the Class who acquired registered securities pursuant to or traceable to the 2021 Offering Documents.

434. This claim was brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the 2021 Offering Documents.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-160-
Case No. 22-cv-01936

## COUNT IV - Violations of § 12(a)(2) of the Securities Act
## in Connection with the 2021 Offerings
## (Against Silvergate, Executive and Director Defendants, and Underwriter
## Defendants)

435. Plaintiffs repeat and reallege the allegations above in paragraphs 317 to 434 relating only to the Securities Act claims as if fully set forth herein.

436. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the 2021 Offerings, and were damaged thereby. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Silvergate or the Underwriter Defendants acted with intentional, reckless, or otherwise fraudulent intent, which are not elements of a Section 12(a)(2) claim. This claim is based solely in strict liability and/or negligence.

437. Defendants' liability under this count is predicated on their statutory liability for making untrue and materially misleading statements or omissions in the 2021 Offerings Documents.

438. Plaintiffs bring this claim on behalf of members of the Class pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Defendant Silvergate and the Underwriter Defendants.

439. The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Lane, Lempres, Martino, Reed, and Sullivan each signed the January 2021 Registration Statement, which formed the January 2021 and March 2021 Offering Documents and contained the January 2021 Prospectus. The Securities Act Executive and Director Defendants Brassfield, Campbell, Colucci, Dircks, Frank, Gupta Lane, Lempres, Martino, Reed, and Sullivan each signed the July 2021 Registration Statement, which formed the July 2021 and December 2021 Offering Documents and contained the July 2021 Prospectus.

440. The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, and Keefe each were underwriters for the January 2021 Offering.

441. The Underwriter Defendants Canaccord, Compass, Craig-Hallum, Goldman, Keefe, and Wedbush were the underwriters for the March 2021 Offering.

442. The Underwriter Defendants Citigroup, Goldman, J.P. Morgan, Keefe, and UBS each were underwriters for the July 2021 Offering.

443. The Underwriter Defendants Compass, Craig-Hallum, Goldman, J.P. Morgan, Keefe, and Wedbush each were underwriters for the December 2021 Offering.

444. The Defendants named in this count were statutory sellers and offerors and/or solicitors of purchases of the Silvergate securities registered in the 2021 Offerings and sold by means of the prospectuses within the 2021 Offering Documents. By means of the defective 2021 Offering Documents, each Defendant named in this count promoted, solicited, and/or sold millions of Silvergate securities to Plaintiffs and members of the Class. Silvergate and the Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, Silvergate and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the 2021 Offerings by means of the materially false and misleading 2021 Offering Documents.

445. Silvergate and the Underwriter Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public which were contained in the 2021 Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

446. As set forth in its respective PSLRA certification (attached hereto), Bucks County acquired common stock pursuant to the January 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged

herein. Bucks County purchased 660 shares of Silvergate common stock on January 22, 2021 at the public offering price in the January 2021 Offering. The misstatements in the January 2021 Offering Documents were repeated in the March 2021, July 2021, and December 2021 Offering Documents.

447. As set forth in their respective PSLRA certifications, Indiana (attached hereto) and Local 793 (ECF No. 16-3) each acquired common stock pursuant to the December 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Indiana purchased 14,200 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering. Local 793 purchased 591 shares of common stock on December 7, 2021 at the public offering price in the December 2021 Offering. The misstatements in the December 2021 Offering Documents were repeated in the January 2021, March 2021 and July 2021 Offering Documents.

448. The 2021 Offering Documents all contained the same untrue statements of material fact and all omitted the same facts necessary to make the statements in them not misleading. *See* ¶¶331-36. Each was false and misleading for the same reasons. *See* ¶¶337-406.

449. Through their purchases of shares in the 2021 Offerings, which all contained the same misstatements and omissions, Lead Plaintiff Indiana and Local 793 and Plaintiff Bucks County have standing to bring these claims on behalf of themselves and those persons who also purchased shares in the 2021 Offerings.

450. In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

451. None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2021 Offering Documents were accurate and complete in all

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-163-

Case No. 22-cv-01936

material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

452.  Class members did not know, nor in the exercise of reasonable diligence could they have known, that the 2021 Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

453.  As a direct and proximate result of the Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of securities pursuant and/or traceable to the 2021 Offering Documents.

454.  This claim was brought within one year after the untrue statements and omissions were or could have been discovered, and within three years after the issuance of the 2021 Offering Documents.  By reason of the foregoing, the Defendants named in this count have violated Section 12(a)(2) of the Securities Act.

455.  By reason of the foregoing, the Defendants named in this count are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased Silvergate securities pursuant and/or traceable to the January 2021 Offering Documents, and who were damaged thereby.

**COUNT V - Violation of § 15 of the Securities Act**
**in Connection with the 2021 Offerings**
**(Against the Executive and Director Defendants)**

456.  Plaintiffs repeat and reallege the allegations above in paragraphs 317 to 455 relating only to the Securities Act claims as if fully set forth herein.

457.  This count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the 2021 Offering Documents. This count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the 2021 Offering Documents are excluded from

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-164-
Case No. 22-cv-01936

this count. For purposes of asserting this count, Plaintiffs do not allege that the Securities Act Executive and Director Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

458. This count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who have asserted claims pursuant to Sections 11 and 12(a), against the Securities Act Executive and Director Defendants.

459. The Securities Act Executive and Director Defendants were at all relevant times controlling persons of Silvergate within the meaning of Section 15 of the Securities Act. Each of the Securities Act Executive and Director Defendants served as the most senior executive officers and directors of Silvergate at the time of the 2021 Offerings. The Securities Act Executive and Director Defendants participated at all relevant times in the operation and management of Silvergate, and conducted and participated, directly and indirectly, in the conduct of Silvergate's business affairs. As directors and officers of a publicly owned company, the Securities Act Executive and Director Defendants had a duty to disseminate accurate and truthful information with respect to Silvergate. Because of their positions of control and authority as directors and officers of Silvergate, the Securities Act Executive and Director Defendants were able to, and did, control the contents of the 2021 Offering Documents, which contained materially untrue financial information and omissions.

460. By reason of the foregoing, the Securities Act Executive and Director Defendants are liable under Section 15 of the Securities Act, to the same extent that the Securities Act Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class.

## XVI. CLASS ACTION ALLEGATIONS

461. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of (i) all persons or

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT -165-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS  Case No. 22-cv-01936

entities that purchased or otherwise acquired shares of Silvergate Class A common stock between November 7, 2019 through March 21, 2023, inclusive, and who were damaged thereby (the "Class Period"); and (ii) all persons or entities who purchased Silvergate stock in or traceable to Silvergate's securities offerings conducted through the 2021 Offerings, and were damaged thereby. Excluded from the Class are Defendants, directors and officers of Silvergate, and their families and affiliates.

462. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the class members. During the Class Period, Silvergate had more than 39 million shares of stock outstanding, owned by many thousands of investors.

463. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Silvergate's common stock was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

464. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

465. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

466.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XVII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.    awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XVIII.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated:  May 11, 2023                     Respectfully submitted,

/s/ Carol V. Gilden                          /s/ Jonathan D. Uslaner

**COHEN MILSTEIN SELLERS**        **BERNSTEIN LITOWITZ BERGER**
**   & TOLL PLLC**                          **   & GROSSMANN LLP**
Carol V. Gilden (admitted *pro hac vice*)    Jonathan D. Uslaner (Bar No. 256898)
cgilden@cohenmilstein.com            jonathanu@blbglaw.com
190 S. LaSalle Street, Suite 1705        Lauren M. Cruz (Bar No. 299964)
Chicago, IL 60603                        lauren.cruz@blbglaw.com
Tel: (312) 629-3737                      2121 Avenue of the Stars, Suite 2575
                                         Los Angeles, CA 90067
-and-                                    Tel: (310) 819-3470

Steven J. Toll (*pro hac vice*)              -and-
stoll@cohenmilstein.com
S. Douglas Bunch (admitted *pro hac*        John J. Rizio-Hamilton (*pro hac vice*
*vice*)                                  pending)
dbunch@cohenmilstein.com             johnr@blbglaw.com
                                         Nicole Santoro (*pro hac vice* pending)

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    -167-
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          Case No. 22-cv-01936

Jan Messerschmidt (admitted *pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (admitted *pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice* forthcoming)
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

nicole.santoro@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the proposed Class*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-168-
Case No. 22-cv-01936

# Exhibit A

DocuSign Envelope ID: 6236056-66E9-48C9-A0CD-629EC020413D

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jeffrey M. Gill, on behalf of the Court-appointed Co-Lead Plaintiff Indiana Public Retirement System ("Indiana"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am General Counsel of Indiana.  I have reviewed the Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, and Indiana has authorized its filing by counsel.

2. Indiana did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Indiana fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Indiana's transactions in the Silvergate Capital Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5. Indiana has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Silvergate Capital Corporation Securities Litigation*,
No. 22-cv-1936 (S.D. Cal.)
*Das v. Unity Software Inc.*, No. 22-cv-3962 (N.D. Cal.)
*Alich v. Opendoor Technologies Inc.*, No. 22-cv-1717 (D. Ariz.)
*Ray v. StoneCo Ltd.*, No. 21-cv-9260 (S.D.N.Y.)
*McLeod v. InnovAge Holding Corp.*, No. 21-cv-2770 (D. Colo.)
*Homyk v. ChemoCentryx, Inc.*, No. 21-cv-3343 (N.D. Cal.)
*City of Riviera Beach General Employees Retirement System
v. Royal Caribbean Cruises Ltd.*, No. 20-cv-24111 (S.D. Fla.)

6. Indiana is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Woldanski v. TuSimple Holdings Inc.*, No. 22-cv- 9625 (S.D.N.Y.)

7. Indiana has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for appointment as lead plaintiff or was not appointed lead plaintiff:

*Crews, Jr. v. Rivian Automotive, Inc.*, No. 22-cv-1524 (C.D. Cal.)
*City of Hialeah Employees' Retirement System v. Peloton Interactive, Inc.*,
No. 21-cv-9582 (S.D.N.Y.)

8. Indiana will not accept any payment for serving as a representative party on behalf of the Class beyond Indiana's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of May, 2023.

DocuSigned by:

*Jeffrey M Gill*

Jeffrey M. Gill
General Counsel
*Indiana Public Retirement System*

DocuSign Envelope ID: C6236050-6CF0-48C9-A0CD-629EC020413D

**Indiana Public Retirement System**
**Transactions in Silvergate Capital Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/20/2019 | 620 | 15.9100 |
| Purchase | 1/8/2020 | 100 | 16.4800 |
| Purchase | 6/26/2020 | 2,480 | 13.2500 |
| Purchase | 6/26/2020 | 1,850 | 13.2500 |
| Purchase | 1/8/2021 | 80 | 73.2900 |
| Purchase | 3/19/2021 | 500 | 160.3600 |
| Purchase | 4/30/2021 | 56 | 110.2600 |
| Purchase | 12/7/2021 | 14,200 | 145.0000 |
| Purchase | 12/17/2021 | 299 | 142.1200 |
| Purchase | 12/21/2021 | 700 | 142.0772 |
| Purchase | 12/21/2021 | 2,300 | 141.4832 |
| Purchase | 1/25/2022 | 200 | 98.8650 |
| Purchase | 2/1/2022 | 315 | 110.5100 |
| Purchase | 2/1/2022 | 385 | 110.1714 |
| Purchase | 2/2/2022 | 390 | 107.7879 |
| Purchase | 2/3/2022 | 390 | 103.2874 |
| Purchase | 2/8/2022 | 110 | 120.2546 |
| Purchase | 2/11/2022 | 210 | 124.1841 |
| Purchase | 4/6/2022 | 1,500 | 134.8115 |
| Purchase | 4/14/2022 | 1,400 | 121.9493 |
| Purchase | 4/20/2022 | 360 | 137.5626 |
| Purchase | 4/21/2022 | 310 | 134.6648 |
| Purchase | 4/26/2022 | 150 | 119.9087 |
| Purchase | 4/27/2022 | 800 | 118.9255 |
| Purchase | 4/29/2022 | 90 | 123.8798 |
| Purchase | 5/5/2022 | 1,100 | 113.8714 |
| Purchase | 5/6/2022 | 500 | 112.7043 |
| Purchase | 5/12/2022 | 370 | 60.8241 |
| Purchase | 5/16/2022 | 320 | 72.2134 |
| Purchase | 5/25/2022 | 96 | 70.2750 |
| Purchase | 5/25/2022 | 44 | 70.2180 |
| Purchase | 5/26/2022 | 140 | 73.4916 |
| Purchase | 6/22/2022 | 140 | 55.5864 |
| Purchase | 6/24/2022 | 470 | 63.4500 |
| Purchase | 6/24/2022 | 690 | 63.4500 |
| Purchase | 8/26/2022 | 100 | 93.8475 |
| Purchase | 9/16/2022 | 10 | 80.2600 |

DocuSign Envelope ID: C6236059-6CE9-48C9-A0CD-629EC020413D

**Indiana Public Retirement System**
**Transactions in Silvergate Capital Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/28/2022 | 4,500 | 78.0752 |
| Purchase | 10/19/2022 | 1,000 | 53.6674 |
| Purchase | 11/9/2022 | 200 | 36.2375 |
| Purchase | 11/11/2022 | 960 | 30.0001 |
| Purchase | 11/21/2022 | 99 | 23.9175 |
| Purchase | 11/21/2022 | 371 | 24.0477 |
| Purchase | 11/23/2022 | 152 | 26.6280 |
| Purchase | 11/23/2022 | 187 | 26.1874 |
| Purchase | 11/23/2022 | 251 | 26.3413 |
| Purchase | 11/28/2022 | 260 | 26.4965 |
| Purchase | 12/13/2022 | 480 | 18.9861 |
| Purchase | 12/15/2022 | 410 | 19.1056 |
| Purchase | 1/3/2023 | 1,590 | 17.2443 |
| Sale | 3/31/2021 | (375) | 142.1700 |
| Sale | 4/27/2021 | (374) | 113.2100 |
| Sale | 6/25/2021 | (1,827) | 102.3300 |
| Sale | 6/25/2021 | (1,540) | 102.3300 |
| Sale | 3/23/2022 | (1,260) | 147.7308 |
| Sale | 3/24/2022 | (200) | 147.5697 |
| Sale | 3/24/2022 | (940) | 149.0737 |
| Sale | 3/24/2022 | (1,800) | 151.7327 |
| Sale | 7/19/2022 | (1,500) | 75.2767 |
| Sale | 7/20/2022 | (1,700) | 90.4077 |
| Sale | 8/4/2022 | (400) | 101.0333 |
| Sale | 8/4/2022 | (300) | 101.3900 |
| Sale | 11/7/2022 | (2,100) | 51.0763 |
| Sale | 12/21/2022 | (5,100) | 16.9109 |
| Sale | 12/21/2022 | (500) | 17.0600 |
| Sale | 12/23/2022 | (4,900) | 16.5929 |
| Sale | 12/28/2022 | (6,700) | 15.9649 |
| Sale | 2/2/2023 | (570) | 22.1879 |
| Sale | 3/2/2023 | (9,110) | 7.4716 |
| Sale | 3/9/2023 | (2,559) | 2.8400 |
| Sale | 3/9/2023 | (480) | 2.8400 |

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Marlene Igel-Harris, on behalf of UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust ("Wespath"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Associate General Counsel at Wespath Benefits and Investments. In this capacity, I am authorized to make this certification on Wespath's behalf and have reviewed the amended complaint ("Complaint") to be filed in this matter.

2.  Wespath did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in any private action arising under the federal securities laws.

3.  Wespath is willing to continue to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Wespath fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  Wespath's transactions in the Silvergate Capital Corporation securities that are the subject of this action are set forth on the attached Schedule A.

5.  Wespath has full power and authority to bring suit to recover for its investment losses.

6.  Wespath authorized the filing of a motion for appointment as lead plaintiff on its behalf in this action.

7.  Wespath was appointed to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in the following cases:

    a.  *Doyle v. Reata Pharmaceuticals, Inc. et al.*, No. 4:21-cv-00987 (E.D. Tex.)

    b.  *In re Silvergate Capital Corp. Securities Litigation*, No. 3:22-cv-01936 (S.D. Cal.)

8.  Except for above, Wespath has not sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

DocuSign Envelope ID: 15558945-C350-453A-BDBE-49905B2E9BB1

9. Wespath will not accept any payment for serving as a class representative on behalf of the Class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 4 day of May, 2023.

By: _____
Marlene Igel-Harris
Associate General Counsel

## SCHEDULE A

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 1/12/2021 | PURCHASE | 1,896 | 68.05 |
| 3/19/2021 | PURCHASE | 343 | 160.36 |
| 3/19/2021 | PURCHASE | 615 | 160.36 |
| 6/23/2021 | PURCHASE | 400 | 99.6416 |
| 6/23/2021 | PURCHASE | 2,800 | 99.6416 |
| 6/24/2021 | PURCHASE | 2,850 | 105.4886 |
| 6/24/2021 | PURCHASE | 18,200 | 105.4886 |
| 6/25/2021 | PURCHASE | 1,200 | 103.1685 |
| 6/25/2021 | PURCHASE | 7,400 | 103.1685 |
| 6/25/2021 | SALE | (343) | 102.33 |
| 6/25/2021 | SALE | (2,511) | 102.33 |
| 6/29/2021 | PURCHASE | 1,600 | 111.775293 |
| 6/29/2021 | PURCHASE | 850 | 112.767 |
| 6/29/2021 | PURCHASE | 9,500 | 111.775293 |
| 6/29/2021 | PURCHASE | 5,550 | 112.767 |
| 6/30/2021 | PURCHASE | 1,600 | 113.3261 |
| 6/30/2021 | PURCHASE | 11,000 | 113.3261 |
| 7/6/2021 | PURCHASE | 150 | 105.6198 |
| 7/6/2021 | PURCHASE | 1,150 | 105.6198 |
| 7/7/2021 | PURCHASE | 1,100 | 106.2151 |
| 7/7/2021 | PURCHASE | 6,500 | 106.2151 |
| 7/8/2021 | PURCHASE | 750 | 99.8318 |
| 7/8/2021 | PURCHASE | 4,700 | 99.8318 |
| 7/20/2021 | PURCHASE | 700 | 98.5816 |
| 7/20/2021 | PURCHASE | 4,800 | 98.5816 |
| 7/21/2021 | PURCHASE | 1,100 | 106.4565 |

DocuSign Envelope ID: 15558945-C350-453A-BDBF-19005B2F9BB1

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 7/21/2021 | PURCHASE | 7,400 | 106.4565 |
| 7/22/2021 | PURCHASE | 900 | 105.7702 |
| 7/22/2021 | PURCHASE | 5,400 | 105.7702 |
| 12/7/2021 | PURCHASE | 1,050 | 156.1556 |
| 12/7/2021 | PURCHASE | 6,800 | 156.1556 |
| 12/8/2021 | PURCHASE | 52 | 168.05 |
| 12/13/2021 | PURCHASE | 50 | 139.03 |
| 7/21/2022 | PURCHASE | 300 | 92.6702 |
| 7/21/2022 | PURCHASE | 1,300 | 92.6702 |
| 8/25/2022 | PURCHASE | 10,000 | 97.6752 |
| 12/6/2022 | SALE | (5,400) | 22.6459 |
| 12/6/2022 | SALE | (40,675) | 22.645899 |
| 12/8/2022 | SALE | (4,600) | 23.0509 |
| 12/8/2022 | SALE | (30,900) | 23.0509 |
| 12/9/2022 | SALE | (250) | 22.7244 |
| 12/9/2022 | SALE | (2,050) | 22.7244 |
| 12/12/2022 | SALE | (4,300) | 21.1276 |
| 12/12/2022 | SALE | (28,875) | 21.1276 |
| 1/19/2023 | PURCHASE | 557 | 12.15 |
| 3/9/2023 | SALE | (609) | 2.84 |
| 3/9/2023 | SALE | (50) | 2.84 |

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Kimberly S. Doran, on behalf of Bucks County Employees' Retirement System ("Bucks County"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Deputy Controller of Bucks County Employees' Retirement System. In this capacity, I am authorized to make this certification on Bucks County's behalf and have reviewed a complaint filed in this matter.

2.  Bucks County did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in any private action arising under the federal securities laws.

3.  Bucks County is willing to serve as an additional plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Bucks County fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  Bucks County's transactions in the Silvergate Capital Corporation securities that are the subject of this action are set forth on the attached Schedule A.

5.  Bucks County has full power and authority to participate in litigation to recover for its investment losses.

6.  Bucks County has reviewed the accompanying Amended Complaint and authorized the filing on its behalf in this action.

7.  Bucks County was appointed to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in the following case:

    a.  *Delaware County Employees Retirement System v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp. et al.*, No. 2:21-cv-03382 (E.D. Pa.)

8.  Bucks County also sought to serve (but was not appointed or not yet appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in the following cases:

    a.  *Pitman v. Immunovant, Inc. et al.*, No. 1:21-cv-00918 (E.D.N.Y)

    b.  *Bucks County Employees Retirement System v. Norfolk Southern Corp., et al.*, No. 2:23-cv-00982 (S.D. Ohio)

9.      Bucks County will not accept any payment for serving as an additional plaintiff or class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 9th day of May, 2023.

By: _____

Kimberly S. Doran
Deputy Controller

## SCHEDULE A

| Trade Date | Transaction Type | Shares | Share Price ($) |
|------------|------------------|--------|-----------------|
| 1/8/2021 | PURCHASE | 200 | 74.6856 |
| 1/11/2021 | PURCHASE | 151 | 65.0471 |
| 1/22/2021 | PURCHASE | 660 | 63 |
| 1/25/2021 | PURCHASE | 110 | 84.6566 |
| 7/12/2021 | SALE | (170) | 103.2688 |
| 11/17/2021 | PURCHASE | 46 | 198.99 |
| 2/1/2022 | PURCHASE | 40 | 110.4069 |
| 4/25/2022 | SALE | (100) | 124.2487 |
| 12/28/2022 | SALE | (457) | 15.9702 |
| 12/29/2022 | SALE | (434) | 16.5018 |
| 3/9/2023 | SALE | (46) | 2.84 |

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**COHEN MILSTEIN SELLERS & TOLL**
  **PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

*Lead Counsel for Plaintiffs and the Settlement Class*

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**NOTICE OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS**<br><br>Judge:      Hon. James E. Simmons, Jr.<br>Courtroom:  4B<br>Date:       June 25, 2025<br>Time:       9:00 a.m.<br><br>**No Oral Argument Requested** |

NOTICE OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB

TO:    All Counsel of Record

PLEASE TAKE NOTICE that based on the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), attached hereto as Exhibit 1; the accompanying memorandum of law; and all other papers and proceedings herein, Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively "Lead Plaintiffs"); and Bucks County Employees Retirement Fund (collectively with the Lead Plaintiffs, "Plaintiffs") hereby move this Court, under Rule 23(e)(1) of the Federal Rules of Civil Procedure, for entry of an order: (i) preliminarily approving the proposed Settlement; (ii) approving the form and manner of giving notice of the proposed Settlement to Settlement Class Members; and (iii) scheduling a hearing to consider final approval of the Settlement and approval of the Plan of Allocation and Lead Counsel's motion for attorneys' fees and expenses.[1] The Parties' agreed-upon [Proposed] Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement is submitted with this motion. Defendants agree to entry of the proposed order, in accordance with the terms of the Stipulation. Accordingly, Plaintiffs respectfully suggest that this motion may be decided without a hearing.

---

[1] All capitalized terms used herein that are not otherwise defined herein have the meanings ascribed to them in the Stipulation.

NOTICE OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB                    1

Dated: May 21, 2025


*s/ Carol V. Gilden*                          *s/ Jonathan D. Uslaner*
**COHEN MILSTEIN SELLERS**          **BERNSTEIN LITOWITZ BERGER**
  **& TOLL PLLC**                          **& GROSSMANN LLP**
Carol V. Gilden (*pro hac vice*)              Jonathan D. Uslaner (Bar No. 256898)
cgilden@cohenmilstein.com                     jonathanu@blbglaw.com
200 S. Wacker Drive, Suite 2375               Lauren M. Cruz (Bar No. 299964)
Chicago, IL 60606                             lauren.cruz@blbglaw.com
Tel: (312) 629-3737                           2121 Avenue of the Stars, Suite 2575
                                              Los Angeles, CA  90067
-and-                                         Tel: (310) 819-3470

Steven J. Toll (*pro hac vice*)               -and-
stoll@cohenmilstein.com
S. Douglas Bunch (*pro hac vice*)             John J. Rizio-Hamilton (*pro hac vice* pending)
dbunch@cohenmilstein.com                      johnr@blbglaw.com
Jan Messerschmidt (*pro hac vice*)            Shane D. Avidan (*pro hac vice* pending)
jmesserschmidt@cohenmilstein.com              shane.avidan@blbglaw.com
Brendan Schneiderman (*pro hac vice*)         1251 Avenue of the Americas
bschneiderman@cohenmilstein.com               New York, NY  10020
1100 New York Avenue, N.W.                    Tel: (212) 554-1400
Suite 800
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice*)
csaler@cohenmilstein.com
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

*Lead Counsel for Plaintiffs and the Settlement Class*

NOTICE OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND
APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB                 2

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

*Lead Counsel for Lead Plaintiffs*
*and for the Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |
| | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS** |
| | Judge:         Hon. James E. Simmons, Jr. |
| | Courtroom:   4B |
| | Date:          June 25, 2025 |
| | Time:          9:00 a.m. |
| | **No Oral Argument Requested** |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     BACKGROUND OF THE LITIGATION ................................................................. 2

III.    ARGUMENT .......................................................................................................... 5

        A.      The Court Should Grant Preliminary Approval of the Proposed
                Settlement .................................................................................................... 5

                1.      The Settlement Is the Product of Good-Faith, Arm's-Length
                        Negotiations Among Experienced Counsel and a Mediator ...................... 6

                2.      The Proposed Settlement Falls Well Within the Range of
                        Approval ....................................................................................... 7

                3.      The Settlement Treats All Settlement Class Members Fairly ..................... 9

                4.      The Settlement Does Not Excessively Compensate
                        Plaintiffs' Counsel ............................................................................. 11

                5.      Plaintiffs Have Identified All Agreements Made in
                        Connection with the Settlement ....................................................... 12

        B.      The Proposed Settlement Class Satisfies Rule 23 ............................................ 12

                1.      The Settlement Class Satisfies the Requirements of Rule
                        23(a) ............................................................................................. 13

                        a)      The Settlement Class Is So Numerous That Joinder Is
                                Impracticable ................................................................... 14

                        b)      There Are Common Questions of Law and Fact............................ 14

                        c)      Plaintiffs' Claims Are Typical of Those of the
                                Settlement Class .............................................................. 15

                        d)      Plaintiffs Will Fairly and Adequately Protect the
                                Interests of the Settlement Class ....................................... 15

                1.      The Settlement Class Satisfies the Requirements of Rule
                        23(b)(3)........................................................................................ 16

                        a)      Common Legal and Factual Questions Predominate .................... 16

                        b)      A Class Action Is Superior to Other Methods of
                                Adjudication ................................................................... 17

IV.     THE COURT SHOULD APPROVE THE PROPOSED FORM OF
        NOTICE AND PLAN FOR PROVIDING NOTICE TO THE
        SETTLEMENT CLASS.......................................................................................... 18

V.      PROPOSED SCHEDULE OF SETTLEMENT EVENTS ............................................. 19

VI.    CONCLUSION ..................................................................................................... 19

Appendix A ......................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abadilla v. Precigen, Inc.*,
    2023 WL 7305053 (N.D. Cal. Nov. 6, 2023) ............................................................. 7

*Akins v. Facebook, Inc.*,
    2025 WL 484621 (9th Cir. Feb. 13, 2025) ................................................................ 6

*In re Allergan, Inc. Proxy Violation Derivative Litig.*,
    2018 WL 4959014 (C.D. Cal. Aug. 13, 2018) ......................................................... 11

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................... 17

*In re Amgen Inc. Sec. Litig.*,
    2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ....................................................... 11

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA")*
    *Litig.*,
    281 F.R.D. 134 (S.D.N.Y. 2012) ........................................................................... 15

*In re BofI Holding, Inc. Sec. Litig.*,
    2022 WL 2068424 (S.D. Cal. June 8, 2022) ........................................................... 13

*In re Capacitors Antitrust Litig.*,
    2020 WL 13210652 (N.D. Cal. July 10, 2020) ....................................................... 19

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
    348 F.R.D. 372 (S.D. Cal. 2024) ...................................................... 14, 15, 16, 17

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ................................................................................. 5

*Ford v. CEC Ent. Inc.*,
    2015 WL 11439033 (S.D. Cal. Dec. 14, 2015) ......................................................... 6

*Guevoura Fund Ltd. v. Sillerman*,
    2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ........................................................... 7

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................................... 15

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ................................................................................. 15

*Hardy v. Embark Tech., Inc.*,
  2023 WL 6276728 (N.D. Cal. Sept. 26, 2023)...................................................................... 13

*Hefler v. Wells Fargo & Co.*,
  2018 WL 4207245 (N.D. Cal. Sept. 4, 2018)........................................................................ 12

*In re Hewlett-Packard Co. Sec. Litig.*,
  No. 8:11-cv-1404-AG, slip op. (C.D. Cal. Sept. 15, 2014), ECF No. 167 ............................ 11

*Holmes v. NCO Fin. Sys., Inc.*,
  2014 WL 12899143 (S.D. Cal. Mar. 10, 2014)........................................................................ 5

*In re Immune Response Sec. Litig.*,
  2007 WL 9777749 (S.D. Cal. Mar. 14, 2007)........................................................................ 19

*In re ImmunityBio, Inc. Sec. Litig.*,
  2025 WL 834767 (S.D. Cal. Mar. 17, 2025).......................................................................... 12

*In re Int'l Rectifier Corp. Sec. Litig.*,
  Case No. 2:07-cv-02544-JFW, slip op. (C.D. Cal. Feb. 8, 2010), ECF No. 316 .................... 11

*Lemieux v. EZ Lube, Inc.*,
  2014 WL 12102167 (S.D. Cal. June 25, 2014) ...................................................................... 19

*In re: Lithium Ion Batteries Antitrust Litig.*,
  2017 WL 6728701 (N.D. Cal. Dec. 22, 2017) ....................................................................... 19

*Norris-Wilson v. Delta-T Grp., Inc.*,
  270 F.R.D. 596 (S.D. Cal. 2010)........................................................................................... 17

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015)................................................................................................. 11

*Purple Mountain Tr. v. Wells Fargo & Co.*,
  2022 WL 3357835 (N.D. Cal. Aug. 15, 2022)....................................................................... 15

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016)............................................................................................... 17

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) .......................................................................... 7

*In re Silvergate Capital Corp.*,
  Case No. 1:24-12158-KBO (Bankr. D. Del. Apr. 22, 2025), ECF No. 664 ............................ 8

*In re Silvergate Capital Corp.*,
  No. 1:24-12158-KBO (Bankr. D. Del. May 13, 2025), ECF No. 728 ..................................... 5

*In re Splunk Inc. Sec. Litig.*,
  2024 WL 923777 (N.D. Cal. Mar. 4, 2024) .......................................................................... 12

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. (2016) ......................................................................................................... 16

*Valentino v. Carter–Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .................................................................................... 17

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................................. 11

*In re Volkswagen "Clean Diesel" Mktg. Sales Pracs., & Prods. Liab. Litig.*,
    2019 WL 2077847 (N.D. Cal. May 10, 2019) ......................................................... 11

*In re Wireless Facilities, Inc. Sec. Litig.*,
    253 F.R.D. 630 (S.D. Cal. 2008).............................................................................. 13

**Statutes**

11 U.S.C. § 362 .............................................................................................................. 4, 5

11 U.S.C. § 510(b) .............................................................................................................. 8

15 U.S.C. § 78u-4(e) ......................................................................................................... 18

Private Securities Litigation Reform Act .............................................................. 7, 12, 18

Securities Act of 1933 ......................................................................................................... 2

Securities Exchange Act of 1934 ............................................................................. 2, 10, 14

**Other Authorities**

Fed. R. Civ. P. 23 ......................................................................................................*passim*

## I.    PRELIMINARY STATEMENT

Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs") are pleased to report that they have reached an agreement, subject to the Court's approval, to settle this securities class action (the "Action") in exchange for a cash payment totaling $37,500,000.00 for the benefit of the Settlement Class (the "Settlement"). Lead Plaintiffs now seek preliminary approval of the Settlement pursuant to Rule 23(e)(1).[1]

The proposed $37.5 million cash Settlement represents a favorable recovery for the Settlement Class under the circumstances. Those circumstances include Silvergate Capital Corporation's bankruptcy and the significant ability-to-pay risks resulting from that bankruptcy and the limits on available directors' and officers' insurance. The Settlement ensures that the Settlement Class will receive: (a) essentially all of the remaining $27.5 million in insurance; (b) more than $5 million indirectly from Silvergate's bankruptcy estate by way of the Preferred Equity Holder Contribution,[2] a rare source of recovery in a securities class action with a bankrupt issuer; and (c) $4.68 million from the Underwriter Defendants. The recovery also eliminates the real risks that protracted litigation might lead to lesser or no recovery—including very significant risks relating to liability, loss causation, and damages—and guarantees a significant and near-term recovery for the Settlement Class.

---

[1] All capitalized terms that are not otherwise defined in this memorandum have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), filed contemporaneously herewith.

[2] As described in the Stipulation and in footnote 8 below, pursuant to the Preferred Equity Holder Contribution, $5.32 million of funds that otherwise would be distributed to holders of preferred stock in Silvergate Capital under the Debtors' Chapter 11 Plan will be paid over to the Settlement Class.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB                1

The proposed Settlement was achieved after over two years of hard-fought litigation, motion practice, and vigorous and extended arm's-length negotiations occurring over many months before the Honorable Layn Phillips, a former federal judge and well-respected mediator. The Plaintiffs—all sophisticated institutional investors—actively oversaw the litigation and fully endorse the Settlement. The proposed Settlement readily satisfies each of the approval factors required by Federal Rule of Civil Procedure 23(e) and Ninth Circuit precedent.

For these reasons and those discussed further below, Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order (Exhibit A to the Stipulation). Entry of the proposed Preliminary Approval Order would authorize the dissemination of notice of the Settlement to the Settlement Class, after which there would be a final approval hearing for the Court to make a final determination as to whether the Settlement is fair, reasonable, and adequate (the "Settlement Hearing"). Pursuant to the terms of the Settlement, Defendants agree to entry of the proposed Preliminary Approval Order and, accordingly, Plaintiffs respectfully suggest that this motion may be decided without a hearing.

## II.    BACKGROUND OF THE LITIGATION

This matter involves allegations that Silvergate Capital Corporation ("Silvergate Capital" or "the Company") and its CEO, Alan Lane, made false and misleading statements to investors in violation of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities Act of 1933 (the "Securities Act").  Plaintiffs alleged that, throughout the Class Period, Silvergate Capital and Lane repeatedly represented that the Company's "vetting," "due diligence," and "monitoring" procedures gave the Company and its subsidiary bank a "distinct competitive advantage," allowing them to "know" their customers and "eliminating counterparty risk" for the Company's customers transacting on Silvergate-approved cryptocurrency exchanges. Plaintiffs further alleged that, while these representations had the effect of increasing Silvergate Capital's shareholder price, in truth, Silvergate Capital did not conduct the customer vetting, due diligence, or ongoing monitoring that Defendants touted. Plaintiffs alleged that, as a result, Silvergate failed to discover that its approved cryptocurrency exchange customers—including FTX—were sham entities. When the truth emerged, the Company's stock price plummeted from over $225 to roughly $1 per share.

On February 28, 2023, the Court appointed Lead Plaintiffs to litigate the Action and approved their selection of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Lead Counsel for the putative class.

On May 11, 2023, Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Complaint") asserting claims against the Company and Lane under Section 10(b) of the Exchange Act and against Lane under Section 20(a) of the Exchange Act. Plaintiffs also asserted claims arising under the Securities Act against Silvergate Capital, Lane, and the other Executive Defendants,[3] the Director Defendants,[4] and the Underwriter Defendants[5] under Sections 11 and 12(a)(2), and against Lane and the Director Defendants under Section 15 of the Securities Act.

On July 10, 2023, Defendants moved, in three separate motions, to dismiss the Complaint. On September 8, 2023, Plaintiffs opposed the motions and, on October 23, 2023, Defendants served their reply papers. On November 29, 2023, the Court heard oral argument on Defendants' motions. Defendants' motions remained pending until they were denied as moot, without prejudice to refiling, in light of this Settlement, on March 26, 2025. ECF No. 130.

At the end of June 2024, the Parties held their first mediation session, in what would become extended settlement negotiations conducted through the Honorable Layn Phillips, a former federal judge and well-respected mediator. In connection with the mediation, the Parties exchanged extensive mediation statements, including as to potential damages, and Defendants provided Plaintiffs' counsel with additional financial information. During that first session, Plaintiffs and Defendants exchanged multiple offers. A resolution was not achieved during the first mediation

---

[3] In addition to Lane, the Executive Defendants include Antonio Martino (Silvergate Capital's CFO).

[4] In addition to Lane, the Director Defendants include Karen F. Brassfield; Robert C. Campbell; Paul D. Colucci; Thomas C. Dircks; Dennis S. Frank; Aanchal Gupta; Michael Lempres; Scott A. Reed; and Colleen Sullivan.

[5] The Underwriter Defendants include Canaccord Genuity LLC; Citigroup Global Markets Inc; Compass Point Research & Trading, LLC; Craig-Hallum Capital Group LLC; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Keefe, Bruyette & Woods, Inc.; UBS Securities LLC; and Wedbush Securities Inc.

session. However, the Parties continued to engage in settlement negotiations through Judge Phillips, with Defendants providing Plaintiffs further financial information over the next several months.

On September 18, 2024, Silvergate Capital filed for Chapter 11 bankruptcy protection. The Parties engaged in further negotiations in light of the bankruptcy over the next few months and ultimately agreed to a second in-person mediation session with Judge Phillips on February 6, 2025. The Parties met for a full-day session with Judge Phillips on that date and continued their negotiations. That mediation session was ultimately unsuccessful, but extensive negotiations continued over subsequent months. Finally, the Parties came to agreement on key monetary and non-monetary terms, which then culminated in a signed term sheet and, ultimately, a stipulation of settlement.

The proposed $37.5 million Settlement is comprised of (a) $27,500,000 to be paid on behalf of the Silvergate Defendants from the insurance proceeds for which the Individual Defendants are beneficiaries (the "D&O Insurance Contribution"); (b) $4,680,000 to be paid by or on behalf of the Underwriter Defendants (the "Underwriter Contribution"); and (c) $5,320,000 to be paid from the cash distribution made by the Debtors (Silvergate Capital and its subsidiary Silvergate Bank) to the preferred equity holders under the Debtors' Chapter 11 Plan (the "Preferred Equity Holder Contribution"). *See* Stipulation ¶ 10. The D&O Insurance Contribution and Underwriter Contribution will be paid within twenty business days after preliminary approval of the Settlement; the Preferred Equity Holder Contribution will be paid on the effective date of the Debtors' Chapter 11 Plan. *Id.*

On April 22, 2025, the Debtors filed in the Bankruptcy Court (a) a motion (the "Rule 9019 Motion") seeking entry of an order approving the Debtors' entry into and performance of their obligations under the Settlement of this Action as well a separate March 27, 2025 settlement term sheet among the Individual Defendants, certain other indemnified individuals, the *ad hoc* group of preferred equity holders and the Debtors (the "Indemnified Individuals Term Sheet"); and (b) a motion (the "Stay Modification Motion") seeking entry of an order modifying the automatic stay under Section 362 of the Bankruptcy Code, to the extent necessary, to permit the Parties to seek and

obtain this Court approval of the Settlement and consummate the Settlement. 11 U.S.C. § 362; Stipulation ¶ 3.

On May 13, 2025, the Bankruptcy Court entered an order granting the Stay Modification Motion, and on May 14, 2025, the Bankruptcy Court entered an order granting the Rule 9019 Motion, enabling the Parties to seek preliminary and final approval of the Settlement in this Court. *See In re Silvergate Capital Corp.*, No. 1:24-12158-KBO (Bankr. D. Del. May 13, 2025), ECF No. 728. Consistent with the Stipulation, the Settlement is contingent on the Debtors filing the Chapter 11 Plan, and the release of all claims held or potentially held by the Debtors (and their affiliates and assigns) against the Defendant Releasees and the Indemnified Individuals, as approved by a non-appealable order of the Bankruptcy Court, with such release occurring upon the Chapter 11 Plan Effective Date. The Settlement will be effective once this Court has finally approved the Settlement and the Effective Date of the Chapter 11 Plan has occurred. *See* Stipulation ¶¶ 36, 37.

## III. ARGUMENT

The Settlement readily meets the standards for preliminary approval. The Settlement provides valuable benefits to investors and avoids the substantial risks and delays that would otherwise accompany the Action. The Settlement is the product of extensive, hard-fought litigation and arm's-length settlement negotiations overseen by Judge Phillips, a preeminent mediator.

### A. The Court Should Grant Preliminary Approval of the Proposed Settlement

Federal Rule of Civil Procedure 23(e)(2) provides that a class action settlement warrants court approval if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In the Ninth Circuit, there is a "strong judicial policy that favors settlement[s], particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Holmes v. NCO Fin. Sys., Inc.*, 2014 WL 12899143, at *2 (S.D. Cal. Mar. 10, 2014) (same).

Judicial approval of a class action settlement is a two-step process—*first*, the court performs a preliminary review of the terms of the proposed settlement to determine whether to send notice of the proposed settlement to the class, *see* Fed. R. Civ. P. 23(e)(1); *second*, after notice has been provided and a hearing has been held, the court determines whether to grant final approval of the settlement, *see* Fed. R. Civ. P. 23(e)(2). A court grants preliminary approval upon a finding that it

"will likely be able" to (i) finally approve the settlement under Rule 23(e)(2); and (ii) certify the proposed class for purposes of the settlement. *See* Fed. R. Civ. P. 23(e)(1)(B).

In considering *final* approval of the Settlement, Rule 23(e)(2) provides that the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[6] These factors are satisfied here, and preliminary approval is appropriate.

### 1. The Settlement Is the Product of Good-Faith, Arm's-Length Negotiations Among Experienced Counsel and a Mediator

The Settlement was achieved after extensive, vigorous negotiations among well-informed and experienced counsel following over two years of hard-fought litigation. The Parties and their counsel were knowledgeable about the strengths and weaknesses of the case before entering into the Stipulation. Plaintiffs conducted an extensive pre-suit investigation, which included speaking with dozens of former Silvergate employees; briefed three motions to dismiss; and consulted with experts, including on issues of regulatory compliance, loss causation, and damages. As a result, Plaintiffs and Lead Counsel had a firm basis to assess the Action's strengths and weaknesses and the reasonableness of the proposed Settlement.

---

[6] "The Ninth Circuit has enumerated various factors that the court should consider in determining whether a proposed settlement meets the fair, reasonable, and adequate standard, including: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Ford v. CEC Ent. Inc.*, 2015 WL 11439033, at *3 (S.D. Cal. Dec. 14, 2015) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998)). In 2018, the key Ninth Circuit factors were baked into the text of Rule 23(e), and the remaining ones can still be considered for Rule 23(e)(2) analysis. *See, e.g.*, *Akins v. Facebook, Inc.*, 2025 WL 484621, at *1 (9th Cir. Feb. 13, 2025).

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB                    6

Plaintiffs fully endorse the Settlement. Plaintiffs were each well-informed of the strengths and weaknesses of the claims. They consulted extensively with Lead Counsel throughout the litigation and actively participated in and consulted with Lead Counsel during the Parties' mediation and settlement negotiations. They are precisely the type of sophisticated institutional investors favored by Congress when it enacted the PSLRA.

Each of these facts supports preliminary approval of the Settlement in this case. *See, e.g.*, *Abadilla v. Precigen, Inc.*, 2023 WL 7305053, at *9 (N.D. Cal. Nov. 6, 2023) (granting final approval following mediation before Judge Phillips); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *3 (S.D.N.Y. July 21, 2020) (granting final approval of a settlement following mediation before, and a mediator's proposal by, Judge Phillips); *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *2 (S.D.N.Y. Dec. 18, 2019) (granting final approval of a settlement after an all-day mediation with Judge Phillips).

### 2.    The Proposed Settlement Falls Well Within the Range of Approval

The Settlement amount is $37.5 million in cash. The Settlement accounts for the meaningful risks associated with the litigation, including the substantial risks related to Plaintiffs' ability to recover a larger judgment through litigation as a result of Silvergate Capital's bankruptcy and limits on insurance coverage, as well as the risks arising from Defendants' pending motions to dismiss, and at class certification, summary judgment, trial, and appeal.

As noted above, Silvergate Capital and two of its affiliates (collectively, the "Debtors") filed for Chapter 11 bankruptcy protection in September 2024, while the motions to dismiss the Complaint in this Action were still being litigated. The bankruptcy automatically stayed all litigation against the Debtors and created significant hurdles for the Settlement Class in obtaining any substantial recovery in this litigation. The Debtors' filings in the Bankruptcy Court have made clear that, if litigation were to proceed, there likely would not be sufficient funds available in the Debtors' estate to allow any payment from the estate to members of the Settlement Class, whose securities law claims based on purchases or other acquisitions of common stock are subordinated to the claims of the Debtors' other creditors and preferred shareholders and are treated as on par with common stock. *See* 11 U.S.C. § 510(b). Moreover, the amount of available directors' and officers' insurance

was limited and was being continuously diminished as a result of defense costs in this Action, other civil litigation, and government investigations.

Particularly in light of these significant ability-to-pay limitations, the $37.5 million Settlement reflects a very favorable outcome for the Settlement Class.  As noted, the $27.5 million D&O Insurance Contribution constitutes essentially *all* of the Silvergate Defendants' remaining available insurance.[7] The $27.5 million D&O Insurance Contribution exceeds the amount that could reasonably be obtained directly from the personal assets of the Individual Defendants, which could only be obtained after years of additional hard-fought litigation. In addition to maxing out the available insurance, the Settlement Class will also receive an additional $5,320,000 payment indirectly from Silvergate Capital's estate by way of the Preferred Equity Holder Contribution.[8] Because securities class action claims are subordinated in bankruptcy, such a contribution is a very favorable outcome for the Settlement Class. Finally, the Underwriter Defendants have also agreed to contribute an additional $4,680,000 to the Settlement. Plaintiffs and Lead Counsel believe that the proposed Settlement is not just adequate; it is the best result that could be achieved under these circumstances.

In addition to the above considerations, the Action also presented several substantial risks to establishing liability and damages.

First, Plaintiffs faced challenges at trial in establishing that each misstatement was false and misleading. Plaintiffs alleged that, from 2019 through 2023, Defendants repeatedly assured

---

[7] *See* Rule 9019 Motion, at 6, *In re Silvergate Capital Corp.*, Case No. 1:24-12158-KBO (Bankr. D. Del. Apr. 22, 2025), ECF No. 664 ("The Proposed Securities Litigation Settlement contemplated a total settlement amount of $37.5 million, of which $27.5 million would be paid *from all remaining D&O insurance proceeds*") (emphasis added); *id.* at 11 ("Approximately $27.5 million in insurance currently remains available under the D&O Policies.").

[8] Essentially, the holders of Silvergate Capital's preferred equity, who are the "fulcrum" stakeholders in the bankruptcy case (*i.e.*, the group in priority order under the bankruptcy that is expected to receive the last available dollars), have agreed to allow $5,320,000 from the funds that would otherwise be distributed to the preferred equity holders in the bankruptcy to be paid to the Settlement Class in order to permit a global settlement resolving significant indemnity claims against the Debtors and complex legal issues associated therewith and materially reducing legal costs of the estate.

investors and the public that Silvergate Capital had instituted adequate due diligence procedures for the customers it chose to onboard. However, Defendants maintained that Plaintiffs' allegations relied on unreliable former employees, and that the FTX fraud could not retroactively establish that Silvergate Capital failed to perform adequate due diligence. In support of this argument, Plaintiffs anticipate that Defendants would pursue discovery and seek to establish that the frauds perpetrated by FTX and other bank customers were unique, unforeseeable, and undetectable.

Second, with respect to scienter, Defendants asserted that they did not act with fraudulent intent. Specifically, Defendants argued that, even if they were aware of some shortcomings of their due diligence protocols, it is implausible that they would deliberately perform *no* due diligence for the sake of allowing any entity wanting to use their banking services to do so.

Third, Plaintiffs faced risks in proving price impact, loss causation, and damages. The Parties' disputes concerning the amount of the Company's stock price drops attributable to the alleged fraud (versus other confounding factors, *i.e.*, negative causation) would be a hotly contested issue at class certification, summary judgment, and trial, with Plaintiffs and Defendants providing dueling expert testimony. This anticipated "battle-of-the-experts" created significant uncertainty and risks to recovery.

Finally, even if Plaintiffs ultimately prevailed at trial, they still faced likely appeals—a process that could extend for years and might lead to a smaller recovery, or no recovery at all. As noted above, given the Company's ongoing bankruptcy proceedings and wasting insurance, any prolonged litigation created very substantial risks of non-recovery, even if Plaintiffs *were* successful on the merits.

Given all these significant litigation risks, Plaintiffs and Lead Counsel believe that the proposed $37.5 million Settlement is a very favorable result for the Settlement Class.

**3.     The Settlement Treats All Settlement Class Members Fairly**

The Settlement treats all Settlement Class Members fairly and does not improperly grant preferential treatment to Plaintiffs or any segment of the Settlement Class. All Settlement Class Members will receive a distribution from the Net Settlement Fund pursuant to a plan of allocation approved by the Court.

At the final Settlement Hearing, Plaintiffs will ask the Court to approve the proposed Plan of Allocation for the Net Settlement Fund (the "Plan"), which is set forth in the Notice (Exhibit A-1) and was developed by Plaintiffs' damages expert, in consultation with Lead Counsel. The Plan is based on Plaintiffs' allegations (i) that Defendants' materially false and misleading statements and omissions caused artificial inflation in the prices of Silvergate Capital stock during the Class Period, and that a series of public disclosures that each partially corrected the alleged misrepresentations and omissions removed that inflation, and (ii) that the Offering Materials for Silvergate Capital's 2021 Offerings were materially misleading, allowing investors who purchased stock in or traceable to those offerings to recover under the Securities Act.

The Plan calculates an "Exchange Act Recognized Loss" amount for each purchase or acquisition of Silvergate Capital common stock or preferred stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the Claimant. The calculation of Exchange Act Recognized Loss under the Plan will depend on when the Claimant purchased and/or sold their shares, whether the Claimant held their shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of their shares when the Claimant purchased, sold, or held them. The portions of the Settlement Fund paid on behalf of the Individual Defendants (the D&O Insurance Contribution) and Silvergate Capital's bankruptcy estate (Preferred Equity Holder Contribution) (collectively, the "Exchange Act Fund") will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Exchange Act Recognized Losses. In addition, Claimants who purchased Silvergate Capital common stock or preferred stock in or traceable to one of the 2021 Offerings will also be eligible for a Securities Act Recognized Loss for those shares, which will be calculated using the measure of damages in Section 11 of the Securities Act.

The Claims Administrator will calculate Claimants' Recognized Losses under the Plan using the transaction information that Claimants provide to the Claims Administrator in their Claim Forms. Once the Claims Administrator has processed all submitted claims, notified Claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will make distributions to eligible Authorized Claimants in the form of checks and

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB                10

wire transfers. If any monies remain in the Net Settlement Fund, the Claims Administrator will conduct additional re-distributions until it is no longer cost-effective to do so.  At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

### 4. The Settlement Does Not Excessively Compensate Plaintiffs' Counsel

The proposed Settlement does not grant excessive compensation to Plaintiffs' Counsel. The Settlement does not contemplate any specific award to Plaintiffs' Counsel, and Plaintiffs' Counsel will be compensated solely out of the Settlement Fund after approval by the Court.

In connection with Plaintiffs' Counsel's fee and expense application, Lead Counsel will seek a fee of no more than 17% of the Settlement Fund, which is well below the 25% "benchmark" and the 30% "norm" in cases, such as this one, that are prosecuted on a contingency basis.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) (recognizing 25% fee percentage as the Ninth Circuit "benchmark"); *In re Allergan, Inc. Proxy Violation Derivative Litig.*, 2018 WL 4959014, at *1 (C.D. Cal. Aug. 13, 2018) (recognizing "a 30% award" is "the norm"). The 17% fee request is also below the range of fee requests that Ninth Circuit courts repeatedly approve in similarly sized or larger settlements in securities class actions with contingency fee risks. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming award of 28% of $97 million); *In re Volkswagen "Clean Diesel" Mktg. Sales Pracs., & Prods. Liab. Litig.*, 2019 WL 2077847, at *4 (N.D. Cal. May 10, 2019) (awarding 25% of $48 million settlement); *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *9-10 (C.D. Cal. Oct. 25, 2016) (awarding 25% of $95 million settlement); *In re Hewlett-Packard Co. Sec. Litig.*, No. 8:11-cv-1404-AG, slip op. at 2 (C.D. Cal. Sept. 15, 2014), ECF No. 167 (awarding 25% of $57 million settlement); *In re Int'l Rectifier Corp. Sec. Litig.*, Case No. 2:07-cv-02544-JFW, slip op. at 1 (C.D. Cal. Feb. 8, 2010), ECF No. 316 (awarding 25% of $90 million). The 17% requested fee percentage is also consistent with fee agreements entered into between Lead Counsel and Lead Plaintiffs.  Lead Counsel will also seek payment of litigation expenses incurred in connection with the institution, prosecution, and resolution of the Action, in an amount not to exceed $1.4 million, which may include requests for reimbursement of costs and expenses of Lead Plaintiffs under the PSLRA.

Plaintiffs' Counsel's fee and expense application will be fully briefed in a motion filed in accordance with the Preliminary Approval Order. By granting preliminary approval of the proposed Settlement, the Court does not in any way rule upon the reasonableness of the fee or expense application, which will be decided *de novo* at the Settlement Hearing.

**5.      Plaintiffs Have Identified All Agreements Made in Connection with the Settlement**

In addition to the Stipulation, Plaintiffs and Defendants have entered into a confidential agreement (the "Supplemental Agreement") regarding requests for exclusion ("opt-outs") from the Settlement Class. *See* Stipulation ¶ 42. The Supplemental Agreement sets forth the conditions under which Defendants may terminate the Settlement if the opt-outs from the Settlement Class exceed an agreed-upon threshold. "[T]his type of agreement is common in securities fraud actions and does not weigh against preliminary approval." *In re ImmunityBio, Inc. Sec. Litig.*, 2025 WL 834767, at *12 (S.D. Cal. Mar. 17, 2025); *see also In re Splunk Inc. Sec. Litig.*, 2024 WL 923777, at *6 (N.D. Cal. Mar. 4, 2024) ("The existence of a termination option triggered by the number of class members who opt out of the settlement does not by itself render the settlement unfair."). The agreement's terms are confidential "to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts" for themselves at the expense of other Settlement Class members. *ImmunityBio*, 2025 WL 834767, at *12; *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *7 (N.D. Cal. Sept. 4, 2018).

**B.      The Proposed Settlement Class Satisfies Rule 23**

In determining whether to grant preliminary approval, the Court also determines whether it "will likely be able to" grant certification to the proposed Settlement Class for purposes of the Settlement at final approval. Fed. R. Civ. P. 23(e)(1)(B). The proposed Settlement Class, which has been stipulated to by the Parties, consists of:

(a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019, through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby, and

---

(b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021, and were damaged thereby.

Stipulation ¶ 1(yy).[9] Defendants have stipulated to the certification of the Settlement Class only for purposes of the Settlement. *See* Stipulation ¶ 2. If the Settlement is not approved, Defendants reserve their right to object for any and all reasons to the certification of the Settlement Class, the appointment of Lead Plaintiffs as Class Representatives for the Settlement Class, or to the appointment of Lead Counsel as Class Counsel for the Settlement Class. *Id.*

The Ninth Circuit acknowledges the propriety of certifying a class for purposes of a class action settlement. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2022 WL 2068424, at *11 (S.D. Cal. June 8, 2022); *Hardy v. Embark Tech., Inc.*, 2023 WL 6276728, at *12 (N.D. Cal. Sept. 26, 2023). Certification of a settlement class "is superior to other available methods of adjudication of the controversy because the claims of many individuals will be efficiently resolved at one time, eliminating the possibility of repetitious litigation that would waste the parties' and the Court's resources." *In re Wireless Facilities, Inc. Sec. Litig.*, 253 F.R.D. 630, 636 (S.D. Cal. 2008).

As demonstrated below, the proposed Settlement Class satisfies all the applicable requirements of Rules 23(a) and 23(b)(3).

**1.     The Settlement Class Satisfies the Requirements of Rule 23(a)**

Certification is appropriate under Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

---

[9] Excluded from the Settlement Class are: (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; provided, however, that no "Investment Vehicle" shall be excluded from the Settlement Class. "Investment Vehicle" means any investment company or pooled investment fund, including but not limited to mutual fund families, exchange-traded funds, funds of funds, private equity funds, real estate funds, and hedge funds, in which Defendants, or any of them, have, has or may have a direct or indirect interest, or as to which their affiliates may act as an investment advisor, but in which any Defendant alone or together with its, his or her respective affiliates does not hold a majority beneficial interest. *Id.* ¶¶ 1(aa), 1(yy).

(4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

### a) The Settlement Class Is So Numerous That Joinder Is Impracticable

In the Ninth Circuit, Rule 23(a)(1)'s numerosity requirement is satisfied for classes larger than 60 members and, in securities fraud class actions, is shown where there are a large number of shares outstanding and traded during the relevant period. *See, e.g.*, *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372, 382-83 (S.D. Cal. 2024) (noting a class of more than 60 satisfies numerosity). Here, Silvergate Capital traded on the New York Stock Exchange and had tens of millions of shares of common stock issued and outstanding during the Class Period, which were owned by many thousands of investors. *See* ECF No. 43, at ¶ 462. These metrics easily demonstrate numerosity.

### b) There Are Common Questions of Law and Fact

Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *Acadia*, 348 F.R.D. at 383. Commonality exists when "[e]ven a single common question of law or fact … resolves a central issue." *Id.* at 383 (citing *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020)).

The common questions of law and fact in this case are numerous and include: (i) whether Defendants' statements were materially false and misleading when made; (ii) whether Defendants omitted material information regarding the status of the Company's customer due diligence; (iii) whether the Exchange Act Defendants acted with scienter; (iv) whether the Underwriter Defendants were statutory liable for the alleged misstatements in the Offering Materials for the 2021 Offerings and whether they conducted sufficient due diligence before those Offerings; (v) whether the price of Silvergate Capital's stock was artificially inflated during the Class Period due to these alleged misstatements; (vi) whether Defendants' misrepresentations and omissions caused Settlement Class Members to suffer economic losses when the truth was revealed; and (vii) whether Defendant Lane controlled Silvergate Capital during the Class Period. Because these questions of

law and fact are common to all members of the Settlement Class, the commonality requirement of Rule 23(a)(2) is met.

### c) Plaintiffs' Claims Are Typical of Those of the Settlement Class

Under Rule 23(a)(3), the claims or defenses of the named plaintiffs must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *Acadia*, 348 F.R.D. at 383-84. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.*; *see also Acadia*, 348 F.R.D. at 383-84. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Acadia*, 348 F.R.D. at 384 (citing *Hanlon*, 150 F.3d at 1020).

Here, Plaintiffs' claims arise from the same alleged course of conduct that gives rise to claims of other Settlement Class Members, are based on the same legal theory, and will be proven by the same set of operative facts. As such, the typicality requirement is satisfied. *See Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *2 (N.D. Cal. Aug. 15, 2022); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act ("ERISA") Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

### d) Plaintiffs Will Fairly and Adequately Protect the Interests of the Settlement Class

Under Rule 23(a)(4), the named plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Plaintiffs are adequate here.

First, "the interests of Plaintiffs align with the interests of the proposed Class because all allegedly suffered injuries from the same conduct." *Acadia*, 348 F.R.D. at 384. Like all Settlement Class Members, Plaintiffs purchased Silvergate Capital stock during the Class Period and were subjected to the same fraudulent conduct. No conflicts exist between Plaintiffs and the Settlement Class.

Second, Plaintiffs put forth evidence that they are represented by competent and qualified counsel who have vigorously litigated this Action, including by litigating dispositive motions, negotiating through extensive, sophisticated mediations, and generating a strong settlement despite a complex bankruptcy proceeding with many stakeholders involved. Plaintiffs fully understand their duties and responsibilities as class representatives, have demonstrated their commitment to lead this Action for the Settlement Class, and will continue to actively participate in and supervise the litigation through trial. *See, e.g.*, ECF No. 16-5 (Joint Declaration of Lead Plaintiffs). Plaintiffs have also retained qualified counsel who have extensive experience and success in prosecuting securities litigation. *See, e.g.*, ECF Nos. 16-9, 10 (Lead Counsel resumes). Accordingly, Rule 23(a)(4) is satisfied here.

### 1.    The Settlement Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Settlement Class satisfies these requirements.

### a)    Common Legal and Factual Questions Predominate

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. at 442, 453 (2016). For purposes of this analysis, "[a]n individual question is one 'where members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence

will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof.'" *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (quoting *Tyson Foods*, 577 U.S. at 453). Considering whether common questions are more prevalent than individual ones "begins, of course, with the elements of the underlying cause of action." *Acadia*, 348 F.R.D. at 385 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)). This "test [is] readily met in certain cases alleging … securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Here, the central issue for establishing Defendants' liability is whether the Defendants made misstatements or omissions of material fact. *See id.* This issue is susceptible of generalized proof and, accordingly, the predominance requirement of Rule 23(b)(3) is satisfied.

###           b)           A Class Action Is Superior to Other Methods of Adjudication

Rule 23(b)(3) also asks whether class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation," and it is superior "if no realistic alternative exists." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). The four factors under the superiority prong are "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 611-12 (S.D. Cal. 2010).

Each of the factors supports certification here. First, the number of Settlement Class members is far too numerous, and the typical claim is too small, for each individual Settlement Class Member to have an interest in maintaining a separate action. Second, Plaintiffs are aware of no other action that seeks recovery under the federal securities laws for damages caused by Defendants' alleged fraud. Third, the geographical dispersion of the Settlement Class Members makes it

desirable to litigate Plaintiffs' claims in this forum. Finally, there are no management difficulties that would preclude this Action from being maintained as a class action.

In sum, the proposed Settlement Class meets all of the requirements of Rules 23(a) and (b)(3) and is appropriate for certification for purposes of the Settlement.

## IV.   THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE AND PLAN FOR PROVIDING NOTICE TO THE SETTLEMENT CLASS

As outlined in the proposed Preliminary Approval Order, if the Court grants preliminary approval, the Claims Administrator will mail the Notice and Claim Form (Exhibits 1 and 2 to the Preliminary Approval Order) to all Settlement Class Members who can be identified with reasonable effort, as well as post the Notice and the Claim Form on a website to be developed for the Settlement.[10] The Claims Administrator will utilize a list of the largest and most common U.S. banks, brokerage firms, and nominees that purchase securities on behalf of beneficial owners to facilitate the dissemination of notice. The Notice will advise Settlement Class Members of: (i) the pendency of the class action; (ii) the essential terms of the Settlement; and (iii) information regarding Lead Counsel's application for attorneys' fees and expenses. The Notice will also provide specifics on the date, time, and place of the Settlement Hearing and set forth the procedures for objecting to the Settlement, the proposed Plan of Allocation and/or the motion for attorneys' fees and expenses, and the procedure for requesting exclusion from the Settlement Class. In addition to the mailing of the Notice and Claim Form, the Summary Notice will be published in *The Wall Street Journal* and transmitted over the *PR Newswire*.

The form and manner of providing notice to the Settlement Class satisfies the requirements of due process, Rule 23, and the PSLRA, 15 U.S.C. § 78u-4(a)(7). The Notice contains all of the

---

[10] Lead Plaintiffs request that the Court approve retention of JND Legal Administration ("JND"), as the claims administrator for this case. JND has successfully administered numerous complex securities class action settlements in this District and elsewhere. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-cv-02324-GPC (S.D. Cal.) (JND administered $14.1 million securities class action settlement); *In re Fibrogen, Inc., Sec. Litig.*, Case No. 3:21-cv-02623-EMC (N.D. Cal.) (JND administered $28.5 million securities class action settlement); *In re Mattel, Inc. Securities Litigation,* No. 2:19-cv-10860-MCS (C.D. Cal.) (JND administered $98 million securities class action settlement).

information required by Rule 23(c)(2)(B) and the PSLRA, and will be "reasonably calculated to apprise Settlement Class Members of the pendency of this Action and their right to object to or exclude themselves from the Settlement Class." *Lemieux v. EZ Lube, Inc.*, 2014 WL 12102167, at *3 (S.D. Cal. June 25, 2014). This manner of providing notice, which includes individual notice by first-class mail to all class members who can be reasonably identified, supplemented by additional publication and internet notice, represents the best notice practicable under the circumstances and satisfies the requirements of due process and Rule 23. *See, e.g.*, *In re Capacitors Antitrust Litig.*, 2020 WL 13210652, at *2 (N.D. Cal. July 10, 2020); *In re: Lithium Ion Batteries Antitrust Litig.*, 2017 WL 6728701, at *2 (N.D. Cal. Dec. 22, 2017); *In re Immune Response Sec. Litig.*, 2007 WL 9777749, at *5 (S.D. Cal. Mar. 14, 2007).

Accordingly, Plaintiffs respectfully submit that the proposed notice procedures are appropriate and should be approved.

## V.      PROPOSED SCHEDULE OF SETTLEMENT EVENTS

Plaintiffs respectfully propose the schedule for Settlement-related events as set forth in Appendix A. If the Court agrees with the proposed schedule, Plaintiffs request that the Court schedule the Settlement Hearing for a date 100 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter. If the Court grants preliminary approval as requested, the only date that the Court need schedule is the date for the final Settlement Hearing. The remaining dates will be determined by the date the Preliminary Approval Order is entered and the date the Settlement Hearing is scheduled.

## VI.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (i) preliminarily approve the proposed Settlement; (ii) approve the proposed form and manner of notice to putative Settlement Class Members; and (iii) schedule a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters.

Dated: May 21, 2025

*s/ Carol V. Gilden*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

-and-

Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
S. Douglas Bunch (*pro hac vice*)
dbunch@cohenmilstein.com
Jan Messerschmidt (*pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (*pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W., Suite 800
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice*)
csaler@cohenmilstein.com
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

*s/ Jonathan D. Uslaner*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA  90067
Tel: (310) 819-3470

-and-

John J. Rizio-Hamilton (*pro hac vice* pending)
johnr@blbglaw.com
Shane D. Avidan (*pro hac vice* pending)
shane.avidan@blbglaw.com
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the Settlement Class*

**Appendix A**

**Proposed Schedule of Settlement Events**

| Event | Proposed Timing | Example Date[11] |
|---|---|---|
| Deadline for mailing the Notice and Claim Form to Settlement Class Members (which date shall be the "Notice Date") (Preliminary Approval Order ¶ 5(b)) | No later than 20 business days after entry of Preliminary Approval Order | June 24, 2025 |
| Deadline for publishing the Summary Notice (Preliminary Approval Order ¶ 5(d)) | No later than 10 business days after the Notice Date | July 9, 2025 |
| Deadline for filing of papers in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's motion for attorneys' fees and expenses (Preliminary Approval Order ¶ 25) | 35 calendar days before the date set for the Settlement Hearing | July 29, 2025 |
| Deadline for receipt of requests for exclusion or objections (Preliminary Approval Order ¶¶ 12, 15, 16) | 21 calendar days before the date set for the Settlement Hearing | August 12, 2025 |
| Deadline for filing reply papers (Preliminary Approval Order ¶ 25) | 7 calendar days before the Settlement Hearing | August 26, 2025 |
| Settlement Hearing (Preliminary Approval Order ¶ 3) | 100 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter | September 2, 2025 |
| Postmark deadline for submitting Claim Forms (Preliminary Approval Order ¶ 9) | 120 calendar days after the Notice Date | September 15, 2025 |

---

[11] The example dates provided are based on the assumptions that the Court enters the Preliminary Approval Order on May 23, 2025 and schedules the Settlement Hearing for September 2, 2025.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE SETTLEMENT CLASS
CASE NO. 22-CV-01936-JES-MSB                    21

# Exhibit 1

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
LAUREN M. CRUZ (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**COHEN MILSTEIN SELLERS & TOLL
  PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

*Lead Counsel for Plaintiffs and the Settlement
Class*

[Additional Counsel Appear on Signature
Page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**STIPULATION AND AGREEMENT OF SETTLEMENT** |

---

STIPULATION OF SETTLEMENT                    CASE NO. 22-CV-01936-JES-MSB

This Stipulation and Agreement of Settlement, dated as of May 9, 2025 (the "Stipulation") is entered into between (a) Plaintiffs Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class (as defined in paragraph 1(yy) below); and (b) defendants Silvergate Capital Corporation ("Silvergate Capital" and together with its subsidiary Silvergate Bank, the "Debtors"), Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Antonio Martino, Dennis Frank and Robert Campbell (collectively, the "Individual Defendants" and together with the Debtors, the "Silvergate Defendants") and defendants Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants" and together with the Silvergate Defendants, the "Defendants"), by and through their respective undersigned counsel, and embodies the terms and conditions of the settlement of the above-captioned action (the "Action"). Subject to the approval of the Court and the terms and conditions expressly provided herein, this Stipulation is intended to fully, finally and forever compromise, settle, release, resolve, and dismiss with prejudice all claims that were or could have been asserted in the Action against Defendants.

WHEREAS:

A.    By Order dated February 28, 2023 (Dkt. No. 21), the Honorable Cathy Ann Bencivengo appointed the Institutional Investors as Lead Plaintiffs for the Action; and approved Lead Plaintiffs' selection of Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel.

---

STIPULATION OF SETTLEMENT              1              CASE NO. 22-CV-01936-JES-MSB

B.    On March 16, 2023, the Action was reassigned to the Honorable James E. Simmons, Jr.  Dkt. No. 38.

C.    On May 11, 2023, Plaintiffs filed and served their Amended Consolidated Class Action Complaint (the "Complaint") (Dkt. No. 43) asserting claims against Silvergate Capital and Defendant Lane under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Defendant Lane under Section 20(a) of the Exchange Act.  Plaintiffs also asserted claims against Silvergate Capital, the Individual Defendants, and the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and against the Individual Defendants under Section 15 of the Securities Act.

D.    On July 10, 2023, Silvergate Capital and the Individual Defendants other than Defendants Campbell and Frank served a motion to dismiss the Complaint together with a request for judicial notice (Dkt. No. 66); Defendants Campbell and Frank separately served a second motion to dismiss the Complaint together with a request for judicial notice (Dkt. No. 70); and the Underwriter Defendants served a third motion to dismiss the Complaint together with a request for judicial notice (Dkt. No. 71).  On September 8, 2023, Plaintiffs served memoranda of law in opposition to (1) the motions to dismiss the Exchange Act claims (Dkt. No. 79) and related requests for judicial notice (Dkt. No. 80); and (2) the motions to dismiss the Securities Act claims (Dkt. No. 81) and related requests for judicial notice (Dkt. No. 82).  Defendants served their reply papers on October 23, 2023 (Dkt. Nos. 89-93).

E.    On November 29, 2023, the Court heard oral argument on Defendants' motions to dismiss and requests for judicial notice.  Dkt. No. 98.

F.    Plaintiffs submitted Notices of Recent Authority (1) on March 22, 2024 (Dkt. No. 103), to which Defendants responded on March 27, 2024 (Dkt. No. 107); and (2) on July 1, 2024 (Dkt. No. 108), to which Defendants responded on July 3, 9, and 18, 2024 (Dkt. Nos. 109-11).

G.    On September 19, 2024, Silvergate Capital filed a Notice of Bankruptcy (Dkt. No. 112), in which it asserted a stay of litigation against it pursuant to Section 362(a) of the U.S. Bankruptcy Code.  Also on September 19, Plaintiffs responded to Silvergate Capital's Notice of

Bankruptcy (Dkt. No. 113). The Underwriter Defendants filed a further response to the Notice of Bankruptcy on September 20, 2024 (Dkt. No. 114).

H.    On October 28, 2024, Plaintiffs filed a further Notice of Recent Authority (Dkt. No. 115), to which the Underwriter Defendants responded on November 1, 2024 (Dkt. No. 116). On November 21, 2024, the Underwriter Defendants filed a Notice of Recent Authority (Dkt. No. 117), to which Plaintiffs responded on November 22, 2024 (Dkt. No. 118). On February 12, 2025, the Underwriter Defendants filed a further Notice of Recent Authority (Dkt. No. 127), to which Plaintiffs responded on February 13, 2025 (Dkt. No. 128).

I.    On April 22, 2025, the Parties executed the Securities Class Action Term Sheet (the "Term Sheet") setting forth material terms of the Settlement. This Stipulation (together with the exhibits hereto) has been duly executed by the undersigned signatories on behalf of their respective clients and reflects the binding agreement between the Parties.

J.    This Stipulation constitutes a compromise of all matters that are in dispute between the Parties. Plaintiffs and Lead Counsel have concluded that the terms and conditions of this Stipulation are fair, reasonable, and adequate to Plaintiffs and the other members of the Settlement Class, and in their best interests. Based on Plaintiffs' direct oversight of the prosecution of this matter and with the advice of their counsel, each of the Plaintiffs has agreed to settle and release the Released Plaintiffs' Claims (as defined below) pursuant to the terms and provisions of this Stipulation, after considering, among other things: (a) the financial benefit that Plaintiffs and the other members of the Settlement Class will receive under the proposed Settlement; and (b) the significant risks of continued litigation and trial.

K.    Defendants are entering into this Stipulation solely to avoid the cost, disruption, and uncertainty of further litigation. Each of the Defendants denies any wrongdoing, and this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Defendants with respect to any claim or allegation of any fault or liability or wrongdoing or damage whatsoever, or any infirmity in the defenses that Defendants have, or could have, asserted. Defendants expressly deny that Plaintiffs have asserted any valid claims, and expressly deny any and all allegations of fault, liability, wrongdoing, or damages.

STIPULATION OF SETTLEMENT          3          CASE NO. 22-CV-01936-JES-MSB

Similarly, this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of Plaintiffs of any infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Defendants' defenses to liability had any merit.

L.     The Parties agree that certification of the Action as a class action, for settlement purposes only, is appropriate.  For purposes of this Settlement only, the Settlement Class is defined in ¶ 1(yy) below.  The Parties agree that the provisions herein concerning certification of the Settlement Class shall have no effect whatsoever in the event the Settlement does not become Final.

NOW THEREFORE, without any admission or concession on the part of Plaintiffs of any lack of merit to the Action whatsoever, and without any admission or concession on the part of Defendants of any liability or wrongdoing or any lack of merit to the defenses whatsoever, it is hereby STIPULATED AND AGREED, by and among Plaintiffs (together and on behalf of all other members of the Settlement Class) and Defendants, by and through their respective undersigned attorneys, subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and subject to the Bankruptcy Court Approval Order, that, in consideration of the benefits flowing to the Parties from the Settlement, all Released Plaintiffs' Claims as against the Defendant Releasees and all Released Defendants' Claims as against the Plaintiff Releasees shall be fully, finally, and forever compromised, settled, released, discharged and dismissed with prejudice, upon and subject to the terms and conditions set forth below.

DEFINITIONS

1.     As used in this Stipulation and any exhibits attached hereto and made a part hereof, the following capitalized terms shall have the following meanings:

a.     "Action" means the consolidated securities class action in the matter styled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB, and includes all actions consolidated therein.

STIPULATION OF SETTLEMENT                4                CASE NO. 22-CV-01936-JES-MSB

b. "Authorized Claimant" means a Settlement Class Member who submits a Claim to the Claims Administrator for payment from the Net Settlement Fund that is approved by the Court.

c. "Bankruptcy Court" means U.S. Bankruptcy Court for the District of Delaware.

d. "Chapter 11 Cases" means the Debtors' chapter 11 cases captioned *In re Silvergate Capital Corp.*, Case No. 24-12158 (KBO) in the Bankruptcy Court.

e. "Chapter 11 Plan Effective Date" means the effective date of the Chapter 11 Plan.

f. "Chapter 11 Plan" means the forthcoming amended chapter 11 plan for the Debtors filed in the Chapter 11 Cases.

g. "Claim" means a paper claim submitted on a Proof of Claim Form or an electronic claim that is submitted to the Claims Administrator.

h. "Claim Form" or "Proof of Claim Form" means the form, substantially in the form attached hereto as Exhibit A-2, that a Claimant must complete and submit should that Claimant seek to share in a distribution of the Net Settlement Fund.

i. "Claimant" means a person or entity who submits a Claim to the Claims Administrator seeking to be eligible to share in the proceeds of the Net Settlement Fund.

j. "Claims Administrator" means the firm retained by Lead Counsel, subject to approval of the Court, to provide all notices approved by the Court to potential Settlement Class Members and to administer the Settlement.

k. "Class Distribution Order" means an order entered by the Court authorizing and directing that the Net Settlement Fund be distributed, in whole or in part, to Authorized Claimants.

l. "Class Period" means the period from November 7, 2019 through March 21, 2023, inclusive.

m. "Complaint" means the Amended Consolidated Class Action Complaint filed on May 11, 2023.

STIPULATION OF SETTLEMENT 5 CASE NO. 22-CV-01936-JES-MSB

n.    "Court" or "District Court" means the United States District Court for the Southern District of California.

o.    "Debtors" means Silvergate Capital, together with Silvergate Bank.

p.    "Defendants" means the Silvergate Defendants and the Underwriter Defendants.

q.    "Defendants' Counsel" means Sheppard, Mullin, Richter & Hampton LLP, Cravath, Swaine & Moore LLP, Latham & Watkins LLP, Foley & Lardner LLP, Glenn Agre Bergman & Fuentes LLP, Goodwin Procter LLP, and Linklaters LLP, or any successors thereof.

r.    "Defendant Releasees" means Defendants and each of their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, members, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

s.    "Defendant Releasors" means Defendants and each of their respective heirs, executors, administrators, predecessors, successors, assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Defendants' Claims on behalf of a Defendant, in that capacity.

t.    "Effective Date" with respect to the Settlement means the first date by which all of the events and conditions specified in ¶¶ 36 and 37 of this Stipulation have been met and have occurred or have been waived.

u.    "Escrow Account" means an interest-bearing account maintained at Huntington Bank wherein the Settlement Amount shall be deposited and held in escrow under the control of Lead Counsel.

v.    "Escrow Agent" means Huntington Bank.

w.    "Escrow Agreement" means the agreement between Lead Counsel and the Escrow Agent setting forth the terms under which the Escrow Agent shall maintain the Escrow Account.

STIPULATION OF SETTLEMENT             6             CASE NO. 22-CV-01936-JES-MSB

x.      "Final," with respect to the Judgment or any other court order, means the later of: (i) if no appeal is filed, the expiration date of the time provided for filing or noticing any appeal under the applicable Federal Rules of Civil Procedure and Appellate Procedure, *i.e.*, thirty (30) days after entry of the judgment or order; or (ii) if there is an appeal from the judgment or order, (a) the date of final dismissal of all such appeals, or the final dismissal of any proceeding on *certiorari* or otherwise, or (b) the date the judgment or order is finally affirmed on an appeal, the expiration of the time to file a petition for a writ of *certiorari* or other form of review, or the denial of a writ of *certiorari* or other form of review, and, if *certiorari* or other form of review is granted, the date of final affirmance following review pursuant to that grant.  However, any appeal or proceeding seeking subsequent judicial review pertaining solely to an order issued with respect to (i) attorneys' fees, costs or expenses, (ii) the plan of allocation of Settlement proceeds (as submitted or subsequently modified), or (iii) the procedures for determining Authorized Claimants' recognized claims, or distribution of the Net Settlement Fund to Authorized Claimants, shall not in any way delay or preclude a judgment from becoming Final.

y.      "Immediate Family Member(s)" means children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, sisters-in-law and any persons (other than a tenant or employee) sharing the household, and any trust or foundation which is for the benefit of any person described herein.

z.      "Individual Defendants" means Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen F. Brassfield, Aanchal Gupta, Colleen Sullivan, Antonio Martino, Dennis Frank, and Robert Campbell.

aa.      "Investment Vehicle" means any investment company or pooled investment fund, including but not limited to mutual fund families, exchange-traded funds, funds of funds, private equity funds, real estate funds, and hedge funds, in which Defendants, or any of them, have, has or may have a direct or indirect interest, or as to which their affiliates may act as an investment advisor, but in which any Defendant alone or together with its, his or her respective affiliates does not hold a majority beneficial interest.

STIPULATION OF SETTLEMENT                    7              CASE NO. 22-CV-01936-JES-MSB

bb.    "Judgment" means a final order of judgment and dismissal, substantially in the form attached hereto as Exhibit B, to be entered by the Court approving the Settlement (or in such other form as may be approved in writing by all of the Parties acting by and through their respective counsel of record in the Action).

cc.    "Lead Counsel" means the law firms of Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP, for purposes of this Stipulation and the Settlement only.

dd.    "Lead Plaintiffs" means Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust.

ee.    "Litigation Expenses" means the reasonable costs and expenses incurred in connection with commencing, prosecuting and settling the Action (which may include the costs and expenses of Plaintiffs directly related to their representation of the Settlement Class), for which Lead Counsel intend to apply to the Court for payment or reimbursement from the Settlement Fund.

ff.    "Net Settlement Fund" means the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court.

gg.    "Notice" means the Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses, substantially in the form attached hereto as Exhibit A-1, which is to be mailed to Settlement Class Members.

hh.    "Notice and Administration Costs" means the costs, fees, and expenses that are incurred by the Claims Administrator and/or Lead Counsel in connection with: (i) providing notices to the Settlement Class; and (ii) administering the Settlement, including but not limited to

STIPULATION OF SETTLEMENT                8              CASE NO. 22-CV-01936-JES-MSB

the Claims process, as well as the costs, fees, and expenses incurred in connection with the Escrow Account.

ii.    "Officer" means any officer as that term is defined in Securities and Exchange Act Rule 16a-1(f).

jj.    "Parties" means Defendants and Plaintiffs, on behalf of themselves and the Settlement Class.

kk.    "Plaintiffs" means Lead Plaintiffs together with Bucks County Employees Retirement Fund.

ll.    "Plaintiffs' Counsel" means Lead Counsel and all other legal counsel who, at the direction and under the supervision of Lead Counsel, performed services on behalf of the Settlement Class in the Action

mm.    "Plaintiff Releasees" means Plaintiffs and all other Settlement Class Members, and their respective current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

nn.    "Plaintiff Releasors" means Plaintiffs and all other Settlement Class Members, and their respective heirs, executors, administrators, predecessors, successors, assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Plaintiffs' Claims on behalf of a Settlement Class Member, in that capacity.

oo.    "Plan of Allocation" means the proposed plan of allocation of the Net Settlement Fund set forth in the Notice.

pp.    "Preliminary Approval Order" means the order, substantially in the form attached hereto as Exhibit A, to be entered by the Court preliminarily approving the Settlement and directing that notice of the Settlement be provided to the Settlement Class.

STIPULATION OF SETTLEMENT                9                CASE NO. 22-CV-01936-JES-MSB

qq. "PSLRA" means the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1, 78u-4, as amended.

rr. "Released Claims" means all Released Defendants' Claims and all Released Plaintiffs' Claims.

ss. "Released Defendants' Claims" means all claims and causes of action of every nature and description, whether known or Unknown Claims, whether arising under federal, state, common, or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement or any claims against any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

tt. "Released Plaintiffs' Claims" means all claims, demands, losses, rights, and causes of action of any nature whatsoever, whether known claims or Unknown Claims, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, common, or foreign law or any other law, rule or regulation, by Plaintiffs, any member of the Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which arise out of, are based upon, or relate in any way to (i) any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to, in the Action, or which could have been alleged in the Action, and/or (ii) the purchase, acquisition, holding, sale, or disposition of the publicly traded common stock of Silvergate Capital during the Class Period and/or the securities issued in or traceable to any of Silvergate Capital's securities offerings during 2021. This release does not include any claims relating to the enforcement of the Settlement.

uu. "Releasee(s)" means each and any of the Defendant Releasees and each and any of the Plaintiff Releasees.

vv. "Releases" means the releases set forth in ¶¶ 6-7 of this Stipulation.

STIPULATION OF SETTLEMENT    10    CASE NO. 22-CV-01936-JES-MSB

ww.    "Settlement" or "Class Action Settlement" means the resolution of the Action against Defendants in accordance with the terms and conditions set forth in this Stipulation.

xx.    "Settlement Amount" means the total amount of $37,500,000 in cash. Except as provided for in ¶ 23, Defendants shall not have any obligation whatsoever to pay any amount over and above the principal amount of $37,500,000 in cash.

yy.    "Settlement Class" means (a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital during the Class Period and were damaged thereby, and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021, and were damaged thereby.[1]  Excluded from the Settlement Class are:  (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no Investment Vehicle shall be excluded from the Settlement Class.  Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court.

zz.    "Settlement Class Member" means each person and entity that is a member of the Settlement Class.

aaa.    "Settlement Fund" means the Settlement Amount plus any and all interest earned thereon.

bbb.    "Settlement Hearing" means the hearing set by the Court under Rule 23(e)(2) of the Federal Rules of Civil Procedure to consider final approval of the Settlement.

ccc.    "Silvergate Capital" means Silvergate Capital Corporation.

ddd.    "Silvergate Capital Preferred Stock" means depositary shares representing

---

[1] Silvergate Capital's securities offerings during 2021 (the "2021 Offerings") included (a) three offerings of Silvergate Capital Class A common stock conducted on or about January 20, 2021, March 18 through May 18, 2021, and December 6, 2021, and (b) a public offering of depositary shares, each representing a 1/40th ownership interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A, conducted on or around July 28, 2021.

STIPULATION OF SETTLEMENT          11          CASE NO. 22-CV-01936-JES-MSB

a 1/40th ownership interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A.

eee. "Silvergate Capital Stock" means Silvergate Capital common stock and Silvergate Capital Preferred Stock.

fff. "Silvergate Capital's Counsel" means Sheppard, Mullin, Richter & Hampton LLP and Cravath, Swaine & Moore LLP.

ggg. "Silvergate Defendants" means the Debtors and the Individual Defendants.

hhh. "Summary Notice" means the Summary Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Fairness Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses, substantially in the form attached hereto as Exhibit A-3, to be published as set forth in the Preliminary Approval Order.

iii. "Taxes" means: (i) all federal, state and/or local taxes of any kind (including any interest or penalties thereon) on any income earned by the Settlement Fund, including but not limited to any taxes or tax detriments that might be imposed upon Defendants or Defendant Releasees with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "Qualified Settlement Fund" for federal or state income tax purposes, which if imposed shall be reimbursed from the Settlement Fund to Defendants or Defendant Releasees within fourteen (14) days of written demand for such reimbursement ; and (ii) the reasonable expenses and costs incurred by Lead Counsel in connection with determining the amount of, and paying, any taxes owed by the Settlement Fund (including, without limitation, expenses of tax attorneys and accountants); and (iii) all taxes imposed on payments by the Settlement Fund, including withholding taxes.

jjj. "Underwriter Defendants" means Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc.

kkk. "Unknown Claims" means any Released Plaintiffs' Claims which any Plaintiff or any other Settlement Class Member or any other Plaintiff Releasor does not know or

STIPULATION OF SETTLEMENT                12                CASE NO. 22-CV-01936-JES-MSB

suspect to exist in his, her, or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other Defendant Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, in each case which, if known by him, her, or it, might have affected his, her, or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly waive, and each of the Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Plaintiffs, Settlement Class Members, and Defendants acknowledge that they may hereafter discover facts in addition to or different from those which he, she, or it or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly fully, finally, and forever settle and release, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and Defendants acknowledge, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed by operation of

STIPULATION OF SETTLEMENT     13     CASE NO. 22-CV-01936-JES-MSB

the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a material element of the Settlement.

## CLASS CERTIFICATION

2.      Solely for purposes of this Stipulation and the Settlement and for no other purpose, Defendants and Plaintiffs, on behalf of themselves and each of the Settlement Class Members, stipulate and agree to: (a) certification of the Settlement Class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure; (b) certification of Plaintiffs as Class Representatives for the Settlement Class; and (c) appointment of Lead Counsel as Class Counsel for the Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  In the event that the Settlement upon the terms and conditions set forth in this Stipulation is not approved by the Court, is terminated, or the Effective Date does not occur for any reason, the certification of the Settlement Class automatically shall be revoked without requiring any additional action by the Parties or the Court.  In such event, Defendants reserve their right to object for any and all reasons to the certification of the Settlement Class or to the appointment of Lead Plaintiffs as Class Representatives for the Settlement Class or to the appointment of Lead Counsel as Class Counsel for the Settlement Class, and this Stipulation shall not be used or considered in any way in connection with class certification or class representation.

## PRELIMINARY APPROVAL OF SETTLEMENT

3.      Following the execution of the Term Sheet, on April 22, 2025, Debtors filed a motion (the "Rule 9019 Motion") with the Bankruptcy Court in the Chapter 11 Cases seeking entry of an order of the Bankruptcy Court (the "Bankruptcy Court Approval Order") (a) approving the Debtors' entry into and performance under the Term Sheet and this Stipulation and the March 27, 2025 settlement term sheet as among the Individual Defendants, certain other indemnified individuals listed in Exhibit A of the March 27, 2025 settlement term sheet (together the "Indemnified Individuals"), the *ad hoc* group of preferred equity holders (the "*Ad Hoc* Group"), and the Debtors (the "Indemnified Individuals Term Sheet"); and the settlements contemplated thereby (together with the Class Action Settlement, the "Settlements"); and (b) modifying the

STIPULATION OF SETTLEMENT                14                CASE NO. 22-CV-01936-JES-MSB

automatic stay under Section 362 of the Bankruptcy Code, to the extent necessary, to permit the Parties to seek and obtain Court approval of and consummate the Settlement.

4. Within five (5) business days after entry of the Bankruptcy Court Approval Order, Plaintiffs will move for preliminary approval of the Settlement, certification of the Settlement Class for settlement purposes only, authorization to provide notice of the Settlement to the Settlement Class, and the scheduling of a hearing for consideration of final approval of the Settlement. Concurrently with the motion for preliminary approval, Plaintiffs shall apply to the Court for, and Defendants shall agree to, entry of the Preliminary Approval Order, substantially in the form attached hereto as Exhibit A. If the Settlement is terminated for any reason or not approved by the Court, the conditional approval of the Action as a class action shall be vacated immediately without further application or motion by any person or entity, and the Action shall proceed as if the Settlement Class had never been certified, and the appointments in ¶ 2 had not been made.

## **RELEASE OF CLAIMS**

5. The obligations incurred pursuant to this Stipulation shall be in full and final disposition of the Action against the Defendants, and shall fully and finally release any and all Released Claims as against all Releasees. The Judgment shall, among other things, provide for the dismissal with prejudice of the Action against the Defendants, without costs to any party.

6. As a material condition of the Settlement, pursuant to the Judgment, without further action by anyone, upon the Effective Date of the Settlement, Plaintiffs and each of the Settlement Class Members, on behalf of themselves, and the Plaintiff Releasors, regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, shall be deemed to have, and by operation of this Stipulation, of law, and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Plaintiffs' Claim against Defendants and the Defendant Releasees, and shall forever be barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own

STIPULATION OF SETTLEMENT                    15          CASE NO. 22-CV-01936-JES-MSB

behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

7. Pursuant to the Judgment, without further action by anyone, upon the Effective Date of the Settlement, Defendants, on behalf of themselves and the Defendant Releasors, shall be deemed to have, and by operation of law and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Defendants' Claim against Plaintiffs and the other Plaintiff Releasees, and shall forever be barred and enjoined from commencing, instituting, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Defendants' Claims against any of the Plaintiff Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity. This release shall not apply to any person or entity that submits a request for exclusion from the Settlement Class that is accepted by the Court.

8. Upon the Effective Date, this Stipulation shall operate conclusively as an estoppel, res judicata, bar, full defense, and any other theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim in the event, and to the extent, of any claim, demand, action, or proceeding brought by Plaintiff Releasors against any of the Defendant Releasees with respect to any Released Plaintiffs' Claims, or brought by Defendant Releasors against any of the Plaintiff Releasees with respect to any Released Defendants' Claim.

9. Notwithstanding ¶¶ 6-7 above, nothing in the Judgment shall bar any action by any of the Parties to enforce or effectuate the terms of this Stipulation or the Judgment.

STIPULATION OF SETTLEMENT            16            CASE NO. 22-CV-01936-JES-MSB

## THE SETTLEMENT CONSIDERATION

10. In consideration of the settlement of the Released Plaintiffs' Claims against Defendants and the other Defendant Releasees, the Settlement Amount shall be paid as follows: (a) contemporaneously with, or within twenty (20) business days after the later of preliminary approval of the Settlement by the Court or Defendants' Counsel's receipt from Lead Counsel of the information necessary to effectuate a transfer of funds to the Escrow Account, including wiring instructions that include the bank name and ABA routing number, account name and number, and a signed W-9 reflecting a valid taxpayer identification number for the qualified settlement fund in which the Settlement Amount is to be deposited, (i) Silvergate Defendants shall cause $27,500,000 to be paid into the Escrow Account, which will come from insurance proceeds for which the Individual Defendants are beneficiaries (the "D&O Insurance Contribution"), and (ii) the Underwriter Defendants shall pay or cause to be paid $4,680,000 into the Escrow Account (the "Underwriter Contribution"), as to which the allocation of payment amongst the Underwriter Defendants shall remain strictly confidential; and (b) an additional $5,320,000 which, on the Chapter 11 Plan Effective Date, will be transferred to the Escrow Account for the benefit of the Plaintiffs from the cash distribution made by the Debtors to the preferred equity holders under the Chapter 11 Plan (the "Preferred Equity Holder Contribution"). Except as provided in Paragraph 23 herein, the Settlement Amount represents the entirety of the Defendants' financial obligations under this Stipulation and in connection with this Settlement, meaning that the Settlement Amount includes all attorneys' fees and expenses, Notice and Administration Costs, Taxes, and costs of any kind whatsoever associated with the Settlement. The full payment of the entire Settlement Amount into the Escrow Account in accordance with this paragraph fully discharges Defendants' financial obligations under this Stipulation and in connection with the Settlement, meaning that none of the Defendants shall have any other obligation to make any payment into the Escrow Account or to any Plaintiff Releasee, or any other person, under this Stipulation or as part of the Settlement once the payment described in this paragraph has been made.

STIPULATION OF SETTLEMENT 17 CASE NO. 22-CV-01936-JES-MSB

## **USE OF SETTLEMENT FUND**

11. Subject to the terms and conditions of this Stipulation and the Settlement, the Settlement Fund is inclusive of and shall be used to pay: (a) any Taxes; (b) any Notice and Administration Costs; (c) any Litigation Expenses awarded by the Court; (d) any attorneys' fees awarded by the Court; and (e) any other costs and fees approved by the Court. The balance remaining in the Settlement Fund, that is, the Net Settlement Fund, shall be distributed to Authorized Claimants as provided in ¶¶ 21-33 below, or as otherwise ordered by the Court.

12. Immediately upon deposit of the Settlement Amount into the Escrow Account, Defendants shall have no liability to fund that portion of the Settlement Amount so deposited and no responsibility for the Settlement Fund, including any loss of principal. Plaintiffs, on behalf of themselves, and all Settlement Class Members, shall hold Defendants harmless for any losses, claims, causes of action, damages, liability, or expenses (including reasonable attorneys' fees) arising from or related to any default by the Escrow Agent in respect of any of their responsibilities, duties or obligations regarding the Settlement Amount, the Settlement Fund, or Net Settlement Fund.

13. Except as provided herein or pursuant to orders of the Court, the Net Settlement Fund shall remain in the Escrow Account prior to the Effective Date. All funds held by the Escrow Agent shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed or returned pursuant to the terms of this Stipulation and/or further order of the Court. The Escrow Agent shall invest any funds in the Escrow Account exclusively in United States Treasury Bills (or a mutual fund invested solely in such instruments) and shall collect and reinvest all interest accrued thereon, except that any residual cash balances up to the amount that is insured by the FDIC may be deposited in any account that is fully insured by the FDIC. In the event that the yield on United States Treasury Bills is negative, in lieu of purchasing such Treasury Bills, all or any portion of the funds held by the Escrow Agent may be deposited in any account that is fully insured by the FDIC or backed by the full faith and credit of the United States. Additionally, if short-term placement of the funds is

STIPULATION OF SETTLEMENT              18              CASE NO. 22-CV-01936-JES-MSB

necessary, all or any portion of the funds held by the Escrow Agent may be deposited in any escrow account that is fully insured by the FDIC or backed by the full faith and credit of the United States.

14.    The Parties agree that the Settlement Fund is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and that Lead Counsel, as administrators of the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be solely responsible for filing or causing to be filed all informational and other tax returns or other tax-related documents as may be necessary or appropriate (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)) for the Settlement Fund. Lead Counsel shall also be responsible for causing payment to be made from the Settlement Fund of any Taxes owed with respect to the Settlement Fund. The Defendant Releasees shall not have any liability or responsibility for any such Taxes. Upon written request, Silvergate Capital will provide to Lead Counsel the statement described in Treasury Regulation § 1.468B-3(e). Lead Counsel, as administrators of the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall timely make such elections as are necessary or advisable to carry out this paragraph, including, as necessary, making a "relation back election," as described in Treasury Regulation § 1.468B-1(j), to cause the Qualified Settlement Fund to come into existence at the earliest allowable date, and shall take or cause to be taken all actions as may be necessary or appropriate in connection therewith.

15.    All Taxes shall be paid out of the Settlement Fund, and shall be timely paid, or caused to be paid, by Lead Counsel and without further order of the Court. Any tax returns prepared for the Settlement Fund (as well as the election set forth therein) shall be consistent with the previous paragraph and in all events shall reflect that all Taxes on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided herein.

16.    The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, no Defendant, Defendant Releasee, or any other person or entity that paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever, including without limitation, the number of Claims submitted, the collective amount of Recognized Claims of Authorized Claimants (as defined in the

STIPULATION OF SETTLEMENT              19              CASE NO. 22-CV-01936-JES-MSB

Plan of Allocation set forth in the Notice attached hereto as Exhibit 1 to Exhibit A), the percentage of recovery of losses, or the amounts to be paid to Authorized Claimants from the Net Settlement Fund.

17.     Following entry of the Preliminary Approval Order, Lead Counsel shall have sole responsibility for directing payment from the Settlement Fund, without further order of the Court, all Notice and Administration Costs actually incurred and paid or payable.  Such costs and expenses shall include, without limitation, the actual costs of printing and mailing the Notice, publishing the Summary Notice, reimbursements to nominee owners for forwarding the Notice to their beneficial owners, the administrative expenses actually incurred and fees reasonably charged by the Claims Administrator in connection with providing notice and administering the Settlement (including processing the submitted Claims), and the fees, if any, of the Escrow Agent.  In the event that the Settlement is terminated pursuant to the terms of this Stipulation, all Notice and Administration Costs paid or incurred, including any related fees, shall not be returned or repaid to Defendants, any of the other Defendant Releasees, or any other person or entity that paid any portion of the Settlement Amount.

## ATTORNEYS' FEES AND LITIGATION EXPENSES

18.     Lead Counsel will apply to the Court for a collective award of attorneys' fees to Plaintiffs' Counsel to be paid solely from (and out of) the Settlement Fund once funded.  Lead Counsel will also apply to the Court for payment or reimbursement of Litigation Expenses, which may include a request for reimbursement of Plaintiffs' costs and expenses directly related to their representation of the Settlement Class pursuant to the PSLRA, 15 U.S.C. §§ 77z-1, 78u-4(a)(4), to be paid solely from (and out of) the Settlement Fund.  Lead Counsel's application for an award of attorneys' fees and/or Litigation Expenses is not the subject of any agreement between Defendants and Plaintiffs other than what is set forth in this Stipulation.

19.     Any attorneys' fees and Litigation Expenses that are awarded by the Court shall be paid to Lead Counsel from the Settlement Fund immediately upon award and approval of the Settlement by the Court, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof, subject to

the joint and several obligation of Plaintiffs' Counsel to make appropriate refunds or repayments to the Settlement Fund, plus accrued interest at the same net rate as is earned by the Settlement Fund, if the Settlement is terminated pursuant to the terms of this Stipulation or if, as a result of any court order, appeal or further proceedings on remand, or successful collateral attack, the award of attorneys' fees and/or Litigation Expenses is reduced or reversed and such order reducing or reversing the award has become Final. Lead Counsel shall make the appropriate refund or repayment in full no later than thirty (30) days after: (a) receiving from Defendants' Counsel notice of the termination of the Settlement; or (b) any order reducing or reversing the award of attorneys' fees and/or Litigation Expenses has become Final. An award of attorneys' fees and/or Litigation Expenses is not a necessary term of this Stipulation and is not a condition of the Settlement embodied herein. The Parties understand that whatever amount is awarded by the Court is within the sole discretion of the Court, and if the award is less than the amount sought by Plaintiffs' Counsel, this will not be a basis for setting aside the Settlement. Neither Plaintiffs nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses. Neither Defendants nor their counsel shall have any responsibility for any application for attorneys' fees or litigation expenses submitted by Plaintiffs' Counsel or Plaintiffs.

20.     Lead Counsel shall allocate the attorneys' fees awarded among Plaintiffs' Counsel in a manner which they, in good faith, believe reflects the contributions of such counsel to the institution, prosecution and settlement of the Action. The Defendant Releasees shall have no responsibility for or liability whatsoever with respect to the allocation or award of attorneys' fees or Litigation Expenses. The attorneys' fees and Litigation Expenses that are awarded to Plaintiffs' Counsel shall be payable solely from the Settlement Fund in the Escrow Account.

### NOTICE AND SETTLEMENT ADMINISTRATION

21.     As part of the Preliminary Approval Order, Lead Counsel shall seek appointment of a Claims Administrator. The Claims Administrator shall administer the Settlement, including but not limited to the process of receiving, reviewing, and approving or denying Claims, under Lead Counsel's supervision and subject to the jurisdiction of the Court. None of the Defendants,

STIPULATION OF SETTLEMENT          21          CASE NO. 22-CV-01936-JES-MSB

Defendants' Counsel, nor any other Defendant Releasees, shall have any involvement in or any responsibility, authority, or liability whatsoever for the selection of the Claims Administrator, the Plan of Allocation, the administration of the Settlement, the Claims process, or disbursement of the Net Settlement Fund, and shall have no liability whatsoever to any person or entity, including, but not limited to, Plaintiffs, any other Settlement Class Members, or Lead Counsel, in connection with the foregoing. Defendants' Counsel shall cooperate in the administration of the Settlement to the extent reasonably necessary to effectuate its terms.

22. In accordance with the terms of the Preliminary Approval Order to be entered by the Court, Lead Counsel shall cause the Claims Administrator to mail the Notice and Claim Form to those Settlement Class Members as may be identified through reasonable effort. Lead Counsel shall also cause the Claims Administrator to have the Summary Notice published in accordance with the terms of the Preliminary Approval Order to be entered by the Court.

23. Defendants shall be responsible for serving notice under the Class Action Fairness Act ("CAFA") if they determine it is required, and for coordinating with the Claims Administrator to the extent necessary. Silvergate Capital shall be solely responsible for the costs of those CAFA notices. At least seven (7) calendar days before the Settlement Hearing, or as otherwise ordered by the Court, Defendants shall cause to be served on Lead Counsel and filed with the Court proof, by affidavit or declaration, regarding compliance with CAFA § 1715(b).

24. The Claims Administrator shall receive Claims and determine first, whether the Claim is a valid Claim, in whole or part, and second, each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Claim compared to the total Recognized Claims of all Authorized Claimants (as set forth in the Plan of Allocation set forth in the Notice attached hereto as Exhibit A-1, or in such other plan of allocation as the Court approves).

25. The Plan of Allocation proposed in the Notice is not a necessary term of the Settlement or of this Stipulation and it is not a condition of the Settlement or of this Stipulation that any particular plan of allocation be approved by the Court. Plaintiffs and Lead Counsel may not cancel or terminate the Settlement (or this Stipulation) based on the Court's or any appellate

STIPULATION OF SETTLEMENT                22                CASE NO. 22-CV-01936-JES-MSB

court's ruling with respect to the Plan of Allocation or any other plan of allocation in this Action, and any order or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel the Stipulation or affect the finality of the approval of the Settlement. Defendants and the other Defendant Releasees shall not object in any way to the Plan of Allocation or any other plan of allocation in this Action. No Defendant, nor any other Defendant Releasees, shall have any involvement with or liability, obligation, or responsibility whatsoever in connection with the Plan of Allocation or any other Court-approved plan of allocation.

26. Any Settlement Class Member who does not submit a valid Claim by the deadline set by the Court (unless and to the extent the deadline is extended by the Court) will not be entitled to receive any distribution from the Net Settlement Fund, but will, nevertheless, upon the occurrence of the Effective Date, be otherwise bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment, to be entered in the Action and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim, or other proceeding of any kind against any of the Defendants or any of the other Defendant Releasees with respect to the Released Plaintiffs' Claims in the event that the Effective Date occurs with respect to the Settlement.

27. Lead Counsel shall be responsible for supervising the administration of the Settlement and the disbursement of the Net Settlement Fund subject to Court approval. No Defendant, or any other Defendant Releasees, shall be responsible for, have any liability for, or be permitted to review, contest, or object to any Claim, or any decision of the Claims Administrator or Lead Counsel with respect to accepting or rejecting any Claim for payment. Lead Counsel shall have the right, but not the obligation, to waive what it deems to be formal or technical defects in any Claims submitted in the interests of achieving substantial justice.

28. For purposes of determining the extent, if any, to which a Settlement Class Member shall be entitled to be treated as an Authorized Claimant, the following conditions shall apply:

a. each Claimant shall be required to submit a Claim in paper form, substantially in the form attached hereto as Exhibit A-2, or in electronic form, in accordance with the instructions for the submission of such Claims, and supported by such documents as are

STIPULATION OF SETTLEMENT          23          CASE NO. 22-CV-01936-JES-MSB

designated therein, including proof of the Claimant's loss, or such other documents or proof as the Claims Administrator or Lead Counsel, in their discretion, may deem acceptable;

b.    all Claims must be submitted by the date set by the Court in the Preliminary Approval Order and specified in the Notice, unless extended by the Court.  Any Settlement Class Member who fails to submit a Claim by such date shall be forever barred from receiving any distribution from the Net Settlement Fund or payment pursuant to this Stipulation (unless by order of the Court such Settlement Class Member's Claim is accepted), but shall in all other respects be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment, and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any Defendant Releasees with respect to any Released Plaintiffs' Claim.  Provided that it is mailed by the claim-submission deadline, a Claim Form shall be deemed to be submitted when postmarked, if received with a postmark indicated on the envelope and if mailed by first-class mail and addressed in accordance with the instructions thereon.  In all other cases, the Claim Form shall be deemed to have been submitted on the date when actually received by the Claims Administrator;

c.    each Claim shall be submitted to and reviewed by the Claims Administrator who shall determine in accordance with this Stipulation and the plan of allocation approved by the Court the extent, if any, to which each Claim shall be allowed, subject to review by the Court pursuant to subparagraph (e) below as necessary;

d.    Claims that do not meet the submission requirements may be rejected.  Prior to rejecting a Claim in whole or in part, the Claims Administrator shall communicate with the Claimant in writing, to give the Claimant the chance to remedy any curable deficiencies in the Claim submitted.  The Claims Administrator shall notify, in a timely fashion and in writing, all Claimants whose Claim the Claims Administrator proposes to reject in whole or in part, setting forth the reasons therefor, and shall indicate in such notice that the Claimant whose Claim is to be rejected has the right to a review by the Court if the Claimant so desires and complies with the requirements of subparagraph (e) below; and

---

STIPULATION OF SETTLEMENT                24            CASE NO. 22-CV-01936-JES-MSB

e.      if any Claimant whose Claim has been rejected in whole or in part desires to contest such rejection, the Claimant must, within twenty (20) days after the date of mailing of the notice required in subparagraph (d) above or a lesser time period if the Claim was untimely, serve upon the Claims Administrator a notice and statement of reasons indicating the Claimant's grounds for contesting the rejection along with any supporting documentation, and requesting a review thereof by the Court.  If a dispute concerning a Claim cannot be otherwise resolved, Lead Counsel shall thereafter present the request for review to the Court.

29.      Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to the Claimant's Claim, including, but not limited to, the releases provided in the Judgment, and the Claim will be subject to investigation and discovery under the Federal Rules of Civil Procedure, provided, however, that such investigation and discovery shall be limited to that Claimant's status as a Settlement Class Member and the validity and amount of the Claimant's Claim.  No discovery shall be allowed on the merits of this Action or of the Settlement in connection with the processing of Claims, nor shall there be any discovery from the Defendants or Defendant's Releasees.

30.      Lead Counsel will apply to the Court, on reasonable notice to Defendants' Counsel, for a Class Distribution Order: (a) approving the Claims Administrator's administrative determinations concerning the acceptance and rejection of the Claims submitted; (b) approving payment of any administration fees and expenses associated with the administration of the Settlement from the Escrow Account; and (c) if the Effective Date has occurred, directing payment of the Net Settlement Fund to Authorized Claimants from the Escrow Account.

31.      Payment pursuant to the Class Distribution Order shall be final and conclusive against all Claimants.  All Settlement Class Members who do not submit a Claim or whose Claims are not approved by the Court for payment shall be barred from participating in distributions from the Net Settlement Fund, but otherwise shall be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment to be entered in this Action and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any

STIPULATION OF SETTLEMENT                25                CASE NO. 22-CV-01936-JES-MSB

action against any and all Defendant Releasees with respect to any and all of the Released Plaintiffs' Claims.

32. No person or entity shall have any claim against Plaintiffs, Plaintiffs' Counsel, the Claims Administrator, or any other agent designated by Lead Counsel, Defendants, Defendants' Counsel, or Defendant Releasees and/or their respective counsel, arising from distributions made substantially in accordance with the Stipulation, the plan of allocation approved by the Court, or any order of the Court. Plaintiffs and Defendants, and their respective counsel, and Plaintiffs' damages expert and all other Releasees shall have no liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund, the plan of allocation approved by the Court, or the determination, administration, calculation, or payment of any claim or nonperformance of the Claims Administrator, the payment or withholding of taxes (including interest and penalties) owed by the Settlement Fund, or any losses incurred in connection therewith.

33. All proceedings with respect to the administration, processing and determination of Claims and the determination of all controversies relating thereto, including disputed questions of law and fact with respect to the validity of Claims, shall be subject to the jurisdiction of the Court. All Settlement Class Members, other Claimants, and parties to this Settlement expressly waive trial by jury (to the extent any such right may exist) and any right of appeal or review with respect to such determinations.

## TERMS OF THE JUDGMENT

34. If the Settlement contemplated by this Stipulation is approved by the Court, Lead Counsel shall request that the Court enter a Judgment, substantially in the form attached hereto as Exhibit B.

35. The Judgment shall, as a material condition of the Settlement, contain a bar order ("Bar Order") substantially in the form set forth in ¶ 14 of Exhibit B that permanently bars, enjoins, and restrains any individual or entity from commencing, prosecuting, or asserting any claims, future claims, or claims against any of the Defendant Releasees, and by the Defendant Releasees against any individual or entity, whether asserted in the Action or any other proceeding, in this

STIPULATION OF SETTLEMENT        26        CASE NO. 22-CV-01936-JES-MSB

Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, for (a) contribution or indemnity (or any other claim, however denominated, whether as a claim, cross-claim, counterclaim, third-party claim, or otherwise, on whatsoever theory) based upon, arising out of, or related to the claims or allegations asserted by Plaintiffs in the Action, or (b) any other claim of any type, whether arising under state, federal, common or foreign law, for which the injury claimed is that person's or entity's actual or threatened liability to Plaintiffs and/or members of the Settlement Class; provided, however, the order shall not preclude Defendants from seeking to enforce any rights or claims they may have under their applicable insurance policies or that the Individual Defendants may have based on the charter and by-laws of the Debtors or their agreements with the Debtors. Moreover, except as provided in an Insurance Release Agreement between the Silvergate Defendants and certain insurers, nothing in the Bar Order shall be construed to impair, negate, diminish, or adversely affect any rights of the Defendant Releasees or their successors or assigns under or with respect to any insurance policies, including, but without limitation, any rights to seek to recover or to recover insurance proceeds or payments under any insurance policies with respect to amounts paid pursuant to the Settlement or incurred in connection with the Action, or any other actual or alleged loss or liability, and Defendant Releasees expressly reserve all rights, claims, positions, arguments, contentions, and defenses with respect to such matters. The Bar Order shall be the broadest permitted under the PSLRA, common law, and the District Court's inherent authority, as applicable. The Bar Order shall also provide that any final verdict or judgment that may be obtained against any individual or entity subject to the Bar Order shall be reduced by the greater of: (a) an amount that corresponds to the percentage of responsibility of the Defendants for common damages; or (b) the amount paid by or on behalf of the Defendants to the Settlement Class or Settlement Class Members, for common damages. If the Judgment fails to include any material part of the Bar Order, or if appellate review of the Bar Order is sought and on such review any material part of the Bar Order is vacated, modified or reversed, then Defendants shall have the right to terminate the Settlement and this Stipulation as specified in ¶ 40 below.

## CONDITIONS OF SETTLEMENT AND EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION

36.     The Effective Date of the Settlement shall be deemed to occur on the occurrence or waiver of all of the following events:

a.     the Court has entered the Preliminary Approval Order, substantially in the form set forth in Exhibit A attached hereto;

b.     the Settlement Amount has been deposited into the Escrow Account in accordance with the provisions of ¶ 10 above;

c.     Silvergate Capital has not exercised its option to terminate the Settlement pursuant to the provisions of this Stipulation (including the Supplemental Agreement described in ¶ 42 below);

d.     Plaintiffs have not exercised their option to terminate the Settlement pursuant to the provisions of this Stipulation;

e.     the Court has approved the Settlement as described herein, following notice to the Settlement Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, and entered the Judgment and the Judgment has become Final; and

f.     the conditions set forth in ¶ 37 below have been met.

37.     The Settlement is also contingent on the Debtors having filed the Rule 9019 Motion, and the Bankruptcy Court having entered the Bankruptcy Court Approval Order granting the Rule 9019 Motion as discussed in ¶ 3 above.  The Settlement is also contingent on the Debtors having filed the Chapter 11 Plan, as soon as practicable after execution of the Stipulation, which shall not be inconsistent with and not derogate from any of the terms of the Settlements and be in a form and substance acceptable to the *Ad Hoc* Group, and, with respect to any terms of the Chapter 11 Plan that materially affect the terms set forth herein, the Indemnified Individuals, the Individual Defendants, the Underwriter Defendants, and the Plaintiffs.  The Chapter 11 Plan shall include the Underwriter Defendants and their respective affiliates, advisors, attorneys, agents, employees, officers, directors, and representatives as beneficiaries of any provisions of the Chapter 11 Plan that seek to provide third-party releases on the same terms provided to the members of the *Ad Hoc*

STIPULATION OF SETTLEMENT            28            CASE NO. 22-CV-01936-JES-MSB

Group, but, for the avoidance of doubt, shall in each case be subject to the terms of such provision as agreed to by the members of the *Ad Hoc* Group. The Settlement is also contingent on the release of all claims held or potentially held by the Debtors (and their affiliates and assigns) against the Defendant Releasees and the Indemnified Individuals, as approved by a non-appealable order of the Bankruptcy Court, with such release occurring upon the Chapter 11 Plan Effective Date and the release of all claims held or potentially held by the Indemnified Individuals against the D&O Insurance Policies, which shall not be unduly delayed or unreasonably withheld by the Indemnified Individuals. Separately, the Settlement shall not be effective until final District Court and Bankruptcy Court approval and the occurrence of the Chapter 11 Plan Effective Date (which may occur simultaneously with payment of the Settlement Amount).

38. Upon the occurrence or waiver of all of the events referenced in ¶¶ 36 and 37 above, any and all remaining interest or right of Defendants in or to the Settlement Fund, if any, shall be absolutely and forever extinguished and the Releases herein shall be effective.

39. If (i) Defendants exercise their right to terminate the Settlement as provided in this Stipulation; (ii) Plaintiffs exercise their right to terminate the Settlement as provided in this Stipulation; (iii) the Court disapproves the Settlement (however any decision with respect to an application for attorneys' fees or Litigation Expenses, or with any respect to any Plan of Allocation, shall not be considered grounds for termination); or (iv) the Effective Date as to the Settlement otherwise fails to occur, then:

a. The Settlement and the relevant portions of this Stipulation shall be canceled and terminated without prejudice and this Stipulation shall be null and void and shall have no further force or effect.

b. Plaintiffs and Defendants shall revert to their respective litigation positions in the Action as of March 25, 2025.

c. The terms and provisions of this Stipulation and the fact of this Settlement, with the exception of this ¶ 39 and ¶¶ 17, 19, 43, 44, 63, and 64 herein, shall have no further force and effect with respect to the Parties and shall not be enforceable, or used in the Action or in any

STIPULATION OF SETTLEMENT                29                CASE NO. 22-CV-01936-JES-MSB

other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Stipulation shall be treated as vacated, *nunc pro tunc*.

d.     Within five (5) business days after (a) joint written notification of termination is sent by Defendants' Counsel and Lead Counsel to the Escrow Agent, or (b) this Settlement fails to become effective for any reason (including because the Bankruptcy Court or the District Court issues a Final order declining to approve the Settlement), the Settlement Fund (including accrued interest thereon, and change in value as a result of the investment of the Settlement Fund, and any funds received by Lead Counsel consistent with ¶ 19 above), less any Notice and Administration Costs actually incurred, paid or payable, and less any Taxes paid, due or owing shall be refunded by the Escrow Agent to Defendants (or such other persons or entities as Defendants may direct) pursuant to written instructions from Defendants' Counsel.  Any such Notice and Administration Costs or Taxes shall be deducted in thirds from each of the D&O Insurance Contribution, the Underwriter Contribution, and the Preferred Equity Holder Contribution. In the event that the funds received by Lead Counsel consistent with ¶ 19 above have not been refunded to the Settlement Fund within the five (5) business days specified in this paragraph, those funds shall be refunded by the Escrow Agent to Defendants (or such other persons or entities as Defendants may direct) pursuant to written instructions from Defendants' Counsel immediately upon their deposit into the Escrow Account consistent with ¶ 19 above.  The Escrow Agent or its designee shall apply for any tax refund owed to the Settlement Fund and pay the proceeds, after deduction of any fees or expenses reasonably incurred in connection with such application(s) for refund, to the Defendants.

40.     It is further stipulated and agreed that Defendants and Plaintiffs shall each have the right to terminate the Settlement and this Stipulation, by providing written notice of their election to do so ("Termination Notice") to the other Parties to this Stipulation within thirty (30) days of: (a) the Court's final refusal to enter the Preliminary Approval Order in any material respect ; (b) the Court's final refusal to approve the Settlement or any material part thereof; (c) the Court's final refusal to enter the Judgment in any material respect as to the Settlement; or (d) the date upon which the Judgment is modified or reversed in any material respect by the United States Court of

STIPULATION OF SETTLEMENT                 30              CASE NO. 22-CV-01936-JES-MSB

Appeals for the Ninth Circuit or the United States Supreme Court. However, any decision or proceeding, whether in this Court or any appellate court, with respect to an application for attorneys' fees or Litigation Expenses or with respect to any plan of allocation, shall not be considered material to the Settlement, shall not affect the finality of any Judgment, and shall not be grounds for termination of the Settlement.

41. In addition to the grounds set forth in ¶ 40 above, Plaintiffs shall also have the right to terminate the Settlement in the event that (i) the Settlement Amount has not been paid as provided for in ¶ 10 above; (ii) Plaintiffs thereafter provide written notice of the election to terminate to Defendants' Counsel; and (iii) there is a failure to pay the Settlement Amount within fourteen (14) calendar days of such written notice.

42. In addition to the grounds set forth in ¶ 40 above, Defendants shall have the unilateral right to terminate the Settlement in the event that collective requests for exclusion from the Settlement Class by Settlement Class Members meet the conditions set forth in Defendants' confidential supplemental agreement with Plaintiffs (the "Supplemental Agreement"), in accordance with the terms of that agreement. The Supplemental Agreement, which is being executed concurrently herewith, shall not be filed with the Court and its terms shall not be disclosed in any other manner (other than the statements herein and in the Notice, to the extent necessary, or as otherwise provided in the Supplemental Agreement) unless and until the Court otherwise directs or a dispute arises between Plaintiffs and Defendants concerning its interpretation or application. If submission of the Supplemental Agreement is required for resolution of a dispute or is otherwise ordered by the Court, Plaintiffs and Defendants will undertake to have the Supplemental Agreement submitted to the Court *in camera*.

## NO ADMISSION OF WRONGDOING

43. The Parties agree that, by entering into the Settlement and Stipulation, Defendants are not admitting any liability, fault or violation of law. The Parties agree and acknowledge that Defendants vigorously deny all allegations and claims asserted against them but are signing this Settlement and Stipulation to avoid the risk, burden and expense of continued litigation.

44.     Neither the Term Sheet, this Stipulation (whether or not consummated), including the exhibits hereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Judgment, the Supplemental Agreement, the negotiations leading to the execution of the Term Sheet and this Stipulation, nor any proceedings taken pursuant to or in connection with this Stipulation, and/or approval of the Settlement (including any arguments proffered in connection therewith):

a.     shall be offered or received against any of the Defendant Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendant Releasees with respect to the truth of any fact alleged by Plaintiffs or the validity of any claim or alleged damages that were or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendant Releasees or in any way used or referred to for any other reason as against any of the Defendant Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation;

b.     shall be offered or received against any of the Plaintiff Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Plaintiff Releasees that any of their claims are without merit, that any of the Defendant Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way used or referred to for any other reason as against any of the Plaintiff Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation;

c.     shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial;

STIPULATION OF SETTLEMENT            32            CASE NO. 22-CV-01936-JES-MSB

d. shall be construed as or received in evidence as an admission, concession or presumption that class certification is or was appropriate in this Action, except for purposes of this Settlement.

*provided, however*, that if this Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted hereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendant Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

## **MISCELLANEOUS PROVISIONS**

45. All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. Notwithstanding the foregoing, in the event that there exists a conflict or inconsistency between the terms of this Stipulation and the terms of any exhibit attached hereto or the Supplemental Agreement, the terms of the Stipulation shall prevail.

46. In the event of the entry of a final order of a court of competent jurisdiction determining the transfer of money to the Settlement Fund or any portion thereof to be a preference, voidable transfer, fraudulent transfer or similar transaction and any portion thereof is required to be returned, and such amount is not promptly deposited into the Settlement Fund by others, then, at the election of Plaintiffs, Plaintiffs and Defendants shall jointly move the Court to vacate and set aside the Releases given and the Judgment, in which event the Releases and Judgment shall be null and void, and the Parties shall be restored to their respective positions in the litigation as provided in ¶ 39 above and any cash amounts in the Settlement Fund (less any Taxes paid, due or owing with respect to the Settlement Fund and less any Notice and Administration Costs actually incurred, paid or payable, shall be returned as provided in ¶ 39).

47. The Parties intend this Stipulation and the Settlement to be a final and complete resolution of all disputes asserted or which could be asserted by Plaintiffs and any other Settlement

STIPULATION OF SETTLEMENT 33 CASE NO. 22-CV-01936-JES-MSB

Class Members against the Defendant Releasees with respect to the Released Plaintiffs' Claims. Accordingly, except in the event of termination of this Settlement, Plaintiffs, and their counsel, and Defendants, and their counsel, agree not to assert in any forum that this Action was brought by Plaintiffs or defended by Defendants in bad faith and without a reasonable basis. No Party shall assert any claims of any violation of Rule 11 of the Federal Rules of Civil Procedure relating to the institution, prosecution, defense, or settlement of this Action. The Parties agree that the amounts paid and the other terms of the Settlement were negotiated at arm's length and in good faith by the Parties, including through a mediation process supervised and conducted by the Honorable Layn Phillips of Phillips ADR, and reflect the Settlement that was reached voluntarily after extensive negotiations and consultation with experienced legal counsel, who were fully competent to assess the strengths and weaknesses of their respective clients' claims or defenses. In all events, Plaintiffs and their counsel and Defendants and their counsel shall not make any accusations of wrongful or actionable conduct by any Party concerning the prosecution, defense, and resolution of the Action, and shall not otherwise suggest that the Settlement constitutes an admission of any claim or defense alleged.

48. The terms of the Settlement, as reflected in this Stipulation including the exhibits thereto and the Supplemental Agreement, may not be modified or amended, nor may any of its provisions be waived, except by a writing signed on behalf of both Plaintiffs and Defendants (or their successors-in-interest).

49. The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

50. All time periods set forth herein shall be computed in calendar days unless otherwise expressly provided. In computing any period of time prescribed or allowed by the terms of this Stipulation or by order of Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which case the period shall run until the end of the next day that is not one of the aforementioned days. As used in the preceding sentence, "legal holiday" includes New Year's Day, Martin Luther King, Jr. Day,

STIPULATION OF SETTLEMENT 34 CASE NO. 22-CV-01936-JES-MSB

Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, Christmas Day, and any other day appointed as a federal holiday.

51. The administration and consummation of the Settlement as embodied in this Stipulation shall be under the authority of the Court, and the Court shall retain jurisdiction for the purpose of entering orders providing for awards of attorneys' fees and Litigation Expenses to Plaintiffs' Counsel and enforcing the terms of this Stipulation, including the Plan of Allocation (or such other plan of allocation as may be approved by the Court) and the distribution of the Net Settlement Fund to Settlement Class Members.

52. Any condition in this Stipulation may be waived by the Party entitled to enforce the condition in a writing signed by that Party or its counsel. The waiver by one Party of any breach of this Stipulation by any other Party shall not be deemed a waiver of any other prior or subsequent breach of this Stipulation. Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of this Stipulation.

53. This Stipulation and its exhibits and the Supplemental Agreement constitute the entire agreement among Plaintiffs and Defendants concerning the Settlement and this Stipulation and its exhibits. All Parties acknowledge that no other agreements, representations, warranties, or inducements have been made by any Party hereto concerning this Stipulation, its exhibits, or the Supplemental Agreement other than those contained and memorialized in such documents.

54. This Stipulation may be executed in one or more counterparts, including by signature transmitted via facsimile, or by a .pdf/.tif image of the signature transmitted via email. The signatures so transmitted shall be given the same effect as the original signatures. All executed counterparts and each of them shall be deemed to be one and the same instrument.

55. This Stipulation shall be binding upon and inure to the benefit of the successors and assigns of the Parties, including any and all Releasees and any corporation, partnership, or other entity into or with which any Party hereto may merge, consolidate, or reorganize.

56. The construction, interpretation, operation, effect, and validity of this Stipulation, the Supplemental Agreement, and all documents necessary to effectuate them shall be governed

---

STIPULATION OF SETTLEMENT 35 CASE NO. 22-CV-01936-JES-MSB

by the internal laws of the State of California without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

57. Any action arising under or to enforce this Stipulation or any portion thereof, shall be commenced and maintained only in the Court, except as may be necessary to defend against or respond to an action against Defendant Releasees in any other forum that might be brought against them, to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

58. This Stipulation shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, it being recognized that it is the result of arm's-length negotiations between the Parties and all Parties have contributed substantially and materially to the preparation of this Stipulation.

59. All counsel and any other person executing this Stipulation and any of the exhibits hereto, and the Supplemental Agreement, or any related Settlement documents, warrant and represent that they have the full authority to do so and that they have the authority to take appropriate action required or permitted to be taken pursuant to the Stipulation to effectuate its terms.

60. Lead Counsel and Defendants' Counsel agree to cooperate fully with one another in seeking Court approval of the Preliminary Approval Order and the Settlement, as embodied in this Stipulation, and to use best efforts to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement.

61. If any Party is required to give notice to another Party under this Stipulation, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery or facsimile or email transmission, with confirmation of receipt. Notice shall be provided as follows:

STIPULATION OF SETTLEMENT                36                CASE NO. 22-CV-01936-JES-MSB

**If to Plaintiffs or Lead Counsel:**

Cohen Milstein Sellers & Toll PLLC
Attn: Carol V. Gilden
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel.: (312) 629-3737
Fax: (202) 408-4699
Email: cgilden@cohenmilstein.com

      -and-

Bernstein Litowitz Berger & Grossmann LLP
Attn: Jonathan D. Uslaner
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA  90067
Tel.: (310) 819-3470
Fax: (212) 554-1444
Email: jonathanu@blbglaw.com

**If to Defendant Silvergate Capital Corporation:**

Sheppard, Mullin, Richter & Hampton LLP
John P. Stigi III
12275 El Camino Real, Suite 100
San Diego, CA 92130-4092
Tel.: (858) 720-8900
Fax: (858) 509-3691
Email: jstigi@sheppardmullin.com

      -and-

Cravath, Swaine & Moore LLP
Lindsay J. Timlin
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel.: (212) 474-1000
Fax: (212) 474-370
Email: ltimlin@cravath.com

---

STIPULATION OF SETTLEMENT      37      CASE NO. 22-CV-01936-JES-MSB

**If to Defendants Goldman Sachs & Co. LLC, Keefe, Bruyette & Woods, Inc., Canaccord Genuity LLC, Compass Point Research & Trading LLC, Craig-Hallum Capital Group LLC, J.P. Morgan Securities LLC, Wedbush Securities Inc., Citigroup Global Markets Inc., and UBS Securities LLC:**

Latham & Watkins LLP
Jason C. Hegt
1271 Avenue of the Americas
New York, NY 10020
Tel.: (212) 906-1200
Fax: (212) 751-4864
Email: jason.hegt@lw.com

**If to Defendants Karen F. Brassfield, Paul D. Colucci, Thomas C. Dircks, Aanchal Gupta, Michael Lempres, Scott A. Reed, and Colleen Sullivan:**

Glenn Agre Bergman & Fuentes LLP
Andrew K. Glenn
1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
Tel.: 212-970-1618
Email: aglenn@glennagre.com


**If to Defendant Alan J. Lane:**

Foley & Lardner LLP
Beth I. Z. Boland
111 Huntington Avenue, Suite 2500
Boston, MA 02199-7610
Tel.: (617) 226-3179
Email: bboland@foley.com


**If to Defendants Dennis S. Frank, Robert C. Campbell, and Derek J. Eisele:**

Goodwin Procter LLP
Alexander J. Nicas, Esq.
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Email: anicas@goodwinlaw.com

STIPULATION OF SETTLEMENT          38          CASE NO. 22-CV-01936-JES-MSB

**If to Defendant Antonio Martino:**

Linklaters LLP
Patrick C. Ashby
1290 Avenue of the Americas
New York, NY 10104
Tel.: (212) 903-9000
Fax: (212) 903-9100
patrick.ashby@linklaters.com

62.     Except as otherwise provided herein, each Party shall bear its own costs.

63.     Whether or not the Stipulation is approved by the Court and whether or not the Stipulation is consummated, or the Effective Date occurs, the Parties and their counsel shall use their best efforts to keep all negotiations, discussions, acts performed, agreements, drafts, documents signed, and proceedings in connection with the Stipulation confidential.

64.     All agreements made and orders entered during the course of this Action relating to the confidentiality of information shall survive this Settlement.

65.     No opinion or advice concerning the tax consequences of the proposed Settlement to individual Settlement Class Members is being given or will be given by the Parties or their counsel; nor is any representation or warranty in this regard made by virtue of this Stipulation. Each Settlement Class Member's tax obligations, and the determination thereof, are the sole responsibility of the Settlement Class Member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member.

---

STIPULATION OF SETTLEMENT                39                CASE NO. 22-CV-01936-JES-MSB

IN WITNESS WHEREOF, the Parties hereto have caused this Stipulation to be executed, by their duly authorized attorneys, as of May 9, 2025.

_Carol V. Gilden_

_____
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
Carol V. Gilden (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

-and-

Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
S. Douglas Bunch (*pro hac vice*)
dbunch@cohenmilstein.com
Jan Messerschmidt (*pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (*pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 800
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice*)
csaler@cohenmilstein.com
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

_____
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA  90067
Tel: (310) 819-3470

-and-

John J. Rizio-Hamilton (*pro hac vice* pending)
johnr@blbglaw.com
Shane D. Avidan (*pro hac vice* pending)
shane.avidan@blbglaw.com
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the Settlement Class*

IN WITNESS WHEREOF, the Parties hereto have caused this Stipulation to be executed, by their duly authorized attorneys, as of May 9, 2025.

_____
**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
Carol V. Gilden (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

-and-

Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
S. Douglas Bunch (*pro hac vice*)
dbunch@cohenmilstein.com
Jan Messerschmidt (*pro hac vice*)
jmesserschmidt@cohenmilstein.com
Brendan Schneiderman (*pro hac vice*)
bschneiderman@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 800
Washington, DC 20005
Tel: (202) 408-4600

-and-

Christina D. Saler (*pro hac vice*)
csaler@cohenmilstein.com
100 N. 18th Street
Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707

_____
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA  90067
Tel: (310) 819-3470

-and-

John J. Rizio-Hamilton (*pro hac vice* pending)
johnr@blbglaw.com
Shane D. Avidan (*pro hac vice* pending)
shane.avidan@blbglaw.com
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 554-1400

*Lead Counsel for Plaintiffs and the Settlement Class*

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
John P. Stigi III
jstigi@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, CA 92130-4092
Tel: (858) 876-3559
Fax: (858) 509-3691

-and-

Polly Towill
ptowill@sheppardmullin.com
John M. Landry
jlandry@sheppardmullin.com
350 South Grand Avenue, 40th Floor
Los Angeles, CA 90071
Tel: (213) 620-1780
Fax: (213) 620-1398

**CRAVATH, SWAINE & MOORE LLP**
George E. Zobitz
jzobitz@cravath.com
Paul H. Zumbro
pzumbro@cravath.com
Lauren A. Moskowitz
lmoskowitz@cravath.com
Lindsay J. Timlin
ltimlin@cravath.com
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 474-1000
Fax: (212) 474-370

*Counsel for the Debtors and Debtors in Possession*

STIPULATION OF SETTLEMENT    41    CASE NO. 22-CV-01936-JES-MSB

**MILBANK LLP**
Dennis F. Dunne
ddunne@milbank.com
Lauren C. Doyle
ldoyle@milbank.com
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 530-5219

-and-

Andrew M. Leblanc
aleblanc@milbank.com
1850 K Street NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel for the Ad Hoc Group of Preferred
Equity Holders*

**LATHAM & WATKINS LLP**
Michele D. Johnson
michele.johnson@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Tel: (714) 540-1235
Fax: (714) 755-8290

-and-

Douglas K. Yatter
douglas.yatter@lw.com
Jason C. Hegt
jason.hegt@lw.com
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864

*Counsel for Defendants Goldman Sachs & Co.
LLC, Keefe, Bruyette & Woods, Inc.,
Canaccord Genuity LLC, Compass Point
Research & Trading LLC, Craig-Hallum
Capital Group LLC, J.P. Morgan Securities
LLC, Wedbush Securities Inc., Citigroup
Global Markets Inc., And UBS Securities LLC*

---

STIPULATION OF SETTLEMENT               42               CASE NO. 22-CV-01936-JES-MSB

**GLENN AGRE BERGMAN &
FUENTES LLP**
Andrew K. Glenn
aglenn@glennagre.com
Jed I. Bergman
jbergman@glennagre.com
Jonathan H. Friedman
jfriedman@glennagre.com
George L. Santiago
gsantiago@glennagre.com
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Tel: (212) 970-1618

-and-

Lyn R. Agre
lagre@glennagre.com
580 California Street, Suite 1420
San Francisco, CA 94104
Tel: (212) 970-1602

*Counsel for Defendants Karen F. Brassfield,
Paul D. Colucci, Thomas C. Dircks, Aanchal
Gupta, Michael Lempres, Scott A. Reed, and
Colleen Sullivan*

**FOLEY & LARDNER LLP**
Beth Boland
bboland@foley.com
111 Huntington Avenue, Suite 2500
Boston, MA 02199-7610
Tel: (617) 226-3179

-and-

Pamela Johnston
pjohnston@foley.com
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2418
Tel: (213) 972-4632

*Counsel for Defendant Alan J. Lane*

STIPULATION OF SETTLEMENT                43                CASE No. 22-CV-01936-JES-MSB

DocuSigned by:

*Beth Boland*

D6360A611161453...

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn
aglenn@glennagre.com
Jed I. Bergman
jbergman@glennagre.com
Jonathan H. Friedman
jfriedman@glennagre.com
George L. Santiago
gsantiago@glennagre.com
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Tel: (212) 970-1618

-and-

Lyn R. Agre
lagre@glennagre.com
580 California Street, Suite 1420
San Francisco, CA 94104
Tel: (212) 970-1602

*Counsel for Defendants Karen F. Brassfield, Paul D. Colucci, Thomas C. Dircks, Aanchal Gupta, Michael Lempres, Scott A. Reed, and Colleen Sullivan*

**FOLEY & LARDNER LLP**
Beth Boland
bboland@foley.com
111 Huntington Avenue, Suite 2500
Boston, MA 02199-7610
Tel: (617) 226-3179

-and-

Pamela Johnston
pjohnston@foley.com
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2418
Tel: (213) 972-4632

*Counsel for Defendant Alan J. Lane*

STIPULATION OF SETTLEMENT        43        CASE NO. 22-CV-01936-JES-MSB

*/s Jonathan Shapiro\**

**GOODWIN PROCTER LLP**
Alexander J. Nicas, Esq.
anicas@goodwinlaw.com
Stacy Dasaro, Esq.
sdasaro@goodwinlaw.com
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 813-8800

-and-

Jonathan Shapiro, Esq.
jshapiro@goodwinlaw.com
525 Market Street
32nd Floor
San Francisco, California 94105
Tel: (415) 733-6000

-and-

Aaron Thompson, Esq.
athompson@goodwinlaw.com
520 Broadway Suite #500
Santa Monica, California 90401
Tel: (424) 252-6400

*Attorneys for Dennis S. Frank, Robert C. Campbell, and Derek J. Eisele*


\* With authorization, as provided under S.D. Cal. ECF Adm. Policies and Procedures ¶ 2.f.4.

**LINKLATERS LLP**
Patrick C. Ashby
patrick.ashby@linklaters.com
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 903-9000
Fax: (212) 903-9100

*Counsel for Defendant Antonio Martino*

_____          _____

**GOODWIN PROCTER LLP**             **LINKLATERS LLP**
Alexander J. Nicas, Esq.            Patrick C. Ashby
anicas@goodwinlaw.com               patrick.ashby@linklaters.com
Stacy Dasaro, Esq.                  1290 Avenue of the Americas
sdasaro@goodwinlaw.com              New York, NY 10104
The New York Times Building         Tel: (212) 903-9000
620 Eighth Avenue                   Fax: (212) 903-9100
New York, New York 10018
Tel: (212) 813-8800                 *Counsel for Defendant Antonio Martino*

-and-

Jonathan Shapiro, Esq.
jshapiro@goodwinlaw.com
525 Market Street
32nd Floor
San Francisco, California 94105
Tel: (415) 733-6000

-and-

Aaron Thompson, Esq.
athompson@goodwinlaw.com
520 Broadway Suite #500
Santa Monica, California 90401
Tel: (424) 252-6400

*Attorneys for Dennis S. Frank, Robert C.
Campbell, and Derek J. Eisele*

---

STIPULATION OF SETTLEMENT            44            CASE NO. 22-CV-01936-JES-MSB

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT AND AUTHORIZING DISSEMINATION OF NOTICE OF SETTLEMENT** |

[PROPOSED] ORDER PRELIMINARILY
APPROVING SETTLEMENT

Case No. 22-cv-01936-JES-MSB

WHEREAS, a consolidated securities class action is pending in this Court entitled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (the "Action");

WHEREAS, (a) Plaintiffs Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class (as defined in paragraph 1(pp) below); and (b) defendants Silvergate Capital Corporation ("Silvergate Capital" and together with its subsidiary Silvergate Bank, the "Debtors"), Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank and Robert Campbell (collectively, the "Individual Defendants" and together with the Debtors, the "Silvergate Defendants") and defendants Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants" and together with the Silvergate Defendants, the "Defendants") have determined to settle all claims asserted against Defendants in this Action with prejudice on the terms and conditions set forth in the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), subject to the approval of this Court (the "Settlement");

WHEREAS, Plaintiffs have made a motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for an order preliminarily approving the Settlement in accordance with the Stipulation and allowing notice to Settlement Class Members as more fully described herein;

WHEREAS, the Court has read and considered: (a) Plaintiffs' motion for preliminary approval of the Settlement and authorization to send notice of the Settlement to the Settlement

[PROPOSED] ORDER PRELIMINARILY    1    CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

Class, and the papers filed and arguments made in connection therewith; and (b) the Stipulation and the exhibits attached thereto; and

WHEREAS, unless otherwise defined in this Order, all capitalized terms herein shall have the same meanings as they have in the Stipulation;

NOW THEREFORE, IT IS HEREBY ORDERED:

1.    **Proposed Class Certification for Settlement Purposes** – The Parties have proposed the certification of the following Settlement Class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure solely for purposes of effectuating the proposed Settlement: (a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019 through March 21, 2023, inclusive, and were damaged thereby, and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021, and were damaged thereby. Excluded from the Settlement Class are (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no Investment Vehicle shall be excluded from the Settlement Class. Also excluded from the Settlement Class are any persons or entities who or which timely and validly exclude themselves by submitting a request for exclusion that is accepted by the Court.

a.    The Court finds, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure and for purposes of effectuating the proposed Stipulation and the Settlement, that it will likely be able to certify the Settlement Class. Specifically, the Court finds that each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met or will likely be met: (a) the members of the Settlement Class are so numerous that their joinder in the Action would be impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of Plaintiffs in the Action are typical of the claims of the Settlement Class; (d) Plaintiffs and Lead Counsel have fairly and adequately represented and protected the interests of the

[PROPOSED] ORDER PRELIMINARILY                    2                    CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

Settlement Class; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the Action.

b. The Court also finds, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure and for purposes of effectuating the proposed Stipulation and the Settlement, that it will likely be able to certify Plaintiffs as Class Representatives for the Settlement Class and preliminarily appoints Lead Counsel as Class Counsel for the Settlement Class, for purposes of the Stipulation and Settlement only, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. Lead Counsel are authorized to act on behalf of the Settlement Class with respect to all acts required by, or which may be undertaken pursuant to, the Stipulation or such other acts that are reasonably necessary to consummate the proposed Settlement set forth in the Stipulation.

2. **Preliminary Approval of the Settlement** – The Court hereby preliminarily approves the Settlement, as embodied in the Stipulation, and finds, pursuant to Rule 23(e)(1)(B)(i) of the Federal Rules of Civil Procedure, that it will likely be able to approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further consideration at the Settlement Hearing to be conducted as described below.

3. **Settlement Hearing** – The Court will hold a settlement hearing (the "Settlement Hearing") on _____, 2025 at _:__ _.m. at Courtroom 4B of the Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, CA 92101, for the following purposes: (a) to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Settlement Class, and should be finally approved by the Court; (b) to determine whether, for purposes of the Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (c) to determine whether a Judgment substantially in the form attached as Exhibit B to the Stipulation should be entered dismissing the Action with prejudice against Defendants, without costs to any party; (d) to determine whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; (e) to determine whether Lead Counsel's motion for attorneys' fees and Litigation Expenses should be approved;

[PROPOSED] ORDER PRELIMINARILY    3    CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

and (f) to consider any other matters that may properly be brought before the Court in connection with the Settlement. Notice of the Settlement and the Settlement Hearing shall be given to Settlement Class Members as set forth in paragraph 5 of this Order.

4.      The Court may adjourn the Settlement Hearing without further notice to the Settlement Class and may approve the proposed Settlement with such modifications as the Parties may agree to, if appropriate, without further notice.

5.      **Retention of Claims Administrator and Manner of Giving Notice** – Lead Counsel are hereby authorized to retain JND Legal Administration (the "Claims Administrator") to supervise and administer the notice procedure in connection with the proposed Settlement, as well as the processing of Claims as more fully set forth below. Notice of the Settlement and the Settlement Hearing shall be given by Lead Counsel as follows:

(a)      within ten (10) business days of the date of entry of this Order, at no cost to the Settlement Fund, Lead Counsel, the Settlement Class, or the Claims Administrator, (i) Silvergate Capital shall provide or cause to be provided to the Claims Administrator, in electronic format, records reasonably available to Silvergate Capital or its transfer agent concerning the identity, last known mailing addresses, and, if available, last known email addresses of potential Settlement Class Members, which information the Claims Administrator shall treat and maintain as confidential, and (ii) the Underwriter Defendants shall provide or cause to be provided to the Claims Administrator, in electronic format, records reasonably available to the Underwriter Defendants concerning the identity of persons and entities who purchased Silvergate Capital Stock in the 2021 Offerings, which information the Claims Administrator shall treat and maintain as confidential;

(b)      beginning not later than twenty (20) business days after the date of entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and the Claim Form, substantially in the forms attached hereto as Exhibits 1 and 2, respectively (collectively, the "Notice Packet"), to be mailed by first-class mail or emailed to all potential Settlement Class Members who may be identified through reasonable effort, including those identified by Silvergate Capital and the Underwriter Defendants and through mailing the Notice

[PROPOSED] ORDER PRELIMINARILY          4          CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

Packet to the largest and most common brokers and other nominee owners, who will be instructed to forward the Notice Packet or provide names and addresses of Settlement Class Members, as discussed below in paragraph 7;

(c)   by the Notice Date, the Claims Administrator shall cause copies of the Notice and Claim Form to be posted on a website to be developed for the Settlement, from which copies of the Notice and Claim Form can be downloaded;

(d)   not later than ten (10) business days after the Notice Date, the Claims Administrator shall cause the Summary Notice, substantially in the form attached hereto as Exhibit 3, to be published in *The Wall Street Journal* and to be transmitted once over the *PR Newswire*; and

(e)   not later than seven (7) calendar days prior to the Settlement Hearing, Lead Counsel shall serve on Defendants' Counsel and file with the Court proof, by affidavit or declaration, of such mailing and publication.

6.    **Approval of Form and Content of Notice** – The Court (a) approves, as to form and content, the Notice, the Claim Form, and the Summary Notice, attached hereto as Exhibits 1, 2, and 3, respectively, and (b) finds that the mailing and distribution of the Notice and Claim Form and the publication of the Summary Notice in the manner and form set forth in paragraph 5 of this Order (i) is the best notice practicable under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, of the effect of the proposed Settlement (including the Releases to be provided thereunder), of Lead Counsel's motion for attorneys' fees and Litigation Expenses, of Settlement Class Members' right to object to the Settlement, the Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses, of their right to exclude themselves from the Settlement Class, and of their right to appear at the Settlement Hearing; (iii) constitutes due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1, 78u-4, as amended, and all other

[PROPOSED] ORDER PRELIMINARILY        5        CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

applicable law and rules. The date and time of the Settlement Hearing shall be included in the Notice and Summary Notice before they are mailed and published, respectively.

7.    **Nominee Procedures** – Brokers and other nominees who purchased or otherwise acquired Silvergate Capital common stock during the Class Period or purchased Silvergate Capital Stock in or traceable to the 2021 Offerings for the benefit of another person or entity shall: (a) within seven (7) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Notice Packet to forward to all such beneficial owners and, within seven (7) calendar days of receipt of those Notice Packets, forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names, mailing addresses, and, if available, email addresses, of all such beneficial owners to the Claims Administrator in which event the Claims Administrator shall promptly mail or email the Notice Packet to such beneficial owners. Upon full compliance with this Order, such nominees may seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such expenses incurred by the nominees shall not exceed $0.05 plus postage at the current pre-sort rate used by the Claims Administrator per Notice Packet mailed; or $0.05 per name, address, and email address (to the extent available) provided to the Claims Administrator. Such properly documented expenses incurred by nominees in compliance with the terms of this Order shall be paid solely from the Settlement Fund, with any disputes as to the reasonableness or documentation of expenses incurred subject to review by the Court.

8.    **CAFA Notice** – As provided in the Stipulation, Defendants shall be responsible for serving notice under the Class Action Fairness Act ("CAFA") if they determine it is required, and for coordinating with the Claims Administrator to the extent necessary. Silvergate Capital shall be solely responsible for the costs of the CAFA notices. At least seven (7) calendar days before the Settlement Hearing, or as otherwise ordered by the Court, Defendants shall cause to be served on Lead Counsel and filed with the Court proof, by affidavit or declaration, regarding compliance with CAFA § 1715(b).

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT                    6                    CASE NO. 22-CV-01936-JES-MSB

9. **Participation in the Settlement** – Settlement Class Members who wish to participate in the Settlement and to be potentially eligible to receive a distribution from the Net Settlement Fund must complete and submit a Claim Form in accordance with the instructions contained therein. Unless the Court orders otherwise, all Claim Forms must be postmarked no later than one hundred twenty (120) calendar days after the Notice Date. Notwithstanding the foregoing, Lead Counsel may, at their discretion, accept for processing late Claims provided such acceptance does not delay the distribution of the Net Settlement Fund to the Settlement Class. By submitting a Claim, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim and the subject matter of the Settlement.

10. Each Claim Form submitted must satisfy the following conditions: (a) it must be properly completed, signed, and submitted in a timely manner in accordance with the provisions of the preceding paragraph; (b) it must be accompanied by adequate supporting documentation for the transactions and holdings reported therein, in the form of broker confirmation slips, broker account statements, an authorized statement from the broker containing the transactional and holding information found in a broker confirmation slip or account statement, or such other documentation as is deemed adequate by Lead Counsel or the Claims Administrator; (c) if the person executing the Claim Form is acting in a representative capacity, a certification of his, her, or its current authority to act on behalf of the Settlement Class Member must be included in the Claim Form to the satisfaction of Lead Counsel or the Claims Administrator; and (d) the Claim Form must be complete and contain no material deletions or modifications of any of the printed matter contained therein and must be signed under penalty of perjury.

11. Any Settlement Class Member that does not timely and validly submit a Claim Form or whose Claim is not otherwise approved by the Court: (a) shall be deemed to have waived his, her, or its right to share in the Net Settlement Fund; (b) shall be forever barred from participating in any distributions therefrom; (c) shall be bound by the provisions of the Stipulation and the Settlement and all proceedings, determinations, orders, and judgments in the Action relating thereto, including, without limitation, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be forever barred and enjoined from commencing,

[PROPOSED] ORDER PRELIMINARILY    7    CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.  Notwithstanding the foregoing, late Claim Forms may be accepted for processing as set forth in paragraph 9 above.

12.    **Exclusion from the Settlement Class** – Any member of the Settlement Class who wishes to exclude himself, herself, or itself from the Settlement Class must request exclusion in writing within the time and in the manner set forth in the Notice, which shall provide that: (a) any such request for exclusion from the Settlement Class must be mailed or delivered such that it is received no later than twenty-one (21) calendar days prior to the Settlement Hearing, to: *Silvergate Securities Litigation*, EXCLUSIONS, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111, and (b) each request for exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Settlement Class in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.)"; (iii) state the number of shares of Silvergate Capital common stock that the person or entity requesting exclusion (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold; (iv) state the number of shares of Silvergate Capital common stock and Silvergate Capital Preferred Stock that the person or entity requesting exclusion purchased in or traceable to Silvergate Capital's 2021 Offerings, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold; and (v) be signed by the person or entity requesting exclusion or an authorized representative.  A request for exclusion

[PROPOSED] ORDER PRELIMINARILY          8          CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

shall not be effective unless it provides all the required information and is received within the time stated above, or is otherwise accepted by the Court.

13. Any person or entity who or which timely and validly requests exclusion in compliance with the terms stated in this Order and is excluded from the Settlement Class shall not be a Settlement Class Member, shall not be bound by the terms of the Settlement or any orders or judgments in the Action, and shall not receive any payment out of the Net Settlement Fund.

14. Any Settlement Class Member who or which does not timely and validly request exclusion from the Settlement Class in the manner stated in this Order: (a) shall be deemed to have waived his, her, or its right to be excluded from the Settlement Class; (b) shall be forever barred from requesting exclusion from the Settlement Class in this or any other proceeding; (c) shall be bound by the provisions of the Stipulation and Settlement and all proceedings, determinations, orders, and judgments in the Action, including, but not limited to, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be forever barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.

15. **Appearance and Objections at Settlement Hearing** – Any Settlement Class Member who or which does not request exclusion from the Settlement Class may enter an appearance in the Action, at his, her, or its own expense, individually or through counsel of his, her, or its own choice, by filing with the Clerk of Court and delivering a notice of appearance to both Lead Counsel and Representative Defendants' Counsel, at the addresses set forth in paragraph 16 below, such that it is received no later than twenty-one (21) calendar days prior to the Settlement Hearing, or as the Court may otherwise direct. Any Settlement Class Member who does not enter an appearance will be represented by Lead Counsel.

[PROPOSED] ORDER PRELIMINARILY           9           CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

16.    Any Settlement Class Member who or which does not request exclusion from the Settlement Class may file a written objection to the proposed Settlement, the proposed Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses and appear and show cause, if he, she, or it has any cause, why the proposed Settlement, the proposed Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses should not be approved; *provided, however*, that no Settlement Class Member shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, the proposed Plan of Allocation, and/or the motion for attorneys' fees and Litigation Expenses unless that person or entity has filed a written objection with the Court and served copies of such objection on Lead Counsel and Representative Defendants' Counsel at the addresses set forth below such that they are received no later than twenty-one (21) calendar days prior to the Settlement Hearing.

**Lead Plaintiffs' Counsel**:

Carol V. Gilden
Cohen Milstein Sellers & Toll PLLC
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606

Jonathan D. Uslaner
Bernstein Litowitz Berger & Grossmann LLP
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA  90067

**Representative Defendants' Counsel**:

John P. Stigi III
Sheppard, Mullin, Richter & Hampton LLP
12275 El Camino Real, Suite 100
San Diego, CA 92130-4092

Jason C. Hegt
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020

17.    Any objections, filings, and other submissions by the objecting Settlement Class Member must: (a) identify the case name and docket number in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.); (b) state the name,

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT          10          CASE NO. 22-CV-01936-JES-MSB

address, and telephone number of the person or entity objecting and be signed by the objector; (c) state with specificity the grounds for the Settlement Class Member's objection, including any legal and evidentiary support the Settlement Class Member wishes to bring to the Court's attention and whether the objection applies only to the objector, to a specific subset of the Settlement Class, or to the entire Settlement Class; and (d) include documents sufficient to prove membership in the Settlement Class, including documents showing (i) the number of shares of Silvergate Capital common stock that the person or entity (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold, and/or (ii) the number of shares of Silvergate Capital common stock and Silvergate Capital Preferred Stock that the person or entity purchased in or traceable to Silvergate Capital's 2021 Offerings, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold.  Documentation establishing membership in the Settlement Class must consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from the objector's broker containing the transactional and holding information found in a broker confirmation slip or account statement. Objectors who enter an appearance and desire to present evidence at the Settlement Hearing in support of their objection must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and any exhibits they intend to introduce into evidence at the hearing.

18.     Any Settlement Class Member who or which does not make his, her, or its objection in the manner provided herein shall be deemed to have waived his, her, or its right to object to any aspect of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses and shall be forever barred and foreclosed from objecting to the fairness, reasonableness, or adequacy of the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses, or from otherwise being heard concerning

[PROPOSED] ORDER PRELIMINARILY          11          CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses in this or any other proceeding.

19. **Stay and Temporary Injunction** – Until otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination of whether the Settlement should be approved, the Court bars and enjoins Plaintiffs, Plaintiffs' Counsel, and all other members of the Settlement Class from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.

20. **Settlement Administration Fees and Expenses** – All reasonable costs incurred in identifying Settlement Class Members and notifying them of the Settlement as well as in administering the Settlement shall be paid as set forth in the Stipulation without further order of the Court.

21. **Settlement Fund** – The contents of the Settlement Fund held by Huntington Bank (which the Court approves as the Escrow Agent) shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as they shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

22. **Taxes** – Lead Counsel are authorized and directed to prepare any tax returns and any other tax reporting form for or in respect to the Settlement Fund, to pay from the Settlement Fund any Taxes owed with respect to the Settlement Fund, to apply for any tax refund owed to the Settlement Fund, and to otherwise perform all obligations with respect to Taxes and any reporting or filings in respect thereof without further order of the Court in a manner consistent with the provisions of the Stipulation.

[PROPOSED] ORDER PRELIMINARILY           12           CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

23.    **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation, the Settlement is not approved (however, any decision with respect to an application for attorneys' fees or Litigation Expenses, or with any respect to any Plan of Allocation, shall not be considered grounds for termination), or the Effective Date of the Settlement otherwise fails to occur, this Order shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Order shall be without prejudice to the rights of Plaintiffs, the other Settlement Class Members, and Defendants, and the Parties shall revert to their respective litigation positions in the Action as of March 25, 2025, as provided in the Stipulation.

24.    **Use of This Order** – Neither this Order, the Term Sheet, the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Judgment, the Supplemental Agreement, the negotiations leading to the execution of the Term Sheet and the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a)    shall be offered or received against any of the Defendant Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendant Releasees with respect to the truth of any fact alleged by Plaintiffs or the validity of any claim or alleged damages that were or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendant Releasees or in any way used or referred to for any other reason as against any of the Defendant Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b)    shall be offered or received against any of the Plaintiff Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Plaintiff Releasees that any of their claims are without merit, that

[PROPOSED] ORDER PRELIMINARILY    13    CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

any of the Defendant Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way used or referred to for any other reason as against any of the Plaintiff Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(c)      shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; or

(d)      shall be construed as or received in evidence as an admission, concession or presumption that class certification is or was appropriate in this Action, except for purposes of this Settlement.

*provided, however,* that if the Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted thereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendant Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

25.      **Supporting Papers** – Lead Counsel shall file and serve the opening papers in support of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses no later than thirty-five (35) calendar days prior to the Settlement Hearing; and reply papers, if any, shall be filed and served no later than seven (7) calendar days prior to the Settlement Hearing.

26.      The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT      14      CASE NO. 22-CV-01936-JES-MSB

SO ORDERED this ___day of _____, 2025.

_____
The Honorable James E. Simmons, Jr.
United States District Judge

**Exhibit A-1**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |

### NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

**NOTICE OF PENDENCY OF CLASS ACTION:** Please be advised that your rights may be affected by the above-captioned securities class action (the "Action") pending in the U.S. District Court for the Southern District of California (the "Court"), if, during the period from November 7, 2019, through March 21, 2023, inclusive (the "Class Period"), you purchased or otherwise acquired the common stock of Silvergate Capital Corporation ("Silvergate Capital") and were damaged thereby or purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021 and were damaged thereby.[1]

**NOTICE OF SETTLEMENT:** Please also be advised that the Court-appointed Lead Plaintiffs, Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class (as defined in ¶ 16 below), have reached a proposed settlement of the Action for $37,500,000 in cash that, if approved, will resolve all claims in the Action. The Settlement will become effective only if the Court finally approves the Settlement and the effective date of Silvergate Capital's Chapter 11 Plan occurs.

**PLEASE READ THIS NOTICE CAREFULLY. This Notice explains important rights you may have, including the possible receipt of a payment from the Settlement. If you are a member of the Settlement Class, your legal rights will be affected whether or not you act.**

---

[1] All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), which is available at www.SilvergateSecuritiesLitigation.com.

**If you have any questions about this Notice, the proposed Settlement, or your eligibility to participate in the Settlement, please DO NOT contact the Court, Silvergate Capital, the other Defendants in the Action, or their counsel. All questions should be directed to Lead Counsel or the Claims Administrator (*see* ¶ 58 below).**

1.      **Description of the Action and the Settlement Class:** This Notice relates to a proposed settlement of claims in a pending securities class action brought by investors alleging, among other things, that Silvergate Capital[2] (collectively with the Individual Defendants and the Underwriter Defendants as defined in ¶ 12 below, "Defendants") violated the federal securities laws by making false and misleading statements about Silvergate Bank's vetting, due diligence, and monitoring of customers. A more detailed description of the Action is set forth in ¶¶ 11-15 below. The proposed Settlement, if approved by the Court, will settle claims of the Settlement Class, as defined in ¶ 16 below.

2.      **Statement of the Settlement Class's Recovery:** Subject to Court approval, Plaintiffs, on behalf of themselves and the Settlement Class, have agreed to settle the Action in exchange for $37,500,000 in cash (the "Settlement Amount") to be deposited into an escrow account. The Net Settlement Fund (*i.e.*, the Settlement Amount plus any and all interest earned thereon (the "Settlement Fund") less (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) will be distributed in accordance with a plan of allocation that is approved by the Court. The proposed plan of allocation (the "Plan of Allocation") is set forth in Appendix A below. The Plan of Allocation will determine how the Net Settlement Fund shall be allocated among members of the Settlement Class.

3.      **Estimate of Average Amount of Recovery Per Share:** Based on Plaintiffs' damages expert's estimate of the number of shares of Silvergate Capital common stock and depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A ("Silvergate Capital Preferred Stock" and, with Silvergate Capital common stock, "Silvergate Capital Stock") that were purchased by Settlement Class Members and that may have been affected by the conduct at issue in the Action, and assuming that all Settlement Class Members elect to participate in the Settlement, the estimated average recovery (before the deduction of any Court-approved fees, expenses, and costs as described herein) is $0.13 per affected share of Silvergate Capital common stock and $0.22 per affected share of Silvergate Capital Preferred Stock. Settlement Class Members should note, however, that the foregoing average recovery is only an estimate. Some Settlement Class Members may recover more or less than this estimated amount depending on, among other factors, when and at what prices they purchased/acquired or sold their Silvergate Capital Stock, and the total number and value of valid Claim Forms submitted. Distributions to Settlement Class Members will be made based on the Plan of Allocation set forth herein (*see* Appendix A below) or such other plan of allocation as may be ordered by the Court.

4.      **Average Amount of Damages Per Share:** The Parties do not agree on the average amount of damages per share that would be recoverable if Plaintiffs were to prevail in the Action. Among

---

[2] Silvergate Capital filed a Notice of Bankruptcy in this Action on September 19, 2024. Together, Silvergate Capital and its subsidiary Silvergate Bank are the "Debtors."

other things, Defendants do not agree with the assertion that they violated the federal securities laws or that any damages were suffered by any members of the Settlement Class as a result of their conduct.

5.    **Attorneys' Fees and Expenses Sought:** Court-appointed Lead Counsel, Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP, have been prosecuting the Action on a wholly contingent basis since their appointment as Lead Counsel in February 2023, have not received any payment of attorneys' fees for their representation of the Settlement Class, and have advanced the funds to pay expenses necessarily incurred to prosecute this Action. Before final approval of the Settlement, Lead Counsel will apply to the Court  for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed 17% of the Settlement Fund. In addition, Lead Counsel will apply for payment of Plaintiffs' Counsel's Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1.4 million, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Any fees and expenses awarded by the Court will be paid from the Settlement Fund. Settlement Class Members are not personally liable for any such fees or expenses. The estimated average cost for such  fees and expenses, if the Court approves Lead Counsel's fee and expense application, is $0.03 per affected share of Silvergate Capital common stock and $0.04 per affected share of Silvergate Capital Preferred Stock.

6.    **Identification of Attorney Representatives:** Plaintiffs and the Settlement Class are represented by Carol V. Gilden, Esq., of Cohen Milstein Sellers & Toll PLLC, 200 S. Wacker Drive, Suite 2375, Chicago, IL 60606, (312) 629-3737, and Jonathan D. Uslaner, Esq., of Bernstein Litowitz Berger & Grossmann LLP, 2121 Avenue of the Stars, Suite 2575, Los Angeles, CA 90067, (310) 819-3470, settlements@blbglaw.com.

7.    **Reasons for the Settlement:** Plaintiffs' principal reason for entering into the Settlement is the substantial and certain recovery for the Settlement Class without the risk or the delays inherent in further litigation. Moreover, the substantial recovery provided under the Settlement must be considered against the significant risk that a smaller recovery—or indeed no recovery at all—might be achieved after contested motions, a trial of the Action, and the likely appeals that would follow a trial. This process could be expected to last several years. Defendants, who deny that they have committed any act or omission giving rise to liability under the federal securities laws, are entering into the Settlement solely to eliminate the uncertainty, burden, and expense of further litigation.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM POSTMARKED NO LATER THAN_____, 2025.** | This is the only way to be eligible to receive a payment from the Settlement Fund. If you are a Settlement Class Member and you remain in the Settlement Class, you will be bound by the Settlement as approved by the Court and you will give up any Released Plaintiffs' Claims (defined in ¶ 26 below) that you have against Defendants and the other Defendant Releasees (defined in ¶ 27 below), so it is in your interest to submit a Claim Form. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT CLASS BY SUBMITTING A WRITTEN REQUEST FOR EXCLUSION SO THAT IT IS *RECEIVED* NO LATER THAN_____, 2025.** | If you exclude yourself from the Settlement Class, you will not be eligible to receive any payment from the Settlement Fund. This is the only option that allows you ever to be part of any other lawsuit against any of the Defendants or the other Defendant Releasees concerning the Released Plaintiffs' Claims. |
| **OBJECT TO THE SETTLEMENT BY SUBMITTING A WRITTEN OBJECTION SO THAT IT IS *RECEIVED* NO LATER THAN_____, 2025.** | If you do not like the proposed Settlement, the proposed Plan of Allocation, or the request for attorneys' fees and Litigation Expenses, you may write to the Court and explain why you do not like them. You cannot object to the Settlement, the Plan of Allocation, or the fee and expense request unless you are a Settlement Class Member and do not exclude yourself from the Settlement Class. |
| **GO TO A HEARING ON_____, 2025 AT __:__ __.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS *RECEIVED* NO LATER THAN_____, 2025.** | Filing a written objection and notice of intention to appear by _____, 2025 allows you to speak in Court, at the discretion of the Court, about the fairness of the proposed Settlement, the Plan of Allocation, and/or the request for attorneys' fees and Litigation Expenses. If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Court, speak to the Court about your objection. |
| **DO NOTHING.** | If you are a member of the Settlement Class and you do not submit a valid Claim Form, you will not be eligible to receive any payment from the Settlement Fund. You will, however, remain a member of the Settlement Class, which means that you give up your right to sue about the claims that are resolved by the Settlement and you will be bound by any judgments or orders entered by the Court in the Action. |

4

## WHAT THIS NOTICE CONTAINS

Why Did I Get This Notice?                                                          Page [__]
What Is This Case About?                                                            Page [__]
How Do I Know If I Am Affected By The Settlement?
    Who Is *Included* In The Settlement Class?                  Page [__]
What Are Plaintiffs' Reasons For The Settlement?                                    Page [__]
What Might Happen If There Were No Settlement?                                      Page [__]
How Are Settlement Class Members Affected By The Action
    And The Settlement?                                         Page [__]
How Do I Participate In The Settlement? What Do I Need To Do?                        Page [__]
How Much Will My Payment Be?                                                        Page [__]
What Payment Are The Attorneys For The Settlement Class Seeking?
    How Will The Lawyers Be Paid?                               Page [__]
What If I Do Not Want To Be A Member Of The Settlement Class?
    How Do I Exclude Myself?                                    Page [__]
When And Where Will The Court Decide Whether To Approve The
    Settlement? Do I Have To Come To The Hearing? May I Speak At
    The Hearing If I Don't Like The Settlement?                 Page [__]
What If I Bought Shares On Someone Else's Behalf?                                   Page [__]
Can I See The Court File? Whom Should I Contact If I Have
      Questions?                                      Page [__]

## WHY DID I GET THIS NOTICE?

8.      The Court directed that this Notice be mailed to you because you or someone in your family or an investment account for which you serve as a custodian may have purchased or otherwise acquired Silvergate Capital stock during the Class Period. The Court has directed us to send you this Notice because, as a potential Settlement Class Member, you have a right to know about your options before the Court rules on the proposed Settlement. Additionally, you have the right to understand how this class action lawsuit may generally affect your legal rights. If the Court approves the Settlement and the Plan of Allocation (or some other plan of allocation), the Claims Administrator selected by Plaintiffs and approved by the Court will make payments pursuant to the Settlement after any objections and appeals are resolved.

9.      The purpose of this Notice is to inform you of the existence of this case, that it is a class action, how you might be affected, and how to exclude yourself from the Settlement Class if you wish to do so. It is also being sent to inform you of the terms of the proposed Settlement and of a hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement, the proposed Plan of Allocation, and the motion by Lead Counsel for an award of attorneys' fees and payment of Litigation Expenses (the "Settlement Hearing"). *See* ¶¶ 48-49 below for details about the Settlement Hearing, including the date and location of the hearing.

10.     The issuance of this Notice is not an expression of any opinion by the Court concerning the merits of any claim in the Action, and the Court still has to decide whether to approve the

5

Settlement. If the Court approves the Settlement and a plan of allocation, then payments to Authorized Claimants will be made after any appeals are resolved and after the completion of all claims processing. Please be patient, as this process can take some time to complete.

---

## WHAT IS THIS CASE ABOUT?

11.     On February 28, 2023, the Court appointed the Institutional Investors as Lead Plaintiffs for the Action and approved Lead Plaintiffs' selection of Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel.

12.     On May 11, 2023, Plaintiffs filed and served a Consolidated Amended Class Action Complaint (the "Complaint") asserting claims against Silvergate Capital and Alan J. Lane under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Lane under Section 20(a) of the Exchange Act. Plaintiffs also asserted claims against Silvergate Capital; Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank, and Robert Campbell (collectively, the "Individual Defendants"); and Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants") under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and against the Individual Defendants under Section 15 of the Securities Act.

13.     The Complaint alleged that the Silvergate Defendants made materially false and/or misleading statements about Silvergate Bank's vetting, due diligence, and monitoring of customers. The Complaint further alleged that the price of Silvergate Capital stock was artificially inflated as a result of Defendants' allegedly false and/or misleading statements, and declined when the truth was revealed.

14.     On May 9, 2025, the Parties entered into the Stipulation and Agreement of Settlement, which sets forth the terms and conditions of the Settlement. The Stipulation is available at www.SilvergateSecuritiesLitigation.com.

15.     On _____, 2025, the Court preliminarily approved the Settlement, authorized this Notice to be disseminated to potential Settlement Class Members, and scheduled the Settlement Hearing to consider whether to grant final approval to the Settlement.

---

## HOW DO I KNOW IF I AM AFFECTED BY THE SETTLEMENT?
## WHO IS INCLUDED IN THE SETTLEMENT CLASS?

16.     If you are a member of the Settlement Class, you are subject to the Settlement, unless you timely request to be excluded. The Settlement Class consists of:

6

(a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019 through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby, and

(b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021,[3] and were damaged thereby.

Excluded from the Settlement Class are: (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members[4] and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no "Investment Vehicle" shall be excluded from the Settlement Class.[5]

Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court. *See* "What If I Do Not Want To Be A Member Of The Settlement Class? How Do I Exclude Myself?" on page below.

**PLEASE NOTE: Receipt of this Notice does not mean that you are a Settlement Class Member or that you will be entitled to a payment from the Settlement.**

**If you are a Settlement Class Member and you wish to be eligible to receive a payment from the Settlement, you are required to submit the Claim Form that is being distributed with this Notice and the required supporting documentation as set forth therein postmarked (or submitted online) no later than _____, 2025.**

---

[3] Silvergate Capital's securities offerings during 2021 (the "2021 Offerings") included (a) three offerings of Silvergate Capital common stock conducted on or about January 20, 2021, March 18 through May 18, 2021, and December 6, 2021, and (b) an initial public offering of depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A (the "Silvergate Capital Preferred Stock" and, with Silvergate Capital common stock, "Silvergate Capital Stock"), conducted on or around July 28, 2021.

[4] "Immediate Family Member(s)" means children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, sisters-in-law and any persons (other than a tenant or employee) sharing the household.

[5] "Investment Vehicle" means any investment company or pooled investment fund, including but not limited to mutual fund families, exchange-traded funds, funds of funds, private equity funds, real estate funds, and hedge funds, in which Defendants, or any of them, have, has or may have a direct or indirect interest, or as to which their affiliates may act as an investment advisor, but in which any Defendant alone or together with its, his or her respective affiliates does not hold a majority beneficial interest.

7

## WHAT ARE PLAINTIFFS' REASONS FOR THE SETTLEMENT?

17.    Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. They recognize, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through summary judgment, trial, and appeals, as well as the very substantial risks they would face in establishing liability and damages. For example, those risks include challenges in establishing that Defendants' statements about Silvergate Capital's due diligence of its banking customers were false or misleading and that the Individual Defendants knew that the statements were false or were reckless in making them. Defendants have contended—and would have contended at summary judgment or trial—that their statements were neither false nor misleading and were supported by contemporaneous facts.

18.    Plaintiffs also faced risks relating to loss causation and damages. Defendants would have contended at summary judgment and trial, supported by their economic expert's analysis, that Plaintiffs could not establish a causal connection between the alleged misrepresentations about Silvergate Capital's banking customer due diligence and the losses investors allegedly suffered, as required by law. Moreover, even if Plaintiffs were able to establish damages, collectability would have been uncertain given Silvergate Capital's bankruptcy.

19.    In light of these risks, the amount of the Settlement, and the immediacy of recovery to the Settlement Class, Plaintiffs and Lead Counsel believe that the proposed Settlement is fair, reasonable, and adequate, and in the best interests of the Settlement Class. Plaintiffs and Lead Counsel believe that the Settlement provides a substantial benefit to the Settlement Class, namely $37,500,000 in cash (less the various deductions described in this Notice), as compared to the risk that the claims in the Action would produce a smaller recovery, or no recovery, after summary judgment, trial, and appeals, possibly years in the future.

20.    Defendants have denied the claims asserted against them in the Action and deny that the Settlement Class was harmed or suffered any damages as a result of the conduct alleged in the Action. Defendants have agreed to the Settlement solely to eliminate the burden and expense of continued litigation. Accordingly, the Settlement may not be construed as an admission of any wrongdoing by Defendants.

## WHAT MIGHT HAPPEN IF THERE WERE NO SETTLEMENT?

21.    If there were no Settlement and Plaintiffs failed to establish any essential legal or factual element of their claims against Defendants, neither Plaintiffs nor the other members of the Settlement Class would recover anything from Defendants. Also, if Defendants were successful in proving any of their defenses, either at summary judgment, at trial, or on appeal, the Settlement Class could recover substantially less than the amount provided in the Settlement, or nothing at all.

## HOW ARE SETTLEMENT CLASS MEMBERS AFFECTED BY THE ACTION AND THE SETTLEMENT?

22.    As a Settlement Class Member, you are represented by Plaintiffs and Lead Counsel, unless you enter an appearance through counsel of your own choice at your own expense. You are not required to retain your own counsel, but if you choose to do so, such counsel must file a notice of appearance on your behalf and must serve copies of his or her appearance on the attorneys listed in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?," below.

23.    If you are a Settlement Class Member and do not wish to remain a Settlement Class Member, you may exclude yourself from the Settlement Class by following the instructions in the section entitled, "What If I Do Not Want To Be A Member Of The Settlement Class? How Do I Exclude Myself?," below.

24.    If you are a Settlement Class Member and you wish to object to the Settlement, the Plan of Allocation, or Lead Counsel's application for attorneys' fees and Litigation Expenses, and if you do not exclude yourself from the Settlement Class, you may present your objections by following the instructions in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?," below.

25.    If you are a Settlement Class Member and you do not exclude yourself from the Settlement Class, you will be bound by any orders issued by the Court. If the Settlement is approved, the Court will enter a judgment (the "Judgment"). The Judgment will dismiss with prejudice the claims against Defendants and will provide that, upon the Effective Date of the Settlement, Plaintiffs and each of the other Settlement Class Members, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Plaintiffs' Claims on behalf of a Settlement Class Member, in that capacity (collectively, "Plaintiff Releasors"), regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, will have fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Plaintiffs' Claim (as defined in ¶ 26 below) against Defendants and the Defendant Releasees (as defined in ¶ 27 below), and will forever be barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

26.    "Released Plaintiffs' Claims" means all claims, demands, losses, rights, and causes of action of any nature whatsoever, whether known claims or Unknown Claims, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether

9

foreign or domestic, whether arising under federal, state, common, or foreign law or any other law, rule or regulation, by Plaintiffs, any member of the Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which arise out of, are based upon, or relate in any way to (i) any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to, in the Action, or which could have been alleged in the Action, and/or (ii) the purchase, acquisition, holding, sale, or disposition of the publicly traded common stock of Silvergate Capital during the Class Period and/or the securities issued in or traceable to any of Silvergate Capital's securities offerings during 2021. Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

27. "Defendant Releasees" means Defendants and each of their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, members, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

28. "Unknown Claims" means any Released Plaintiffs' Claims which any Plaintiff or any other Settlement Class Member or any other Plaintiff Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other Defendants' Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, in each case which, if known by him, her, or it, might have affected his, her, or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly waive, and each of the Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Plaintiffs, Settlement Class Members, and Defendants acknowledge that they may hereafter discover facts in addition to or different from those which he, she, or it or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly fully, finally, and forever settle and release, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon

10

any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and Defendants acknowledge, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a material element of the Settlement.

29.     The Judgment will also provide that, upon the Effective Date of the Settlement, Defendants, on behalf of themselves and their respective heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Defendants' Claims on behalf of a Defendant, in that capacity (collectively, "Defendant Releasors"), will have fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Defendants' Claim (as defined in ¶ 30 below) against Plaintiffs and the other Plaintiff Releasees (as defined in ¶ 31 below), and will forever be barred and enjoined from commencing, instituting, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Defendants' Claims against any of the Plaintiff Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

30.     "Released Defendants' Claims" means all claims and causes of action of every nature and description, whether known or Unknown Claims, whether arising under federal, state, common, or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement or any claims against any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

31.     "Plaintiff Releasees" means Plaintiffs and all other Settlement Class Members, and their respective current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

| **HOW DO I PARTICIPATE IN THE SETTLEMENT? WHAT DO I NEED TO DO?** |
| --- |

32.     To be eligible for a payment from the Settlement, you must be a member of the Settlement Class and you must timely complete and return the Claim Form with adequate supporting documentation ***postmarked* (if mailed) or submitted online at www.SilvergateSecuritiesLitigation.com no later than _____, 2025**. A Claim Form is included with this Notice, or you may obtain one from the website maintained by the Claims Administrator for the Settlement, www.SilvergateSecuritiesLitigation.com. You may also request

11

that a Claim Form be mailed to you by calling the Claims Administrator toll free at 866-287-0746 or by emailing the Claims Administrator at info@SilvergateSecuritiesLitigation.com. Please retain all records of your ownership of and transactions in Silvergate Capital Stock, as they will be needed to document your Claim. The Parties and Claims Administrator do not have information about your transactions in Silvergate Capital Stock.

33.    If you request exclusion from the Settlement Class or do not submit a timely and valid Claim Form, you will not be eligible to share in the Net Settlement Fund.

<table>
<tr><td><strong>HOW MUCH WILL MY PAYMENT BE?</strong></td></tr>
</table>

34.    At this time, it is not possible to make any determination as to how much any individual Settlement Class Member may receive from the Settlement.

35.    Pursuant to the Settlement, Defendants have agreed to pay or cause to be paid a total of $37,5000,000 in cash (the "Settlement Amount"). The Settlement Amount will be deposited into an escrow account. The Settlement Amount plus any interest earned thereon is referred to as the "Settlement Fund." If the Settlement is approved by the Court and the Effective Date occurs, the "Net Settlement Fund" (that is, the Settlement Fund less (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) will be distributed to Settlement Class Members who submit valid Claim Forms, in accordance with the proposed Plan of Allocation or such other plan of allocation as the Court may approve.

36.    The Net Settlement Fund will not be distributed unless and until the Court has approved the Settlement and a plan of allocation, and the time for any petition for rehearing, appeal, or review, whether by *certiorari* or otherwise, has expired.

37.    Neither Defendants nor any other person or entity that paid any portion of the Settlement Amount on their behalf are entitled to get back any portion of the Settlement Fund once the Court's order or judgment approving the Settlement becomes Final. Defendants shall not have any liability, obligation, or responsibility for the administration of the Settlement, the disbursement of the Net Settlement Fund, or the plan of allocation.

38.    Approval of the Settlement is independent from approval of a plan of allocation. Any determination with respect to a plan of allocation will not affect the Settlement, if approved.

39.    Unless the Court otherwise orders, any Settlement Class Member who or which fails to submit a Claim Form postmarked (or submitted online) on or before _____, 2025 shall be fully and forever barred from receiving payments pursuant to the Settlement but will in all other respects remain a member of the Settlement Class and be subject to the provisions of the Stipulation, including the terms of any Judgment entered and the releases given. This means that each Settlement Class Member releases the Released Plaintiffs' Claims (as defined in ¶ 26 above) against the Defendant Releasees (as defined in ¶ 27 above) and will be barred and enjoined from prosecuting any of the Released Plaintiffs' Claims against any of the Defendant Releasees whether

or not such Settlement Class Member submits a Claim Form.

40.     The Court has reserved jurisdiction to allow, disallow, or adjust on equitable grounds the Claim of any Settlement Class Member.

41.     Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim Form.

42.     Only members of the Settlement Class will be eligible to share in the distribution of the Net Settlement Fund. Persons and entities that are excluded from the Settlement Class by definition or that exclude themselves from the Settlement Class pursuant to request will not be eligible for a payment and should not submit Claim Forms.

## WHAT PAYMENT ARE THE ATTORNEYS FOR THE SETTLEMENT CLASS SEEKING? HOW WILL THE LAWYERS BE PAID?

43.     Lead Counsel have not received any payment for their services in pursuing claims asserted in the Action on behalf of the Settlement Class, nor have Lead Counsel been paid for their Litigation Expenses. Before final approval of the Settlement, Lead Counsel will apply to the Court on behalf of Plaintiffs' Counsel for an award of attorneys' fees in an amount not to exceed 17% of the Settlement Fund. In addition, Lead Counsel will apply for payment of Plaintiffs' Counsel's Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1.4 million, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class. The Court will determine the amount of any award of attorneys' fees or Litigation Expenses. Such sums as may be approved by the Court will be paid from the Settlement Fund. Settlement Class Members are not personally liable for any such fees or expenses.

## WHAT IF I DO NOT WANT TO BE A MEMBER OF THE SETTLEMENT CLASS? HOW DO I EXCLUDE MYSELF?

44.     Each Settlement Class Member will be bound by all determinations and judgments in this lawsuit, whether favorable or unfavorable, unless such person or entity mails or delivers a written Request for Exclusion from the Settlement Class, addressed to *Silvergate Securities Litigation*, EXCLUSIONS, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111. The Request for Exclusion must be *received* no **later than _____, 2025**. You will not be able to exclude yourself from the Settlement Class after that date. Each Request for Exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Settlement Class in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.)"; (iii) state the number of shares of Silvergate Capital common stock that the person or entity requesting exclusion

13

(A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold; (iv) state the number of securities that the person or entity requesting exclusion purchased in or traceable to Silvergate Capital's securities offerings during 2021, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold; and (v) be signed by the person or entity requesting exclusion or an authorized representative. A Request for Exclusion shall not be valid and effective unless it provides all of the information called for in this paragraph and is received within the time stated above, or is otherwise accepted by the Court.

45.    If you do not want to be part of the Settlement Class, you must follow these instructions for exclusion even if you have pending, or later file, another lawsuit, arbitration, or other proceeding relating to any Released Plaintiffs' Claim against any of the Defendant Releasees.

46.    If you ask to be excluded from the Settlement Class, you will not be eligible to receive any payment out of the Net Settlement Fund.

47.    Defendants have the right to terminate the Settlement if valid requests for exclusion are received from persons and entities entitled to be members of the Settlement Class in an amount that exceeds an amount agreed to by Plaintiffs and Defendants.

> **WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT? DO I HAVE TO COME TO THE HEARING? MAY I SPEAK AT THE HEARING IF I DON'T LIKE THE SETTLEMENT?**

48.    **Settlement Class Members do not need to attend the Settlement Hearing. The Court will consider any submission made in accordance with the provisions below even if a Settlement Class Member does not attend the hearing. You can participate in the Settlement without attending the Settlement Hearing.** Please Note: The date and time of the Settlement Hearing may change without further written notice to the Settlement Class. You should check the Court's docket or the Settlement website, www.SilvergateSecuritiesLitigation.com, before making plans to attend the Settlement Hearing. You may also confirm the date and time of the Settlement Hearing by contacting Lead Counsel.

49.    The Settlement Hearing will be held on _____, 2025 at : _.m., before the Honorable James E. Simmons, Jr. either in person at the U.S. District Court for the Southern District of California, Edward J. Schwartz United States Courthouse, Courtroom 4B, 221 West Broadway, San Diego, CA 92101, or by telephone or videoconference, to determine, among other things, (i) whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Settlement Class, and should be finally approved by the Court; (ii) whether, for purposes of the Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (iii) whether the Action should be dismissed with prejudice against Defendants and the Releases specified and described in the Stipulation (and in this Notice) should

be granted; (iv) whether the proposed Plan of Allocation should be approved as fair and reasonable; (v) whether Lead Counsel's motion for attorneys' fees and Litigation Expenses should be approved; and (vi) any other matters that may properly be brought before the Court in connection with the Settlement. The Court reserves the right to certify the Settlement Class; approve the Settlement, the Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses; and/or consider any other matter related to the Settlement at or after the Settlement Hearing without further notice to the members of the Settlement Class.

50.    Any Settlement Class Member who or which does not request exclusion may object to the Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for attorneys' fees and Litigation Expenses. Objections must be in writing. You must file any written objection, together with copies of all other papers and briefs supporting the objection, with the Clerk's Office at the U.S. District Court for the Southern District of California at the address set forth below **on or before _____, 2025**. You must also serve the papers on Lead Counsel and on Representative Defendants' Counsel at the addresses set forth below so that the papers are *received* **on or before _____, 2025**.

| | |
|---|---|
| Clerk's Office: | U.S. District Court<br>Southern District of California<br>Edward J. Schwartz United States Courthouse<br>221 West Broadway<br>San Diego, CA 92101 |
| Lead Counsel: | Carol V. Gilden<br>Cohen Milstein Sellers & Toll PLLC<br>200 S. Wacker Drive, Suite 2375<br>Chicago, IL 60606<br><br>Jonathan D. Uslaner<br>Bernstein Litowitz Berger & Grossmann LLP<br>1251 Avenue of the Stars, Suite 2575<br>Los Angeles, CA 90067 |
| Representative Defendants' Counsel: | John P. Stigi III<br>Sheppard, Mullin, Richter & Hampton LLP<br>12275 El Camino Real, Suite 100<br>San Diego, CA 92130-4092<br><br>Jason C. Hegt<br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020 |

51.    Any objection must (a) identify the case name and docket number, *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.); (b) state the name, address, and telephone number of the person or entity objecting and be signed by the objector;

15

(c) state with specificity the grounds for the Settlement Class Member's objection, including any legal and evidentiary support the Settlement Class Member wishes to bring to the Court's attention and whether the objection applies only to the objector, to a specific subset of the Settlement Class, or to the entire Settlement Class; and (d) include documents sufficient to prove membership in the Settlement Class, including documents showing (i) the number of shares of Silvergate Capital common stock that the person or entity (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 to March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold, and/or (ii) the number of securities that the person or entity purchased in or traceable to Silvergate Capital's securities offerings during 2021, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold. Documentation establishing membership in the Settlement Class must consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from the objector's broker containing the transactional and holding information found in a broker confirmation slip or account statement. You may not object to the Settlement, the Plan of Allocation, or Lead Counsel's motion for attorneys' fees and Litigation Expenses if you exclude yourself from the Settlement Class or if you are not a member of the Settlement Class.

52.    You may file a written objection without having to appear at the Settlement Hearing. You may not, however, appear at the Settlement Hearing to present your objection unless you first file and serve a written objection in accordance with the procedures described above, unless the Court orders otherwise.

53.    If you wish to be heard orally at the hearing in opposition to the approval of the Settlement, the Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses, assuming you timely file and serve a written objection as described above, you must also file a notice of appearance with the Clerk's Office and serve it on Lead Counsel and on Representative Defendants' Counsel at the addresses set forth in ¶ 50 above so that it is *received* **on or before _____, 2025**. Persons who intend to object and desire to present evidence at the Settlement Hearing must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the hearing. Such persons may be heard orally at the discretion of the Court.

54.    You are not required to hire an attorney to represent you in making written objections or in appearing at the Settlement Hearing. However, if you decide to hire an attorney, it will be at your own expense, and that attorney must file a notice of appearance with the Court and serve it on Lead Counsel and Representative Defendants' Counsel at the addresses set forth in ¶ 50 above so that the notice is *received* **on or before _____, 2025.**

55.    The Settlement Hearing may be adjourned by the Court without further written notice to the Settlement Class. If you plan to attend the Settlement Hearing, you should confirm the date and time with Lead Counsel.

56.    **Unless the Court orders otherwise, any Settlement Class Member who does not object in the manner described above will be deemed to have waived any objection and shall be**

16

**forever foreclosed from making any objection to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses. Settlement Class Members do not need to appear at the Settlement Hearing or take any other action to indicate their approval.**

**WHAT IF I BOUGHT STOCK ON SOMEONE ELSE'S BEHALF?**

57.     If you purchased or otherwise acquired Silvergate Capital common stock during the period from November 7, 2019 through March 21, 2023, inclusive, or purchased Silvergate Capital securities in or traceable to Silvergate Capital's securities offerings during 2021 for the beneficial interest of persons or organizations other than yourself, you must either (i) within seven (7) calendar days of receipt of this Notice, request from the Claims Administrator sufficient copies of the Notice and Claim Form (the "Notice Packet") to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (ii) within seven (7) calendar days of receipt of this Notice, provide a list of the names, addresses, and email addresses (if available) of all such beneficial owners to *Silvergate Capital Corporation Securities Litigation*, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111. If you choose the second option, the Claims Administrator will send a copy of the Notice Packet to the beneficial owners. Upon full compliance with these directions, such nominees may seek reimbursement of their reasonable expenses actually incurred, by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such expenses shall not exceed $0.05 plus postage at the current pre-sort rate used by the Claims Administrator per Notice Packet mailed; or $0.05 per name, address, and email address (to the extent available) provided to the Claims Administrator. Copies of this Notice and the Claim Form may also be obtained from the Settlement website, www.SilvergateSecuritiesLitigation.com, by calling the Claims Administrator toll-free at 866-287-0746, or by emailing the Claims Administrator at info@SilvergateSecuritiesLitigation.com.

**CAN I SEE THE COURT FILE? WHOM SHOULD I CONTACT IF I HAVE QUESTIONS?**

58.     This Notice contains only a summary of the terms of the proposed Settlement. For more detailed information about the matters involved in this Action, you are referred to the papers on file in the Action, including the Stipulation, which may be inspected during regular office hours at the Office of the Clerk, U.S. District Court for the Southern District of California, Edward J. Schwartz U.S. Courthouse, 221 West Broadway, San Diego, CA 92101. Additionally, copies of the Stipulation and any related orders entered by the Court will be posted on the Settlement website, www.SilvergateSecuritiesLitigation.com.

All inquiries concerning this Notice and the Claim Form should be directed to:

*Silvergate Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111
866-287-0746

17

info@SilvergateSecuritiesLitigation.com
www. SilvergateSecuritiesLitigation.com

**DO NOT CALL OR WRITE THE COURT, THE OFFICE OF THE CLERK OF THE COURT, DEFENDANTS, OR THEIR COUNSEL REGARDING THIS NOTICE.**

Dated: _____, 2025                    By Order of the Court
                                            United States District Court
                                            Southern District of California

## APPENDIX A

### Proposed Plan of Allocation of Net Settlement Fund Among Authorized Claimants

59.    The Plan of Allocation set forth herein is the plan that is being proposed by Plaintiffs to the Court for approval after consultation with their damages expert. The Court may approve the Plan of Allocation with or without modification, or approve another plan of allocation, without further notice to the Class. Any Orders regarding a modification to the Plan of Allocation will be posted on the Settlement website, www.SilvergateSecuritiesLitigation.com. Defendants have had, and will have, no involvement or responsibility for the terms or application of the Plan of Allocation.

60.    The Net Settlement Fund shall be distributed based on the acceptable Claim Forms submitted by or on behalf of Settlement Class Members. The Net Settlement Fund will be distributed to "Authorized Claimants," who are those Settlement Class Members who timely submit acceptable Claim Forms which are accepted for recovery under the Plan of Allocation described herein, or as otherwise ordered by the Court.

61.    The objective of the Plan of Allocation (the "Plan") is to equitably distribute the Net Settlement Fund among Authorized Claimants who allegedly suffered economic losses as a result of the alleged violations of the federal securities laws. The Plan, however, is not a formal damages analysis, and the calculations made pursuant to the Plan are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial. Nor are the calculations pursuant to the Plan intended to be estimates of the amounts that will be paid to Authorized Claimants. The computations under the Plan are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making pro rata allocations of the Exchange Act Settlement Fund and the Securities Act Settlement Fund.

62.    The total Net Settlement Fund will be allocated between an Exchange Act Fund and a Securities Act Fund based on the groups of Defendants who are funding certain portions of the Settlement Amount and the nature of the claims asserted against those Defendants.

   (a)    The Exchange Act Fund will be comprised of the $27,500,000 D&O Insurance Contribution (paid on behalf of the Individual Defendants) **plus** the $5,320,000 Preferred Equity Holder Contribution, less a proportional amount of the total Court-approved attorneys' fees, Litigation Expenses, Taxes, and Notice and Administration Costs for the Settlement.

18

(b) The Securities Act Fund will be comprised of the $4,680,000 Underwriter Contribution (paid on behalf of the Underwriter Defendants), less a proportional amount of the total Court-approved attorneys' fees, Litigation Expenses, Taxes, and Notice and Administration Costs for the Settlement.

63. Pursuant to the Plan, members of the Settlement Class will generally be potentially eligible for a claim under the Securities Exchange Act of 1934 (the "Exchange Act") and some members may additionally be potentially eligible for a claim under the Securities Act of 1933 (the "Securities Act"). Settlement Class Members with Exchange Act claims will claim in the Exchange Act Fund. Settlement Class Members with Securities Act claims will claim in the Securities Act Fund. Authorized Claimants will receive a payment which will be their *pro rata* share of the Exchange Act Fund based on their Exchange Act Recognized Loss (if applicable), plus their *pro rata* share of the Securities Act Fund based on their Securities Act Recognized Loss (if applicable), as described below.

## I.   CALCULATION OF EXCHANGE ACT RECOGNIZED LOSSES

64. In this case, Plaintiffs allege that Defendants made false and misleading statements and omitted material information that inflated the price of Silvergate Capital Corporation ("Silvergate") Class A Common Stock ("Silvergate Common Stock" or "Common Stock") and depositary shares representing a 1/40th interest in a share of Silvergate Capital's 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A ("Silvergate Preferred Stock" or "Preferred Stock") during the Class Period (*i.e.*, November 7, 2019 through March 21, 2023, inclusive), for Silvergate Common Stock, and from July 29, 2021 through March 21, 2023, inclusive, for Silvergate Preferred Stock.

65. In calculating the estimated artificial inflation allegedly caused by Defendants' misrepresentations and omissions, Plaintiffs' damages expert considered price changes in Silvergate Common Stock and Silvergate Preferred Stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. In order to have recoverable damages under the Exchange Act, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of Silvergate Common Stock or Preferred Stock. As such, the relevant dates considered differ for Silvergate Common Stock and Preferred Stock.

### A.  COMMON STOCK

66. It is alleged that there was relevant information released to the market that impacted the market price of Silvergate Common Stock on several dates during the Class Period: November 7, 2022 (after market close), November 15, 2022 (during market hours), November 17, 2022 (during market hours), November 18, 2022 (during market hours), December 1, 2022 (during market hours), December 5, 2022 (before market open), December 6, 2022 (before market open), December 12, 2022 (after market close), January 5, 2023 (before market open), February 2, 2023 (after market close), February 16, 2023 (during market hours), March 1, 2023 (after market close), March 8, 2023 (after market close), and March 20, 2023 (after market close). These dates impacted the artificial inflation from Silvergate Common Stock, causing it to decline on: November 8, 2022,

November 9, 2022, November 10, 2022, November 15, 2022, November 17, 2022, November 18, 2022, December 1, 2022, December 5, 2022, December 6, 2022, December 13, 2022, January 5, 2023, February 3, 2023, February 16, 2023, March 2, 2023, March 9, 2023, and March 21, 2023.

67.    For purposes of this Settlement, an "Exchange Act Recognized Loss" shall be calculated for Silvergate Common Stock as follows:

A.  An Exchange Act Recognized Loss will be calculated for each purchase or acquisition of Silvergate Common Stock during the Class Period that is listed on the Claim Form and for which adequate documentation is provided. If an Exchange Act Recognized Loss calculates to a negative number or zero under the applicable formula below, that number will be zero.

B.  For each share of Silvergate Common Stock purchased or otherwise acquired from November 7, 2019 (including purchases in the initial public offering of Silvergate Common Stock that occurred on or about November 7, 2019) through and including the close of trading on March 21, 2023, and:

> (i)  sold before November 8, 2022, the Exchange Act Recognized Loss will be $0.00.[6]

> (ii)  sold from November 8, 2022 through the close of trading on March 20, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A *minus* the amount of artificial inflation per share on the date of sale as stated in Table A; or (b) the purchase/acquisition price per share *minus* the sale price per share.

> (iii)  sold from March 21, 2023 through the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A; (b) the purchase/acquisition price per share *minus* the average closing price between March 21, 2023 and the date of sale as stated in Table B below; or (c) the purchase/acquisition price per share *minus* the sale price per share.

> (iv)  held as of the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A; or (b) the purchase/acquisition price *minus* $1.27, the average closing price between March 21, 2023 and June 16, 2023, as stated in Table B below.[7]

---

[6] Any transactions in Silvergate Common Stock executed outside of regular trading hours for the U.S. financial markets shall be deemed to have occurred during the next regular trading session.

[7] Under Section 21(D)(e)(1) of the Exchange Act, "in any private action arising under this chapter

## B.  PREFERRED STOCK

68.     It is alleged that there was relevant information released to the market that impacted the market price of Silvergate Preferred Stock in a statistically significant manner on several dates from July 29, 2021 through March 21, 2023, inclusive: November 7, 2022 (after market close), November 15, 2022 (during market hours), November 17, 2022 (during market hours), November 18, 2022 (during market hours), December 1, 2022 (during market hours), December 6, 2022 (before market open), December 12, 2022 (after market close), January 5, 2023 (before market open), February 2, 2023 (after market close), February 16, 2023 (during market hours), March 1, 2023 (after market close), and March 20, 2023 (after market close). These dates impacted the artificial inflation from Silvergate Common Stock, causing it to decline on: November 8, 2022, November 9, 2022, November 15, 2022, November 17, 2022, November 18, 2022, December 1, 2022, December 6, 2022, December 13, 2022, January 5, 2023, February 3, 2023, February 16, 2023, March 2, 2023, and March 21, 2023.

69.     For purposes of this Settlement, an "**Exchange Act Recognized Loss**" shall be calculated for Silvergate Preferred Stock as follows:

A.      An Exchange Act Recognized Loss will be calculated for each purchase or acquisition of Silvergate Preferred Stock from July 29, 2021 through March 21, 2023, inclusive that is listed on the Claim Form and for which adequate documentation is provided. If an Exchange Act Recognized Loss calculates to a negative number or zero under the applicable formula below, that number will be zero.

B.      For each share of Silvergate Preferred Stock purchased or otherwise acquired from July 29, 2021 (including purchases in the initial public offering of Silvergate Preferred Stock that occurred on or about July 29, 2021) through and including the close of trading on March 21, 2023, and:

(i)   sold before November 8, 2022, the Exchange Act Recognized Loss will be $0.00.[8]

---

in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Consistent with the requirements of the statute, Exchange Act Recognized Losses are reduced to an appropriate extent by taking into account the closing prices of Silvergate Common Stock during the "90-day look-back period," *i.e.*, March 21, 2023 through and including June 16, 2023. The mean (average) closing price for Silvergate Common Stock during this 90-day look-back period was $1.27.

[8] Any transactions in Silvergate Preferred Stock executed outside of regular trading hours for the U.S. financial markets shall be deemed to have occurred during the next regular trading session.

21

(ii) sold from November 8, 2022 through the close of trading on March 20, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C *minus* the amount of artificial inflation per share on the date of sale as stated in Table C; or (b) the purchase/acquisition price per share *minus* the sale price per share.

(iii) sold from March 21, 2023 through the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C; (b) the purchase/acquisition price per share *minus* the average closing price between March 21, 2023 and the date of sale as stated in Table D below; or (c) the purchase/acquisition price per share *minus* the sale price per share.

(iv) held as of the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C; or (b) the purchase/acquisition price *minus* $8.36, the average closing price between March 21, 2023 and June 16, 2023, as stated in Table D below.[9]

## II.    CALCULATION OF SECURITIES ACT RECOGNIZED LOSSES

### A.  COMMON STOCK

70.    For shares of Silvergate Common Stock purchased in (or traceable to) the secondary public offerings of Silvergate Common Stock issued on January 22, 2021 and December 7, 2021, and the "at-the-market" secondary public offering of Silvergate Common Stock between March 9, 2021 and May 18, 2021, inclusive, a Securities Act Recognized Loss shall be calculated under the Securities Act's statutory formula for the calculation of Section 11 damages, as provided below.

71.    For each share of Silvergate Common Stock either (a) purchased directly in the January 22, 2021 secondary public offering, or (b) purchased in the open market from January 22, 2021 through and including January 19, 2023[10] and for which the Claimant provides records establishing that those specific shares were issued in the January 22, 2021 secondary public offering and:

---

[9] Consistent with the requirements of the statute, Exchange Act Recognized Losses are reduced to an appropriate extent by taking into account the closing prices of Silvergate Preferred Stock during the "90-day look-back period," March 21, 2023 through and including June 16, 2023. The mean (average) closing price for Silvergate Preferred Stock during this 90-day look-back period was $8.36.

[10] For purposes of the statutory calculations for the January 22, 2021 secondary public offering of Silvergate Common Stock, January 19, 2023, the date of filing of the initial Section 11 Complaint in the Action related to the January 22, 2021 secondary public offering of Silvergate Common Stock, is the date of suit.

A.    Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

B.    Sold from November 8, 2022 through January 19, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $63.00 secondary offering per share price) *minus* the sale price per share.

C.    Sold from January 20, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $63.00 secondary offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $12.15 (the closing value on the date of suit).

D.    Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $63.00 secondary offering per share price) *minus* $12.15 (the closing value on the date of suit).

72.    For each share of Silvergate Common Stock either (a) purchased directly in the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive, or (b) purchased in the open market from March 9, 2021 through and including May 11, 2023[11] and for which the Claimant provides records establishing that those specific shares were issued in the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive and:

A.    Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

B.    Sold from November 8, 2022 through May 11, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the "at-the-market" secondary public offering per share price)[12] *minus* the sale price per share.

C.    Sold from May 12, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the "at-the-market" secondary public offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $0.91.[13]

---

[11] For purposes of the statutory calculations for the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive, of Silvergate Common Stock, May 11, 2023, the date of filing of the initial Section 11 Complaint in the Action related to the "at-the-market" secondary public offering of Silvergate Common Stock, is the date of suit.

[12] Shares issued in the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive were issued at different prices. In connection with the "at-the-market" secondary public offering, the company issued a combined total of 2,793,826 shares at an average price of $107.38. If the "at-the-market" secondary public offering per share price that corresponds to a Claimant's shares is not available, $107.38 should be used as the "at-the-market" secondary public offering per share price.

[13] A reported closing price for Silvergate Common Stock on May 11, 2023 is not available. Accordingly, the closing price of Silvergate Common Stock on the next trading day, May 12, 2023, of $0.91 shall be considered the value of Silvergate Common Stock as of the date of suit.

23

D.  Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the "at-the-market" secondary public offering per share price) *minus* $0.91.

73.  For each share of Silvergate Common Stock either (a) purchased directly in the December 7, 2021 secondary public offering, or (b) purchased in the open market from December 7, 2021 through and including January 19, 2023[14] and for which the Claimant provides records establishing that those specific shares were issued in the December 7, 2021 secondary public offering and:

A.  Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

B.  Sold from November 8, 2022 through January 19, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $145.00 secondary offering per share price) *minus* the sale price per share.

C.  Sold from January 20, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $145.00 secondary offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $12.15 (the closing value on the date of suit).

D.  Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $145.00 secondary offering per share price) *minus* $12.15 (the closing value on the date of suit).

## B.  PREFERRED STOCK

74.  For shares of Silvergate Preferred Stock purchased in (or traceable to) the initial public offering of Silvergate Preferred Stock on or around July 29, 2021, a Securities Act Recognized Loss shall be calculated under the Securities Act's statutory formula for the calculation of Section 11 damages, as provided below.

75.  For each share of Silvergate Preferred Stock either (a) purchased directly in the July 29, 2021 initial public offering, or (b) purchased in the open market from July 29, 2021 through and including May 11, 2023[15] and:

A.  Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

---

[14] For purposes of the statutory calculations for the December 7, 2021 secondary public offering of Silvergate Common Stock, January 19, 2023, the date of filing of the initial Section 11 Complaint in the Action related to the December 7, 2021 secondary public offering of Silvergate Common Stock, is the date of suit.

[15] For purposes of the statutory calculations for Silvergate Preferred Stock, May 11, 2023, the date of filing of the initial Section 11 Complaint in the Action related to Silvergate Preferred Stock, is the date of suit.

24

B.      Sold from November 8, 2022 through May 11, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $25.00 initial offering per share price) *minus* the sale price per share.

C.      Sold from May 12, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $25.00 initial offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $9.00.[16]

D.      Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $25.00 initial offering per share price) *minus* $9.00.

## III.      ADDITIONAL PROVISIONS

76.      **FIFO Matching:** In the event that a Claimant has multiple transactions of Silvergate Common Stock or Silvergate Preferred Stock during the relevant time periods, all purchases/acquisitions and sales of like security shall be matched on a first-in, first-out ("FIFO") basis. Sales will be matched first against any holdings at the beginning of the Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made during the Class Period.

77.      **"Purchase/Sale" Prices:** For the purposes of calculations under this Plan, "purchase price" means the actual price paid, excluding any fees, commissions, and taxes, and "sale price" means the actual amount received, not deducting any fees, commissions, and taxes.

78.      **"Purchase/Sale" Dates:** Purchases or acquisitions and sales of Silvergate Common Stock and Preferred Stock shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, inheritance or operation of law of Silvergate Common Stock or Preferred Stock shall not be deemed a purchase, acquisition or sale of the security for the calculation of an Authorized Claimant's Recognized Claim, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/acquisition of the security unless (i) the donor or decedent purchased or otherwise acquired such Silvergate Common Stock or Preferred Stock during the Class Period and/or in or traceable to one of the 2021 Offerings; (ii) no Claim Form was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to that security; and (iii) it is specifically so provided in the instrument of gift or assignment.

79.      **Short Sales:** The Exchange Act Recognized Loss or the Securities Act Recognized Loss on any portion of a purchase or acquisition that matches against (or "covers") a "short sale" is zero. The Exchange Act Recognized Loss or the Securities Act Recognized Loss on a "short sale" that is not covered by a purchase or acquisition is also zero. In the event that a Claimant has an opening short position in Silvergate Common Stock or Preferred Stock at the start of the Class Period, the

---

[16] A reported closing price for Silvergate Preferred Stock on May 11, 2023 is not available. Accordingly, the closing price of Silvergate Preferred Stock on the next trading day, May 12, 2023, of $9.00 shall be considered the value of Silvergate Preferred Stock as of the date of suit.

earliest Class Period purchases or acquisitions shall be matched against such an opening short position in accordance with the FIFO matching described above, and any portion of such purchases or acquisitions that cover such short sales will not be entitled to recovery. In the event that a Claimant newly establishes a short position during the Class Period, the earliest subsequent Class Period purchase or acquisition shall be matched against such short position on a FIFO basis and will not be entitled to a recovery.

80.    **Shares Purchased/Sold Through the Exercise of Options:** Silvergate Common Stock and Preferred Stock are the only securities eligible for recovery under the Plan. Option contracts to purchase or sell Silvergate Common Stock are not securities eligible to participate in the Settlement. With respect to Silvergate Common Stock purchased or sold through the exercise of an option, the purchase/sale date of such shares is the exercise date of the option and the purchase/sale price is the exercise price of the option.

81.    **Determination of Distribution Amount:** The Exchange Act Fund will be distributed on a pro rata basis to Authorized Claimants based on their total Exchange Act Recognized Loss and the Securities Act Fund will be distributed on a pro rata basis to Authorized Claimants based on their Securities Act Recognized Loss. Specifically, a "**Distribution Amount**" will be calculated for each Authorized Claimant, which will be (a) the Authorized Claimant's total Exchange Act Recognized Loss divided by the total Exchange Act Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Exchange Act Fund, plus (b) the Authorized Claimant's total Securities Act Recognized Loss divided by the total Securities Act Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Securities Act Fund.

82.    The Net Settlement Fund will be allocated among all Authorized Claimants whose Distribution Amount is $10.00 or greater. If any Authorized Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Authorized Claimant. Those funds will be included in the payments to Authorized Claimants with Distribution Amounts over $10.00.

83.    After the initial distribution of the Net Settlement Fund, the Claims Administrator will make reasonable and diligent efforts to have Authorized Claimants cash their distribution checks. To the extent any monies remain in the Net Settlement Fund after the initial distribution, if Lead Counsel, in consultation with the Claims Administrator, determine that it is cost-effective to do so, the Claims Administrator, no less than seven (7) months after the initial distribution, will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determines that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

26

84.     Payment pursuant to the Plan, or such other plan of allocation as may be approved by the Court, will be conclusive against all Authorized Claimants. No person or entity shall have any claim against Plaintiffs, Lead Counsel, the Claims Administrator, or any other agent designated by Lead Counsel, or Defendants' Releasees and/or their respective counsel, arising from distributions made substantially in accordance with the Stipulation, the plan of allocation approved by the Court, or any order of the Court. Plaintiffs and Defendants, and their respective counsel, and all other Releasees shall have no liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund, the plan of allocation approved by the Court, or the determination, administration, calculation, or payment of any claim or nonperformance of the Claims Administrator, the payment or withholding of Taxes (including interest and penalties) owed by the Settlement Fund, or any losses incurred in connection therewith.

## TABLE A

| Transaction Date | Artificial Inflation Per Share |
|---|---|
| November 7, 2019 - November 7, 2022 | $64.58 |
| November 8, 2022 - November 8, 2022 | $55.41 |
| November 9, 2022 - November 9, 2022 | $53.50 |
| November 10, 2022 - November 14, 2022 | $46.90 |
| November 15, 2022 - November 16, 2022 | $39.73 |
| November 17, 2022 - November 17, 2022 | $36.37 |
| November 18, 2022 - November 30, 2022 | $33.08 |
| December 1, 2022 - December 4, 2022 | $30.97 |
| December 5, 2022 - December 5, 2022 | $29.46 |
| December 6, 2022 - December 12, 2022 | $28.76 |
| December 13, 2022 - January 4, 2023 | $25.65 |
| January 5, 2023 - February 2, 2023 | $16.49 |
| February 3, 2023 - February 15, 2023 | $14.78 |
| February 16, 2023 - March 1, 2023 | $9.62 |
| March 2, 2023 - March 8, 2023 | $1.66 |
| March 9, 2023 - March 20, 2023 | $0.26 |
| March 21, 2023 - March 21, 2023 | $0.00 |

**TABLE B**

| Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown | | Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown |
|---|---|---|---|---|---|---|
| 3/21/2023 | $1.47 | $1.47 | | 5/4/2023 | $1.21 | $1.49 |
| 3/22/2023 | $1.32 | $1.40 | | 5/5/2023 | $1.34 | $1.49 |
| 3/23/2023 | $1.13 | $1.31 | | 5/8/2023 | $1.26 | $1.48 |
| 3/24/2023 | $1.72 | $1.41 | | 5/9/2023 | $1.24 | $1.48 |
| 3/27/2023 | $1.97 | $1.52 | | 5/10/2023 | $1.25 | $1.47 |
| 3/28/2023 | $2.08 | $1.62 | | 5/12/2023 | $0.91 | $1.45 |
| 3/29/2023 | $1.84 | $1.65 | | 5/15/2023 | $0.63 | $1.43 |
| 3/30/2023 | $1.62 | $1.64 | | 5/16/2023 | $0.65 | $1.41 |
| 3/31/2023 | $1.62 | $1.64 | | 5/17/2023 | $1.12 | $1.41 |
| 4/3/2023 | $1.62 | $1.64 | | 5/18/2023 | $1.15 | $1.40 |
| 4/4/2023 | $1.58 | $1.63 | | 5/19/2023 | $1.20 | $1.39 |
| 4/5/2023 | $1.47 | $1.62 | | 5/22/2023 | $1.10 | $1.39 |
| 4/6/2023 | $1.43 | $1.61 | | 5/23/2023 | $0.90 | $1.38 |
| 4/10/2023 | $1.39 | $1.59 | | 5/24/2023 | $0.90 | $1.37 |
| 4/11/2023 | $1.56 | $1.59 | | 5/25/2023 | $1.00 | $1.36 |
| 4/12/2023 | $1.55 | $1.59 | | 5/26/2023 | $0.95 | $1.35 |
| 4/13/2023 | $1.59 | $1.59 | | 5/30/2023 | $0.92 | $1.34 |
| 4/14/2023 | $1.52 | $1.58 | | 5/31/2023 | $0.92 | $1.33 |
| 4/17/2023 | $1.57 | $1.58 | | 6/1/2023 | $0.93 | $1.32 |
| 4/18/2023 | $1.53 | $1.58 | | 6/2/2023 | $0.87 | $1.31 |
| 4/19/2023 | $1.62 | $1.58 | | 6/5/2023 | $0.97 | $1.31 |
| 4/20/2023 | $1.61 | $1.58 | | 6/6/2023 | $0.97 | $1.30 |
| 4/21/2023 | $1.52 | $1.58 | | 6/7/2023 | $0.90 | $1.29 |
| 4/24/2023 | $1.38 | $1.57 | | 6/8/2023 | $1.03 | $1.29 |
| 4/25/2023 | $1.32 | $1.56 | | 6/9/2023 | $1.03 | $1.28 |
| 4/26/2023 | $1.27 | $1.55 | | 6/12/2023 | $1.02 | $1.28 |
| 4/27/2023 | $1.33 | $1.54 | | 6/13/2023 | $1.11 | $1.28 |
| 4/28/2023 | $1.35 | $1.54 | | 6/14/2023 | $1.18 | $1.28 |
| 5/1/2023 | $1.30 | $1.53 | | 6/15/2023 | $1.15 | $1.27 |
| 5/2/2023 | $1.19 | $1.52 | | 6/16/2023 | $0.83 | $1.27 |
| 5/3/2023 | $1.13 | $1.50 | | | | |

**TABLE C**

| Transaction Date | Artificial Inflation Per Share |
| --- | --- |
| July 29, 2021 - November 7, 2022 | $11.48 |
| November 8, 2022 - November 8, 2022 | $11.25 |
| November 9, 2022 - November 14, 2022 | $11.10 |
| November 15, 2022 - November 16, 2022 | $10.36 |
| November 17, 2022 - November 17, 2022 | $10.16 |
| November 18, 2022 - November 30, 2022 | $9.68 |
| December 1, 2022 - December 5, 2022 | $9.32 |
| December 6, 2022 - December 12, 2022 | $8.54 |
| December 13, 2022 - January 4, 2023 | $8.37 |
| January 5, 2023 - February 2, 2023 | $6.41 |
| February 3, 2023 - February 15, 2023 | $5.54 |
| February 16, 2023 - March 1, 2023 | $4.93 |
| March 2, 2023 - March 20, 2023 | $0.75 |
| March 21, 2023 - March 21, 2023 | $0.00 |

**TABLE D**

| Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown | Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown |
|---|---|---|---|---|---|
| 3/21/2023 | $5.96 | $5.96 | 5/4/2023 | $9.91 | $7.84 |
| 3/22/2023 | $5.80 | $5.88 | 5/5/2023 | $9.89 | $7.91 |
| 3/23/2023 | $6.00 | $5.92 | 5/8/2023 | $9.92 | $7.97 |
| 3/24/2023 | $7.95 | $6.43 | 5/9/2023 | $9.89 | $8.02 |
| 3/27/2023 | $8.02 | $6.75 | 5/10/2023 | $9.97 | $8.08 |
| 3/28/2023 | $8.00 | $6.96 | 5/12/2023 | $9.00 | $8.10 |
| 3/29/2023 | $7.84 | $7.08 | 5/15/2023 | $9.75 | $8.14 |
| 3/30/2023 | $7.90 | $7.18 | 5/16/2023 | $10.00 | $8.19 |
| 3/31/2023 | $7.95 | $7.27 | 5/17/2023 | $9.96 | $8.24 |
| 4/3/2023 | $8.03 | $7.35 | 5/18/2023 | $10.05 | $8.28 |
| 4/4/2023 | $7.96 | $7.40 | 5/19/2023 | $9.75 | $8.31 |
| 4/5/2023 | $7.96 | $7.45 | 5/22/2023 | $9.00 | $8.33 |
| 4/6/2023 | $7.77 | $7.47 | 5/23/2023 | $8.50 | $8.33 |
| 4/10/2023 | $7.56 | $7.48 | 5/24/2023 | $8.75 | $8.34 |
| 4/11/2023 | $7.95 | $7.51 | 5/25/2023 | $9.00 | $8.36 |
| 4/12/2023 | $8.00 | $7.54 | 5/26/2023 | $8.76 | $8.37 |
| 4/13/2023 | $8.02 | $7.57 | 5/30/2023 | $8.48 | $8.37 |
| 4/14/2023 | $8.06 | $7.60 | 5/31/2023 | $8.70 | $8.38 |
| 4/17/2023 | $8.36 | $7.64 | 6/1/2023 | $8.50 | $8.38 |
| 4/18/2023 | $8.04 | $7.66 | 6/2/2023 | $8.50 | $8.38 |
| 4/19/2023 | $7.95 | $7.67 | 6/5/2023 | $8.15 | $8.38 |
| 4/20/2023 | $7.94 | $7.68 | 6/6/2023 | $8.00 | $8.37 |
| 4/21/2023 | $7.69 | $7.68 | 6/7/2023 | $8.01 | $8.36 |
| 4/24/2023 | $7.74 | $7.69 | 6/8/2023 | $8.05 | $8.36 |
| 4/25/2023 | $7.49 | $7.68 | 6/9/2023 | $8.90 | $8.37 |
| 4/26/2023 | $7.70 | $7.68 | 6/12/2023 | $8.35 | $8.37 |
| 4/27/2023 | $8.05 | $7.69 | 6/13/2023 | $8.20 | $8.36 |
| 4/28/2023 | $8.30 | $7.71 | 6/14/2023 | $8.20 | $8.36 |
| 5/1/2023 | $7.56 | $7.71 | 6/15/2023 | $8.10 | $8.36 |
| 5/2/2023 | $7.56 | $7.70 | 6/16/2023 | $8.35 | $8.36 |
| 5/3/2023 | $10.01 | $7.78 | | | |

30

| MUST BE POSTMARKED NO LATER THAN _____, 2025 | *In re Silvergate Capital Corporation Securities Litigation*<br>No. 3:22-cv-01936-JES-MSB (S.D. Cal.) | |

## INSTRUCTIONS FOR COMPLETING PROOF OF CLAIM AND RELEASE FORM

### GENERAL RULES FOR RECOVERING

1. To recover as a Settlement Class Member based on your claims in the action entitled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.) (the "Action"),[1] you must complete and, on page 10 hereof, sign this Proof of Claim and Release Form ("Claim Form"). If you fail to timely and completely file a properly addressed (as set forth in paragraph 3 below) Claim Form, your Claim may be rejected and you may be precluded from any recovery from the Net Settlement Fund created in connection with the proposed Settlement.

2. Submission of this Claim Form, however, does not assure that you will share in the proceeds of the Settlement. Your recovery, if any, will be calculated as described in the Plan of Allocation in the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Notice").

3. YOU MUST COMPLETE AND SUBMIT THE ELECTRONIC VERSION OF THIS CLAIM FORM AVAILABLE AT WWW.SILVERGATESECURITIESLITIGATION.COM NO LATER THAN 11:59 P.M. ET ON _____, 2025 OR MAIL YOUR COMPLETED AND SIGNED CLAIM FORM POSTMARKED ON OR BEFORE _____, 2025, ADDRESSED AS FOLLOWS:

*Silvergate Capital Corporation Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111

4. If you are NOT a Settlement Class Member (as defined in the Notice), DO NOT submit a Claim Form.

5. If you are a Settlement Class Member and you did not timely and validly request exclusion from the proposed Settlement Class (pursuant to the procedures set forth in the Notice), you will still be bound by the terms of the Settlement and proposed Judgment to be entered in the Action, including the releases provided therein, WHETHER OR NOT YOU SUBMIT A CLAIM FORM.

6. **PLEASE NOTE:** As set forth in the Plan of Allocation, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund. If the prorated payment to any Authorized Claimant calculates to less than $10.00, it will not be included in the calculation, and no distribution will be made to that Authorized Claimant.

### IDENTIFICATION OF CLAIMANT

7. THIS CLAIM FORM MUST BE SUBMITTED BY THE ACTUAL BENEFICIAL PURCHASER(S), OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S), OF SILVERGATE CAPITAL CORPORATION ("SILVERGATE CAPITAL") STOCK UPON WHICH THESE CLAIMS ARE BASED.

8. Use Part I of this form entitled "Claimant Identification" to identify each beneficial purchaser.

---

[1] This Claim Form incorporates by reference the definitions in the Stipulation and Agreement of Settlement between the Parties, dated May 9, 2025 (the "Stipulation"), and all capitalized terms used, but not defined herein, shall have the same meanings as in the Stipulation or in the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Notice"). Copies of both documents can be obtained at www.SilvergateSecuritiesLitigation.com.

9. All joint purchasers must sign this Claim Form. Executors, administrators, guardians, conservators, and trustees must complete and sign this Claim Form on behalf of persons represented by them, and their authority must accompany this Claim and their titles or capacities must be stated. The last four digits of the Social Security (or taxpayer identification) number and telephone number of the beneficial owner(s) may be used in verifying the Claim. Failure to provide the foregoing information could delay verification of your Claim or result in rejection of the Claim.

10. **One Claim should be submitted for each separate legal entity or separately managed account.** Separate Claim Forms should be submitted for each separate legal entity (*e.g.*, an individual should not combine his or her IRA transactions with transactions made solely in the individual's name). Generally, a single Claim Form should be submitted on behalf of one legal entity including all holdings and transactions made by that entity on one Claim Form. However, if a single person or legal entity had multiple accounts that were separately managed, separate Claims may be submitted for each such account. The Claims Administrator reserves the right to request information on all the holdings and transactions in Silvergate Capital Stock made on behalf of a single beneficial owner.

11. Agents, executors, administrators, guardians, and trustees must complete and sign the Claim Form on behalf of persons represented by them, and they must:

    (a)    expressly state the capacity in which they are acting;

    (b)    identify the name, account number, Social Security Number (or taxpayer identification number), address, and telephone number of the beneficial owner of (or other person or entity on whose behalf they are acting with respect to) the Silvergate Capital Stock; and

    (c)    furnish herewith evidence of their authority to bind to the Claim Form the person or entity on whose behalf they are acting. (Authority to complete and sign a Claim Form cannot be established by stockbrokers demonstrating only that they have discretionary authority to trade securities in another person's accounts.)

## IDENTIFICATION OF TRANSACTION(S)

12. Use Parts II and III of this form to supply all required details of your transaction(s) in (a) Silvergate Capital common stock and (b) depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A ("Silvergate Capital Preferred Stock" and with Silvergate Capital common stock, "Silvergate Capital Stock"). If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

13. On the schedules, provide all of the requested transaction and holding information with respect to *all* of your transactions in Silvergate Capital Stock, whether or not such transactions resulted in a profit or a loss. Failure to report all such transactions may result in the rejection of your Claim.

14. List each transaction separately and in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day, and year of each transaction you list.

15. You should attach documentation verifying your transactions in Silvergate Capital Stock, such as copies of broker confirmations. Failure to provide this documentation could delay verification of your Claim or result in rejection of your Claim.

16. By submitting a signed Claim Form, you will be swearing to the truth of the statements contained therein and the genuineness of the documents attached thereto, subject to penalties of perjury under the laws of the United States of America. The making of false statements, or the submission of forged or fraudulent documentation, will result in the rejection of your claim and may subject you to civil liability or criminal prosecution.

## OTHER

17. Payments to eligible Authorized Claimants will be made only if the Court approves the Settlement, after any appeals are resolved, and after the completion of all claims processing.

18. If you have questions concerning the Claim Form, or need additional copies of the Claim Form or the Notice, you may contact the Claims Administrator, JND Legal Administration, at the above address, by email at info@SilvergateSecuritiesLitigation.com or by toll-free phone at 866-287-0746, or you can visit the website, www.SilvergateSecuritiesLitigation.com, where copies of the Claim Form and Notice are available for downloading.

19. **NOTICE REGARDING ELECTRONIC FILES:** Certain claimants with large numbers of transactions may request, or may be requested, to submit information regarding their transactions in electronic files. To obtain the mandatory electronic filing requirements and file layout, you may visit the settlement website at

2

www.SilvergateSecuritiesLitigation.com or you may email the Claims Administrator's electronic filing department at SVGSecurities@SilvergateSecuritiesLitigation.com. Any file not in accordance with the required electronic filing format will be subject to rejection. The complete name of the beneficial owner of the securities must be entered where called for. No electronic files will be considered to have been submitted unless the Claims Administrator issues an email confirming receipt of your submission. Do not assume that your file has been received until you receive that email. If you do not receive such an email within 10 days of your submission, you should contact the electronic filing department at SVGSecurities@SilvergateSecuritiesLitigation.com to inquire about your file and confirm it was received.

### IMPORTANT: PLEASE NOTE

**YOUR CLAIM IS NOT DEEMED FILED UNTIL YOU RECEIVE AN ACKNOWLEDGEMENT POSTCARD. THE CLAIMS ADMINISTRATOR WILL ACKNOWLEDGE RECEIPT OF YOUR CLAIM FORM BY MAIL, WITHIN 60 DAYS. IF YOU DO NOT RECEIVE AN ACKNOWLEDGEMENT POSTCARD WITHIN 60 DAYS, CALL THE CLAIMS ADMINISTRATOR TOLL FREE AT 866-287-0746.**

# PROOF OF CLAIM AND RELEASE FORM

**MUST BE POSTMARKED NO LATER THAN _____, 2025**

*In re Silvergate Capital Corporation Securities Litigation*
No. 3:22-cv-01936-JES-MSB (S.D. Cal.)

## PART I: CLAIMANT IDENTIFICATION

**Claimant/Representative Contact Information:**
The Claims Administrator will use the contact information for all correspondence relevant to this Claim (including the issuance of the distribution check, if the Claim is ultimately determined to be eligible for payment). If the contact information changes, then you must notify the Claims Administrator in writing at the address identified above.

Claimant's Name (as you would like it to appear on your check if eligible for payment)

Address Line 1 (Number and Street or P.O. Box)

Address Line 2 (if needed)

City                                    State or Province            Zip Code

Country name                            Last four digits of Social Security Number (for individuals)

                                        or T.I.N. (for estates, trusts, corporations, etc.)

Representative's Name (if different from the Claimant's Name(s) listed above)

Telephone Number (Work)                 Telephone Number (Home)

Email

4

**PART II: SCHEDULE OF TRANSACTIONS IN SILVERGATE CAPITAL COMMON STOCK**

A. **Purchases: List all purchases of Silvergate Capital Common Stock from November 7, 2019 (including in the November 7, 2019 initial public offering), through May 11, 2023, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Purchase Price (Excluding Commissions) | Check this box if the shares were purchased in or traceable to a 2021 Offering* |
| --- | --- | --- | --- | --- |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |

\* The 2021 Offerings of Silvergate Capital Common Stock were conducted on or about January 22, 2021 (at an offering price of $63 per share); from March 9, 2021 through May 18, 2021 (at market prices); and on or about December 7, 2021 (at an offering price of $145 per share). If you purchased shares that were not purchased directly in one of the 2021 Offerings at the offering price, but that you believe are specifically traceable to one of those offerings, you must submit documents with your Claim Form showing that the specific shares that you purchased were issued in that offering.

B. **Purchases: List the total number of shares of Silvergate Capital Common Stock purchased from May 11, 2023, through May 9, 2025, inclusive.**

| |
| --- |
| |

C. **Sales: List all sales of Silvergate Capital Common Stock from November 7, 2019, through May 9, 2025, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Sales Proceeds (Excluding Commissions) |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |

5

D. **Unsold Holdings: List the number of shares of Silvergate Capital Common Stock held as of the close of trading on May 9, 2025. Be sure to attach documentation verifying your holdings such as a current account statement.**

**<u>Quantity of Shares Held</u>**

|  |
|---|

**If you require additional space to list your transactions, use photocopies of this page and check this box. ☐**

6

**PART III: SCHEDULE OF TRANSACTIONS IN SILVERGATE CAPITAL PREFERRED STOCK**

A. **Purchases: List all purchases of Silvergate Capital Preferred Stock from July 29, 2021 (including in the July 29, 2021 initial public offering), through May 11, 2023, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Purchase Price (Excluding Commissions) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

B. **Purchases: List the total number of shares of Silvergate Capital Preferred Stock purchased from May 12, 2023, through May 9, 2025, inclusive.**

| |
|---|
| |

C. **Sales: List all sales of Silvergate Capital Preferred Stock from July 29, 2021, through May 9, 2025, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Sales Proceeds (Excluding Commissions) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

D. **Unsold Holdings: List the number of shares of Silvergate Capital Preferred Stock held as of the close of trading on May 9, 2025. Be sure to attach documentation verifying your holdings such as a current account statement.**

**Quantity of Shares Held**

| |
|---|
| |

**If you require additional space to list your transactions, use photocopies of this page and check this box.** ☐

YOU MUST READ THE RELEASE AND YOUR SIGNATURE ON PAGE 10 WILL CONSTITUTE YOUR ACKNOWLEDGMENT OF THE RELEASE.

## PART IV: SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

**I (we) submit this Claim Form under the terms of the Settlement described in the notice. I (we) also submit to the jurisdiction of the United States District Court for the Southern District of California with respect to my (our) claim as a Settlement Class Member and for purposes of enforcing the releases set forth in the Settlement and repeated herein. I (we) further acknowledge that I am (we are) bound by and subject to the terms of any judgment that may be entered in the Action. I (we) agree to furnish additional information to the Claims Administrator to support this claim if requested to do so. I (we) have not submitted any other claim covering the same purchases or sales of Silvergate Capital Stock and know of no other person having done so on my (our) behalf.**

## PART V: RELEASE

1. **I (we) hereby acknowledge, on behalf of myself (ourselves), and each of my (our) heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Plaintiffs' Claims on behalf of myself (ourselves), in that capacity (collectively, "Plaintiffs' Releasors"), regardless of whether I, we, or they share in the Settlement Fund, that I (we) fully, finally, and forever compromise, settle, release, resolve, relinquish, dismiss, waive, and discharge each and every Released Plaintiffs' Claim against Defendants and the other Defendants' Releasees, and will forever be barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.**

2. **"Defendants' Releasees" means Defendants and each of their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.**

3. **"Released Plaintiffs' Claims" means all claims, demands, losses, rights, and causes of action of any nature whatsoever, whether known claims or Unknown Claims, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, common, or foreign law or any other law, rule or regulation, by Plaintiffs, any member of the Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which arise out of, are based upon, or relate in any way to (i) any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to, in the Action, or which could have been alleged in the Action, and/or (ii) the purchase, acquisition, holding, sale, or disposition of the publicly traded common stock of Silvergate Capital during the Class Period and/or the securities issued in or traceable to any of Silvergate Capital's securities offerings during 2021. This release does not include any claims relating to the enforcement of the Settlement.**

4. **"Unknown Claims" means any Released Plaintiffs' Claims which any Plaintiff or any other Settlement Class Member or any other Plaintiff Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other**

8

Defendant Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, in each case which, if known by him, her, or it, might have affected his, her, or its decision(s) with respect to this Settlement including but not limited to whether to object to the Settlement or seek exclusion from the Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly waive, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Plaintiffs, Settlement Class Members,  and Defendants acknowledge that they may hereafter discover facts in addition to or different from those which he, she, or it or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly settle and release, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and Defendants acknowledge, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a material element of the Settlement.

5. This release shall be of no force or effect unless and until the Court approves the Settlement and the Effective Date of the Settlement (as defined in the Stipulation) occurs.

6. I (we) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to the Settlement or any other part or portion thereof.

7. I (we) hereby warrant and represent that I (we) have included information about all of my (our) purchases and sales of Silvergate Capital Stock during the required periods as set forth above.

8. I (we) hereby warrant and represent that I (we) have not submitted any other claim covering the same purchases of Silvergate Capital Stock and knows (know) of no other person having done so on my (our) behalf.

9. I (we) hereby warrant and represent that I am (we are) not excluded from the Settlement Classes as defined in the Notice and that I (we) have not requested to be excluded from the Settlement Classes pursuant to the procedures set forth in the notice.

10. The claimant(s) submit(s) to the jurisdiction of the Court with respect to claimant's (claimants') claim and for purposes of enforcing the releases set forth herein.

11. I (we) agree to furnish such additional information with respect to this Claim Form as Lead Counsel, the Claims Administrator, or the Court may require.

12. The claimant(s) waive(s) the right to trial by jury, to the extent it exists, and agree(s) to the determination by the Court of the validity or amount of this Claim, and waive(s) any right of appeal or review with respect to such determination.

**13.** I (we) acknowledge that the claimant(s) will be bound by and subject to the terms of any judgment(s) that may be entered in the Action; and

**14.** I (we) certify that I am (we are) not subject to backup withholding under the provisions of section 3406(a)(1)(c) of the Internal Revenue Code.

> **Note:** if you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike out the language that you are not subject to backup withholding in the certification above.

**I (WE) DECLARE THAT THE FOREGOING INFORMATION SUPPLIED BY THE UNDERSIGNED IS TRUE AND CORRECT.**

Executed this _____ day of _____, in _____, _____

(Month/Year)                (City)                        (State/Country)

| | |
|---|---|
| Signature of Claimant | Signature of Joint Claimant, if any |
| Print Name of Claimant | Print Name of Joint Claimant, if any |
| Date | Date |

*If Claimant is other than an individual, or is not the person completing this form, the following <u>also</u> must be provided:*

| | |
|---|---|
| Signature of Person Completing Form | Date |
| Print Name of Person Completing Form or Administrator, see ¶ 11 on page 2) | Capacity of Person(s) Signing (*e.g.*, Beneficial Purchaser, Executor |

## REMINDER CHECKLIST

☐ 1. Please be sure to sign this Claim Form.
☐ 2. Remember to attach **COPIES OF** documentation verifying your transactions listed above.
☐ 3. **DO NOT SEND ORIGINALS OF ANY DOCUMENTS VERIFYING YOUR TRANSACTIONS.**
☐ 4. Keep a copy of your Claim Form for your records.
☐ 5. If you move, please send your new address to the Claims Administrator at the address below:

*Silvergate Capital Corporation Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111
866-287-0746

info@SilvergateSecuritiesLitigation.com

☐ 6. **Do not use highlighter on the Claim Form or supporting documentation.**

10

**Exhibit A-3**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN RE SILVERGATE CAPITAL
CORPORATION SECURITIES LITIGATION

Case No. 3:22-cv-01936-JES-MSB

## SUMMARY NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

**TO:**     (a) All persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital Corporation ("Silvergate Capital") from November 7, 2019 through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby; and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021 and were damaged thereby (collectively, the "Settlement Class").[1]

**PLEASE READ THIS NOTICE CAREFULLY, YOUR RIGHTS WILL BE AFFECTED BY A CLASS ACTION LAWSUIT PENDING IN THIS COURT.**

YOU ARE HEREBY NOTIFIED, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the U.S. District Court for the Southern District of California (the "Court"), that the above-captioned securities class action (the "Action") is pending in the Court.

YOU ARE ALSO NOTIFIED that Plaintiffs in the Action have reached a proposed settlement of the Action for $37,500,000 in cash (the "Settlement"), that, if approved, will resolve all claims in the Action.

A hearing will be held on _____, 2025 at _:__ _.m., before the Honorable James E. Simmons, Jr. either in person at the U.S. District Court for the Southern District of California, Edward J. Schwartz United States Courthouse, Courtroom 4B, 221 West Broadway, San Diego, CA 92101, or by telephone or videoconference, to determine (i) whether the proposed Settlement should be approved as fair, reasonable, and adequate; (ii) whether, for purposes of the proposed Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (iii) whether the Action should be dismissed with prejudice against Defendants, and the Releases specified and described in the Stipulation and Agreement of Settlement dated May 9, 2025 (and in the Notice) should be granted; (iv) whether the proposed Plan of Allocation should be approved as fair and reasonable; and (v) whether Lead Counsel's application for an award of attorneys' fees and Litigation Expenses should be approved.

---

[1] Certain persons and entities are excluded from the Settlement Class by definition as set forth in the full Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice"), available at www.SilvergateSecuritiesLitigation.com.

**If you are a member of the Settlement Class, your rights will be affected by the pending Action and the Settlement, and you may be entitled to a payment from the Settlement**. If you have not yet received the Notice and Claim Form, you may obtain copies of these documents by contacting the Claims Administrator at *Silvergate Capital Corporation Securities Litigation*, c/o JND Legal Administration, P.O. Box 91072; Seattle, WA 98111; or info@SilvergateSecuritiesLitigation.com. Copies of the Notice and Claim Form can also be downloaded from the Settlement website, www.SilvergateSecuritiesLitigation.com.

If you are a member of the Settlement Class, in order to be eligible to receive a payment from the Settlement, you must submit a Claim Form *postmarked* **(or submitted online) no later than _____, 2025**. If you are a Settlement Class Member and do not submit a proper Claim Form, you will not be eligible to receive a payment from the Settlement but you will nevertheless be bound by any judgments or orders entered by the Court in the Action.

If you are a member of the Settlement Class and wish to exclude yourself from the Settlement Class, you must submit a request for exclusion such that it is *received* **no later than _____, 2025**, in accordance with the instructions set forth in the Notice. If you properly exclude yourself from the Settlement Class, you will not be bound by any judgments or orders entered by the Court in the Action and you will not be eligible to receive a payment from the Settlement. Excluding yourself is the only option that may allow you to be part of any other current or future lawsuit against Defendants or any of the other released parties concerning the claims being resolved by the Settlement.

Any objections to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for attorneys' fees and Litigation Expenses, must be filed with the Court and delivered to Lead Counsel and Defendants' Counsel such that they are *received* **no later than _____, 2025**, in accordance with the instructions set forth in the Notice.

**Please do not contact the Court, the Clerk's office, Defendants, or their counsel regarding this notice. All questions about this notice, the proposed Settlement, or your eligibility to participate in the Settlement should be directed to the Claims Administrator or Lead Counsel.**

Requests for the Notice and Claim Form should be made to:

*Silvergate Capital Corporation Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111
866-287-0746

info@SilvergateSecuritiesLitigation.com
www.SilvergateSecuritiesLitigation.com

Inquiries, other than requests for the Notice and Claim Form, should be made to Lead Counsel:

Cohen Milstein Sellers & Toll PLLC
Attn: Carol V. Gilden
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel.: (312) 629-3737
Email: cgilden@cohenmilstein.com

2

Bernstein Litowitz Berger & Grossmann LLP
Attn: Jonathan D. Uslaner
2121 Avenue of the Stars
Los Angeles, CA 90067
Tel.: (310) 819-3470
Email: settlements@blbglaw.com

By Order of the Court

3

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**[PROPOSED] JUDGMENT APPROVING CLASS ACTION SETTLEMENT** |

WHEREAS, a consolidated securities class action is pending in this Court entitled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (the "Action");

WHEREAS, (a) Plaintiffs Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class; and (b) defendants Silvergate Capital Corporation ("Silvergate Capital" and together with its subsidiary Silvergate Bank, the "Debtors"), Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank and Robert Campbell (collectively, the "Individual Defendants" and together with the Debtors, the "Silvergate Defendants") and defendants Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants" and together with the Silvergate Defendants, the "Defendants") have entered into a Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), that provides for a complete dismissal with prejudice of the claims asserted against Defendants in the Action on the terms and conditions set forth in the Stipulation, subject to the approval of this Court (the "Settlement");

WHEREAS, unless otherwise defined in this Judgment, all capitalized terms herein shall have the same meaning as they have in the Stipulation;

WHEREAS, by Order dated _____, 2025 (the "Preliminary Approval Order"), this Court: (a) found, pursuant to Rule 23(e)(1)(B) of the Federal Rules of Civil Procedure, that it would likely be able to approve the Settlement as fair, reasonable, and adequate under Rule

[PROPOSED] JUDGMENT APPROVING CLASS ACTION SETTLEMENT     1     CASE NO. 22-CV-01936-JES-MSB

23(e)(2), (b) pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure, preliminarily certified the Settlement Class for purposes of effectuating the proposed Stipulation and the Settlement only; (c) ordered that notice of the proposed Settlement be provided to potential Settlement Class Members; (d) provided Settlement Class Members with the opportunity either to exclude themselves from the Settlement Class or to object to the proposed Settlement; and (e) scheduled a hearing regarding final approval of the Settlement;

WHEREAS, due and adequate notice has been given to the Settlement Class;

WHEREAS, the Court conducted a hearing on _____, 2025 (the "Settlement Hearing") to consider, among other things, (a) whether the terms and conditions of the Settlement are fair, reasonable, and adequate to the Settlement Class, and should therefore be approved; and (b) whether a judgment should be entered dismissing the Action with prejudice as against the Defendants; and

WHEREAS, the Court having reviewed and considered the Stipulation, all papers filed and proceedings held herein in connection with the Settlement, all oral and written comments received regarding the Settlement, and the record in the Action, and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. **Jurisdiction** – The Court has jurisdiction over the subject matter of the Action, and all matters relating to the Settlement, as well as personal jurisdiction over all of the Parties and each of the Settlement Class Members.

2. **Incorporation of Settlement Documents** – This Judgment incorporates and makes a part hereof: (a) the Stipulation filed with the Court on May __, 2025; and (b) the Notice and the Summary Notice, both of which were filed with the Court on May __, 2025.

3. **Class Certification for Settlement Purposes** – The Court hereby certifies for the purposes of the Settlement only, the Action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Settlement Class consisting of (a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019 through March 21, 2023, inclusive, and were damaged thereby, and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to

[PROPOSED] JUDGMENT APPROVING      2      CASE NO. 22-CV-01936-JES-MSB
CLASS ACTION SETTLEMENT

any of Silvergate Capital's securities offerings during 2021, and were damaged thereby (collectively, the "Settlement Class"). Excluded from the Settlement Class are (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no Investment Vehicle shall be excluded from the Settlement Class. [Also excluded from the Settlement Class are the persons and entities listed on Exhibit 1 hereto, who or which have excluded themselves by submitting a timely, complete, and valid request for exclusion that is accepted by the Court.]

4. **Settlement Class Findings** – For purposes of the Settlement only, the Court finds that each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met: (a) the members of the Settlement Class are so numerous that their joinder in the Action would be impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of Plaintiffs in the Action are typical of the claims of the Settlement Class; (d) Plaintiffs and Lead Counsel have fairly and adequately represented and protected the interests of the Settlement Class; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the claims of the Settlement Class in the Action.

5. **Adequacy of Representation** – Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for the purposes of the Settlement only, the Court hereby appoints Plaintiffs as Class Representatives for the Settlement Class, and appoints Lead Counsel Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP as Class Counsel for the Settlement Class. Plaintiffs and Lead Counsel have fairly and adequately represented the Settlement Class both in terms of litigating the Action and for purposes of entering into and implementing the Settlement and have satisfied the requirements of Federal Rules of Civil Procedure 23(a)(4) and 23(g), respectively.

6. **Notice** – The Court finds that the dissemination of the Notice and the publication of the Summary Notice: (a) were implemented in accordance with the Preliminary Approval Order; (b) constituted the best notice practicable under the circumstances; (c) constituted notice that was

[PROPOSED] JUDGMENT APPROVING    3    CASE NO. 22-CV-01936-JES-MSB
CLASS ACTION SETTLEMENT

reasonably calculated, under the circumstances, including individual notice to all Settlement Class Members who could be identified through reasonable efforts, to apprise Settlement Class Members of (i) the pendency of the Action; (ii) the effect of the proposed Settlement (including the Releases to be provided thereunder); (iii) Lead Counsel's motion for attorneys' fees and Litigation Expenses; (iv) Settlement Class Members' right to object to any aspect of the Settlement, the Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses; (v) their right to exclude themselves from the Settlement Class; and (vi) their right to appear at the Settlement Hearing; (d) constituted due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (e) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1, 78u-4, as amended, and all other applicable law and rules.

7.      **CAFA** – The Court finds that the notice requirements set forth in the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 *et seq.*, to the extent applicable to the Action, have been satisfied.

8.      **Final Settlement Approval and Dismissal of Claims** – Pursuant to, and in accordance with, Rule 23(e)(2) of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement set forth in the Stipulation in all respects (including, without limitation, the amount of the Settlement, the Releases provided for therein, and the dismissal with prejudice of the claims asserted against Defendants in the Action), and finds that the Settlement is, in all respects, fair, reasonable and adequate to the Settlement Class.  Specifically, the Court finds that (a) Plaintiffs and Lead Counsel have adequately represented the Settlement Class; (b) the Settlement was negotiated by the Parties at arm's length; (c) the relief provided for the Settlement Class under the Settlement is adequate taking into account the costs, risks, and delay of trial and appeal, the proposed means of distributing the Settlement Fund to the Settlement Class, and the proposed attorneys' fee award; and (d) the Settlement treats members of the Settlement Class equitably relative to each other.  The Parties are directed to implement, perform, and consummate the Settlement in accordance with the terms and provisions contained in the Stipulation.

9.    The Action and all of the claims asserted against Defendants in the Action are hereby dismissed with prejudice.  The Parties shall bear their own costs and expenses, except as otherwise expressly provided in the Stipulation.

10.    **Binding Effect** – The terms of the Stipulation and of this Judgment shall be forever binding on Defendants, Plaintiffs, and all other Settlement Class Members (regardless of whether or not any individual Settlement Class Member submits a Claim Form or seeks or obtains a distribution from the Net Settlement Fund), as well as their respective successors, assigns, heirs, predecessors, executors, administrators, representatives, attorneys, and agents. [The persons and entities listed on Exhibit 1 hereto are excluded from the Settlement Class pursuant to timely, complete, and valid requests for exclusion that are accepted by the Court]

11.    **Releases** – The Releases set forth in paragraphs 6 and 7 of the Stipulation, together with the definitions contained in paragraph 1 of the Stipulation relating thereto, are expressly incorporated herein in all respects.  The Releases are effective as of the Effective Date. Accordingly, this Court orders that:

(a)    Without further action by anyone, and subject to paragraph 13 below, upon the Effective Date of the Settlement, Plaintiffs and each of the Settlement Class Members, on behalf of themselves and their respective Plaintiff Releasors, regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, shall be deemed to have, and by operation of the Stipulation, of law and of this Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Plaintiffs' Claim against Defendants and the Defendant Releasees, and shall forever be barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

[PROPOSED] JUDGMENT APPROVING    5    CASE NO. 22-CV-01936-JES-MSB
CLASS ACTION SETTLEMENT

(b)    Without further action by anyone, and subject to paragraph 13 below, upon the Effective Date of the Settlement, Defendants, on behalf of themselves, and their respective Defendant Releasors, shall be deemed to have, and by operation of law and of this Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Defendants' Claim against Plaintiffs and the other Plaintiff Releasees, and shall forever be barred and enjoined from commencing, instituting, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Defendants' Claims against any of the Plaintiff Releasees.  [This Release shall not apply to any person or entity listed on Exhibit 1 hereto.]

12.    Upon the Effective Date, the Stipulation shall operate conclusively as an estoppel, res judicata, bar, full defense, and any other theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim in the event, and to the extent, of any claim, demand, action, or proceeding brought by a Plaintiff or Settlement Class Member against any of the Defendant Releasees with respect to any Released Plaintiffs' Claims, or brought by a Defendant against any of the Plaintiff Releasees with respect to any Released Defendants' Claim.

13.    Notwithstanding paragraphs 11(a) – (b) and 12 above, nothing in this Judgment shall bar any action by any of the Parties to enforce or effectuate the terms of the Stipulation or this Judgment.

14.    **Bar Order:**  Upon the Effective Date of the Settlement, any and all claims, future claims, and claims over by any individual or entity against any of the Defendant Releasees, and by the Defendant Releasees against any individual or entity, for (a) contribution or indemnity, however denominated, whether as a claim, cross-claim, counterclaim, third-party claim, or otherwise, on whatsoever theory, based upon, arising out of, or related to the Released Plaintiffs' Claims, or (b) any other claim of any type, whether arising under state, federal, common or foreign law, for which the injury claimed is that person's or entity's actual or threatened liability to Plaintiffs and/or members of the Settlement Class, whether asserted in the Action or any other

[PROPOSED] JUDGMENT APPROVING          6          CASE NO. 22-CV-01936-JES-MSB
CLASS ACTION SETTLEMENT

proceeding, in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, are permanently barred, enjoined, restrained, extinguished, and discharged to the fullest extent permitted by law (the "Bar Order"); *provided, however,* that the Bar Order shall not preclude the Defendants from seeking to enforce any rights or claims they may have under their applicable insurance policies or any right of indemnification or contribution that the Individual Defendants may have under contract or based on the charter and by-laws of Debtors or their agreements with Debtors. Moreover, nothing in this Bar Order shall be construed to impair, negate, diminish, or adversely affect any rights of Defendant Releasees or their successors or assigns under or with respect to any insurance policies, including, but without limitation, any rights to seek to recover or to recover insurance proceeds or payments under any insurance policies with respect to amounts paid pursuant to the Settlement or incurred in connection with the Action, or any other actual or alleged loss or liability, and Defendant Releasees expressly reserve all rights, claims, positions, arguments, contentions, and defenses with respect to such matters. This Bar Order shall be interpreted and applied as the broadest permitted under the PSLRA, common law, and the District Court's inherent authority, as applicable.

15. **Judgment Reduction:** Any final verdict or judgment that may be obtained against any person or entity subject to the Bar Order shall be reduced by the greater of: (a) an amount that corresponds to the percentage of responsibility of Defendants for common damages; or (b) the amount paid by or on behalf of Defendants to the Settlement Class or Settlement Class Member for common damages.

16. **Rule 11 Findings** – The Court finds and concludes that the Parties and their respective counsel have complied in all respects with the requirements of Rule 11 of the Federal Rules of Civil Procedure in connection with the institution, prosecution, defense, and settlement of the Action.

17. **No Admissions** – Neither the Term Sheet, this Judgment, the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Supplemental Agreement,

the negotiations leading to the execution of the Term Sheet and the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a)     shall be offered or received against any of the Defendant Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendant Releasees with respect to the truth of any fact alleged by Plaintiffs or the validity of any claim or alleged damages that were or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendant Releasees or in any way used or referred to for any other reason as against any of the Defendant Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b)     shall be offered or received against any of the Plaintiff Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession or admission by any of the Plaintiff Releasees that any of their claims are without merit, that any of the Defendant Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way used or referred to for any other reason as against any of the Plaintiff Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(c)     shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; or

(d)     shall be construed as or received in evidence as an admission, concession or presumption that class certification is or was appropriate in this Action, except for purposes of this Settlement.

[PROPOSED] JUDGMENT APPROVING          8          CASE NO. 22-CV-01936-JES-MSB
CLASS ACTION SETTLEMENT

*provided, however*, that if the Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted hereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendant Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

18. **Retention of Jurisdiction** – Without affecting the finality of this Judgment in any way, this Court retains continuing and exclusive jurisdiction over: (a) the Parties for purposes of the administration, interpretation, implementation, and enforcement of the Settlement; (b) the disposition of the Settlement Fund; (c) any motion for an award of attorneys' fees and/or Litigation Expenses by Lead Counsel in the Action that will be paid from the Settlement Fund; (d) any motion to approve the Plan of Allocation (or any other plan of allocation relating to the Action); (e) any motion to approve the Class Distribution Order; and (f) the Settlement Class Members for all matters relating to the Action.

19. Separate orders shall be entered regarding approval of a plan of allocation and the motion of Lead Counsel for attorneys' fees and Litigation Expenses. Such orders shall in no way affect or delay the finality of this Judgment and shall not affect or delay the Effective Date of the Settlement.

20. **Modification of the Agreement of Settlement** – Without further approval from the Court, Plaintiffs and Defendants are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the Settlement that are approved of in writing by all the Parties acting by and through their respective counsel of record in the Action so long as they: (a) are not materially inconsistent with this Judgment; and (b) do not materially limit the rights of Settlement Class Members in connection with the Settlement. Without further order of the Court, Plaintiffs and Defendants may agree to reasonable extensions of time to carry out any provisions of the Settlement.

[PROPOSED] JUDGMENT APPROVING                9           CASE NO. 22-CV-01936-JES-MSB
CLASS ACTION SETTLEMENT

21. **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation or the Effective Date of the Settlement otherwise fails to occur, this Judgment shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Judgment shall be without prejudice to the rights of Plaintiffs, the other Settlement Class Members, and Defendants, and the Parties shall revert to their respective litigation positions in the Action as of March 25, 2025, as provided in the Stipulation.

22. **Entry of Final Judgment** – There is no just reason to delay the entry of this Judgment as a final judgment in this Action. Accordingly, the Clerk of Court is expressly directed to immediately enter this final judgment dismissing this Action with prejudice.

SO ORDERED this ___day of _____, 2025.

_____
The Honorable James E. Simmons, Jr.
United States District Judge

**Exhibit 1**

**[List of Persons and Entities Excluded from the Settlement Class Pursuant to Request]**

# Exhibit 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN RE SILVERGATE CAPITAL
CORPORATION SECURITIES
LITIGATION

Case No. 3:22-cv-01936-JES-MSB

CLASS ACTION

**[PROPOSED] ORDER
PRELIMINARILY APPROVING
SETTLEMENT AND AUTHORIZING
DISSEMINATION OF NOTICE OF
SETTLEMENT**

[PROPOSED] ORDER PRELIMINARILY
APPROVING SETTLEMENT

CASE NO. 22-CV-01936-JES-MSB

WHEREAS, a consolidated securities class action is pending in this Court entitled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (the "Action");

WHEREAS, (a) Plaintiffs Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class (as defined in paragraph 1(pp) below); and (b) defendants Silvergate Capital Corporation ("Silvergate Capital" and together with its subsidiary Silvergate Bank, the "Debtors"), Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank and Robert Campbell (collectively, the "Individual Defendants" and together with the Debtors, the "Silvergate Defendants") and defendants Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants" and together with the Silvergate Defendants, the "Defendants") have determined to settle all claims asserted against Defendants in this Action with prejudice on the terms and conditions set forth in the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), subject to the approval of this Court (the "Settlement");

WHEREAS, Plaintiffs have made a motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for an order preliminarily approving the Settlement in accordance with the Stipulation and allowing notice to Settlement Class Members as more fully described herein;

WHEREAS, the Court has read and considered: (a) Plaintiffs' motion for preliminary approval of the Settlement and authorization to send notice of the Settlement to the Settlement

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT     1     CASE No. 22-CV-01936-JES-MSB

Class, and the papers filed and arguments made in connection therewith; and (b) the Stipulation and the exhibits attached thereto; and

WHEREAS, unless otherwise defined in this Order, all capitalized terms herein shall have the same meanings as they have in the Stipulation;

NOW THEREFORE, IT IS HEREBY ORDERED:

1.      **Proposed Class Certification for Settlement Purposes** – The Parties have proposed the certification of the following Settlement Class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure solely for purposes of effectuating the proposed Settlement: (a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019 through March 21, 2023, inclusive, and were damaged thereby, and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021, and were damaged thereby.  Excluded from the Settlement Class are (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no Investment Vehicle shall be excluded from the Settlement Class.  Also excluded from the Settlement Class are any persons or entities who or which timely and validly exclude themselves by submitting a request for exclusion that is accepted by the Court.

a.      The Court finds, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure and for purposes of effectuating the proposed Stipulation and the Settlement, that it will likely be able to certify the Settlement Class.  Specifically, the Court finds that each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met or will likely be met: (a) the members of the Settlement Class are so numerous that their joinder in the Action would be impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of Plaintiffs in the Action are typical of the claims of the Settlement Class; (d) Plaintiffs and Lead Counsel have fairly and adequately represented and protected the interests of the

[PROPOSED] ORDER PRELIMINARILY          2          CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

Settlement Class; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the Action.

b.   The Court also finds, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure and for purposes of effectuating the proposed Stipulation and the Settlement, that it will likely be able to certify Plaintiffs as Class Representatives for the Settlement Class and preliminarily appoints Lead Counsel as Class Counsel for the Settlement Class, for purposes of the Stipulation and Settlement only, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. Lead Counsel are authorized to act on behalf of the Settlement Class with respect to all acts required by, or which may be undertaken pursuant to, the Stipulation or such other acts that are reasonably necessary to consummate the proposed Settlement set forth in the Stipulation.

2.   **Preliminary Approval of the Settlement** – The Court hereby preliminarily approves the Settlement, as embodied in the Stipulation, and finds, pursuant to Rule 23(e)(1)(B)(i) of the Federal Rules of Civil Procedure, that it will likely be able to approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further consideration at the Settlement Hearing to be conducted as described below.

3.   **Settlement Hearing** – The Court will hold a settlement hearing (the "Settlement Hearing") on _____, 2025 at _:__ _.m. at Courtroom 4B of the Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, CA 92101, for the following purposes: (a) to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Settlement Class, and should be finally approved by the Court; (b) to determine whether, for purposes of the Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (c) to determine whether a Judgment substantially in the form attached as Exhibit B to the Stipulation should be entered dismissing the Action with prejudice against Defendants, without costs to any party; (d) to determine whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; (e) to determine whether Lead Counsel's motion for attorneys' fees and Litigation Expenses should be approved;

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT                3                CASE NO. 22-CV-01936-JES-MSB

and (f) to consider any other matters that may properly be brought before the Court in connection with the Settlement.  Notice of the Settlement and the Settlement Hearing shall be given to Settlement Class Members as set forth in paragraph 5 of this Order.

4.      The Court may adjourn the Settlement Hearing without further notice to the Settlement Class and may approve the proposed Settlement with such modifications as the Parties may agree to, if appropriate, without further notice.

5.      **Retention of Claims Administrator and Manner of Giving Notice** – Lead Counsel are hereby authorized to retain JND Legal Administration (the "Claims Administrator") to supervise and administer the notice procedure in connection with the proposed Settlement, as well as the processing of Claims as more fully set forth below.  Notice of the Settlement and the Settlement Hearing shall be given by Lead Counsel as follows:

(a)      within ten (10) business days of the date of entry of this Order, at no cost to the Settlement Fund, Lead Counsel, the Settlement Class, or the Claims Administrator, (i) Silvergate Capital shall provide or cause to be provided to the Claims Administrator, in electronic format, records reasonably available to Silvergate Capital or its transfer agent concerning the identity, last known mailing addresses, and, if available, last known email addresses of potential Settlement Class Members, which information the Claims Administrator shall treat and maintain as confidential, and (ii) the Underwriter Defendants shall provide or cause to be provided to the Claims Administrator, in electronic format, records reasonably available to the Underwriter Defendants concerning the identity of persons and entities who purchased Silvergate Capital Stock in the 2021 Offerings, which information the Claims Administrator shall treat and maintain as confidential;

(b)      beginning not later than twenty (20) business days after the date of entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and the Claim Form, substantially in the forms attached hereto as Exhibits 1 and 2, respectively (collectively, the "Notice Packet"), to be mailed by first-class mail or emailed to all potential Settlement Class Members who may be identified through reasonable effort, including those identified by Silvergate Capital and the Underwriter Defendants and through mailing the Notice

[PROPOSED] ORDER PRELIMINARILY          4          CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

Packet to the largest and most common brokers and other nominee owners, who will be instructed to forward the Notice Packet or provide names and addresses of Settlement Class Members, as discussed below in paragraph 7;

(c)     by the Notice Date, the Claims Administrator shall cause copies of the Notice and Claim Form to be posted on a website to be developed for the Settlement, from which copies of the Notice and Claim Form can be downloaded;

(d)     not later than ten (10) business days after the Notice Date, the Claims Administrator shall cause the Summary Notice, substantially in the form attached hereto as Exhibit 3, to be published in *The Wall Street Journal* and to be transmitted once over the *PR Newswire*; and

(e)     not later than seven (7) calendar days prior to the Settlement Hearing, Lead Counsel shall serve on Defendants' Counsel and file with the Court proof, by affidavit or declaration, of such mailing and publication.

6.     **Approval of Form and Content of Notice** – The Court (a) approves, as to form and content, the Notice, the Claim Form, and the Summary Notice, attached hereto as Exhibits 1, 2, and 3, respectively, and (b) finds that the mailing and distribution of the Notice and Claim Form and the publication of the Summary Notice in the manner and form set forth in paragraph 5 of this Order (i) is the best notice practicable under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, of the effect of the proposed Settlement (including the Releases to be provided thereunder), of Lead Counsel's motion for attorneys' fees and Litigation Expenses, of Settlement Class Members' right to object to the Settlement, the Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses, of their right to exclude themselves from the Settlement Class, and of their right to appear at the Settlement Hearing; (iii) constitutes due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1, 78u-4, as amended, and all other

applicable law and rules. The date and time of the Settlement Hearing shall be included in the Notice and Summary Notice before they are mailed and published, respectively.

7. **Nominee Procedures** – Brokers and other nominees who purchased or otherwise acquired Silvergate Capital common stock during the Class Period or purchased Silvergate Capital Stock in or traceable to the 2021 Offerings for the benefit of another person or entity shall: (a) within seven (7) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Notice Packet to forward to all such beneficial owners and, within seven (7) calendar days of receipt of those Notice Packets, forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names, mailing addresses, and, if available, email addresses, of all such beneficial owners to the Claims Administrator in which event the Claims Administrator shall promptly mail or email the Notice Packet to such beneficial owners. Upon full compliance with this Order, such nominees may seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such expenses incurred by the nominees shall not exceed $0.05 plus postage at the current pre-sort rate used by the Claims Administrator per Notice Packet mailed; or $0.05 per name, address, and email address (to the extent available) provided to the Claims Administrator. Such properly documented expenses incurred by nominees in compliance with the terms of this Order shall be paid solely from the Settlement Fund, with any disputes as to the reasonableness or documentation of expenses incurred subject to review by the Court.

8. **CAFA Notice** – As provided in the Stipulation, Defendants shall be responsible for serving notice under the Class Action Fairness Act ("CAFA") if they determine it is required, and for coordinating with the Claims Administrator to the extent necessary. Silvergate Capital shall be solely responsible for the costs of the CAFA notices. At least seven (7) calendar days before the Settlement Hearing, or as otherwise ordered by the Court, Defendants shall cause to be served on Lead Counsel and filed with the Court proof, by affidavit or declaration, regarding compliance with CAFA § 1715(b).

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT

6

CASE NO. 22-CV-01936-JES-MSB

9.    **Participation in the Settlement** – Settlement Class Members who wish to participate in the Settlement and to be potentially eligible to receive a distribution from the Net Settlement Fund must complete and submit a Claim Form in accordance with the instructions contained therein. Unless the Court orders otherwise, all Claim Forms must be postmarked no later than one hundred twenty (120) calendar days after the Notice Date. Notwithstanding the foregoing, Lead Counsel may, at their discretion, accept for processing late Claims provided such acceptance does not delay the distribution of the Net Settlement Fund to the Settlement Class. By submitting a Claim, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim and the subject matter of the Settlement.

10.    Each Claim Form submitted must satisfy the following conditions: (a) it must be properly completed, signed, and submitted in a timely manner in accordance with the provisions of the preceding paragraph; (b) it must be accompanied by adequate supporting documentation for the transactions and holdings reported therein, in the form of broker confirmation slips, broker account statements, an authorized statement from the broker containing the transactional and holding information found in a broker confirmation slip or account statement, or such other documentation as is deemed adequate by Lead Counsel or the Claims Administrator; (c) if the person executing the Claim Form is acting in a representative capacity, a certification of his, her, or its current authority to act on behalf of the Settlement Class Member must be included in the Claim Form to the satisfaction of Lead Counsel or the Claims Administrator; and (d) the Claim Form must be complete and contain no material deletions or modifications of any of the printed matter contained therein and must be signed under penalty of perjury.

11.    Any Settlement Class Member that does not timely and validly submit a Claim Form or whose Claim is not otherwise approved by the Court: (a) shall be deemed to have waived his, her, or its right to share in the Net Settlement Fund; (b) shall be forever barred from participating in any distributions therefrom; (c) shall be bound by the provisions of the Stipulation and the Settlement and all proceedings, determinations, orders, and judgments in the Action relating thereto, including, without limitation, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be forever barred and enjoined from commencing,

[PROPOSED] ORDER PRELIMINARILY    7    CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice. Notwithstanding the foregoing, late Claim Forms may be accepted for processing as set forth in paragraph 9 above.

12. **Exclusion from the Settlement Class** – Any member of the Settlement Class who wishes to exclude himself, herself, or itself from the Settlement Class must request exclusion in writing within the time and in the manner set forth in the Notice, which shall provide that: (a) any such request for exclusion from the Settlement Class must be mailed or delivered such that it is received no later than twenty-one (21) calendar days prior to the Settlement Hearing, to: *Silvergate Securities Litigation*, EXCLUSIONS, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111, and (b) each request for exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Settlement Class in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.)"; (iii) state the number of shares of Silvergate Capital common stock that the person or entity requesting exclusion (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold; (iv) state the number of shares of Silvergate Capital common stock and Silvergate Capital Preferred Stock that the person or entity requesting exclusion purchased in or traceable to Silvergate Capital's 2021 Offerings, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold; and (v) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT      8      CASE NO. 22-CV-01936-JES-MSB

shall not be effective unless it provides all the required information and is received within the time stated above, or is otherwise accepted by the Court.

13.    Any person or entity who or which timely and validly requests exclusion in compliance with the terms stated in this Order and is excluded from the Settlement Class shall not be a Settlement Class Member, shall not be bound by the terms of the Settlement or any orders or judgments in the Action, and shall not receive any payment out of the Net Settlement Fund.

14.    Any Settlement Class Member who or which does not timely and validly request exclusion from the Settlement Class in the manner stated in this Order: (a) shall be deemed to have waived his, her, or its right to be excluded from the Settlement Class; (b) shall be forever barred from requesting exclusion from the Settlement Class in this or any other proceeding; (c) shall be bound by the provisions of the Stipulation and Settlement and all proceedings, determinations, orders, and judgments in the Action, including, but not limited to, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be forever barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.

15.    **Appearance and Objections at Settlement Hearing** – Any Settlement Class Member who or which does not request exclusion from the Settlement Class may enter an appearance in the Action, at his, her, or its own expense, individually or through counsel of his, her, or its own choice, by filing with the Clerk of Court and delivering a notice of appearance to both Lead Counsel and Representative Defendants' Counsel, at the addresses set forth in paragraph 16 below, such that it is received no later than twenty-one (21) calendar days prior to the Settlement Hearing, or as the Court may otherwise direct. Any Settlement Class Member who does not enter an appearance will be represented by Lead Counsel.

[PROPOSED] ORDER PRELIMINARILY          9          CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

16. Any Settlement Class Member who or which does not request exclusion from the Settlement Class may file a written objection to the proposed Settlement, the proposed Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses and appear and show cause, if he, she, or it has any cause, why the proposed Settlement, the proposed Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses should not be approved; *provided, however*, that no Settlement Class Member shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, the proposed Plan of Allocation, and/or the motion for attorneys' fees and Litigation Expenses unless that person or entity has filed a written objection with the Court and served copies of such objection on Lead Counsel and Representative Defendants' Counsel at the addresses set forth below such that they are received no later than twenty-one (21) calendar days prior to the Settlement Hearing.

**Lead Plaintiffs' Counsel**:

> Carol V. Gilden
> Cohen Milstein Sellers & Toll PLLC
> 200 S. Wacker Drive, Suite 2375
> Chicago, IL 60606
>
> Jonathan D. Uslaner
> Bernstein Litowitz Berger & Grossmann LLP
> 2121 Avenue of the Stars, Suite 2575
> Los Angeles, CA  90067

**Representative Defendants' Counsel**:

> John P. Stigi III
> Sheppard, Mullin, Richter & Hampton LLP
> 12275 El Camino Real, Suite 100
> San Diego, CA 92130-4092
>
> Jason C. Hegt
> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020

17. Any objections, filings, and other submissions by the objecting Settlement Class Member must: (a) identify the case name and docket number in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.); (b) state the name,

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT    10    CASE No. 22-CV-01936-JES-MSB

address, and telephone number of the person or entity objecting and be signed by the objector; (c) state with specificity the grounds for the Settlement Class Member's objection, including any legal and evidentiary support the Settlement Class Member wishes to bring to the Court's attention and whether the objection applies only to the objector, to a specific subset of the Settlement Class, or to the entire Settlement Class; and (d) include documents sufficient to prove membership in the Settlement Class, including documents showing (i) the number of shares of Silvergate Capital common stock that the person or entity (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold, and/or (ii) the number of shares of Silvergate Capital common stock and Silvergate Capital Preferred Stock that the person or entity purchased in or traceable to Silvergate Capital's 2021 Offerings, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold.  Documentation establishing membership in the Settlement Class must consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from the objector's broker containing the transactional and holding information found in a broker confirmation slip or account statement. Objectors who enter an appearance and desire to present evidence at the Settlement Hearing in support of their objection must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and any exhibits they intend to introduce into evidence at the hearing.

18.     Any Settlement Class Member who or which does not make his, her, or its objection in the manner provided herein shall be deemed to have waived his, her, or its right to object to any aspect of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses and shall be forever barred and foreclosed from objecting to the fairness, reasonableness, or adequacy of the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses, or from otherwise being heard concerning

the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses in this or any other proceeding.

19.    **Stay and Temporary Injunction** – Until otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination of whether the Settlement should be approved, the Court bars and enjoins Plaintiffs, Plaintiffs' Counsel, and all other members of the Settlement Class from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.

20.    **Settlement Administration Fees and Expenses** – All reasonable costs incurred in identifying Settlement Class Members and notifying them of the Settlement as well as in administering the Settlement shall be paid as set forth in the Stipulation without further order of the Court.

21.    **Settlement Fund** – The contents of the Settlement Fund held by Huntington Bank (which the Court approves as the Escrow Agent) shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as they shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

22.    **Taxes** – Lead Counsel are authorized and directed to prepare any tax returns and any other tax reporting form for or in respect to the Settlement Fund, to pay from the Settlement Fund any Taxes owed with respect to the Settlement Fund, to apply for any tax refund owed to the Settlement Fund, and to otherwise perform all obligations with respect to Taxes and any reporting or filings in respect thereof without further order of the Court in a manner consistent with the provisions of the Stipulation.

[PROPOSED] ORDER PRELIMINARILY              12              CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

23.     **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation, the Settlement is not approved (however, any decision with respect to an application for attorneys' fees or Litigation Expenses, or with any respect to any Plan of Allocation, shall not be considered grounds for termination), or the Effective Date of the Settlement otherwise fails to occur, this Order shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Order shall be without prejudice to the rights of Plaintiffs, the other Settlement Class Members, and Defendants, and the Parties shall revert to their respective litigation positions in the Action as of March 25, 2025, as provided in the Stipulation.

24.     **Use of This Order** – Neither this Order, the Term Sheet, the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Judgment, the Supplemental Agreement, the negotiations leading to the execution of the Term Sheet and the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a)     shall be offered or received against any of the Defendant Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendant Releasees with respect to the truth of any fact alleged by Plaintiffs or the validity of any claim or alleged damages that were or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendant Releasees or in any way used or referred to for any other reason as against any of the Defendant Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b)     shall be offered or received against any of the Plaintiff Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Plaintiff Releasees that any of their claims are without merit, that

[PROPOSED] ORDER PRELIMINARILY         13         CASE NO. 22-CV-01936-JES-MSB
APPROVING SETTLEMENT

any of the Defendant Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way used or referred to for any other reason as against any of the Plaintiff Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(c)     shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; or

(d)     shall be construed as or received in evidence as an admission, concession or presumption that class certification is or was appropriate in this Action, except for purposes of this Settlement.

*provided, however,* that if the Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted thereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendant Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

25.     **Supporting Papers** – Lead Counsel shall file and serve the opening papers in support of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses no later than thirty-five (35) calendar days prior to the Settlement Hearing; and reply papers, if any, shall be filed and served no later than seven (7) calendar days prior to the Settlement Hearing.

26.     The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

[PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT     14     CASE NO. 22-CV-01936-JES-MSB

SO ORDERED this __day of _____, 2025.

_____
The Honorable James E. Simmons, Jr.
United States District Judge

**Exhibit 1**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |

## NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

### *A federal court authorized this Notice. This is not a solicitation from a lawyer.*

**NOTICE OF PENDENCY OF CLASS ACTION:** Please be advised that your rights may be affected by the above-captioned securities class action (the "Action") pending in the U.S. District Court for the Southern District of California (the "Court"), if, during the period from November 7, 2019, through March 21, 2023, inclusive (the "Class Period"), you purchased or otherwise acquired the common stock of Silvergate Capital Corporation ("Silvergate Capital") and were damaged thereby or purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021 and were damaged thereby.[1]

**NOTICE OF SETTLEMENT:** Please also be advised that the Court-appointed Lead Plaintiffs, Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class (as defined in ¶ 16 below), have reached a proposed settlement of the Action for $37,500,000 in cash that, if approved, will resolve all claims in the Action. The Settlement will become effective only if the Court finally approves the Settlement and the effective date of Silvergate Capital's Chapter 11 Plan occurs.

**PLEASE READ THIS NOTICE CAREFULLY. This Notice explains important rights you may have, including the possible receipt of a payment from the Settlement. If you are a member of the Settlement Class, your legal rights will be affected whether or not you act.**

---

[1] All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), which is available at www.SilvergateSecuritiesLitigation.com.

**If you have any questions about this Notice, the proposed Settlement, or your eligibility to participate in the Settlement, please DO NOT contact the Court, Silvergate Capital, the other Defendants in the Action, or their counsel. All questions should be directed to Lead Counsel or the Claims Administrator (*see* ¶ 58 below).**

1.     **Description of the Action and the Settlement Class:** This Notice relates to a proposed settlement of claims in a pending securities class action brought by investors alleging, among other things, that Silvergate Capital[2] (collectively with the Individual Defendants and the Underwriter Defendants as defined in ¶ 12 below, "Defendants") violated the federal securities laws by making false and misleading statements about Silvergate Bank's vetting, due diligence, and monitoring of customers. A more detailed description of the Action is set forth in ¶¶ 11-15 below. The proposed Settlement, if approved by the Court, will settle claims of the Settlement Class, as defined in ¶ 16 below.

2.     **Statement of the Settlement Class's Recovery:** Subject to Court approval, Plaintiffs, on behalf of themselves and the Settlement Class, have agreed to settle the Action in exchange for $37,500,000 in cash (the "Settlement Amount") to be deposited into an escrow account. The Net Settlement Fund (*i.e.*, the Settlement Amount plus any and all interest earned thereon (the "Settlement Fund") less (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) will be distributed in accordance with a plan of allocation that is approved by the Court. The proposed plan of allocation (the "Plan of Allocation") is set forth in Appendix A below. The Plan of Allocation will determine how the Net Settlement Fund shall be allocated among members of the Settlement Class.

3.     **Estimate of Average Amount of Recovery Per Share:** Based on Plaintiffs' damages expert's estimate of the number of shares of Silvergate Capital common stock and depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A ("Silvergate Capital Preferred Stock" and, with Silvergate Capital common stock, "Silvergate Capital Stock") that were purchased by Settlement Class Members and that may have been affected by the conduct at issue in the Action, and assuming that all Settlement Class Members elect to participate in the Settlement, the estimated average recovery (before the deduction of any Court-approved fees, expenses, and costs as described herein) is $0.13 per affected share of Silvergate Capital common stock and $0.22 per affected share of Silvergate Capital Preferred Stock. Settlement Class Members should note, however, that the foregoing average recovery is only an estimate. Some Settlement Class Members may recover more or less than this estimated amount depending on, among other factors, when and at what prices they purchased/acquired or sold their Silvergate Capital Stock, and the total number and value of valid Claim Forms submitted. Distributions to Settlement Class Members will be made based on the Plan of Allocation set forth herein (*see* Appendix A below) or such other plan of allocation as may be ordered by the Court.

4.     **Average Amount of Damages Per Share:** The Parties do not agree on the average amount of damages per share that would be recoverable if Plaintiffs were to prevail in the Action. Among

---

[2] Silvergate Capital filed a Notice of Bankruptcy in this Action on September 19, 2024. Together, Silvergate Capital and its subsidiary Silvergate Bank are the "Debtors."

other things, Defendants do not agree with the assertion that they violated the federal securities laws or that any damages were suffered by any members of the Settlement Class as a result of their conduct.

5. **Attorneys' Fees and Expenses Sought:** Court-appointed Lead Counsel, Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP, have been prosecuting the Action on a wholly contingent basis since their appointment as Lead Counsel in February 2023, have not received any payment of attorneys' fees for their representation of the Settlement Class, and have advanced the funds to pay expenses necessarily incurred to prosecute this Action. Before final approval of the Settlement, Lead Counsel will apply to the Court for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed 17% of the Settlement Fund. In addition, Lead Counsel will apply for payment of Plaintiffs' Counsel's Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1.4 million, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Any fees and expenses awarded by the Court will be paid from the Settlement Fund. Settlement Class Members are not personally liable for any such fees or expenses. The estimated average cost for such fees and expenses, if the Court approves Lead Counsel's fee and expense application, is $0.03 per affected share of Silvergate Capital common stock and $0.04 per affected share of Silvergate Capital Preferred Stock.

6. **Identification of Attorney Representatives:** Plaintiffs and the Settlement Class are represented by Carol V. Gilden, Esq., of Cohen Milstein Sellers & Toll PLLC, 200 S. Wacker Drive, Suite 2375, Chicago, IL 60606, (312) 629-3737, and Jonathan D. Uslaner, Esq., of Bernstein Litowitz Berger & Grossmann LLP, 2121 Avenue of the Stars, Suite 2575, Los Angeles, CA 90067, (310) 819-3470, settlements@blbglaw.com.

7. **Reasons for the Settlement:** Plaintiffs' principal reason for entering into the Settlement is the substantial and certain recovery for the Settlement Class without the risk or the delays inherent in further litigation. Moreover, the substantial recovery provided under the Settlement must be considered against the significant risk that a smaller recovery—or indeed no recovery at all—might be achieved after contested motions, a trial of the Action, and the likely appeals that would follow a trial. This process could be expected to last several years. Defendants, who deny that they have committed any act or omission giving rise to liability under the federal securities laws, are entering into the Settlement solely to eliminate the uncertainty, burden, and expense of further litigation.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM POSTMARKED NO LATER THAN _____, 2025.** | This is the only way to be eligible to receive a payment from the Settlement Fund. If you are a Settlement Class Member and you remain in the Settlement Class, you will be bound by the Settlement as approved by the Court and you will give up any Released Plaintiffs' Claims (defined in ¶ 26 below) that you have against Defendants and the other Defendant Releasees (defined in ¶ 27 below), so it is in your interest to submit a Claim Form. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT CLASS BY SUBMITTING A WRITTEN REQUEST FOR EXCLUSION SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2025.** | If you exclude yourself from the Settlement Class, you will not be eligible to receive any payment from the Settlement Fund. This is the only option that allows you ever to be part of any other lawsuit against any of the Defendants or the other Defendant Releasees concerning the Released Plaintiffs' Claims. |
| **OBJECT TO THE SETTLEMENT BY SUBMITTING A WRITTEN OBJECTION SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2025.** | If you do not like the proposed Settlement, the proposed Plan of Allocation, or the request for attorneys' fees and Litigation Expenses, you may write to the Court and explain why you do not like them. You cannot object to the Settlement, the Plan of Allocation, or the fee and expense request unless you are a Settlement Class Member and do not exclude yourself from the Settlement Class. |
| **GO TO A HEARING ON _____, 2025 AT __:__ __.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2025.** | Filing a written objection and notice of intention to appear by _____, 2025 allows you to speak in Court, at the discretion of the Court, about the fairness of the proposed Settlement, the Plan of Allocation, and/or the request for attorneys' fees and Litigation Expenses. If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Court, speak to the Court about your objection. |
| **DO NOTHING.** | If you are a member of the Settlement Class and you do not submit a valid Claim Form, you will not be eligible to receive any payment from the Settlement Fund. You will, however, remain a member of the Settlement Class, which means that you give up your right to sue about the claims that are resolved by the Settlement and you will be bound by any judgments or orders entered by the Court in the Action. |

## WHAT THIS NOTICE CONTAINS

Why Did I Get This Notice?                                                                    Page [__]

What Is This Case About?                                                                       Page [__]

How Do I Know If I Am Affected By The Settlement?

    Who Is *Included* In The Settlement Class?                            Page [__]

What Are Plaintiffs' Reasons For The Settlement?                                              Page [__]

What Might Happen If There Were No Settlement?                                                Page [__]

How Are Settlement Class Members Affected By The Action

    And The Settlement?                                                    Page [__]

How Do I Participate In The Settlement? What Do I Need To Do?                                 Page [__]

How Much Will My Payment Be?                                                                   Page [__]

What Payment Are The Attorneys For The Settlement Class Seeking?

    How Will The Lawyers Be Paid?                                          Page [__]

What If I Do Not Want To Be A Member Of The Settlement Class?

    How Do I Exclude Myself?                                               Page [__]

When And Where Will The Court Decide Whether To Approve The

    Settlement? Do I Have To Come To The Hearing? May I Speak At

    The Hearing If I Don't Like The Settlement?                            Page [__]

What If I Bought Shares On Someone Else's Behalf?                                             Page [__]

Can I See The Court File? Whom Should I Contact If I Have

      Questions?                                                 Page [__]

## WHY DID I GET THIS NOTICE?

8.      The Court directed that this Notice be mailed to you because you or someone in your family or an investment account for which you serve as a custodian may have purchased or otherwise acquired Silvergate Capital stock during the Class Period. The Court has directed us to send you this Notice because, as a potential Settlement Class Member, you have a right to know about your options before the Court rules on the proposed Settlement. Additionally, you have the right to understand how this class action lawsuit may generally affect your legal rights. If the Court approves the Settlement and the Plan of Allocation (or some other plan of allocation), the Claims Administrator selected by Plaintiffs and approved by the Court will make payments pursuant to the Settlement after any objections and appeals are resolved.

9.      The purpose of this Notice is to inform you of the existence of this case, that it is a class action, how you might be affected, and how to exclude yourself from the Settlement Class if you wish to do so. It is also being sent to inform you of the terms of the proposed Settlement and of a hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement, the proposed Plan of Allocation, and the motion by Lead Counsel for an award of attorneys' fees and payment of Litigation Expenses (the "Settlement Hearing"). *See* ¶¶ 48-49 below for details about the Settlement Hearing, including the date and location of the hearing.

10.     The issuance of this Notice is not an expression of any opinion by the Court concerning the merits of any claim in the Action, and the Court still has to decide whether to approve the

5

Settlement. If the Court approves the Settlement and a plan of allocation, then payments to Authorized Claimants will be made after any appeals are resolved and after the completion of all claims processing. Please be patient, as this process can take some time to complete.

## WHAT IS THIS CASE ABOUT?

11. On February 28, 2023, the Court appointed the Institutional Investors as Lead Plaintiffs for the Action and approved Lead Plaintiffs' selection of Cohen Milstein Sellers & Toll PLLC and Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel.

12. On May 11, 2023, Plaintiffs filed and served a Consolidated Amended Class Action Complaint (the "Complaint") asserting claims against Silvergate Capital and Alan J. Lane under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Lane under Section 20(a) of the Exchange Act. Plaintiffs also asserted claims against Silvergate Capital; Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank, and Robert Campbell (collectively, the "Individual Defendants"); and Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants") under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and against the Individual Defendants under Section 15 of the Securities Act.

13. The Complaint alleged that the Silvergate Defendants made materially false and/or misleading statements about Silvergate Bank's vetting, due diligence, and monitoring of customers. The Complaint further alleged that the price of Silvergate Capital stock was artificially inflated as a result of Defendants' allegedly false and/or misleading statements, and declined when the truth was revealed.

14. On May 9, 2025, the Parties entered into the Stipulation and Agreement of Settlement, which sets forth the terms and conditions of the Settlement. The Stipulation is available at www.SilvergateSecuritiesLitigation.com.

15. On _____, 2025, the Court preliminarily approved the Settlement, authorized this Notice to be disseminated to potential Settlement Class Members, and scheduled the Settlement Hearing to consider whether to grant final approval to the Settlement.

## HOW DO I KNOW IF I AM AFFECTED BY THE SETTLEMENT? WHO IS INCLUDED IN THE SETTLEMENT CLASS?

16. If you are a member of the Settlement Class, you are subject to the Settlement, unless you timely request to be excluded. The Settlement Class consists of:

6

(a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019 through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby, and

(b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021,[3] and were damaged thereby.

Excluded from the Settlement Class are: (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members[4] and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no "Investment Vehicle" shall be excluded from the Settlement Class.[5]

Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court. *See* "What If I Do Not Want To Be A Member Of The Settlement Class? How Do I Exclude Myself?" on page below.

**PLEASE NOTE: Receipt of this Notice does not mean that you are a Settlement Class Member or that you will be entitled to a payment from the Settlement.**

**If you are a Settlement Class Member and you wish to be eligible to receive a payment from the Settlement, you are required to submit the Claim Form that is being distributed with this Notice and the required supporting documentation as set forth therein postmarked (or submitted online) no later than _____, 2025.**

---

[3] Silvergate Capital's securities offerings during 2021 (the "2021 Offerings") included (a) three offerings of Silvergate Capital common stock conducted on or about January 20, 2021, March 18 through May 18, 2021, and December 6, 2021, and (b) an initial public offering of depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A (the "Silvergate Capital Preferred Stock" and, with Silvergate Capital common stock, "Silvergate Capital Stock"), conducted on or around July 28, 2021.

[4] "Immediate Family Member(s)" means children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, sisters-in-law and any persons (other than a tenant or employee) sharing the household.

[5] "Investment Vehicle" means any investment company or pooled investment fund, including but not limited to mutual fund families, exchange-traded funds, funds of funds, private equity funds, real estate funds, and hedge funds, in which Defendants, or any of them, have, has or may have a direct or indirect interest, or as to which their affiliates may act as an investment advisor, but in which any Defendant alone or together with its, his or her respective affiliates does not hold a majority beneficial interest.

7

## WHAT ARE PLAINTIFFS' REASONS FOR THE SETTLEMENT?

17.    Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. They recognize, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through summary judgment, trial, and appeals, as well as the very substantial risks they would face in establishing liability and damages. For example, those risks include challenges in establishing that Defendants' statements about Silvergate Capital's due diligence of its banking customers were false or misleading and that the Individual Defendants knew that the statements were false or were reckless in making them. Defendants have contended—and would have contended at summary judgment or trial—that their statements were neither false nor misleading and were supported by contemporaneous facts.

18.    Plaintiffs also faced risks relating to loss causation and damages. Defendants would have contended at summary judgment and trial, supported by their economic expert's analysis, that Plaintiffs could not establish a causal connection between the alleged misrepresentations about Silvergate Capital's banking customer due diligence and the losses investors allegedly suffered, as required by law. Moreover, even if Plaintiffs were able to establish damages, collectability would have been uncertain given Silvergate Capital's bankruptcy.

19.    In light of these risks, the amount of the Settlement, and the immediacy of recovery to the Settlement Class, Plaintiffs and Lead Counsel believe that the proposed Settlement is fair, reasonable, and adequate, and in the best interests of the Settlement Class. Plaintiffs and Lead Counsel believe that the Settlement provides a substantial benefit to the Settlement Class, namely $37,500,000 in cash (less the various deductions described in this Notice), as compared to the risk that the claims in the Action would produce a smaller recovery, or no recovery, after summary judgment, trial, and appeals, possibly years in the future.

20.    Defendants have denied the claims asserted against them in the Action and deny that the Settlement Class was harmed or suffered any damages as a result of the conduct alleged in the Action. Defendants have agreed to the Settlement solely to eliminate the burden and expense of continued litigation. Accordingly, the Settlement may not be construed as an admission of any wrongdoing by Defendants.

## WHAT MIGHT HAPPEN IF THERE WERE NO SETTLEMENT?

21.    If there were no Settlement and Plaintiffs failed to establish any essential legal or factual element of their claims against Defendants, neither Plaintiffs nor the other members of the Settlement Class would recover anything from Defendants. Also, if Defendants were successful in proving any of their defenses, either at summary judgment, at trial, or on appeal, the Settlement Class could recover substantially less than the amount provided in the Settlement, or nothing at all.

8

## HOW ARE SETTLEMENT CLASS MEMBERS AFFECTED BY THE ACTION AND THE SETTLEMENT?

22.    As a Settlement Class Member, you are represented by Plaintiffs and Lead Counsel, unless you enter an appearance through counsel of your own choice at your own expense. You are not required to retain your own counsel, but if you choose to do so, such counsel must file a notice of appearance on your behalf and must serve copies of his or her appearance on the attorneys listed in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?," below.

23.    If you are a Settlement Class Member and do not wish to remain a Settlement Class Member, you may exclude yourself from the Settlement Class by following the instructions in the section entitled, "What If I Do Not Want To Be A Member Of The Settlement Class? How Do I Exclude Myself?," below.

24.    If you are a Settlement Class Member and you wish to object to the Settlement, the Plan of Allocation, or Lead Counsel's application for attorneys' fees and Litigation Expenses, and if you do not exclude yourself from the Settlement Class, you may present your objections by following the instructions in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?," below.

25.    If you are a Settlement Class Member and you do not exclude yourself from the Settlement Class, you will be bound by any orders issued by the Court. If the Settlement is approved, the Court will enter a judgment (the "Judgment"). The Judgment will dismiss with prejudice the claims against Defendants and will provide that, upon the Effective Date of the Settlement, Plaintiffs and each of the other Settlement Class Members, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Plaintiffs' Claims on behalf of a Settlement Class Member, in that capacity (collectively, "Plaintiff Releasors"), regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, will have fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Plaintiffs' Claim (as defined in ¶ 26 below) against Defendants and the Defendant Releasees (as defined in ¶ 27 below), and will forever be barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

26.    "Released Plaintiffs' Claims" means all claims, demands, losses, rights, and causes of action of any nature whatsoever, whether known claims or Unknown Claims, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether

foreign or domestic, whether arising under federal, state, common, or foreign law or any other law, rule or regulation, by Plaintiffs, any member of the Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which arise out of, are based upon, or relate in any way to (i) any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to, in the Action, or which could have been alleged in the Action, and/or (ii) the purchase, acquisition, holding, sale, or disposition of the publicly traded common stock of Silvergate Capital during the Class Period and/or the securities issued in or traceable to any of Silvergate Capital's securities offerings during 2021.  Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

27.    "Defendant Releasees" means Defendants and each of their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, members, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

28.    "Unknown Claims" means any Released Plaintiffs' Claims which any Plaintiff or any other Settlement Class Member or any other Plaintiff Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other Defendants' Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, in each case which, if known by him, her, or it, might have affected his, her, or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly waive, and each of the Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Plaintiffs, Settlement Class Members, and Defendants acknowledge that they may hereafter discover facts in addition to or different from those which he, she, or it or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly fully, finally, and forever settle and release, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon

10

any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and Defendants acknowledge, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a material element of the Settlement.

29.    The Judgment will also provide that, upon the Effective Date of the Settlement, Defendants, on behalf of themselves and their respective heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Defendants' Claims on behalf of a Defendant, in that capacity (collectively, "Defendant Releasors"), will have fully, finally, and forever compromised, settled, released, resolved, relinquished, dismissed, waived, and discharged each and every Released Defendants' Claim (as defined in ¶ 30 below) against Plaintiffs and the other Plaintiff Releasees (as defined in ¶ 31 below), and will forever be barred and enjoined from commencing, instituting, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Defendants' Claims against any of the Plaintiff Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

30.    "Released Defendants' Claims" means all claims and causes of action of every nature and description, whether known or Unknown Claims, whether arising under federal, state, common, or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement or any claims against any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

31.    "Plaintiff Releasees" means Plaintiffs and all other Settlement Class Members, and their respective current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

## HOW DO I PARTICIPATE IN THE SETTLEMENT? WHAT DO I NEED TO DO?

32.    To be eligible for a payment from the Settlement, you must be a member of the Settlement Class and you must timely complete and return the Claim Form with adequate supporting documentation **postmarked (if mailed) or submitted online at www.SilvergateSecuritiesLitigation.com no later than _____, 2025**. A Claim Form is included with this Notice, or you may obtain one from the website maintained by the Claims Administrator for the Settlement, www.SilvergateSecuritiesLitigation.com. You may also request

11

that a Claim Form be mailed to you by calling the Claims Administrator toll free at 866-287-0746 or by emailing the Claims Administrator at info@SilvergateSecuritiesLitigation.com. Please retain all records of your ownership of and transactions in Silvergate Capital Stock, as they will be needed to document your Claim. The Parties and Claims Administrator do not have information about your transactions in Silvergate Capital Stock.

33.     If you request exclusion from the Settlement Class or do not submit a timely and valid Claim Form, you will not be eligible to share in the Net Settlement Fund.

| HOW MUCH WILL MY PAYMENT BE? |
|---|

34.     At this time, it is not possible to make any determination as to how much any individual Settlement Class Member may receive from the Settlement.

35.     Pursuant to the Settlement, Defendants have agreed to pay or cause to be paid a total of $37,5000,000 in cash (the "Settlement Amount"). The Settlement Amount will be deposited into an escrow account. The Settlement Amount plus any interest earned thereon is referred to as the "Settlement Fund." If the Settlement is approved by the Court and the Effective Date occurs, the "Net Settlement Fund" (that is, the Settlement Fund less (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) will be distributed to Settlement Class Members who submit valid Claim Forms, in accordance with the proposed Plan of Allocation or such other plan of allocation as the Court may approve.

36.     The Net Settlement Fund will not be distributed unless and until the Court has approved the Settlement and a plan of allocation, and the time for any petition for rehearing, appeal, or review, whether by *certiorari* or otherwise, has expired.

37.     Neither Defendants nor any other person or entity that paid any portion of the Settlement Amount on their behalf are entitled to get back any portion of the Settlement Fund once the Court's order or judgment approving the Settlement becomes Final. Defendants shall not have any liability, obligation, or responsibility for the administration of the Settlement, the disbursement of the Net Settlement Fund, or the plan of allocation.

38.     Approval of the Settlement is independent from approval of a plan of allocation. Any determination with respect to a plan of allocation will not affect the Settlement, if approved.

39.     Unless the Court otherwise orders, any Settlement Class Member who or which fails to submit a Claim Form postmarked (or submitted online) on or before _____, 2025 shall be fully and forever barred from receiving payments pursuant to the Settlement but will in all other respects remain a member of the Settlement Class and be subject to the provisions of the Stipulation, including the terms of any Judgment entered and the releases given. This means that each Settlement Class Member releases the Released Plaintiffs' Claims (as defined in ¶ 26 above) against the Defendant Releasees (as defined in ¶ 27 above) and will be barred and enjoined from prosecuting any of the Released Plaintiffs' Claims against any of the Defendant Releasees whether

12

or not such Settlement Class Member submits a Claim Form.

40.    The Court has reserved jurisdiction to allow, disallow, or adjust on equitable grounds the Claim of any Settlement Class Member.

41.    Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim Form.

42.    Only members of the Settlement Class will be eligible to share in the distribution of the Net Settlement Fund. Persons and entities that are excluded from the Settlement Class by definition or that exclude themselves from the Settlement Class pursuant to request will not be eligible for a payment and should not submit Claim Forms.

## WHAT PAYMENT ARE THE ATTORNEYS FOR THE SETTLEMENT CLASS SEEKING? HOW WILL THE LAWYERS BE PAID?

43.    Lead Counsel have not received any payment for their services in pursuing claims asserted in the Action on behalf of the Settlement Class, nor have Lead Counsel been paid for their Litigation Expenses. Before final approval of the Settlement, Lead Counsel will apply to the Court on behalf of Plaintiffs' Counsel for an award of attorneys' fees in an amount not to exceed 17% of the Settlement Fund. In addition, Lead Counsel will apply for payment of Plaintiffs' Counsel's Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1.4 million, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class. The Court will determine the amount of any award of attorneys' fees or Litigation Expenses. Such sums as may be approved by the Court will be paid from the Settlement Fund. Settlement Class Members are not personally liable for any such fees or expenses.

## WHAT IF I DO NOT WANT TO BE A MEMBER OF THE SETTLEMENT CLASS? HOW DO I EXCLUDE MYSELF?

44.    Each Settlement Class Member will be bound by all determinations and judgments in this lawsuit, whether favorable or unfavorable, unless such person or entity mails or delivers a written Request for Exclusion from the Settlement Class, addressed to *Silvergate Securities Litigation*, EXCLUSIONS, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111. The Request for Exclusion must be ***received*** no **later than _____, 2025**. You will not be able to exclude yourself from the Settlement Class after that date. Each Request for Exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Settlement Class in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.)"; (iii) state the number of shares of Silvergate Capital common stock that the person or entity requesting exclusion

13

(A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold; (iv) state the number of securities that the person or entity requesting exclusion purchased in or traceable to Silvergate Capital's securities offerings during 2021, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold; and (v) be signed by the person or entity requesting exclusion or an authorized representative. A Request for Exclusion shall not be valid and effective unless it provides all of the information called for in this paragraph and is received within the time stated above, or is otherwise accepted by the Court.

45.    If you do not want to be part of the Settlement Class, you must follow these instructions for exclusion even if you have pending, or later file, another lawsuit, arbitration, or other proceeding relating to any Released Plaintiffs' Claim against any of the Defendant Releasees.

46.    If you ask to be excluded from the Settlement Class, you will not be eligible to receive any payment out of the Net Settlement Fund.

47.    Defendants have the right to terminate the Settlement if valid requests for exclusion are received from persons and entities entitled to be members of the Settlement Class in an amount that exceeds an amount agreed to by Plaintiffs and Defendants.

---

**WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT? DO I HAVE TO COME TO THE HEARING? MAY I SPEAK AT THE HEARING IF I DON'T LIKE THE SETTLEMENT?**

---

48.    **Settlement Class Members do not need to attend the Settlement Hearing. The Court will consider any submission made in accordance with the provisions below even if a Settlement Class Member does not attend the hearing. You can participate in the Settlement without attending the Settlement Hearing.** Please Note: The date and time of the Settlement Hearing may change without further written notice to the Settlement Class. You should check the Court's docket or the Settlement website, www.SilvergateSecuritiesLitigation.com, before making plans to attend the Settlement Hearing. You may also confirm the date and time of the Settlement Hearing by contacting Lead Counsel.

49.    The Settlement Hearing will be held on _____, 2025 at : _.m., before the Honorable James E. Simmons, Jr. either in person at the U.S. District Court for the Southern District of California, Edward J. Schwartz United States Courthouse, Courtroom 4B, 221 West Broadway, San Diego, CA 92101, or by telephone or videoconference, to determine, among other things, (i) whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Settlement Class, and should be finally approved by the Court; (ii) whether, for purposes of the Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (iii) whether the Action should be dismissed with prejudice against Defendants and the Releases specified and described in the Stipulation (and in this Notice) should

14

be granted; (iv) whether the proposed Plan of Allocation should be approved as fair and reasonable; (v) whether Lead Counsel's motion for attorneys' fees and Litigation Expenses should be approved; and (vi) any other matters that may properly be brought before the Court in connection with the Settlement. The Court reserves the right to certify the Settlement Class; approve the Settlement, the Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses; and/or consider any other matter related to the Settlement at or after the Settlement Hearing without further notice to the members of the Settlement Class.

50.    Any Settlement Class Member who or which does not request exclusion may object to the Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for attorneys' fees and Litigation Expenses. Objections must be in writing. You must file any written objection, together with copies of all other papers and briefs supporting the objection, with the Clerk's Office at the U.S. District Court for the Southern District of California at the address set forth below **on or before _____, 2025**. You must also serve the papers on Lead Counsel and on Representative Defendants' Counsel at the addresses set forth below so that the papers are *received* **on or before _____, 2025**.

| | |
|---|---|
| Clerk's Office: | U.S. District Court<br>Southern District of California<br>Edward J. Schwartz United States Courthouse<br>221 West Broadway<br>San Diego, CA 92101 |
| Lead Counsel: | Carol V. Gilden<br>Cohen Milstein Sellers & Toll PLLC<br>200 S. Wacker Drive, Suite 2375<br>Chicago, IL 60606<br><br>Jonathan D. Uslaner<br>Bernstein Litowitz Berger & Grossmann LLP<br>1251 Avenue of the Stars, Suite 2575<br>Los Angeles, CA 90067 |
| Representative Defendants' Counsel: | John P. Stigi III<br>Sheppard, Mullin, Richter & Hampton LLP<br>12275 El Camino Real, Suite 100<br>San Diego, CA 92130-4092<br><br>Jason C. Hegt<br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020 |

51.    Any objection must (a) identify the case name and docket number, *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.); (b) state the name, address, and telephone number of the person or entity objecting and be signed by the objector;

15

(c) state with specificity the grounds for the Settlement Class Member's objection, including any legal and evidentiary support the Settlement Class Member wishes to bring to the Court's attention and whether the objection applies only to the objector, to a specific subset of the Settlement Class, or to the entire Settlement Class; and (d) include documents sufficient to prove membership in the Settlement Class, including documents showing (i) the number of shares of Silvergate Capital common stock that the person or entity (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 to March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold, and/or (ii) the number of securities that the person or entity purchased in or traceable to Silvergate Capital's securities offerings during 2021, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold. Documentation establishing membership in the Settlement Class must consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from the objector's broker containing the transactional and holding information found in a broker confirmation slip or account statement. You may not object to the Settlement, the Plan of Allocation, or Lead Counsel's motion for attorneys' fees and Litigation Expenses if you exclude yourself from the Settlement Class or if you are not a member of the Settlement Class.

52.     You may file a written objection without having to appear at the Settlement Hearing. You may not, however, appear at the Settlement Hearing to present your objection unless you first file and serve a written objection in accordance with the procedures described above, unless the Court orders otherwise.

53.     If you wish to be heard orally at the hearing in opposition to the approval of the Settlement, the Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses, assuming you timely file and serve a written objection as described above, you must also file a notice of appearance with the Clerk's Office and serve it on Lead Counsel and on Representative Defendants' Counsel at the addresses set forth in ¶ 50 above so that it is *received* **on or before _____, 2025**. Persons who intend to object and desire to present evidence at the Settlement Hearing must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the hearing. Such persons may be heard orally at the discretion of the Court.

54.     You are not required to hire an attorney to represent you in making written objections or in appearing at the Settlement Hearing. However, if you decide to hire an attorney, it will be at your own expense, and that attorney must file a notice of appearance with the Court and serve it on Lead Counsel and Representative Defendants' Counsel at the addresses set forth in ¶ 50 above so that the notice is *received* **on or before _____, 2025.**

55.     The Settlement Hearing may be adjourned by the Court without further written notice to the Settlement Class. If you plan to attend the Settlement Hearing, you should confirm the date and time with Lead Counsel.

56.     **Unless the Court orders otherwise, any Settlement Class Member who does not object in the manner described above will be deemed to have waived any objection and shall be**

16

**forever foreclosed from making any objection to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses. Settlement Class Members do not need to appear at the Settlement Hearing or take any other action to indicate their approval.**

| WHAT IF I BOUGHT STOCK ON SOMEONE ELSE'S BEHALF? |
| :---: |

57.     If you purchased or otherwise acquired Silvergate Capital common stock during the period from November 7, 2019 through March 21, 2023, inclusive, or purchased Silvergate Capital securities in or traceable to Silvergate Capital's securities offerings during 2021 for the beneficial interest of persons or organizations other than yourself, you must either (i) within seven (7) calendar days of receipt of this Notice, request from the Claims Administrator sufficient copies of the Notice and Claim Form (the "Notice Packet") to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (ii) within seven (7) calendar days of receipt of this Notice, provide a list of the names, addresses, and email addresses (if available) of all such beneficial owners to *Silvergate Capital Corporation Securities Litigation*, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111. If you choose the second option, the Claims Administrator will send a copy of the Notice Packet to the beneficial owners. Upon full compliance with these directions, such nominees may seek reimbursement of their reasonable expenses actually incurred, by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such expenses shall not exceed $0.05 plus postage at the current pre-sort rate used by the Claims Administrator per Notice Packet mailed; or $0.05 per name, address, and email address (to the extent available) provided to the Claims Administrator. Copies of this Notice and the Claim Form may also be obtained from the Settlement website, www.SilvergateSecuritiesLitigation.com, by calling the Claims Administrator toll-free at 866-287-0746, or by emailing the Claims Administrator at info@SilvergateSecuritiesLitigation.com.

| CAN I SEE THE COURT FILE? WHOM SHOULD I CONTACT IF I HAVE QUESTIONS? |
| :---: |

58.     This Notice contains only a summary of the terms of the proposed Settlement. For more detailed information about the matters involved in this Action, you are referred to the papers on file in the Action, including the Stipulation, which may be inspected during regular office hours at the Office of the Clerk, U.S. District Court for the Southern District of California, Edward J. Schwartz U.S. Courthouse, 221 West Broadway, San Diego, CA 92101. Additionally, copies of the Stipulation and any related orders entered by the Court will be posted on the Settlement website, www.SilvergateSecuritiesLitigation.com.

All inquiries concerning this Notice and the Claim Form should be directed to:

*Silvergate Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111
866-287-0746

17

info@SilvergateSecuritiesLitigation.com
www. SilvergateSecuritiesLitigation.com

**DO NOT CALL OR WRITE THE COURT, THE OFFICE OF THE CLERK OF THE COURT, DEFENDANTS, OR THEIR COUNSEL REGARDING THIS NOTICE.**

Dated: _____, 2025                    By Order of the Court
                                            United States District Court
                                            Southern District of California

## APPENDIX A

**Proposed Plan of Allocation of Net Settlement Fund Among Authorized Claimants**

59.     The Plan of Allocation set forth herein is the plan that is being proposed by Plaintiffs to the Court for approval after consultation with their damages expert. The Court may approve the Plan of Allocation with or without modification, or approve another plan of allocation, without further notice to the Class. Any Orders regarding a modification to the Plan of Allocation will be posted on the Settlement website, www.SilvergateSecuritiesLitigation.com. Defendants have had, and will have, no involvement or responsibility for the terms or application of the Plan of Allocation.

60.     The Net Settlement Fund shall be distributed based on the acceptable Claim Forms submitted by or on behalf of Settlement Class Members. The Net Settlement Fund will be distributed to "Authorized Claimants," who are those Settlement Class Members who timely submit acceptable Claim Forms which are accepted for recovery under the Plan of Allocation described herein, or as otherwise ordered by the Court.

61.     The objective of the Plan of Allocation (the "Plan") is to equitably distribute the Net Settlement Fund among Authorized Claimants who allegedly suffered economic losses as a result of the alleged violations of the federal securities laws. The Plan, however, is not a formal damages analysis, and the calculations made pursuant to the Plan are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial. Nor are the calculations pursuant to the Plan intended to be estimates of the amounts that will be paid to Authorized Claimants. The computations under the Plan are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making pro rata allocations of the Exchange Act Settlement Fund and the Securities Act Settlement Fund.

62.     The total Net Settlement Fund will be allocated between an Exchange Act Fund and a Securities Act Fund based on the groups of Defendants who are funding certain portions of the Settlement Amount and the nature of the claims asserted against those Defendants.

(a)     The Exchange Act Fund will be comprised of the $27,500,000 D&O Insurance Contribution (paid on behalf of the Individual Defendants) **plus** the $5,320,000 Preferred Equity Holder Contribution, less a proportional amount of the total Court-approved attorneys' fees, Litigation Expenses, Taxes, and Notice and Administration Costs for the Settlement.

18

(b) The Securities Act Fund will be comprised of the $4,680,000 Underwriter Contribution (paid on behalf of the Underwriter Defendants), less a proportional amount of the total Court-approved attorneys' fees, Litigation Expenses, Taxes, and Notice and Administration Costs for the Settlement.

63. Pursuant to the Plan, members of the Settlement Class will generally be potentially eligible for a claim under the Securities Exchange Act of 1934 (the "Exchange Act") and some members may additionally be potentially eligible for a claim under the Securities Act of 1933 (the "Securities Act"). Settlement Class Members with Exchange Act claims will claim in the Exchange Act Fund. Settlement Class Members with Securities Act claims will claim in the Securities Act Fund. Authorized Claimants will receive a payment which will be their *pro rata* share of the Exchange Act Fund based on their Exchange Act Recognized Loss (if applicable), plus their *pro rata* share of the Securities Act Fund based on their Securities Act Recognized Loss (if applicable), as described below.

## I.    CALCULATION OF EXCHANGE ACT RECOGNIZED LOSSES

64. In this case, Plaintiffs allege that Defendants made false and misleading statements and omitted material information that inflated the price of Silvergate Capital Corporation ("Silvergate") Class A Common Stock ("Silvergate Common Stock" or "Common Stock") and depositary shares representing a 1/40th interest in a share of Silvergate Capital's 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A ("Silvergate Preferred Stock" or "Preferred Stock") during the Class Period (*i.e.*, November 7, 2019 through March 21, 2023, inclusive), for Silvergate Common Stock, and from July 29, 2021 through March 21, 2023, inclusive, for Silvergate Preferred Stock.

65. In calculating the estimated artificial inflation allegedly caused by Defendants' misrepresentations and omissions, Plaintiffs' damages expert considered price changes in Silvergate Common Stock and Silvergate Preferred Stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. In order to have recoverable damages under the Exchange Act, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of Silvergate Common Stock or Preferred Stock. As such, the relevant dates considered differ for Silvergate Common Stock and Preferred Stock.

### A.  COMMON STOCK

66. It is alleged that there was relevant information released to the market that impacted the market price of Silvergate Common Stock on several dates during the Class Period: November 7, 2022 (after market close), November 15, 2022 (during market hours), November 17, 2022 (during market hours), November 18, 2022 (during market hours), December 1, 2022 (during market hours), December 5, 2022 (before market open), December 6, 2022 (before market open), December 12, 2022 (after market close), January 5, 2023 (before market open), February 2, 2023 (after market close), February 16, 2023 (during market hours), March 1, 2023 (after market close), March 8, 2023 (after market close), and March 20, 2023 (after market close). These dates impacted the artificial inflation from Silvergate Common Stock, causing it to decline on: November 8, 2022,

19

November 9, 2022, November 10, 2022, November 15, 2022, November 17, 2022, November 18, 2022, December 1, 2022, December 5, 2022, December 6, 2022, December 13, 2022, January 5, 2023, February 3, 2023, February 16, 2023, March 2, 2023, March 9, 2023, and March 21, 2023.

67.     For purposes of this Settlement, an "Exchange Act Recognized Loss" shall be calculated for Silvergate Common Stock as follows:

A.  An Exchange Act Recognized Loss will be calculated for each purchase or acquisition of Silvergate Common Stock during the Class Period that is listed on the Claim Form and for which adequate documentation is provided. If an Exchange Act Recognized Loss calculates to a negative number or zero under the applicable formula below, that number will be zero.

B.  For each share of Silvergate Common Stock purchased or otherwise acquired from November 7, 2019 (including purchases in the initial public offering of Silvergate Common Stock that occurred on or about November 7, 2019) through and including the close of trading on March 21, 2023, and:

(i)   sold before November 8, 2022, the Exchange Act Recognized Loss will be $0.00.[6]

(ii)  sold from November 8, 2022 through the close of trading on March 20, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A *minus* the amount of artificial inflation per share on the date of sale as stated in Table A; or (b) the purchase/acquisition price per share *minus* the sale price per share.

(iii) sold from March 21, 2023 through the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A; (b) the purchase/acquisition price per share *minus* the average closing price between March 21, 2023 and the date of sale as stated in Table B below; or (c) the purchase/acquisition price per share *minus* the sale price per share.

(iv) held as of the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A; or (b) the purchase/acquisition price *minus* $1.27, the average closing price between March 21, 2023 and June 16, 2023, as stated in Table B below.[7]

---

[6] Any transactions in Silvergate Common Stock executed outside of regular trading hours for the U.S. financial markets shall be deemed to have occurred during the next regular trading session.

[7] Under Section 21(D)(e)(1) of the Exchange Act, "in any private action arising under this chapter

## B.  PREFERRED STOCK

68.    It is alleged that there was relevant information released to the market that impacted the market price of Silvergate Preferred Stock in a statistically significant manner on several dates from July 29, 2021 through March 21, 2023, inclusive: November 7, 2022 (after market close), November 15, 2022 (during market hours), November 17, 2022 (during market hours), November 18, 2022 (during market hours), December 1, 2022 (during market hours), December 6, 2022 (before market open), December 12, 2022 (after market close), January 5, 2023 (before market open), February 2, 2023 (after market close), February 16, 2023 (during market hours), March 1, 2023 (after market close), and March 20, 2023 (after market close). These dates impacted the artificial inflation from Silvergate Common Stock, causing it to decline on: November 8, 2022, November 9, 2022, November 15, 2022, November 17, 2022, November 18, 2022, December 1, 2022, December 6, 2022, December 13, 2022, January 5, 2023, February 3, 2023, February 16, 2023, March 2, 2023, and March 21, 2023.

69.    For purposes of this Settlement, an "**Exchange Act Recognized Loss**" shall be calculated for Silvergate Preferred Stock as follows:

A.    An Exchange Act Recognized Loss will be calculated for each purchase or acquisition of Silvergate Preferred Stock from July 29, 2021 through March 21, 2023, inclusive that is listed on the Claim Form and for which adequate documentation is provided. If an Exchange Act Recognized Loss calculates to a negative number or zero under the applicable formula below, that number will be zero.

B.    For each share of Silvergate Preferred Stock purchased or otherwise acquired from July 29, 2021 (including purchases in the initial public offering of Silvergate Preferred Stock that occurred on or about July 29, 2021) through and including the close of trading on March 21, 2023, and:

(i)    sold before November 8, 2022, the Exchange Act Recognized Loss will be $0.00.[8]

---

in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Consistent with the requirements of the statute, Exchange Act Recognized Losses are reduced to an appropriate extent by taking into account the closing prices of Silvergate Common Stock during the "90-day look-back period," *i.e.*, March 21, 2023 through and including June 16, 2023. The mean (average) closing price for Silvergate Common Stock during this 90-day look-back period was $1.27.

[8] Any transactions in Silvergate Preferred Stock executed outside of regular trading hours for the U.S. financial markets shall be deemed to have occurred during the next regular trading session.

    (ii)   sold from November 8, 2022 through the close of trading on March 20, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C *minus* the amount of artificial inflation per share on the date of sale as stated in Table C; or (b) the purchase/acquisition price per share *minus* the sale price per share.

    (iii)   sold from March 21, 2023 through the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C; (b) the purchase/acquisition price per share *minus* the average closing price between March 21, 2023 and the date of sale as stated in Table D below; or (c) the purchase/acquisition price per share *minus* the sale price per share.

    (iv)   held as of the close of trading on June 16, 2023, the Exchange Act Recognized Loss will be **the lesser of**: (a) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table C; or (b) the purchase/acquisition price *minus* $8.36, the average closing price between March 21, 2023 and June 16, 2023, as stated in Table D below.[9]

## II.    CALCULATION OF SECURITIES ACT RECOGNIZED LOSSES

### A.  COMMON STOCK

70.    For shares of Silvergate Common Stock purchased in (or traceable to) the secondary public offerings of Silvergate Common Stock issued on January 22, 2021 and December 7, 2021, and the "at-the-market" secondary public offering of Silvergate Common Stock between March 9, 2021 and May 18, 2021, inclusive, a Securities Act Recognized Loss shall be calculated under the Securities Act's statutory formula for the calculation of Section 11 damages, as provided below.

71.    For each share of Silvergate Common Stock either (a) purchased directly in the January 22, 2021 secondary public offering, or (b) purchased in the open market from January 22, 2021 through and including January 19, 2023[10] and for which the Claimant provides records establishing that those specific shares were issued in the January 22, 2021 secondary public offering and:

---

[9] Consistent with the requirements of the statute, Exchange Act Recognized Losses are reduced to an appropriate extent by taking into account the closing prices of Silvergate Preferred Stock during the "90-day look-back period," March 21, 2023 through and including June 16, 2023. The mean (average) closing price for Silvergate Preferred Stock during this 90-day look-back period was $8.36.

[10] For purposes of the statutory calculations for the January 22, 2021 secondary public offering of Silvergate Common Stock, January 19, 2023, the date of filing of the initial Section 11 Complaint in the Action related to the January 22, 2021 secondary public offering of Silvergate Common Stock, is the date of suit.

A.      Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

B.      Sold from November 8, 2022 through January 19, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $63.00 secondary offering per share price) *minus* the sale price per share.

C.      Sold from January 20, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $63.00 secondary offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $12.15 (the closing value on the date of suit).

D.      Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $63.00 secondary offering per share price) *minus* $12.15 (the closing value on the date of suit).

72.     For each share of Silvergate Common Stock either (a) purchased directly in the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive, or (b) purchased in the open market from March 9, 2021 through and including May 11, 2023[11] and for which the Claimant provides records establishing that those specific shares were issued in the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive and:

A.      Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

B.      Sold from November 8, 2022 through May 11, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the "at-the-market" secondary public offering per share price)[12] *minus* the sale price per share.

C.      Sold from May 12, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the "at-the-market" secondary public offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $0.91.[13]

---

[11] For purposes of the statutory calculations for the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive, of Silvergate Common Stock, May 11, 2023, the date of filing of the initial Section 11 Complaint in the Action related to the "at-the-market" secondary public offering of Silvergate Common Stock, is the date of suit.

[12] Shares issued in the "at-the-market" secondary public offering between March 9, 2021 and May 18, 2021, inclusive were issued at different prices. In connection with the "at-the-market" secondary public offering, the company issued a combined total of 2,793,826 shares at an average price of $107.38. If the "at-the-market" secondary public offering per share price that corresponds to a Claimant's shares is not available, $107.38 should be used as the "at-the-market" secondary public offering per share price.

[13] A reported closing price for Silvergate Common Stock on May 11, 2023 is not available. Accordingly, the closing price of Silvergate Common Stock on the next trading day, May 12, 2023, of $0.91 shall be considered the value of Silvergate Common Stock as of the date of suit.

23

D.     Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the "at-the-market" secondary public offering per share price) *minus* $0.91.

73.     For each share of Silvergate Common Stock either (a) purchased directly in the December 7, 2021 secondary public offering, or (b) purchased in the open market from December 7, 2021 through and including January 19, 2023[14] and for which the Claimant provides records establishing that those specific shares were issued in the December 7, 2021 secondary public offering and:

A.     Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

B.     Sold from November 8, 2022 through January 19, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $145.00 secondary offering per share price) *minus* the sale price per share.

C.     Sold from January 20, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $145.00 secondary offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $12.15 (the closing value on the date of suit).

D.     Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $145.00 secondary offering per share price) *minus* $12.15 (the closing value on the date of suit).

## B. PREFERRED STOCK

74.     For shares of Silvergate Preferred Stock purchased in (or traceable to) the initial public offering of Silvergate Preferred Stock on or around July 29, 2021, a Securities Act Recognized Loss shall be calculated under the Securities Act's statutory formula for the calculation of Section 11 damages, as provided below.

75.     For each share of Silvergate Preferred Stock either (a) purchased directly in the July 29, 2021 initial public offering, or (b) purchased in the open market from July 29, 2021 through and including May 11, 2023[15] and:

A.     Sold before November 8, 2022, the Securities Act Recognized Loss shall be $0.00.

---

[14] For purposes of the statutory calculations for the December 7, 2021 secondary public offering of Silvergate Common Stock, January 19, 2023, the date of filing of the initial Section 11 Complaint in the Action related to the December 7, 2021 secondary public offering of Silvergate Common Stock, is the date of suit.

[15] For purposes of the statutory calculations for Silvergate Preferred Stock, May 11, 2023, the date of filing of the initial Section 11 Complaint in the Action related to Silvergate Preferred Stock, is the date of suit.

24

B.    Sold from November 8, 2022 through May 11, 2023, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $25.00 initial offering per share price) *minus* the sale price per share.

C.    Sold from May 12, 2023 through May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $25.00 initial offering per share price) *minus* the greater of: (i) the sale price per share, or (ii) $9.00.[16]

D.    Held through the close of trading on May 9, 2025, the Securities Act Recognized Loss shall be the purchase price per share (not to exceed the $25.00 initial offering per share price) *minus* $9.00.

## III.    ADDITIONAL PROVISIONS

76.    **FIFO Matching:** In the event that a Claimant has multiple transactions of Silvergate Common Stock or Silvergate Preferred Stock during the relevant time periods, all purchases/acquisitions and sales of like security shall be matched on a first-in, first-out ("FIFO") basis. Sales will be matched first against any holdings at the beginning of the Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made during the Class Period.

77.    **"Purchase/Sale" Prices:** For the purposes of calculations under this Plan, "purchase price" means the actual price paid, excluding any fees, commissions, and taxes, and "sale price" means the actual amount received, not deducting any fees, commissions, and taxes.

78.    **"Purchase/Sale" Dates:** Purchases or acquisitions and sales of Silvergate Common Stock and Preferred Stock shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, inheritance or operation of law of Silvergate Common Stock or Preferred Stock shall not be deemed a purchase, acquisition or sale of the security for the calculation of an Authorized Claimant's Recognized Claim, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/acquisition of the security unless (i) the donor or decedent purchased or otherwise acquired such Silvergate Common Stock or Preferred Stock during the Class Period and/or in or traceable to one of the 2021 Offerings; (ii) no Claim Form was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to that security; and (iii) it is specifically so provided in the instrument of gift or assignment.

79.    **Short Sales:** The Exchange Act Recognized Loss or the Securities Act Recognized Loss on any portion of a purchase or acquisition that matches against (or "covers") a "short sale" is zero. The Exchange Act Recognized Loss or the Securities Act Recognized Loss on a "short sale" that is not covered by a purchase or acquisition is also zero. In the event that a Claimant has an opening short position in Silvergate Common Stock or Preferred Stock at the start of the Class Period, the

---

[16] A reported closing price for Silvergate Preferred Stock on May 11, 2023 is not available. Accordingly, the closing price of Silvergate Preferred Stock on the next trading day, May 12, 2023, of $9.00 shall be considered the value of Silvergate Preferred Stock as of the date of suit.

earliest Class Period purchases or acquisitions shall be matched against such an opening short position in accordance with the FIFO matching described above, and any portion of such purchases or acquisitions that cover such short sales will not be entitled to recovery. In the event that a Claimant newly establishes a short position during the Class Period, the earliest subsequent Class Period purchase or acquisition shall be matched against such short position on a FIFO basis and will not be entitled to a recovery.

80.    **Shares Purchased/Sold Through the Exercise of Options:** Silvergate Common Stock and Preferred Stock are the only securities eligible for recovery under the Plan. Option contracts to purchase or sell Silvergate Common Stock are not securities eligible to participate in the Settlement. With respect to Silvergate Common Stock purchased or sold through the exercise of an option, the purchase/sale date of such shares is the exercise date of the option and the purchase/sale price is the exercise price of the option.

81.    **Determination of Distribution Amount:** The Exchange Act Fund will be distributed on a pro rata basis to Authorized Claimants based on their total Exchange Act Recognized Loss and the Securities Act Fund will be distributed on a pro rata basis to Authorized Claimants based on their Securities Act Recognized Loss. Specifically, a "**Distribution Amount**" will be calculated for each Authorized Claimant, which will be (a) the Authorized Claimant's total Exchange Act Recognized Loss divided by the total Exchange Act Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Exchange Act Fund, plus (b) the Authorized Claimant's total Securities Act Recognized Loss divided by the total Securities Act Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Securities Act Fund.

82.    The Net Settlement Fund will be allocated among all Authorized Claimants whose Distribution Amount is $10.00 or greater. If any Authorized Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Authorized Claimant. Those funds will be included in the payments to Authorized Claimants with Distribution Amounts over $10.00.

83.    After the initial distribution of the Net Settlement Fund, the Claims Administrator will make reasonable and diligent efforts to have Authorized Claimants cash their distribution checks. To the extent any monies remain in the Net Settlement Fund after the initial distribution, if Lead Counsel, in consultation with the Claims Administrator, determine that it is cost-effective to do so, the Claims Administrator, no less than seven (7) months after the initial distribution, will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determines that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

84.    Payment pursuant to the Plan, or such other plan of allocation as may be approved by the Court, will be conclusive against all Authorized Claimants. No person or entity shall have any claim against Plaintiffs, Lead Counsel, the Claims Administrator, or any other agent designated by Lead Counsel, or Defendants' Releasees and/or their respective counsel, arising from distributions made substantially in accordance with the Stipulation, the plan of allocation approved by the Court, or any order of the Court. Plaintiffs and Defendants, and their respective counsel, and all other Releasees shall have no liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund, the plan of allocation approved by the Court, or the determination, administration, calculation, or payment of any claim or nonperformance of the Claims Administrator, the payment or withholding of Taxes (including interest and penalties) owed by the Settlement Fund, or any losses incurred in connection therewith.

## TABLE A

| Transaction Date | Artificial Inflation Per Share |
|---|---|
| November 7, 2019 - November 7, 2022 | $64.58 |
| November 8, 2022 - November 8, 2022 | $55.41 |
| November 9, 2022 - November 9, 2022 | $53.50 |
| November 10, 2022 - November 14, 2022 | $46.90 |
| November 15, 2022 - November 16, 2022 | $39.73 |
| November 17, 2022 - November 17, 2022 | $36.37 |
| November 18, 2022 - November 30, 2022 | $33.08 |
| December 1, 2022 - December 4, 2022 | $30.97 |
| December 5, 2022 - December 5, 2022 | $29.46 |
| December 6, 2022 - December 12, 2022 | $28.76 |
| December 13, 2022 - January 4, 2023 | $25.65 |
| January 5, 2023 - February 2, 2023 | $16.49 |
| February 3, 2023 - February 15, 2023 | $14.78 |
| February 16, 2023 - March 1, 2023 | $9.62 |
| March 2, 2023 - March 8, 2023 | $1.66 |
| March 9, 2023 - March 20, 2023 | $0.26 |
| March 21, 2023 - March 21, 2023 | $0.00 |

27

**TABLE B**

| Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown | Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown |
|---|---|---|---|---|---|
| 3/21/2023 | $1.47 | $1.47 | 5/4/2023 | $1.21 | $1.49 |
| 3/22/2023 | $1.32 | $1.40 | 5/5/2023 | $1.34 | $1.49 |
| 3/23/2023 | $1.13 | $1.31 | 5/8/2023 | $1.26 | $1.48 |
| 3/24/2023 | $1.72 | $1.41 | 5/9/2023 | $1.24 | $1.48 |
| 3/27/2023 | $1.97 | $1.52 | 5/10/2023 | $1.25 | $1.47 |
| 3/28/2023 | $2.08 | $1.62 | 5/12/2023 | $0.91 | $1.45 |
| 3/29/2023 | $1.84 | $1.65 | 5/15/2023 | $0.63 | $1.43 |
| 3/30/2023 | $1.62 | $1.64 | 5/16/2023 | $0.65 | $1.41 |
| 3/31/2023 | $1.62 | $1.64 | 5/17/2023 | $1.12 | $1.41 |
| 4/3/2023 | $1.62 | $1.64 | 5/18/2023 | $1.15 | $1.40 |
| 4/4/2023 | $1.58 | $1.63 | 5/19/2023 | $1.20 | $1.39 |
| 4/5/2023 | $1.47 | $1.62 | 5/22/2023 | $1.10 | $1.39 |
| 4/6/2023 | $1.43 | $1.61 | 5/23/2023 | $0.90 | $1.38 |
| 4/10/2023 | $1.39 | $1.59 | 5/24/2023 | $0.90 | $1.37 |
| 4/11/2023 | $1.56 | $1.59 | 5/25/2023 | $1.00 | $1.36 |
| 4/12/2023 | $1.55 | $1.59 | 5/26/2023 | $0.95 | $1.35 |
| 4/13/2023 | $1.59 | $1.59 | 5/30/2023 | $0.92 | $1.34 |
| 4/14/2023 | $1.52 | $1.58 | 5/31/2023 | $0.92 | $1.33 |
| 4/17/2023 | $1.57 | $1.58 | 6/1/2023 | $0.93 | $1.32 |
| 4/18/2023 | $1.53 | $1.58 | 6/2/2023 | $0.87 | $1.31 |
| 4/19/2023 | $1.62 | $1.58 | 6/5/2023 | $0.97 | $1.31 |
| 4/20/2023 | $1.61 | $1.58 | 6/6/2023 | $0.97 | $1.30 |
| 4/21/2023 | $1.52 | $1.58 | 6/7/2023 | $0.90 | $1.29 |
| 4/24/2023 | $1.38 | $1.57 | 6/8/2023 | $1.03 | $1.29 |
| 4/25/2023 | $1.32 | $1.56 | 6/9/2023 | $1.03 | $1.28 |
| 4/26/2023 | $1.27 | $1.55 | 6/12/2023 | $1.02 | $1.28 |
| 4/27/2023 | $1.33 | $1.54 | 6/13/2023 | $1.11 | $1.28 |
| 4/28/2023 | $1.35 | $1.54 | 6/14/2023 | $1.18 | $1.28 |
| 5/1/2023 | $1.30 | $1.53 | 6/15/2023 | $1.15 | $1.27 |
| 5/2/2023 | $1.19 | $1.52 | 6/16/2023 | $0.83 | $1.27 |
| 5/3/2023 | $1.13 | $1.50 | | | |

**TABLE C**

| Transaction Date | Artificial Inflation Per Share |
|---|---|
| July 29, 2021 - November 7, 2022 | $11.48 |
| November 8, 2022 - November 8, 2022 | $11.25 |
| November 9, 2022 - November 14, 2022 | $11.10 |
| November 15, 2022 - November 16, 2022 | $10.36 |
| November 17, 2022 - November 17, 2022 | $10.16 |
| November 18, 2022 - November 30, 2022 | $9.68 |
| December 1, 2022 - December 5, 2022 | $9.32 |
| December 6, 2022 - December 12, 2022 | $8.54 |
| December 13, 2022 - January 4, 2023 | $8.37 |
| January 5, 2023 - February 2, 2023 | $6.41 |
| February 3, 2023 - February 15, 2023 | $5.54 |
| February 16, 2023 - March 1, 2023 | $4.93 |
| March 2, 2023 - March 20, 2023 | $0.75 |
| March 21, 2023 - March 21, 2023 | $0.00 |

**TABLE D**

| Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown | Date | Closing Price | Average Closing Price Between March 21, 2023 and Date Shown |
|---|---|---|---|---|---|
| 3/21/2023 | $5.96 | $5.96 | 5/4/2023 | $9.91 | $7.84 |
| 3/22/2023 | $5.80 | $5.88 | 5/5/2023 | $9.89 | $7.91 |
| 3/23/2023 | $6.00 | $5.92 | 5/8/2023 | $9.92 | $7.97 |
| 3/24/2023 | $7.95 | $6.43 | 5/9/2023 | $9.89 | $8.02 |
| 3/27/2023 | $8.02 | $6.75 | 5/10/2023 | $9.97 | $8.08 |
| 3/28/2023 | $8.00 | $6.96 | 5/12/2023 | $9.00 | $8.10 |
| 3/29/2023 | $7.84 | $7.08 | 5/15/2023 | $9.75 | $8.14 |
| 3/30/2023 | $7.90 | $7.18 | 5/16/2023 | $10.00 | $8.19 |
| 3/31/2023 | $7.95 | $7.27 | 5/17/2023 | $9.96 | $8.24 |
| 4/3/2023 | $8.03 | $7.35 | 5/18/2023 | $10.05 | $8.28 |
| 4/4/2023 | $7.96 | $7.40 | 5/19/2023 | $9.75 | $8.31 |
| 4/5/2023 | $7.96 | $7.45 | 5/22/2023 | $9.00 | $8.33 |
| 4/6/2023 | $7.77 | $7.47 | 5/23/2023 | $8.50 | $8.33 |
| 4/10/2023 | $7.56 | $7.48 | 5/24/2023 | $8.75 | $8.34 |
| 4/11/2023 | $7.95 | $7.51 | 5/25/2023 | $9.00 | $8.36 |
| 4/12/2023 | $8.00 | $7.54 | 5/26/2023 | $8.76 | $8.37 |
| 4/13/2023 | $8.02 | $7.57 | 5/30/2023 | $8.48 | $8.37 |
| 4/14/2023 | $8.06 | $7.60 | 5/31/2023 | $8.70 | $8.38 |
| 4/17/2023 | $8.36 | $7.64 | 6/1/2023 | $8.50 | $8.38 |
| 4/18/2023 | $8.04 | $7.66 | 6/2/2023 | $8.50 | $8.38 |
| 4/19/2023 | $7.95 | $7.67 | 6/5/2023 | $8.15 | $8.38 |
| 4/20/2023 | $7.94 | $7.68 | 6/6/2023 | $8.00 | $8.37 |
| 4/21/2023 | $7.69 | $7.68 | 6/7/2023 | $8.01 | $8.36 |
| 4/24/2023 | $7.74 | $7.69 | 6/8/2023 | $8.05 | $8.36 |
| 4/25/2023 | $7.49 | $7.68 | 6/9/2023 | $8.90 | $8.37 |
| 4/26/2023 | $7.70 | $7.68 | 6/12/2023 | $8.35 | $8.37 |
| 4/27/2023 | $8.05 | $7.69 | 6/13/2023 | $8.20 | $8.36 |
| 4/28/2023 | $8.30 | $7.71 | 6/14/2023 | $8.20 | $8.36 |
| 5/1/2023 | $7.56 | $7.71 | 6/15/2023 | $8.10 | $8.36 |
| 5/2/2023 | $7.56 | $7.70 | 6/16/2023 | $8.35 | $8.36 |
| 5/3/2023 | $10.01 | $7.78 | | | |

30

<strong>Exhibit 2</strong>

<table>
<tr><td>

**MUST BE POSTMARKED NO LATER THAN _____, 2025**

</td><td>

*In re Silvergate Capital Corporation Securities Litigation*
No. 3:22-cv-01936-JES-MSB (S.D. Cal.)

</td><td></td></tr>
</table>

## INSTRUCTIONS FOR COMPLETING PROOF OF CLAIM AND RELEASE FORM

### GENERAL RULES FOR RECOVERING

1. To recover as a Settlement Class Member based on your claims in the action entitled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.) (the "Action"),[1] you must complete and, on page 10 hereof, sign this Proof of Claim and Release Form ("Claim Form"). If you fail to timely and completely file a properly addressed (as set forth in paragraph 3 below) Claim Form, your Claim may be rejected and you may be precluded from any recovery from the Net Settlement Fund created in connection with the proposed Settlement.

2. Submission of this Claim Form, however, does not assure that you will share in the proceeds of the Settlement. Your recovery, if any, will be calculated as described in the Plan of Allocation in the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Notice").

3. YOU MUST COMPLETE AND SUBMIT THE ELECTRONIC VERSION OF THIS CLAIM FORM AVAILABLE AT WWW.SILVERGATESECURITIESLITIGATION.COM NO LATER THAN 11:59 P.M. ET ON _____, 2025 OR MAIL YOUR COMPLETED AND SIGNED CLAIM FORM POSTMARKED ON OR BEFORE _____, 2025, ADDRESSED AS FOLLOWS:

*Silvergate Capital Corporation Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111

4. If you are NOT a Settlement Class Member (as defined in the Notice), DO NOT submit a Claim Form.

5. If you are a Settlement Class Member and you did not timely and validly request exclusion from the proposed Settlement Class (pursuant to the procedures set forth in the Notice), you will still be bound by the terms of the Settlement and proposed Judgment to be entered in the Action, including the releases provided therein, WHETHER OR NOT YOU SUBMIT A CLAIM FORM.

6. **PLEASE NOTE:** As set forth in the Plan of Allocation, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund. If the prorated payment to any Authorized Claimant calculates to less than $10.00, it will not be included in the calculation, and no distribution will be made to that Authorized Claimant.

### IDENTIFICATION OF CLAIMANT

7. THIS CLAIM FORM MUST BE SUBMITTED BY THE ACTUAL BENEFICIAL PURCHASER(S), OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S), OF SILVERGATE CAPITAL CORPORATION ("SILVERGATE CAPITAL") STOCK UPON WHICH THESE CLAIMS ARE BASED.

8. Use Part I of this form entitled "Claimant Identification" to identify each beneficial purchaser.

---

[1] This Claim Form incorporates by reference the definitions in the Stipulation and Agreement of Settlement between the Parties, dated May 9, 2025 (the "Stipulation"), and all capitalized terms used, but not defined herein, shall have the same meanings as in the Stipulation or in the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Notice"). Copies of both documents can be obtained at www.SilvergateSecuritiesLitigation.com.

9.  All joint purchasers must sign this Claim Form. Executors, administrators, guardians, conservators, and trustees must complete and sign this Claim Form on behalf of persons represented by them, and their authority must accompany this Claim and their titles or capacities must be stated. The last four digits of the Social Security (or taxpayer identification) number and telephone number of the beneficial owner(s) may be used in verifying the Claim. Failure to provide the foregoing information could delay verification of your Claim or result in rejection of the Claim.

10. **One Claim should be submitted for each separate legal entity or separately managed account.** Separate Claim Forms should be submitted for each separate legal entity (*e.g.*, an individual should not combine his or her IRA transactions with transactions made solely in the individual's name). Generally, a single Claim Form should be submitted on behalf of one legal entity including all holdings and transactions made by that entity on one Claim Form. However, if a single person or legal entity had multiple accounts that were separately managed, separate Claims may be submitted for each such account. The Claims Administrator reserves the right to request information on all the holdings and transactions in Silvergate Capital Stock made on behalf of a single beneficial owner.

11. Agents, executors, administrators, guardians, and trustees must complete and sign the Claim Form on behalf of persons represented by them, and they must:

    (a)    expressly state the capacity in which they are acting;

    (b)    identify the name, account number, Social Security Number (or taxpayer identification number), address, and telephone number of the beneficial owner of (or other person or entity on whose behalf they are acting with respect to) the Silvergate Capital Stock; and

    (c)    furnish herewith evidence of their authority to bind to the Claim Form the person or entity on whose behalf they are acting. (Authority to complete and sign a Claim Form cannot be established by stockbrokers demonstrating only that they have discretionary authority to trade securities in another person's accounts.)

## IDENTIFICATION OF TRANSACTION(S)

12. Use Parts II and III of this form to supply all required details of your transaction(s) in (a) Silvergate Capital common stock and (b) depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A ("Silvergate Capital Preferred Stock" and with Silvergate Capital common stock, "Silvergate Capital Stock"). If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

13. On the schedules, provide all of the requested transaction and holding information with respect to *all* of your transactions in Silvergate Capital Stock, whether or not such transactions resulted in a profit or a loss. Failure to report all such transactions may result in the rejection of your Claim.

14. List each transaction separately and in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day, and year of each transaction you list.

15. You should attach documentation verifying your transactions in Silvergate Capital Stock, such as copies of broker confirmations. Failure to provide this documentation could delay verification of your Claim or result in rejection of your Claim.

16. By submitting a signed Claim Form, you will be swearing to the truth of the statements contained therein and the genuineness of the documents attached thereto, subject to penalties of perjury under the laws of the United States of America. The making of false statements, or the submission of forged or fraudulent documentation, will result in the rejection of your claim and may subject you to civil liability or criminal prosecution.

## OTHER

17. Payments to eligible Authorized Claimants will be made only if the Court approves the Settlement, after any appeals are resolved, and after the completion of all claims processing.

18. If you have questions concerning the Claim Form, or need additional copies of the Claim Form or the Notice, you may contact the Claims Administrator, JND Legal Administration, at the above address, by email at info@SilvergateSecuritiesLitigation.com or by toll-free phone at 866-287-0746, or you can visit the website, www.SilvergateSecuritiesLitigation.com, where copies of the Claim Form and Notice are available for downloading.

19. **NOTICE REGARDING ELECTRONIC FILES:** Certain claimants with large numbers of transactions may request, or may be requested, to submit information regarding their transactions in electronic files. To obtain the mandatory electronic filing requirements and file layout, you may visit the settlement website at

2

www.SilvergateSecuritiesLitigation.com or you may email the Claims Administrator's electronic filing department at SVGSecurities@SilvergateSecuritiesLitigation.com. Any file not in accordance with the required electronic filing format will be subject to rejection. The complete name of the beneficial owner of the securities must be entered where called for. No electronic files will be considered to have been submitted unless the Claims Administrator issues an email confirming receipt of your submission. Do not assume that your file has been received until you receive that email. If you do not receive such an email within 10 days of your submission, you should contact the electronic filing department at SVGSecurities@SilvergateSecuritiesLitigation.com to inquire about your file and confirm it was received.

## IMPORTANT: PLEASE NOTE

**YOUR CLAIM IS NOT DEEMED FILED UNTIL YOU RECEIVE AN ACKNOWLEDGEMENT POSTCARD. THE CLAIMS ADMINISTRATOR WILL ACKNOWLEDGE RECEIPT OF YOUR CLAIM FORM BY MAIL, WITHIN 60 DAYS. IF YOU DO NOT RECEIVE AN ACKNOWLEDGEMENT POSTCARD WITHIN 60 DAYS, CALL THE CLAIMS ADMINISTRATOR TOLL FREE AT 866-287-0746.**

# PROOF OF CLAIM AND RELEASE FORM

| MUST BE POSTMARKED NO LATER THAN _____, 2025 | *In re Silvergate Capital Corporation Securities Litigation*<br>No. 3:22-cv-01936-JES-MSB (S.D. Cal.) | |

**PART I: CLAIMANT IDENTIFICATION**

**Claimant/Representative Contact Information:**
The Claims Administrator will use the contact information for all correspondence relevant to this Claim (including the issuance of the distribution check, if the Claim is ultimately determined to be eligible for payment). If the contact information changes, then you must notify the Claims Administrator in writing at the address identified above.

Claimant's Name (as you would like it to appear on your check if eligible for payment)

Address Line 1 (Number and Street or P.O. Box)

Address Line 2 (if needed)

City                              State or Province          Zip Code

Country name                      Last four digits of Social Security Number (for individuals)

or T.I.N. (for estates, trusts, corporations, etc.)

Representative's Name (if different from the Claimant's Name(s) listed above)

Telephone Number (Work)                          Telephone Number (Home)

Email

4

**PART II: SCHEDULE OF TRANSACTIONS IN SILVERGATE CAPITAL COMMON STOCK**

A. **Purchases: List all purchases of Silvergate Capital Common Stock from November 7, 2019 (including in the November 7, 2019 initial public offering), through May 11, 2023, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Purchase Price (Excluding Commissions) | Check this box if the shares were purchased in or traceable to a 2021 Offering* |
|---|---|---|---|---|
|  |  |  |  | ☐ |
|  |  |  |  | ☐ |
|  |  |  |  | ☐ |
|  |  |  |  | ☐ |

* The 2021 Offerings of Silvergate Capital Common Stock were conducted on or about January 22, 2021 (at an offering price of $63 per share); from March 9, 2021 through May 18, 2021 (at market prices); and on or about December 7, 2021 (at an offering price of $145 per share).  If you purchased shares that were not purchased directly in one of the 2021 Offerings at the offering price, but that you believe are specifically traceable to one of those offerings, you must submit documents with your Claim Form showing that the specific shares that you purchased were issued in that offering.

B. **Purchases: List the total number of shares of Silvergate Capital Common Stock purchased from May 11, 2023, through May 9, 2025, inclusive.**

|  |
|---|
|  |

C. **Sales: List all sales of Silvergate Capital Common Stock from November 7, 2019, through May 9, 2025, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Sales Proceeds (Excluding Commissions) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

D. **Unsold Holdings: List the number of shares of Silvergate Capital Common Stock held as of the close of trading on May 9, 2025. Be sure to attach documentation verifying your holdings such as a current account statement.**

**<u>Quantity of Shares Held</u>**

If you require additional space to list your transactions, use photocopies of this page and check this box. ☐

6

**PART III: SCHEDULE OF TRANSACTIONS IN SILVERGATE CAPITAL PREFERRED STOCK**

A.  **Purchases: List all purchases of Silvergate Capital Preferred Stock from July 29, 2021 (including in the July 29, 2021 initial public offering), through May 11, 2023, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Purchase Price (Excluding Commissions) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

B.  **Purchases: List the total number of shares of Silvergate Capital Preferred Stock purchased from May 12, 2023, through May 9, 2025, inclusive.**

C.  **Sales: List all sales of Silvergate Capital Preferred Stock from July 29, 2021, through May 9, 2025, inclusive. Be sure to attach documentation verifying your transactions.**

| Trade Date (List Chronologically) (Month/Day/Year) | Number of Shares | Price Per Share | Total Sales Proceeds (Excluding Commissions) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

D.  **Unsold Holdings: List the number of shares of Silvergate Capital Preferred Stock held as of the close of trading on May 9, 2025. Be sure to attach documentation verifying your holdings such as a current account statement.**

**Quantity of Shares Held**

**If you require additional space to list your transactions, use photocopies of this page and check this box. ☐**

7

YOU MUST READ THE RELEASE AND YOUR SIGNATURE ON PAGE 10 WILL CONSTITUTE YOUR ACKNOWLEDGMENT OF THE RELEASE.

## PART IV: SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

I (we) submit this Claim Form under the terms of the Settlement described in the notice. I (we) also submit to the jurisdiction of the United States District Court for the Southern District of California with respect to my (our) claim as a Settlement Class Member and for purposes of enforcing the releases set forth in the Settlement and repeated herein. I (we) further acknowledge that I am (we are) bound by and subject to the terms of any judgment that may be entered in the Action. I (we) agree to furnish additional information to the Claims Administrator to support this claim if requested to do so. I (we) have not submitted any other claim covering the same purchases or sales of Silvergate Capital Stock and know of no other person having done so on my (our) behalf.

## PART V: RELEASE

1. I (we) hereby acknowledge, on behalf of myself (ourselves), and each of my (our) heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, anyone claiming through or on behalf of any of them, and any other person or entity legally entitled to bring Released Plaintiffs' Claims on behalf of myself (ourselves), in that capacity (collectively, "Plaintiffs' Releasors"), regardless of whether I, we, or they share in the Settlement Fund, that I (we) fully, finally, and forever compromise, settle, release, resolve, relinquish, dismiss, waive, and discharge each and every Released Plaintiffs' Claim against Defendants and the other Defendants' Releasees, and will forever be barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

2. "Defendants' Releasees" means Defendants and each of their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, heirs, executors, estates, administrators, joint ventures, entities in which they have a controlling interest, partnerships, partners, trustees, trusts, employees, Immediate Family Members, insurers, reinsurers, accountants, auditors, and attorneys, in their capacities as such.

3. "Released Plaintiffs' Claims" means all claims, demands, losses, rights, and causes of action of any nature whatsoever, whether known claims or Unknown Claims, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, common, or foreign law or any other law, rule or regulation, by Plaintiffs, any member of the Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which arise out of, are based upon, or relate in any way to (i) any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to, in the Action, or which could have been alleged in the Action, and/or (ii) the purchase, acquisition, holding, sale, or disposition of the publicly traded common stock of Silvergate Capital during the Class Period and/or the securities issued in or traceable to any of Silvergate Capital's securities offerings during 2021. This release does not include any claims relating to the enforcement of the Settlement.

4. "Unknown Claims" means any Released Plaintiffs' Claims which any Plaintiff or any other Settlement Class Member or any other Plaintiff Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other

Defendant Releasor does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, in each case which, if known by him, her, or it, might have affected his, her, or its decision(s) with respect to this Settlement including but not limited to whether to object to the Settlement or seek exclusion from the Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly waive, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Plaintiffs, Settlement Class Members, and Defendants acknowledge that they may hereafter discover facts in addition to or different from those which he, she, or it or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but, upon the Effective Date of the Settlement, Plaintiffs and Defendants shall expressly settle and release, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and Defendants acknowledge, and each of the other Settlement Class Members and each of the other Plaintiff Releasors and Defendant Releasors shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a material element of the Settlement.

5. This release shall be of no force or effect unless and until the Court approves the Settlement and the Effective Date of the Settlement (as defined in the Stipulation) occurs.

6. I (we) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to the Settlement or any other part or portion thereof.

7. I (we) hereby warrant and represent that I (we) have included information about all of my (our) purchases and sales of Silvergate Capital Stock during the required periods as set forth above.

8. I (we) hereby warrant and represent that I (we) have not submitted any other claim covering the same purchases of Silvergate Capital Stock and knows (know) of no other person having done so on my (our) behalf.

9. I (we) hereby warrant and represent that I am (we are) not excluded from the Settlement Classes as defined in the Notice and that I (we) have not requested to be excluded from the Settlement Classes pursuant to the procedures set forth in the notice.

10. The claimant(s) submit(s) to the jurisdiction of the Court with respect to claimant's (claimants') claim and for purposes of enforcing the releases set forth herein.

11. I (we) agree to furnish such additional information with respect to this Claim Form as Lead Counsel, the Claims Administrator, or the Court may require.

12. The claimant(s) waive(s) the right to trial by jury, to the extent it exists, and agree(s) to the determination by the Court of the validity or amount of this Claim, and waive(s) any right of appeal or review with respect to such determination.

9

**13.** I (we) acknowledge that the claimant(s) will be bound by and subject to the terms of any judgment(s) that may be entered in the Action; and

**14.** I (we) certify that I am (we are) not subject to backup withholding under the provisions of section 3406(a)(1)(c) of the Internal Revenue Code.

**Note:** if you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike out the language that you are not subject to backup withholding in the certification above.

**I (WE) DECLARE THAT THE FOREGOING INFORMATION SUPPLIED BY THE UNDERSIGNED IS TRUE AND CORRECT.**

Executed this _____ day of _____, in _____, _____
                            (Month/Year)                    (City)                      (State/Country)

| | |
|---|---|
| Signature of Claimant | Signature of Joint Claimant, if any |
| Print Name of Claimant | Print Name of Joint Claimant, if any |
| Date | Date |

*If Claimant is other than an individual, or is not the person completing this form, the following <u>also</u> must be provided:*

| | |
|---|---|
| Signature of Person Completing Form | Date |
| Print Name of Person Completing Form or Administrator, see ¶ 11 on page 2) | Capacity of Person(s) Signing (*e.g.*, Beneficial Purchaser, Executor |

### REMINDER CHECKLIST

☐ 1. Please be sure to sign this Claim Form.
☐ 2. Remember to attach **COPIES OF** documentation verifying your transactions listed above.
☐ 3. **DO NOT SEND ORIGINALS OF ANY DOCUMENTS VERIFYING YOUR TRANSACTIONS.**
☐ 4. Keep a copy of your Claim Form for your records.
☐ 5. If you move, please send your new address to the Claims Administrator at the address below:

*Silvergate Capital Corporation Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111
866-287-0746

info@SilvergateSecuritiesLitigation.com

☐ 6. **Do not use highlighter on the Claim Form or supporting documentation.**

10

**Exhibit 3**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |

**SUMMARY NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TO:**  (a) All persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital Corporation ("Silvergate Capital") from November 7, 2019 through March 21, 2023, inclusive (the "Class Period"), and were damaged thereby; and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021 and were damaged thereby (collectively, the "Settlement Class").[1]

**PLEASE READ THIS NOTICE CAREFULLY, YOUR RIGHTS WILL BE AFFECTED BY A CLASS ACTION LAWSUIT PENDING IN THIS COURT.**

YOU ARE HEREBY NOTIFIED, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the U.S. District Court for the Southern District of California (the "Court"), that the above-captioned securities class action (the "Action") is pending in the Court.

YOU ARE ALSO NOTIFIED that Plaintiffs in the Action have reached a proposed settlement of the Action for $37,500,000 in cash (the "Settlement"), that, if approved, will resolve all claims in the Action.

A hearing will be held on _____, 2025 at _:__ _.m., before the Honorable James E. Simmons, Jr. either in person at the U.S. District Court for the Southern District of California, Edward J. Schwartz United States Courthouse, Courtroom 4B, 221 West Broadway, San Diego, CA 92101, or by telephone or videoconference, to determine (i) whether the proposed Settlement should be approved as fair, reasonable, and adequate; (ii) whether, for purposes of the proposed Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (iii) whether the Action should be dismissed with prejudice against Defendants, and the Releases specified and described in the Stipulation and Agreement of Settlement dated May 9, 2025 (and in the Notice) should be granted; (iv) whether the

---

[1] Certain persons and entities are excluded from the Settlement Class by definition as set forth in the full Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice"), available at www.SilvergateSecuritiesLitigation.com.

proposed Plan of Allocation should be approved as fair and reasonable; and (v) whether Lead Counsel's application for an award of attorneys' fees and Litigation Expenses should be approved.

**If you are a member of the Settlement Class, your rights will be affected by the pending Action and the Settlement, and you may be entitled to a payment from the Settlement**. If you have not yet received the Notice and Claim Form, you may obtain copies of these documents by contacting the Claims Administrator at *Silvergate Capital Corporation Securities Litigation*, c/o JND Legal Administration, P.O. Box 91072; Seattle, WA 98111; or info@SilvergateSecuritiesLitigation.com. Copies of the Notice and Claim Form can also be downloaded from the Settlement website, www.SilvergateSecuritiesLitigation.com.

If you are a member of the Settlement Class, in order to be eligible to receive a payment from the Settlement, you must submit a Claim Form *postmarked* **(or submitted online) no later than _____, 2025**. If you are a Settlement Class Member and do not submit a proper Claim Form, you will not be eligible to receive a payment from the Settlement but you will nevertheless be bound by any judgments or orders entered by the Court in the Action.

If you are a member of the Settlement Class and wish to exclude yourself from the Settlement Class, you must submit a request for exclusion such that it is *received* **no later than _____, 2025**, in accordance with the instructions set forth in the Notice. If you properly exclude yourself from the Settlement Class, you will not be bound by any judgments or orders entered by the Court in the Action and you will not be eligible to receive a payment from the Settlement. Excluding yourself is the only option that may allow you to be part of any other current or future lawsuit against Defendants or any of the other released parties concerning the claims being resolved by the Settlement.

Any objections to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for attorneys' fees and Litigation Expenses, must be filed with the Court and delivered to Lead Counsel and Defendants' Counsel such that they are *received* **no later than _____, 2025**, in accordance with the instructions set forth in the Notice.

**Please do not contact the Court, the Clerk's office, Defendants, or their counsel regarding this notice. All questions about this notice, the proposed Settlement, or your eligibility to participate in the Settlement should be directed to the Claims Administrator or Lead Counsel.**

Requests for the Notice and Claim Form should be made to:

*Silvergate Capital Corporation Securities Litigation*
c/o JND Legal Administration
P.O. Box 91072
Seattle, WA 98111
866-287-0746

info@SilvergateSecuritiesLitigation.com
www.SilvergateSecuritiesLitigation.com

Inquiries, other than requests for the Notice and Claim Form, should be made to Lead Counsel:

Cohen Milstein Sellers & Toll PLLC
Attn: Carol V. Gilden
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606

2

Tel.: (312) 629-3737
Email: cgilden@cohenmilstein.com

Bernstein Litowitz Berger & Grossmann LLP
Attn: Jonathan D. Uslaner
2121 Avenue of the Stars
Los Angeles, CA 90067
Tel.: (310) 819-3470
Email: settlements@blbglaw.com

By Order of the Court

3

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB<br><br>CLASS ACTION<br><br>**ORDER PRELIMINARILY APPROVING SETTLEMENT AND AUTHORIZING DISSEMINATION OF NOTICE OF SETTLEMENT**<br><br>**[ECF No. 139]** |

WHEREAS, a consolidated securities class action is pending in this Court entitled *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (the "Action");

WHEREAS, (a) Plaintiffs Indiana Public Retirement System, Boston Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the other members of the Settlement Class (as defined in paragraph 1(pp) below); and (b) defendants Silvergate Capital Corporation ("Silvergate Capital" and together with its subsidiary Silvergate Bank, the "Debtors"), Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Tony Martino, Dennis Frank and Robert Campbell (collectively, the "Individual Defendants" and together with the Debtors, the "Silvergate Defendants") and defendants Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants" and together with the Silvergate Defendants, the "Defendants") have determined to settle all claims asserted against Defendants in this Action with prejudice on the terms and conditions set forth in the Stipulation and Agreement of Settlement dated May 9, 2025 (the "Stipulation"), subject to the approval of this Court (the "Settlement");

WHEREAS, Plaintiffs have made a motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for an order preliminarily approving the

Settlement in accordance with the Stipulation and allowing notice to Settlement Class Members as more fully described herein;

WHEREAS, the Court has read and considered: (a) Plaintiffs' motion for preliminary approval of the Settlement and authorization to send notice of the Settlement to the Settlement Class, and the papers filed and arguments made in connection therewith; and (b) the Stipulation and the exhibits attached thereto; and

WHEREAS, unless otherwise defined in this Order, all capitalized terms herein shall have the same meanings as they have in the Stipulation;

NOW THEREFORE, IT IS HEREBY ORDERED:

1.    **Proposed Class Certification for Settlement Purposes** – The Parties have proposed the certification of the following Settlement Class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure solely for purposes of effectuating the proposed Settlement: (a) all persons and entities who purchased or otherwise acquired the publicly traded common stock of Silvergate Capital from November 7, 2019 through March 21, 2023, inclusive, and were damaged thereby, and (b) all persons and entities who purchased Silvergate Capital securities in and/or traceable to any of Silvergate Capital's securities offerings during 2021, and were damaged thereby.  Excluded from the Settlement Class are (a) Defendants; (b) directors and officers of Defendants (at all relevant times); (c) Defendants' Immediate Family Members and their legal representatives, heirs, successors or assigns; and (d) any entity in which any Defendant has or had a controlling interest; *provided*, *however*, that no Investment Vehicle shall be excluded from the Settlement Class.  Also excluded from the Settlement Class are any persons or entities who or which timely and validly exclude themselves by submitting a request for exclusion that is accepted by the Court.

a.    The Court finds, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure and for purposes of effectuating the proposed Stipulation and the Settlement, that it will likely be able to certify the Settlement Class.

Specifically, the Court finds that each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met or will likely be met: (a) the members of the Settlement Class are so numerous that their joinder in the Action would be impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of Plaintiffs in the Action are typical of the claims of the Settlement Class; (d) Plaintiffs and Lead Counsel have fairly and adequately represented and protected the interests of the Settlement Class; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the Action.

b.      The Court also finds, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure and for purposes of effectuating the proposed Stipulation and the Settlement, that it will likely be able to certify Plaintiffs as Class Representatives for the Settlement Class and preliminarily appoints Lead Counsel as Class Counsel for the Settlement Class, for purposes of the Stipulation and Settlement only, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. Lead Counsel are authorized to act on behalf of the Settlement Class with respect to all acts required by, or which may be undertaken pursuant to, the Stipulation or such other acts that are reasonably necessary to consummate the proposed Settlement set forth in the Stipulation.

2.      **Preliminary Approval of the Settlement** – The Court hereby preliminarily approves the Settlement, as embodied in the Stipulation, and finds, pursuant to Rule 23(e)(1)(B)(i) of the Federal Rules of Civil Procedure, that it will likely be able to approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further consideration at the Settlement Hearing to be conducted as described below.

3.      **Settlement Hearing** – The Court will hold a settlement hearing (the "Settlement Hearing") on November 19, 2025, at 9:00 a.m. in Courtroom 4B of the

Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, CA 92101, for the following purposes: (a) to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Settlement Class, and should be finally approved by the Court; (b) to determine whether, for purposes of the Settlement only, the Action should be certified as a class action on behalf of the Settlement Class, Plaintiffs should be certified as Class Representatives for the Settlement Class, and Lead Counsel should be appointed as Class Counsel for the Settlement Class; (c) to determine whether a Judgment substantially in the form attached as Exhibit B to the Stipulation should be entered dismissing the Action with prejudice against Defendants, without costs to any party; (d) to determine whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; (e) to determine whether Lead Counsel's motion for attorneys' fees and Litigation Expenses should be approved; and (f) to consider any other matters that may properly be brought before the Court in connection with the Settlement. Notice of the Settlement and the Settlement Hearing shall be given to Settlement Class Members as set forth in paragraph 5 of this Order.

4.      The Court may adjourn the Settlement Hearing without further notice to the Settlement Class and may approve the proposed Settlement with such modifications as the Parties may agree to, if appropriate, without further notice.

5.      **Retention of Claims Administrator and Manner of Giving Notice** – Lead Counsel are hereby authorized to retain JND Legal Administration (the "Claims Administrator") to supervise and administer the notice procedure in connection with the proposed Settlement, as well as the processing of Claims as more fully set forth below. Notice of the Settlement and the Settlement Hearing shall be given by Lead Counsel as follows:

(a)      within ten (10) business days of the date of entry of this Order, at no cost to the Settlement Fund, Lead Counsel, the Settlement Class, or the Claims

Administrator, (i) Silvergate Capital shall provide or cause to be provided to the Claims Administrator, in electronic format, records reasonably available to Silvergate Capital or its transfer agent concerning the identity, last known mailing addresses, and, if available, last known email addresses of potential Settlement Class Members, which information the Claims Administrator shall treat and maintain as confidential, and (ii) the Underwriter Defendants shall provide or cause to be provided to the Claims Administrator, in electronic format, records reasonably available to the Underwriter Defendants concerning the identity of persons and entities who purchased Silvergate Capital Stock in the 2021 Offerings, which information the Claims Administrator shall treat and maintain as confidential;

(b)    beginning not later than twenty (20) business days after the date of entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and the Claim Form, substantially in the forms attached hereto as Exhibits 1 and 2, respectively (collectively, the "Notice Packet"), to be mailed by first-class mail or emailed to all potential Settlement Class Members who may be identified through reasonable effort, including those identified by Silvergate Capital and the Underwriter Defendants and through mailing the Notice Packet to the largest and most common brokers and other nominee owners, who will be instructed to forward the Notice Packet or provide names and addresses of Settlement Class Members, as discussed below in paragraph 7;

(c)    by the Notice Date, the Claims Administrator shall cause copies of the Notice and Claim Form to be posted on a website to be developed for the Settlement, from which copies of the Notice and Claim Form can be downloaded;

(d)    not later than ten (10) business days after the Notice Date, the Claims Administrator shall cause the Summary Notice, substantially in the form attached hereto as Exhibit 3, to be published in *The Wall Street Journal* and to be transmitted once over the *PR Newswire*; and

(e)    not later than seven (7) calendar days prior to the Settlement

Hearing, Lead Counsel shall serve on Defendants' Counsel and file with the Court proof, by affidavit or declaration, of such mailing and publication.

6.    **<u>Approval of Form and Content of Notice</u>** – The Court (a) approves, as to form and content, the Notice, the Claim Form, and the Summary Notice, attached hereto as Exhibits 1, 2, and 3, respectively, and (b) finds that the mailing and distribution of the Notice and Claim Form and the publication of the Summary Notice in the manner and form set forth in paragraph 5 of this Order (i) is the best notice practicable under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, of the effect of the proposed Settlement (including the Releases to be provided thereunder), of Lead Counsel's motion for attorneys' fees and Litigation Expenses, of Settlement Class Members' right to object to the Settlement, the Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses, of their right to exclude themselves from the Settlement Class, and of their right to appear at the Settlement Hearing; (iii) constitutes due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1, 78u-4, as amended, and all other applicable law and rules.  The date and time of the Settlement Hearing shall be included in the Notice and Summary Notice before they are mailed and published, respectively.

7.    **<u>Nominee Procedures</u>** – Brokers and other nominees who purchased or otherwise acquired Silvergate Capital common stock during the Class Period or purchased Silvergate Capital Stock in or traceable to the 2021 Offerings for the benefit of another person or entity shall: (a) within seven (7) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Notice Packet to forward to all such beneficial owners and, within seven (7) calendar days

of receipt of those Notice Packets, forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names, mailing addresses, and, if available, email addresses, of all such beneficial owners to the Claims Administrator in which event the Claims Administrator shall promptly mail or email the Notice Packet to such beneficial owners. Upon full compliance with this Order, such nominees may seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such expenses incurred by the nominees shall not exceed $0.05 plus postage at the current pre-sort rate used by the Claims Administrator per Notice Packet mailed; or $0.05 per name, address, and email address (to the extent available) provided to the Claims Administrator. Such properly documented expenses incurred by nominees in compliance with the terms of this Order shall be paid solely from the Settlement Fund, with any disputes as to the reasonableness or documentation of expenses incurred subject to review by the Court.

8. **CAFA Notice** – As provided in the Stipulation, Defendants shall be responsible for serving notice under the Class Action Fairness Act ("CAFA") if they determine it is required, and for coordinating with the Claims Administrator to the extent necessary. Silvergate Capital shall be solely responsible for the costs of the CAFA notices. At least seven (7) calendar days before the Settlement Hearing, or as otherwise ordered by the Court, Defendants shall cause to be served on Lead Counsel and filed with the Court proof, by affidavit or declaration, regarding compliance with CAFA § 1715(b).

9. **Participation in the Settlement** – Settlement Class Members who wish to participate in the Settlement and to be potentially eligible to receive a distribution from the Net Settlement Fund must complete and submit a Claim Form in accordance with the instructions contained therein. Unless the Court orders otherwise, all Claim Forms must be postmarked no later than one hundred twenty

(120) calendar days after the Notice Date. Notwithstanding the foregoing, Lead Counsel may, at their discretion, accept for processing late Claims provided such acceptance does not delay the distribution of the Net Settlement Fund to the Settlement Class. By submitting a Claim, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim and the subject matter of the Settlement.

10. Each Claim Form submitted must satisfy the following conditions: (a) it must be properly completed, signed, and submitted in a timely manner in accordance with the provisions of the preceding paragraph; (b) it must be accompanied by adequate supporting documentation for the transactions and holdings reported therein, in the form of broker confirmation slips, broker account statements, an authorized statement from the broker containing the transactional and holding information found in a broker confirmation slip or account statement, or such other documentation as is deemed adequate by Lead Counsel or the Claims Administrator; (c) if the person executing the Claim Form is acting in a representative capacity, a certification of his, her, or its current authority to act on behalf of the Settlement Class Member must be included in the Claim Form to the satisfaction of Lead Counsel or the Claims Administrator; and (d) the Claim Form must be complete and contain no material deletions or modifications of any of the printed matter contained therein and must be signed under penalty of perjury.

11. Any Settlement Class Member that does not timely and validly submit a Claim Form or whose Claim is not otherwise approved by the Court: (a) shall be deemed to have waived his, her, or its right to share in the Net Settlement Fund; (b) shall be forever barred from participating in any distributions therefrom; (c) shall be bound by the provisions of the Stipulation and the Settlement and all proceedings, determinations, orders, and judgments in the Action relating thereto, including, without limitation, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be forever barred and enjoined from

commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice. Notwithstanding the foregoing, late Claim Forms may be accepted for processing as set forth in paragraph 9 above.

12. **Exclusion from the Settlement Class** – Any member of the Settlement Class who wishes to exclude himself, herself, or itself from the Settlement Class must request exclusion in writing within the time and in the manner set forth in the Notice, which shall provide that: (a) any such request for exclusion from the Settlement Class must be mailed or delivered such that it is received no later than twenty-one (21) calendar days prior to the Settlement Hearing, to: *Silvergate Securities Litigation*, EXCLUSIONS, c/o JND Legal Administration, P.O. Box 91072, Seattle, WA 98111, and (b) each request for exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Settlement Class in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.)"; (iii) state the number of shares of Silvergate Capital common stock that the person or entity requesting exclusion (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023, inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold; (iv) state the number of shares of Silvergate

9                          CASE NO. 22-CV-01936-JES-MSB

Capital common stock and Silvergate Capital Preferred Stock that the person or entity requesting exclusion purchased in or traceable to Silvergate Capital's 2021 Offerings, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold; and (v) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion shall not be effective unless it provides all the required information and is received within the time stated above, or is otherwise accepted by the Court.

13. Any person or entity who or which timely and validly requests exclusion in compliance with the terms stated in this Order and is excluded from the Settlement Class shall not be a Settlement Class Member, shall not be bound by the terms of the Settlement or any orders or judgments in the Action, and shall not receive any payment out of the Net Settlement Fund.

14. Any Settlement Class Member who or which does not timely and validly request exclusion from the Settlement Class in the manner stated in this Order: (a) shall be deemed to have waived his, her, or its right to be excluded from the Settlement Class; (b) shall be forever barred from requesting exclusion from the Settlement Class in this or any other proceeding; (c) shall be bound by the provisions of the Stipulation and Settlement and all proceedings, determinations, orders, and judgments in the Action, including, but not limited to, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be forever barred and enjoined from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative

capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.

15. **Appearance and Objections at Settlement Hearing** – Any Settlement Class Member who or which does not request exclusion from the Settlement Class may enter an appearance in the Action, at his, her, or its own expense, individually or through counsel of his, her, or its own choice, by filing with the Clerk of Court and delivering a notice of appearance to both Lead Counsel and Representative Defendants' Counsel, at the addresses set forth in paragraph 16 below, such that it is received no later than twenty-one (21) calendar days prior to the Settlement Hearing, or as the Court may otherwise direct. Any Settlement Class Member who does not enter an appearance will be represented by Lead Counsel.

16. Any Settlement Class Member who or which does not request exclusion from the Settlement Class may file a written objection to the proposed Settlement, the proposed Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses and appear and show cause, if he, she, or it has any cause, why the proposed Settlement, the proposed Plan of Allocation, and/or Lead Counsel's motion for attorneys' fees and Litigation Expenses should not be approved; *provided, however*, that no Settlement Class Member shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, the proposed Plan of Allocation, and/or the motion for attorneys' fees and Litigation Expenses unless that person or entity has filed a written objection with the Court and served copies of such objection on Lead Counsel and Representative Defendants' Counsel at the addresses set forth below such that they are received no later than twenty-one (21) calendar days prior to the Settlement Hearing.

**Lead Plaintiffs' Counsel**:

Carol V. Gilden
Cohen Milstein Sellers & Toll PLLC
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606

Jonathan D. Uslaner
Bernstein Litowitz Berger & Grossmann LLP
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067

**Representative Defendants' Counsel**:

John P. Stigi III
Sheppard, Mullin, Richter & Hampton LLP
12275 El Camino Real, Suite 100
San Diego, CA 92130-4092

Jason C. Hegt
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020

17. Any objections, filings, and other submissions by the objecting Settlement Class Member must: (a) identify the case name and docket number in *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-01936-JES-MSB (S.D. Cal.); (b) state the name, address, and telephone number of the person or entity objecting and be signed by the objector; (c) state with specificity the grounds for the Settlement Class Member's objection, including any legal and evidentiary support the Settlement Class Member wishes to bring to the Court's attention and whether the objection applies only to the objector, to a specific subset of the Settlement Class, or to the entire Settlement Class; and (d) include documents sufficient to prove membership in the Settlement Class, including documents showing (i) the number of shares of Silvergate Capital common stock that the person or entity (A) owned as of the opening of trading on November 7, 2019 and (B) purchased/acquired and/or sold from November 7, 2019 through March 21, 2023,

inclusive, as well as the dates and prices of each such purchase/acquisition and/or sale and, for each, the numbers of shares purchased/acquired and/or sold, and/or (ii) the number of shares of Silvergate Capital common stock and Silvergate Capital Preferred Stock that the person or entity purchased in or traceable to Silvergate Capital's 2021 Offerings, as well as the dates and prices of each such purchase and the dates and prices of any related sale, if applicable, and, for each, the numbers of securities purchased and/or sold. Documentation establishing membership in the Settlement Class must consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from the objector's broker containing the transactional and holding information found in a broker confirmation slip or account statement. Objectors who enter an appearance and desire to present evidence at the Settlement Hearing in support of their objection must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and any exhibits they intend to introduce into evidence at the hearing.

18. Any Settlement Class Member who or which does not make his, her, or its objection in the manner provided herein shall be deemed to have waived his, her, or its right to object to any aspect of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses and shall be forever barred and foreclosed from objecting to the fairness, reasonableness, or adequacy of the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses, or from otherwise being heard concerning the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses in this or any other proceeding.

19. **<u>Stay and Temporary Injunction</u>** – Until otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination of whether the Settlement should be approved, the Court bars and enjoins Plaintiffs, Plaintiffs' Counsel, and all other members of the Settlement Class

from commencing, instituting, intervening in, participating in, continuing, maintaining, asserting or prosecuting, either directly or indirectly, whether in the United States or elsewhere, on their own behalf or on behalf of any class or any other person, any action, suit, cause of action, claim, or demand with respect to any or all of the Released Plaintiffs' Claims against any of the Defendant Releasees in any court of law or equity, arbitration, tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity, as more fully described in the Stipulation and Notice.

20.    **Settlement Administration Fees and Expenses** – All reasonable costs incurred in identifying Settlement Class Members and notifying them of the Settlement as well as in administering the Settlement shall be paid as set forth in the Stipulation without further order of the Court.

21.    **Settlement Fund** – The contents of the Settlement Fund held by Huntington Bank (which the Court approves as the Escrow Agent) shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as they shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

22.    **Taxes** – Lead Counsel are authorized and directed to prepare any tax returns and any other tax reporting form for or in respect to the Settlement Fund, to pay from the Settlement Fund any Taxes owed with respect to the Settlement Fund, to apply for any tax refund owed to the Settlement Fund, and to otherwise perform all obligations with respect to Taxes and any reporting or filings in respect thereof without further order of the Court in a manner consistent with the provisions of the Stipulation.

23.    **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation, the Settlement is not approved (however, any decision with respect to an application for attorneys' fees or Litigation Expenses, or with any

respect to any Plan of Allocation, shall not be considered grounds for termination), or the Effective Date of the Settlement otherwise fails to occur, this Order shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Order shall be without prejudice to the rights of Plaintiffs, the other Settlement Class Members, and Defendants, and the Parties shall revert to their respective litigation positions in the Action as of March 25, 2025, as provided in the Stipulation.

24. **Use of This Order** – Neither this Order, the Term Sheet, the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Judgment, the Supplemental Agreement, the negotiations leading to the execution of the Term Sheet and the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a) shall be offered or received against any of the Defendant Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendant Releasees with respect to the truth of any fact alleged by Plaintiffs or the validity of any claim or alleged damages that were or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendant Releasees or in any way used or referred to for any other reason as against any of the Defendant Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b) shall be offered or received against any of the Plaintiff Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption,

concession, or admission by any of the Plaintiff Releasees that any of their claims are without merit, that any of the Defendant Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault, or wrongdoing of any kind, or in any way used or referred to for any other reason as against any of the Plaintiff Releasees, in any arbitration proceeding or other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(c)     shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; or

(d)     shall be construed as or received in evidence as an admission, concession or presumption that class certification is or was appropriate in this Action, except for purposes of this Settlement.

*provided, however,* that if the Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted thereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendant Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

25.     **Supporting Papers** – Lead Counsel shall file and serve the opening papers in support of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses no later than

thirty-five (35) calendar days prior to the Settlement Hearing; and reply papers, if any, shall be filed and served no later than seven (7) calendar days prior to the Settlement Hearing.

26. The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

**IT IS SO ORDERED**

Dated:  May 22, 2025

_____
Honorable James E. Simmons Jr.
United States District Judge