**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**COHEN MILSTEIN SELLERS**
   **& TOLL PLLC**
CAROL V. GILDEN (*pro hac vice*)
cgilden@cohenmilstein.com
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Tel: (312) 629-3737

*Lead Counsel for Plaintiffs
and for the Settlement Class*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SILVERGATE CAPITAL CORPORATION SECURITIES LITIGATION | Case No. 3:22-cv-01936-JES-MSB |
| | CLASS ACTION |
| | **JOINT DECLARATION OF JONATHAN D. USLANER AND CAROL V. GILDEN IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES** |
| | Date:  September 3, 2025<br>Time: 9:00 a.m.<br>Dept: 4B<br>Hon. James E. Simmons, Jr. |

JOINT DECL. ISO SETTLEMENT
AND FEE MOTIONS

CASE NO. 22-CV-1936-JES-MSB

# TABLE OF CONTENTS

**PAGE**

I.   HISTORY OF THE ACTION ...............................................................4

    A.   The Appointment of Lead Plaintiffs and Lead Counsel .......................4

    B.   The Investigation and Filing of the Complaint ...................................5

    C.   Defendants' Motions to Dismiss.........................................................7

    D.   The Initial Mediation..........................................................................9

    E.   Silvergate Capital Files for Bankruptcy.............................................10

    F.   Plaintiffs' Work with Experts ............................................................11

    G.   The Parties' Further Mediation Efforts and the Settlement of the Action ........................................................................................11

    H.   The Court Grants Preliminary Approval of the Settlement ................13

    I.   Further Proceedings in the Bankruptcy Court.....................................14

II.   RISKS OF CONTINUED LITIGATION .........................................14

    A.   Ability to Pay Risks............................................................................15

    B.   Risks Concerning Liability and Damages...........................................17

III.   PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REqUIRING ISSUANCE OF NOTICE...................................................................19

IV.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT...............................................................................21

    A.   Exchange Act Recognized Losses......................................................23

    B.   Securities Act Recognized Losses......................................................24

    C.   General Provisions .............................................................................25

V.   THE FEE AND EXPENSE APPLICATION....................................27

    A.   The Fee Application............................................................................27

        1.   Plaintiffs Have Authorized and Support the Fee Application.............................................................................28

        2.   The Work Performed by Plaintiffs' Counsel ..........................28

        3.   The Experience and Standing of Lead Counsel.......................29

4.    The Standing and Caliber of Defendants' Counsel ..................33

5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases...............................................................33

6.    The Reaction of the Settlement Class to the Fee Application...............................................................34

B.    The Expense Application ..................................................35

VI.    CONCLUSION...........................................................................38

## TABLE OF EXHIBITS

| | |
|---|---|
| **Exhibit 1** | Declaration of Layn R. Phillips in Support of Plaintiffs' Motion for Final Approval of Settlement ("Phillips Decl.") |
| **Exhibit 2** | Declaration of Jeffrey M. Gill, General Counsel of Indiana Public Retirement System, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Gill Decl.") |
| **Exhibit 3** | Declaration of Natacha Thomas, General Counsel of Boston Retirement System, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Thomas Decl.") |
| **Exhibit 4** | Declaration of Carlton W. Lenoir, Sr., Executive Director of Public School Teachers' Pension & Retirement Fund of Chicago, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Lenoir Decl.") |
| **Exhibit 5** | Declaration of Virgil Nosè, on Behalf of International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Nosè Decl.") |
| **Exhibit 6** | Declaration of Marlene Igel-Harris, Associate General Counsel, on Behalf of UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Igel-Harris Decl.") |
| **Exhibit 7** | Declaration of Amy Fitzpatrick, Bucks County Solicitor, on behalf of Bucks County Employees Retirement Fund, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fitzpatrick Decl.") |

| **Exhibit 8** | Declaration of Luiggy Segura of JND Legal Administration Regarding: (A) Mailing of Notice and Clam Form; (B) Publication of the Summary Notice; and (C) Requests for Exclusion Received to Date ("Segura Decl.") |
|---|---|
| **Exhibit 9** | Summary of Plaintiffs' Counsel's Lodestar and Expenses |
| **Exhibit 9A** | Declaration of Jonathan D. Uslaner in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| **Exhibit 9B** | Declaration of Carol V. Gilden in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Cohen Milstein Sellers & Toll PLLC |
| **Exhibit 9C** | Declaration of Mark Zigler in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Koskie Minsky LLP |
| **Exhibit 10** | Breakdown of Plaintiffs' Counsel's Expenses by Category |
| **Exhibit 11** | Compendium of Unpublished Authority Cited in Fee Memorandum |

JONATHAN D. USLANER and CAROL V. GILDEN declare as follows:

1.      Jonathan D. Uslaner is a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G").  Carol V. Gilden is a partner in the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein").  BLB&G and Cohen Milstein were appointed Lead Counsel for Lead Plaintiffs Indiana Public Retirement System ("Indiana"), Boston Retirement System ("Boston"), Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers"), International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793"), UMC Benefit Board, Inc. and Wespath Institutional Investments LLC, both as administrative trustees of the Wespath Funds Trust ("Wespath") (collectively, the "Institutional Investors" or "Lead Plaintiffs"); and Bucks County Employees Retirement Fund ("Bucks County," and collectively with the Lead Plaintiffs, "Plaintiffs") and the Settlement Class in the above-captioned action (the "Action").  We have personal knowledge of the matters set forth herein based on our active participation in all aspects of the prosecution and settlement of the Action.

2.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a total cash payment of $37,500,000, plus interest, for the benefit of the Settlement Class.  As detailed herein, the Settlement is a highly favorable outcome for the Settlement Class because it confers a substantial, certain, and near-term recovery for class members while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

3.      The proposed Settlement is the result of extensive efforts by Plaintiffs and Lead Counsel, which included, among other things: (1) conducting an extensive investigation into the alleged fraud, including interviews with 88 former Silvergate employees and a thorough review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call

JOINT DECL. ISO SETTLEMENT                                    CASE NO. 22-CV-1936-JES-MSB
AND FEE MOTIONS                          1

transcripts, news articles, and information from other litigation and public inquiries involving Silvergate and the collapse of FTX; (2) drafting a detailed Consolidated Class Action Complaint (the "Complaint") based on Lead Counsel's extensive investigation; (3) researching and drafting two detailed opposition briefs to the motions to dismiss filed by three sets of Defendants, along with oppositions to two requests for judicial notice, and motions to file under seal; (4) preparing for and conducting oral argument on the motions; (5) consulting extensively with experts, including on issues of damages, loss causation, and traceability; (6) working extensively with bankruptcy counsel to protect the interests of Plaintiffs and the class in light of Silvergate Capital's notice of bankruptcy; and (7) engaging in extended months long arm's-length settlement negotiations overseen by an independent mediator, including through two full-day, in-person mediation sessions seven months apart. Due to these efforts, Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.

4.    The proposed $37.5 million cash Settlement represents a favorable recovery for the Settlement Class under the circumstances. Those circumstances include Silvergate Capital's notice of bankruptcy and the significant ability-to-pay risks resulting from that bankruptcy and the limits on available directors' and officers' insurance. The Settlement ensures that the Settlement Class will receive: (a) $27.5 million from Silvergate Capital's D&O Insurance, which is essentially all of the remaining insurance funds; (b) more than $5 million indirectly from Silvergate's bankruptcy estate by way of the Preferred Equity Holder Contribution,[1] a rare source of recovery in a securities class action with a bankrupt issuer; and

---

[1] As described below, pursuant to the Preferred Equity Holder Contribution, $5.32 million of funds that otherwise would be distributed to holders of preferred stock in Silvergate Capital under the Debtors' Chapter 11 Plan will be paid over to the Settlement Class.

(c) $4.68 million from the Underwriter Defendants.  The recovery also eliminates the real risks that protracted litigation might lead to lesser or no recovery—including very significant risks relating to liability, loss causation, and damages—and guarantees a significant and near-term recovery for the Settlement Class.

5.     The $37.5 million Settlement followed extensive and complex negotiations between experienced counsel, which included two mediation sessions overseen by Layn R. Phillips, a former United States District Judge and experienced mediator of securities class actions and other complex litigation.  The $37.5 million Settlement amount was based on a mediator's recommendation made by Judge Phillips.  Judge Phillips has submitted a declaration in support of the Settlement, which details the Parties' mediation efforts and states that "the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith," and "the Settlement represents a recovery and outcome that is reasonable and fair for the Settlement Class and all Parties involved."  Declaration of Layn R. Phillips in Support of Plaintiffs' Motion for Final Approval of Settlement ("Phillips Decl."), attached hereto as Exhibit 1, at ¶¶ 13, 14.

6.     In addition, each of the Plaintiffs—Indiana, Boston, Chicago Teachers, Local 793, Wespath, and Bucks County—is a sophisticated institutional investor that actively participated in the Action and closely supervised the work of Lead Counsel. All of the Plaintiffs endorse the approval of the Settlement.  *See* Ex. 2 (Gill Decl.), ¶ 2-5; Ex. 3 (Thomas Decl.), ¶ 2-5; Ex. 4 (Lenoir Decl.), ¶ 2-5; Ex. 5 (Nosè Decl.), ¶ 2-5; Ex. 6 (Igel-Harris Decl.), ¶¶ 2-5; Ex. 7 (Fitzpatrick Decl.), ¶¶ 2-5.

7.     As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis taking into the account the different types of legal claims possessed by members of the Settlement Class.

8. For their efforts in achieving the Settlement, Lead Counsel request attorneys' fees of 17% of the Settlement Fund. This request is far below the 25% benchmark and 30% norm for percentage fee awards in the Ninth Circuit and on the very low end of the range of fees that courts in this District and Circuit typically award in connection with comparable settlements. Moreover, the fee request is essentially the same as the lodestar devoted to the case by Plaintiffs' Counsel, representing a multiplier of approximately 1.03. Lead Counsel respectfully submit that the requested fee is fair and reasonable in light of the result achieved in the Action, the efforts of Lead Counsel, and the risks and complexity of the litigation.

## I.      HISTORY OF THE ACTION

### A.      The Appointment of Lead Plaintiffs and Lead Counsel

9. On December 7, 2022, the initial complaint was filed in this Action, asserting violations of the Securities Exchange Act of 1934 ("Exchange Act") against Silvergate Capital, Alan J. Lane, and Antonio Martino. ECF No. 1.

10. On January 19, 2023, BLB&G filed a class action complaint on behalf Local 793 (the "Local 793 Action") that asserted violations of the Exchange Act against Silvergate Capital and certain of its officers, and violations of the Securities Act of 1933 ("Securities Act") against Silvergate Capital, its directors, and the underwriters of Silvergate Capital's January 2021 and December 2021 secondary offerings of common stock. *See Int'l Union of Operating Engineers v. Silvergate Capital Corp.*, No. 3:23-cv-00099-RSH-DEB (S.D. Cal. Jan. 19, 2023), ECF No. 1. This was the first action to assert Securities Act claims arising from this matter.

11. Between January 5, 2023 and February 14, 2023, the Court ordered that several related cases, including the Local 793 Action, be consolidated into this Action. ECF Nos. 11, 13, 17.

12. On February 6, 2023, Indiana, Boston, Chicago Teachers, Local 793, and Wespath (collectively, the "Institutional Investors") filed a motion for appointment to serve as Lead Plaintiffs. ECF No. 16. As set forth in their motion,

the Institutional Investors had the largest financial interest of any of the competing movants and were adequate representatives of the proposed class. *Id*. One other entity initially filed a motion for appointment as lead plaintiff (ECF No. 15), but subsequently filed a notice of non-opposition to the Institutional Investors' motion, recognizing that the Institutional Investors had the largest financial interest (ECF No. 18).

13. On February 28, 2023, the Court (the Honorable Cathy Ann Bencivengo) appointed the Institutional Investors as Lead Plaintiffs for the Action and approved Lead Plaintiffs' selection of Cohen Milstein and BLB&G as Lead Counsel. ECF No. 21

14. On March 16, 2023, the Action was reassigned from Judge Bencivengo to the Honorable James E. Simmons, Jr. for all further proceedings. ECF No. 38.

**B.    The Investigation and Filing of the Complaint**

15. Lead Counsel undertook an extensive investigation regarding the potential claims that could be asserted by Plaintiffs in the Action. This investigation began prior to the Court's appointment of Lead Plaintiffs and continued through the preparation of the Consolidated Amended Class Action Complaint. The investigation included a thorough review and analysis of: (i) Silvergate's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts; (iii) transcripts of Silvergate investor conference calls; (iv) Silvergate investor presentations; (v) press releases and media reports; and (vi) securities pricing data. In addition, in preparation for the Complaint and throughout the litigation, Lead Counsel extensively researched public materials related to the collapse of Silvergate and FTX, including materials from the criminal proceedings against Samuel Bankman-Fried, FTX's bankruptcy proceedings, and other litigation brought against FTX and Silvergate, as well as Congressional testimony, news articles, and reports from regulators including the Federal Reserve and the Consumer Financial Protection Bureau ("CFPB").

16.    In connection with its investigation, Lead Counsel and their in-house investigators made extensive efforts to identify, locate, and interview former employees of Silvergate Capital who might have relevant information pertaining to the claims asserted in the Action.  This included contacting 283 former Silvergate employees who were believed to have potentially relevant information.  Lead Counsel and/or their in-house investigators spoke to 88 of these individuals and Lead Counsel ultimately included information received from six of the former Silvergate employees in the Complaint.

17.    In addition, in connection with the preparation of the Complaint, Lead Counsel consulted with an expert in financial economics with respect to damages and loss causation issues.

18.    On May 11, 2023, Plaintiffs filed and served a Consolidated Amended Class Action Complaint (ECF No. 43) (the "Complaint"), based on this extensive investigation.  The Complaint asserted claims against Silvergate Capital and Alan J. Lane under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Lane under Section 20(a) of the Exchange Act.  Plaintiffs also asserted claims against Silvergate Capital; Alan J. Lane, Paul D. Colucci, Thomas C. Dircks, Michael Lempres, Scott A. Reed, Karen Brassfield, Aanchal Gupta, Colleen Sullivan, Antonio Martino, Dennis Frank, and Robert Campbell (collectively, the "Individual Defendants," and as to Dennis S. Frank and Robert C. Campbell, the "Outside Directors"); and Canaccord Genuity LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, Craig-Hallum Capital Group LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Keefe, Bruyette & Woods, Inc., UBS Securities LLC, and Wedbush Securities Inc. (collectively, the "Underwriter Defendants") under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and against the Individual Defendants under Section 15 of the Securities Act.

19. The Complaint alleged that the Defendants made materially false and misleading statements about Silvergate Bank's vetting, due diligence, and monitoring of customers. Specifically, as to the Exchange Act claims, Plaintiffs alleged that throughout the Class Period, Silvergate Capital and its Chief Executive Officer, Alan Lane, made a series of statements that they knew or, at minimum, were severely recklessly in not knowing were materially false or misleading, and that the price of Silvergate Capital common stock and preferred stock (collectively, "Silvergate Capital Stock") was artificially inflated as a result of the allegedly false and misleading statements, and declined when the truth was revealed. As to the Securities Act claims, Plaintiffs alleged that the Securities Act Defendants were strictly liable for the materially false and misleading statements in the Offering Materials for the 2021 Offerings of Silvergate Capital Stock, which included three secondary offerings of Silvergate Capital common stock and an initial public offering of Silvergate Capital preferred stock.

### C. Defendants' Motions to Dismiss

20. On July 10, 2023, Defendants moved, in three separate motions, to dismiss the Complaint. ECF Nos. 66, 70, 71. In their motions, Defendants asserted that the Complaint failed to sufficiently plead that the statements at issue were materially false or misleading.

21. The Silvergate Defendants argued, among other things, that Plaintiffs had failed to allege that the challenged statements were false or misleading when made and that the existence of the later-revealed FTX fraud could not establish that Silvergate performed no due diligence on FTX or other clients. ECF No. 66, at 10-16. The Silvergate Defendants further contended that Plaintiffs' theory of scienter was implausible, as it was based upon an alleged scheme by which Silvergate performed no due diligence whatsoever on its prospective customers even though Defendants knew this would inevitably have destructive consequences. *Id*. at 18-23.

22.     The Underwriter Defendants additionally asserted that the Plaintiffs had not established statutory standing under Sections 11 and 12 of the Securities Act because they did not plead facts sufficient to show they purchased securities sold in each of the offerings.  ECF No. 71-1, at 1, 7-15.  The Underwriter Defendants also argued that Plaintiffs did not sufficiently allege that the statements included in the 2021 Offering Materials were false or misleading when they were made.  The Underwriter Defendants highlighted the fact that, unlike the Exchange Act claims, which involved dozens of statements that Silvergate and its CEO made from 2019 to 2023, the Securities Act claims were based on only five statements in the 2021 Offering Materials concerning Silvergate's customer diligence practices.  The Underwriter Defendants further pointed to the cautionary language contained in the Offering Materials and argued that in order to show that the statements in the 2021 Offering Materials were false, Plaintiffs would need to show that Silvergate had no customer diligence procedures at all in 2021.  *Id*. at 2, 17-25.

23.     The Outside Directors filed a third motion, joining the arguments of the Silvergate Defendants and Underwriter Defendants and including further arguments that Plaintiffs had not adequately alleged Securities Act claims against them.  ECF No. 70.  Among other arguments, the Outside Directors argued that statements in the Offering Materials they signed concerning Silvergate's "deep-rooted commitment" to compliance, "extensive regulatory compliance diligence" and "thorough reviews" were not the sort of concrete material statements that could be actionable under the Securities Act.  *Id*. at 1.

24.     Defendants' motions to dismiss each also included requests that the Court consider documents incorporated by reference in the Complaint and also take judicial notice of additional documents submitted to the Court, including various SEC filings and other public documents.  In total, the three motions to dismiss and their exhibits and other supporting materials amounted to over 1,100 pages.

25. On September 8, 2023, Plaintiffs filed and served two 35-page memoranda of law in opposition to Defendants' motions to dismiss. ECF Nos. 79, 81. One brief addressed Defendants' motions to dismiss the Exchange Act claims (ECF No. 79), and the other addressed Defendants' motions to dismiss the Securities Act claims (ECF No. 81). Plaintiffs argued that the Complaint adequately identified the false and misleading statements and omissions, detailed the reasons why each challenged statement was materially false and omitted material facts, and raised a strong inference of scienter. ECF No. 79. Plaintiffs also set forth their arguments as to Plaintiffs' standing to assert claims under Sections 11 and 12 of the Securities Act and detailed how the Complaint adequately alleged the falsity of statements included in the 2021 Offering Materials. ECF No. 81.

26. Plaintiffs also objected to Defendants' request for judicial notice. ECF Nos. 80, 82. Plaintiffs argued that certain of Defendants' proffered exhibits were extrinsic evidence that cannot be considered for any purpose, and that other exhibits (certain SEC filings) could potentially be considered by the Court for limited purposes, but not for the improper purpose of contradicting the Complaint's well-pleaded allegations with facts purportedly asserted therein. *Id.*

27. On October 23, 2023, Defendants served their reply papers in further support of their motions. ECF Nos. 89-93.

28. On November 29, 2023, the Court heard oral argument on Defendants' motions. ECF No. 98. Defendants' motions to dismiss remained pending before the Court until they were denied as moot, without prejudice to refiling, in light of this Settlement, on March 26, 2025. ECF No. 130.

**D.    The Initial Mediation**

29. During the Spring of 2024, the Parties first attempted to resolve the Action through mediation and selected Layn R. Phillips, a former United States District Judge, to act as mediator. In advance of the first mediation session, the

Parties exchanged and submitted to Judge Phillips detailed mediation briefs addressing liability and damages.

30.    The Parties participated in a full-day, in-person mediation with Judge Phillips on June 27, 2024 in Corona del Mar, California.  During the mediation session, counsel for Plaintiffs and Defendants presented arguments regarding their clients' respective positions and exchanged multiple rounds of settlement demands and offers, but the Parties were not able to reach an agreement during this session.  However, the Parties continued to engage in settlement negotiations through Judge Phillips, with Defendants providing Plaintiffs further financial information over the next several months.

**E.    Silvergate Capital Files for Bankruptcy**

31.    On September 18, 2024, Silvergate Capital filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

32.    On September 19, 2024, Silvergate Capital filed a Notice of Bankruptcy in this Action.  ECF No. 112.  Silvergate Capital noted that, as a result of its bankruptcy filing, any further action against it was stayed under Bankruptcy Code Section 262(a).  *Id*.

33.    After Silvergate Capital declared bankruptcy, Lead Counsel immediately moved to protect the interests of Plaintiffs and the class in the bankruptcy proceedings.  Lead Counsel retained bankruptcy counsel at Lowenstein Sandler LLP ("Lowenstein Sandler") to help protect the interests of the class.  Lowenstein Sandler worked closely and extensively with Lead Counsel to, among other things, protect the class's rights to the relevant directors and officers insurance policies (the "D&O Insurance"), to protect the rights and interests of the Plaintiffs and the Settlement Class under the various iterations of Silvergate Capital's proposed Chapter 11 plan of reorganization, and to assist Lead Counsel in negotiating the terms of a favorable settlement in light of the bankruptcy.

**F. Plaintiffs' Work with Experts**

34. Throughout the litigation, Plaintiffs consulted with highly qualified experts in a variety of disciplines and on numerous subjects, including damages, loss causation, and securities tracing. These experts provided critical insights and assistance to Plaintiffs and Lead Counsel in the successful prosecution and resolution of this case. These experts included: (a) Chad Coffman, a financial economist, initially of Global Economics Group LLC and later of Peregrine Economics LLP, who served as Plaintiffs' expert on damages and loss causation issues; (b) financial economists at Forensic Economics, Inc., who also worked on damages and loss causation issues; and (c) Professor Joshua Mitts of Columbia Law School who provided expert advice on securities tracing issues relevant to Plaintiffs' Securities Act claims. In addition, as noted above, Lead Counsel also worked extensively with specialized bankruptcy counsel at Lowenstein Sandler.

**G. The Parties' Further Mediation Efforts and the Settlement of the Action**

35. The Parties engaged in further negotiations in light of Silvergate's bankruptcy and ultimately agreed to a second in-person mediation session with Judge Phillips on February 6, 2025. The Parties met for a full-day session with Judge Phillips on that date and continued their negotiations. The participants in the second mediation session included Lead Counsel, bankruptcy counsel for Silvergate Capital, counsel for Silvergate Capital's preferred shareholders, and counsel for Alan Lane, among others. Additionally, bankruptcy counsel for Plaintiffs participated remotely and counsel for the Underwriter Defendants were available and communicated telephonically with Judge Phillips during the mediation session. That mediation session was ultimately unsuccessful, but extensive negotiations continued over subsequent months. The settlement negotiations were exceedingly complex, given the bankruptcy issues and the number of stakeholders involved.

36. Thereafter, Judge Phillips issued a mediator's recommendation proposing that the case be settled for $37.5 million. After further discussion among the Parties, on March 19, 2025, the Parties reached an agreement in principle to settle the Action for the amount Judge Phillips had proposed. On March 25, 2025, the Parties notified the Court of the settlement in principle. In the weeks thereafter, the Parties continued to negotiate the non-monetary terms of their settlement agreement and to draft related settlement documents.

37. On April 22, 2025, the Parties executed a detailed Term Sheet. As set forth in the Term Sheet and subsequently in the Stipulation (ECF No. 139-1), the proposed $37.5 million Settlement will be funded in three parts: (a) $27,500,000 to be paid on behalf of the Silvergate Defendants from the insurance proceeds for which the Individual Defendants are beneficiaries (the "D&O Insurance Contribution"); (b) $4,680,000 to be paid by or on behalf of the Underwriter Defendants (the "Underwriter Contribution"); and (c) $5,320,000 to be paid from the cash distribution made by the Debtors (Silvergate Capital and its subsidiary Silvergate Bank) to the preferred equity holders under the Debtors' Chapter 11 Plan (the "Preferred Equity Holder Contribution"). *See* Stipulation ¶ 10.

38. On April 22, 2025, the Debtors filed in the Bankruptcy Court a motion under Bankruptcy Rule 9019 (the "Rule 9019 Motion") seeking entry of an order approving the Debtors' entry into and performance of their obligations under the Settlement of this Action. The Rule 9019 Motion also sought approval of the Debtors' separate March 27, 2025 settlement term sheet among the Individual Defendants, certain other indemnified individuals, the *ad hoc* group of preferred equity holders and the Debtors (the "Indemnified Individuals Term Sheet"). On the same day, the Debtors also filed a motion (the "Stay Modification Motion") seeking entry of an order modifying the automatic stay under Section 362 of the Bankruptcy Code, to the extent necessary, to permit the Parties to seek and obtain this Court's approval of the Settlement and consummate the Settlement. In advance of these

filings, Lead Counsel and Plaintiffs' bankruptcy counsel reviewed and commented on these filings.

39. On May 9, 2025, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 139-1) ("Stipulation") setting forth the full terms of their agreement to settle the Action. The same day, the Parties also executed a Supplemental Agreement establishing the conditions under which Defendants could terminate the Settlement if persons and entities who request exclusion from the Settlement Class exceeded a certain threshold.

40. On May 13, 2025, the Bankruptcy Court entered an order granting the Stay Modification Motion. *See In re Silvergate Capital Corp.*, No. 1:24-12158-KBO (Bankr. D. Del. May 13, 2025), ECF No. 728. On May 14, 2025, the Bankruptcy Court entered an order granting the Rule 9019 Motion, enabling the Parties to seek preliminary and final approval of the Settlement in this Court. *See In re Silvergate Capital Corp.*, No. 1:24-12158-KBO (Bankr. D. Del. May 14, 2025), ECF No. 732.

**H.     The Court Grants Preliminary Approval of the Settlement**

41. On May 21, 2025, Plaintiffs filed a motion for preliminary approval of the Settlement, which included filing the Stipulation and related papers with the Court. ECF No. 139.

42. On May 22, 2025, the Court entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 140) (the "Preliminary Approval Order") which, among other things: (1) preliminarily approved the Settlement; (2) approved the form of Notice, Summary Notice, and the Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, and publication of the Summary Notice in *The Wall Street Journal* and over the PR Newswire; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense

application, or request exclusion from the Settlement Class; and (4) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also scheduled the Settlement Hearing to determine, among other things, whether the Settlement should be finally approved.[2]

## I.   Further Proceedings in the Bankruptcy Court

43.   On June 24, 2025, Silvergate Capital filed a first amended proposed Chapter 11 Plan in the Bankruptcy Court, and a related Disclosure Statement, which included provisions approving Debtors' entry into the proposed Settlement. *See In re Silvergate Capital Corp.*, No. 1:24-12158-KBO (Bankr. D. Del. June 24, 2025), ECF Nos. 811-814.

44.   The Bankruptcy Court has scheduled a hearing to consider the approval of the Disclosure Statement and related proposed Order for September 5, 2025.

45.   Consistent with the Stipulation, the Settlement is contingent on the Bankruptcy Court's approval of a Chapter 11 Plan and the release of all claims held or potentially held by the Debtors (and their affiliates and assigns) against the Defendant Releasees and the Indemnified Individuals, as approved by a non-appealable order of the Bankruptcy Court, with such release occurring upon the Chapter 11 Plan Effective Date. The Settlement will be effective once this Court has finally approved the Settlement and the Effective Date of the Chapter 11 Plan has occurred. *See* Stipulation ¶¶ 36-37.

## II.   RISKS OF CONTINUED LITIGATION

46.   Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. They recognize, however, the substantial risks that the Settlement Class would have faced in recovering any amount substantially larger

---

[2] The Settlement Hearing was initially scheduled for November 19, 2025 at 9:00 a.m. ECF No. 140, at ¶ 3. On May 29, 2025, the Court rescheduled the Settlement Hearing for September 3, 2025 at 9:00 a.m. ECF No. 141.

than the Settlement in continued litigation, as well as the risks of establishing liability and damages in continued litigation, and the significant delay and expenses that would necessarily be incurred to pursue their claims against Defendants through the resolution of summary judgment, trial, and appeals.

### A.   Ability to Pay Risks

47.   As noted above, Silvergate Capital and two of its affiliates (collectively, the "Debtors") filed for Chapter 11 bankruptcy protection in September 2024, while the motions to dismiss the Complaint in this Action were still being litigated. The notice of bankruptcy automatically stayed all litigation against Silvergate Capital and created significant hurdles for the Settlement Class in obtaining any substantial recovery in this litigation.

48.   The Debtors' filings in the Bankruptcy Court have made clear that, if litigation were to proceed, there likely would not be sufficient funds available in the Debtors' estate to allow payment from the estate to members of the Settlement Class. Securities law claims based on purchases or other acquisitions of common stock are subordinated to the claims of the Debtors' other creditors and preferred shareholders, and are treated as on par with the claims of common stockholders, *see* 11 U.S.C. § 510(b), and the Debtor's filings concerning the available assets of the estate compared to its liabilities showed that the common stockholders would not be able to recover in the bankruptcy. Moreover, the amount of available directors' and officers' insurance was limited and was being continuously diminished as a result of defense costs in this Action, other civil litigation, and government investigations.

49.   In light of these significant ability-to-pay limitations, Plaintiffs and Lead Counsel believe that the $37.5 million Settlement reflects a very favorable outcome for the Settlement Class.

50.   First, the $27.5 million D&O Insurance Contribution constitutes essentially all of the Silvergate Defendants' remaining available insurance. *See* Rule 9019 Motion, at 6, *In re Silvergate Capital Corp.*, Case No. 1:24-12158-KBO

(Bankr. D. Del. Apr. 22, 2025), ECF No. 664 ("The Proposed Securities Litigation Settlement contemplated a total settlement amount of $37.5 million, of which $27.5 million would be paid *from all remaining D&O insurance proceeds*") (emphasis added); *id.* at 11 ("Approximately $27.5 million in insurance currently remains available under the D&O Policies.").

51. In addition to maxing out the available insurance, the Settlement Class will also receive an additional $5,320,000 payment indirectly from Silvergate Capital's estate by way of the Preferred Equity Holder Contribution. The holders of Silvergate Capital's preferred equity were actively involved in the settlement negotiations for the Action (through their counsel). The preferred equity holders are the "fulcrum" stakeholders in Silvergate's bankruptcy—that is, the group in priority order under the bankruptcy that is expected to receive the estate's last available dollars—and thus have the most direct interest in how the estate is managed in order to maximize that recovery. Here, the preferred equity holders have agreed to allow $5,320,000 from the funds that would otherwise be distributed to them in the bankruptcy to be paid to the Settlement Class in order to permit a global settlement that would also resolve the significant indemnity claims against the estate and the complex legal issues associated therewith, which would materially reduce legal costs of the estate.

52. Because securities class action claims are subordinated in bankruptcy, this type of monetary contribution to a settlement from an insolvent debtor is not common and represents a favorable outcome for the Settlement Class.

53. Finally, the Underwriter Defendants have also agreed to contribute an additional $4,680,000 to the Settlement. Plaintiffs and Lead Counsel believe that the proposed Settlement is the best result that could realistically be achieved under these circumstances.

## B.   Risks Concerning Liability and Damages

54.    In addition to the above considerations, the Action also presented several substantial risks to establishing liability. Plaintiffs would have faced substantial risks in establishing each of the required elements of falsity, scienter, loss causation, and damages.

55.    *First*, Plaintiffs faced challenges at trial in establishing that each misstatement was false and misleading.  Plaintiffs alleged that, from 2019 through 2023, Defendants repeatedly assured investors and the public that Silvergate Capital had instituted adequate due diligence procedures for the customers it chose to onboard.  However, Defendants maintained that the Complaint included accounts of unreliable former employees, and that the FTX fraud could not retroactively establish that Silvergate Capital had failed to perform adequate due diligence.  In support of this argument, Plaintiffs anticipate that Defendants would pursue discovery and seek to establish that the frauds perpetrated by FTX and other bank customers were unique, unforeseeable, and undetectable.

56.    *Second*, with respect to scienter for the Exchange Act claims, Defendants contended that they did not act with fraudulent intent.  Specifically, the Exchange Act Defendants argued that, even if they were aware of some shortcomings in Silvergate's due diligence protocols, it was not plausible that they would deliberately perform no due diligence for the sake of allowing any entity wanting to use their banking services to do so.

57.    With respect to the Securities Act claims against the Underwriter Defendants and Silvergate's directors, while there was no scienter requirement as to these claims, the set of alleged misstatements contained in the Offering Materials was substantially narrower than the misstatements at issue for the Exchange Act claims.  The Securities Act Defendants strenuously argued that the statements in the Offering Materials about Silvergate's customer diligence procedures were either too general to be actionable or could not be shown to be false when made.  To succeed

on these claims, Plaintiffs would likely have had to establish that Silvergate essentially did not have any customer diligence practices at all, which might have been difficult to establish. Even then, the Securities Act Defendants could assert a due diligence defense to liability, creating additional risks for Plaintiffs. Accordingly, there were substantial risks to success on the Securities Act claims.

58. ***Third***, Plaintiffs faced risks in proving price impact, loss causation, and damages. The Parties' disputes concerning the amount of the Company's stock price drops attributable to the alleged fraud (versus other confounding factors, *i.e.*, negative causation) would be a hotly contested issue at class certification, summary judgment, and trial, with Plaintiffs and Defendants providing dueling expert testimony. Defendants were expected to argue that Plaintiffs could not appropriately disaggregate the impact of information that was not related to the alleged false and misleading statements and omissions on the price declines at issue. This dispute would have led to "battles-of-the-experts" that would create significant uncertainty and risks to recovery.

59. All of these issues would be litigated over many years. At the time the Settlement was reached, the motions to dismiss had not yet been resolved (and the resolution of the motions might have narrowed Plaintiffs' claims). Thereafter, Plaintiffs would have had to prevail on a contested motion for class certification, at summary judgment, and a trial. Even if Plaintiffs ultimately prevailed at trial, they still faced likely appeals—a process that could extend for years and might lead to a smaller recovery, or no recovery at all. As noted above, given the Company's ongoing bankruptcy proceedings and wasting insurance, any further prolonged litigation created very substantial risks of non-recovery, even if Plaintiffs were successful on the merits.

60. In sum, given the very significant risks of continued litigation and the range of potential outcomes at trial and on appeal, Plaintiffs and Lead Counsel

strongly believe that the $37.5 million Settlement represents a highly favorable result for the Settlement Class.

## III. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

61. The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to Settlement Class Members as set forth in that Order. The Preliminary Approval Order also set August 13, 2025 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class.

62. In accordance with the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, who was hired following a bid process, to begin disseminating copies of the Notice and Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the reasons for the Settlement, the proposed Plan of Allocation, and information about Settlement Class Members' rights to participate in the Settlement and object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 17% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $1.4 million. *See* Notice ¶¶ 5, 43.

63. To disseminate the Notice and Claim Form (together, the "Notice Packet"), JND obtained information from Silvergate Capital and the Underwriter Defendants and from banks, brokers, and other nominees regarding the names and

---

JOINT DECL. ISO SETTLEMENT AND FEE MOTIONS

CASE NO. 22-CV-1936-JES-MSB

19

addresses of potential Settlement Class Members.  The accompanying Declaration of Luiggy Segura ("Segura Decl."), attached hereto as Exhibit 8, provides additional information about the Claims Administrator's distribution of the Notice Packet.  *See* Segura Decl. ¶¶ 3-11.

64.    JND began mailing copies of the Notice Packet to potential Settlement Class Members and nominee owners on June 16, 2025.  *Id*. ¶¶ 4-7.  As of July 29, 2025, JND had mailed a total of 208,165 Notice Packets to potential Settlement Class Members and nominees.  *Id*. ¶ 11.

65.    On July 8, 2025, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*.  *Id*. ¶ 12.

66.    Lead Counsel also caused JND to establish a dedicated settlement website, www.SilvergateSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as copies of the Complaint, Stipulation, Preliminary Approval Order, and other relevant documents.  *See* Segura Decl. ¶ 13. That website became operational on June 13, 2025.  *Id*.  The website also allows Settlement Class Members to submit their claims online if they wish to do so.  Lead Counsel and JND have regularly monitored the settlement website to ensure that it is operating correctly.  Lead Counsel and JND will continue to monitor and to update the settlement website as the settlement process continues.  For example, Plaintiffs' papers in support of their motion for final approval of the Settlement and Lead Counsel's papers in support of their motion for attorneys' fees and Litigation Expenses will be made available on the case website after they are filed, and any orders entered by the Court in connection with those motions will also be posted. Lead Counsel also published copies of the Notice and Claim Form to their firm websites, www.blbglaw.com and www.cohenmilstein.com.

67.   As noted above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, or Fee and Expense Application or to request exclusion from the Settlement Class is August 13, 2025.  To date, no objections to the Settlement, Plan of Allocation, or Lead Counsel's forthcoming Fee and Expense Application have been received.  Plaintiffs and Lead Counsel will file reply papers on or before August 27, 2025, that will address any objections that may be received.

## IV.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

68.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than October 21, 2025.  The Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

69.   Lead Counsel consulted with Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation" or "Plan").  Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the alleged violations of the federal securities laws taking into account the securities involved and the types of claims that could be asserted.

70.   The Plan of Allocation is set forth at pages 17 to 28 of the Notice.  *See* Segura Decl., Ex. A at pp. 17-28.  As described in the Notice, the calculations under the Plan of Allocation are intended as a method to weigh the claims of Class Members against one another for the purposes of making an equitable *pro rata* allocation of the Net Settlement Fund.  *See* Notice ¶ 61.

71.    The Plan is based on Plaintiffs' allegations (i) that Defendants' materially false and misleading statements and omissions caused artificial inflation in the prices of Silvergate Capital Stock during the Class Period in violation of the Exchange Act, and that a series of public disclosures that each partially corrected the alleged misrepresentations and omissions removed that inflation, and (ii) that the Offering Materials for Silvergate Capital's 2021 securities offerings were materially misleading, allowing investors who purchased stock in or traceable to those offerings to recover under the Securities Act.[3]

72.    The portions of the Settlement Fund paid on behalf of the Individual Defendants (the D&O Insurance Contribution) and Silvergate Capital's bankruptcy estate (the Preferred Equity Holder Contribution) will make up the "Exchange Act Fund." Notice ¶ 62. The Exchange Act Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of each Claimant's claim under the Exchange Act (referred to as their "Exchange Act Recognized Loss"). *Id.* ¶ 63. The portion of the Settlement Fund paid by the Underwriter Defendants (the Underwriter Defendants Contribution) will be the "Securities Act Fund." *Id.* ¶ 62. The Securities Act Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Securities Act Recognized Losses. *Id.* ¶ 63.

73.    If a Claimant has a claim under both the Exchange Act and Securities Act for the same purchase of Silvergate Capital Stock, they will be able to recover in both Funds for that purchase. In general, all Settlement Class Members should have potential Exchange Act Recognized Losses if they purchased Silvergate Capital

---

[3] Silvergate Capital's securities offerings during 2021 (the "2021 Offerings") included (a) three offerings of Silvergate Capital common stock conducted on or about January 22, 2021, March 9, 2021 through May 18, 2021, and December 7, 2021, and (b) an initial public offering of depositary shares representing a 1/40th interest in a share of 5.375% Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A (the "Silvergate Capital Preferred Stock" and, with Silvergate Capital common stock, "Silvergate Capital Stock"), conducted on or around July 29, 2021.

Stock during the Class Period and held those shares through at least one of the alleged corrective disclosure and suffered a loss. The subset of Settlement Class Members who purchased their shares of Silvergate Capital Stock in or traceable to one of the 2021 Offerings will be eligible for an additional payment from the Securities Act Fund.

A.    **Exchange Act Recognized Losses**

74.    The Plan calculates an "Exchange Act Recognized Loss" amount for each purchase or acquisition of Silvergate Capital Stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the Claimant. The calculation of Exchange Act Recognized Loss under the Plan will depend on when the Claimant purchased and/or sold their shares, whether the Claimant held their shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of their shares when the Claimant purchased, sold, or held them.

75.    In developing the Plan, Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share closing prices of Silvergate Capital Stock which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period. *See* Notice ¶ 65. In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered the price changes in Silvergate Capital Stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. *Id*.

76.    In general, Exchange Act Recognized Loss amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. Notice ¶¶ 67,

69. For shares sold before November 8, 2022, the Exchange Act Recognized Loss is zero, because those shares were sold before the first alleged corrective disclosure and thus were not damaged by the alleged fraud. *Id.* ¶¶ 67.B(i), 69.B(i). For shares sold from November 9, 2022 through the end of the Class Period (March 20, 2023), the Exchange Act Recognized Loss is the lesser of (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price. *Id.* ¶¶ 67.B(ii), 69.B(ii).

77. For shares sold during the 90-day period after the end of the Class Period, the Exchange Act Recognized Loss is the least of the (a) artificial inflation at the time of purchase; (b) the difference between the purchase price and the sale price; or (c) the difference between the purchase price and the average closing price of the stock during that period. *Id.* ¶¶ 67.B(iii), 69.B(iii). Finally, for shares still held as of May 9, 2025 (the end of the 90-day lookback period), the Exchange Act Recognized Loss is the lesser of (a) the artificial inflation at the time of purchase or (b) the average closing price for the stock during the 90-day period ($1.27 for common stock and $8.36 for preferred stock). These provisions of the Plan track the statutory provisions of the PSLRA, which require that any plaintiffs' recovery under the Exchange Act be limited to the difference between the purchase price paid and the average trading price of the security during the 90-day period after the information correcting the misstatement was disseminated to the market. *See* 15 U.S.C. § 78u-4(e)(1).

**B.     Securities Act Recognized Losses**

78. As discussed above, Claimants who purchased Silvergate Capital Stock in or traceable to one of the 2021 Offerings will also be eligible for a Securities Act Recognized Loss for those shares. *See* Notice ¶¶ 70-75.

79. The Securities Act Recognized Loss is generally calculated using the measure of damages in Section 11 of the Securities Act, 15 U.SC. § 77k(e), except

that no recovery is permitted for shares sold before November 9, 2022 because Plaintiffs believe that Defendants would likely succeed in establishing a defense of negative causation with respect to those shares. *See* Notice ¶¶ 71A, 72A, 73A, 75A. Specifically, because information about the FTX scandal and Silvergate's lack of customer diligence had not yet been revealed, Defendants would likely be able to show that any price declines before that date were unrelated to the alleged false statements.

80. All shares of Silvergate Capital common stock purchased directly in one of the three secondary offerings of common stock that occurred in 2021 are potentially eligible for a Securities Act Recognized Loss. *See* Notice ¶¶ 71, 72, 73. For shares of common stock that were not directly purchased in an Offering, claimants who can establish through documentation that the specific shares that the claimant purchased were issued in the one of the Offerings at issue will also be eligible for a Securities Act Recognized Loss. *Id.* All shares of Silvergate Capital Preferred Stock either purchased directly in the initial offering of that security in July 2021 or purchased in the open market through May 11, 2023, are potentially eligible for a Securities Act Recognized Loss, *id.* ¶ 75, because such purchasers can automatically trace their preferred shares to the Offering as only preferred shares issued in the Offering were traded during this period.

**C. General Provisions**

81. The Exchange Act Fund will be distributed on a *pro rata* basis to Authorized Claimants based on their total Exchange Act Recognized Loss and the Securities Act Fund will be distributed on a *pro rata* basis to Authorized Claimants based on their Securities Act Recognized Loss. Specifically, a "Distribution Amount" will be calculated for each Authorized Claimant, which will be (a) the Authorized Claimant's total Exchange Act Recognized Loss divided by the total Exchange Act Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Exchange Act Fund, plus (b) the Authorized Claimant's total

Securities Act Recognized Loss divided by the total Securities Act Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Securities Act Fund. Notice ¶ 81.

82. The Net Settlement Fund will be allocated among all Authorized Claimants whose Distribution Amount is $10.00 or greater. If any Authorized Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to that Authorized Claimant. Those funds will be included in the payments to Authorized Claimants with Distribution Amounts over $10.00. Notice ¶ 82.

83. The Claims Administrator will calculate Claimants' Recognized Losses under the Plan using the transaction information that Claimants provide to the Claims Administrator in their Claim Forms. Once the Claims Administrator has processed all submitted claims, notified Claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will make distributions to eligible Authorized Claimants in the form of checks and wire transfers.

84. One-hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 83. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will the funds be contributed to one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be selected by Lead Counsel and approved by the Court. *Id*.

85. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members

based on the nature of their claims.  To date, no objections to the proposed Plan of Allocation have been received.

## V.    THE FEE AND EXPENSE APPLICATION

86.    Lead Counsel are applying to the Court for an award of attorneys' fees of 17% of the Settlement Fund, including interest as earned on that portion of the Settlement Fund (the "Fee Application") for all Plaintiffs' Counsel.[4]  Lead Counsel also request payment from the Settlement Fund of expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action.  This request is in accordance with *ex ante* agreements negotiated between BLB&G and certain of the Lead Plaintiffs—the most restrictive of several retainer agreements entered into between Plaintiffs and the Lead Counsel firms at the outset of the Action.

87.    The legal authorities supporting the requested fees and expenses are discussed in Lead Counsel's Fee Memorandum. As discussed in the Fee Memorandum, the 17% fee award requested is far below the benchmark for percentage fee awards in the Ninth Circuit, is well within the range of percentage fees typically awarded in comparable securities class actions in this Circuit and elsewhere, and is fair and reasonable in light of all the circumstances in this case.

### A.    The Fee Application

88.    For the efforts of Plaintiffs' Counsel on behalf of the Settlement Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee Memorandum, the percentage method is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  Use of the percentage method has been

---

[4] "Plaintiffs' Counsel" are Lead Counsel, BLB&G and Cohen Milstein, and Koskie Minsky LLP ("Koskie Minsky"), additional counsel for Lead Plaintiff Local 793.

recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature where an all-cash common fund has been recovered for a class.

### 1. Plaintiffs Have Authorized and Support the Fee Application

89. Plaintiffs Indiana, Boston, Chicago Teachers, Local 793, Wespath, and Bucks County are each sophisticated institutional investors that have closely supervised and monitored the prosecution and settlement of this Action. *See* Gill Decl. ¶¶ 2-4; Thomas Decl. ¶¶ 2-4; Lenoir Decl. ¶¶ 2-4; Nosè Decl. ¶¶ 2-4; Igel-Harris Decl. ¶¶ 2-4; Fitzpatrick Decl. ¶¶ 2-4. Plaintiffs have each evaluated the Fee Application and fully support the fee requested. *See* Gill Decl. ¶ 6; Thomas Decl. ¶ 6; Lenoir Decl. ¶ 6; Nosè Decl. ¶ 6; Igel-Harris Decl. ¶ 6; Fitzpatrick Decl. ¶ 6. Plaintiffs believe that the proposed fee of 17% is fair and reasonable in light of the result obtained for the Settlement Class, the work performed by Plaintiffs' Counsel, and the risks counsel faced. *Id*.

### 2. The Work Performed by Plaintiffs' Counsel

90. Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. The work that Plaintiffs' Counsel performed in this Action included, among other things: (1) conducting an extensive investigation into the alleged fraud, including interviews with dozens of former Silvergate employees and a thorough review of public information such as SEC filings, analyst reports, conference call transcripts, news articles, and information from other litigation and public inquiries involving Silvergate and FTX; (2) drafting a detailed Complaint based on Lead Counsel's extensive investigation; (3) researching and drafting two detailed opposition briefs to the motions to dismiss filed by three sets of Defendants, including oppositions to two requests for judicial notice filed by Defendants and motions to seal; (4) conducting oral argument on the motions; (5) consulting extensively with experts, including on issues of damages, loss causation, and traceability; (6) working extensively with bankruptcy counsel to protect the interest of Plaintiffs and the class in light of Silvergate Capital's bankruptcy; and

(7) engaging in extended arm's-length settlement negotiations overseen by an independent mediator, including through two mediation sessions that took place seven months apart and which included extended discussions and negotiations over several months following the sessions.

91.   Attached hereto as Exhibits 9A, 9B, and 9C are Declarations from Jonathan D. Uslaner on behalf of BLB&G, Carol V. Gilden on behalf of Cohen Milstein, and Mark Zigler on behalf of Koskie Minsky, in support of the motion for attorneys' fees and Litigation Expenses.  The first page of Exhibit 9 contains a summary chart of the hours expended and lodestar amounts for each firm, as well as a summary of each firm's Litigation Expenses. Included within each supporting Declaration are schedules summarizing the hours and lodestar of each firm from the inception of the case through June 30, 2025; a summary of Litigation Expenses, by category; and a firm resume, among other documents. No time expended in preparing the application for fees and expenses has been included.

92.   As set forth in Exhibit 9, Plaintiffs' Counsel collectively expended a total of 6,761.5 hours in the prosecution of the Action from its inception through June 30, 2025, for a lodestar of $6,181,391.30.  The requested fee of 17% of the Settlement Fund would be $6,375,000 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 1.03 of Plaintiffs' Counsel's lodestar.  As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is below the range of multipliers typically seen in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3.   The Experience and Standing of Lead Counsel

93.   A copy of Lead Counsel BLB&G's firm resume, which includes information about the standing of the firm, is attached as Exhibit 9A-3.

94.   As demonstrated by its firm resume, BLB&G is among the most experienced and skilled law firms in the securities litigation field and in the country,

with a long and successful track record representing investors in such cases. BLB&G is consistently ranked among the top plaintiffs' firms in the country. BLB&G was recently ranked as the top firm in the nation for plaintiff-side securities litigation work in *Chambers USA*'s 2025 guide. In addition, as reflected in ISS/Securities Class Action Services' latest report on the "Top 100 U.S. Class Action Settlements of All Time," BLB&G has been lead or co-lead counsel in more top recoveries than any other firm in U.S. history. Further, BLB&G has taken complex cases such as this to trial, and is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. This willingness and ability added valuable leverage in the settlement negotiations.

95. For example, BLB&G served as Lead Counsel in *In re WorldCom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.), in which settlements were obtained for the class totaling in excess of $6 billion. BLB&G also secured a resolution of $2.43 billion for the class in *In re Bank of America Corp. Securities, Derivative & "ERISA" Litigation*, No. 09-md-2058 (S.D.N.Y.); a $1.06 billion recovery for the class in *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, No. 05-cv-1151 (D.N.J.); a $1 billion recovery for the class in *In re Wells Fargo & Co. Securities Litigation*, No. 1:20-cv-04494-GHW-SN (S.D.N.Y.), in which it worked with Cohen Milstein as Co-Lead Counsel; and a $730 million settlement on behalf of the class in *In re Citigroup Inc. Bond Action Litigation*, No. 08-cv-9522 (S.D.N.Y.).

96. Courts in this District and Circuit have recognized BLB&G as qualified class counsel in securities class actions. Such examples include *In re Qualcomm Inc. Securities Litigation*, No. 3:17-cv-00121-JO-MSB (S.D. Cal.), in which BLB&G recovered $75 million for the class in this District last year; *In re McKesson HBOC, Inc. Securities Litigation*, No. 99-cv-20743 (N.D. Cal.), in which BLB&G recovered $1.05 billion for investors, the largest recovery in a securities class action in the Ninth Circuit; *Hefler v. Wells Fargo & Company*, No. 16-cv-5479 (N.D. Cal.),

in which BLB&G recovered $480 million for investors; *In re Allergan, Inc. Proxy Violation Securities Litigation*, No. 14-cv-2004 (C.D. Cal.), in which BLB&G recovered $250 million for investors; and *In re New Century Securities Litigation*, No. 07-cv-931 (C.D. Cal.), in which BLB&G secured an approximately $125 million recovery for investors.

97.    As demonstrated by its firm resume, Cohen Milstein is also regarded as one of the top plaintiff-side law firms in the country. A copy of Lead Counsel Cohen Milstein's firm resume, which includes information about the standing of the firm, is attached as Exhibit 9B-3.  In 2025, *The National Law Journal* named the firm Plaintiff Law Firm of the Year.  In addition, Cohen Milstein's Securities Litigation & Investor Protection practice is ranked as among the nation's leading practices of its kind, including being named Securities Practice of the Year by *The National Law Journal* (2024) and *Law360* (2020, 2022, 2023). In addition, *Chambers USA*, *Legal 50*, and *Benchmark Litigation* consistently rank the firm among the top plaintiff-side securities litigation practices in the nation.

98.    Cohen Milstein has recovered billions of dollars for its public pension fund and Taft-Harley fund clients, and other institutional investor clients, including in some of the largest and most complex securities class actions in recent history. For example, together with BLB&G as Co-Lead Counsel noted above, Cohen Milstein obtained a $1 billion settlement for the class in *In re Wells Fargo & Co. Securities Litigation*, No. 1:20-cv-04494-JLR-SN (S.D.N.Y.), which is the 17th largest securities class action settlement ever, the sixth largest in the last decade, the ninth largest ever in the Second Circuit, and the largest ever without a restatement or related actions by the Securities Exchange Commission or U.S. Department of Justice.

99.    Cohen Milstein also recovered more than $2.5 billion for investors in a dozen mortgage-backed securities ("MBS") class actions, including landmark settlements of $500 million on behalf of institutional investor clients against not only

Countrywide Financial Corporation (*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302 (C.D. Cal.)), but also against Bear Stearns (*In re Bear Stearns Mortgage Pass-Through Litig.*, No. 1:08-cv-08093-LTS (S.D.N.Y.)). Other MBS settlements include: a $275 million settlement in an MBS class action against the Royal Bank of Scotland (*New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp., plc, et al.*, No. 1:08-cv-05310-DAB-HBP (S.D.N.Y.)); $335 million in settlements in a class action against Residential Accredit Loans, Inc. and various investment banks (*New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 1:08-cv-08781 (KPF) (S.D.N.Y.)); a $165 million settlement in a class action against various underwriters (*New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc., et al.*, No. 08-cv-5310 (DAB) (S.D.N.Y.)); and a $110 million settlement in a class action against Credit Suisse AG and its affiliates (*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al.*, No. 08-5653 (PAC) (S.D.N.Y.)).

100.   In just over the past decade, Cohen Milstein has achieved well over $1 billion in securities class action and shareholder derivative settlements in California federal and state courts and other courts throughout the Ninth Circuit. For example, Cohen Milstein, as lead or co-lead counsel, recovered $500 million on behalf of institutional investor clients against Countrywide Financial Corporation (noted above) before the Central District of California; a historic $310 million commitment from Alphabet's board of directors to fund workplace policies and institute robust corporate reforms (*In re Alphabet S'holder Derivative Litig.*, No. 19-CV-341522 (Sup. Crt. Cal., Santa Clara Cnty.)); a $90 million settlement and landmark corporate governance reforms from Wynn Resorts' board of directors (*In re Wynn Resorts, Ltd. Derivative Litig.*, No. A-18-769630-B (Eighth Jud. Dist. Crt., Clark Cnty., Nev.)); a $50 million settlement against SanDisk LLC (*In re SanDisk LLC Sec. Litig.*, No. 15-cv-01455-VC (N.D. Cal.)); a $50 million funding commitment from Pinterest's board of directors for workplace policy changes and board reforms (*In re*

*Pinterest Derivative Litig.*, No. 3:20-cv-08331-WHA (N.D. Cal.)); preliminary approval of a $38 million settlement against Bayer AG on June 27, 2025 (*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 3:20-cv-04737-RS (N.D. Cal.)); *Public School Teachers' Pension and Retirement Fund v. Gary S. Guthart, et al. (Intuitive Surgical Derivative Litigation)*, No. 2014 CIV-526930 (Sup. Ct., San Mateo County) ($15 million monetary package plus extensive governance reforms valued at $117 million); and a $7 million settlement in *In re Tintri, Inc. Sec. Litig.*, No. 17-CIV-04312 (Sup. Crt., San Mateo Cnty., Cal.).

### 4. The Standing and Caliber of Defendants' Counsel

101. Defendants were represented in the Action by extremely able counsel from Sheppard, Mullin, Richter & Hampton LLP; Latham & Watkins LLP, Goodwin Procter LLP, and Cravath Swaine & Moore LLP, among others, all of whom vigorously represented their clients in the Action. In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that are highly favorable to the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

102. The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. The risks assumed by Lead Counsel here, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

103. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that the prosecution of the case would require. In undertaking that responsibility,

Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors, experts and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation often proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel have received no compensation during the course of this Action and no reimbursement of any out-of-pocket expenses.

104. Lead Counsel also bore the risk that no recovery would be achieved in the Action. As discussed above, this case presented a number of significant trial risks and uncertainties from the outset, including challenges in proving the materiality and falsity of Defendants' statements, and establishing causation and damages. These risks were heightened in this case because ability-to-pay issues stemming from Silvergate's bankruptcy and the unique complexities involved in that bankruptcy, all of which created further substantial risks of no recovery or limited recovery.

105. The Settlement was reached only after more than two years of litigation in the face of these risks. Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.

**6.     The Reaction of the Settlement Class to the Fee Application**

106. As noted above, as of July 29, 2025, more than 208,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 17% of the Settlement Fund. *See* Segura Decl. ¶ 11 and Ex. A (Notice ¶¶ 5, 43). In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and

transmitted over the *PR Newswire* on July 8, 2025. *See* Segura Decl. ¶ 12. To date, no objections to the request for attorneys' fees have been received.

**B.     The Expense Application**

107.   Lead Counsel also seek payment from the Settlement Fund of the Litigation Expenses that Plaintiffs' Counsel reasonably incurred in connection with commencing, litigating and settling the claims asserted in the Action.

108.   From the outset of the Action, Lead Counsel have been aware that they might not recover any of the expenses they incurred, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

109.   As set forth in Exhibit 9 hereto, Plaintiffs' Counsel have paid or incurred a total of $991,648.74 in Litigation Expenses in connection with the prosecution of the Action. These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs' Counsel's hourly rates. A breakdown of Plaintiffs' Counsel's Litigation Expenses by category is attached as Exhibit 10.

110.   Of the total amount of expenses, $178,807.15, or approximately 18%, was expended for the retention of experts and consultants. As discussed above, Lead Counsel consulted with several well-qualified experts in financial economics concerning market efficiency, loss causation, and damages during their investigation and the preparation of the Complaint, during the settlement negotiations with Defendants, and in connection with the development of the proposed Plan of

Allocation. In addition, Lead Counsel also consulted with an expert in securities tracing relevant to the Settlement Class's Securities Act claims.

111. Another major component of expenses was for the retention of Plaintiffs' specialized bankruptcy counsel at Lowenstein Sandler who played a critical role in assisting Plaintiffs and Lead Counsel to navigate the complex bankruptcy process and protect the interests of the class in the settlement negotiations. Lowenstein Sandler's total fees and expenses are $499,280.00 or 50% of the total.

112. Another large component of the Litigation Expenses was for online legal and factual research, which included research necessary to prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, and research on issues that arose as a result of Silvergate's bankruptcy and in the course of mediation. The charges for on-line research amounted to $130,543.86 or 13% of the total amount of expenses.

113. Lead Counsel also incurred $9,810.00 in attorneys' fees for the retention of independent counsel, Hach Rose Schirripa & Cheverie LLP, to represent former Silvergate employees that Lead Counsel contacted during the course of their investigation and who wished to be represented by independent counsel.

114. The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, court reporting costs, travel costs, long distance telephone charges, and postage and delivery expenses.

115. All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Plaintiffs. *See* Gill Decl. ¶ 7; Thomas Decl. ¶ 7; Lenoir Decl. ¶ 7; Nosè Decl. ¶ 7; Igel-Harris Decl. ¶ 7; Fitzpatrick Decl. ¶ 7.

116. In addition, Plaintiffs seek reimbursement of a total of $88,373.98 for the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class, based on the time dedicated to the Action by their employees. Specifically, Lead Plaintiff Indiana seeks $14,062.50 based on the 72.75 hours that its employees dedicated to the Action. *See* Gill Decl. ¶¶ 3-4, 9. Lead Plaintiff Boston seeks $9,076.86 based on 98 hours devoted to the Action by its employees. *See* Thomas Decl. ¶¶ 3-4, 9. Lead Plaintiff Chicago Teachers requests $26,956.38 based the hours its employees dedicated to the Action. *See* Lenoir Decl. ¶¶ 3-4, 9. Similarly, Lead Plaintiff Local 793 requests $20,200 in compensation for the time dedicated by its employees and Trustees. *See* Nosè Decl. ¶¶ 3-4, 9. Lead Plaintiff Wespath requests $16,800 for 120 hours spent by its Associate General Counsel. *See* Igel-Harris Decl. ¶¶ 3-4, 9. Finally, Bucks County requests $1,278.24 in compensation for the 16.5 hours devoted by its staff. *See* Fitzpatrick Decl. ¶¶ 3-4, 9. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 18-19.

117. The Notice informed Settlement Class Members that Lead Counsel would be seeking Litigation Expenses in an amount not to exceed $1.4 million, which might include PLSRA awards for Plaintiffs. Notice ¶¶ 5, 43. The total amount requested, $1,080,022.72, which includes $991,648.74 for Plaintiffs' Counsel's Litigation Expenses and $88,373.98 for Plaintiffs' requested PSLRA awards, is below the amount that Settlement Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

118. Attached in Exhibit 11 hereto is a compendium of true and correct copies of the following documents cited in the Fee Memorandum:

| Ex. 11A | *In re Qualcomm Inc. Sec. Litig.*, No. 3:17-cv-00121-JO-MS, slip op. (S.D. Cal. Sept. 27, 2024), ECF No. 450 |
|---|---|

| Ex. 11B | *In re SanDisk LLC Sec. Litig.*, No. 3:15-cv-01455-VC, slip op. (N.D. Cal. Oct. 23, 2019), ECF No. 284 |
|---|---|
| Ex. 11C | *In re Hewlett-Packard Co. Sec. Litig.*, No. 8:11-cv-1404-AG-RNBx), slip op. (C.D. Cal. Sept. 15, 2014), ECF No. 167 |
| Ex. 11D | *In re Questcor Sec. Litig.*, No. 8:12-cv-01623-DMG (JPRx), slip op. (C.D. Cal. Sept. 21, 2015), ECF No. 255 |
| Ex. 11E | *Schulein v. Petro. Dev. Corp.*, No. 8:11-cv-01891-AG (ANx), slip op. (C.D. Cal. Mar. 16, 2015), ECF No. 265 |
| Ex. 11F | *Wilhoite v. Hou*, No. 3:23-cv-02333-BEN-MSB, slip op. (S.D. Cal. July 23, 2025), ECF No. 331 |
| Ex. 11G | *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, No. 1:19-cv-00128-TS, slip op. (D. Utah Feb. 5, 2025), ECF No. 293 |
| Ex. 11H | *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-cv-04494-JLR-SN, slip op. (S.D.N.Y. Sept. 8, 2023), ECF No. 206 |
| Ex. 11I | *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-cv-03591-GHW, slip op. (S.D.N.Y. Nov. 21, 2022), ECF No. 303 |
| Ex. 11J | *In re GreenSky Sec. Litig.,* No. 1:18-cv-11071-AKH, slip op. at 3 (S.D.N.Y. Oct. 22, 2021), ECF No. 211 |
| Ex. 11K | *In re Silvergate Capital Corp.*, No. 1:24-bk-12158-KBO, Notice of Third Interim Application of Sheppard, Mullin, Richter & Hampton LLP, as Special Counsel to the Debtors and Debtors in Possession (Bankr. D. Del. July 15, 2025), ECF No. 862 (excerpt) |
| Ex. 11L | *In re Silvergate Capital Corp.*, No. 1:24-bk-12158-KBO, Notice of Third Interim Fee Application of Cravath, Swaine & Moore LLP (Bankr. D. Del. July 15, 2025), ECF No. 861 (excerpt) |
| Ex. 11M | *In re Oracle Corp. Sec. Litig.*, No. 5:18-cv-04844-BLF, slip op. at 3 (N.D. Cal. Jan. 13, 2023), ECF No. 147 |

## VI.   CONCLUSION

119. For all the reasons set forth above, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the

JOINT DECL. ISO SETTLEMENT                                CASE NO. 22-CV-1936-JES-MSB
AND FEE MOTIONS                           38

requested fee in the amount of 17% of the Settlement Fund should be approved as fair and reasonable, and the request for Litigation Expenses, including Plaintiffs' PSLRA awards, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct. Executed on July 30, 2025.

| */s Jonathan D. Uslaner* | */s Carol V. Gilden\** |
|---|---|
| Jonathan D. Uslaner | Carol V. Gilden |

*Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court of the Southern District of California, all signatories have authorized placement of their electronic signature on this document.